UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
BRAINWAVE SCIENCE, INC.
        Plaintiff

        - against -

        Civil Action No.: 21-cv-4402 (BMC)

ARSHEE, INC., DR. LAWRENCE A.
FARWELL, DR. THIERRY MAISON and
BRAIN FINGERPRINTING FOUNDATION

        Defendants.
--------------------------------------------------------- X

### MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

RESPECTFULLY SUBMITTED

CARBONARO LAW, PC
Attorneys for the Defendants
Dr. Lawrence A. Farwell
Dr. Thierry Maison
Mr. Abul Kalam Azad
757 Third Avenue, 20th Floor
New York, New York 10017
(212)888-5200
Fax: (212) 898-0394
Email: joe@jcarbonarolaw.com

## INTRODUCTORY STATEMENT

This memorandum of law is submitted in opposition to Plaintiff Brainwave Science ("BWS"), Inc.'s motion for a preliminary injunction. For the reasons set forth below and in the attached declarations of Dr. Lawrence A. Farwell ("Farwell"), Dr. Thierry Maison ("Maison") and Mr. Abul Kalam Azad ("Azad"), the motion should be denied in its entirety.

## STATEMENT OF FACTS

The facts of this case are indeed in dispute. The above-cited declarations make clear that the facts surrounding the alleged existence of protected trade secrets pursuant to the federal Defend Trade Secrets Act, 18 USC Sections 1832-1839 ("DTSA"). This is the only cause of action pleaded in the Complaint.

The Plaintiff BWS is a Delaware corporation that transacts business from the State of Massachusetts. See, Compl. ¶1. Defendant Farwell is a resident of the State of Washington. Compl. ¶3; Defendant Maison is a resident of the State of Massachusetts. See Compl. ¶¶ 3-4. Defendant Azad is the sole owner and operator of Defendant Arshee, Inc. See, Azad Declaration. Azad is a resident of the State of Washington. Since 2016, Arshee has had no presence nor contacts with the State of New York. See, Azad Declaration. It is alleged that Arshee is a New York corporation with its principal place of business in Jamaica, Queens. See, Compl. ¶2. This allegation is disputed.

Plaintiff alleges, in sum and substance, that Defendants violated the DTSA by misappropriating alleged trade secrets, specifically its "iCognataive" [sic] software. As Drs.

Farwell and Maison explain in great detail in their respective Declarations, "iCognative" software is comprised almost exclusively of technology and software that was in the public domain long before BWS even existed.

As the Farwell and Maison Declarations also make clear, brainwave science was invented by Dr. Farwell in 1985. The science has developed since and become more accepted, including use by the military, other governments, the FBI, CIA and US Navy. See, Farwell Decl. at ¶23. The idea behind brainwave science, or "Brain Fingerprinting," is succinctly explained in the Farwell Declaration at ¶8 as an

> …investigative technique which measures recognition of familiar stimuli by measuring electrical brain wave responses to words, phrases, or pictures that are presented on a computer screen. Brain fingerprinting was invented by Lawrence Farwell. Its theory explains that the suspect's reaction to the details of an event or activity will reflect if the suspect had prior knowledge of the event or activity…quoting Dhiraj Ahuja and Bharat Singh, *Journal of Engineering and Technology Research Vol. 4(6)*, pp. 98-103, November 2012.

Brain Fingerprinting, as invented by Dr. Farwell, uses a headset which is placed on the subject and conveys brain waves to a computer that analyzes them for certain criteria which enables the user to understand whether the relevant information is known to the subject. It is this software that connects and interprets the brainwaves that is at the heart of this case. BWS alleges that the inventor of the technology misappropriated the technology that BWS uses to conduct brain fingerprinting. This is patently absurd and incorrect.

As Dr. Farwell and Dr. Maison explain, they use a different headset than does BWS and accordingly to interpret the information that the headset sends to the computer for analysis. It may be that a portion of the software used by BWS for this purpose is proprietary to them. This

is of no matter to Farwell and Maison, who use a different headset with which BWS software would be incompatible.

