# **Exhibit F**

Exhibit F

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_F_BrainwaveScienceLLCRevisedAgreement-05-18-2013-SignedEditable.pdf

Brainwave Science, LLC Limited Liability Company agreement

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**BRAINWAVE SCIENCE, LLC**

This AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (together with the schedules attached hereto, as amended, restated, supplemented or otherwise modified from time to time, this "Agreement") of BRAINWAVE SCIENCE, LLC (the "Company") is entered into as of May 8, 2013 effective July 5, 2012, by and among each Person listed on Schedule A hereto (each, a "Member" and, together, the "Members") pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. § 18-101 et seq.), as amended from time to time (the "Act").

## RECITALS

**WHEREAS**, the Members entered into the Limited Liability Company Agreement of the Company on July 5, 2012 (the "Initial Agreement"); and

**WHEREAS**, the Members desire to amend and restate the Initial Agreement to reflect certain previously agreed terms not included in the Initial Agreement regarding, among others, the Members' respective obligations to the Company on an ongoing basis.

**NOW, THEREFORE**, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

**Section 1.** **Defined Terms**. When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such Person.

"**Approved Transfer**" has the meaning set forth in Section 17.

"**Authorized Representatives**" of a Member means such Member's employees, agents, accountants, advisors (including financial advisors) or representatives responsible for matters relating to the Company.

"**Book Item**" has the meaning set forth in Section 13.

"**Capital Accounts**" has the meaning set forth in Section 11.

1

"**Certificate**" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on August 1, 2012, as amended or amended and restated from time to time.

"**Code**" has the meaning set forth in Section 11.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

"**Covered Person**" has the meaning set forth in Section 16.

"**eHealthcareWorks**" means eHealthcareWorks Corp., a Delaware corporation.

"**Farwell**" means Lawrence Farwell, an individual residing at 14220 37th Ave NE Seattle WA 98125.

"**Fingerprinting**" means Brain Fingerprinting Laboratories, Inc., a Delaware corporation.

"**Fiscal Year**" means the calendar year.

"**Former Member**" has the meaning set forth in Section 13.

"**Improper Conduct**" has the meaning set forth in Section 9.

"**Immediate Family**" of a natural Person means such Person's parents, spouse or siblings and the lineal descendants of any of them, including by adoption.

"**Indemnifiable Losses**" has the meaning set forth in Section 16.

"**Interest**" of any Member at any time means the entire ownership interest of such Member in the Company at such time, represented by a Percentage Interest, including all benefits to which the owner of such Interest is entitled under this Agreement and applicable law, together with all obligations of such Member under this Agreement and applicable law and that are not inconsistent with the provisions of this Agreement.

"**Managing Member**" has the meaning set forth in Section 8.

"**Percentage Interest**" means, with respect to a Member, the percentage set forth next to such Member's name on Schedule A hereto.

"**Person**" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust,

2

unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"**Profits**" and "**Losses**" mean, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments: (i) any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss; or (ii) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) of the Code expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss.

"**Works**" has the meaning set forth in Section 10.

Section 2.    **Name**. The name of the limited liability company is "**Brainwave Science, LLC.**"

Section 3.    **Principal Business Office**. The principal business office of the Company shall be located at 257 Turnpike Road, Southborough, MA 01772 or such other location as may hereafter be determined by the Managing Member.

Section 4.    **Registered Office; Registered Agent**. The address of the registered office of the Company in the State of Delaware and the name and address of the registered agent of the Company for service of process on the Company in the State of Delaware, shall be as set forth in the Certificate.

Section 5.    **Members**. The mailing address of each Member is set forth on Schedule A attached hereto. Each Member was admitted to the Company as a Member upon execution of a counterpart signature page to the Initial Agreement.

Section 6.    **Formation**. Upon the filing of the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, the Members formed a limited liability company pursuant to the Act.

