FILED
in the Clerk's Office
U.S. District Court, EDNY
April 1, 2022
12:25AM
Brooklyn Pro Se Office via
Box.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X

BRAINWAVE SCIENCE, INC.

        Plaintiff

                                        Affidavit of Defendant
Dr. Lawrence A. Farwell in
Response to Order of 3/2/2022 and to
Plaintiff's Letter Motion dated March 21,
2022 (ECF 54).

                - against -

                                       Civil Action No.: 21-cv-4402 (BMC-RLM)

ARSHEE, INC., DR. LAWRENCE A.
FARWELL, DR. THIERRY MAISON and
BRAIN FINGERPRINTING FOUNDATION

                    Defendants.

-------------------------------------------------------- X

Dr. Lawrence A. Farwell, being duly sworn, declares under penalty of perjury as follows:

By Order dated March 2, 2022, the Court directed Defendants to file affidavits to the Court "establishing that they have complied with the presently imposed preliminary injunction…" (ECF #38).    In response to the Court's directive, I provided an Affidavit to the Court (ECF #51). In response, Plaintiff filed a letter motion dated March 21, 2022 (ECF 54) in which Plaintiff alleged various deficiencies of said affidavit.

I am writing in response to Plaintiff's Letter Motion of March 21, to cure the alleged deficiencies in said Affidavit, and in further response to the Court's Order of March 2, 2022.

Plaintiff's Letter Motion of March 21 contained demonstrably false substantive statements regarding the most significant facts alleged.

Specifically, Plaintiff's statement that "the undersigned executed a retainer agreement for the third-party evaluator selected by Defendant Farwell to conduct the code comparison directed by the Court's Temporary Injunction" is an out-and-out lie.

I, Defendant Dr. Farwell – not Plaintiff -- executed an agreement with said third-party evaluator, Mindfire Technologies, who is one of the most capable, experienced, and respected company for such complex software evaluation.

Plaintiff also falsely stated that "The undersigned was thereafter advised by the proposed testing entity that, upon their review of documents apparently provided by Defendant Farwell, that they could not agree to the limited scope of work proposed by Plaintiff."

The reason that I, and Mindfire, both stated that the contract proposed by Plaintiff was not viable, was NOT that either one of us objected to the "limited scope of work."  On the contrary, the contract proposed by Plaintiff, and Plaintiff's subsequent correspondence, insisted on a major *increase,* not a limitation, in the scope of work.

Plaintiff has insisted on a scope of work that, in addition to the report required by the order of the Court, added an additional report to the Plaintiff that comprised the evaluator providing to the Plaintiff specific details of my (Defendant Farwell's) new software to be tested, including, among other things, screen shots.

Both I and Mindfire recognized the fact that the expanded scope that Plaintiff insisted upon, wherein Mindfire would transfer *my (Defendant Farwell's)* new proprietary information and trade secrets to Plaintiff – including screen shots of my software – not only was totally unnecessary and beyond the scope of the order of the Court, but would constitute a clear violation of my non-disclosure agreement with Mindfire, a necessary agreement with any evaluator for protecting my intellectual property.

Plaintiff refused to abide by the order of the Court and provide a retainer and submit their software for analysis – despite the fact that Mindfire and I already had an agreement in place that met the requirements of the order of the Court -- because Plaintiff insisted on said expanded scope of the contract with Mindfire.

The contract between BWS and Mindfire -- which Tomkins falsely stated in his above-referenced motion and in emails to me was executed by both parties, when in fact it was only signed by Tomkins and not Mindfire – included a second report, in addition to the report specified in the order of the Court, that would have transferred my intellectual property, including screenshots of my software, to BWS.  Obviously, no legitimate testing expert would consider signing such a contract, which clearly subverted the purpose of engaging a testing expert from comparing software to transferring my software to BWS.

Not only is Plaintiff's statement that "the undersigned executed a retainer agreement for the third-party evaluator selected by Defendant Farwell to conduct the code comparison directed by the Court's Temporary Injunction" an out-and-out lie, but the preamble in that sentence, "At the request and urging of Defendant Farwell's former counsel," is yet another lie.  My former counsel, Joseph Carbonaro, was well aware that I had already executed a satisfactory contract with Mindfire, there was no reason for Plaintiff to attempt to execute an alternative contract with Mindfire, and in any case he certainly did not request or urge Plaintiff to sign a contract with Mindfire or anyone else that expanded the scope of the work to include a second report transferring my intellectual property to Plaintiff.

Plaintiff subsequently found "an alternate, neutral evaluator" named Dr. Howard Cohen who apparently had agreed with Plaintiff to execute a testing agreement that expanded the scope beyond that of the order of the Court to include two reports, one of which would have transferred my intellectual property to Plaintiff.  Any party who would consider executing such a contract is clearly neither objective, nor competent, nor neutral.  Moreover, from Dr. Cohen's resume it was clear that he lacked the necessary expertise to examine and evaluate complex software such as

2

the code in consideration here.  For this reason, and because I already had a contract in place with Mindfire, an evaluator who, unlike Dr. Cohen, had the necessary expertise to conduct the comparison, I rejected Cohen as an evaluator.

In his motion, Tomkins falsely stated that "Defendant Farwell also subsequently objected to proceeding with the code comparison…"  That is yet another out-and-out lie.  As our emails will verify, I repeatedly demanded that Plaintiff proceed with the required testing.  I only asserted that I had no obligation to provide my software to anyone that Plaintiff had engaged ostensibly for the purpose of software testing but in fact with the actual assigned task of transferring my intellectual property to Plaintiff in a second report uncalled for in the order of the Court.

At Tomkins request, I executed a revised agreement with Mindfire that included the specifications he asked for with respect to the scope of work. On March 8, 2022, I wrote an email to Tomkins that stated:

> "Mr. Tomkins:
> Per your request, I have executed a revised contract with Mindfire that strictly limits the scope of work to exactly the words in the preliminary injunction.
> I have attached the document, signed by both parties.
> The attached fully executed contract now not only meets the requirements of the court's preliminary injunction, but also gives you everything you asked for in the way of restricting the scope of work to the maximum possible extent.
> Kindly provide the iCognative software to Mindfire  and pay their retainer without further delay.
> As a gesture of goodwill and cooperation, I also offer that you may feel free to provide Mindfire with any additional information you like that you think supports your case, and communicate freely with them during the course of their performance on the contract.  I will forward any progress reports to you as soon as I receive them.
> Note that neither you nor I have the right to interfere with the comparison or prevent Mindfire from completing their work, whether we like the results or not. If either of us attempted to obtain such undue influence, the testing company would no longer be independent, but rather would be under the control of one party or the other.  Such a situation would be in direct contradiction of the requirement of the court that the company I hire to provide me with the report that I then provide to you per the injunction must be an independent third party.
> Regards,
> Dr. Lawrence A. Farwell"

Mr. Tomkins replied on March 8.  His email stated, in part, as follows:

> Dr. Farwell,
> Your proposal is not acceptable to the Plaintiff for the following reasons:
> 1.   As I have previously advised, Brainwave is not amenable to releasing our code or remitting payment for the services of any evaluator/expert without a retainer agreement in place between Brainwave and the evaluator.  Again, this is neither unreasonable nor unusual when securing the services of an <u>independent</u>, third-party evaluator. This may be accomplished by way of a tri-parte retainer

agreement or a retainer agreement between Brainwave and the evaluator with an NDA and full release in favor of submitting Defendant(s).

2. As I have also previously advised, the "Scope of Work" provision must include some verification by the subject matter expert(s) that the code submitted by Defendant(s) represents a bona fide representation of code to be demonstrated, sold or transferred by Defendant(s).  I.E. the code should be able to be compiled into executable form and should be verified as a bona fide P300-related application.  I have been advised by our technical staff that this verification should take no more than 2-3 hours.  Absent such a verification, we have no way of confirming that the code being submitted for evaluation relates to the software which is the subject of the Court's Temporary Injunction Order.

3. As I also have previously advised, the retainer agreement should provide the names and qualifications of all persons to be conducting the code analysis.

Although I already had a contract in place with Mindfire that met the requirements of the order of the Court, in order to be as forthcoming as possible, I sent an email to Tomkins stating that I would consider a tri-parte contract with Mindfire that included Plaintiff as a party in addition to myself, and that included all of the provisions specified by Tomkins in his above email of March 8.

I went so far as to prepare a tri-parte agreement for execution by Plaintiff, myself, and Mindfire that included everything that Tomkins said he wanted, and was modified so as to fully address all of the objections that he had raised to previous versions.  This is attached hereto as Exhibit I-A.

I emailed said proposed contract to Tomkins on March 11, with the following email text:

Mr. Tomkins:

I acknowledge receipt of the contract you proposed to Mindfire.   It appears to be signed by you, and not fully executed by both parties.

As you know, I have a fully executed contract in place with Mindfire, signed by myself and Mindfire, to conduct the software comparison required by the court order.

However, I am willing to consider signing a different contract that includes BWS and also includes all of the terms you have requested.

I understand your concern that Mindfire should confirm that the code I submit is actually functional code.  If it is not, then there is no reason for them to continue with their comparison.  However, I will not consider a contract that includes Mindfire giving BWS any of my code or any information about my code, other than their professional confirmation that it is functional code. Anything else would be a clear violation of my confidentiality agreement with Mindfire.  This provision goes both ways.  Mindfire has the same obligation to protect your confidential information as they do to protect mine.  Mindfire will not be required to provide me with any of your code or anything else covered by your confidentiality agreement.  I will not consider any contract that includes a provision for a preliminary report to be evaluated by BWS.  A confirmation by Mindfire to both BWS and myself that my code is functional, as you have requested, is fine.  A "preliminary report" that provides you with any information whatsoever about my code is a total non-starter. That would be in direct contradiction of my confidentiality

4

agreement with Mindfire, as well as with normal and ethical business practices for an independent third-party consultant.

I have attached a draft of a contract that provides everything you have requested. Kindly let me know if this is acceptable to you. If so, we can forward it to Mindfire to insert the names and qualifications of their personnel.

Sincerely,

Dr. Lawrence A. Farwell

Mr. Tomkins has to date not replied to said email. Instead, he filed the Motion of March 21 (ECF 54) in a transparent attempt to trick the Court into requiring me to allow Plaintiff, under the guise of software testing, to obtain my intellectual property from a purported software tester, and to participate in testing by a clearly unqualified and biased person such as Dr. Cohen.

Said motion also contained other provisions, which I address below.

In the Preliminary Injunction (ECF 30), the Court ordered me to "take any and all commercially-practicable actions to recall or replace any software containing plaintiff's 'confidential or proprietary information' from third parties;" and has defined "confidential or proprietary information" as "any portion of the program plaintiff originally submitted to Codequiry as its code."

In my previous Affidavit, I stated the following: "The response of my clients eliminates the possibility of 'commercially-practicable' 'recall,' and leaves open the possibility of 'replace[ment],' but only if and when BWS cooperates with the independent testing of my software by providing their software and paying for the testing as ordered by the Court, and only after I have had sufficient time to develop software that is certain to meet the standard set by the Court."

The Court is crystal clear in said Preliminary Injunction. I have two options: (1) recall said software, insofar is that is "commercially practicable," or (2) replace the same, insofar as that is "commercially practicable."

By elementary logic, if it is not "commercially practicable" to "recall" said software, if any, then my only remaining option is to "replace" the same. In that case, contrary to Tomkins' statements in said Motion of March 21, my only remaining option depends on Plaintiff (1) providing their software to the tester that I engage to test my software against "the program plaintiff originally submitted to Codequiry as its code," and (2) paying for said testing. Plaintiff so far has refused to do so. Plaintiff's contention that I must somehow be forced to comply with the Preliminary Injunction, while Plaintiff refuses to comply with the requirement that they submit their software for testing and pay for the same, is without merit. Obviously, I cannot "replace" existing software with software that has been proven by a tester to not contain Plaintiff's confidential or proprietary information so long as Plaintiff continues to refuse to fulfill their obligations under the Preliminary Injunction to do the actions from their side that are necessary for such testing to take place.

In my previous Affidavit I stated truthfully that (1) it is not "commercially-practicable" for me to "recall" software unless my clients cooperate by returning the software; (2) I have no way of forcing my clients to return the software, and (3) none of my clients will do so voluntarily.

Statements (1) and (2) are indisputable. Tomkins apparently was unconvinced of statement (3).

Therefore, in this Affidavit, I will document the words and deeds of my clients, and let the Court draw its own conclusions as to whether my clients will act in such a way as to make it "commercially-practicable" to "recall" the software and have it actually returned.

I will also document my further communications with my clients, including informing them that software in their possession was subject to a "recall or replace" court order, in the cases where that is applicable.

Before discussing my first client, the US Central Intelligence Agency, I will also elaborate on the reasons why I will not, cannot legally, and cannot legally be forced to, disclose classified information.

Much of my Brain Fingerprinting work recent years has been classified counterterrorism operations overseas.  In recent years, before COVID, I spent more time in the Middle East than at home in the US.  In my previous Affidavit, I summarized the situation as follows:

> "11. With respect to records related to this litigation, I must disclose that most of the work I have done worldwide in counterterrorism and international law enforcement, from the time my work began in the early 1990s with the FBI, the CIA, and the US Navy until the present day, has been and remains classified. There are severe penalties to me, as well as potential damage to national and global security, for violating the applicable laws and agreements regarding classified information.  These frequently do not provide for exceptions regarding information provided to a US court, particularly when they involve foreign counterterrorism agencies and international criminal-investigation agencies.  I cannot, and will not, disclose such classified information except as required by law."

I stand by that statement.  If I were to disclose classified information, this would constitute simultaneously violating applicable laws and admitting to violating said laws, which, aside from being illegal, would violate my constitutional rights under the Fifth Amendment.

Contrary to Tomkins assertion that my position has no basis in fact or law, the fact is that I have in my possession classified information, the law is that I am constrained by law not to disclose said classified information, and my right not to simultaneously violate the applicable laws and confess to the same is protected by the Constitution.

This brings me to the discussion of my first client, the CIA.

**The US Central Intelligence Agency (CIA)**

I first started working with the CIA in 1992.  Since then I have met on numerous occasions with the Director of the CIA, and on even more numerous occasions with others in the Agency and also in counterpart agencies in our allies abroad, particularly the Middle East.

I have trained intelligence agency personnel in Farwell Brain Fingerprinting.  All of this work is classified.  However, some unclassified reports have been released, without identifying information, on the following applications of Farwell Brain Fingerprinting in the Middle East:

- A hijacking wherein all of the hijackers were killed.  One handler and one mastermind who planned and orchestrated the crime remained to be brought to justice.  We developed a Brain Fingerprinting test to detect concealed information known only to the mastermind and to the handler (and to investigators).

- A mass shooting involving multiple victims and multiple shooters.  Some of the shooters died at the scene, along with numerous victims.  Some of the shooters were neither killed, captured, nor identified at the scene.  The surviving shooters, along with the mastermind and handler, remained to be brought to justice.  We developed a Brain Fingerprinting test to detect information known only to the surviving shooters, the mastermind, and the handler (and to investigators).

- A suicide bombing in which the suicide bomber died at the scene, along with multiple victims.  A mastermind planned the attack and recruited the suicide bomber. A handler provided instructions, explosives, and logistical support for the suicide bomber.  We developed a Brain Fingerprinting test to detect information known only to the mastermind and handler (and to investigators).

The Farwell Brain Fingerprinting system now in use by the CIA comprises approximately 80% "Plaintiff's confidential or proprietary information," That is my professional opinion based on knowing every line of code in the CIA system, having designed it, and everything of substance in the BWS Software, having designed it to the same specifications. I cannot be certain that this estimate is accurate, because I do not know exactly what code BWS Submitted to Codequiry.

All I know for certain is the following.

I provided BWS with detailed specifications for software to implement Farwell Brain Fingerprinting, all of which I had previously released to the public domain.  These are the same precise specifications that I provided in the design of the Brain Fingerprinting system now at the CIA. Dr. Thierry Maison, BWS' CTO at the time, implemented my public-domain specifications in the BWS Software, using open-source development tools.  The BWS Software was released to a public domain source at 6:15 PM on 9/10/2017 from IP address 65.52.55.39 in Chicago, using the credentials of BWS employee Karuna Raja, who was in Southborough, MA at the time.  In his Affidavit (ECS 20), Ika admitted that the BWS Software was uploaded to the internet, but falsely stated that it was uploaded to a secure cloud server. (Said Affidavit contained many other demonstrably false statements that will not be further discussed here.) The BWS Software was never uploaded to a secure cloud server.  It was maintained on a physical server in a rented office in Southborough, MA and accessed by numerous BWS employees in the US and India. Both Dr. Maison and myself know that from first-hand observation.

Dr. Maison later downloaded the BWS Software – which he had originally written – deleted the part that was specific to the BWS brainwave headset (the only part that might possibly be considered to be proprietary), and modified the code to develop an application (the "Maison-Farwell Software") that I have been applying in conducting Brain Fingerprinting tests in counterterrorism and criminal investigations around the world.

Ika obtained the Maison-Farwell Software from Dr. Maison through a settlement agreement.  His engineers then modified the BWS Software to be as similar as possible to the Maison-Farwell Software, generating the "Modified BWS Software."  Ika then submitted the two to a Codequiry similarity checker test.  Not surprisingly, the two were found to be highly similar.

Ika represented that the BWS Modified Software, which had been modified to appear as similar as possible to the Maison-Farwell software after BWS obtained the same from Dr. Maison – was the unmodified BWS Software that was uploaded to a public source on the internet and

downloaded by Dr. Maison.  In other words, the software comparison Ika used to attempt to show that Dr. Maison misappropriated BWS's software was faked and fraudulent.

Ika's company then used the fraudulent comparison test results to file the present lawsuit.

Regardless of the above, the Preliminary Injunction requires me to "recall or replace" the software now in the CIA's Farwell Brain Fingerprinting system, as it contains, if not 80%, then certainly at least some part of the "plaintiff's confidential and proprietary information."

Consequently, in compliance with the Preliminary Injunction, I have written a letter to the Director of the CIA informing him of this requirement.  As I stated above, I cannot control what the CIA does in response, and I cannot force the CIA to give up technology they are using that is of critical importance for national security. Nevertheless, from my side I have complied with the requirements of the Preliminary Injunction.

My letter to the Director of the CIA is attached hereto as Exhibit I-B. An attachment to that letter is a relevant FBI Report and Supplement, Exhibit I-C. The FBI Report has numerous Exhibits, some of which will be referred to below.  (For example, a reference to "Exhibit AS" below will refer to Exhibit AS in the FBI Report.)

**Afghanistan and Surrounding Countries**

According to the sworn affidavit of one of the top Brain Fingerprinting experts in the region (Exhibit AS), he witnessed an attempt by Ika, BWS LLC, and/or BWS Inc to defraud an intelligence agency involved in counterterrorism in Afghanistan and elsewhere in the region on or about April 15, 2019.

In his affidavit, he stated the following: "My experience in applying the genuine Farwell Brain Fingerprinting in collaboration with Dr. Farwell and counterterrorism and intelligence agencies leads me to the conclusion that if Ika and BWS ever succeeded in selling their counterfeit technology and training by unqualified personnel to any major intelligence, counterterrorism, or law enforcement agency; this would be a major threat to national security and justice. There is no evidence that BWS' and Ika's counterfeit technology works at all, let alone with high accuracy. Their 'trainers' are not qualified to practice forensic neuroscience, specifically Brain Fingerprinting, let alone to train others to do so. Applying such an unproven and untested technology, and attempting to apply training by such unqualified personnel, would in my opinion be likely to have disastrous consequences for counterterrorism, counterintelligence, and law enforcement efforts."

In light of the above facts, I consider it unlikely that either the CIA or my private-sector client in the region, Prime Technologies, will respond to a "recall or replace" order.  Nevertheless, I have emailed Prime Technologies and told them that any software in its possession that meets the standard set by the Preliminary Injunction is subject to a "recall or replace" court order. (My communication on the matter with the Director of the CIA is discussed above.)

**South Africa**

On or about March 18, 2019, Dr. Farwell received the first of a series of communications from Donald Buti Ramfolo ("Ramfolo"), and his associate Christo Botes in South Africa regarding their plans to collaborate with Dr. Farwell and Brain Fingerprinting, LLC to bring Dr. Farwell's Brain Fingerprinting technology to South Africa.  General Ramfolo is a Brigadier General (ret) Military Intelligence in South Africa.  Some of these communications from General Ramfolo contained information regarding alleged fraud by Ika and BWS Inc involving the science and technology of Brain Fingerprinting that Dr.

Farwell invented and developed.  General Ramfolo provided the facts contained in his sworn affidavit (Exhibit AR). See the Exhibit for details.  The affidavit of General Ramfolo contains the following facts.

According to General Ramfolo, Ika, BWS LLC, and/or BWS Inc made false and fraudulent claims regarding Brain Fingerprinting and the Ika Parties' Counterfeit Product in an attempt to sell Ika Parties' Counterfeit Product to the South African government.

According to General Ramfolo, when General Ramfolo asked Ika to provide information regarding the acceptance in court that Ika, BWS LLC, and/or BWS Inc claimed that Ika Parties' Counterfeit Product had achieved, the only references Ika, BWS LLC, and/or BWS Inc provided were to court cases in which Dr. Lawrence Farwell and his genuine Brain Fingerprinting science were involved, cases that predated the existence of BWS LLC and BWS Inc. and had nothing to do with Ika, BWS LLC, BWS Inc, and Ika Parties' Counterfeit Product.

In light of the above facts, I consider it unlikely that my clients in South Africa, Christo Botes and General Buti Ramfolo, will respond to a "recall or replace" order.  Nevertheless, I have emailed them and told them that any software in their possession that meets the standard set by the Preliminary Injunction is subject to a "recall or replace" court order.

**Thailand**

On or about May 10, 2017, Dr. Farwell received the first of a series of communications regarding the science and technology of Brain Fingerprinting that Dr. Farwell invented and developed from Jose Kuruvilla ("Kuruvilla"), CEO of Mainland Security, Inc., with headquarters in Hong Kong and Thailand. Mr. Kuruvilla informed Dr. Farwell of the following facts.

According to Kuruvilla, on or about May 1, 2017, Ika, BWS LLC, and/or BWS Inc attempted to defraud the government of Thailand by selling them their counterfeit technology and associated training by unqualified personnel.

According to Kuruvilla, Ika gave a demonstration of their counterfeit technology in which he purported to be measuring and analyzing brainwaves and achieving an accurate result with Ika Parties' Counterfeit Product, which Ika misrepresented as genuine Brain Fingerprinting.

According to Kuruvilla, after placing a headset on a subject and running the software, Ika told the government of Thailand that they had collected sufficient data, and now they would analyze the data. He said the results of the analysis of the data they had just collected would appear on the screen.

According to Kuruvilla, Kuruvilla observed that Ika did not attempt to analyze the data as he falsely represented to the government he was doing.  Instead, he simply accessed and displayed a previously developed graphics file that appeared to show the results of a brainwave test.  Ika fraudulently represented that the previously produced graphics file was actually a representation of the results of computer analysis of the data that they had just purportedly collected. This is documented in Exhibit AT.

According to Kuruvilla, Ika told Kuruvilla that they had bought the system they were presenting from Dr. Farwell and that they were still paying royalties to Dr. Farwell.  Dr. Farwell knows both of these statements to be false and fraudulent. Neither of those events ever happened.

According to Kuruvilla, Ika lied to Kuruvilla in an attempt to sell the Ika Parties' Counterfeit Product. In a phone conversation with Dr. Farwell on or about May 12, 2019, Kuruvilla stated, "When people

are lying I don't need a lie detector.  I told my people we will not do business with [Ika, BWS LLC, and/or BWS Inc]."

In light of the above facts, I consider it unlikely that my clients in Thailand Mainland Security Inc. will respond to a "recall or replace" order.  Nevertheless, I have emailed them and told them that any software in their possession that meets the standard set by the Preliminary Injunction is subject to a "recall or replace" court order.

## Nigeria

On or about June 28, 2017, Dr. Farwell received the first of a series of communications regarding the science and technology of Brain Fingerprinting that Dr. Farwell invented and developed from Bolaji Oye ("Oye"), Chief Operating Officer of Piqure Solutions LTD in Nigeria.  He informed Dr. Farwell of the following facts:

According to Oye, Ika, BWS LLC, and/or BWS Inc attempted to defraud the Nigerian Defense Intelligence Agency by selling them Ika Parties' Counterfeit Product and associated training by unqualified personnel.

According to Oye, the Nigerian NSA, the Nigerian Defense Intelligence Agency, and Oye detected and thwarted the attempted fraud by Ika, BWS LLC, and/or BWS Inc.

Oye stated the following in an email to Dr. Farwell on July 8, 2017.  "Just for your information, the Nigerian Government is about to be fleeced by Brainwave Science...This meeting I am having this morning will be the start of pulling the plug on BrainWave Science in Nigeria. We have already contacted the Nigerian NSA on this matter, but we are also approaching the DEFENCE INTELLIGENCE AGENCY (institution that wants to buy the item) to make them aware that BRAINWAVE SCIENCE [BWS Inc.] is all a con."  The Nigerian government recognized these facts, and did not purchase Ika Parties' Counterfeit Product.

In light of the above facts, I consider it unlikely that my clients in Thailand, Mainland Security Inc. will respond to a "recall or replace" order.  Nevertheless, I have emailed them and told them that any software in their possession that meets the standard set by the Preliminary Injunction is subject to a "recall or replace" court order.

## India

Forensic Science Laboratory, New Delhi, India ("FSL") is a client of Dr. Farwell, having purchased a Brain Fingerprinting system and associated training by Dr. Farwell.

On or about May 14, 2019 Tomkins falsely and fraudulently libeled Dr. Farwell in communications to Dr. Farwell's client FSL.  Tomkins falsely accused Dr. Farwell of fraud, theft, sabotage, lying, dishonesty, bad faith, duplicity, unethical business practices, and other illicit and undesirable actions.

On or about May 14, 2019 Tomkins wrote and caused to be delivered a letter ("Tomkins' Libelous Letter," Exhibit AU) to Dr. Farwell's client FSL.

Tomkins' Libelous Letter falsely, fraudulently, and libelously claimed that Dr. Farwell had stolen hardware comprising Ika Parties' Counterfeit Product from Defendant Brainwave Science, Inc.

Tomkins' Libelous Letter falsely, fraudulently, and libelously claimed that Dr. Farwell had sold to Dr. Farwell's client FSL said allegedly stolen hardware (comprising an EEG headset, as described in documents accompanying Tomkins' Libelous Letter).  It would be ludicrous for Dr. Farwell -- the inventor and developer of the genuine Brain Fingerprinting, who had been applying and selling his

genuine Brain Fingerprinting system for decades before BWS LLC and BWS Inc existed -- would steal and attempt to sell a counterfeit system such as Ika Parties' Counterfeit Product. Moreover, such an accusation must be false for the following reason. The headset that Dr. Farwell and his affiliated company Brain Fingerprinting, LLC sold to FSL (as part of the Farwell Brain Fingerprinting system purchased by FSL) was a custom headset ("Dr. Farwell's Custom Headset") designed by Dr. Farwell and custom manufactured in the USA. Based upon information and belief, Ika, BWS LLC, and BWS Inc. only use and only have ever possessed entirely different headsets manufactured in Taiwan, and all of their software works only with said Taiwanese headsets and not with Dr. Farwell's Custom Headset. On information and belief, no one other than Dr. Farwell and his affiliated companies, Brain Fingerprinting, LLC and Brain Fingerprinting Laboratories, Inc., possesses Dr. Farwell's Custom Headset or any instantiation thereof. have never possessed any instantiation of Farwell's Custom Headset – the headset that Dr. Farwell sold to FSL. Consequently, any allegation that Dr. Farwell stole from the Farwell's Custom Headset that he sold to FSL (or anyone else) must be false, fraudulent, and libelous or slanderous.