But much more is involved in brain fingerprinting than this portion of the software. As Drs. Farwell and Maison state, there are numerous algorithms, extensive code and fairly complex formulas used in the BWS and Farwell/Maison systems that are, and have been for many years, in the public domain. Software that is "open-source" is used in both the Farwell and BWS systems. Dr. Maison describes the open-source software he used when he worked for BWS. At ¶¶ 8-9, 11, 16, 21, 22, and 24. Dr. Maison details the public sources of the software used on the now-iCognative system (Dr. Maison did not work at BWS when the product was named or marketed as such. See, Decl. ¶7).

Perhaps most important, Dr. Maison describes the similarities and distinction between the BWS and Farwell/Maison systems at ¶18, stating that the only similarity between the systems could be the headset and the software interface design. However, he also states that these designs were "very specifically excluded from the Farwell brain fingerprinting design." Likewise, the headset is different in that the BWS system uses two channels while the Farwell system uses four. Both headsets are manufactured by different third-party companies and sold respectively to Farwell, BWS and anyone else who cares to purchase them. See, Farwell Decl. at ¶¶ 24-25.

LEGAL ARGUMENT

I.   *Plaintiff is Not Entitled to a Preliminary Injunction Because the Likelihood of Success on the Merits is Slim.*

In *Ali v. Barr*, 464 F. Supp. 3d 549, 556 (S.D.N.Y. 2020), the Court explained that

'A preliminary injunction is an extraordinary remedy never awarded as of right.' <u>Winter v. Nat. Resources Def. Council, Inc.</u>, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). 'In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.' <u>Id.</u> (internal quotation marks omitted). 'To receive a preliminary injunction, the plaintiff must show (1) a likelihood of success on the merits, (2) that the plaintiff is likely to suffer irreparable injury in the absence of an injunction, (3) that the balance of hardships tips in the plaintiff's favor, and (4) that the public interest would not be disserved by the issuance of the injunction.' *Capstone Logistics Holdings, Inc. v. Navarrete*, 736 F. App'x 25, 26 (2d Cir. 2018) (internal quotation marks omitted). 'The burden is even higher on a party ... that seeks a mandatory preliminary injunction *that alters the status quo* by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo.' [emphasis added] *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (internal quotation marks omitted). 'A mandatory preliminary injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.' *Id.*

While any type of injunction should be issued carefully, a mandatory injunction requires even more care.  In this case, on its face, it seems Plaintiff is seeking to enjoin Defendants from doing something, selling brainwave technology, which is the Defendants' livelihood.  Issuing an injunction preventing them from doing changes the status quo drastically.  Moreover, the injunction that Plaintiff seeks would require the Defendants to turn over the names of every customer with which it has done brain fingerprinting business; in other words, Plaintiff wants Defendants to give them their customer list, an item which would customarily be considered confidential.  Perhaps worst of all, the injunction sought would require Defendants to essentially get permission from the Plaintiff each time it wished to sell any type of P300[1] (which includes

---

[1] All brainwave fingerprinting is comprised of P300 technology.  Crafting an injunction that includes all P300-related technology would be sweeping, overbroad and highly detrimental to the Defendants' businesses.  It would effectively prevent Defendants from selling anything.

all brain fingerprinting) software by turning the software over to a third-party expert for examination to ensure it contained no trade secrets before the sale could be made. Plaintiff characterizes this injunctive relief as "narrowly tailored." That characterization is disingenuous and false. If anything, the requested injunction is overbroad and incredibly burdensome. No third party would do business with Drs. Farwell and Maison if they knew the software technology they were purchasing had to go through an unknown third party, or that their contact information might be disclosed to a corporate entity with whom they were completely unfamiliar. It would destroy Defendants' business, which quite frankly, is exactly the point of this action.

Plaintiff should be required to compete in the free market, not use the judicial system to knock off its competitors. As if this weren't enough, the Plaintiff's "narrowly tailored" injunction would require Defendants to recall all software embodying BWS's purported trade secrets. This assumes the conclusion: that Defendants have ever sold software embodying BWS trade secrets. There would be no practical enforcement mechanism for this prong of the injunction either.