Section 7.    **Purpose**. The Company (i) is formed principally for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, to engage in the business of marketing, licensing, supporting and developing that certain software enabled invention by Fingerprinting (the "Applications"), as more fully described in the Intellectual Property Acknowledgment and Assignment entered into between Fingerprinting and the Company on or about the date hereof, and engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes, including taking any actions related to the foregoing prior to the date hereof or the filing of the Company's Certificate of Formation, all of

which are hereby ratified in all respects (the "Principal Purpose") and (ii) may engage in any other lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes. If any term of this Agreement is inconsistent with any term of the Act that is not mandatory, then this Agreement shall control.

### Section 8. Management.

(a) *Conduct under the Direction of the Managing Member.* All Members hereby agree that the powers of the Company shall be exercised by or under the authority of, and the business affairs of the Company shall be managed under the direction of the Managing Member (the "**Managing Member**").

(b) *Exclusive Control.* Except as expressly provided herein or as otherwise required by law, the Managing Member shall have complete and exclusive control of the management of the Company's business affairs, and the Members, other than the Managing Member, shall have no right to participate in the management of the conduct of the Company's business and affairs nor any power or authority to act for or on behalf of the Company in any respect whatsoever. Except as otherwise specifically provided in this Agreement, the Managing Member shall have the right, power and authority on behalf of the Company and in its name to execute documents or other instruments and exercise all of the rights, power, and authority of the Company under the Act, subject to any express limitations set forth in this Agreement.

(c) *Degree of Care.* The Managing Member shall perform its duties as such in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances. In performing such duties, the Managing Member shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by: (i) one or more agents of the Company; or (ii) counsel, public accountants or other Persons as to matters that the Managing Member believes to be within such Person's professional or expert competence.

(d) *Term of Managing Member.* The term of office, and the removal, appointment and reappointment of the Managing Member, shall be as determined from time to time by the Members holding a majority of the Percentage Interests. The Managing Member shall hold office until its successor has been elected, or until its earlier resignation or removal. The Managing Member of the Company shall initially be eHealthcareWorks.

(e) *Action by Managing Member and Members.* Any action required or permitted to be taken by the Managing Member or the Members under this Agreement may be taken at a meeting or by a writing evidencing the required level of approval. Unless otherwise specified by this Agreement, any action by the Members shall require approval by the Members holding a majority of the Percentage Interests.

### Section 9. Limited Liability.

(a)    No Member, including the Managing Member (including a Person serving in more than one such capacity), shall be liable for any debts, obligations or liabilities of the Company or any other Member, including the Managing Member, whether arising in tort, contract or otherwise, solely by reason of being a Member or the Managing Member or acting (or omitting to act) in such capacities or participating in the conduct of the business of the Company; provided, however, that the foregoing shall not eliminate or limit the liability of such Member, including the Managing Member, to the extent it has been finally determined by a court of competent jurisdiction that such liability resulted from (i) fraud, intentional misconduct, bad faith or a knowing violation of law, in each case, on the part of such Person, or (ii) any transaction from which such Person derived an improper personal benefit (in each case, whether arising prior to or after the date hereof, "**Improper Conduct**").

(b)    Notwithstanding anything contained in this Agreement to the contrary: (i) to the extent that, at law or in equity, a Member, including the Managing Member has duties, obligations or liabilities (whether express or implied), including fiduciary duties, relating to the Company or to any other Member, including the Managing Member, such Member, including the Managing Member, acting under this Agreement, shall not be liable to the Company or any other Member, including the Managing Member, for its good faith reliance on the provisions of this Agreement or any other approval or authorization granted by the Company; and (ii) the provisions of this Agreement, to the extent they restrict or otherwise modify the duties, obligations and liabilities of a Member, including the Managing Member, otherwise existing at law or in equity (whether express or implied), including fiduciary duties, are agreed by the parties hereto to replace such other duties, obligations and liabilities of such Member, including the Managing Member, and any and all such other duties, obligations and liabilities (whether express or implied) are hereby expressly waived and no Person will assert that a breach has occurred.