Tomkins' allegation that Dr. Farwell stole a headset from Ika and Brainwave Science Inc. is false and libelous with regard to the false accusation of theft.

The allegation or implication in Tomkins' Libelous Letter that Dr. Farwell stole and then sold a headset from Ika and Brainwave Science Inc. is additionally false and libelous with regard to the false accusation that Dr. Farwell sold stolen goods.

Tomkins' allegation or implication in Tomkins' Libelous Letter that Dr. Farwell sold Ika Parties' Counterfeit Product to FSL is additionally false and libelous in that such a sale would never be undertaken by Dr. Farwell or any other legitimate forensic scientist with expertise in Brain Fingerprinting. In falsely alleging that Dr. Farwell sold Ika Parties' Counterfeit Product, Tomkins implies that in the course such sale Dr. Farwell must have misrepresented that Ika Parties' Counterfeit Product had value and was worth buying – which it does not and is not, and that Ika Parties' Counterfeit Product had his endorsement or was represented by him – which it does not and is not. Such representations or implications are damaging to Dr. Farwell's reputation, stature, and professional success as a forensic scientist and expert in genuine Brain Fingerprinting. No legitimate forensic scientist with expertise in Brain Fingerprinting would make such misrepresentations regarding Ika Parties' Counterfeit Product or any other product that fails to meet the Brian Fingerprinting Scientific Standards.

Tomkins' Libelous Letter also threatened Dr. Farwell's client FSL with criminal prosecution for possession of stolen property, on the basis of having purchased the same from Dr. Farwell.

Tomkins' Libelous Letter falsely and libelously stated that Dr. Farwell is being investigated by the FBI. No such investigation exists. Ika spoke to an FBI agent in 2016 regarding the various disputes at the time. No investigation ensued, and no investigation was taking place at the time of Tomkins' Libelous Letter.

Tomkins' Libelous Letter falsely stated that Brainwave Science, Inc. is actively and fully cooperating with a (non-existent) FBI investigation of Dr. Farwell. No such cooperation is taking place. No such investigation is taking place, and no such investigation or cooperation was taking place at the time of Tomkins' Libelous Letter.

In the context of security clearances, Dr. Farwell has been investigated by numerous national and international law enforcement, intelligence, counterterrorism, and military agencies around the world, beginning with the FBI and the CIA in the early 1990s.

Throughout the last quarter of a century, including over 20 years prior to the existence of BWS LLC and BWS Inc., Dr. Farwell has cooperated and collaborated with national and international law enforcement, intelligence, counterterrorism, and military agencies around the world, beginning with the FBI and the CIA in the early 1990s, and has provided said agencies with his professional expertise as a forensic neuroscientist as well as his invention of Brain Fingerprinting.

As described below and documented in the exhibits hereto, Ika, Tomkins, BWS LLC, BWS Inc. and their employees have never collaborated with national and international law enforcement, intelligence, counterterrorism, or military agencies and provided said agencies with professional expertise in forensic neuroscience, because lack any training, certification, qualification, credentials, education, knowledge, or expertise in forensic neuroscience, and specifically in the forensic neuroscience of Brain Fingerprinting.

Tomkins' Libelous Letter contained additional false, fabricated, and remarkably fanciful hearsay apparently designed to disparage and defame Dr. Farwell and his science and technology.

Tomkins' actions, including but not limited to libeling Dr. Farwell and threatening Dr. Farwell's client FSL with criminal prosecution for doing business with Dr. Farwell, can only reasonably be understood as an attempt to interfere with Dr. Farwell's contract and business relationship with FSL and Dr. Farwell's other clients, to defame Dr. Farwell, and to disparage Dr. Farwell's science and technology, and to weaken or intimidate Dr. Farwell as a potential witness in future criminal prosecutions of Ika based on authorities having accused Ika of fraud in Pakistan, South Africa, Nigeria, and Thailand, as Dr. Farwell has testified as a witness in a previous fraud case against Ika, as described herein.

In Dr. Farwell's professional opinion as the inventor of Brain Fingerprinting, the world's leading expert in the science of Brain Fingerprinting, and the most experienced expert in applying Brain Fingerprinting in criminal, counterterrorism, and counterintelligence cases with national law enforcement and national security agencies around the world, any misguided attempt by unqualified persons to apply counterfeit technology, such as Ika Parties' Counterfeit Product, which Ika, BWS LLC, and/or BWS Inc are attempting to market, in real criminal or counterterrorism cases would be a serious threat to national security and justice. Other experts agree with this opinion, as documented below, and no known Brain Fingerprinting expert disagrees with this assessment.

In light of the above facts, I consider it unlikely that my clients in India, FSL, will respond to a "recall or replace" order. Nevertheless, I have emailed them and told them that any software in their possession that meets the standard set by the Preliminary Injunction is subject to a "recall or replace" court order.

In light of the above facts, the response to date of my clients almost certainly eliminates the possibility of "commercially-practicable" "recall," and leaves open the possibility of "replace[ment]," but only if and when BWS cooperates with the independent testing of my software by providing their software and paying for the testing as ordered by the Court, and only after I have had sufficient time to develop software that is certain to meet the standard set by the Court in a commercially-practicable manner.

In light of the above facts, I stand by my statement in paragraph 8 of my previous Affidavit.

Unlike the Court (with all due respect), Dr. Farwell's clients are not new to this. They have invested many thousands of hours over a period of decades working with Dr. Farwell and his invention of Brain

Fingerprinting in the field of international counterterrorism, intelligence, and criminal investigations. They are not easily fooled.

They are not going to relinquish their Farwell Brain Fingerprinting systems, which they know from experience provide a critical and irreplaceable technology in their efforts to bring international criminals and terrorists to justice.  Nothing this Court, or any of the litigants -- including Dr. Farwell – do or say will change that.

They know the game and they know the players.  They have been with Dr. Farwell through two lawsuits in Ika's native India very similar to this one, both of which went all the way to the Supreme Court of India, and both of which Dr. Farwell won. They are extensively familiar with Ika's attempts to defraud government agencies.  It's their mission to be aware of and extremely knowledgeable about such things.

Dr. Farwell's clients are the ones who have been working to bring Ika to justice for the fraud he has perpetrated in their countries.  They are not about to turn around now, and be tricked or coerced into collaborating with Ika to subvert the US justice system to attack the two major witnesses – Dr. Farwell and Dr. Maison – whose expertise and testimony they need to bring Ika to justice.  That is not going to happen.  It is not "commercially-practicable."

Dr. Farwell's clients recognize Dr. Farwell's unique expertise and his invention of Brain Fingerprinting as indispensable and irreplaceable tools that they have long been successfully applying to accomplish their mission of fighting terrorism and major international crimes. Nothing that Ika and his co-conspirators, or anyone whom he can dupe into being a tool in the furtherance of his fraudulent schemes (including this Court, in the unlikely event that Ika succeeds in bamboozling the Court with his perjured testimony and Tomkins' lies) can cause Dr. Farwell's clients to give up their working relationship with Dr. Farwell or their continuing and uninterrupted use of his invention of Brain Fingerprinting.  That is not going to happen.  It is not "commercially-practicable."

[Signature page immediately follows.]

Dr. Lawrence A. Farwell

Sworn to before me this 31 day of March, 2022

State of WASHINGTON
County of KITSAP

On this, the 31 st day of MARCH, 2022, before me, a notary public, the undersigned officer, personally appeared <u>Lawrence A. Farwell</u>, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness hereof, I hereunto set my hand and official seal.

Notary Public
ERIN PATTON
EXP: 01/23/2026

Dr. Lawrence A. Farwell, Defendant

Email: brainwave@larryfarwell.com
Website: https://farwellbrainfingerprinting.com
Phone: +1 206-905-1009
Mobile: +1 206-250-5516

Address: 28375 Sandy Beach Lane NE
        PO Box 547
        Kingston, WA 98346

cc: Paul Tomkins, Esq.
    Dr. Thierry Maison
    Arshee, Inc.
    Andrew Black, Esq.

# Exhibit I - A



# Litigation Support
# and Consulting Services Agreement

This Litigation Support and Consulting Services Agreement (the "Agreement") is made and effective
<u>March 11, 2022</u> ,

**BETWEEN CLIENTS:**

<u>Dr. Lawrence A. Farwell</u>        ("Dr. Farwell"), an individual residing in
the state of        <u>Washington</u>      , its head office located at:

Street Address:        <u>28375 Sandy Beach Lane NE, PO Box 547</u>
City, State, Zip:        <u>Kingston, WA 98346</u>

**and:**

<u>Brainwave Science, Inc.</u>        ("BWS"), a corporation organized and
existing under the laws of the state of   <u>Massachusetts</u>   , its head office located at:

Street Address:        <u>257 Turnpike Road</u>
City, State, Zip:        <u>Southborough, MA 10001</u>

**Collectively, "Farwell" and "BWS" shall be referred to herein as "Clients."**

AND:        **Mindfire Consulting Group, LLC, dba Mindfire Technology** ("Mindfire"), a corporation
organized and existing under the laws of the Utah, with its head office located at:

872 W Heritage Park Boulevard, Suite 200
Layton, UT, 84041

## 1.   LITIGATION SUPPORT AND CONSULTING SERVICES

Litigation Support and Consulting Services (the "Services") when used in this Agreement consist of the
performance of professional services that include but are not limited to software and technical
consultation, technical strategy, courtroom strategy, courtroom testimony, source code analysis, source
code comparison, manual and automated system analysis, creating analysis tools, writing code, source
code abstraction, filtration and comparison, documentation, reporting, document review and document
examination.  Specifically, Mindfire will perform the Services as outlined within the "Scope of Work"
within Attachment A hereto with personnel described in Attachment B hereto.

## 2.   CLIENTS' RESPONSIBILITIES

Clients may need to perform certain activities in order for Mindfire to fulfil its responsibilities under this
Agreement including but not limited to meetings or interviews in person or by other electronic means,
granting access to requirements, specifications, documents, files, test accounts, test devices, app store
accounts, third party accounts and software demos and testing. Unnecessary or unreasonable delays
attributable directly to Clients which result in additional costs to Mindfire are subject to additional
compensation to Mindfire.

3.   TERM OF THE AGREEMENT

This Agreement is effective as of the date it is signed by both parties. The terms and conditions of the Agreement will remain in effect until terminated by either party. In no event shall this Agreement be in effect for more than five (5) years unless both parties execute an amendment which extends the term of this Agreement. The expiration of this Agreement shall not affect the obligations of either party to the other with respect to those obligations established under this Agreement. Dr. Farwell, BWS, or Mindfire may terminate this Agreement for any reason upon prior written notice.  Both parties agree that they will give as much notice as possible in the event of early termination of this agreement.

4.   SURVIVAL BEYOND COMPLETION

The provisions herein and Services performed under this Agreement as well as confidentiality, use, indemnification, assignment, reproduction, warranty, ownership, return or destruction shall survive the delivery of the Services and the payment of associated charges.

5.   CONFIDENTIALITY AND SECURITY OF THE SYSTEMS

I. DR FARWELL AND MINDFIRE

Dr. Farwell and Mindfire each acknowledge that all material and information which has or will come into the possession and knowledge of each in connection with this Agreement or the performance hereof, consists of confidential and proprietary data, whose disclosure to or use by third parties could be damaging. Both parties, therefore, agree to hold such material and information in strictest confidence, not to make use thereof other than for the performance of this Agreement, to release it only to individuals requiring such information, and not to release or disclose it to any other party, except as approved by the parties or required by law.  For the purposes of this provision, BWS is a "third party."

II. BWS AND MINDFIRE

BWS and Mindfire each acknowledge that all material and information which has or will come into the possession and knowledge of each in connection with this Agreement or the performance hereof, consists of confidential and proprietary data, whose disclosure to or use by third parties could be damaging. Both parties, therefore, agree to hold such material and information in strictest confidence, not to make use thereof other than for the performance of this Agreement, to release it only to individuals requiring such information, and not to release or disclose it to any other party, except as approved by the parties or required by law. For the purposes of this provision, Dr. Farwell is a "third party."

6.   NON-DISCLOSURE / CONFIDENTIALITY

I. DR FARWELL AND MINDFIRE

This Agreement shall govern the conditions of disclosure by Dr. Farwell to Mindfire of certain "Confidential Information" including but not limited to prototypes, drawings, data, trade secrets and intellectual property relating to the business of Dr. Farwell.

With regard to the Confidential Information, Mindfire hereby agrees:

A.   To safeguard the information against disclosure to others with the same degree of care as exercised with its own information of a similar nature.
B.   Not to disclose the information to others, without the express written permission of Dr. Farwell, except that:
   a.   which Mindfire can demonstrate by written records was previously known;

     b.   which are now, or become in the future, public knowledge other than through acts or omissions of Mindfire;

     c.   which are lawfully obtained by Mindfire from sources independent of Dr. Farwell;

C.   That Mindfire shall not directly or indirectly acquire any interest in, or design, create, manufacture, sell or otherwise deal with any item or product, containing, based upon or derived from the information, except as may be expressly agreed to in writing by Dr. Farwell.

D.   That the non-disclosure and confidentiality obligations of Mindfire with respect to the information shall continue for a period ending two years from the termination date of this Agreement.

E.   That the non-disclosure and confidentiality obligations of Mindfire with respect to the information shall include BWS; that is, no Confidential Information of Dr. Farwell shall be disclosed to BWS for any reason.

## II. BWS AND MINDFIRE

This Agreement shall govern the conditions of disclosure by BWS to Mindfire of certain "Confidential Information" including but not limited to prototypes, drawings, data, trade secrets and intellectual property relating to the business of BWS.

With regard to the Confidential Information, Mindfire hereby agrees:

A.   To safeguard the information against disclosure to others with the same degree of care as exercised with its own information of a similar nature.

B.   Not to disclose the information to others, without the express written permission of BWS, except that:

     a.   which Mindfire can demonstrate by written records was previously known;

     b.   which are now, or become in the future, public knowledge other than through acts or omissions of Mindfire;

     c.   which are lawfully obtained by Mindfire from sources independent of BWS;

C.   That Mindfire shall not directly or indirectly acquire any interest in, or design, create, manufacture, sell or otherwise deal with any item or product, containing, based upon or derived from the information, except as may be expressly agreed to in writing by BWS.

D.   That the non-disclosure and confidentiality obligations of Mindfire with respect to the information shall continue for a period ending two years from the termination date of this Agreement.

E.   That the non-disclosure and confidentiality obligations of Mindfire with respect to the information shall include Dr. Farwell; that is, no Confidential Information of BWS shall be disclosed to Dr. Farwell for any reason.

## 7.   CLIENTS' RIGHT TO CONTRACT FOR SIMILAR WORK

Clients reserve the right to contract with other parties for work similar to that being performed under this Agreement so long as that work does not violate its covenant of non-disclosure.

## 8.   CANCELLATION

BWS and Dr. Farwell, each individually, shall have the right to cancel this Agreement at his/its option by written notice to Mindfire. In the event that BWS or Dr. Farwell elects to cancel this Agreement, BWS will pay Mindfire the amount equal to the actual time and materials charges incurred for that work so cancelled through the day of receipt of written notice of cancellation and any further work required to transfer work or services from Mindfire to Clients at the agreed upon Rate as set forth in Attachment A.

## 9.   INVOICES AND PAYMENTS

In consideration of the Services to be performed hereunder BWS shall pay Mindfire as follows:

A. As full compensation for the Services performed in association with this Agreement, BWS agrees to pay Mindfire the applicable Rate per consultant engaged in the Services, as set forth in Attachment A.

B. BWS shall pay Mindfire a ("Retainer") in the amount set forth in Attachment A. Retainer will be held by Mindfire in a trust account and will not earn interest. Upon the issuance of each invoice, Mindfire is authorized to debit the amount of funds indicated on the invoice from the Retainer. Client agrees to remit the amount of the invoice to replenish the Retainer such that the Retainer account shall at all times remain positive. If the balance of the Retainer account drops below zero, Mindfire may suspend its performance of Services and delivery of any work product until the balance is restored. Final invoice will be applied against the funds in deposit. If total invoices do not exhaust the Retainer, Mindfire will refund the balance to BWS at the conclusion of the engagement and upon clearance of expected costs. Any payment made by credit card, is subject to a 2.5% credit card processing fee.

## 10. ATTORNEYS' FEES

If any dispute arises under this Agreement, the parties hereto shall negotiate in good faith to settle such dispute. If the parties cannot resolve such disputes themselves, then either party may submit the dispute to mediation by a mediator approved by both parties. If either party does not wish to abide by any decision of the mediator, they shall submit the dispute to litigation. The jurisdiction for any dispute shall be administered in Davis County, State of Utah. Prevailing party shall be entitled to attorneys' fees, court costs, accrued interest (18% per annum) in addition to any other relief it may be awarded, and any other costs to resolve such dispute.

## 11. GOVERNING LAW & JURISDICTION

This Agreement shall be governed by and construed in accordance with the laws of the state of Utah. All parties agree to the exclusive jurisdiction and venue of the Second Judicial District, Davis County Justice Court in the State of Utah.

## 12. INDEMNIFICATION INCLUSION OF COSTS

Each party hereunder agrees to indemnify the other against all losses, costs, expenses (including reasonable counsel fees) which may occur by reason of the breach of any term, provision, warranty or representation contained herein and/or in connection with the enforcement of this Agreement or any provision thereof.

## 13. ALL AMENDMENTS IN WRITING

No amendments to this Agreement shall be effective unless it is in writing and signed by duly authorized representative of all parties.

## 14. NON-SOLICITATION

Both Clients and Mindfire agree not to solicit employees or subcontractors from either party nor will solicitation be made to key business partners, suppliers, etc.

## 15. SEVERABILITY

If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to affect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

## 16. SUCCESSORS & ASSIGNS

This Agreement shall inure to the benefit of and be binding upon the Clients and Mindfire hereto and their respective permitted successors and permitted assigns. Mindfire shall not assign any of its rights or delegate any of its obligations under this Agreement to any person or entity without Dr. Farwell's and BWS' prior written consent, which may be given or withheld in Dr. Farwell's and BWS' sole discretion. Any purported assignment or delegation by Mindfire in violation of this Section shall be null and void and without any legal or binding effect.

## 17. HEADINGS

The headings of articles, sections, and subsections in this Agreement are included for convenience and reference only and do not affect the interpretation of this Agreement.

## 18. ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties with respect to the subject matter; all prior agreements, representations, statements, negotiations and undertakings are superseded hereby.

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates set forth first above, with full knowledge of its content and significance and intending to be legally bound by the terms hereof.

[Signature Page Immediately Follows]

DR. FARWELL                                    MINDFIRE

_____                _____
Authorized Signature                           Authorized Signature

Dr. Lawrence A. Farwell                         Shane Willard, CEO
_____                _____
Print Name                                     Print Name and Title


BRAINWAVE SCIENCE, INC.

_____
Authorized Signature

Paul F. Tomkins, In House Counsel
_____
Print Name and Title



# Attachment A

1. **RATE SCHEDULE**

   A.  $500 per hour: Dr. Stephen Beard or any other testifying witness affiliated with Mindfire.

   B.  $400 per hour: Any software engineer or project manager affiliated with Mindfire with more than 10 years' experience.

   C.  $275 per hour: Any software engineer or project manager affiliated with Mindfire with more than three but less than 10 years' experience.

   D.  $200 per hour: Any software engineer or project manager affiliated with Mindfire with less than three years' experience.

   E.  $150 per hour: Any time spent by non-engineer or non-project manager professionals associated with Mindfire.

A list of the individuals to be engaged by Mindfire in each of categories A – E is attached hereto as Attachment B.

2. **RETAINER**

BWS shall pay Mindfire an initial Retainer in the amount of $5,000.

3. **SCOPE OF WORK**

Mindfire to evaluate the defendants' software and determine whether it includes "confidential or proprietary information" of Brainwave Science, Inc. "Confidential or proprietary information" is defined as "any portion of the program Brainwave Science, Inc. originally submitted to Codequiry as its code," which shall constitute the code submitted by BWS to Mindfire, as per Preliminary Injunction in US District Court for the Eastern District of New York case 21-cv-4402.

Prior to conducting the code comparison, Mindfire will conduct a preliminary review of the code submitted by Dr. Farwell.  The purpose of this review is to ensure that the code submitted represents a functional code.  Mindfire will either (A) provide confirmation to Dr. Farwell and BWS that in Mindfire's professional evaluation the code represents a viable functional code that can be implemented in a workable format, and continue with the code comparison; or (B) provide confirmation to Dr. Farwell and BWS that in Mindfire's professional evaluation the code does not represent a viable functional code that can be implemented in a workable format, and cease further analysis.  As per the terms of the Confidentiality Agreement herein, Mindfire shall not provide any part of Dr. Farwell's code or any additional information whatsoever about Dr. Farwell's code to BWS.

Pursuant to the Court's Order, the code comparison is being conducted to confirm whether the code provided by Defendant Dr. Farwell contains any portion(s) of the code submitted by Plaintiff BWS.   If Mindfire finds any portion of the code provided by Defendant Farwell to contain any significant portion(s) of the code submitted by Plaintiff BWS, Mindfire will suspend its comparison and provide a report on same to Dr. Farwell and BWS.  Otherwise, Mindfire will complete its code comparison and submit a report on the same to Dr. Farwell and BWS.

Attachment B

## Mindfire Personnel

| Rate | Name | Qualifications |
|------|------|----------------|
| A $500 | Dr. Stephen Beard | |
| B $400 | | [# years with Mindfire; title/position; other qualifications] |
| B $400 | | |
| C $275 | | |
| C $275 | | |
| C $275 | | |
| D $200 | | |
| D $200 | | |
| D $200 | | |
| E $150 | | |
| E $150 | | |
| E $150 | | |

# Billing Information Form

| | |
|---|---|
| Business Name | Business Name |
| Project Name | Project Name |
| Project Number/Code | Project Number |
| Project Contact Name | Project Contact Name |
| Client Project Manager (if different) | Client Project Manager |
| Physical Street Address | Physical Street Address |
| Physical City | Physical City |
| Physical State | Physical State |
| Physical Zip | Physical Zip |
| Main Phone | Main Phone |
| Alternate Phone | Alternate Phone |
| Main Email | Main Email |
| Additional Email | Additional Email |
| Billing Point of Contact | Billing POC |
| Billing POC Main Phone | Billing POC Main Phone |
| Billing POC Alternate Phone | Billing POC Alternate Phone |
| Billing POC Email | Billing POC Email |
| Other | Other |

**Exhibit I-B**

Central Intelligence Agency
Director William J. Burns
Washington, DC 20505

March 29, 2022

Dear Director Burns:

My name is Dr. Lawrence A. Farwell. I am the inventor of Brain Fingerprinting.

I first worked for the CIA on contract No. 92-F138600-000 comprising research on using Farwell Brain Fingerprinting to detect concealed information stored in the brain for the purpose of investigating terrorism and other crimes.

I have met personally on a number of occasions with your predecessor, ███████████. He is also familiar with some of my more recent activities.

Former DIA Director and National Security Advisor Michael Flynn and I have also engaged in correspondence about the situation described herein and in particular about suspect Krishna Ika, as described below and in the attached FBI Report referenced below.

I have worked extensively in applying Farwell Brain Fingerprinting in counterterrorism operations with your counterparts in ██████ and elsewhere. I have trained ███████ intelligence agency personnel in Farwell Brain Fingerprinting. All of this work is classified. However, some unclassified reports have been released, without identifying information, on the following applications of Farwell Brain Fingerprinting in ███████████████:

- A hijacking wherein all of the hijackers were killed. One handler and one mastermind who planned and orchestrated the crime remained to be brought to justice. We developed a Brain Fingerprinting test to detect concealed information known only to the mastermind and to the handler (and to investigators).

- A mass shooting involving multiple victims and multiple shooters. Some of the shooters died at the scene, along with numerous victims. Some of the shooters were neither killed, captured, nor identified at the scene. The surviving shooters, along with the mastermind and handler, remained to be brought to justice. We developed a Brain Fingerprinting test to detect information known only to the surviving shooters, the mastermind, and the handler (and to investigators).

- A suicide bombing in which the suicide bomber died at the scene, along with multiple victims. A mastermind planned the attack and recruited the suicide bomber. A handler provided instructions, explosives, and logistical support for the suicide bomber. We developed a Brain Fingerprinting test to detect information known only to the mastermind and handler (and to investigators).

I have also worked extensively with the FBI Laboratory and published Brain Fingerprinting research with FBI forensic scientists Drew Richardson and Sharon Smith.

I have two purposes in writing this letter. I would like to bring to your attention a threat to national and global security that I have been dealing with in my interactions with authorities in Pakistan, South Africa, Thailand, Nigeria, and elsewhere.

Details are contained in the attached report I prepared for the FBI. I submitted the FBI Report to SAC Donald M. Voiret of the Seattle office on August 1, 2021, and submitted the attached

1

Supplement on March 29, 2022.  The FBI Report, Supplement, and all Exhibits can be downloaded from this link: https://www.dropbox.com/sh/29vhnwa7g3fjgvl/AAD-h6NmHlw9ePesIIQ9h5L0a?dl=0

The threat involves attempts by Krishna Ika and Paul Tomkins and co-conspirators to defraud government agencies regarding a scientific technology I invented that is playing a critical role in counterterrorism operations in Pakistan and elsewhere.  Authorities in Pakistan, South Africa, Thailand, and Nigeria have allegedly caught Krishna Ika attempting to defraud government agencies.  Details are in the FBI Report.

The implications for the CIA and international counterparts are summarized in the following section of the Supplement to the FBI Report.

### X. IMPLICATIONS FOR NATIONAL SECURITY

Fortunately, so far Ika, Tomkins, and their employees at BWS Inc. have totally failed in their efforts to defraud government agencies by misrepresenting themselves as skilled forensic scientists with the necessary training, credentials, expertise, and experience to effect a technology transfer of brainwave-based technology for detection of concealed information to a government agency and train agency personnel in the same, whereas they totally lack said training, credentials, expertise, and experience.

If Ika, Tomkins, and their co-conspirators every succeed in defrauding any government agency to engage them to effect a technology transfer of critical technology to detect concealed information regarding major terrorist crimes, and said agency actually goes through with the training from BWS Inc. –  by individuals who have never conducted a successful Brain Fingerprinting test either in the laboratory or the field, and are totally unqualified to conduct such a test, let alone train others to do so – the result will be a major disaster for national and global security.  To put it bluntly, if Ika, Tomkins, and their co-conspirators ever succeed in their scheme to defraud government agencies, the result will not only lead to a waste of money, a major miscarriage of justice, and a serious violation of human rights.  More importantly, the truth will not be detected or acted upon. It is not an exaggeration to say that if such a disaster occurs, it is highly likely that innocent people will be falsely imprisoned or executed, and terrorists will be provided false evidence of their innocence and freed to continue their terrorist crimes.

Former DIA Director and National Security Advisor Michael Flynn and I have corresponded about suspect Krishna Ika and his company, Brainwave Science, Inc. (BWS).  Ika falsely stated on the BWS website that General Flynn was a member of his board of directors, when in fact he never was.  Ika also falsely stated on his website that I was an employee of BWS, which I never was (although I was at one time an equity holder in BWS and allowed the company to copy some of my Brain Fingerprinting software before I discovered the criminal affiliations and crimes of Ika and others described in the attached FBI Report).