All of these many requests in the motion for a preliminary injunction are based on a single aborted sale in which BWS claims Defendants tried to sell their system, or parts of their system they consider trade secrets. No other businesses are afforded this type of relief on claims as thin and unsubstantiated as this one.

A. <u>The Court Lacks Personal Jurisdiction Over All Defendants.</u>

In the Complaint, BWS relies on the claim that "a substantial part of the events or or omissions giving rise to the claim occurred with the judicial district of this Court" as a basis for jurisdiction. The Complaint fails to allege that any of the occurrences alleged took place in

New York.  Consider that BWS is a Massachusetts company with its headquarters and offices in Southborough.  The work alleged to have been done by Maison and Farwell all took place in that office.  The security BWS allegedly used to safeguard the technology includes security systems at its Southborough office.  Nowhere in the Complaint does BWS allege any act or omission occurred in the State of New York, let alone in this District.

Maison is a resident of Massachusetts as alleged the Complaint at ¶4; Farwell is a Washington State resident as alleged at ¶3; the Brain Fingerprinting Foundation is alleged to have its principal place of business in Washington State at the same address as Farwell's.  See, Compl. ¶5.  While Defendant Arshee is alleged to be a New York corporation with offices in Jamaica, Queens, the evidence belies that claim.  See, Azad Declaration, ¶¶8-10; see Defense Exhibit 5, State of Washington Corporations filing system showing date of incorporation in Washington State.

In short, Plaintiff erroneously claims that acts and omissions relevant to this action took place in New York State, yet fails to specify any; and no Defendant resides nor does business in the State of New York.  Accordingly, minimum contacts to this State do not exist. See, *International Shoe Co. v. Washington*, 326 U.S. 310 (1945); *McGee v. International Life Insurance Co.*, 355 U.S. 220 (1957).

In the alternative, Plaintiff relies on 28 USC Sections 1391(b)(2) and (b)(3).  They provide that a civil action may be brought in

> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

Having reasoned that Section (b)(2) does not provide jurisdiction, and if, as seems clear, there is no jurisdiction over any Defendant, the Plaintiff seeks jurisdiction on the theory that jurisdiction over Dr. Farwell and Dr. Maison exists because jurisdiction over Arshee exists. The fact that no Defendant, including Arshee, is subject to the Court's jurisdiction should end the inquiry with respect to personal jurisdiction. Moreover, there are likely other jurisdictions which have jurisdiction over the Defendants, such as the District of Massachusetts where Dr. Maison resides and where BWS has its principal place of business. Frankly, it is odd that BWS chose this District to bring suit. Without speculating as to BWS's motivation to do so, it seems reasonable to infer that it is forum shopping.

Accordingly, this action has no likelihood of success on the merits because this Court does not have personal jurisdiction over any defendant, making it impossible to survive a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction.[2]

B. The Disputed Software was Compiled with Software Already in the Public Domain and is Not a Trade Secret.

In *Elsevier Inc. v. Dr. Evidence, LLC,* No. 17-CV-5540 (KBF), 2018 WL 557906, at *3 (S.D.N.Y. Jan. 23, 2018), the Court discussed the DTSA and explained that

> under the federal Defend Trade Secrets Act, "a party must show 'an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.' " *In re Document Techs. Litig.,* No. 17-cv-2405, 2017 WL 2895945, at *5 (S.D.N.Y. July 6, 2017) (quoting *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.,* No. 15-cv-0211, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016)); see also 18 U.S.C. § 1839(3)(A)-

---

[2] Defendant Arshee will bring such a motion due for filing on November 30, 2021. If granted, then Defendant will bring a similar motion with respect to Dr. Farwell and Dr. Maison, if need be since the issue of whether any defendant resides within this Court's jurisdiction will be fully and finally resolved.