(c)    The failure of the Company or the Managing Member to observe any formalities relating to the exercise of its powers or management of its business or affairs under this Agreement shall not be a ground for imposing personal liability on any Member, including the Managing Member, for the obligations and liabilities of the Company.  For the avoidance of doubt, nothing in this Section 9 shall limit or affect a Person's obligations under this Agreement to make any payment or otherwise abide by this Agreement.

**Section 10.    Capital Contributions, etc.**

(a)    *Capital Contributions of eHealthcare Works*.  Notwithstanding anything herein to the contrary, eHealthcareWorks shall make capital contributions to the equity capital of the Company as determined from time to time by the Managing Member; provided that such capital contributions shall be in amounts sufficient to satisfy any obligations to make any required payment pursuant to the terms of that certain Consulting Agreement between the Company and Neuroscience Inventions, LLC dated July 5, 2012.  To the extent that eHealthcare Works makes a capital contribution to the Company, the Managing Member shall revise Schedule A of this Agreement to reflect the unreturned amount of such capital contributions; provided that the failure to revise Schedule A shall not be dispositive in determining the amount of capital contributions or unreturned capital contributions of eHealthcare Works.  Until such time as a

5

new party becomes a Member of the Company, such capital contributions by eHealthcareWorks shall not result in a change in the Percentage Interests of the Members.

(b)     *Capital Contributions of Fingerprinting and Farwell.* Fingerprinting and Farwell have each assigned, through separate Intellectual Property Acknowledgement and Assignments ("Assignments"), certain intellectual property rights to the Company, copies of which are attached hereto as Exhibit I.   In addition, Fingerprinting contributed title to and ownership of the inventory, hardware, and other assets contemplated by Exhibit 3 to the Term Sheet dated June 12, 2012 between the parties hereto, to the extent not covered by the Assignments.

(c)     *Return of Capital.* Except as otherwise provided in this Agreement, no Member shall have the right to withdraw from the Company or to demand or to receive the return of all or any part of his, her or its capital contribution to the Company. No Member shall be liable for the return of the capital contribution of the other Members, and no Member shall have any obligation to restore the amount of any deficit in its Capital Account (as defined below) to the Company.

(d)     *Other Agreements of the Members.*

(i)     Agreements of eHealthcare Works. eHealthcare Works shall perform the following services for the Company, each as reasonably requested by the Managing Member and on terms consistent with those in effect prior to the date hereof:

i.   Provide technology and operational resources reasonably needed by the Company to conduct its business on a day to day basis, including personnel;

ii.  Provide technology and software consulting related to the installationa, support, maintenance and ongoing development of the Applications; and

iii. Provide marketing and sales support and resources reasonably needed by the Company to conduct its business, including the marketing and licensing of the Applications.

(ii)     Agreements of Farwell. Farwell shall perform the following services for the Company, each as reasonably requested by the Managing Member and on terms consistent with those in effect prior to the date hereof:

i.   Provide technology and software consulting to the Company related to the installation, support, maintenance and ongoing development of the Applications; and

ii.  Be responsible for the development, maintenance and upgrade of new versions and derivative works of the Applications, as well as new products.

(iii)     Branding; Applications Developments. The Company may use, provide and otherwise exploit the Applications with such names, trademarks, logos, slogans, designs and other indicia of origin, and such packaging, marketing, sales and other

promotional and advertising material as it determines. In consideration of the equity issued by the Company to the Members and any cash or other compensation paid or payable to any of them prior to or following the effective date of this Agreement, all modifications and new versions of, and other changes to, the Applications, and all derivative works thereof, and all intellectual property rights related thereto, whether developed by the Company, a Member or an affiliate of a Member, shall be owned by the Company and no Member or other party shall have any rights thereto.

Section 11.    **Capital Accounts**. Separate capital accounts ("Capital Accounts") shall be maintained for each Member on the books of the Company. Each Capital Account shall be adjusted to reflect such Member's share of allocations and distributions as provided in Sections 12 and 14 of this Agreement, and any capital contributions to the Company or withdrawals of capital from the Company. Such Capital Accounts shall further be adjusted to conform to the Treasury Regulations under Sections 704(b) and 704(c) of the Internal Revenue Code of 1986, as amended (the "Code"), as interpreted in good faith by the Managing Member.