Both General Flynn and I received considerable bad press due to our respective (falsely) alleged involvements with Ika, as follows. Ika falsely claimed affiliation with a former DIA Director and National Security Advisor (Flynn) and a forensic scientist (myself) who had worked extensively with the CIA and the FBI and was well known to the public, having been featured extensively in the news media and selected by *TIME* magazine as one of the TIME 100 Top Innovators of the century, "the Picassos or Einsteins of the 21st Century."  Ika attempted to use these fake

2

affiliations to provide a veneer of legitimacy to a company that later turned out to be an alleged criminal enterprise in at least four countries, with two alleged international criminals, one already convicted.  I testified against Ika in a fraud case in Dubai, and he currently stands accused of fraud by authorities in South Africa, Pakistan, Nigeria, and Thailand. His partner Subu Kota, who was listed on the website as a board member and identified in correspondence as an officer, was convicted in the US of attempting to sell stolen high-technology secrets to a foreign government, essentially the same crime of which Ika now stands accused.  When these facts came to light, various news outlets – unfairly and incorrectly – besmirched General Flynn's reputation and mine on the basis of our alleged affiliation with a convicted felon and an alleged criminal enterprise run by Ika. Details are in the attached FBI Report, along with extensive additional evidence.

In the larger scheme of things, my reputation and General Flynn's are of little consequence, and that is not what this letter is about.  What is of major consequence is the threat to national and global security posed by Ika and his co-conspirators, as described in the attached FBI Report.

The second reason for this letter is that I am responding to a court order regarding the Brain Fingerprinting system now in use by the CIA that I designed and Westinghouse built and delivered.

Very briefly, the situation is as follows.   I invented Brain Fingerprinting in 1985 and patented it in 1994 and 1995.  I published it in the peer-reviewed scientific literature.  I applied it in solving real-world crimes.  My invention of Brain Fingerprinting and my testimony on it were ruled admissible as scientific evidence in court. (All of this is in the FBI Report and also on my website, [https://FarwellBrainFingerprinting.com](https://FarwellBrainFingerprinting.com) .)

In 2013 I engaged Krishna Ika and his software engineers in some software development based on the Farwell Brain Fingerprinting systems that I developed and have been using since 1985. We formed an LLC together for that purpose.  I parted company with Ika when (1) I discovered that he had an undisclosed silent partner, Subu Kota, who had pleaded guilty and been convicted of essentially the same crimes of which Ika now stands accused in four countries: attempting to sell stolen high-technology secrets to a foreign government, and (2) I was myself a witness to Ika committing several felonies (details are in the FBI Report).

In 2019, as the inventor and world's leading expert in Brain Fingerprinting, I testified against Ika in a fraud case in Dubai that involved several foreign and domestic jurisdictions. I am also almost certain to be a witness against Ika when and if he is brought to justice in any of the above countries where he currently stands accused.

Ika retaliated by filing six blatantly frivolous lawsuits against me and my colleagues in venues designed to be as expensive and inconvenient as possible for me.  Three have been dismissed, one is with a third party and will likely be dismissed shortly, and two remain.

In a civil case in US District Court for the Eastern District of New York (21-cv-4402), the following events transpired.  I provided Ika's company Brainwave Science LLC / Inc. (BWS) with detailed specifications for software to implement Farwell Brain Fingerprinting, all of which I had previously released to the public domain.  These are the same precise specifications that I provided in the design of the Brain Fingerprinting system now at the CIA. Dr. Thierry Maison, BWS' CTO at the time, implemented my public-domain specifications in the BWS Software, using open-source development tools.  The BWS Software was released to a public domain

source at 6:15 PM on 9/10/2017 from IP address 65.52.55.39 in Chicago, using the credentials of Ika's employee Karuna Raja, who was in Southborough, MA at the time.

Dr. Maison later downloaded this software – which he had originally written – deleted the part that was specific to the BWS brainwave headset (the only part that might possibly be considered to be proprietary), and modified the code to develop an application (the "Maison-Farwell Software") that Dr. Maison and I have been using in conducting Brain Fingerprinting tests. Ika obtained the Maison-Farwell Software from Dr. Maison. His engineers then modified the BWS Software to be as similar as possible to the Maison-Farwell Software, generating the "Modified BWS Software." Ika he submitted the two to a Codequiry similarity checker test. Not surprisingly, the two were found to be highly similar.

Ika represented that the BWS Modified Software, which had been modified to appear as similar as possible to the Maison-Farwell software after BWS obtained the same from Maison – was the unmodified BWS Software that was uploaded to a public source on the internet and downloaded by Dr. Maison. In other words, the software comparison Ika used to attempt to show that Dr. Maison misappropriated BWS's software was faked and fraudulent.

Ika's company then used the fraudulent comparison test results to filed a lawsuit against me, Dr. Maison – the individual other than myself best positioned and qualified to testify against Ika in criminal proceedings in Pakistan, South Africa, Nigeria, and Thailand – and others.

Ika committed perjury in an affidavit and a hearing by stating that none of the BWS Software was open source, whereas virtually all of it was. He committed further perjury by stating that BWS had introduced seven specific technical innovations constituting "trade secrets," whereas in fact all of those were features that I had developed between 1985 and 2007, implemented in previous versions of the Brain Fingerprinting software – including the system now at the CIA – and released to the public domain in my patents and scientific publications. Ika also committed perjury when he stated that BWS had made sure that the BWS Software was not released to any public-domain source. Ika's attorney Paul Tomkins also lied to the judge in stating that BWS had sold their brainwave systems to multiple clients, each buying multiple systems, and each system costing $400,000, whereas in fact BWS has never sold any of their systems to any government agency, and if they did to it would constitute fraud.

The claim of the lawsuit was that my invention had somehow become "trade secrets" of BWS, and Dr. Maison and I had stolen my invention from BWS. In fact, virtually all of the BWS software was public domain material provided by me and implemented by Dr. Maison using open-source software tools, and in any case all of the BWS Software that Dr. Maison used was in the public domain because it was downloaded from a public-domain source online.

Taking into account the possibility, however remote, that Ika might not have been committing perjury when he claimed that none of the BWS Modified Software was public domain and that the innovations that I included in my previous scientific papers, patents, and previous software – including the CIA system – were developed by BWS in 2014 – 2017, the judge issued a preliminary injunction stating that any software that included any part of the BWS Modified Code that BWS has submitted to Codequiry was subject to "recall or replacement."

Since about 85% of the code in the CIA system implements the same identical scientific protocols, analysis methods, parameters, mathematics, statistics, algorithms, timing, and

everything else of substance as the BWS Modified Code, this means that the CIA Brain Fingerprinting system is now subject to the "recall or replace" order.

Therefore, a second purpose of this letter is to comply with the court order requiring me to inform you (along with all others in possession of Farwell Brain Fingerprinting systems) that the CIA Brain Fingerprinting system is subject to a "replace or recall" order. Of course, the order only affects me, as a party to the lawsuit, and the CIA has no obligation to comply or even respond to it.

If this occurs to you as beyond absurd and into the range of surreal, you are not alone. However, I suggest that we treat the judge with a level of respect and understanding. He has not yet been exposed to the actual facts regarding the software, the science, the intellectual property, and the technology. He is also unaware of the relevant history, and as of yet has no idea whom he is dealing with on either side of the case. In that light, the preliminary injunction may generously be looked upon and simply prudent. Once the facts come to light, the Court will be free to rule otherwise, and will inevitably do so.

Perhaps it is fortunate that this situation has come along at this particular time. It is important that the CIA be aware of the implications for national security of the crimes of which Ika and Tomkins currently stand accused in Pakistan, South Africa, Thailand, Nigeria, and elsewhere. If you have not already heard of this from your counterparts in Pakistan, you may want to communicate with them about the same. I have met extensively and personally with the relevant top-level leaders, and worked extensively over a period of years with their personnel.

I have also sent a copy of this letter to FBI Director Christopher A. Wray, as a courtesy since I have referenced the FBI Report and the Supplement thereto.

I will be happy to meet with you or your representatives and to provide any additional information you request.

Sincerely,

Dr. Lawrence A. Farwell, PhD

brainwave@larryfarwell.com
https://farwellbrainfingerprinting.com
28375 Sandy Beach Lane NE
PO Box 547
Kingston, WA 98346
phone +1 (206) 905-1009
mobile +1 (206) 250-5516

**Exhibit I-C**



# Supplement #1 to

## United States Federal Bureau of Investigation (FBI) Report

### Re: Investigation of

### Suspects Krishna Ika and Paul Tomkins

### Regarding

### Racketeer Influenced and Corrupt Organizations (RICO) Act

### Original FBI Report: July 19, 2021

### Supplement: March 27, 2022

*This supplement presumes knowledge and understanding of the facts presented in the original July 19, 2021 FBI Report, which is attached hereto.*

*This Supplement refers to Exhibits A – AV incorporated in the original FBI Report as well as additional Exhibit AW.*

Summary of Evidence Submitted by:

**Dr. Lawrence A. Farwell**

https://farwellbrainfingerprinting.com

Email: brainwave@larryfarwell.com

8825 34th Ave NE, Suite L155

Quil Ceda Village, WA 98271

Phone: (+1)  206-905-1009

Mobile: (+1) 206-250-5516

This Supplement, the original FBI Report, and all Exhibits can be downloaded from this link:

https://www.dropbox.com/sh/29vhnwa7g3fjgvl/AAD-h6NmHlw9ePesIIQ9h5L0a?dl=0

## I.      SCOPE OF THIS SUPPLEMENT

The racketeering scheme and pattern of other associated crimes allegedly perpetrated by suspects Krishna Ika ("Ika") and Paul Tomkins ("Tomkins") that were described in the original FBI Report have continued to the present day. This Supplement presents the facts regarding developments since the issuance of the original FBI Report.

## II.      BRIEF HISTORY PRIOR TO THE ORIGINAL FBI REPORT (7/19/21)

**Chronology of Events Regarding Dr. Lawrence Farwell's Invention of Brain Fingerprinting and Subsequent Software Development**

1985. Dr. Lawrence Farwell invented Farwell Brain Fingerprinting comprising applying the P300 brain response in the detection of concealed information. The science and technology embodied therein, comprising the scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed, shall be referred to herein as "Farwell Brain Fingerprinting Information."

1986, 1998, 1991. Dr. Farwell and colleagues published scientific papers on Farwell Brain Fingerprinting Information, disclosing the scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed, and entering the same into the public domain.

1992.   Dr. Farwell provided the Brain Fingerprinting Information scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed, along with his source code, to the FBI, the CIA, and Westinghouse Electric Corporation (on a contract with the CIA).

1990, 1994, 1995. Dr. Farwell patented his Brain Fingerprinting invention, including the Farwell Brain Fingerprinting Information, scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed. The patents have now expired, thus once again releasing the Farwell Brain Fingerprinting Information to the public domain.

1997. Dr. Farwell provided the Farwell Brain Fingerprinting Information, including source code, to professor William Iacono for research purposes, and Dr. Iacono published the same in a public-domain scientific journal.

2013. Dr. Farwell provided the public-domain Farwell Brain Fingerprinting Information to Brainwave Science, LLC (BWS LLC). Dr. Farwell and Ika formed BWS LLC with Ika's company owning 51% and Dr. Farwell and his company owning 49%. Dr. Farwell engaged BWS LLC to assist with software development and international marketing of his invention.[i] Dr. Farwell was an owner of BWS LLC. He was never an employee of BWS LLC and did not have an employment or non-disclosure agreement.

2013. Dr. Farwell wrote the detailed specifications for the Farwell Brain Fingerprinting software to be coded by BWS LLC (and later BWS Inc.), and provided his source code for the same.

2014 – 2017. Dr. Thierry Maison coded the BWS software ("BWS Software") implementing the detailed specifications provided by Dr. Farwell.

Other events from 2017 – 2021 are as documented in the original FBI Report.

### III.   THE BWS SOFTWARE

In the BWS Software, all of the scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed comprised public-domain information provided by Dr. Farwell.

Dr. Maison implemented the BWS Software, the same through multiple public-domain software tools, as follows:

How the BWS Software was written with free and open-source software.

1) The Software components are written in Microsoft C# programing language.  C# (pronounced See-Sharp) is a popular and modern programming language created by Microsoft in 2000 alongside their .NET framework. They wanted a more flexible language to build a variety of secure and robust modern applications for Windows, web servers, tablets, and phones. It is now arguably one of the most valuable programming languages in the world to know. C# is an open-source programming language.
https://dotnet.microsoft.com/languages/csharp

2) Aside from the language itself, the building blocks of the application use the Microsoft .NET framework (pronounced as "dot net").  .NET framework is a free software developer open-source platform for building software applications.
https://dotnet.microsoft.com/

3) The software application uses two different Graphical User Interface (GUI).  The GUI is what dictates how the application will look on the computer screen.
We use Microsoft WinForms and Microsoft Windows Presentation Framework (WPF) both in the public domain and open software.
https://en.wikipedia.org/wiki/Windows_Forms
https://github.com/dotnet/wpf

4) To facilitate and speed up the development we used additional software components to create graphs and display data in tables.  The Graphical display software (Interactive Data Display created by Dmitry Voitsekhovskiy and Mikhail.) is open software and freely downloadable on the GitHub repository.
https://www.microsoft.com/en-us/research/project/interactive-data-display/
https://github.com/predictionmachines/InteractiveDataDisplay and
https://github.com/microsoft/InteractiveDataDisplay.WPF

5) The data table package is based on the Extended DataGrid open source project as mentioned in https://www.findbestopensource.com/tagged/datagrid?fq=Ms-PL
the project was so successful that it's now incorporated into Microsoft's open-source framework.
https://github.com/dotnet/DataGridExtensions

6) The internal data format for storing data uses the eXtended Markup Language (XML) as denied in open standard
https://www.w3.org/XML/
https://en.wikipedia.org/wiki/XML

3

7) Microsoft provides free of charge the necessary tools to create software for Windows or other platforms.  We used Microsoft Visual Studio.
https://visualstudio.microsoft.com/vs/community/

## IV.  THE MAISON-FARWELL SOFTWARE

Dr. Maison and Dr. Farwell worked together to develop a new implementation of Farwell Brain Fingerprinting.

Dr. Maison had written the BWS Software while CTO of BWS Inc. When beginning development of the new version for application in collaboration with Dr. Farwell, Dr. Maison sought a public-domain source to form the basis for his new code.  Through an extensive search, he found the BWS Software in a public-domain source online.  This apparently came about because someone who was working on the software asked for help in an online forum, and uploaded the software so others could collaborate.  This is a common practice in software development.  Dr. Maison has documented the events where BWS Inc. uploaded the BWS Software to a public source, or allowed it to be uploaded.

The BWS Software included one portion – and only one portion – that might be construed as proprietary.  That is the section that communicated with the headset.  This is because BWS Inc. uses a different headset from other implementations of Farwell Brain Fingerprinting, so the software communicating with the headset must be different.  Everything else in the BWS Software that Dr. Maison downloaded from a public source online comprised the implementation Dr. Maison had made of the public-domain scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed provided by Dr. Farwell, implemented through open-source tools as described above.

Dr. Maison removed the part of the BWS Software that communicated with the Taiwan-made headset used by BWS Inc., and substituted code that communicated with a custom headset designed by Dr. Farwell and manufactured in the US.  He also made various other improvements to the code, some related to the superior features of the Farwell-Maison headset, and others related to other methods for improving the performance of the system.

## V.  AUTHORITIES IN FOUR COUNTRIES ACCUSE IKA AND BWS OF FRAUD

For half a dozen years, Ika attempted to market "Brain Fingerprinting."  However, no government agency hired him and his employees to effect a technology transfer of the science to the agency, train them to apply the science, and provide the necessary technology, because it was obvious to everyone in the field that Ika and his employees lacked that capability.  Still today, Ika and BWS Inc. have never successfully sold and implemented their system in any government agency.

Authorities in South Africa, Pakistan, Nigeria, and Thailand allegedly caught Ika attempting to defraud their agencies into engaging Ika and his employees to implement a technology transfer of Farwell Brain Fingerprinting to their agency, when neither Ika nor his employees had the necessary expertise, training, credentials to do so. For example, a General and former agency head in South Africa stated, in a sworn affidavit, that, when the General asked Ika to provide information regarding the acceptance in court that Ika, BWS LLC, and/or BWS Inc claimed that Ika Parties' Counterfeit Product (the BWS Software) had achieved, the only references Ika Parties Ika, BWS LLC, and/or BWS Inc provided were to court cases in which Dr. Lawrence

4

Farwell and his genuine Brain Fingerprinting science were involved, cases that predated the existence of BWS LLC and BWS Inc. and had nothing to do with Ika, BWS LLC, BWS Inc, and Ika Parties' Counterfeit Product (Exhibit AR).

Similarly, authorities in Thailand allegedly caught Ika attempting to defraud them by purporting to conduct Brain Fingerprinting brainwave testing and analysis, but instead displaying a graphics file with a picture of brainwave results, without actually conducting any actual brainwave testing. As expert Jose Kuruvilla stated, "When people are lying I don't need a lie detector. I told my people we will not do business with [Ika and BWS Inc]." (This is documented in Exhibit AT.)

Ika reportedly engaged in similar fraudulent activities in ███████, as detailed in the original FBI Report, as follows.

According to Brain Fingerprinting expert ███████ sworn affidavit ███████, he witnessed an attempt by Ika Parties Ika, BWS LLC, and/or BWS Inc to defraud an intelligence agency of the ███████ government on or about April 15, 2019.

According to ███, Ika Parties Ika, BWS LLC, and/or BWS Inc through their representative attempted to sell said agency their counterfeit product, fraudulently represented that their product was the same as Dr. Farwell's Brain Fingerprinting, and fraudulently represented that they and their employees were qualified to practice forensic neuroscience, specifically Brain Fingerprinting, and to train others to do so.

According to ███, Ika Parties Ika, BWS LLC, and/or BWS Inc' representative, on instructions from Ika Parties Ika, BWS LLC, and/or BWS Inc, falsely represented to the ███████ government that BWS represented Dr. Lawrence Farwell and his Brain Fingerprinting technology, whereas in fact Dr. Farwell has no relationship with BWS, and they do not have his Brain Fingerprinting technology.

According to Brain Fingerprinting expert ███ any attempt to apply Ika Parties' Counterfeit Product (the BWS Software) in law enforcement, counterterrorism, or intelligence operations would have "disastrous consequences." In his affidavit ███████ stated the following: "My experience in applying the genuine Farwell Brain Fingerprinting in collaboration with Dr. Farwell and agencies of ███ leads me to the conclusion that if Ika and BWS ever succeeded in selling their counterfeit technology and training by unqualified personnel to any major intelligence, counterterrorism, or law enforcement agency; this would be a major threat to national security and justice. There is no evidence that BWS' and Ika's counterfeit technology works at all, let alone with high accuracy. Their 'trainers' are not qualified to practice forensic neuroscience, specifically Brain Fingerprinting, let alone to train others to do so. Applying such an unproven and untested technology, and attempting to apply training by such unqualified personnel, would in my opinion be likely to have disastrous consequences for counterterrorism, counterintelligence, and law enforcement efforts."

## VI. FRAUD LEADING TO THE RENAMING AND REBRANDING OF THE BWS SOFTWARE

In response to events reviewed very briefly herein and described in detail in the original FBI Report, Ika, Tomkins, and BWS Inc. changed the name of the BWS Software and the representations on the BWS Inc. website. In the first few years, Ika had been attempting to market "Brain Fingerprinting" expertise and technology, and the website touted the connection with the

inventor of Brain Fingerprinting, Dr. Farwell, and the various achievements of Farwell Brain Fingerprinting – Dr. Farwell's publications in the scientific journals verifying the accuracy and reliability of Farwell Brain Fingerprinting, Dr. Farwell's applications of his invention at the FBI, the CIA, and the US Navy, etc.  Later, when Dr. Farwell parted company with BWS Inc., they removed all reference to Dr. Farwell, but retained the references to Dr. Farwell's invention of Brain Fingerprinting, including the name "Brain Fingerprinting."

When it became clear that any attempt by Ika and BWS Inc. to market "Brain Fingerprinting" science and technology would be quickly exposed as fraudulent, and after half a dozen years of attempting to defraud intelligence and law enforcement agencies into paying them for "Brain Fingerprinting," Ika and BWS Inc. changed the name of their software to "iCognative," (sic) without adding any functionality or features to the software.  Thus, "BWS Software" and "iCognative" have now become synonymous and are used interchangeably.

## VII.   DR. FARWELL AND DR. MAISON AS WITNESSES AGAINST IKA AND BWS IN PAST AND FUTURE FRAUD CASES

As described in detail in the original FBI Report, Dr. Farwell, in his role as the inventor and world's leading expert in Brain Fingerprinting, testified against Ika and BWS in a fraud case in Dubai that spread to multiple jurisdictions.  Dr. Farwell will almost certainly be a primary witness in all future cases arising from the accusations of fraud by Ika relating to Brain Fingerprinting, when and if Ika is brought to justice in Pakistan, South Africa, Thailand, or Nigeria, where he currently stands accused, or elsewhere.

As the former CTO of BWS LLC with extensive knowledge of the inner workings of the software and technology and the company, Dr. Maison is also a very likely witness any future cases arising out of the present accusations or future accusations.

Ika demanded that Dr. Farwell change his sworn testimony in the Dubai case.  As described in the original FBI Report, when Dr. Farwell refused, Ika retaliated by filing a barrage of six frivolous lawsuits in various jurisdictions designed to be as inconvenient and expensive as possible for Dr. Farwell and others involved with Farwell Brain Fingerprinting.  Three lawsuits have been dismissed.  A fourth is against third parties who were owners of the Brain Fingerprinting patents, and will almost certainly be dismissed shortly.

In 2021, Ika, Tomkins, and BWS Inc. filed the sixth lawsuit, as described below. The events of this Supplement in conjunction with this lawsuit took place after the original FBI Report had been completed.

Ika's and Tomkins' filing multiple lawsuits against the past and potential future witnesses against Ika in fraud trials, taken in conjunction with the multiple crimes described in the original FBI Report, reveal a pattern of attempts to eliminate the obstacles to their RICO scheme by intimidating, coercing, discrediting, retaliating against, and exhausting the resources of witnesses who are in the best position to testify and thereby contribute to the efforts of authorities to bring Ika to justice for fraud in at least four countries.

## VIII.   THE BWS LAWSUIT - BWS VS FARWELL, MAISON, AND OTHERS

In 2021, Ika, Tomkins, and BWS filed a lawsuit against Farwell, Maison, and others (Brainwave Science, Inc. v. Arshee, Inc. Dr. Lawrence A. Farwell, Dr. Thierry Maison, and Brain Fingerprinting Foundation, US District Court, Eastern District of New York, Civil Action No.: 21-cv-4402 [BMC-RLM]) claiming that the Farwell-Maison Software incorporated BWS Inc.'s

proprietary information and trade secrets and that Dr. Farwell's and Dr. Maison's actions damaged BWS Inc.'s business interests.

We shall not discuss the merits of that civil case here. This Supplement will focus solely on crimes committed by Ika and Tomkins in pursuing said lawsuit.

## IX.   CRIMES COMMITTED BY IKA AND TOMKINS SINCE THE ORIGINAL FBI REPORT

**Ika committed perjury in his affidavit in said lawsuit, and Tomkins, who wrote Ika's affidavit, suborned perjury, as follows.**

Ika's Affidavit (Exhibit AW) made the following demonstrably false statements:

10.   The challenge in developing and marketing any P300 based system lies not within the concept of P300 measurement itself but in creating a system which, among other things,

a) prompts testing personnel for appropriate stimuli;

b) displays stimuli to testing subjects in optimal order and at optimal intervals;

c) captures appropriate P300 brainwave responses;

d) disregards and/or eliminates extraneous responses ("noise") which may produce false positive or false negative results;

e) detects and disregards any attempted countermeasures by suspects or others involved in conducting testing;

f) performs appropriate analysis of P300 measured responses utilizing statistical and machine learning algorithms and Artificial Intelligence;

g) generates unbiased reports for use by examiners, investigating agencies and legal authorities.

11.   Brainwave [BWS Inc.] has expended substantial time and resources to address the afore-referenced challenges by developing proprietary software code, user interfaces, algorithms and hardware ("Brainwave Trade Secrets") to create a system that is accurate, scalable and more-readily utilized by field investigators without extensive scientific training.

Contrary to Ika's false statement, all of (a) – (g) were contained in the software design that Dr. Farwell provided and Dr. Maison implemented. Since Dr. Farwell provided detailed specifications for every part of the software, and Dr. Maison implemented it, they are familiar with every line of code in the BWS Software. Below is a brief account of where Dr. Farwell and his colleagues had already placed every part of (a) – (g) in the public domain before BWS Inc. existed. There is absolutely nothing in the BWS Software that was not already fully implemented by Dr. Farwell and others before BWS Inc. existed, and placed in the public domain, and then provided to BWS Inc., with the sole exception of the specific part of the code that communicated with the headset. The part of the code that communicates with the headset is not mentioned in (a) – (g).

In a later, more detailed Supplement, we will specify every single line of code in the BWS Software, and provide details of exactly where the scientific protocols, experimental design,

algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed therein, and everything of substance in the BWS Software were previously placed in the public domain by Dr. Farwell and others (except the section of code for communication with the headset, since BWS Inc. used a different headset).

The following is a brief description of where in the public domain all of the scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed in the BWS Software were in the public domain prior to the time that Dr. Farwell provided the same to BWS Inc. and Dr. Maison implemented the same.

a) "prompts testing personnel for appropriate stimuli;"  -- In the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AM, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.

b) "displays stimuli to testing subjects in optimal order and at optimal intervals;" In the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AM, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.

c) "captures appropriate P300 brainwave responses;" In the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AM, AN, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.

d) "disregards and/or eliminates extraneous responses ("noise") which may produce false positive or false negative results;" In the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777, and also in previous publications on digital filtering by Dr. Farwell and colleagues.

e) "detects and disregards any attempted countermeasures by suspects or others involved in conducting testing;" In the public domain in AG, AH, AI, AL, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.

f) "performs appropriate analysis of P300 measured responses utilizing statistical and machine learning algorithms and Artificial Intelligence;"  -- Everything that is included in the BWS Software that analysis of P300 measured responses, and everything that involved mathematics and statistics is in the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.  Dr. Farwell and Dr. Maison are experts in machine learning and AI, but did not include machine learning algorithms and AI in the BWS Software, and no machine learning and AI were in the software that Dr. Maison downloaded from the internet that formed the basis for the Maison-Farwell Software.

g) "generates unbiased reports for use by examiners, investigating agencies and legal authorities." – In the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AM, AN, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.

Ika's affidavit contains numerous other demonstrably false statements that have been addressed in the original FBI report.  These will not be further discussed here.

**In a hearing on November 30, 2021 in the referenced case, Ika lied under oath.**

In the above referenced hearing on November 30, 2021 in the present case, Krishna Ika ("Ika") lied under oath. When asked both by our attorney Joseph Carbonaro and by Judge Cogan whether BWS Inc. system included any open-source or public domain components, Ika repeatedly answered "No." There are dozens if not hundreds of instances in the software proving that Ika's statement is unequivocally and demonstrably false.

With respect to the scientific protocols, algorithms, mathematics, statistics, and every aspect of the procedures for conducting a Brain Fingerprinting test, everything in the BWS software was derived from information Dr. Farwell provided to BWS. This is and was in the public domain due to my colleagues and myself having implemented all of the above in software in several iterations, beginning in 1986 when Dr. Farwell first invented the system, and including software that Dr. Farwell shared with many others over the years. This includes colleagues including William Iacono at the University of Minnesota, my colleagues at the University of Illinois and Harvard, the FBI, the CIA, the US Navy, and many others. All of above were also disclosed in patents wherein I am the inventor that have now expired. All of the above were also disclosed in scientific publications by myself and colleagues on our research at the FBI, the CIA, the US Navy, and elsewhere. All of this is documented in In the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AM, AN, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.

The above features were implemented using several open-source and public-domain software packages, as explained above.

**In the same hearing referenced above, Tomkins lied to the judge.**

**Mr. Tomkins stated that his client had sold iCognative (BWS Software) systems for a cost of about $400,000 per license, and each sale included several licenses, and that more than one such sale had taken place.**

**All parts of that statement are entirely false.**

Mr. Tomkins knows his statement is false, and knew it at the time.