(B); *Broker Genius, Inc. v. Zalta*, No. 17-cv-2099, 2017 WL
5991831, at *11 (S.D.N.Y. Dec. 4, 2017) "'The DTSA (codified in
18 U.S.C. § 1831, et seq.), which created a federal cause of action
for the misappropriation of trade secrets used in interstate
commerce, requires that the plaintiff establish 'an unconsented
disclosure or use of a trade secret by one who (i) used improper
means to acquire the secret, or (ii) at the time of disclosure, knew
or had reason to know that the trade secret was acquired through
improper means, under circumstances giving rise to a duty to
maintain the secrecy of the trade secret, or derived from or through
a person who owed such a duty.'" (quoting *Free Country Ltd. v.
Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016))).

The purported trade secret that Plaintiff claims is a combination of various open-source

software designs which run the Farwell system. There may be a significant number of open-

source software applications in the BWS system, but there is virtually no similarity to the

Farwell system. See, Maison Declaration at ¶18, Farwell Declaration ¶¶23-26. Moreover,

Dr. Farwell invented the system originally by using open-source software or software he

created but placed into the public domain.

In *Schroeder v. Pinterest Inc.,* 133 A.D.3d 12, 28–29, 17 N.Y.S.3d 678, 691–92 (2015)

the New York State Appellate Division, First Department, interpreting New York law, held

that

Although we uphold the misappropriation of trade secrets cause of
action against Cohen, the claim should be limited to the
confidential information referenced in the complaint, and cannot
extend to information in the public domain. "[A] trade secret must
first of all be secret" (*Ashland Mgt.,* 82 N.Y.2d at 407, 604
N.Y.S.2d 912, 624 N.E.2d 1007), *i.e.,* "somethin[g] known to only
one or a few and kept from the general public" (*Leo Silfen, Inc. v.
Cream,* 29 N.Y.2d 387, 394–395, 328 N.Y.S.2d 423, 278 N.E.2d
636 [1972] ). Thus, information that is readily available from
public sources is not entitled to trade secret protection (*JAD Corp.
of Am. v. Lewis,* 305 A.D.2d 545, 546, 759 N.Y.S.2d 388 [2d
Dept.2003]; *Newton Garment Carriers v. Consolidated Carriers
Corp.,* 250 A.D.2d 482, 482, 673 N.Y.S.2d 631 [1st Dept.1998] ).

In *Elsevier, id.,* at *3–4 (S.D.N.Y. Jan. 23, 2018), the Court interpreted the DFTA in the

context of New York trade secret law, citing a Second Circuit case and, reasoning that

> Trade secrets can "exist in a combination of characteristics and
> components, each of which, by itself, is in the public domain, but
> the unified process, design and operation of which, in unique
> combination, affords a competitive advantage and is a protectable
> trade secret." *Integrated Cash Mgmt. Serv., Inc. v. Digital
> Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) (citations
> omitted). As the Court said in another case interpreting the federal
> Defend Trade Secrets Act ("DTSA"),
> Although there is no one-size-fits all definition to a trade secret,
> New York courts generally consider the following factors to
> determine its contours:
> "(1) the extent to which the information is known outside of the
> business;
> (2) the extent to which it is known by employees and others
> involved in the business;
> (3) the extent of measures taken by the business to guard the
> secrecy of the information;
> (4) the value of the information to the business and its competitors;
> (5) the amount of effort or money expended by the business in
> developing the information; [and]
> (6) the ease or difficulty with which the information could be
> properly acquired or duplicated by others."