Section 12.    **Profits and Losses**.

(a)    *Determination of Profits and Losses.*  The Profits or Losses realized or incurred by the Company for each taxable year shall be determined on an annual basis.

(b)    *Allocation of Profits and Losses.*  For each taxable year in which the Company realizes Profits or Losses, such Profits or Losses, respectively, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 14 hereof if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their book values, all Company liabilities were satisfied (limited in the case of each nonrecourse liability to the book value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 14 to the Members immediately after making such allocations, *minus* (ii) such Member's share of "partnership minimum gain" (as that term is defined in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d)) and "partner nonrecourse debt minimum gain" (as that term is defined in Treasury Regulations Section 1.704-2(i)(2)), computed immediately prior to the hypothetical sale of the assets. Allocations made pursuant to this Section 12 for any taxable year shall take account of the Member's varying interests in the Company for such year in a manner consistent with Section 706(d) of the Code.

Section 13.    **Tax Matters**.

(a)    *Allocation of Book Items.* Each item of income, gain, loss, deduction or credit for federal income tax purposes that corresponds to an item of income, gain, loss or expense that is taken into account in determining Capital Accounts (a "Book Item") shall be allocated among the Members in the same proportion as the corresponding Book Item; *provided, however,* that in the case of any Company asset the book value of which differs from its adjusted tax basis for federal income tax purposes, income, gain, loss and deduction with respect to such asset shall be allocated solely for federal income tax purposes in accordance with the principles of Sections

7

704(b) and (c) of the Code (using any permissible method determined by the Managing Member).

(b)     *Determination of Certain Matters.* All matters concerning valuations and the allocation of taxable income, deductions, credits, net income and net losses of the Members, including taxes thereon and accounting procedures, not expressly provided for by the terms of this Agreement, shall be determined by the Managing Member.

(c)     *Filing of Tax Returns.* The Managing Member, or its designated agent, at the Company's expense, shall prepare and file, or cause the accountants of the Company to prepare and file, a federal information tax return in compliance with Section 6031 of the Code and any required state and local income tax and information returns for each tax year of the Company.

(d)     *Reports to Current and Former Members.* As soon as practical after the end of a fiscal year, the Company shall prepare and mail, or cause its accountants to prepare and mail, to the Members and, to the extent applicable, former Members ("Former Members"), a report setting forth in sufficient detail that information which will enable the Members and Former Members to prepare their federal, state and local tax returns in accordance with the laws, rules and regulations then prevailing.

(e)     *Tax Matters Partner.* eHealthcareWorks shall be designated on the Company's annual federal information tax return as the Tax Matters Partner of the Company for purposes of Section 6231(a)(7) of the Code and corresponding provisions of state and local law and, as such, shall have all powers and responsibilities provided in Code as may become applicable to limited liability companies.

(f)     *Tax Elections.* The Managing Member may cause the Company to make or revoke any tax election that the Managing Member deem appropriate, including without limitation an election pursuant to Section 754 of the Code.

(g)     *Member's Tax Basis.* Upon request of the Managing Member, each Member agrees to provide to the Managing Member information regarding its adjusted tax basis in its interest in the Company along with documentation substantiating such amount.

(h)     *No State-Law Partnership.* The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member or Members shall be a partner or joint venturer of any other Member or Members, for any purpose other than federal and state tax purposes, and this Agreement shall not be construed to the contrary. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

### Section 14.     Distributions/Withholding.

(a)     The Managing Member shall determine whether distributions shall be made to the Members; provided, that in the event the Managing Member makes the determination to make

8

such distributions, such distributions shall be made to the Members in accordance with their respective Percentage Interests as set forth opposite the name of each Member on Schedule A hereto.