Brainwave Science, Inc. has never sold a license for an iCognative system (or any other brainwave system) for $400,000 (or anything remotely approaching that figure). They have not sold multiple licenses to the same customer for that price, or for any price. They have not made similar sales to multiple customers.

To my knowledge, Brainwave Science, Inc. has never sold any of their iCognative systems to anyone. As the inventor and world's leading expert in Brain Fingerprinting and the individual who has successfully implemented Brain Fingerprinting at the FBI, the CIA, the US Navy, and in national counterterrorism and law enforcement agencies around the world, I am in a position to know. BWS Inc. has supplied some of their brainwave systems to a few potential clients for the purposes of demonstration, but nothing remotely resembling what Mr. Tomkins claimed has ever occurred.

Mr. Tomkins' false statement is material to the case at hand. He made the statement in answer to the only question the judge asked during the hearing. The hearing was about (false) allegations by Mr. Tomkins' client that the Defendants (including myself) had misappropriated his client's trade secrets embodied in the brainwave systems specified in Mr. Tomkins' false statement, and thereby

cost his clients potential sales and money.  The amount of money accruing from sales was an important part of the judge's deliberations regarding alleged damages.

In reality, Mr. Tomkins' client's entire brainwave system was a copy of a system that I invented, patented, and developed, and had been using since the 1980s.  In particular, I provided Mr. Tomkins' client with all the details of a system I developed in 2007. I provided his client with all the algorithms, experimental protocols, specifications, methods, and everything they needed to build the system to imitate what my original system accomplished.  The central contention of this lawsuit is equivalent to some businessman with zero knowledge, expertise, experience, credentials, education, or aptitude in aeronautics or airplanes accusing the Wright brothers of stealing the intellectual property of the airplane from him. I would have no imaginable reason for misappropriating Mr. Tomkins' client's untested and unproven system, when I had a brainwave system of my own that I had developed, published in the scientific journals, tested and proven at the FBI, the CIA, and the US Navy, and successfully applied in the field, a system that had been ruled admissible as scientific evidence in court.  Brainwave's system has achieved none of these.

The following relevant facts currently stand as undisputed.  Mr. Tomkins has had multiple opportunities to dispute these facts, and never has done so.  His response to being confronted with the facts has consistently been to obfuscate and attempt to redirect and change the subject, citing other, irrelevant or marginally relevant facts (and in some cases lies).

I.   Regarding Dr. Lawrence Farwell:

  a.   Dr. Farwell is a Harvard graduate with a PhD in biological psychology and a former research associate at Harvard Medical School.

  b.   Dr. Farwell is the inventor of Brain Fingerprinting, as per the Patents and peer-reviewed publications cited below.  Dr. Farwell has published extensively on Brain Fingerprinting in leading peer-reviewed scientific journals.

  c.   Dr. Farwell was selected by *TIME* magazine as one of the top innovators this century, "the Picassos or Einsteins of the 21st Century."

  d.   Dr. Farwell has conducted Brain Fingerprinting research at the FBI, the CIA, and the US Navy and published the results in peer-reviewed scientific journals.

  e.   Dr. Farwell has successfully applied Brain Fingerprinting science in real-world criminal cases.

  f.   The science and technology of Brain Fingerprinting that Dr. Farwell invented and developed and his expert testimony on it have been ruled admissible in court.

  g.   Dr. Farwell has successfully practiced his profession as a forensic neuroscientist, and specifically as the world's leading expert in the Brain Fingerprinting science and technology that he invented, for over 25 years.

II.   Regarding the BWS system: Unlike the genuine Farwell Brain Fingerprinting that Dr. Farwell has developed and implemented in the US and throughout the world, the BWS product that Mr. Tomkins, Brainwave Science, LLC, Brainwave Science, Inc., and Ika have been attempting to market, the BWS system:

a. Has not been shown to be an effective implementation of the Brain Fingerprinting scientific technology that was invented by Harvard-trained neuroscientist Dr. Farwell, who was selected by TIME magazine as one of the top innovators this century, "the Picassos or Einsteins of the 21st Century."

b. Has not been shown to meet the 20 Brain Fingerprinting Scientific Standards that Dr. Farwell has published and that are met by Dr. Farwell's versions of the technology. There is no evidence anywhere that the counterfeit product and faux training by unqualified individuals that BWS Inc. is offering meet these standards.

c. Has not been tested and proven at the CIA, the FBI, and the US Navy.

d. Has never been applied in real-world criminal cases, including serial killer JB Grinder and innocent murder convict Terry Harrington.

e. Has not been proven over 99% accurate in research at the FBI, the CIA, the US Navy, and elsewhere published in the top peer-reviewed scientific journals. There is no evidence anywhere that what BWS Inc is offering has achieved such accuracy in scientific studies or field applications.

f. Has never achieved 99% accuracy, or any other proven level of accuracy, in any published research, forensic applications, field applications, or in any other context.

g. Has not been featured in major national and international news media, including CBS Evening News, ABC World News, CNN, PBS, BBC, CBS 60 Minutes, ABC Good Morning America, the Discovery Channel, The New York Times, The Washington Post, TIME Magazine, and US News and World Report.

h. Has not been proven to be capable of detecting bomb makers, criminals, and terrorists, in peer-reviewed publications.

i. Lacks the qualities and achievements of the genuine Brain Fingerprinting invented and developed by Dr. Farwell, as listed herein and in the Exhibits.

j. Has produced no evidence that the unproven technology BWS Inc is offering achieves the same accuracy, reliability, or validity of the genuine Brain Fingerprinting practiced by Dr. Farwell and other competent, trained, and credentialed scientists.

III. Regarding Mr. Ika and the BWS employees: Neither Mr. Ika nor anyone else one employed by Brainwave Science, LLC, Brainwave Science, Inc.:

a. Has ever been trained in Brain Fingerprinting by a qualified Brain Fingerprinting expert such as Dr. Lawrence Farwell or FBI forensic scientist Dr. Drew Richardson;

b. Has ever conducted or published Brain Fingerprinting research;

c. Has ever successfully applied Brain Fingerprinting in real-world cases;

d. Has ever conducted Brain Fingerprinting research for the FBI, the CIA, or the US Navy;

e. Is qualified to conduct a scientific Brain Fingerprinting test that meets the Brain Fingerprinting Scientific Standards; or

> f.  Has been featured in any of the major news sources mentioned above that
>     have featured Dr. Farwell and his genuine Brain Fingerprinting invention.

Mr. Tomkins' lie to the judge in the hearing described above was not an isolated, accidental, or random incident.  It was a carefully planned, strategic deception.  In Mr. Ika's affidavit, Mr. Ika's touting of  BWS Inc.'s success in the marketplace was confined to this:  "[unnamed and unspecified] Agencies and educational institutions within several countries have successfully conducted testing and validation studies on our system."  It is not an accident that Mr. Ika did not claim that BWS Inc. had sold its system to multiple customers, each one of which purchased multiple systems for $400,000 each, as Tomkins did.  Such a statement, in writing in an affidavit, would have inevitably been proven false, and Mr. Ika would have unquestionably committed perjury. (Mr. Ika made several other demonstrably and unequivocally false statements in his affidavit. These I will address elsewhere and will not discuss here, except for one, which is discussed immediately below.)  Tomkins strategically told his substantive and material lie in a situation where it would be heard and relied upon by the judge, and yet he was not under oath, and it was not in writing.

Two instances of perjury by an individual and one lie to a judge by his attorney and co-conspirator, taken alone, might not be considered to be of major importance.  However, these lies were a strategic part of the RICO conspiracy described in the original FBI Report wherein Ika, Tomkins, and their co-conspirators have attempted, and continue to attempt, to defraud government agencies by misrepresenting themselves as skilled forensic scientists with the necessary training, credentials, expertise, and experience to effect a technology transfer of brainwave-based technology for detection of concealed information to a government agency and train agency personnel in the same, whereas they totally lack said training, credentials, expertise, and experience.

**Virtually everything of substance regarding brainwave technology, the achievements of BWS Inc., and endorsements of others on the BWS Inc. website is false and fraudulent.**

Another aspect of this conspiracy to commit fraud is the BWS Inc. website.  The original FBI Report documented multiple instances where the BWS Inc. website presented false and fraudulent information in the past. Ika and BWS Inc. have now updated their website, and it now contains an entire new set of false and fraudulent information.

Everything, or virtually everything, of substance on the BWS website with respect to the science and technology that Ika and BWS Inc. purport to be offering is false and fraudulent.  The following are some of the most salient examples.

**As of March 28, 2022, the BWS website has three purported "Testimonials.". All three are totally false, fabricated, and fraudulent.**

At this link on the Brainwave Science, Inc. website https://brainwavescience.com/testimonial/, the statement is as follows.

---

**Testimonials**



**Dr Adel Al Eid (Former Brig. Gen at National Information in Ministry of Interior, Saudi Arabia)**

"iCognative empowers investigators to accurately measure information hidden in a suspect's brain, leading accurately to the terrorists who schemed, contributed or carried

> out any act of terrorism or a criminal offence even before it happens. This technique enables counter terrorism officials to scientifically test suspected terrorists and to indict or exonerate them based on the information stored in their brains, even if a suspect has participated in a sleeper cell."

Dr. Adel Al Eid never made that statement, or any statement remotely similar to that statement, or any statement that might be construed as an endorsement of iCognative or Brainwave Science, Inc., or any statement at all that mentioned iCognative or Brainwave Science, Inc.

Dr. Al Eid is a long-time colleague and friend of the inventor of Brain Fingerprinting, Dr. Lawrence A. Farwell, with whom Dr. Farwell been working for years on implementing the genuine Farwell Brain Fingerprinting in Saudi Arabia. In addition to being a professional colleague, he is a personal friend of Dr. Farwell. He has entertained Dr. Farwell at his home in Riyadh, a rare honor in that closed, formal society.

He holds the rank of General as well as a PhD-level expert in biotechnology. He is a rare combination of a highly decorated General and a renowned scientist and technologist.

Dr. Farwell has spoken with him personally about the above quotation, and he has stated that he never did and never would make such a statement.

Dr. Al Eid has the necessary expertise in both biotechnology and counterterrorism to recognize the fact that the genuine Farwell Brain Fingerprinting is an effective and proven scientific technology, an iCognative is not.

Dr. Al Eid has spoken publicly on television and in other outlets about the value of Farwell Brain Fingerprinting  (not iCognative) for law enforcement and counterterrorism in Saudi Arabia.  The following are two examples:

https://twitter.com/yahalashow/status/1345424174274256898?s=24

https://aawsat.com/home/article/2662816/%C2%AB%D8%A8%D8%B5%D9%85%D8%A9-%D8%A7%D9%84%D8%AF%D9%85%D8%A7%D8%BA%C2%BB-%D8%AF%D9%82%D9%91%D8%A9-%D9%81%D9%8A-%D8%A5%D8%AB%D8%A8%D8%A7%D8%AA-%D8%A7%D9%84%D8%AC%D8%B1%D8%A7%D8%A6%D9%85-%D9%88%D9%83%D8%B4%D9%81-%D8%A7%D9%82%D8%B6%D8%A7%D9%8A%D8%A7-%D8%A7%D9%84%D8%BA%D8%A7%D9%85%D8%B6%D8%A9

The second "Testimonial" on the BWS website is purportedly from Detective Sen-SGT Ron Iddles (Homicide Squad, Melbourne, Australia). It begins with ""iCognative has value as an investigative tool…"  Mr. Iddles never made such a statement, or any endorsement of iCognative.  He retired years ago from the Melbourne police.

The third "Testimonial" on the BWS website is a false quotation from the newspaper *Indian Express.* The quotation on the BWS website is as follows:

> Indian Express and DNA India (Leading Newspapers in Indian Subcontinent)
>
> "We are helping the CBI by using ***iCognative*** technology on the two suspects. This is a new technology in the country which is useful for cracking cases like this where the

police need to find out some clues," RSU Director and IPS officer Vikas Sahay told The Indian Express.

The actual quotation did not mention iCognative at all.  It was about the genuine Brain Fingerprinting technology, not about iCognative.  Here is the actual quotation:

> "We are helping the CBI by using ***brain fingerprinting*** technology on the two suspects. This is a new technology in the country which is useful for cracking cases like this where the police need to find out some clues," RSU Director and IPS officer Vikas Sahay told *The Indian Express*."

It is at this link as of March 28, 2022:  https://indianexpress.com/article/india/india-news-india/2005-mssing-woman-kochi-smitha-george-suspect-brain-fingerprint-test-2870263/.

In summary, all three of the "Testimonials" on the BWS website are false, fabricated, and fraudulent.

**The Brainwave Science website https://brainwavescience.com/ makes the following false, fraudulent, and totally unsubstantiated claims regarding the science and technology purportedly offered by BWS.  Contrary to the statements on the BWS website, iCognative has never been proven in the scientific laboratory, in peer-reviewed scientific publications, or in real-world applications to have achieved any of these claims.**

Specific, quantifiable, numerical claims that are false and unsupported by any scientific evidence or field experience are noted in **bold and underlined.**

At this link: https://brainwavescience.com/icognative/

**RELIABLE**

A noteworthy advancement from the polygraph, iCognative® detects whether certain specific information is known to a suspect with **over 99% accuracy**. [This is true of Farwell Brain Fingerprinting, and false regarding iCognative.]

**HIGH VALUE**

The remarkable applications of iCognative® maximize intelligence collection disciplines across various security verticals. Unlike fingerprints and DNA that are available only in 1-2% of the cases, **iCognative® is applicable in over 85% of cases**. [This is true of Farwell Brain Fingerprinting, and false regarding iCognative.]

**INTELLIGENT DETECTION**

iCognative® collects an advanced scientific brain response called the P300 to analyze patterns of semantic memory recognition. Proprietary algorithm processes intelligently detect specific information stored in the brain.  [Except for the word "proprietary," this is true of Farwell Brain Fingerprinting.  It is false of iCognative, with or without that word.]

iCognative® technology scientifically, accurately, and humanely detects concealed information, such as the details of criminal or terrorist activities, stored in the brains of the perpetrators non-invasively, and eliminates torture in all investigations, be it civil or criminal. [This is true of Farwell Brain Fingerprinting, and false regarding iCognative.]

At this link: https://brainwavescience.com/why-icognative/

14

**PRECISION, ACCURACY, RELIABILITY**

**Results always have high accuracy rates with over 99% statistical confidence** [This is false regarding iCognative, and it is even false regarding the genuine Farwell Brain Fingerprinting. This statement exhibits a total lack of knowledge and understanding regarding "statistical confidence." Farwell Brain Fingerprinting has been shown in the peer-reviewed scientific literature to produce median statistical confidences of over 99%, but results do not "always" have "over 99% statistical confidence." iCognative has never been shown in any published scientific study or field application to have any statistical confidence at all, let alone "always" "over 99%."]

**Zero false positives and negatives** [This is true of Farwell Brain Fingerprinting, and false regarding iCognative.]

Purpose-built to eliminate countermeasures [This is false with respect to iCognative. This is advertising copy that doesn't make sense with respect to science and technology. Farwell Brain Fingerprinting has been shown to be highly resistant to countermeasures, but the phrase "eliminate countermeasures" does not accurately represent this.]

At this link: https://brainwavescience.com/icognativetraining/

**Get security experts with real-world experience.** [This is false with respect to BWS Inc. None of the employees of BWS Inc. have ever conducted and published a peer-reviewed scientific study, nor have any of them ever conducted a successful field test in detecting concealed information stored in the brain in any real-world situation. BWS Inc. may have advisors with real-world experience, but not with experience in conducting P300-based tests to detect concealed information in real-world situations. No one other than Dr. Farwell, his colleagues, and others trained by him has such experience and track record of success.]

A noteworthy advancement from the polygraph, **iCognative® detects whether certain specific information is known to a suspect with over 99.9% accuracy**. [This is false with respect to iCognative, and true with respect to Farwell Brain Fingerprinting.]

The technology pictured on the BWS Inc. website is fake, and does not actually conduct brainwave-based tests to detect concealed information stored in the brain. The following are some examples:

On this page https://brainwavescience.com/icognative/, this page https://brainwavescience.com/why-icognative/, and this page https://brainwavescience.com/press-kit/ , the site shows pictures of an Apple computer with an "iCognative" sticker on it. BWS Inc. does not have any software for brainwave data acquisition and analysis for detecting concealed information stored in the brain (the P300 method invented by Dr. Farwell) that runs on an Apple computer. The iCognative software runs on a PC, not the iPad and MacBook computers pictured. The videos on the home page https://brainwavescience.com/ show a screen with the sentence "I intend to commit a terrorist attack in the United States" with a subject holding a standard off-the-shelf game controller and pushing buttons, purportedly during a brainwave test responding to that screen, and then shows a

15

computer screen with simulated brainwave plots and results. BWS Inc. does not have any actual brainwave-based software that would make any meaningful measurements or conduct any meaningful brainwave analysis on brain responses in such a situation.  Any legitimate scientist, or any knowledgeable layman with an elementary understanding of detection of concealed information with brainwaves, would immediately recognize that  such an algorithm, if it existed in the scientific world, which it does not, would not be an effective means to elicit the P300 brain response or to detect concealed information in the brain. The scientific reasons why this is the case are presented in Exhibits AG, AH, AI, AJ, AK, AL, AM, AN, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777, and for the sake of brevity will not be repeated here.

**In short, everything or virtually everything of substance on the BWS Inc. website with respect to science and technology for detecting concealed information in the brain by measuring brainwaves comprises either demonstrably false claims or entirely false depictions of fake technology.**

Taken alone, this fact might not be significant.  BWS Inc. is not the only company to present mock-ups of technology that they do not have and pretend they are real, and not the only company to make blatantly false claims about the capabilities of the technology that they actually have.

However, when this is taken together with other evidence, a more complete picture emerges. Tomkins lied to a judge when he falsely stated that BWS Inc. had sold their iCognative technology to multiple clients, each one purchasing multiple systems for $400,000 each. In fact, BWS Inc. has never sold even one such system to even one client at any price, let alone nearly half a million dollars.  This presents the false impression that the sophisticated agencies whom BWS Inc. has been only attempting to defraud have evaluated BWS's technology and purchased it. It implies that BWS Inc. has a legitimate and successful business, outside of mere unsuccessful attempts to commit fraud.

Ika committed perjury when he stated that the BWS Software contained no open-source or public-domain material, and when he said that BWS Inc. had developed many proprietary features, when in fact all of these features were public domain and were provided to BWS Inc. by Dr. Farwell based on his successful development of Farwell Brain Fingerprinting over the previous 30 years.

The BWS Inc. website comprises a conglomeration of demonstrably false, totally baseless, and unproven claims, along with a fake depiction of technology.

Taken together, the existing evidence leads to the conclusion that Ika's and Tomkins recent crimes, like the pattern of fraud delineated and documented in the original FBI Report, are aspects of a conspiracy to defraud government agencies.

## X.  IMPLICATIONS FOR NATIONAL SECURITY

Fortunately, so far Ika, Tomkins, and their employees at BWS Inc. have totally failed in their efforts to defraud government agencies by misrepresenting themselves as skilled forensic scientists with the necessary training, credentials, expertise, and experience to effect a technology transfer of brainwave-based technology for detection of concealed information to a government agency and train agency personnel in the same, whereas they totally lack said training, credentials, expertise, and experience.

If Ika, Tomkins, and their co-conspirators every succeed in defrauding any government agency to engage them to effect a technology transfer of critical technology to detect concealed information

regarding major terrorist crimes, and said agency actually goes through with the training from BWS Inc. – by individuals who have never conducted a successful Brain Fingerprinting test either in the laboratory or the field, and are totally unqualified to conduct such a test, let alone train others to do so – the result will be a major disaster for national and global security. To put it bluntly, if Ika, Tomkins, and their co-conspirators ever succeed in their scheme to defraud government agencies, the result will not only lead to a waste of money, a major miscarriage of justice, and a serious violation of human rights. More importantly, the truth will not be detected or acted upon. It is not an exaggeration to say that if such a disaster occurs, it is highly likely that innocent people will be falsely imprisoned or executed, and terrorists will be provided false evidence of their innocence and freed to continue their terrorist crimes.

---

[i] Ika's affidavit contains numerous other demonstrably false statements that have been addressed in the original FBI report. These will not be discussed in detail here. The following has been documented in detail in the original FBI Report, and will not be repeated except for a very brief summary here. Ika's attorney took an Unexecuted Draft Document, that was not executed by or even known to the undisputed patent owner at the time (American Scientific Innovations, LLC, "ASI"), and recorded it as a "patent assignment" at the USPTO. (It failed as a patent assignment not only because the undisputed patent owner did not execute it, but also because it included no consideration flowing to the purported assignor.) Dr. Farwell, upon discovering that said document had been erroneously or fraudulently recorded, recorded a correction at the USPTO clarifying that ASI was and had never ceased to be the owner of the patents. BWS LLC's attorney acknowledged in writing at the time that BWS LLC never owned any part of the patents. Dr. Farwell, ASI, and every individual who has ever executed any patent assignment recorded at the USPTO since 1992 has stated in sworn affidavits that BWS LLC never had any ownership interest in the Brain Fingerprinting patents. Ika purported to remove Dr. Farwell and his company from BWS LLC without due process and without any compensation for their 49% equity, which Ika unilaterally purported to transfer to a company he controlled. Ika formed BWS Inc., the purported successor in interest to BWS LLC, with himself as sole owner. BWS Inc. has never been even mentioned in any patent assignment recorded at the USPTO. As described in the original FBI Report, in 2019 BWS Inc. filed a lawsuit in New York attempting to rewrite history and claim that BWS Inc. (which was never even mentioned in any patent assignment ever recorded at the USPTO) somehow owned the Farwell Brain Fingerprinting patents. Since the patents have expired, all of this is moot with respect to patent ownership. It is still relevant, however, with respect to the crimes committed by Ika, as described in the original FBI Report.



# United States Federal Bureau of Investigation (FBI) Report

### Re: Investigation of
### Suspects Krishna Ika and Paul Tomkins

### Regarding
### Racketeer Influenced and Corrupt Organizations (RICO) Act

### July 19, 2021

Summary of Evidence Submitted by:

**Brain Fingerprinting Laboratories, Inc.**
**Dr. Lawrence A. Farwell**
Chief Science Officer and CEO
https://farwellbrainfingerprinting.com
Email: brainwave@larryfarwell.com

8825 34th Ave NE, Suite L155
Quil Ceda Village, WA 98271
Phone: (+1)  206-905-1009
Mobile: (+1) 206-250-5516

This Report and all Exhibits can be downloaded from this link:

https://www.dropbox.com/sh/29vhnwa7g3fjgvl/AAD-h6NmHlw9ePesIIQ9h5L0a?dl=0

## Executive Summary

### Statutes and Crimes

This Report constitutes evidence in the investigation of an ongoing racketeering scheme involving the following statutes and crimes investigated by the FBI:

1. Racketeering Influenced and Corrupt Organizations Act: 18 U.S.C. § 1961, Definitions; § 1962, Prohibited activities;
2. 18 U.S.C. § 1512, Tampering with a witness, victim, or an informant; §1513, Retaliating against a witness, victim, or an informant
3. Securities Act of 1933;
4. Securities Exchange Act of 1934;
5. International fraud constituting a threat to national security;
6. Theft of intellectual property constituting a threat to national security;
7. Theft of financial instruments involved in interstate and international commerce;

### Suspects

Krishna Ika
Home address:                              Business address:
6 Wyndemere Dr.                            257 Turnpike Road
Southborough, MA  01772                    Southborough, MA  01772

Paul Tomkins
Business address:
257 Turnpike Road
Southborough, MA  01772

### Witness

The primary witness in the present case is Dr. Lawrence A. Farwell, PhD, a forensic neuroscientist (contact information as above on page 1).

In Dr. Farwell's professional capacity as a forensic scientist and as the inventor and world's leading authority on the forensic science technique of Brain Fingerprinting, Dr. Farwell testified against suspect Ika in a fraud case in Dubai that spanned several jurisdictions, including the state of New Jersey in the USA.

In addition to that and the present case, Dr. Farwell will undoubtedly be called as a witness when and if Mr. Ika is brought to justice for additional fraud crimes of which he currently stands accused in Pakistan, South Africa, Nigeria, and Thailand.

Dr. Farwell was at one time involved in a business relationship with suspect Ika, but Dr. Farwell terminated the relationship when he discovered that Ika's partner at the time pleaded guilty and was convicted of attempting to sell stolen high-technology secrets to a foreign government agency – a crime similar to the crimes of which Ika now stands accused in Pakistan, South Africa, Nigeria, and Thailand. (Said partner is no longer involved with Ika and is not a subject of this investigation.)

### Locations

The primary locations for the subject crimes were the states of Washington, Massachusetts, and New York in the USA.  Related crimes took place overseas in various countries including Pakistan, South Africa, Nigeria, United Arab Emirates, and Thailand.

# I.    PARTIES REFERENCED HEREIN

1.1    Krishna Ika ("Ika") is a resident of Southborough, Massachusetts. Business address: Brainwave Science, Inc., 257 Turnpike Road, Southborough, MA 01772; Tel: 774-760-1600.

1.2    Paul Tomkins ("Tomkins") is corporate attorney for BWS Inc. Business address: Brainwave Science, Inc., 257 Turnpike Road, Southborough, MA 01772; Tel: 774-760-1600.

1.3    Dr. Lawrence A. Farwell ("Dr. Farwell") is a resident of Tulalip, Snohomish County, Washington.

1.4    Life Science and Technology, LLC is a Wyoming LLC with primary and only office in Edmonds, Snohomish County, Washington.

1.5    Ron Kirkendorfer, a resident of Washington, is the President of Life Science and Technology, LLC ("LST").

1.6    Brainwave Science, Inc. ("BWS Inc.") is a foreign corporation with offices in Southborough, Massachusetts, solely owned by Ika.

1.7    eHealthcareWorks Corp. ("HCW") is a foreign corporation with offices in Southborough, Massachusetts, controlled by Ika.

1.8    Brainwave Science, LLC ("BWS LLC") is a foreign corporation with offices in Southborough, Massachusetts, with ownership as follows: 49% eHealthcare Works Corp, 5% Dr. Farwell, and 44% Brain Fingerprinting Laboratories, Inc.

1.9    American Scientific Innovations, LLC ("ASI") was a foreign limited liability company with offices in Seattle, Washington at the times of all transactions involving ASI mentioned herein, whereof Ben Bryant, a resident of Washington, was the president and only authorized representative.

1.10   Brain Fingerprinting Laboratories, Inc. ("BFL Inc.") is a foreign corporation with offices in Seattle, Washington, controlled and largely owned by Dr. Farwell.

1.11   Brain Fingerprinting, LLC  ("BF LLC") is a foreign limited liability company with offices in Seattle, Washington, controlled by Dr Farwell.

1.12   Government Works, Inc. ("GOV") is a foreign corporation with offices in Southborough, Massachusetts, controlled by Ika.

1.13   Dr. Lawrence Farwell and Brain Fingerprinting Laboratories, Inc. collectively are referred to herein as the "Minority Shareholders" or "Farwell Shareholders" in BWS LLC.

1.14   Neuro Science Technologies, LLC ("NST") is an Iowa limited liability company, with Kirkendorfer as its President.

1.15   Subu Kota ("Kota") is a resident of Boston, Massachusetts.

1.16   Krishna Ika, Brainwave Science, LLC, Brainwave Science, Inc., eHealthcareWorks Corp., Government Works, Inc., Tomkins, one or more undisclosed silent partners (hereinafter "Silent Partner," including singular and plural, to be revealed by Ika and/or in discovery), one or more undisclosed financiers of BWS, LLC, BWS, Inc. and/or Ika

3

(hereinafter "Financier," including singular and plural, to be revealed by Ika and/or in discovery) shall  all collectively be referred to herein as the "Ika Parties."  Ika, BWS LLC, BWS Inc., HCW, and GOV are also referred to herein as the "Known Ika Parties."