Applying the relevant factors to the instant case, the technology for which BWS seeks

injunctive relief is not a trade secret. Having said that, Defendants wish to be clear that they do

not wish to use and will not use (nor have they used) any of BWS's purported trade secrets or

any of its proprietary technology. As Dr. Farwell and Dr. Maison explain, they use a different

headset than does BWS, and accordingly use different software to communicate with the headset

and to interpret the information that the headset sends to the computer for analysis. It may be

that a portion of the software used by BWS for this purpose is proprietary to them. But this is of

no matter to Farwell and Maison, who use a different headset with which BWS software would

be incompatible. In other words, if the Court wishes to enjoin Defendants from using BWS's

actual, established trade secrets, the Defendants do not object. However, what the Plaintiffs seek to do is use the established, open-source software used by Farwell and many others, add one or two components to it, and then claim Defendants cannot use what is open source and publicly available because Plaintiff has used it in conjunction with its own proprietary software. It is as if a chef were making a recipe using mayonnaise and added other unusual (proprietary) spices to it and then sought trade secret protection for the mayonnaise alone. Surely this is not the intent of the DTSA.

The vast majority of the BWS software is derived from open sources and is widely known by many who work in the field, including Farwell and Maison.[3] This is made clear in the Farwell and Maison Declarations which include many citations to the public sources of the BWS and Farwell software. Whether anyone knows about component of the software BWS claims is a trade secret is unknown to Defendants. It would seem likely that all BWS employees are aware of such secrets, if they exist.

The Court also considered the value of the trade secret to the business (BWS) and its competitors (Drs. Farwell and Maison). As also made clear in both the Farwell and Maison affidavits, there is no value to them in the iCognative software. They do not use it, do not need it and believe it to be inferior to the brain fingerprinting product they sell to their customers. BWS may believe the purported trade secrets are quite valuable to them. But that is of no matter because they are of no value to Drs. Farwell and Maison.

As the Second Circuit said in *Boisson v. Banian, Ltd,* 273 F.3d 262, 268–69 (2d Cir. 2001) in the context of a copyrighted work,

> Likewise an element within a work may be unprotectible even if other elements, or the work as a whole, warrant protection. Some material is unprotectible because it is in the public domain, which

---

[3] As opposed to Arshee which is not in the technology or software design business but is merely a broker.

means that it "is free for the taking and cannot be appropriated by a single author even though it is included in a copyrighted work." *Computer Assocs. \*269 Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 710 (2d Cir.1992).

It would be unlikely that Congress intended trade secrets, which have no separate statutory protection, to have more protection than patented or copyrighted works. It makes sense that Congress intended to protect the trade secret itself and the product as a whole which contains the trade secret; it was developed and brought to market by the business, such as iCognative. But protecting the parts divisible of iCognative that derive from open source and suddenly giving them protection is contrary to cases such as *Computer Assocs*., *id*.

II.    *Plaintiff Has Not Demonstrated Irreparable Harm that Cannot be Cured by Money Damages Alone.*

To establish irreparable harm, Plaintiff makes the conclusory and unsupported claim that

> injunctive relief is necessary to prevent further unlawful dissemination and distribution of BWS' proprietary software code, user interfaces, algorithms and hardware ("Brainwave Trade Secrets"). BWS' proprietary software code, user interfaces, algorithms and hardware are the very information upon which BWS' business is based. Furthermore, although BWS' damages associated with losing its trade secrets would alone be incalculable, Defendants are also inflicting irreparable harm to BWS' business relationships and damaging its goodwill. "[P]rospective loss of goodwill alone is sufficient to support a finding of irreparable harm." *Bulman. V. 2BKCO, Inc., 882 F.Supp.2d 551, 560 (S.D.N.Y., 2012).*

First, BWS's claim that further dissemination of its alleged proprietary software will constitute irreparable harm. The only instance in which Plaintiff has alleged sale or distribution of the iCognative system was a sale brokered by Arshee to the Bangladeshi government. That sale was stopped because the government learned of a dispute over the software. In other words, Plaintiff has failed to allege even a single instance where the iCognative system was actually sold to a

third party.  Its supposition that there would be further dissemination of proprietary software is just that and is utterly lacking in factual basis.  While BWS claims "upon information and belief" that sales were made to a university in New Zealand, it has no facts to support such a sale was made or, if made, that it was in some way improper.