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Members on account of their Interest in the Company if such distribution would violate Section 17-607 of the Act or other applicable law.

(c)     All amounts withheld pursuant to the Code or any provision of any state or local law with respect to any payment, distribution or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Section 14 for all purposes of this Agreement. The Managing Member is authorized to withhold from distributions or, with respect to allocations, to the Members and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provision of any other federal, state or local law and shall allocate such amounts to those Members with respect to which such amounts were withheld.

**Section 15.     Other Business.** Notwithstanding any duty otherwise existing at law or in equity, the Members may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others, whether or not any such business venture is in competition with the Company; provided, that no Member shall engage in any business venture that competes in any material respect with the Company's Principal Purpose as defined above, except that the foregoing shall not restrict a Member from holding as a passive investor less than 2% of the stock of a publicly traded company that engages in the Principal Purpose. The Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

Section 16.     **Exculpation and Indemnification.**

(a)     *Exculpation; Indemnification; Advancement of Expenses.*     Each Member, including the Managing Member, Affiliate of a Member and, to the extent approved by the Managing Member, any officer, employee, agent or Affiliate of the Company (each, a "**Covered Person**") shall, to the fullest extent permitted or required by the Act or other applicable law, be exculpated from, and indemnified and defended by, the Company against any liability, loss, damage, penalty, action, claim, judgment, settlement, cost or expense of any kind or nature whatsoever (including all reasonable attorneys' fees, costs and expenses of defense, appeal and settlement of any proceedings instituted against such Covered Person or the Company and all costs of investigation in connection therewith) ("**Indemnifiable Losses**") that in any way relates to or arises out of, or is alleged to relate to or arise out of, any action or inaction on the part of the Company or such Covered Person acting on behalf of the Company, except and to the extent such Indemnifiable Losses are finally determined by a court of competent jurisdiction to have resulted from such Covered Person's Improper Conduct. The Company shall advance expenses incurred by such Covered Person upon the receipt by the Company of the signed statement of such Covered Person agreeing to reimburse the Company for such advance if is ultimately determined by a court of competent jurisdiction that such Covered Person is not entitled to be indemnified by the Company for such expenses. For the avoidance of doubt, this Section 16 shall not provide indemnification or exculpation to a Covered Person resulting from a breach of

9

this Agreement or any other document or agreement entered into between such Covered Person and the Company.

(b) *Exculpation of Covered Persons.* No Covered Person, in his, her or its capacity as such, shall be liable to the Company or the Members for monetary damages for an act or omission in such Person's capacity as a Member, including the Managing Member, in his, her or its capacity as such, except to the extent such damages are finally determined by a court of competent jurisdiction to have resulted from such Covered Person's Improper Conduct. If the Act is amended to authorize further elimination of or limitations on the liability of Persons serving in the capacity as Covered Persons, then the liability of each such Covered Person shall be eliminated or limited to the fullest extent permitted by the Act as so amended. Any repeal or modification of this Section 16 shall not adversely affect the right or protection of such Covered Person existing at the time of such repeal or modification.

(c) *Good Faith Reliance.* A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

(d) *Not Exclusive.* The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 16 shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any agreement.

(e) *Beneficiaries.* The indemnification and advancement of expenses provided by, or granted pursuant to, this Section 16 shall continue as to a Person who has ceased to be a Covered Person and shall inure to the benefit of the heirs, executors, administrators, successors and permitted assigns of such Covered Person.

(f) *Limitations on Exculpation and Indemnification.* For the avoidance of doubt, nothing in this Section 16 shall limit or affect a Covered Person's obligations under this Agreement to make any payment or otherwise abide by this Agreement, and the indemnification and exculpation provisions in this Section 16 shall not apply to any breach or contravention of this Agreement.

(g) *Waiver of Duties.* The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of a Covered Person to the Company or its Members otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Covered Person.

(h) *Survival.* The foregoing provisions of this Section 16 shall survive any termination of this Agreement.