## II.    SUMMARY AND INTRODUCTION

2.1 This Summary and Introduction summarizes the relevant facts.  Details are provided in subsequent sections, along with ample documentation in the form of exhibits.  These will demonstrate that all of the statements made in this Summary and Introduction are demonstrably and unequivocally true and factual.  For clarity, I, Dr. Lawrence A. Farwell, shall generally refer to myself in the third person.

2.2 As the inventor and world's leading expert in Brain Fingerprinting, and the individual who has successfully implemented Brain Fingerprinting at the FBI, the CIA, the US Navy, and in law enforcement and counterterrorism agencies around the world, I, Dr. Lawrence Farwell, was the primary witness in a fraud suit against Ika, BWS LLC, and BWS Inc. spanning several countries and jurisdictions.

2.3 Ika and BWS Inc. also stand accused of fraud in South Africa, Pakistan, Nigeria, and Thailand, in each case involving Ika and his employees (a) falsely representing themselves as experts in forensic neuroscience, event-related brain potentials, and Brain Fingerprinting competent to implement a technology transfer of Brain Fingerprinting technology to government agencies and to train agency personnel in the same; and (b) attempting to sell a counterfeit "Brain Fingerprinting" training and technology that does not in fact meet the established Brain Fingerprinting Standards.

2.4 The current fraud that Ika and the other Ika Parties have been attempting to perpetrate in various countries is the continuation and culmination of a racketeering enterprise that Ika and some of the Ika Parties began in 2012 and 2013.  The purpose of the enterprise was to fraudulently gain control of the patents for Dr. Farwell's invention of Brain Fingerprinting, eliminate Dr. Farwell from participation, and then defraud government agencies in various countries by Ika falsely representing himself and his employees as experts in forensic neuroscience, psychophysiology, event-related brain potentials, and Brain Fingerprinting capable of effecting a technology transfer of Brain Fingerprinting to said agencies, and to sell them a counterfeit system, and faux "training" thereon by unqualified "trainers," that did not meet the Brain Fingerprinting Scientific Standards established by Dr. Farwell and his colleagues in the scientific literature.

2.5 Tomkins and the Known Ika Parties set up BWS Inc. for fraudulent purposes as described herein, one of which was to file frivolous lawsuits against Dr. Farwell and the patent owners, knowing that BWS Inc had no chance of winning the suits. The suits served the purpose of forcing Dr. Farwell and the patent owners to expend money and other resources, while minimizing the risk to the Known Ika Parties, particularly Tomkins, Ika, BWS LLC, HCW, and GOV.  Since BWS Inc. is a shill company with no legitimate business activities and no assets, losing a lawsuit with a substantial judgment against BWS Inc. would not actually cost the Ika Parties anything.

2.6 When Ika first contacted Dr. Farwell and proposed a business arrangement, he and the other Ika Parties concealed from Dr. Farwell the fact that Kota, an individual who had pleaded guilty and been convicted of attempting to sell stolen high-tech secrets to the Soviet Union – essentially the same crime for which Ika's original racketeering organization was founded and which it has since

attempted to perpetrate in multiple countries – would later be identified by BWS LLC as a board member and officer of BWS LLC.

2.7 The steps in said racketeering scheme were as follows:

2.7.1   Ika and other Ika Parties fraudulently induced Dr. Farwell and his company, Brain Fingerprinting Laboratories, Inc. to enter into an LLC agreement with BWS LLC, to be controlled by Ika, by among other things concealing the involvement of Kota and his criminal record and the plans to fraudulently gain control of the Patents and to misappropriate Dr. Farwell's and BFL Inc.'s equity in BWS LLC. (Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.2    Ika and other Ika Parties fraudulently induced Dr. Farwell to sign three Draft Documents that outlined the terms for transfer of the Patents to BWS LLC, but did not yet include any consideration flowing to the apparent "assignors," because that had not yet been negotiated. The Draft Documents were never intended by Dr. Farwell, who signed them, or by ASI, the undisputed owner of the patents, to be patent assignments.  The Draft Documents were not executed by or even known to ASI.  Dr. Farwell was not a member, owner, officer, or agent of ASI and did not have authority to bind ASI.  Then Ika's attorney fraudulently recorded the Draft Documents at the USPTO as "patent assignments" to BWS LLC so as to gain control of the Patents without being required to execute any documents requiring compensation for the same.  Then Ika refused to sign any documents requiring any compensation to the patent owners (or anyone else) in exchange for ownership of the patents by BWS LLC, which he controlled.  When Dr. Farwell discovered the erroneous recording of the Draft Documents at the USPTO, he and BFL Inc. signed and recorded a Correction that clarified ASI's continuing, uninterrupted ownership of the Patents and the fact that the Draft Documents bearing his signature were null and void, were not valid patent assignments, and had no legal binding effect.  Thus, the ownership of the Patents always remained with ASI, and the Ika Parties' initial scheme to fraudulently gain control of the Patents failed. (Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.3   Ika and other Ika Parties purported to deprive the Minority Shareholders of some of their equity in BWS LLC by the following scheme. Dr. Farwell and BFL Inc. (the Minority Shareholders) initially owned 49% of BWS LLC. HCW, controlled by Ika, owned 51%.  The initial agreement required HCW, controlled by Ika, to provide sufficient financing for the LLC.  Ika told the Minority Shareholders that he and HCW had run out of money, that they would have to take on a Silent Partner and sell him equity to finance the company, and that HCW and BFL Inc. would both be diluted proportionally and would both give up ownership proportionally. (Dr. Farwell's ownership was non-dilutable.) Ika then purported to sell equity of BFL Inc. and HCW to an independent Silent Investor (who he implied was Kota).  In fact, however, said equity was transferred to an entity controlled and/or owned by Ika.  Thus Ika's scheme diluted BFL Inc. but in reality did not diminish Ika's effective ownership of BWS LLC.  BFL Inc.'s equity was apparently reduced from 44% to 16% by this scheme, leaving the Minority Shareholders with a total of 21%.     (Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.4   Ika and other Ika Parties then conspired to deprive the Minority Shareholders of their remaining equity in BWS LLC by the following additional scheme.  The BWS LLC agreement required consent of all members to any amendments. Ika purported to unilaterally amend the

BWS LLC agreement to allow himself as managing member, along with the majority members he controlled, to expel members if, in his sole and absolute discretion, they had done certain things that he interpreted as detrimental to the LLC. Then he called a meeting of the members – consisting solely of himself and Kota as corporate secretary – and purported to expel Dr. Farwell and BFL Inc. as members in BWS LLC, and to transfer their ownership interest to himself and entities that he controlled, all without consent or due process. (Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.5    Tomkins, Ika, and other Ika Parties then implemented yet another scheme to eliminate any ownership by Dr. Farwell and BFL Inc. of the functional entity and to fraudulently gain control of the Patents. They formed a new corporation, Brainwave Science, Inc. (BWS Inc.)  BWS Inc. was formed for four purposes, all of them fraudulent, as follows.

2.7.5.1 Tomkins' first fraudulent purpose of establishing BWS Inc. was to eliminate the Minority Shareholders as owners of the functional corporate entity. (Ika must have known, and his attorney acknowledged, that his scheme to expel the Minority Shareholders without consent or due process was illegal and would not stand.)  BWS Inc. had entirely non-overlapping ownership with BWS LLC.  BWS LLC is owned by Dr. Farwell, BFL Inc., HCW, and an unidentified Silent Partner whose shares HCW held in trust. Ika has no ownership in BWS LLC. BWS Inc. is owned solely by Ika. By transferring the assets of BWS LLC to BWS Inc. without any compensation to the owners of BWS LLC, Ika purported to eliminate the Minority Shareholders as owners of the functional corporate entity. The assets of BWS LLC could be transferred to an entity solely owned by Ika without compensation to the owners of BWS LLC must constitute one of two scenarios: (a) Ika already owned or controlled all of the owners of BWS LLC except Dr. Farwell and BFL Inc., in which case sale of equity to the Silent Partner (and concomitant dilution of HCW along with BFL Inc.) was a sham set up by Ika to defraud Dr. Farwell and BFL Inc. of their equity, or (b) Ika also defrauded the Silent Partner out of his equity in BWS LLC by forming the new corporation and transferring the assets. In either case, Ika and other Ika Parties committed fraud by forming BWS Inc.

2.7.5.2 Reference is made to US Patents #7,689,272, #5,363,858, #5,406,956, and #5,467,777, (collectively, the "Patents"). Dr. Farwell, the inventor of the Patents, assigned the Patents and all associated intellectual property to ASI. He assigned #5,363,858, #5,406,956, and #5,467,777 (the "Brain Fingerprinting Patents" or the "Expired Patents") in 2003 and #7,689,272 in 2010. He has had no ownership in the Patents or any associated intellectual property since then. It is undisputed that ASI owned the Patents in 2013, prior to the Draft Documents.

2.7.5.3 Tomkins' second purpose of establishing BWS Inc. was to fraudulently gain ownership of the Patents. There are no documents filed at the USPTO (or anywhere else) that even mention BWS Inc. in connection with ownership of the Patents. There are no documents anywhere that might imaginably be construed as to assign the Patents to BWS Inc.

In different legal actions Ika, Tomkins, BWS LLC, and BWS Inc. have made contradictory claims regarding assignments the ownership of the Patents. Both of the contradictory accounts are demonstrably and unequivocally false.

The claims in the BWS Inc. – Farwell Arbitration are as follows. In this regard, it was not an accident that BWS Inc. had a similar name and identical initials to BWS LLC. In said arbitration and other legal actions described below, Ika and other Ika Parties have abbreviated

Brainwave Science Inc. as "BWS." Then they have stated that "BWS" obtained the Patents in 2013 by assignment from ASI. BWS Inc. stated the following in its Notice in the BWS Inc. – Farwell Arbitration: "Claimant Brainwave Science, Inc. ('BWS') is a Delaware corporation…" "American Scientific Innovations, LLC… assigned BWS all rights, title and interest in… patents [the Patents]… on June 17, 2013." "BWS maintains that it lawfully acquired the subject intellectual property [the Patents]…[through said transaction]." Said statements are blatantly false.

Brainwave Science, Inc. ("BWS" in the definition of said Notice) was not even mentioned in the documents cited in the Notice as purportedly assigning the Patents to it. Said documents referred to Brainwave Science, LLC. "BWS" [Inc.] could not possibly have "lawfully acquired" the Patents in 2013 because it did not exist until several years later. It is striking that Ika and his attorneys presume that the arbitrators and judges in the multiple lawsuits wherein Ika and Tomkins attempted similar verbal sleight of hand would not have the mental acuity to recognize the difference between two different entities with the same initials (and non-overlapping ownership). BWS Inc. has no evidence whatsoever that BWS LLC, ASI, or any other entity ever assigned the Patents to it. No entity ever executed and recorded at the USPTO any documents – valid or not – that even mention BWS Inc.

The second false account Ika, Tomkins, and BWS Inc. have given regarding ownership of the Patents is that ASI assigned the Patents to BWS LLC (not BWS Inc.) in 2013, and at some later time BWS LLC assigned the Patents to BWS Inc. This apparently is their contention in the present Motion to Intervene. Neither of the alleged assignments in this account ever took place in reality.

(a) The Unexecuted ASI-BWS Draft Document purportedly assigning said Patents (to BWS **LLC**, not BWS **Inc.**) in 2013 was not executed by or even known to ASI, the undisputed owner of the Patents at that time, included no consideration flowing to the apparent "assignor," and could not possibly have transferred ASI's Patents to BWS LLC or any other entity.

(b) Even if the Patents had been assigned to BWS LLC by ASI (which they demonstrably were not), there is no evidence that BWS LLC ever assigned the same to BWS Inc. There are no documents filed at the USPTO that even mention BWS Inc. in reference to the Patents.

2.7.5.4 Tomkins' third fraudulent purpose for establishing BWS Inc. was to provide a vehicle to defraud government agencies in various countries by Ika falsely representing himself and his employees as experts in forensic neuroscience, psychophysiology, event-related brain potentials, and Brain Fingerprinting capable of effecting a technology transfer of Brain Fingerprinting to said agencies, and to sell them a counterfeit system, along with faux "training" thereon by unqualified "trainers," that did not meet the Brain Fingerprinting Scientific Standards established by Dr. Farwell and his colleagues in the scientific literature. Ika and BWS Inc. currently stand accused of such fraud in South Africa, Pakistan, Nigeria, and Thailand for attempting to implement this scheme.

2.7.5.5 Tomkins' fourth fraudulent purpose for establishing BWS Inc. was to file patently frivolous legal actions against Dr. Farwell, the primary witness in the first fraud case against Ika, BWS LLC, and BWS Inc. and, as the inventor and world's leading expert in Brain Fingerprinting, the potential expert witness best positioned to testify to expose the fraud that Ika and the Ika Parties have attempted and are attempting in various countries, including those named above, when and if said countries bring Ika and other Ika Parties to justice. Said frivolous lawsuits

constitute witness tampering and an attempt, as part of the Ika Parties' racketeering crimes, to intimidate, coerce, silence, retaliate against, and discredit past and potential future witness Dr. Farwell.   Said frivolous lawsuits are based on two demonstrably and unequivocally false premises:

(a) That Brainwave Science, Inc. acquired the Patents in 2013 -- when it did not yet exist -- through an unexecuted draft document (the Unexecuted ASI-BWS Draft Document) that did not mention Brainwave Science, Inc., was not executed by or even known to the undisputed patent owner at the time (ASI), had no provisions for consideration flowing to the apparent "assignor," and was never intended by either the signer or the undisputed patent owner to be recorded at the USPTO or to constitute a patent assignment;

(b) That Dr. Farwell's unequivocally and demonstrably true – and also privileged – statements were libelous, statements made as a witness in a sworn affidavit in a fraud suit against Ika, BWS LLC, and BWS Inc.

2.8 The above described activities of Tomkins, Ika, and the Ika Parties constitute racketeering, as described below, because per 18 U.S.C. § 1961 they are "(B) indictable under…the following provisions of title 18, United States Code…section 1341 (relating to mail fraud)...section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice)...section 1510 (relating to obstruction of criminal investigations)...section 1512 (relating to tampering with a witness...victim, or an informant)...section 1513 (relating to retaliating against a witness...victim, or an informant)" or  "(D) any offense involving…fraud in the sale of securities…"

2.9 BWS Inc. has no business activities other than fraud, no lawful business activities, no clients, no customers, no revenues, no investors, no purchasers of equity, and no donors, and yet somehow has sufficient funds to maintain Ika in a lavish lifestyle and to finance overseas trips for Ika and others to attempt to defraud government agencies around the world, and to hire a full-time attorney, Tomkins, with virtually no other responsibilities other than filing frivolous lawsuits against Dr. Farwell, the owners of the Patents, and others who do business with Dr. Farwell.  The Financier, to be revealed in discovery, is the source of these funds.  If money laundering is involved (which we do not, as of now, allege, pending discovery of the source of BWS Inc.'s funds and the involvement of the Financier), then this is another instance of racketeering per 18 U.S.C. § 1961, because the Ika's and the other Ika Parties' actions are "indictable under…the following provisions of title 18, United States Code …section 1956 (relating to the laundering of monetary instruments)…"

2.10   Tomkins and all of the Ika Parties know that their claims under the five lawsuits that they have filed, all of which were pursuing the same claims with reference to the same facts, have no basis in fact or law.  Tomkins knows that they have no possibility of prevailing on the merits.  Their transparent strategy is to use the funds provided by the Financier to force Dr. Farwell and the patent owners to expend all of their available resources in time and money defending lawsuits, and then to prevail by default because they are unable to continue to finance his responses to the onslaught.

2.11   Tomkins and the other Ika Parties are attempting to abuse the US justice system to eliminate Dr. Farwell in two different roles. (a) Dr. Farwell, as an expert witness with unique expertise and experience, is the one person who stands in the way of their attempts to defraud government agencies, misrepresent themselves as forensic neuroscience experts when they are not, and sell counterfeit products and false and inadequate training. (b) Dr. Farwell, as the inventor of Brain

Fingerprinting and the individual who with his colleagues is successfully implementing Brain Fingerprinting in government law enforcement and counterterrorism agencies around the world, is also the one individual who is demonstrating by his actions the effective implementation of Brain Fingerprinting that the Ika Parties fraudulently claim to be capable of accomplishing, but never have accomplished and are in fact not capable of accomplishing. The Ika Parties recognize that until they eliminate from the scene the genuine expert in Brain Fingerprinting, Dr. Farwell, it will be virtually impossible to defraud government agencies into hiring them as experts in Brain Fingerprinting, when they in fact have no such expertise. This is because anyone who does adequate due diligence will discover – as authorities in South Africa, Pakistan, Nigeria, and Thailand did – that Dr. Farwell is the genuine expert and Ika and his employees are frauds.

2.12   As an attorney, Tomkins must be aware of the fact that all of BWS Inc.'s claims in the five lawsuits they have filed are false, frivolous, and entirely without basis in fact or law.

2.13   Tomkins' and Ika's actions constitute racketeering under the US RICO laws, as described in detail below.

2.14   Tomkins' and the Ika Parties' scheme to defraud government agencies in various countries also included Tomkins' writing and causing to be delivered a blatantly libelous letter to one of Dr. Farwell's Brain Fingerprinting clients, a government agency in India, attempting to interfere with Dr. Farwell's business and personal relationships, existing contracts, and business activities. Said letter made false, defamatory, and blatantly libelous statements about Dr. Farwell and threatened civil and criminal action against Dr. Farwell's client for doing legitimate and honest business with Dr. Farwell.

## III.   <u>FACTS</u>

3.1   As the inventor and world's leading expert in Brain Fingerprinting, and the individual who has successfully implemented Brain Fingerprinting at the FBI, the CIA, the US Navy, and in law enforcement and counterterrorism agencies around the world, Dr. Lawrence Farwell was the primary witness in a fraud suit against Ika, BWS LLC, and BWS Inc. in the United States District Court for the District of Delaware (*E. Hedinger AG and Hedinger Middle East DWC LLC vs. Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika*). Said fraud suit also was pursued in several other jurisdictions. In his privileged role as a witness, Dr. Farwell provided a sworn affidavit, the contents of which were truthful and within his knowledge and scientific field of expertise.

3.2   In addition to the above, government and non-government agencies have also accused Ika, BWS LLC, and BWS Inc. of fraud relating to false claims of expertise in Brain Fingerprinting science and ineffective and counterfeit related products in several other countries, including but not limited to ████████████████, South Africa (Exhibit AR), Thailand (Exhibit AT), and Nigeria (see below). In light of Dr. Farwell's unique expertise and his considerable knowledge of Ika's alleged crimes, Dr. Farwell may also be a witness in criminal prosecutions that are pursued against Ika, BWS LLC, and BWS Inc. in at least some and likely all of the above jurisdictions, if any, where such prosecutions occur.

3.3   Tomkins, Ika, and BWS Inc. have attempted to coerce and intimidate Dr. Farwell into changing his sworn testimony as a witness in Hedinger allegedly in order to conceal alleged fraud by Ika, BWS LLC, and BWS Inc.

3.4     Since Dr. Farwell refused, Tomkins has filed multiple patently frivolous lawsuits against Dr. Farwell and the owners of the Brain Fingerprinting patents, in a transparent attempt to coerce, intimidate, and discredit Dr. Farwell and to force him to expend his resources in time and money defending lawsuits so as to silence, compromise, intimidate, or discredit him as a witness against Ika in fraud cases in Pakistan, South Africa, Nigeria, Thailand, and/or other jurisdictions where Ika has been accused of fraud relating to Farwell's invention of Brain Fingerprinting.

3.5     The forum shopping and witness tampering that Tomkins is now attempting are part of a larger fraudulent scheme. Tomkins, Ika, BWS Inc., the Silent Partner, the Financier, Ika's various attorneys (including Tomkins in the later stages), and possibly one or more Co-conspirators (collectively, the Ika Parties) conspired to engage in racketeering and engaged in racketeering in the fraudulent scheme.  The main features of said fraudulent scheme are briefly summarized immediately below.  Details of said fraudulent scheme and exhibits documenting the same follow in subsequent sections.

3.5.1   The relevant portions of the federal RICO Act (18 U.S.C. §§ 1961–1968) are as follows:

**§ 1961. Definitions**

(1) racketeering activity means…

(B) any act which is indictable under any of the following provisions of title 18, United States Code…section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant).

**§ 1962. Prohibited activities**

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**§ 1964. Civil remedies**

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering

10

dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorneys fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

3.5.2   The Ika Parties fraudulently induced two Washington state residents, Dr. Farwell and BFL Inc., to invest in a security, specifically ownership in BWS LLC, and to execute the BWS LLC Agreement. They concealed several relevant facts that would have influenced Dr. Farwell's and BFL Inc.'s decision whether to purchase a security. They did not disclose that they would later state on the BWS LLC website and in correspondence with Dr. Farwell that Subu Kota was an officer (Secretary) and board member of BWS LLC, or that Kota was otherwise involved. This is relevant because Kota had pleaded guilty to attempting to sell stolen high-tech secrets to the Soviet Union, a crime very similar to the crimes of which Ika now stands accused in South Africa, Pakistan, Nigeria, and Thailand. They did not disclose that they planned the other fraudulent acts described below with a design to obtain control of the Patents without having to pay for them and to defraud Dr. Farwell and BFL Inc. and misappropriate of all of their original 49% interest (Dr. Farwell 5% non-dilutable and BFL Inc. 44%) in BWS LLC.

3.5.3   The Ika Parties conspired, in the course of negotiations, to obtain Dr. Farwell's signatures on three preliminary documents that concerned terms for the transfer of the Patents to BWS LLC, but lacked any mention of the yet-to-be-negotiated consideration for the same that would flow to the assignors in the actual patent assignments that might be executed by the proper parties when and if the negotiations for consideration were successfully completed. They then recorded these preliminary draft documents with the USPTO as "patent assignments," despite the facts that said documents were signed by undisputed non-owners of the Patents, the one document that mentioned the actual undisputed patent owner was not executed by or even known to the undisputed patent owner, and each of said documents failed on its face as a "patent assignment" because there was no consideration flowing to the apparent purported assignor.

3.5.4   When Ika had apparently succeeded in fraudulently obtaining ownership of the Patents without having to pay any consideration to the patent owner, he then refused to sign any documents calling for any consideration flowing from himself, BWS LLC, HCW, or any other entity in which he had ownership or control. Ika defaulted on his agreement to provide sufficient financing for BWS LLC until the company became profitable.

3.5.5   Dr. Farwell was paid $11,000 per month on some months, $8,000 per month on other months, and nothing on some months over the next several years, not as compensation for the Patents (which Dr. Farwell did had not owned since 2003), but as compensation for his expertise as the inventor and world's leading expert in Brain Fingerprinting.

11

3.5.6    When Dr. Farwell discovered that documents bearing his signature had been falsely and erroneously recorded at the USPTO, he and BFL Inc. signed and recorded at the USPTO a correction that clarified the continuous, uninterrupted ownership of the Patents by ASI and corrected the erroneous information contained in the three Draft Documents.  (The Correction did not result in any change in ownership of the Patents, because ownership never ceased to rest with ASI.)

3.5.7    When the Ika Parties realized that their initial ploy to fraudulently obtain ownership of the Patents without paying any consideration had failed, they devised another scheme to accomplish essentially the same thing.  The Ika Parties committed fraud in the inducement against Dr. Farwell and BFL Inc. for a second time, in a second series of transactions, as follows.  Ika told Dr. Farwell that he did not have sufficient funds to fund the company as agreed, and that BFL Inc., Dr. Farwell, and HCW would have to sell equity to raise funds.  He stated that BFL Inc. and HCW would be proportionally diluted.  (Dr. Farwell's shares were non-dilutable.)  Ika then pretended to sell some of BFL's equity to a purported independent third party, the "Silent Partner," through HCW, and represented that HCW was doing the same.  Through this process, in a series of transactions, Ika purported to reduce BFL Inc.'s ownership of BWS LLC from 44% to 18%, as documented in exhibits below.  He purported in the same documents to reduce HCW's equity proportionally.  However, he in fact transferred BFL Inc.'s and HCW's "sold" equity to himself or an entity he owned and controlled, and concealed this fact from Dr. Farwell and BFL Inc.

3.5.8    It is at this point that Tomkins became actively involved.  Tomkins, Ika, and the other Ika Parties then devised a fraudulent scheme to deprive Dr. Farwell and BFL Inc. of their remaining equity in BWS LLC.  This comprised the following steps. The BWS LLC agreement clearly stated that it could be modified only by agreement of all members (Exhibit F). First, Ika purported to unilaterally change the LLC agreement to grant himself the authority to remove members from the LLC if, in his sole and absolute opinion, they had done certain things that in his opinion were detrimental to the company.  Then he called a meeting to remove the Farwell Shareholders as members.  Then he purported to remove the Farwell Shareholders as members, and to transfer all of their 21% interest in BWS LLC to himself and/or entities that he controlled, without due process and without any compensation to Dr. Farwell and BFL Inc. for their equity.  Ika lacked the authority to remove Dr. Farwell and BFL Inc. as members.  Moreover, there can be no question that neither Ika nor anyone else had the authority to misappropriate the Farwell Shareholders' equity and to transfer it to himself without compensation, whatever the purported justification.  The only mechanism through which Dr. Farwell's and BFL Inc.'s equity could be transferred to Ika or entities he controlled without consent, due process, or compensation is theft.  The above is delineated in detail in later sections of this document below and in the exhibits referred to herein.  This attempt to misappropriate Dr. Farwell's and BFL Inc.'s equity in BWS LLC failed, as there clearly was no legal basis for Ika's and the other Ika Parties' actions, and as Dr. Farwell pointed out at the time, Ika and other Ika Parties committed several felonies in the course of the implementing the scheme described above.

3.5.9    When their attempt to misappropriate Dr. Farwell's and BFL Inc.'s equity in BWS LLC failed, Tomkins and the other Ika Parties then devised yet another way to fraudulently deprive Dr. Farwell and BFL Inc. of their remaining equity in BWS LLC.  BWS LLC was owned 5% by Dr. Farwell, 49% by BFL Inc. (or, if one considers the fraudulent transfer of equity described

above to be legitimate, 16% by BFL Inc.), approximately 25% by HCW, and the balance by the Silent Partner. Ika personally owned none of BWS LLC. The Ika Parties formed a new company, BWS Inc. Ika and his attorneys told Dr. Farwell that this was a "reorganization," with no change in ownership, assets, or liabilities. The entire formation of BWS Inc., however, was fraudulent. Ika, who owned none of BWS LLC, owns all of BWS Inc. This means that, in addition to fraudulently eliminating Dr. Farwell's and BFL Inc.'s equity in BWS LLC, either one of two things took place. Either (1) Ika also defrauded the Silent Investor out of his equity in BWS LLC by forming a new entity, BWS Inc. in which the Silent Investor had no interest; or (2) the purported sales of equity that BFL Inc. was forced into by Ika's purported lack of funds to support the company's operations was a sham, and Ika was selling BFL Inc.'s equity to himself or an entity that he controlled, and pretending to sell HCW's equity proportionally, but actually only transferring it to an entity the same that he owned or controlled. Then this sham entity disappeared when BWS Inc. was formed, leaving Ika with 100% of the equity. In either case, this was a scheme to defraud Dr. Farwell and BFL Inc. of their equity in BWS LLC.

3.5.10   As described elsewhere herein, Tomkins established BWS Inc. for three additional fraudulent purposes in addition to the above: (a) to fraudulently gain control of the Patents; (b) to provide a vehicle to defraud government agencies by falsely marketing Ika and his employees as experts in Brain Fingerprinting and attempting to sell a counterfeit product that does not meet the relevant scientific standards along with training by unqualified "trainers"; and (c) to intimidate, coerce, retaliate against, and discredit Dr. Farwell as a past and likely future witness against Ika in fraud cases.