BWS fears that it may lose out on a future deal with the Bangladeshi government if the Court does not enjoin Defendants from use of its software.  While Defendants have no intention of doing so, obviously, Plaintiff has insight into prospective sales of brain fingerprinting systems since it is in the business of selling such systems.  More likely, BWS is simply trying to take out its main competitor, Drs. Farwell and Maison, so it can effectively corner the market on brain fingerprinting systems, circumventing the free-market through judicial action.

Having no intention nor need to misappropriate the derivative iCognative system given that Farwell has invented his own (and refined it many times), the likelihood that Dr. Farwell and/or Dr. Maison would do so now seems far-fetched.  Farwell has been practicing his brain fingerprinting system since 1985.  He has no need to copy a system being sold by a company with little to no experience in brain fingerprinting other than what it may have derived from Farwell himself.  Preventing Farwell from selling his own version of brain fingerprinting technology while allowing BWS to do so would put Farwell and Maison out of business. Ironically, BWS would be selling software and algorithms that Farwell developed over the past 35 years while Farwell would be prevented from doing so.

Even if Defendants did sell the BWS iCognative system containing trade secrets to a customer, all they would have sold is an executable program (i.e., a program that can be run on a computer), as opposed to the code that is compiled to make the executable version.  The customer could not break into the executable version to obtain the code and thereby further

disseminate the alleged trade secrets.  This is equivalent to installing an unauthorized copy of a common program such as Microsoft Word, which would not expose Microsoft's trade secrets that were used to develop it.  Therefore, the threat of unlimited dissemination that the Plaintiff seems to fear does not exist.

Finally, even if Defendants were to sell Plaintiff's trade secrets, the damage done could easily be measured and money damages awarded by merely looking to the price of the product and requiring the Defendants to pay, as damages, the profit made on the sale to BWS.  However, BWS seeks the easy way out, that is by obtaining an injunction preventing the sale all together.  Contrary to its blanket assertions, money damages are ascertainable and can be awarded if need be.

<u>CONCLUSION</u>

BWS may have indeed created a trade secret, something which might be determined at a hearing.  However, even if it did, the secret is limited to the complete product, here, the iCognative system and any portion of it which is proprietary.  However, the divisible parts remain in the public domain for anyone to use.  Defendants have no objection to an injunction that prevents them from selling iCognative software or any portion thereof shown to be a trade secret, but Plaintiff cannot prevent Defendants Farwell and Maison from distributing, marketing, or selling their products which do not include iCognative software or any portion of it which is a trade secret.  Should the Court believe an injunction is necessary, it should be tailored so as not to prevent the Defendants from conducting their business.  Conditions such as providing lists of customers to whom Defendants may have sold iCognative software, requiring the Defendants to go through a screening process each time they wish to make a sale or returning from their

customers any product that might contain a trade secret is unduly burdensome and essentially puts Farwell and Maison out of business.

Likewise the Plaintiff has not asserted a single fact that Arshee knew that the Bangladeshi sale he tried to broker involved alleged BWS software. All the Complaint alleges is that Arshee was involved in the sale, nothing more. Arshee should not be enjoined from conducting business involving P300 technology. The injunction, as outlined by Plaintiff, does not even align with what Arshee does as a broker.

For the reasons set forth above, in the Declarations of Drs. Farwell and Maison and Mr. Azad, the Court should deny the motion for a preliminary injunction in all respects.

Dated: New York, New York
      November 15, 2021

                                 RESPECTFULLY SUBMITTED

                                 CARBONARO LAW, PC
                                 Attorneys for the Defendants
                                 Dr. Lawrence A. Farwell
                                 Dr. Thierry Maison
                                 Mr. Abul Kalam Azad
                                 757 Third Avenue, 20th Floor
                                 New York, New York 10017
                                 (212)888-5200
                                 Fax: (212) 898-0394
                                 Email: joe@jcarbonarolaw.com

                        By: _____*Joseph W. Carbonaro*_____
                                 Joseph W. Carbonaro
                                 New York 2061455

To: Mr. Paul F. Tomkins
    Attorney for the Plaintiff
    11 Broadway, Suite 615
    New York, New York 10004