KL2 27550325

## Section 17.    Transfers; Drag-Along.

(a)    *Transfers*. No Member may transfer any portion of its Interest in the Company without the prior written consent of the Managing Member, which consent may be given or withheld in the sole and absolute discretion of the Managing Member; provided, however, that any Member may transfer all or a portion of his, her or its interest in the Company to an Affiliate of such Member for the benefit of such Member or such Member's Immediate Family, including in accordance with laws of descent or distribution, with the prior written consent of the Managing Member, which consent shall not be unreasonably withheld.

(b)    *Drag-Along Right*.    Notwithstanding any provision of this Agreement to the contrary, in the event the Managing Member approves a sale of the Company or its business or its assets to a bona fide third party in an arms-length transaction (an "Approved Transfer"), each Member will consent to and raise no objections to the Approved Transfer; provided that (a) if the Approved Transfer is structured as a sale of Interests, each Member will agree to sell the Interests to be sold in such Approved Transfer on the terms and conditions approved by the Managing Member; (b) if the Approved Transfer is structured as a merger, consolidation or other reorganization, each Member will vote in favor thereof, to the extent such Member has the right to vote on such merger, consolidation or other reorganization and will not exercise any dissenters' rights of appraisal it may have under the Act or otherwise; and (c) if the Approved Transfer is structured as a sale of all or substantially all of the assets of the Company, each Member will vote in favor thereof, to the extent such Member has the right to vote on such sale. Each Member will use its commercially reasonable efforts to cooperate in the Approved Transfer and will take all necessary and desirable actions in connection with the consummation of the Approved Transfer as are reasonably requested by the Managing Membe3r, including, but not limited to, the provision of reasonable and customary representations, warranties and indemnities in relation to such Member's Interests.

## Section 18.    Admission of Additional Members; Anti-Dilution.

(a)    *Admission of Additional Members*.    One or more additional Members may be admitted to the Company by approval of the Managing Member.

(b)    *Anti-Dilution Right*.    In the event that the Company shall issue any additional Interests in the Company, the Company shall take such action to assure that notwithstanding the issuance of such additional Interests, Farwell, or his permitted transferee pursuant to Section 17, shall retain a 5% Percentage Interest in the Company. The Percentage Interests of all other Members shall be equally diluted (i.e. 50-50) to reflect the issuance of any such additional Interests. (By way of example, if the Members' Percentage Interests at the time of the issuance of additional interests is 51% (eHealthcareWorks), 44% (Fingerprinting) and 5% (Farwell), and additional Interests representing 10% of the Company are issued, the Members' Percentage Interests following that issuance would be 46% (eHealthcareWorks), 39% (Fingerprinting), 10% (new Member(s)) and 5% (Farwell).)

KL2 2753032.5

**Section 19.** **Dissolution**.

(a)    The Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the approval of the Managing Member to dissolve and wind-up the affairs of the Company, (ii) the termination of the legal existence of the last remaining Member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining Member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (iii) the entry of a decree of judicial dissolution under Section 18-802 of the Act. Upon the occurrence of any event that causes the last remaining Member of the Company to cease to be a Member of the Company, to the fullest extent permitted by law, the personal representative of such Member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such Member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute Member of the Company, effective as of the occurrence of the event that terminated the continued membership of such Member in the Company.

(b)    Notwithstanding any other provision of this Agreement, the bankruptcy of any Member shall not cause such Member, to cease to be a Member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c)    In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(d)    The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company shall have been distributed to Members in the manner provided for in this Agreement and (ii) the Certificate shall have been canceled in the manner required by the Act.

**Section 20.** **Waiver of Partition; Nature of Interest**. Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each Member hereby irrevocably waives any right or power that such Person might have to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. Members shall not have any interest in any specific assets of the Company, and no Member shall have the status of a creditor with respect to any distribution pursuant to Section 14 hereof. The Interest of each Member in the Company shall be personal property for all purposes.

**Section 21.** **Benefits of Agreement; No Third-Party Rights**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of any Member. Nothing in this Agreement shall be deemed to create any right in any Person (other than Covered Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person (other than Covered Persons).