3.6   Ika and BWS LLC accused Kota of being a part of the above described fraudulent scheme. On the BWS website, Kota was listed as being a member of the board (Exhibits W, X, Y, and Z). In correspondence with Dr. Farwell, Ika and his attorney identified Kota as the "Secretary" of BWS LLC (Exhibit K). Ika has implied – but never to the undersigned's knowledge directly stated – that Kota was the Silent Partner and a major owner of BWS LLC. According to current knowledge and belief, Kota denies ever being an officer, board member, investor, owner, or member of BWS LLC or BWS Inc., and denies being involved in any way in any of the alleged fraud, alleged securities violations, alleged theft of the Minority Shareholders' equity, or any other alleged crimes of Ika, BWS LLC, and BWS Inc.

3.7   The demonstrably baseless and frivolous legal proceedings initiated by Tomkins, Ika, and BWS Inc. comprise the following:

3.7.1   (1) *Brainwave Science, Inc. vs. Farwell, et al., Supreme Ct. of the State of New York County of New York, Index No. 153867/2019* (the "New York Lawsuit"). This is the first lawsuit Tomkins filed.

3.7.2   (2) An Arbitration Under the Commercial Rules of Arbitration of the American Arbitration Association, AAA Case Number: 01-20-0005-4534, between Brainwave Science, Inc. (Claimant) and Lawrence A. Farwell, Individually, and Life Science and Technology, LLC (Respondents) (the "BWS Inc.-Farwell Arbitration"), which Tomkins attempted unsuccessfully to commence. The proposed arbitrators have refused to arbitrate the case on the basis of the fact that it is redundant with, and depends upon the outcome of, the New York Lawsuit, which is the appropriate venue.

3.7.3    (3) An attempt by Tomkins to re-litigate the same issues as the New York case by intervening in a settled arbitration case between NST and Dr. Farwell (Neuro Science Technologies, LLC vs. Farwell, Case No. 2:20-cv-1554, Fed Cir. 2020, the "NST vs. Farwell Arbitration" and the "Motion to Intervene" therein).  The Court vacated the original recording of the outcome of the arbitration between NST and Dr. Farwell and allowed BWS Inc. to intervene.   The Court then dismissed this case for lack of subject matter jurisdiction, again recognizing the fact that the New York case was the appropriate venue.

3.7.4    (4) A lawsuit filed by Tomkins on behalf of BWS Inc. against NST in the US District Court for Western Washington (*Brainwave Science, Inc. vs. Neuro Science Technologies, LLC and Ronald J. Kirkendorfer, no. 2:20-cv-01481*, the "BWS Inc. vs. NST Lawsuit." The Court dismissed this suit against NST with prejudice, and dismissal of the suit against Kirkendorfer is pending before the court.

3.7.5    (5) A case filed by Tomkins on behalf of Ika and BWS Inc. before the US District Court for Wyoming (*Brainwave Science, Inc. vs. Life Science and Technology, LLC, Case No. 19-CV-167-F* (the "Wyoming Lawsuit") which the Plaintiff dismissed without prejudice when it became obvious that the case was frivolous and filed in the wrong venue.

3.8    Tomkins, Ika, BWS LLC, and BWS Inc. have maintained two patently false propositions: (1) That BWS Inc. owns the exclusive rights to Dr. Farwell's invention of Brain Fingerprinting as embodied in the Brain Fingerprinting Patents based on the following events: (a) Without the knowledge or consent of ASI, the undisputed owner of the patents at the time, Ika's attorney recorded at the US Patent and Trademark Office ("USPTO") a document that was not executed by or even known to ASI, and was signed only by  a member of BWS LLC (Dr. Farwell) who had no authority to sign on behalf of the undisputed owner of the Patents; (b) BWS Inc. owns the patents because they were assigned to BWS **LLC** -- even though they have never been assigned to BWS **Inc.**, and BWS LLC and BWS Inc. have totally non-overlapping owners; and (c) BWS Inc. still has exclusive rights to the invention embodied, disclosed, and enabled in the Expired Patents even though the Expired Patents have expired; (2) Ika and entities he owns or controls wholly own BWS LLC and BWS Inc., and Ika, BWS LLC, and BWS Inc. owe nothing to the Minority Shareholders (Farwell and BFL Inc.) for misappropriating their 49% equity in BWS LLC, based on the following events: (a) Ika unilaterally purported to amend the BWS LLC agreement to grant himself the right to expel members at his sole and absolute discretion, despite clear language in said agreement that such modification could only be made with the consent of all members; (b) Ika purported to expel  Dr. Farwell and BFL Inc., the other minority member of BWS LLC, without consent or due process; (c) Ika, BFL LLC, and BFL Inc. paid no compensation to said expelled members for their 49% equity in said BFL LLC; and (d) BFL LLC was dissolved and its assets transferred to BWS Inc., which is solely owned by Ika and in which the minority shareholders, Dr. Farwell and BFL Inc., have no interest.

3.9    Tomkins, Ika, and BWS Inc. have engaged in a pattern of practice of forum shopping the courts of the United States to find a forum that is most inconvenient to Dr. Farwell, notwithstanding the fact that many of the facts that gave rise to the Parties' disputes in each of these four ongoing actions are identical.  Ika Parties know or should know that the four ongoing legal actions are without basis in fact or law, and that they have no chance of prevailing on the merits.  Said lawsuits and Ika's attempt to intervene in this case are filed in bad faith with the purpose of attempting to exhaust the limited resources of Dr. Farwell, LST (the former Patent owner), and NST (the current Patent owner), in order to gain control of Dr. Farwell's invention and eliminate

Dr. Farwell as a competitor in applying said invention and as an expert witness uniquely qualified to truthfully testify regarding the fraudulent nature of Ika's attempts to market himself and his employees as experts in Brain Fingerprinting capable of effecting a technology transfer of the same to a client.

3.9.1   For example, although the Wyoming Lawsuit was dismissed, it nevertheless served a purpose for Tomkins and the other Ika Parties as a planned part of their fraudulent scheme.  They filed the lawsuit against LST, in yet another inconvenient jurisdiction for Dr. Farwell, knowing that it was totally frivolous, and sought the same outcome as they sought in the New York case: a declaration that BWS Inc. had clear title to the Patents.  Despite the fact that BWS Inc.'s case was totally without merit, Dr. Farwell was required to spend money petitioning to intervene in the case to prevent a decision by default that BWS Inc. owned the Patents and could prevent Dr. Farwell from practicing his invention.  After Dr. Farwell had spent considerable time, effort, and money, but before the Court reached the inevitable conclusion that the case was frivolous, the Ika Parties dismissed the case.  In a similar ploy, the Ika Parties called a meeting in Boston, ostensibly to negotiate a resolution of the various lawsuits.  After Dr. Farwell had flown from London to Boston at his own expense and paid for his stay in Boston, they cancelled the meeting without reason or explanation, once again using trickery and deceit to cause Dr. Farwell to expend money.  All of this reveals Tomkins' and the Ika Parties' overall strategy, to exhaust Dr. Farwell's resources and thereby eliminate him as a witness in fraud cases against Ika and as a successful practitioner of his invention of Brain Fingerprinting (which, by contrast, Tomkins and Ika are not).

3.10   Statutory law and legal precedent, not to mention elementary logic and common sense, confirm the following indisputable truths.  (1) If Person A legally assigns a patent to Person B, in a properly executed and undisputed transaction, properly recorded at the United States Patent and Trademark Office (USPTO), then Person B owns said patents and IP, and Person A cannot assign legally assign the same to Person C (or anyone). (2) If Person D never has been assigned, never has had, never has claimed, and never has been said by anyone to have ownership of a patent and associated intellectual property, Person D cannot legally assign said patent to Person C (or anyone). (3) If Person B is the undisputed owner of a patent, said patent cannot be assigned by, and patent ownership is unaffected by, any document that is not executed by Person B. Specifically, patent ownership cannot be assigned to Person C by a document that is not executed by a member, equity holder, officer, employee, agent, or any authorized representative of Person B, wherein the existence of said document and even the existence of Person C and any surrounding circumstances are not known to Person B, and furthermore wherein said document could not be a valid patent assignment because there was no consideration flowing to Person B.  Statements (1), (2), and (3) remain true regardless of what anyone says.

3.10.1   The above statements apply to the present case as follows.  (1) Dr. Farwell, inventor, assigned the Patents and associated IP to ASI in 2003, in a properly executed and undisputed transaction, properly recorded at the United States Patent and Trademark Office (USPTO).  Dr. Farwell could not assign said Patents and associated IP to BWS LLC (or anyone) in 2013, because he had no ownership interest in the same. The "LF-BWS Draft Document" referenced below, signed by Dr. Farwell in 2013, did not transfer any Patent ownership to BWS LLC. (2) BFL Inc. never has been assigned, never has had, never has claimed, and never has been said by anyone to have ownership of the Patents and associated intellectual property. The "BFL – BWS Draft Document" referenced below, signed by Dr. Farwell as Chairman of BFL Inc. in

15

2013, did not transfer any Patent ownership to BWS LLC. (3) ASI was the undisputed Patent owner in 2013.  The "Unexecuted ASI – BWS Draft Document" was not signed by ASI, or by any member, equity holder, officer, employee, agent, or any authorized representative of ASI. It was signed by Dr. Farwell as a draft document in the course of negotiations, and was never intended by either Dr. Farwell or ASI to be recorded at the USPTO. The existence of said document and even the existence of BWS LLC (the apparent "assignee") and any surrounding circumstances were not known to ASI, ASI never made any representations that might have been construed as granting Dr. Farwell the authority to assign ASI's Patents to anyone or granting BWS LLC the stature of a possible assignee of said Patents. Furthermore, said document could not be a valid patent assignment because there was no consideration flowing to ASI.

3.11    In normal human discourse, both in legal proceedings and elsewhere, it is an established principle that when Party X makes a demonstrably and unequivocally false statement, and Party Y states and thoroughly documents the indisputable fact that said statement is demonstrably and unequivocally false, it is incumbent on Party X to do one of two things: (1) acknowledge that said statement is false; or (2) present some new evidence and some new argument based thereon to support the view that said statement may not be entirely false.  At a minimum, it is incumbent on Party X to stop simply repeating the same false statement without any reference to or acknowledgement of reality.

3.11.1   The above applies to Tomkins, Ika, and BWS Inc. as follows.  In the New York case, Tomkins made the patently false and frivolous statement that Dr. Farwell assigned the Patents in 2013 to BWS LLC by signing three preliminary draft documents that were never intended by Dr. Farwell to be patent assignments, that were not executed by or even known to the undisputed patent owner, and that in any case could not be construed as patent assignments because they contained no consideration flowing to the purported assignor.  Dr. Farwell's actions in signing the documents were as follows (a) signing the LF-BWS Draft Document on behalf of himself (an undisputed non-owner of the Patents); (b) signing the BFL – BWS Draft Document as Chairman of BFL Inc. (another undisputed non-owner of the Patents) and (c) signing the Unexecuted ASI – BWS Draft Document, whereas ASI (the undisputed Patent owner) was an entity in which he was not an owner, equity holder, member, officer, employee, agent, or any kind of authorized representative, and for which he had no authority or apparent authority to sign.  These are facts regarding which ASI had never made any representations that might possibly be construed to the contrary, and for which both ASI and Dr. Farwell have signed sworn affidavits.

3.11.2   Dr. Farwell stated and thoroughly documented, in the New York case, the indisputable fact that Tomkins' above statement was demonstrably and unequivocally false, as summarized above and explained in detail below with reference to the corresponding exhibits.

3.11.3   Tomkins has taken an aggressively fact-resistant stance regarding these realities.  Tomkins did not address the fact that his statement in the New York case had been definitively proven to be false.  He made no attempt to address reality or the proven facts of the situation. He simply repeated the same false and frivolous statement, virtually word for word, in four subsequent legal cases, the BWS Inc.-Farwell Arbitration, the Motion to Intervene in the NST vs. Farwell Arbitration, the BWS Inc. vs. NST Lawsuit, and the Wyoming Lawsuit.  When Dr. Farwell documented in all four of these cases that Tomkins' statement was demonstrably and unequivocally false, Tomkins again made no attempt to address the facts.  He simply repeated

16

the same false statement virtually word for word again in each each, with no mention of or reference to the actual proven facts of the situation.

3.11.4  Tomkins' continuing, again and again in different forums, to repeat his blatantly false statement, which has been exposed as unequivocally and demonstrably false, without any attempt to address -- or even acknowledge the existence of -- the proven facts of the situation, defies not only the relevant laws, legal precedent, and normal legal procedures, but also elementary logic and common sense.

3.12  Even if one accepts BWS Inc.'s clearly untenable and frivolous premise that the three Draft Documents specified above (referred to in BWS Inc.'s documents as "Intellectual Property Acknowledgment and Assignment Agreements of June 17, 2013") were legal patent assignments and transferred ownership of the Patents to BWS LLC – which they were not and did not – BWS Inc. still has provided absolutely no evidence that BWS Inc. has or ever had any ownership interest in the Patents and associated IP.

3.12.1  Tomkins and Ika have manufactured a fiction that BWS **Inc.** owns the patents. In reality it does not and never did.  BWS **Inc.** has offered absolutely no evidence that any patents ever were assigned to it, because such evidence does not exist.  In the absence of any evidence, BWS Inc. has resorted to verbal trickery as its only resource to support the fiction it generated. BWS Inc.'s Notice of Arbitration (Supplement) (the "Notice" in the Motion to Intervene in the the NST vs. Farwell Arbitration) conflated two different entities with similar names and identical initials (but different and non-overlapping ownership), Brainwave Science, **Inc.** and Brainwave Science, **LLC.**  (For the sake of clarity and contrary to Tomkins' inconsistent and contradictory abbreviations, Brainwave Science, Inc. is referred to herein as "BWS Inc." and Brainwave Science LLC is referred to as "BWS LLC.")

3.12.2  **Said Notice stated the following: "Claimant Brainwave Science, Inc. ('BWS') is a Delaware corporation…"**

**"On or about June 27, 2012, non-party entities American Scientific Innovations, LLC, Inc., Brain Fingerprinting Laboratories, Inc. and Dr. Lawrence Farwell assigned BWS all rights, title and interest in… patents [the Patents]…The June 27, 2012 assignments were memorialized within Intellectual Property Acknowledgment and Assignment Agreements on June 17, 2013. True and accurate copies of the Intellectual Property Acknowledgment and Assignment Agreements are attached hereto as Exhibit B…**

**"BWS maintains that it lawfully acquired the subject intellectual property…"**

3.12.3  Setting aside the fact that said documents were not valid patent assignments (as described above), BWS **Inc.**'s above statements are a total fabrication that bears no resemblance to the demonstrable facts.  **None of the documents that BWS Inc. says transferred the patents to it (BWS Inc.'s Exhibit B) even mentioned BWS Inc.  The entity mentioned in said documents was Brainwave Science LLC, not Brainwave Science, Inc. (Brainwave Science, Inc. was "BWS" in Tomkins' terminology). "BWS" [Inc.] could not possibly have been the assignee of the Patents when those documents were recorded at the USPTO in 2013, because "BWS" [Inc.] did not exist in 2013. Tomkins and Ika structured it in 2016.**

3.12.4  BWS **Inc.** and BWS **LLC** are different entities with entirely non-overlapping ownership.  Ika personally owns none of BWS LLC.  Ika personally owns all of BWS Inc.  BWS LLC is owned

17

by Dr. Farwell, BFL Inc., HCW, and an undisclosed Silent Partner of HCW. (Exhibits F and AV; note that the latter states the percentages of ownership based on purported dilution of BFL Inc. that BFL Inc. and Dr. Farwell dispute, as further discussed below.)

3.12.5   It is frankly insulting to the arbitrators and judges in the various cases for Tomkins and Ika to presume that said arbitrators and judges will not have the mental acuity to read abbreviations and distinguish between two different entities with the same initials and similar names (and non-overlapping ownership). Even if the patents had been assigned to BWS LLC (which they were not), that says nothing about their ever being assigned to BWS Inc. **Tomkins' trickery was to use the initials "BWS," which are common to BWS LLC and BWS Inc., to give the false impression that documents mentioning BWS LLC (and not BWS Inc.) assigned patents to BWS Inc.** (Note, once again, that said documents did not actually assign any patents to BWS LLC either.)

3.13    On or about May 8, 2013, the following members entered into a Restated Limited Liability Company Agreement (the "BWS LLC Agreement," Exhibit F): Dr. Lawrence A. Farwell, HCW (signatory: Krishna Ika), and Brain Fingerprinting Laboratories, Inc. (signatory: Dr. Lawrence A. Farwell).

3.14    For all five of the lawsuits filed by Tomkins in various state and federal jurisdictions designed to be as expensive and inconvenient as possible for Dr. Farwell and the owners of the Patents, the fundamental claim, on which all else depends, is the claim that three specific documents transferred ownership of the Patents either to BWS LLC or to BWS Inc. Even if that claim had merit – which, as described herein, it clearly does not – it would be an abuse of the justice system to file five identical cases in five jurisdictions.

In one of the five cases, Tomkins stated that the Patents were assigned to BWS Inc. in 2013, which is obviously false, because BWS Inc. did not exist until 2016. In the other four cases, Tomkins stated that the Patents were assigned to BWS LLC (by a document that was not executed by or even known to the undisputed patent owner and included no consideration flowing to the purported assignee), and then BWS Inc. somehow came to own the Patents through some undisclosed means despite the fact that BWS Inc. was never mentioned in any documents filed at the USPTO.

The five cases filed by Tomkins, and the central claim that is identical in all of them, are as follows. In all five cases the wording of the claim is almost identical, and the documents referred to are identical.  (The only difference is that in one case Tomkins states that the Patents were assigned to BWS Inc., and in the other four cases he states that they were assigned to BWS LLC, but BWS Inc. somehow now owns them without ever having been mentioned in any documents filed at the USPTO. In fact, both of these narratives are false.) The respective cases, and the central claim that is identical in all of them, are as follows.

3.14.1   BWS Inc.-Farwell Arbitration

"17. On or about June 27, 2012, non-party entities American Scientific Innovations, LLC, Inc., Brain Fingerprinting Laboratories, Inc. and Dr. Lawrence Farwell assigned BWS [**Inc.**] all rights, title and interest in a) the software enabled invention referred to as "Brain Fingerprinting", b) patents and pending patents (including the right to renew or refresh patents) relating to "Brain Fingerprinting" c) all software and intangible assets relating to "Brain Fingerprinting", d) all modifications, including improvements and

18

derivative works relating to "Brain Fingerprinting, e) the exclusive right maintain any license, patent or copyright of, or relating to, Brain Fingerprinting and f) the right to sue for past, present or future infringement.

"18.   The June 27, 2012 assignments were memorialized within Intellectual Property Acknowledgment and Assignment Agreements on June 17, 2013. True and accurate copies of the Intellectual Property Acknowledgment and Assignment Agreements are attached hereto as Exhibit B.

"19.   Dr. Farwell executed the Intellectual Property Acknowledgment and Assignment Agreements in his individual capacity and as a Managing Partner and Chairman of non-party entities American Scientific Innovations, LLC, Inc. and Brain Fingerprinting Laboratories, Inc."

[Said "Exhibit B" comprises the three Draft Documents referenced herein.]

3.14.2 <u>New York Lawsuit</u>

Summons and Complaint

"7. On or about June 17, 2013, [BWS LLC] and Defendant Brain Fingerprinting Laboratories, Inc. entered into an IP Agreement assigning certain rights, title and interests in certain developed intellectual property, including patents, to [BWS LLC]."

Amended Complaint

"8. On or about June 17, 2013, [BWS LLC] and Defendant Brain Fingerprinting Laboratories, Inc. entered into an IP Agreement assigning certain rights, title and interests in certain developed intellectual property, including patents, to [BWS LLC]."

[Said "IP Agreement" comprises the BFL-BWS Draft Document referenced herein.]

"9. On or about June 17, 2013, [BWS LLC] and Defendant Lawrence Farwell, both individually and as Managing Partner of American Scientific Innovations, Inc. entered into an IP agreement assigning certain rights, title, and interest in certain developed intellectual property, including patents, to [BWS LLC]."

[Said "IP Agreement" comprises the Unexecuted ASI-BWS Draft Document and the LF-BWS Draft Document.]

Ika Affidavit:

"9. On or about June 27, 2012, Dr. Farwell agreed to, and did assign to the Company [BWS LLC], all of his rights, title and interest in a) the software enabled invention referred to as "Brain Fingerprinting", b) patents and pending patents (including the right to renew or refresh patents) relating to "Brain Fingerprinting" c) all software and intangible assets relating to "Brain Fingerprinting", d) all modifications, including improvements and derivative works, relating to "Brain Fingerprinting," e) the exclusive right maintain [sic] any license, patent or copyright of, or relating to, Brain Fingerprinting and f) the right to sue for past, present or future infringement.

"10. The June 27, 2012 agreement was memorialized within Intellectual Property Acknowledgment and Assignment Agreements on June 17, 2013.  Attached hereto as

19

Exhibit B are true and accurate copies of the Intellectual Property Acknowledgment and Assignment Agreements."

[Said "Agreements" comprise the three Draft Documents.]

"28. Dr. Farwell conveyed all interest in 'Brain Fingerprinting' technology to the Company [BWS LLC] in 2013."

O'Hara [attorney] Affidavit

"4. On June 17, 2013, Brain Fingerprinting entered into an IP Agreement with an effective date of June 27, 2012 transferring, conveying and assigning al rights, title and interests in certain brain fingerprinting intellectual property, including associated patents."

### 3.14.3 BWS Inc. vs. NST Lawsuit

"Farwell, in his individual capacity and as an authorized agent to ASI and BFL, assigned to BWS LLC all rights, title and interest in the "Brain Fingerprinting" Intellectual Property. This assignment was memorialized within Nunc Pro Tunc Intellectual Property Acknowledgement and Assignment Agreements dated June 17, 2013."

[Said "Nunc Pro Tunc Agreements" comprise the three Draft Documents referenced herein.]

### 3.14.4 Wyoming Lawsuit

"8. On or about June 27, 2012, non-party entities American Scientific Innovations, LLC, Inc., Brain Fingerprinting Laboratories, Inc. and Dr. Larry Farwell assigned BWS all rights, title and interest in a) the software enabled invention referred to as "Brain Fingerprinting", b) patents and pending patents (including the right to renew or refresh patents) relating to "Brain Fingerprinting" c) all software and intangible assets relating to "Brain Fingerprinting", d) all modifications, including improvements and derivative works, relating to "Brain Fingerprinting, e) the exclusive right maintain any license, patent or copyright of, or relating to, Brain Fingerprinting and f) the right to sue for past, present or future infringement.

"9. The June 27, 2012 assignments were memorialized within Intellectual Property Acknowledgment and Assignment Agreements on June 17, 2013. True and accurate copies of the Intellectual Property Acknowledgment and Assignment Agreements are attached hereto as Exhibit A.

"10. Dr. Farwell executed the Intellectual Property Acknowledgment and Assignment Agreements in his individual capacity and as a Managing Partner and Chairman of non-party entities American Scientific Innovations, LLC, Inc. and Brain Fingerprinting Laboratories, Inc."

[Said "Exhibit A" comprises the three Draft Documents referenced herein.]

3.15    As an incentive to invest in BWS LLC and thereby purchase a security, Ika Parties Ika, HCW, GOV, and BWS LLC falsely and fraudulently told the Minority Shareholders that Ika and HCW would finance BWS LLC until either a buyout by a large company, or an IPO, or major funding at a reasonable company valuation was obtained, and the Minority Shareholders would realize a substantial profit unless the company failed and went bankrupt.

3.16    As an incentive to invest in BWS LLC and thereby purchase a security, Ika Parties Ika, HCW, GOV, and BWS LLC falsely and fraudulently told the Minority Shareholders that their equity in BWS LLC would be safe from being assigned to anyone else for any reason; that there was no risk of their equity being assigned to anyone else or otherwise forfeited for any reason; that, although their equity would lose value if the company failed, as long as the company was successful their equity would retain its value, they would continue to own said equity, and they would receive a substantial return on their investment; and that, although their equity could be diluted with their consent when and if additional investors joined the LLC, their equity would never be diluted without their consent.

3.17    At the time of the Minority Shareholders' initial investment and for years thereafter, Ika Parties Ika, HCW, GOV, and BWS LLC concealed from the Minority Shareholders the identity of Ika's Silent Partner, Financier, investor, and equity holder and said partner's history, thus concealing from the Minority Shareholders significant, relevant, material information that would have influenced Minority Shareholders' decision to invest in BWS LLC.

3.18    At the time of the Minority Shareholders' initial investment and for years thereafter, Ika Parties Ika, HCW, BWS LLC, and GOV concealed from the Minority Shareholders the fact that soliciting their investment was part of a scheme, in conspiracy with others, perhaps including the undisclosed Silent Partner and the Financier, to gain control of Dr. Farwell's invention of Brain Fingerprinting and associated patents and intellectual property, then to deprive Dr. Farwell and BFL Inc. of any equity in the entity that controlled said invention or any share in the profits of said entity, and then to attempt to fraudulently sell an imitation of Dr. Farwell's invention of Brain Fingerprinting to foreign governments.

3.19    Ika Parties Ika, HCW, BWS LLC, and GOV committed fraud in the inducement in inducing Dr. Farwell and BFL Inc. to sign the BWS LLC Agreement and other prior and subsequent related and similar agreements, amendments, and re-statements, as described above. (Tomkins was not yet involved.  However, he later participated in the furtherance of this same scheme.)

3.20    In executing the BWS LLC Agreement, the Minority Shareholders, both Washington residents at the time, purchased a security upon false and fraudulent representations by Ika Parties Ika, HCW, GOV, and BWS LLC.

3.21    an undisclosed Silent Partner became a shareholder in BWS LLC subsequent to its formation, without disclosure of the identity or history of said partner to the Minority Shareholders, such that Ika, HCW, and the Silent Partner collectively owned a controlling interest in BWS LLC.

3.22    Ika Parties Ika, HCW, GOV, BWS LLC, and likely others including the Silent Partner and the Financier, conspired to fraudulently deprive Minority Shareholders of their equity in BWS LLC. (Tomkins was not yet involved.  However, he later participated in the furtherance of this same scheme.)

3.23    The    BWS    LLC    Agreement    (Exhibit    F)    stated    the    following: "Section 26. Amendments. This Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Members."

3.24    Ika Parties Ika, GOV, and HCW, BWS LLC and likely other Ika Parties, unilaterally, without the consent of the Minority Shareholders, purported to amend the BWS LLC Agreement.  The purported amendment granted the Managing Member, Ika/HCW, the authority to remove the Minority Shareholders as members and to transfer all of the Minority Shareholders' equity to

Ika, HCW, the Silent Partner, and/or BWS LLC, without consent of the Minority Shareholders and without due process of law. The only stated requirement for so doing was that in the Managing Member's (Ika's) sole and absolute opinion the Minority Shareholders had engaged in certain actions – whether the Minority Shareholders had actually engaged in said actions or not, and whether Managing Member's opinion was in good faith or not.

3.25   Ika notified Dr. Farwell, but not Brain Fingerprinting Laboratories, Inc., of his intent to hold a meeting to grant himself the authority to expel the Minority Shareholders and misappropriate the Minority Shareholders' equity as described above.  (Exhibit G).

3.26   Dr. Farwell replied that he would not participate in such a meeting, because to do so would clearly be committing a felony (Exhibit H).

3.27   Ika notified Dr. Farwell, but not Brain Fingerprinting Laboratories, Inc., that he had held said meeting and had granted himself the authority to misappropriate the Minority Shareholders' equity without consent or due process (Exhibit I).

3.28   Dr. Farwell replied that Ika, in so doing, had committed a number of felonies (Exhibit J).

3.29   Ika notified Dr. Farwell, but not Brain Fingerprinting Laboratories, Inc., that he had exercised his purported authority to remove the Minority Shareholders as members of BWS LLC and misappropriate all of the Minority Shareholders' equity, and that Minority Shareholders were no longer members of BWS LLC and no longer had any equity in BWS LLC (Exhibit K).