12

**Section 22.**   **Severability of Provisions.** Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

**Section 23.**   **Entire Agreement.** This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

**Section 24.**   **Binding Agreement.** This Agreement constitutes a legal, valid and binding agreement of the Members and is enforceable in accordance with its terms.

**Section 25.**   **Governing Law.** This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

**Section 26.**   **Amendments.** This Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Members.

**Section 27.**   **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

**Section 28.**   **Notices.** Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in Section 3, (b) in the case of any Member, at its address as listed on Schedule A attached hereto, and (c) in the case of any of the foregoing, at such other address as may be designated by written notice to the other party.

**Section 29.**   **Effectiveness.** Pursuant to Section 18-201(d) of the Act, this Agreement shall be effective as of the time of the filing of the Certificate with the Office of the Delaware Secretary of State on the date hereof.

**Section 30.**   **Confidentiality.**   Unless otherwise agreed to or authorized by the Managing Member, each Member agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its interest in the Company or for purposes of filing such Member's tax returns or for other routine matters required by applicable law), nor to disclose to any person or entity, any information or matter relating to the Company and its affairs (other than disclosure to such Member's Authorized Representatives who have a need to know such information for a legitimate business purpose); provided that such Member and its Authorized Representatives may make such disclosure to the extent that:

(i)   the information being disclosed is publicly known at the time of proposed disclosure by such Member or Authorized Representative;

(ii)   the information subsequently becomes publicly known through no act or omission of such Member or Authorized Representative in violation of this Section 30;

13

(iii)    the information otherwise is or becomes legally known to such Member other than through disclosure by a source the Member knew or should have known was bound by a confidentiality obligation;

(iv)    such disclosure is required by law or regulation;

(v)    such disclosure is required by any regulatory authority or self-regulatory organization having jurisdiction over such Member;

(vi)    such disclosure is approved in advance and in writing by the Managing Member; or

(vii)    such disclosure is authorized pursuant to this Section 30;

provided, that, in the case of any disclosure under clauses (iv) or (v) above, prior to such disclosure, such Member or Authorized Representative (A) promptly notifies the Company in order to permit the Company to promptly seek an appropriate protective order and/or take any other action to protect the confidentiality of such information, and (B) upon such disclosure, shall submit a request for confidential treatment of the information being disclosed. Prior to any disclosure to any Authorized Representative, each Member shall advise such Authorized Representative of the obligations set forth in this Section 30 and obtain the agreement of such person to be bound by the terms of such obligations. Notwithstanding any other provision of this Agreement, any Member or Authorized Representative may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Company and all materials of any kind (including opinions or other tax analyses) that are provided to such Member relating to such tax treatment or tax structure; provided that the foregoing does not constitute an authorization to disclose information identifying the Company, the Members or any parties to transactions engaged in by the Company (except to the extent relating to such tax structure or tax treatment) any non-public commercial or financial information.

[SIGNATURE PAGE FOLLOWS]

KL2 2753032.5

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement of Brainwave Science, LLC as of the date first written above.

**EHEALTHCAREWORKS CORP.**

By: _____
Name: KRISHMA IKA
Title: PRESIDENT

**BRAIN FINGERPRINTING LABORATORIES, INC.**

By: _____
Name: LAWRENCE A. FARWELL
Title: CHAIRMAN AND CHIEF SCIENTIST

_____
**LAWRENCE FARWELL**

## SCHEDULE A

### Members

| Name | Mailing Address | Percentage Profit Sharing Interest |
|------|-----------------|-----------------------------------|
| EHEALTHCAREWORKS CORP. | Attn: Krishna Ika, 257 Turnpike Road, Southborough, MA 01772 | 57% |
| BRAIN FINGERPRINTING LABORATORIES, INC. | Attn: Lawrence Farwell 14220 37th Ave NE Seattle W A98125. | 38% |
| LAWRENCE FARWELL | 14220 37th Ave NE Seattle W A98125. | 5% |