3.30   Ika Parties paid no compensation to Dr. Farwell and BFL Inc. for Dr. Farwell's and BFL Inc.'s equity in BWS LLC that Ika Parties misappropriated without consent or due process of law (Exhibit K).

3.31   Farwell replied that in misappropriating Farwell's and BFL Inc.'s equity in BWS LLC, Ika Parties had committed a number of felonies and a number of torts, and the misappropriation of Minority Shareholders' equity was not valid and would not stand (Exhibit L).

3.32   Tomkins and Ika Parties Ika, HCW, GOV, and BWS LLC, and likely other Ika Parties, then conspired to further defraud Dr. Farwell and BFL Inc. by dissolving BWS LLC and transferring its assets to a new company, BWS Inc.  The apparent motive for this was that Ika Parties must have realized that their scheme to misappropriate Minority Members' equity as described above was illegal and would not stand up in court, and dissolving BWS LLC and transferring its assets to BWS Inc was a second method to defraud the Minority Shareholders of their equity.

3.33   The BWS LLC Agreement stated the following: "Section 10. Capital Contributions, etc. (a) Capital Contributions of Members. Notwithstanding anything herein to the contrary, the Managing Member [HCW] shall make capital contributions to the equity capital of the Company as determined from time to time by the Managing Member; provided that such capital contributions shall be in amounts sufficient to satisfy any obligations to make any required payment pursuant to the terms of that certain Consulting Agreement between the Company and Neuroscience Inventions, LLC dated July 5, 2012."

3.34   Ika and HCW defaulted on their agreement to provide said capital contributions.  In so doing they defaulted on the BWS LLC Agreement.

3.35   On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a preliminary draft document for intellectual property (the "Unexecuted ASI-BWS Draft Document," Exhibit M).  The purpose of the Unexecuted ASI-BWS Draft Document was to

outline the terms of an intellectual property assignment that could be executed by the authorized parties after all of the parties had reached an agreement on the compensation that would be exchanged for the assignment of intellectual property. Dr. Farwell, acting in good faith but erroneously, and believing that (a) that this was simply a draft, as Ika Parties Ika, HCW, and GOV represented it, and (b) that he could persuade the authorized parties to execute a similar document once the compensation for the exchange of intellectual property had been agreed upon and the relevant documents executed, wrote his name on the Unexecuted ASI-BWS Draft Document without verifying who actually had the authority to execute the document. In fact, Dr. Farwell did not have the authority to execute a document on behalf of American Scientific Innovations, LLC, the undisputed owner of the Patents at the time. Dr. Farwell (Exhibit AE) and Ben Bryant, General Manager of ASI, (Exhibit AD) both executed sworn affidavits evidencing the same.

3.36    The Unexecuted ASI-BWS Draft Document was not notarized. The signatures thereon were not witnessed. This is consistent with the fact that the Unexecuted ASI-BWS Draft Document was a draft document and not a document intended to be recorded with the USPTO.

3.37    The spaces in the Unexecuted ASI-BWS Draft Document reserved for the description of ASI, the state where it was organized, and the address of ASI were left blank, as is common in an unexecuted draft document, and unheard-of in a legitimate document intended to be recorded with the USPTO.

3.38    On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a second preliminary draft document for intellectual property (the "BFL – BWS Draft Document," Exhibit N), which was signed by Ika representing HCW as general manager of BWS LLC and Dr. Farwell as chairman of BFL Inc..

3.39    On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a third preliminary draft document for intellectual property (the "LF – BWS Draft Document," Exhibit O), which was signed by Ika representing HCW as general manager of BWS LLC and Dr. Farwell.

3.40    Collectively, the Unexecuted ASI-BWS Draft Document, the BFL – BWS Draft Document, and the LF – BWS Draft Document, are referred to herein a the "Draft Documents."

3.41    At the time of the development of the Draft Documents, and for years thereafter and years before, Ika Parties Ika, HCW, BWS LLC, and GOV concealed from the Minority Shareholders the facts that a certain individual was Ika's Silent Partner and that they would later claim on the BWS LLC website and in correspondence that Subu Kota was also involved in BWS LLC, as described above. This is relevant because Kota had pleaded guilty to attempting to sell stolen high-tech secrets to the Soviet Union, a crime very similar to the crimes of which Ika now stands accused in South Africa, Pakistan, Nigeria, and Thailand. The Ika Parties also did not disclose that fraudulently inducing Dr. Farwell and BFL Inc. to sign said documents was part of a scheme to gain control of Dr. Farwell's invention of Brain Fingerprinting and associated Patents, then to deprive Dr. Farwell and BFL Inc. of any equity in the entity that controlled said invention or any share in the profits of said entity, and then to fraudulently misrepresent themselves as experts in psychophysiology, forensic neuroscience, and specifically Brain Fingerprinting and to fraudulently attempt to sell an imitation, counterfeit version of Dr. Farwell's invention of Brain Fingerprinting to foreign governments.

23

3.42    American Scientific Innovations LLC, was founded in 2002, with Ben Bryant serving as General Manager.

3.43    At the time of the execution of all documents referenced herein that involve ASI, the only individual authorized to execute any agreement on behalf of ASI was the General Manager, Ben Bryant.  Dr. Farwell and Ben Bryant have executed sworn affidavits stating the same (Exhibits AE an AD respectively).

3.44    Dr. Lawrence Farwell has never been an employee, officer, agent, or member of ASI. Dr. Farwell and ASI General Manager Ben Bryant have executed sworn affidavits stating the same (Exhibits AE an AD respectively).

3.45    Dr. Lawrence Farwell has never been authorized to execute any agreement on behalf of ASI, nor did Dr. Farwell ever have apparent authority to do so. Dr. Farwell and ASI General Manager Ben Bryant have executed sworn affidavits stating the same (Exhibits AE an AD respectively).

3.46    On or about January 24, 2003, Dr. Lawrence A. Farwell, inventor, assigned his interest in the Brain Fingerprinting Patents and all associated "Brain Fingerprinting" intellectual property to ASI. (Exhibit P).  Dr. Farwell therefore subsequently had no ownership interest in said patents or associated "Brain Fingerprinting" intellectual property.  Any agreement between Dr. Farwell and Brainwave Science, LLC or any other party could not result in a change in ownership of said patents or any associated "Brain Fingerprinting" rights or intellectual property.

3.47    On or about April 2, 2010, Dr. Lawrence A. Farwell, inventor, assigned his interest in US Patent 7,689,272 and all associated intellectual property to ASI (Exhibit Q). Dr. Farwell therefore subsequently had no ownership interest in the Patents or associated intellectual property.  Any agreement between Dr. Farwell and Brainwave Science, LLC or any other party could not result in a change in ownership of the Patents or associated intellectual property.

3.48    Brain Fingerprinting Laboratories, Inc. has never claimed and has never had any ownership interest in the Patents and could not assign any ownership interest in the Patents to BWS LLC or any other party.

3.49    Brain Fingerprinting, LLC has never claimed and has never had any ownership interest in the Patents and could not assign ownership interest in the Patents to BWS LLC or any other party.

3.50    Upon information and belief, at the time of the Unexecuted ASI-BWS Draft Document, the compensation to ASI for the intellectual property, and compensation to Dr. Farwell for services rendered were still under negotiation.  Dr. Farwell signed several documents that Ika had led him to believe were non-binding drafts, on the level of a letter of intent, that would be replaced by binding, properly written and executed documents that would be executed by the authorized parties only after appropriate compensation had been agreed upon for both Dr. Farwell's services and ASI's intellectual property.

3.51    Dr. Farwell was not concerned at the time of the Unexecuted ASI-BWS Draft Document about the precise wording of the Unexecuted ASI-BWS Draft Document, or about who had standing at ASI, because Ika had led him to believe that before the actual licensing or transfers of Patents to BWS would take place, formal agreements providing for compensation to Dr. Farwell, BFL Inc., and ASI would be executed, and all details could be corrected at that time.  Dr. Farwell wrote his name on said document in good faith, believing that it was a draft that would not be recorded at the USPTO.

24

3.52    The Unexecuted ASI-BWS Draft Document is null and void and has no legally binding effect because the signatory thereon, Dr. Farwell, was not a member, officer, board member, equity holder, agent, or representative of ASI, the apparent assignor, and had no authority to execute any agreement on behalf of ASI.  Both Dr. Farwell (Exhibit AE) and Ben Bryant (Exhibit AD), the General Manager and only authorized signatory for ASI, executed sworn affidavits evidencing these facts.

3.53    The Unexecuted ASI-BWS Draft Document was written, signed, and recorded at the USPTO without the knowledge or consent of the apparent assignor, ASI. ASI, who owned the Patents, and Dr. Farwell, who signed said Draft Document, never intended it to be recorded at the USPTO or to be employed as a means transfer any interest in the Patents and associated intellectual property.

3.54    Contrary to Tomkins' assertions in the five lawsuits he filed on these identical issues, the Draft Documents are null and void for at least four additional reasons: (1) said documents provided for no quid pro quo, no compensation to the respective apparent assignors, ASI, BFL Inc., and Dr. Farwell;   (2) Ika Parties Ika, HCW, BWS LLC, and GOV committed fraud in the inducement in inducing Dr. Farwell and BFL Inc. to sign the Draft Documents, as described herein; (3) In furtherance of said fraudulent inducement, Ika and HCW defaulted on the BWS LLC Agreement, as described herein; and (4) said documents were preliminary drafts, were not intended by the respective apparent assignors – Dr. Farwell, BFL Inc., and ASI -- to be recorded at the USPTO, and were recorded at the USPTO by BWS LLC without the knowledge or consent of the apparent assignors.

3.55    Aside from the status of the BFL – BWS Draft Document described above, the BFL – BWS Draft Document did not in any case transfer any interest in the Patents and associated intellectual property because BFL Inc. had no such interest.  BWS Inc. had never received a transfer of the Patents and associated intellectual property and never had or claimed any interest in the Patents and associated "Brain Fingerprinting" intellectual property.

3.56    Aside from the status of the LF – BWS Draft Document described above, the LF – BWS Draft Document did not in any case transfer any interest in the Patents and associated intellectual property because at the time of said document Dr. Farwell had no interest in the Patents and associated "Brain Fingerprinting" intellectual property. He had previously transferred the same to ASI, as described above.

3.57    As a consequence of the above, no ownership interests in any Patents or intellectual property was transferred by the Draft Documents.  Consequently, BWS LLC never owned any Patents, any "Brain Fingerprinting" intellectual property, any other related intellectual property, or any intellectual property relevant to the disputes specified herein.  (As described herein, BWS Inc. was not even mentioned in any of said documents, any patent assignments, or any other documents ever filed at the USPTO.)

3.58    The false, invalid, and erroneous recording of the Unexecuted ASI-BWS Draft Document gave the false appearance that BWS LLC owned ASI's Patents, whereas in fact since Dr. Farwell did not have the standing to sign for ASI, the ownership of the Patents and associated intellectual property always continued to rest with ASI.

3.59    Apparently believing that he had obtained all of ASI's interest in the referenced Patents without giving anything in return for it – as evidenced by the lack of compensation in the Unexecuted

ASI-BWS Draft Document, the BFL – BWS Document, and the LF – BWS Document -- Ika then refused to sign any agreement for any compensation to ASI, Dr. Farwell, BFL Inc., or anyone else for the intellectual property embodied in the Patents.  (Tomkins was not yet involved.  However, he later participated in the furtherance of this same scheme.)

3.60    The Brain Fingerprinting Patents have all expired. U.S. Patent 5,363,858 expired May 5, 2013. U.S. Patent #5,406,956 expired February 11, 2013.  U.S. Patent #5,467,777 expired September 15, 2014.

3.61    US Patent # 7,689,272 remains in force, and will expire June 7, 2022.

3.62    On or about October 29, 2013, in order to correct the erroneous, false, and unauthorized recording of the Draft Documents at the USPTO and to eliminate any doubt regarding the continued ownership of the Patents and all associated intellectual property by the rightful owner thereof, ASI, Dr. Farwell and BFL Inc. executed the Corrected Nunc Pro Tunc Intellectual Property Acknowledgement and Assignment (the "Correction," Exhibit A) and recorded it at the USPTO.

3.63    ASI's ownership of the Patents does not depend on the Correction.  Since BWS LLC never owned any of the Patents or associated intellectual property, the Correction was unnecessary to secure ASI's uninterrupted ownership thereof.  The Correction did, however, notify the USPTO of the correct situation regarding the same.

3.64    In correspondence with BWS LLC, Dr. Farwell acknowledged that ASI owned and had always owned the Patents, and that the Unexecuted ASI-BWS Draft Document did not transfer ownership in the Patents and associated intellectual property (Exhibit H).

3.65    In correspondence with Dr. Farwell, BWS LLC through its attorney Moreno acknowledged that ASI owned and had always owned the Patents and associated intellectual property, and that the Unexecuted ASI-BWS Draft Document did not transfer ownership in the Patents and associated intellectual property to BWS LLC, and that BWS LLC never had any ownership of the Patents and associated intellectual property.  The "SECTION 18(e)(i) NOTICE - VOTE TO REMOVE MEMBER" from BWS' attorney Moreno to Dr. Farwell (Exhibit G) admitted as follows:

a.    Said Letter acknowledges one fact that is in true and indisputable:

"…the transfer" [of ] "the Patents and the Fingerprinting IP to the Company"…"was invalid because Farwell and BFL were not the rightful owners with the requisite right, title and interest to the transferred assets." (page 3, paragraph 4).

One fact that the Letter clearly admits in the above section -- which is true, accurate, and indisputable -- is that there never existed a valid assignment of any of the Patents or IP to BWS LLC, and thus BWS LLC never owned any of the patents or IP.

b.    BWS LLC further admits this in said Letter in the following section.

"Company [BWS]…providing Farwell with equity in the Company, which has caused the Company substantial damage as it received no value in exchange for the equity provided to Farwell and BFL." (page 6, paragraph 1)

> The above statement admits one thing that is factual: The Company received no IP or interest in Patents in exchange for providing Dr. Farwell with equity in the company. It is false, however, that the Company received no value. On the contrary, the Company received the services and expertise of the inventor and world's leading expert in Brain Fingerprinting (Dr. Farwell).

3.66   In 2012-2016 BWS LLC and BWS Inc paid a retainer of between $8,000 and $11,000 per month to Dr. Farwell on some months, and nothing on other months.

3.67   Dr. Farwell was identified on BWS LLC's website as a Board Member and Officer (Chief Scientist) of BWS LLC (Exhibits V, W, X, Y, and Z).

3.68   In a transparent attempt to intimidate Dr. Farwell, BFL Inc., and ASI, Ika Parties Ika, GOV, and BWS LLC misrepresented the status in BWS LLC of two individuals on the BWS LLC website, www.brainwavescience.com. Said website misrepresented Trump advisor General Michael Flynn ("Flynn") and former FBI deputy director Brian McCauley ("McCauley") as being a members of the Board of Directors (Exhibit Y). This misrepresentation took place in 2016, when Ika and BWS LLC were issuing threats and demands to Dr. Farwell and ASI related to ownership of the Patents (Exhibits G, H, I, J, K, and L).

3.69   Apparently to the same end as described in the paragraph immediately above, Ika Parties Ika, GOV, and BWS LLC misrepresented the status in BWS LLC of Subu Kota. They misrepresented Kota on their website as being on the Board of Directors of BWS LLC (Exhibits W, X, Y, and Z). In correspondence and communications to Dr. Farwell and BWS LLC, Ika and BWS Inc. through their attorneys also misrepresented Kota as being an Officer (Secretary) of BWS LLC (Exhibit K) and investor in BWS LLC (BWS LLC's attorney Tompkins' allegations in Dr. Farwell's deposition in the King County, Washington case). By falsely identifying Kota as being a board member, officer, a major equity holder, and by implication a participant in the alleged fraud and other alleged crimes of Ika and BWS LLC, BWS LLC and Ika damaged the reputation of Kota and attempted to defraud Dr. Farwell.

3.70   Upon information and belief, and contrary to information on the BWS LLC website (Exhibits W, X, Y, and Z) and in the news media (Exhibits AB and AC) and/or misinformation propagated to Dr. Farwell by Ika Parties (Exhibit K and allegations of BWS Inc.'s attorney Tomkins in Dr. Farwell's deposition in the King County, Washington case), Kota has never been a member, board member, equity holder, investor, or officer of BWS LLC or BWS Inc., and did not participate in any of the alleged fraud or other alleged crimes of Ika, BWS LLC, or BWS Inc. As described herein, Kota is not a part of this action or any other legal action involving the Dr. Farwell, or, to the knowledge of the Dr. Farwell, any other legal action involving any of the parties hereto. Upon knowledge and belief, Kota has committed no crimes or torts related to any of the parties hereto.

3.71   The misinformation presented on the BWS LLC website regarding alleged connections between BWS LLC and Flynn, McCauley, and Kota (Exhibits V and Y), and alleged participation at least of Kota in some of the alleged crimes of Ika and BWS LLC (Exhibits H, J, and K), damaged the reputations of Flynn, McCauley, and Kota, as reported in the press (Exhibits AA, AB, and AC). The same misinformation regarding the alleged connection of Dr. Farwell to all of the above also damaged the reputation of Dr. Farwell (Exhibit AB).

3.72    On or about March 15, 2015, ASI assigned the Patents to Life Science and Technology, LLC. Said assignment was properly executed by Ben Bryant, the General Manager and sole authorized signatory for ASI, and recorded with the US Patent and Trademark Office (Exhibits B, C, D, and E).

3.73    Dr. Farwell is not a member, officer, equity holder, board member, employee, or agent of LST. Dr. Farwell and the President of LST, Ron Kirkendorfer have so stated in sworn affidavits (Exhibits AE and AF respectively).

3.74    Ika Parties BWS LLC, BWS Inc, and Krishna Ika have falsely and fraudulently claimed that they own the Patents and the associated "Brain Fingerprinting" intellectual property disclosed and enabled therein.

3.75    Tomkins, Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika have falsely and fraudulently claimed that they are offering for sale a viable product that embodies the intellectual property described in the Brain Fingerprinting Patents, whereas in fact they are attempting to market a counterfeit product that does effectively implement the invention embodied in the Brain Fingerprinting Patents and does not meet the published and peer-reviewed Brain Fingerprinting Scientific Standards.

3.76    Ika Parties Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika have made multiple false and fraudulent claims on their website (www.brainwavescience.com) and elsewhere regarding the Brain Fingerprinting science and technology that is embodied in the Brain Fingerprinting Patents and that Dr. Lawrence Farwell invented, developed, patented, published in the peer-reviewed scientific literature, successfully applied in criminal cases and in court, and continues to apply. This is documented in Exhibits S and U.

3.77    Tomkins, Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika are falsely and fraudulently attempting to market a counterfeit product that does not have the qualities and attributes of the genuine Brain Fingerprinting invented by Dr. Lawrence Farwell and embodied in the Patents, is equivalent to Dr. Farwell's invention of "Brain Fingerprinting," and was formerly called "Brain Fingerprinting" (Exhibits S, T, and U).

3.78    The counterfeit product that Tomkins, Brainwave Science, LLC, Brainwave Science, Inc., and Ika have been attempting to market (Exhibits S, AG, AH, AI, AJ, AK, AL, AM, AN, AO, and AP):

   a.   Is not the Brain Fingerprinting scientific technology that was invented by Harvard-trained neuroscientist Dr. Farwell, who was selected by *TIME* magazine as one of the top innovators of our time, "the Picassos or Einsteins of the 21st Century."

   b.   Is not the specific scientific technique of Brain Fingerprinting that meets the 20 Brain Fingerprinting Scientific Standards that Dr. Farwell has published. There is no evidence anywhere that the counterfeit product and faux training that BWS Inc. is offering meet these standards.

   c.   Has not been tested and proven at the CIA, the FBI, and the US Navy.

   d.   Has never been applied in real-world criminal cases, including serial killer JB Grinder and innocent murder convict Terry Harrington.

   e.   Has not been proven over 99% accurate in research at the FBI, the CIA, the US Navy, and elsewhere published in the top peer-reviewed scientific journals. There is no

28

evidence anywhere that what BWS Inc is offering has achieved such accuracy in scientific studies or field applications.

f.  Has never achieved 99% accuracy, or any other proven level of accuracy, in any published research, forensic applications, field applications, or in any other context.

g.  Has not been featured in major national and international news media, including *CBS Evening News, ABC World News, CNN, PBS, BBC, CBS 60 Minutes, ABC Good Morning America,* the *Discovery Channel, The New York Times, The Washington Post, TIME Magazine,* and *US News and World Report*.

h.  Has not been proven to be capable of detecting bomb makers, criminals, and terrorists, in peer-reviewed publications.

i.  Lacks the qualities and achievements of the genuine Brain Fingerprinting invented and developed by Dr. Farwell, as listed herein and in the Exhibits.

j.  Has produced no evidence that the unproven technology BWS Inc is offering achieves the same accuracy, reliability, or validity of the genuine Brain Fingerprinting practiced by Dr. Farwell and other competent, trained, and credentialed scientists.

3.79   No one employed by or affiliated with Ika Parties Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika (Exhibits S, AG, AH, AI, AJ, AK, AL, AM, AN, AO, and AP):

a.  has ever been trained in Brain Fingerprinting by a Brain Fingerprinting expert;

b.  has ever conducted or published Brain Fingerprinting research;

c.  has ever successfully applied Brain Fingerprinting in real-world cases;

d.  has ever conducted Brain Fingerprinting research for the FBI, the CIA, or the US Navy;

e.  is qualified to conduct a scientific Brain Fingerprinting test that meets the Brain Fingerprinting Scientific Standards; or

f.  has been featured in any of the major news sources mentioned above that have featured Dr. Farwell and his genuine Brain Fingerprinting invention.

3.80   Ika Parties have purported to practice, make, and use, and have attempted to sell, the intellectual property embodied in the Brain Fingerprinting Patents without compensation to ASI, the rightful owner of the Patents from the founding of BWS LLC and BWS Inc. until March 15, 2015, or LST, the rightful owner of the Patents since March 15, 2015.

3.81   As a result of the Tomkins' and the other Ika Parties' actions and conduct, Dr. Farwell's ability to practice, market, and sell his invention, to perform on existing Brain Fingerprinting contracts with government agencies and others, and to practice his lifetime profession have been damaged.

3.82   From 2000 through 2006, Dr. Farwell held a service mark on "Brain Fingerprinting" registered with the USPTO (registration number 2308729).  Said mark was cancelled October 21, 2006. Subsequently both Dr. Farwell and BWS LLC applied unsuccessfully for said mark (serial number 77247169 and serial number 85775316 respectively).  "Brain Fingerprinting" is now in the public domain.

3.83    Ika Parties should have known in 2013, and knew and admitted in 2016, the following facts, all of which remained undisputed until 2019: the Unexecuted ASI-BWS Draft Document was not executed by ASI, the apparent "assignor" therein, who was then the undisputed owner of the Patents and all associated Brain Fingerprinting intellectual property, and was written, signed, and recorded at the USPTO without the knowledge or consent of ASI, and which consequently transferred no intellectual property to the Ika Parties; the LF-BWS Draft Document was signed by an "assignor" who did not possess the Patents or any associated Brain Fingerprinting intellectual property, having previously assigned the same to ASI, and consequently transferred no intellectual property to the Ika Parties; the BFL-BWS Draft Document was signed by an "assignor" who never had and never claimed any ownership of the Patents and associated Brain Fingerprinting intellectual property, and consequently transferred no intellectual property to the Ika Parties; the Brain Fingerprinting Patents expired in 2013 and 2014 and consequently the Brain Fingerprinting intellectual property embodied and disclosed therein is now in the public domain.  In a transparent attempt to prevent Dr. Farwell from practicing his invention, his profession, and his business, and knowing all of the above facts, the Tomkins filed a false and frivolous lawsuit in federal court in Wyoming (the Wyoming Lawsuit) against LST, the owner of the Patents, based on false statements by Tomkins that directly contradicted the above indisputable and previously undisputed facts.

3.84    Dr. Farwell is a Harvard graduate with a PhD in biological psychology and a former research associate at Harvard Medical School. Dr. Farwell is the inventor of Brain Fingerprinting, as per the Patents and peer-reviewed publications cited below.  Dr. Farwell has published extensively on Brain Fingerprinting in leading peer-reviewed scientific journals (Exhibits AG, AH, AI, AJ, AK, AL, and AM).

3.85    Dr. Farwell has conducted Brain Fingerprinting research at the FBI, the CIA, and the US Navy and published the results in peer-reviewed scientific journals (Exhibits AG, AH, AI, AK, AL, and AM).

3.86    Dr. Farwell has successfully applied Brain Fingerprinting science in real-world criminal cases (Exhibits AG, AH, AI, AK, AL, and AN).

3.87    The science and technology of Brain Fingerprinting that Dr. Farwell invented and developed and his expert testimony on it have been ruled admissible in court (Exhibits AN, AO).

3.88    Dr. Farwell has successfully practiced his profession as a forensic neuroscientist, and specifically as the world's leading expert in the Brain Fingerprinting science and technology that he invented, for over 25 years (Exhibits AG, AH, AI, AJ, AK, AL, AM, AN, AO, and AP).

3.89    Forensic Science Laboratory, New Delhi, India ("FSL") is a client of Dr. Farwell, having purchased a Brain Fingerprinting system and associated training by Dr. Farwell.

3.90    On or about May 14, 2019 Tomkins falsely and fraudulently libeled Dr. Farwell in communications to Dr. Farwell's client FSL.  Tomkins falsely accused Dr. Farwell of fraud, theft, sabotage, lying, dishonesty, bad faith, duplicity, unethical business practices, and other illicit and undesirable actions.

3.91    On or about May 14, 2019 Tomkins wrote and caused to be delivered a letter ("Tomkins' Libelous Letter," Exhibit AU) to Dr. Farwell's client FSL.

3.92   Tomkins' Libelous Letter falsely, fraudulently, and libelously claimed that Dr. Farwell had stolen hardware comprising Ika Parties' Counterfeit Product from Defendant Brainwave Science, Inc.

3.93   Tomkins' Libelous Letter falsely, fraudulently, and libelously claimed that Dr. Farwell had sold to Dr. Farwell's client FSL said allegedly stolen hardware (comprising an EEG headset, as described in documents accompanying Tomkins' Libelous Letter).  It would be ludicrous for Dr. Farwell -- the inventor and developer of the genuine Brain Fingerprinting, who had been applying and selling his genuine Brain Fingerprinting system for decades before Ika Parties BWS LLC and BWS Inc existed -- would steal and attempt to sell a counterfeit system such as Ika Parties' Counterfeit Product. Moreover, such an accusation must be false for the following reason.  The headset that Dr. Farwell and his affiliated company Brain Fingerprinting, LLC sold to FSL (as part of the Farwell Brain Fingerprinting system purchased by FSL) was a custom headset ("Dr. Farwell's Custom Headset") designed by Dr. Farwell and custom manufactured in the USA. Based upon information and belief, Ika Parties Ika, BWS LLC, and BWS Inc only use and only have ever possessed entirely different headsets manufactured in Taiwan, and all of their software works only with said Taiwanese headsets and not with Dr. Farwell's Custom Headset.  On information and belief, no one other than Dr. Farwell and his affiliated companies, Brain Fingerprinting, LLC and Brain Fingerprinting Laboratories, Inc., possesses Dr. Farwell's Custom Headset or any instantiation thereof. Ika Parties have never possessed any instantiation of Farwell's Custom Headset – the headset that Dr. Farwell sold to FSL. Consequently, any allegation that Dr. Farwell stole from Ika Parties the Farwell's Custom Headset that he sold to FSL (or anyone else) must be false, fraudulent, and libelous or slanderous.

3.94   Tomkins' allegation that Dr. Farwell stole a headset from Ika Parties Ika and Brainwave Science Inc. is false and libelous with regard to the false accusation of theft.

3.95   The allegation or implication in Tomkins' Libelous Letter that Dr. Farwell stole and then sold a headset from Ika Parties Ika and Brainwave Science Inc. is additionally false and libelous with regard to the false accusation that Dr. Farwell sold stolen goods.

3.96   Tomkins' allegation or implication in Tomkins' Libelous Letter that Dr. Farwell sold Ika Parties' Counterfeit Product to FSL is additionally false and libelous in that such a sale would never be undertaken by Dr. Farwell or any other legitimate forensic scientist with expertise in Brain Fingerprinting. In falsely alleging that Dr. Farwell sold Ika Parties' Counterfeit Product, Tomkins implies that in the course such sale Dr. Farwell must have misrepresented that Ika Parties' Counterfeit Product had value and was worth buying – which it does not and is not, and that Ika Parties' Counterfeit Product had his endorsement or was represented by him – which it does not and is not.  Such representations or implications are damaging to Dr. Farwell's reputation, stature, and professional success as a forensic scientist and expert in genuine Brain Fingerprinting.  No legitimate forensic scientist with expertise in Brain Fingerprinting would make such misrepresentations regarding Ika Parties' Counterfeit Product or any other product that fails to meet the Brian Fingerprinting Scientific Standards.

3.97   Tomkins' Libelous Letter also threatened Dr. Farwell's client FSL with criminal prosecution for possession of stolen property, on the basis of having purchased the same from Dr. Farwell.

3.98   Tomkins' Libelous Letter falsely and libelously stated that Dr. Farwell is being investigated by the FBI.  No such investigation exists.  Ika spoke to an FBI agent in 2016 regarding the various

disputes at the time.  No investigation ensued, and no investigation was taking place at the time of Tomkins' Libelous Letter.

3.99   Tomkins' Libelous Letter falsely stated that Brainwave Science, Inc. is actively and fully cooperating with a (non-existent) FBI investigation of Dr. Farwell.  No such cooperation is taking place.  No such investigation is taking place, and no such investigation or cooperation was taking place at the time of Tomkins' Libelous Letter.

3.100 In the context of security clearances, Dr. Farwell has been investigated by numerous national and international law enforcement, intelligence, counterterrorism, and military agencies around the world, beginning with the FBI and the CIA in the early 1990s.

3.101 Throughout the last quarter of a century, including over 20 years prior to the existence of Ika Parties BWS LLC and BWS Inc., Dr. Farwell has cooperated and collaborated with national and international law enforcement, intelligence, counterterrorism, and military agencies around the world, beginning with the FBI and the CIA in the early 1990s, and has provided said agencies with his professional expertise as a forensic neuroscientist as well as his invention of Brain Fingerprinting.

3.102 Based upon knowledge and belief and as described below and documented in the exhibits hereto, Ika Parties Ika, Tomkins, BWS LLC, BWS Inc. and their employees have never collaborated with national and international law enforcement, intelligence, counterterrorism, or military agencies and provided said agencies with professional expertise in forensic neuroscience, because Ika Parties lack any training, certification, qualification, credentials, education, knowledge, or expertise in forensic neuroscience, and specifically in the forensic neuroscience of Brain Fingerprinting.

3.103 Tomkins' Libelous Letter contained additional false, fabricated, and remarkably fanciful hearsay apparently designed to disparage and defame Dr. Farwell and his science and technology.

3.104 Tomkins' actions, including but not limited to libeling Dr. Farwell and threatening Dr. Farwell's client FSL with criminal prosecution for doing business with Dr. Farwell, can only reasonably be understood as an attempt to interfere with Dr. Farwell's contract and business relationship with FSL and Dr. Farwell's other clients, to defame Dr. Farwell, and to disparage Dr. Farwell's science and technology, and to weaken or intimidate Dr. Farwell as a potential witness in future criminal prosecutions of Ika based on authorities having accused Ika of fraud in Pakistan, South Africa, Nigeria, and Thailand, as Dr. Farwell has testified as a witness in a previous fraud case against Ika, as described herein.

3.105 In Dr. Farwell's professional opinion as the inventor of Brain Fingerprinting, the world's leading expert in the science of Brain Fingerprinting, and the most experienced expert in applying Brain Fingerprinting in criminal, counterterrorism, and counterintelligence cases with national law enforcement and national security agencies around the world, any misguided attempt by unqualified persons to apply counterfeit technology, such as Ika Parties' Counterfeit Product, which Ika Parties Ika, BWS LLC, and/or BWS Inc are attempting to market, in real criminal or counterterrorism cases would be a serious  threat to national security and justice.  Other experts agree with this opinion, as documented below, and no known Brain Fingerprinting expert disagrees with this assessment.

3.106 On or about March 18, 2019, Dr. Farwell received the first of a series of communications from Donald Buti Ramfolo ("Ramfolo"), and his associates Jacob Madikiza ("Madikiza"), and Christo

Botes in South Africa regarding their plans to collaborate with Dr. Farwell and Brain Fingerprinting, LLC to bring Dr. Farwell's Brain Fingerprinting technology to South Africa. General Ramfolo is a Brigadier General (ret) Military Intelligence in South Africa. Madikiza is a retired Deputy Director General, South African Secret Service. Some of these communications from General Ramfolo contained information regarding alleged fraud by Ika Parties Ika and BWS Inc involving the science and technology of Brain Fingerprinting that Dr. Farwell invented and developed. General Ramfolo provided the facts contained in his sworn affidavit (Exhibit AR). See the Exhibit for details. Madikiza did not provide an affidavit because he was not present at the meetings discussed, and all of the information he had constituted hearsay. The affidavit of General Ramfolo contains the following facts.

3.107 Based upon information and belief and according to General Ramfolo, Ika Parties Ika, BWS LLC, and/or BWS Inc made false and fraudulent claims regarding Brain Fingerprinting and the Ika Parties' Counterfeit Product in an attempt to sell Ika Parties' Counterfeit Product to the South African government.

3.108 Based upon information and belief and according to General Ramfolo, when General Ramfolo asked Ika to provide information regarding the acceptance in court that Ika Parties Ika, BWS LLC, and/or BWS Inc claimed that Ika Parties' Counterfeit Product had achieved, the only references Ika Parties Ika, BWS LLC, and/or BWS Inc provided were to court cases in which Dr. Lawrence Farwell and his genuine Brain Fingerprinting science were involved, cases that predated the existence of BWS LLC and BWS Inc. and had nothing to do with Ika, BWS LLC, BWS Inc, and Ika Parties' Counterfeit Product.

3.109 Over the last three years Dr. Farwell has collaborated with ██████████  ██████ in several law enforcement, intelligence, and counterterrorism agencies in ██████ and assisted those agencies in solving criminal, counterterrorism, and counterintelligence cases. ██████████ has twice successfully completed training in Brain Fingerprinting science and technology that Dr. Farwell conducted.

3.110 According to ██████████████████ he witnessed an attempt by Ika Parties Ika, BWS LLC, and/or BWS Inc to defraud an intelligence agency of the ██████ government on or about April 15, 2019.

3.111 Based upon information and belief and according to ██████, Ika Parties Ika, BWS LLC, and/or BWS Inc through their representative attempted to sell said agency their counterfeit product, fraudulently represented that their product was the same as Dr. Farwell's Brain Fingerprinting, and fraudulently represented that they and their employees were qualified to practice forensic neuroscience, specifically Brain Fingerprinting, and to train others to do so.

3.112 Based upon information and belief and according to ██████ Ika Parties Ika, BWS LLC, and/or BWS Inc' representative, on instructions from Ika Parties Ika, BWS LLC, and/or BWS Inc, falsely represented to the ██████ government that BWS represented Dr. Lawrence Farwell and his Brain Fingerprinting technology, whereas in fact Dr. Farwell has no relationship with BWS, and they do not have his Brain Fingerprinting technology.

3.113 Based upon information and belief and according to Brain Fingerprinting expert ██████, any attempt to apply Ika Parties' Counterfeit Product in law enforcement, counterterrorism, or intelligence operations would have "disastrous consequences." In his affidavit ██████████,

████ stated the following: "My experience in applying the genuine Farwell Brain Fingerprinting in collaboration with Dr. Farwell and agencies of ████ leads me to the conclusion that if Ika and BWS ever succeeded in selling their counterfeit technology and training by unqualified personnel to any major intelligence, counterterrorism, or law enforcement agency; this would be a major threat to national security and justice. There is no evidence that BWS' and Ika's counterfeit technology works at all, let alone with high accuracy. Their 'trainers' are not qualified to practice forensic neuroscience, specifically Brain Fingerprinting, let alone to train others to do so. Applying such an unproven and untested technology, and attempting to apply training by such unqualified personnel, would in my opinion be likely to have disastrous consequences for counterterrorism, counterintelligence, and law enforcement efforts."

3.114 On or about May 10, 2017, Dr. Farwell received the first of a series of communications regarding the science and technology of Brain Fingerprinting that Dr. Farwell invented and developed from Jose Kuruvilla ("Kuruvilla"), CEO of Mainland Security, Inc., with headquarters in Hong Kong and Thailand. Mr. Kuruvilla informed Dr. Farwell of the following facts.

3.115 Based upon information and belief and according to Kuruvilla, on or about May 1, 2017, Ika Parties Ika, BWS LLC, and/or BWS Inc attempted to defraud the government of Thailand by selling them their counterfeit technology and associated training by unqualified personnel.

3.116 Based upon information and belief and according to Kuruvilla, Ika gave a demonstration of their counterfeit technology in which he purported to be measuring and analyzing brainwaves and achieving an accurate result with Ika Parties' Counterfeit Product, which Ika misrepresented as genuine Brain Fingerprinting.

3.117 Based upon information and belief and according to Kuruvilla, after placing a headset on a subject and running the software, Ika told the government of Thailand that they had collected sufficient data, and now they would analyze the data. He said the results of the analysis of the data they had just collected would appear on the screen.

3.118 Based upon information and belief and according to Kuruvilla, Kuruvilla observed that Ika did not attempt to analyze the data as he falsely represented to the government he was doing. Instead, he simply accessed and displayed a previously developed graphics file that appeared to show the results of a brainwave test. Ika fraudulently represented that the previously produced graphics file was actually a representation of the results of computer analysis of the data that they had just purportedly collected. This is documented in Exhibit AT.

3.119 Based upon information and belief and according to Kuruvilla, Ika told Kuruvilla that they had bought the system they were presenting from Dr. Farwell and that they were still paying royalties to Dr. Farwell. Dr. Farwell knows both of these statements to be false and fraudulent. Neither of those events ever happened.

3.120 Based upon information and belief and according to Kuruvilla, Ika lied to Kuruvilla in an attempt to sell the Ika Parties' Counterfeit Product. In a phone conversation with Dr. Farwell on or about May 12, 2019, Kuruvilla stated, "When people are lying I don't need a lie detector. I told my people we will not do business with [Ika Parties Ika, BWS LLC, and/or BWS Inc]."

3.121 On or about June 28, 2017, Dr. Farwell received the first of a series of communications regarding the science and technology of Brain Fingerprinting that Dr. Farwell invented and developed from Bolaji Oye ("Oye"), Chief Operating Officer of Piqure Solutions LTD in Nigeria. He informed Dr. Farwell of the following facts:

3.122 Based upon information and belief and according to Oye, Ika Parties Ika, BWS LLC, and/or BWS Inc attempted to defraud the Nigerian Defense Intelligence Agency by selling them Ika Parties' Counterfeit Product and associated training by unqualified personnel.

3.123 Based upon information and belief and according to Oye, the Nigerian NSA, the Nigerian Defense Intelligence Agency, and Oye detected and thwarted the attempted fraud by Ika Parties Ika, BWS LLC, and/or BWS Inc.

3.124 Oye stated the following in an email to Dr. Farwell on July 8, 2017.  "Just for your information, the Nigerian Government is about to be fleeced by Brainwave Science...This meeting I am having this morning will be the start of pulling the plug on BrainWave Science in Nigeria. We have already contacted the Nigerian NSA on this matter, but we are also approaching the DEFENCE INTELLIGENCE AGENCY (institution that wants to buy the item) to make them aware that BRAINWAVE SCIENCE [BWS Inc.] is all a con."  The Nigerian government recognized these facts, and did not purchase Ika Parties' Counterfeit Product.

# Exhibits

The following are brief descriptions of each of the Exhibits hereto, along with links where the Exhibits can be accessed online.

## A. List of All Exhibits, With Links

https://www.dropbox.com/sh/29vhnwa7g3fjgvl/AAD-h6NmHlw9ePesIIQ9h5L0a?dl=0

**or**

https://farwellbrainfingerprinting.com/pdf/Ex/List_of_Exhibits_FBI_Report_On_Suspects_Krishna_Ika_and_Paul_Tomkins2114.pdf

## B. All Exhibits in a Single Document

https://www.dropbox.com/sh/29vhnwa7g3fjgvl/AAD-h6NmHlw9ePesIIQ9h5L0a?dl=0

**or**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibits_FBI_Report_On_Suspects_Krishna_Ika_and_Paul_Tomkins2114.pdf

## C. Individual Exhibits With Separate Links

(The below list is the same as the list in the above document "List of All Exhibits With Links")

**Exhibit A**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_A_CorrectionUSPTO-BWS-ASI.pdf

A correction filed at the USPTO that informed the USPTO that the Draft Documents were filed in error and did not constitute patent assignments.

**Exhibits B, C, D, and E**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_B_AssignmentRecordationForm3OldUSPatentsAsRecordedUSPTO.pdf

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_C_PatentAssignmentASI-LST-OldUSPatents1501Signed.pdf

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_D_AssignmentRecordationFormCurrentUSPatent7689272AsRecordedUSPTO.pdf

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_E_PatentAssignmentASI-LST-CurrentUS-UKPatents1502Signed.pdf

March 15, 2015, Assignment of the three expired Patents from American Scientific Innovations, LLC to Life Science and Technology, LLC.  Said assignment was properly executed by Ben Bryant, the General Manager and sole authorized signatory for ASI, and recorded with the US Patent and Trademark Office.

**Exhibit F**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_F_BrainwaveScienceLLCRevisedAgreem ent-05-18-2013-SignedEditable.pdf

Brainwave Science, LLC Limited Liability Company agreement

**Exhibit G**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_G_LettertoFarwell-Section18eiNotice-VotetoRemove.pdf

A letter in which Ika's attorney Moreno told Dr. Farwell of Ika's intent to hold a meeting to unilaterally grant himself the authority to remove the Minority Shareholders and misappropriate the equity of the Minority Shareholders in Brainwave Science, LLC to himself.

**Exhibit H**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_H_DrFarwellReplyToNoticeOfAmendme ntAndLetterToFarwellSection18-1603.pdf

Dr. Farwell's reply to Ika's attorney's letter (Exhibit G) in which Dr. Farwell declined to participate in Ika's proposed meeting, as doing so would involve committing a felony.

**Exhibit I**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_I_NoticeofAmendmenttoOperatingAgree mentwExhibits.pdf

A letter in which Ika's attorney Moreno notified Farwell that Ika had held a meeting and had granted himself the authority to remove the Minority Shareholders in Brainwave Science, LLC and misappropriate the Minority Shareholders' equity to himself without consent or due process.

**Exhibit J**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_J_FarwellEmailReplyToMorenoNoticeOf Amendment1901.pdf

A letter in which Dr. Farwell replied that Ika, in taking the actions described by Ika's attorney Moreno in Exhibit I, had committed a number of felonies.

**Exhibit K**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_K_MemberRemovalPursuantToSection81 OfTheOperatingAgt.pdf

A letter from Ika's attorney Moreno to Dr. Farwell in which he stated that Ika had removed the Minority Shareholders from Brainwave Science, LLC and had not paid them any compensation for their equity.

**Exhibit L**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_L_FarwellMorenoFinalFewEmails1601.p df

Emails between Dr. Farwell and Brainwave Science, LLC's attorney Moreno regarding Ika's removal of the Minority Shareholders in Brainwave Science, LLC and misappropriation of their equity to himself without consent or due process.

**Exhibit M**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_M_UnexecutedDraftDocumentASI-BWS.pdf

On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a preliminary draft document for intellectual property (the "Unexecuted ASI-BWS Draft Document," Exhibit M, referred to in Brainwave Science, Inc.'s pleadings as the "Nunc Pro Tunc Intellectual Property Assignment"). The purpose of this document was to outline the terms of an intellectual property assignment that could be executed by the authorized parties after all of the parties had reached an agreement on the compensation that would be exchanged for the assignment of intellectual property. Ika's attorney erroneously recorded said document as a "patent assignment," even though it was not executed by or even known to the undisputed patent owner at the time, American Scientific Innovations, LLC, and contained no compensation flowing to the purported "assignor." This erroneous recording was later corrected at the USPTO by a document executed by Dr. Farwell and Brain Fingerprinting Laboratories, Inc.

**Exhibit N**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_N_PatentDocBFL-BWS.pdf

On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a second preliminary draft document for intellectual property (the "BFL – BWS Draft Document," Exhibit N). The purpose of this document was to outline the terms of an intellectual property assignment that could be executed by the authorized parties after all of the parties had reached an agreement on the compensation that would be exchanged for the assignment of intellectual property. Ika's attorney erroneously recorded said document as a "patent assignment," even though it was not executed by or even known to the undisputed patent owner at the time, American Scientific Innovations, LLC, and contained no compensation flowing to the purported "assignor." The apparent "assignor," Brain Fingerprinting Laboratories, Inc., never had and never claimed any interest in the Patents, and thus could not assign any interest to BWS LLC (or anyone). This erroneous recording was later corrected at the USPTO by a document executed by Dr. Farwell and Brain Fingerprinting Laboratories, Inc.

**Exhibit O**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_O_PatentDocLF-BWS.pdf

On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a third preliminary draft document for intellectual property (the "LF – BWS Draft Document," Exhibit O). The purpose of this document was to outline the terms of an intellectual property assignment that could be executed by the authorized parties after all of the parties had reached an agreement on the compensation that would be exchanged for the assignment of intellectual property. Ika's attorney erroneously recorded said document as a "patent assignment," even though it was not executed by or even known to the undisputed patent owner at the time, American Scientific Innovations, LLC, and contained no compensation flowing to the purported "assignor." The apparent "assignor," Dr. Farwell at this time had no ownership interest in the Patents, and thus could not assign them to BWS LLC (or anyone). This erroneous recording was later corrected at the USPTO by a document executed by Dr. Farwell and Brain Fingerprinting Laboratories, Inc.

**Exhibit P**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_P_AssignmentPatents1-3LF-ASI202.pdf

Patent assignment from Dr. Farwell to American Scientific Innovations, LLC (ASI). On or about January 24, 2003, Dr. Lawrence A. Farwell, inventor, assigned his interest in the Brain Fingerprinting Patents and all associated "Brain Fingerprinting" intellectual property to ASI.

**Exhibit Q**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_Q_AssignmentPatent4LF-ASI1001.pdf

On or about April 2, 2010, Dr. Lawrence A. Farwell, inventor, assigned his interest in US Patent 7,689,272 and all associated intellectual property to American Scientific Innovations, LLC.

**Exhibit S\***

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_S_DifferencesBetweenFarwellBrainFingerprintingAndBWS1905.pdf

Differences between genuine Farwell Brain Fingerprinting and Brainwave Science Inc.'s counterfeit product.

**Exhibit T**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_T_SummaryOfFraudOnBWSWebsiteGenNK1906.pdf

Summary of fraud on Brainwave Science, Inc.'s website as of December 5, 2018. (Note: Much of this material has since been removed.)

**Exhibit U**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_U_FraudulentClaimsOnCurrentBWSWebsiteGenNK1907.pdf

Fraudulent claims on Brainwave Science, Inc.'s website as of December 5, 2018. (Note: Much of this material has since been removed.)

**Exhibit V**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_V_BrainwaveScienceWebsiteArchivesWaybackMachine1901.pdf

Summary of previous versions of Brainwave Science, LLC's and Brainwave Science, Inc.'s website as per the Wayback Machine (http://www.wayback.com/).

**Exhibit W**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_W_BrainwaveScienceWebsiteBoardOfDirectors2016-06-23.pdf

Brainwave Science, LLC Board of Directors according to BWS LLC's website June 23, 2016: Krishna Ika, Dr. Lawrence Farwell, Ravi Ika, and Subu Kota.

**Exhibit X**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_X_BrainwaveScienceWebsiteBoardOfDirectors2016-07-08.pdf

Brainwave Science, LLC Board of Directors according to BWS LLC's website July 8, 2016: Krishna Ika, Dr. Lawrence Farwell, Ravi Ika, and Subu Kota.

**Exhibit Y**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_Y_BrainwaveScienceWebsiteBoardOfDirectors2016-07-24.pdf

Brainwave Science, LLC Board of Directors according to BWS LLC's website July 24, 2016: Krishna Ika, Dr. Lawrence Farwell, General Michael Flynn, Brian McCauley, and Subu Kota.

**Exhibit Z**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_Z_BrainwaveScienceWebsiteBoardOfDirectors2016-08-24.pdf

Brainwave Science, LLC Board of Directors according to BWS LLC's website August 24, 2016: Krishna Ika, Dr. Lawrence Farwell, and Subu Kota.

**Exhibit AA**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AA_FraudClaimsTrailBrainwaveCompanyBostonBusinessJournal1902.pdf

*Boston Business Journal*, 01/05/2018, Brainwave Science: "Fraud claims trail 'brainwave' company tied to Michael Flynn."

**Exhibit AB**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AB_BloombergOnFlynnArticle1602.pdf

*Bloomberg*, 12/23/2016, Brainwave Science: "Trump Aide Partnered With Firm Run by Man With Alleged KGB Ties."

**Exhibit AC**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AC_Michael_Flynn_had_role_in_firm_co-led_by_man_who_tried_to_sell.pdf

*The Washington Post / AP / Chicago Tribune,* 12/21/2016, Brainwave Science: "Michael Flynn had role in firm co-led by man who tried to sell material to the KGB."

**Exhibit AD**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AD_BenBryantAffidavitNo2.pdf

Sworn affidavit of Ben Bryant, President and General Manager of American Scientific Innovations, LLC (ASI), stating that Dr. Farwell assigned the Brain Fingerprinting Patents to ASI, ASI never assigned said Patents to Brainwave Science LLC or Brainwave Science Inc., and ASI assigned said Patents to Life Science and Technology, LLC, and Dr. Farwell has never been a member, director, executive, officer, agent, or employee of ASI, and has never had any real or apparent authority to bind or represent ASI.

**Exhibit AE**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AE_FarwellAffidavitBWSvsLSTIMotionToInterveneSignedNotarized1902.pdf

Sworn affidavit of Dr. Lawrence Farwell stating that he is not a member, equity holder, officer, employee, board member, agent, or representative of American Scientific Innovations, LLC or Life Science and Technology, LLC.

**Exhibit AF**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AF_KirkendorferAffidavitResizedFromP
NG1902.pdf

Sworn affidavit of Ronald Kirkendorfer stating that Dr. Farwell is not a member, equity holder, officer, employee, board member, agent, or representative of Life Science and Technology, LLC.

**Exhibit AG**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AG_Dr_Lawrence_Farwell_Brain_Finger
printing_Field_Studies.pdf

Farwell, L.A.., Richardson, D.C., & Richardson, G.M. (2013). Brain fingerprinting field studies comparing P300-MERMER and P300 brainwave responses in the detection of concealed information. DOI 10.1007/s11571-012-9230-0, *Cognitive Neurodynamics 7*(4): 263-299

**Exhibit AH**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AH_Farwell_et_al_2014_Brain_Fingerpri
nting_US_Navy_Study.pdf

Farwell L.A., Richardson D.C., Richardson G.M .and Furedy J.J. (2014). Brain fingerprinting classification concealed information test detects US Navy military medical information with P300. *Frontiers in Neuroscience 8*:410. doi: 10.3389/fnins.2014.00410

**Exhibit AI**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AI_Dr-Lawrence-Farwell-Brain-
Fingerprinting-P300-MERMER-Review.pdf

Farwell, L.A. (2012). Brain fingerprinting: a comprehensive tutorial review of detection of concealed information with event-related brain potentials, *Cognitive Neurodynamics 6*:115-154, DOI 10.1007/s11571-012-9192-2.

**Exhibit AJ**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AJ_Farwell-Donchin-1991-
Psychophysiology-Brain-Fingerprinting.pdf

Farwell, L. A. and Donchin, E. (1991). The Truth Will Out: Interrogative Polygraphy ("Lie Detection") With Event-Related Brain Potentials. Psychophysiology, 28:531-547.

**Exhibit AK**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AK_LieDetectionEncyclopediaOfForensi
cSciencesFarwellCorrectBFL.pdf

Farwell, L.A. (2013). Lie Detection. In *Encyclopedia of Forensic Sciences*, 2nd Edition.  Oxford: Elsevier.

**Exhibit AL**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AL_Dr-Lawrence-Farwell-Brain-
Fingerprinting-Detection-of-Concealed.pdf

Farwell, L. (2014). Brain Fingerprinting: Detection of Concealed Information, in *Wiley Encyclopedia of Forensic Science*, A. Jamieson and A.A. Moenssens, eds. Chichester: John Wiley. DOI: 10.1002/9780470061589.fsa1013. Published 16th June 2014

**Exhibit AM**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AM_Farwell-Smith-Journal-of-Forensic-Sciences-Brain-Fingerprinting.pdf

Farwell, L. A. and Smith, S. S. (2001). Using Brain MERMER Testing to Detect Concealed Knowledge Despite Efforts to Conceal. *Journal of Forensic Sciences 46*,1: 135-143.

**Exhibit AN**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AN_OpenCourtFarwellMakeig-dr-larry-farwell-brain-fingerprinting.pdf

Farwell, L.A. and Makeig, T.H. (2005), Farwell Brain Fingerprinting in the case of Harrington v. State. *Open Court, X [10]*:3, 7-10. Indiana State Bar Association, September 2005.

**Exhibit AO**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AO_Harrington_v_State_Iowa_Court_Opinion_and_Order.pdf

The Harrington case in which Farwell Brain Fingerprinting and Dr. Farwell's testimony on it were ruled admissible as scientific evidence in court. *Harrington v. State* (2001) Case No. PCCV 073247(Iowa District Court for Pottawattamie County, 5 March 2001

**Exhibit AP**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AP_Time-magazine-dr-larry-farwell-brain-fingerprinting-dr-lawrence-farwell.pdf

*TIME* magazine article announcing that Dr. Lawrence Farwell was selected to the TIME 100 Top Innovators, the "Picassos or Einsteins of the 21st Century."

**Exhibit AR***

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AR_RomfoloAffidavitEditable1904.pdf

Affidavit of General Donald Romfolo of South Africa regarding fraud by Ika and Brainwave Science, Inc.

██████████

████████████████████████████████████████████

██████████████████████████████████████

**Exhibit AT**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AT_JoseKuruvillaEmailReFraudByIkaBrainwaveScience2019-05-13BriefWithIntro.pdf

Communications from Jose Kuruvilla of Thailand regarding fraud by Ika and Brainwave Science, Inc.

**Exhibit AU**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AU_TomkinsLibelousLetter-BrainwaveScienceVsFarwellYadav.pdf

Letter from Tomkins to Dr. Farwell's client Forensic Science Laboratory of Delhi, India containing multiple false and defamatory statements about Dr. Farwell as well as false accusations and threats against a third party.

**Exhibit AV**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AV_StockPurchaseAgreement_EHC_BFL_07-07-2014LFSigned.pdf

Stock purchase agreement noting equity of Dr. Farwell and Brain Fingerprinting Laboratories, Inc. in Brainwave Science, LLC, equity that Ika later misappropriated and transferred to himself without compensation or due process.

## Exhibits to Supplement to FBI Report, March 29, 2022

**Exhibit AW**

Affidavit by Krishna Ika presenting evidence of perjury, as described in the Supplement.

*Note: There is no Exhibit R. There is no Exhibit AQ.