FILED
in the Clerk's Office
U.S. District Court,
EDNY
Aug 22, 2022, 6:57 PM
Brooklyn
Pro Se Office via
Box.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------X

BRAINWAVE SCIENCE, INC.

       Plaintiff

                                 Defendant Dr. Lawrence A. Farwell
                                 Affirmation in Response to Order to Show
                                 Cause

             - against -

                                   Civil Action No.: 21-cv-4402 (BMC-RLM)

ARSHEE, INC., DR. LAWRENCE A.

FARWELL, DR. THIERRY MAISON and

BRAIN FINGERPRINTING FOUNDATION

                    Defendants.

--------------------------------------------------------- X

1. I, Dr. Lawrence A. Farwell, am a Defendant in the referenced case.

2. On August 16, 2021, Judge Mann issued an ORDER re [ECF #71] Letter Response to Order to Show Cause, [ECF #73] Letter Motion to postpone a ruling on whether to hold defendant in contempt of court by Lawrence A. Farwell.  Said ORDER stated: "Accordingly, by August 23, 2022, defendant Farwell is afforded one final opportunity to fully respond to plaintiff's discovery demands, to produce long overdue documents and other demanded discovery, and to show cause why he should not be held in contempt for violating Judge Cogan's December 14, 2021 injunction."

3. I, Defendant Lawrence A. Farwell, will fully and timely respond and produce documents as directed by the Court.

4. This document constitutes my reply to the requirement to show cause why I should not be held in contempt of court.

5. On August 12, 2022 Plaintiff submitted a Reply Affirmation in Response to Defendant Farwell's Response to Order Granting Motion to Show Cause ("Plaintiff's August 12 Reply").  This included allegations that do not appear to be relevant to the issues at hand regarding the Motion to Show Cause.  However, since Plaintiff raised these issues, I have also addressed them herein.

Definitions

6. "Dr. Farwell's Basic Public-Domain Invention of Brain Fingerprinting"  comprises the basic method and apparatus disclosed and enabled in US Patents #5,363,858, #5,406,956, #5,467,777, and # 7,689,272 (the "Expired Farwell Brain Fingerprinting Patents,) Dr. Farwell's publications in the scientific literature (specified at https://farwellbrainfingerprinting.com/research-publications/), and the software that Dr. Farwell developed and applied at the FBI, the CIA, and the US Navy, in court proceedings wherein Dr. Farwell's Brain Fingerprinting invention and his expert-witness testimony on it were ruled admissible, in operations that Dr. Farwell conducted in collaboration with law enforcement and counterterrorism agencies worldwide, and in other venues.

7. "Dr. Farwell's Advanced Public-Domain Features of Brain Fingerprinting" comprises advanced features developed by Dr. Farwell, that were disclosed and enabled in the Expired Farwell Brain

Fingerprinting Patents, Dr. Farwell's publications in the scientific literature (specified at https://farwellbrainfingerprinting.com/research-publications/ ), and the software that Dr. Farwell developed and applied at the FBI, the CIA, the US Navy, in court proceedings wherein Dr. Farwell's Brain Fingerprinting invention was ruled admissible, in counterterrorism operations worldwide, and in other venues, including but not limited to  a system that

> a) prompts testing personnel for appropriate stimuli;
>
> b) displays stimuli to testing subjects in optimal order and at optimal intervals;
>
> c) captures appropriate P300 brainwave responses;
>
> d) disregards and/or eliminates extraneous responses ("noise") which may produce false positive or false negative results;
>
> e) detects and disregards any attempted countermeasures by suspects or others involved in conducting testing;
>
> f) performs appropriate analysis of P300 measured responses utilizing statistical and machine learning algorithms and Artificial Intelligence;
>
> g) generates unbiased reports for use by examiners, investigating agencies and legal authorities.

8. Collectively, Dr. Farwell's Basic Public-Domain Invention of Brain Fingerprinting and Dr. Farwell's Advanced Public-Domain Features of Brain Fingerprinting comprise "Dr. Farwell's Public Domain Brain Fingerprinting Invention."

9. "Dr. Farwell's Brain Fingerprinting Invention" is Dr. Farwell's Public Domain Brain Fingerprinting Invention.

10. "Dr. Farwell's P300 Invention" is Dr. Farwell's Brain Fingerprinting Invention.[1]

---

[1] Dr. Farwell also invented the first brain-computer interface ("Dr. Farwell's Brain-Computer Interface Invention") and published it in the scientific literature.  This was also based on the P300, and could accurately be referred to as "Dr. Farwell's P300 Invention."  However, for the purposes of this document, wherein Farwell Brain Fingerprinting science and technology are at issue, Dr. Farwell's Brain-Computer-Interface Invention shall be excluded from the definition of Dr. Farwell's P300 Invention.

11. "Dr. Maison's Implementation at BWS of Dr. Farwell's Brain Fingerprinting Invention" comprises the software developed by Dr. Maison for Brainwave Science LLC / Inc. ("BWS"), which includes the following four components:

   a. Dr. Farwell's Basic Public-Domain Invention of Brain Fingerprinting;

   b. Dr. Farwell's Advanced Public-Domain Features of Brain Fingerprinting;

   c. A "Blue User Interface"; i.e., a user interface that has blue as its background color throughout; and

   d. Software to interface with the BWS headset (which is different from all of the headsets that Dr. Farwell used previous to the founding of BWS and all headsets Dr. Farwell has sold to clients at any time before, during, or after the founding of BWS).

12. "BWS' Uploaded Blue Software" comprises the software that BWS uploaded or allowed to be uploaded to a public-domain source on the Internet, source at 6:15 PM on 9/10/2017 from IP address 65.52.55.39 in Chicago, using the credentials of BWS employee Karuna Raja, who was in Southborough, MA at the time.  The "BWS Uploaded Software" was identical in all substantive respects to Dr. Maison's Implementation at BWS of Dr. Farwell's Brain Fingerprinting Invention.  The "Blue" in the name refers to the fact that all BWS software had a blue user interface.

(Note: In his Affidavit, ECS 20, Ika admitted that the BWS Software was uploaded to the internet, but falsely stated that it was uploaded to a secure cloud server. The BWS Software was never uploaded to a secure cloud server.  It was maintained on a physical server in a rented office in Southborough, MA and accessed by numerous BWS employees in the US and India. Both Dr. Maison and Dr. Farwell know that from first-hand observation.)

13. "Dr. Maison's Downloaded Blue Software" was the same as BWS' Uploaded Blue Software, as downloaded by Dr. Maison from a public source on the internet.

14. "Dr. Maison's Developed Green Software" comprised the following changes to Dr. Maison's Downloaded Blue Software and its source, BWS' Uploaded Blue Software, as follows.

    a.   Dr. Maison changed the user interface color to green.  This is different from all BWS software that had ever been accessed by Dr. Maison at any time through any means.

    b.   Dr. Maison implemented substantial improvements to the software, including advanced public-domain digital filters (as published by Dr. Farwell and others), which were lacking in all versions of BWS' software.

    c.   Dr. Maison deleted the parts of the BWS software that interfaced with the BWS headset, and substituted software that interfaced with a custom headset designed by Dr. Farwell and manufactured in the US that was never used or possessed by BWS.

15. BWS obtained Dr. Maison's Developed Green Software through a settlement agreement with Dr. Maison.

16. "BWS' Pre-Maison Blue Software" is the version of the BWS software that BWS had prior to receiving Dr. Maison's Developed Green Software.

17. "BWS' Fraudulently Modified Green Software" is the version of the BWS software that BWS developed after receiving Dr. Maison's Developed Green Software and prior to submitting the respective software packages to Codequiry.  This modification was for the transparent purpose of making BWS' software appear more similar to Dr. Maison's.  The modification included changing the color from blue – the color of all BWS software up to the time that BWS obtained Dr. Maison's Developed Green Software – to green – the color of Dr. Maison's Developed Green Software – and other undisclosed changes.

18. The "Program Plaintiff Originally Submitted to Codequiry as Its Code" is "BWS' Fraudulently Modified Green Software," the program that plaintiff originally submitted to Codequiry as its code, as specified in the Preliminary Restraining Order (ECS 30) and referred to therein as BWS' "confidential or proprietary information."

19. "Dr. Farwell's Colleagues" comprise the following:

    a.   The individuals, government agencies, and organizations that collaborated with Dr. Farwell in the actions specified in ¶ 19 below;

b. The over 300 authors of scientific papers on research implementing Dr. Farwell's Public Domain Brain Fingerprinting Invention (see Google Scholar at https://scholar.google.com/citations?user=wgZhgc0AAAAJ&hl=en for lists);

c. The FBI, the CIA, the US Navy, and the other law enforcement, intelligence, and counterterrorism agencies in the Middle East, South Asia, and around the world where Dr. Farwell has collaborated in implementing Dr. Farwell's Brain Fingerprinting Invention and to whom Dr. Farwell has transferred the same.

d. Dr. Farwell's coauthors on scientific publications on Dr. Farwell's Brain Fingerprinting Invention;

e. The former employees and consultants of Human Brain Research Laboratory, Inc., Brain Fingerprinting Laboratories, Inc., and Brain Fingerprinting, LLC who have collaborated with Dr. Farwell in the development of Dr. Farwell's Brain Fingerprinting Invention both prior to the existence of Brainwave Science LLC ("BWS LLC," founded in 2012) and later Brainwave Science, Inc. ("BWS Inc."; collectively, "BWS") and after the founding of BWS LLC and BWS Inc.

20. Dr. Lawrence Farwell

a. invented Dr. Farwell's Brain Fingerprinting Invention in 1984;

b. patented it in 1994, 1995, and 2010;

c. applied it the FBI, the CIA, and the US Navy;

d. published it in the scientific journals;

e. solved major crimes with it, including helping to bring a serial killer to justice and to free an innocent man falsely convicted of murder;

f. met with the President of the United States (in 2006) and the Director of the CIA and developed a program to apply it in classified counterterrorism operations, and successfully  applied it, as published (without identifying details) in a recent scientific article;

g. implemented it in multiple law enforcement and counterterrorism agencies around the world;

h. continues to provide his expertise as the inventor and world's leading expert in Dr. Farwell's Brain Fingerprinting Invention to law enforcement, intelligence, military, and counterterrorism agencies around the world.

i. Developed software to implement Dr. Farwell's Brain Fingerprinting Invention in 1985 and in multiple iterations over the years before BWS LLC existed, placed the same in the public domain, and assisted others – including but not limited to Dr. William Iacono, the CIA, and Westinghouse Electric Corporation – to develop open-source software that implemented Dr. Farwell's Brain Fingerprinting Invention.

21. There are two major reasons beyond my control for the delay in my responding and producing documents as demanded.

22. The first is my medical condition resulting from an injury, which Judge Mann characterized (correctly) as "entirely unsubstantiated" until now. The lack of said documentation resulted in Judge Mann's denial of my request. Judge Mann denied my [ECF #67] "request for an additional extension of time … in the absence of any documentation to support his [my] claim of disability."

23. In my original request [ECF #64] for an extension of time, I stated: "I cannot make it to a notary to have this document notarized. However, if requested, I will swear to the accuracy of the information provided herein once I am able to do so. I can also provide supporting documentation such as prescriptions and test results on request."

24. I never received such a request, either from the Court or from the Plaintiffs.

25. Now that I have been informed that the lack of said documentation has resulted in the Court's denial of my request for additional time, and I have also been informed that I may be in held in contempt as a result of said lack of documentation and the resulting denial, I am submitting said documentation as Exhibits BAA – BAQ[2].

26. Said documents include medical records from Dr. Brian Snitily of Orthopedic Physician Associates, affiliated with Swedish Hospital in Seattle; Dr. Joshua Bailey; Tracy Weiler PA-

[2] Exhibits are designated with three letters to match identical exhibits of other documents.

C; Yalena Watson, ARNP; Indigo Urgent Care of Poulsbo, WA; and RayUS Radiology (for MRIs).  On the referral of Dr. Snitily, I also will be meeting shortly with orthopedic surgeon Dr. Jason King of Orthopedic Physician Associates, who will be performing surgery if it is determined to be medically necessary and appropriate, a decision that has not yet been made.

27. Plaintiff's August 12 Reply states that a Facebook post that I made on June 29, 2022, 60 days after my injury on April 30, "belies his [Dr. Farwell's] assertion that he has been 'unable to work' since May 4, 2022."

  a. When my Facebook friends are unable to work due to an injury or illness, one of the first things they generally do is post something about it on Facebook.  When the injury or illness is serious, Facebook and other social media are one of the major channels through which people who are at home and unable to work communicate about their condition, and also about whatever else is of concern to them at the moment.

  b. Plaintiff's contends that the fact 60 days after my injury I was healthy and functional enough to sit up in bed and post to Facebook somehow casts doubt on my account of my medical condition – which has been now verified and substantiated by the doctors and other medical professionals who have diagnosed and treated me.  Said contention is without merit.  If posting on Facebook were an indication that a patient's claim to be unable to work is false, then virtually everyone who has ever taken a sick day in the last few years would be guilty of deception.

  c. Other aspects of my Facebook post are discussed below.

28. The Preliminary Injunction referred herein paragraphs stated:

        1. Defendants must take any and all commercially-practicable actions to recall or replace any software containing plaintiff's "confidential or proprietary information" from third parties;

        2. Defendants must not sell or transfer plaintiff's "confidential or proprietary information;"

        3. Defendants must not use plaintiff's "confidential or proprietary information" in any software update or product demonstration; and,

> 4. Defendants must take any and all commercially-practicable actions
> to recall or replace any software containing plaintiff's
> "confidential or proprietary information" from third parties;
>
> For the purposes of this preliminary injunction, "confidential or
> proprietary information" is defined as any portion of the program
> plaintiff originally submitted to Codequiry as its code.

29. Plaintiff's August 12 Reply ¶ 12 states: "Defendant Farwell's August 11, 2022 unverified response to Plaintiff's Order to Show Cause (ECF #71) neither denies, or otherwise addresses, Plaintiff's allegations that Defendant Farwell failed to take commercially practicable steps to request return of software subject to the Preliminary Injunction (ECF 66-1, Pages 4-7).

30. Defendant Farwell's August 11, 2022 response did not address said allegations because Defendant Dr. Farwell had already shown definitively in previous Affidavits [ECF #51], [ECF #59], and [ECF #61] that said allegations were entirely false and baseless.  Since Plaintiff apparently considers Dr. Farwell's response to said false and baseless allegations of Plaintiff to be relevant to the present discussion, the relevant facts and arguments are as follows.

    a. Dr. Farwell's Affidavit [ECF #51] stated (P. 3 – 5):

> 3. I am complying with the above provisions in the following
> ways.
>
> 4. I have not sold or transferred any software that contains
> "plaintiff's proprietary information," and will not do so.
>
> 5. I have not used "plaintiffs proprietary information" in any
> software update or product demonstration, and will not do so.
>
> 6. In order to comply with said preliminary injunction, I must
> have software that has been determined by an independent third
> party not to include "plaintiff's proprietary information." I
> have engaged one of the top independent companies in the world
> for conducting such testing, Mindfire Technology. I have a fully
> executed contract in place for Mindfire to test some of my
> existing software. I have informed Plaintiff of their
> responsibility to provide their software and pay the retainer to
> Mindfire, per the court order. Plaintiffs attorney Paul Tomkins
> has requested some changes in my contract with Mindfire before
> his client complies with the court order. I have written Mr.
> Tomkins that I am amenable to modifying the contract in the ways
> that he requests, as long as his modifications do not countermand

the intent of the Court's order. I am currently awaiting a reply from Mr. Tomkins regarding the specific modifications he requests.

7. In addition to the software that is currently awaiting testing, my colleagues and I are developing additional P300 software that does not contain plaintif's proprietary information.

8. Regarding "commercially-practicable solutions," I have discussed the situation with my clients. To understand their reply, it is necessary to understand who my clients are. My clients are some of the top government agencies in the world in the field of counterterrorism and law enforcement and their close business associates. They have an extremely high level of technical sophistication, expertise in forensic neuroscience, and knowledge of the technology, the international players in the field, and the capabilities (or lack of same) and track record (or lack
of same) of these players.


All of my clients are well aware of Brainwave Science, Inc., independent of anything to do with me or this lawsuit. All of my clients know that Brainwave Science, Inc. ("BWS") and Krishna Ika currently stand accused of fraud by authorities in at least four countries, and that the specific fraud alleged comprises, among many other alleged offenses, Ika and BWS falsely representing themselves as experts in forensic neuroscience qualified to effect a technology transfer of my brain fingerprinting invention to a government agency. This includes, for example, Mr. Ika allegedly faking demonstrations of his system by pretending to analyze brainwaves and in fact only displaying a pre-recorded graphics file purporting to represent brainwave analyses. All of my clients are aware that BWS has never sold its iCognative system to any government agency, has never tested it in the scientific laboratory and published the results in peer-reviewed journals, and has never successfully applied their system in the laboratory or the field. In fact, my clients are some of the same people who have detected alleged attempted fraud by Ika and BWS and accused them of the same. In light of these facts, it is not surprising that my clients have responded to any discussion of "recall" of any software they have received from me as follows:

a. They are not in possession of any software or hardware that contains anything that might be construed as proprietary to BWS. They have sufficient expertise to recognize the fact that any such claims by BWS are totally spurious.

b. Even if they were in possession of such software or hardware, there is no way I can force them to remit it to me; that is, there is no way that I can force a "recall" of any software that

they possess, whether it came originally from me or not, and whatever it contains.

c. If I ever delivered to them any software or hardware that contained anything proprietary to BWS, they would reject it, because they know BWS has nothing proprietary that contributes in any way to the field of forensic neuroscience. They have sufficient scientific and technical expertise to know this definitively.

d. I am free to replace any software they have obtained from me, provided only that the replacement software performs as well as or better than what they now have.

9. The response of my clients eliminates the possibility of "commercially-practicable" "recall," and leaves open the possibility of "replace[ment]," but only if and when BWS cooperates with the independent testing of my software by providing their software and paying for the testing as ordered by the Court, and only after I have had sufficient time to develop software that is certain to meet the standard set by the Court.

## Dr. Farwell's Affidavit [ECF #59] stated (P. 5):

In the Preliminary Injunction (ECF 30), the Court ordered me to "take any and all commercially-practicable actions to recall or replace any software containing plaintiff's 'confidential or proprietary information' from third parties;" and has defined "confidential or proprietary information" as "any portion of the program plaintiff originally submitted to Codequiry as its code." In my previous Affidavit [51], I stated the following: "The response of my clients eliminates the possibility of 'commercially-practicable' 'recall,' and leaves open the possibility of 'replace[ment],' but only if and when BWS cooperates with the independent testing of my software by providing their software and paying for the testing as ordered by the Court, and only after I have had sufficient time to develop software that is certain to meet the standard set by the Court." The Court is crystal clear in said Preliminary Injunction. I have two options: (1) recall said software, insofar as that is "commercially practicable," or (2) replace the same, insofar as that is "commercially practicable."
By elementary logic, if it is not "commercially practicable" to "recall" said software, if any, then my only remaining option is to "replace" the same. In that case, contrary to Tomkins' statements in said Motion of March 21, my only remaining option depends on Plaintiff (1) providing their software to the tester that I engage to test my software against "the program plaintiff originally submitted to Codequiry as its code," and (2) paying for said testing. Plaintiff so far has refused to do so. Plaintiff's contention that I must somehow be forced to comply with the Preliminary Injunction, while Plaintiff refuses to

comply with the requirement that they submit their software for testing and pay for the same, is without merit. Obviously, I cannot "replace" existing software with software that has been proven by a tester to not contain Plaintiff's confidential or proprietary information so long as Plaintiff continues to refuse to fulfill their obligations under the Preliminary Injunction to do the actions from their side that are necessary for such testing to take place.

Dr. Farwell's Affidavit [ECF #61] stated (P. 1):

By Order dated March 2, 2022, the Court directed Defendants to file affidavits to the Court "establishing that they have complied with the presently imposed preliminary injunction…" (ECF #38). In response to the Court's directive, I provided an Affidavit to the Court (ECF #51). In response, Plaintiff filed a letter motion dated March 21, 2022 (ECF 54) in which Plaintiff alleged various deficiencies of said affidavit.

I am writing in response to Plaintiff's Letter Motion of March 21, to cure the alleged deficiencies in said Affidavit, and in further response to the Court's Order of March 2, 2022.

The undersigned Defendant Dr. Farwell submitted documents relating to correspondence with Dr. Farwell's clients regarding the Farwell Brain Fingerprinting Software in use by Dr. Farwell's client, including Dr. Farwell's client the US Central Intelligence Agency (CIA) in Dr. Farwell's Affidavit of March 31, 2022.

This Affidavit provides additional information regarding the CIA's use of the Farwell Brain Fingerprinting system provided by Dr. Farwell and his colleagues to the CIA, and the software contained therein. This is documented in records of the following events.

1. **Dr. Farwell's in-person, face-to-face meeting with the President of the United States,** in which Dr. Farwell and the President developed a plan for the application of Farwell Brain Fingerprinting in counterterrorism and intelligence operations that was implemented by Dr. Farwell.

2. Correspondence between Dr. Farwell and the President of the US, attached hereto as Exhibit II-A, which describes the above referenced meeting and associated events involving the Farwell Brain Fingerprinting system.

3. **Dr. Farwell's in-person, face-to-face meetings with the Director of the CIA,** in which the Director provided more detailed guidance for the plan to implement Farwell Brain Fingerprinting in counterterrorism and intelligence operations worldwide.

4. Correspondence between Dr. Farwell and the Director of the CIA, attached hereto as Exhibit II-B, which describes some of the above-referenced meetings and associated events involving the

Farwell Brain Fingerprinting System and its successful
application in counterterrorism operations worldwide.

31. Plaintiff's August 12 Reply ¶ 12 further states: "Defendant Farwell's response likewise fails to deny, or otherwise explain, his forwarding of a manufactured 'FBI Report' to recipient(s) of software subject to the Preliminary Injunction (ECF #66-1, Page 5, ¶2; ECF #59 at Page 49) or advising recipient(s) of software subject to the Preliminary Injunction that they are "under no obligation to comply or even respond to [the Preliminary Injunction]" (ECF #66-1, Page 5; ECF #59 at Page 30, ¶1)."

32. Plaintiff's August 12 Reply refers to a report that Dr. Farwell prepared for the FBI ("Dr. Farwell's Report to the FBI and Supplement," Exhibit AAA) in conjunction with the investigation of alleged crimes by Plaintiff's CEO Krishna Ika and Plaintiff's attorney Paul Tomkins.

   a. In addition to the US, Ika currently stands accused of crimes, including fraud, by authorities in South Africa, Pakistan, Nigeria, and Thailand.

   b. Dr. Farwell's Report to the FBI provides evidence of the Ika's alleged crimes. Dr. Farwell has provided Dr. Farwell's Report to the FBI to the FBI, the CIA, and other parties who have an interest in bringing Ika to justice for his alleged crimes in at the above countries and others.

   c. Dr. Farwell's Report to the FBI and Supplement explicitly stated on the cover page that it comprised a "Summary of evidence submitted by Dr. Lawrence A. Farwell" to the FBI; that is, it comprised a report to the FBI, not a report by the FBI. It is well known that the FBI never makes reports to no one in particular, and that in any case the FBI does not report on ongoing investigations. The author of this report to the FBI, Dr. Farwell, on the other hand, has had an ongoing relationship with the FBI and the CIA since 1992 when he performed on his first million-dollar contract with the CIA and first collaborated with the FBI.  Dr. Farwell has previously prepared reports for the both the FBI and the CIA beginning in 1993, as referenced in Dr. Farwell's Report to the FBI and Supplement.

d.   Although Dr. Farwell reported to the FBI the evidence in Dr. Farwell's Report to the FBI and Supplement, he did not originally discover most of said evidence. Examples are as follows.  The evidence that Ika attempted to defraud the South African government was provided in a sworn affidavit by South African General Donald Buti Ramfolo, who has worked with Dr. Farwell to implement the genuine Farwell Brain Fingerprinting there (Exhibit AR). The evidence that Ika attempted to defraud other governments in the Middle East was provided in a sworn affidavit by one of the top in-country experts who worked with Dr. Farwell to implement Farwell Brain Fingerprinting (Exhibit AS), and also by the Chief of the FBI's Counterterrorism Unit (HMRU), who also worked with Dr. Farwell to implement Farwell Brain Fingerprinting since the 1980s.  The evidence that a purported endorsement on the BWS website of BWS' product iCognative by Saudi Arabian General Adel Al Eid was "false and forged" was provided in a statement by the General himself – who is also a PhD-level expert in forensic science and has worked with Dr. Farwell to implement the genuine Farwell Brain Fingerprinting (Exhibit AAK).   The evidence that Ika faked a demonstration of brainwave technology in Thailand, by pretending to analyze brainwaves but in fact only presenting graphics files unrelated to the purported brainwave measurements, was provided in a statement by one of the authorities who personally observed that crime. The evidence that Ika conspired with another individual who had been previously convicted of attempting to sell stolen high-tech secrets to a foreign government – essentially the same crime of which Ika now stands accused in four countries – to expel the Minority Shareholders from an LLC and transfer their equity to himself without due process, consent, or compensation, is in the relevant documents produced by, among others, the Plaintiff's attorney.  The fact that Tomkins lied to a federal judge when he stated that BWS had sold multiple brainwave systems to each of several clients at $400,000 per system is well known by all the players in the field, and is documented in the Plaintiff's own records and tax returns. The facts that all of the substantive, numerical, verifiable/falsifiable statements on the BWS website regarding BWS' "iCognative" product are false and unsubstantiated by any

research, scientific publications, and that the Mac-based technology depicted on said website was not actual technology capable of recording and analyzing brainwaves, but merely mockups and graphics files, were provided by BWS' own former CTO. The fact that Ika lied under oath in an affidavit regarding events surrounding the ownership of the patents on Dr. Farwell's invention of Brain Fingerprinting is documented at the USPTO and in sworn statements by every individual who has signed a relevant document recorded at the USPTO since 2002, all of whom swore that BWS was never assigned and never owned any interest in said patents. (All of the above are contained in Exhibits to Dr. Farwell's Report to the FBI.)

33.   Plaintiff's statement that Dr. Farwell has been "advising recipient(s) of software subject to the Preliminary Injunction that they are 'under no obligation to comply or even respond to [the Preliminary Injunction]'" has no basis in fact.  Plaintiff has no evidence that the versions of Dr. Farwell's Brain Fingerprinting Invention that are in possession of Dr. Farwell's clients and colleagues are "subject to the Preliminary Injunction."   Plaintiff's contention that said versions are "subject to the Preliminary Injunction" is solely unfounded speculation by Tomkins.

    a.   The Preliminary Injunction specifies software that "any portion of the program plaintiff originally submitted to Codequiry as its code."

    b.   Dr. Farwell has been providing Dr. Farwell's Brain Fingerprinting Invention, and software implementing the same, to his clients, colleagues, and others since 1985. At least 100 of Dr. Farwell's Colleagues have software systems directly or indirectly provided by Dr. Farwell on the basis of Dr. Farwell's original invention of Brain Fingerprinting in 1985.  This includes Dr. Farwell's invention disclosed in Dr. Farwell's expired patents of 1994, 1995, and 2010, before BWS LLC was founded in 2012.

    c.   There is no evidence that any of the software provided by Dr. Farwell to any of Dr. Farwell's Colleagues contains "any portion of the program plaintiff originally submitted to Codequiry as its code."

    d.   Until or unless Plaintiff provides evidence of what comprises "the program plaintiff originally submitted to Codequiry as its code," (which comprises "BWS' Fraudulently Modified Green Software," as defined above) no determination can be made regarding what software possessed by Dr. Farwell's Colleagues is "subject to the Preliminary Injunction."

34. In my June 29, 2022 post to Facebook, my colleagues ("Dr. Farwell's Colleagues," as defined above) and I offered to implement Farwell Brain Fingerprinting in Ukraine free of charge for use in investigating war crimes.  I offered my services as the inventor and world's leading expert in Brain Fingerprinting free of charge.  I encouraged others to provide whatever resources they could to support the Farwell Brain Fingerprinting for Ukraine Project.

35. Plaintiff's August 12 Reply stated: "this post by Defendant Farwell is demonstrative of his ongoing disregard of the Preliminary Injunction." That statement is false, and in fact patently absurd.  Dr. Farwell's Colleagues include at least 100 individuals and organizations who have working implementations of Dr. Farwell's Brain Fingerprinting Invention.  There is no evidence that any of these contain ""any portion of the program plaintiff originally submitted to Codequiry as its code."   In any case, the Preliminary Injunction applies only to three persons in the world, the Defendants.  It does not apply to any of the rest of Dr. Farwell's Colleagues, who are free to offer Dr. Farwell's Brain Fingerprinting Invention for use in Ukraine (or anywhere else) without "disregard[ing]" the Preliminary Injunction.

36. Dr. Farwell has been offering his services as the inventor and world's leading expert on Dr. Farwell's Brain Fingerprinting Invention since the early 1990s when he first started working on contract with the CIA and with the FBI.  Dr. Farwell providing his professional expertise in forensic neuroscience, as he has been doing for decades, does not imply that he is "sell[ing]," "transfer[ring]," or "demonstrate[ing]" "any portion of the program plaintiff originally submitted to Codequiry as its code."  Dr. Farwell has stated under oath in [ECF #51], as quoted above, that he has not done so and will not do so, and the Facebook post at issue provides no evidence to the contrary.

37. The second circumstance beyond my control for the delay in my responding and producing documents as demanded resulted from breakdowns in communication and lack of cooperation from the Plaintiff's attorney, Mr. Paul Tomkins.

38. Originally in this case, and since 2019 in another case (Brainwave Science, Inc. vs. Farwell, et al., Supreme Ct. of the State of New York County of New York, Index No. 153867/2019, the "NY State Case"), I was represented by attorney Joseph Carbonaro. Until May, 2022, he prepared my responses in this and the NY State Case, Brainwave Science, Inc. vs. Farwell, et al., Supreme Ct. of the State of New York County of New York, Index No. 153867/2019. When Mr. Carbonaro withdrew as my attorney due to my lack of the ability to pay him sufficiently, I continued the litigation pro se.

39. Before Mr. Carbonaro withdrew, I provided him with ample information with which to prepare my responses to discovery in this case. This included a narrative of over 200 single-spaced pages plus 27 exhibits containing over a hundred additional pages. I also provided all of this information and documentation to Mr. Tomkins and Mr. Ika in discovery in another case (Lawrence A. Farwell vs. Krishna Ika, Brainwave Science, LLC, and Brainwave Science, Inc., King County, Washington Superior Court No. 19-2-13911-1), wherein it is a matter of public record. (All of this is on Dropbox at this link: https://www.dropbox.com/sh/ib4x64d9cu7rdh8/AADzYAOQ-mJ_fDfKrdcDpXBNa?dl=0.)

40. When I first took over my own defense pro se, both Mr. Carbonaro and I believed that we had responded to all or virtually all of Plaintiff's demands for discovery. Mr. Carbonaro so stated to me in writing, as specified below.

41. On April 24, 2022 Mr. Tomkins wrote me an email stating that Plaintiff had not received responses from me to their discovery demands.

42. I wrote the following email to Mr. Carbonaro on April 24:

> **From:** Dr. Larry Farwell
> **Sent:** Sunday, April 24, 2022 3:52 PM
> **To:** Joseph Carbonaro
> **Subject:** FW: BWS v. Arshee et al - 21-cv-4402 (BMC) - Discovery and Depositions
>
> Hi Joe,

Please see below message from Tomkins.  It is my understanding that you provided all of the information called for in their demands, and also that you made discovery demands to Tomkins to which they have never responded.  Please clarify.

Regards,

Larry

43. Mr. Carbonaro replied as follows:

**From:** Joseph Carbonaro <joe@jcarbonarolaw.com>
**Sent:** Monday, April 25, 2022 6:55 AM
**To:** Dr. Larry Farwell <brainwave@larryfarwell.com>
**Subject:** RE: BWS v. Arshee et al - 21-cv-4402 (BMC) - Discovery and Depositions


Larry, my recollection is that we provided a large number of documents to the plaintiff via a drop box or google drive.  However, we may not have provided a document that directly responds to their demands.  So if demand number 1 provide all communications between plaintiff and defendant, we may have turned over the communications but not a written response saying, "see document attached Bates stamped 1-100."  Ask him if that is what he means, ask him about the drop box/google drive.

Joseph W. Carbonaro, Esq.

44. I wrote the following to Mr. Tomkins on April 24 (emphasis added).

**From:** Dr. Larry Farwell
**Sent:** Sunday, April 24, 2022 8:19 PM
**To:** Paul Tomkins <ptomkins@brainwavescience.com>
**Subject:** RE: BWS v. Arshee et al - 21-cv-4402 (BMC) - Discovery and Depositions

Mr. Tomkins:
**My understanding from my attorney at the time, Joe Carbonaro, is that**

**He provided you with all of the information specified in your demands – I know that I provided all of it to him** -- and

He also served discovery demands to Plaintiff to which Plaintiff has not responded.

I have emailed Mr. Carbonaro seeking clarification on both of these issues.

Given that this is the first I have heard that you claim there is something lacking in my response to your discovery demands, and I have received nothing from you in response to ours, and tomorrow is the deadline, it appears that we will need to make further arrangements.

I respectfully suggest we work out an arrangement that works for both sides, rather than getting histrionic with the judge.

Sincerely,

Dr. Lawrence A. Farwell

45. Mr. Tomkins has not yet replied to my email of April 24, and has provided no communication regarding what documents he demands that he claims we have not yet provided.

46. On August 17, 2022 I wrote the following email to Mr. Carbonaro. (In it, in addition to the present case, I reference another case, *Brainwave Science, Inc. vs. Farwell, et al., Supreme Ct. of the State of New York County of New York, Index No. 153867/2019*.)

**From:** Dr. Larry Farwell
**Sent:** Wednesday, August 17, 2022 6:20 PM
**To:** Joseph Carbonaro <joe@jcarbonarolaw.com>
**Subject:** disclosures

Hi Joe,

As you suggested, I have emailed Tomkins asking him for their interrogatories and specifically asking him what he thinks I'm supposed to have sent him that he doesn't have. He has not responded. Instead, in both the state and federal cases, he has filed motions to hold me in contempt of court for not responding to his demands for disclosures.

(This is separate from his motion to hold me in contempt for revealing the truth regarding some of Ika's crimes and other dirty laundry – I'm handling that as best I can, and I have the information I need to do so.)

There is nothing online at the websites for either case that has this information, and Tomkins is aggressively non-cooperative in providing it.

I have looked everywhere, and I do not have any record of their demands / interrogatories for either case. In the federal case, the judge issued a very brutally worded order telling me that I had to respond immediately with the required disclosures plus an explanation of why I should not be held in contempt.

I realize you may have sent me some or all of this stuff. I had a major computer crash, and lost a lot of documents, so this may a loss at my end. I also realize that you no doubt have other pressing priorities, and you have a life.

In any case, I need whatever they sent us demanding docs or information if I am to avoid being held in contempt of court. Please send this to me ASAP.

Thank you, Joe.

Cheers,

Larry

47. On August 19, 2022 I wrote the following email to Mr. Carbonaro:

**From:** Dr. Larry Farwell <brainwave@larryfarwell.com>
**Sent:** Friday, August 19, 2022 2:41:39 AM
**To:** Joseph Carbonaro <joe@jcarbonarolaw.com>
**Subject:** disclosures

Hi Joe,
I have located Tomkins' original demand for disclosures (PDF attached).
On April 24 you and I had the email exchange contained in the attached Word file.  Essentially, you said you thought we had complied with their demands, and suggested that I ask Tomkins what he thought was lacking.
On April 24 I asked Tomkins what he thought was lacking, as you suggested – see the other attached Word file.  He never replied.
My only remaining question for you is, do you have any information regarding what we sent them? Here's what you said about it:

> **From:** Joseph Carbonaro <joe@jcarbonarolaw.com>
> **Sent:** Monday, April 25, 2022 6:55 AM
> **To:** Dr. Larry Farwell <brainwave@larryfarwell.com>
> **Subject:** RE: BWS v. Arshee et al - 21-cv-4402 (BMC) - Discovery and Depositions
>
> Larry, my recollection is that we provided a large number of documents to the plaintiff via a drop box or google drive.  However, we may not have provided a document that directly responds to their demands.  So if demand number 1 provide all communications between plaintiff and defendant, we may have turned over the communications but not a written response saying, "see document attached Bates stamped 1-100."  Ask him if that is what he means, ask him about the drop box/google drive.
>
> Joseph W. Carbonaro, Esq.
> CARBONARO LAW, PC

I want to be able to tell the Court that I thought we had responded fully, I told Tomkins so and asked him what more he needed, and he never replied.  If you can give me some info on what we actually did provide to them, this will strengthen my argument.
Thanks.
Cheers,
Larry

48. On August 19, 2022 Mr. Carbonaro replied as follows:

**From:** Joseph Carbonaro <joe@jcarbonarolaw.com>
**Sent:** Friday, August 19, 2022 5:18 AM
**To:** Dr. Larry Farwell <brainwave@larryfarwell.com>
**Subject:** Re: disclosures

> I would make sure the judge knows about the Dropbox docs.  Go into it yourself (you may have actually uploaded them) and designate each with a title, make a list and show it to the judge together with your email asking Tomkins what he thinks you owe him.
>
> Joseph W. Carbonaro, Esq.

49. I replied as follows:

> **From:** Dr. Larry Farwell
> **Sent:** Friday, August 19, 2022 1:01 PM
> **To:** Joseph Carbonaro <joe@jcarbonarolaw.com>
> **Subject:** RE: disclosures
>
> Hi Joe,
>
> I have no idea what Dropbox docs you are talking about...
>
> Can you educate me as to what Dropbox Tomkins is, or should be, aware of?
>
> Regards,
>
> Larry

50. Mr. Carbonaro responded by writing an email to Mr. Tomkins asking him to send me a list of documents or classes of documents that are to be produced and that he does not yet have.  He forwarded this email to me, as below:

> **From:** Joseph Carbonaro <joe@jcarbonarolaw.com>
> **Sent:** Friday, August 19, 2022 1:23 PM
> **To:** Dr. Larry Farwell <brainwave@larryfarwell.com>
> **Subject:** FW: Farwell
>
> See below.
>
> Joseph W. Carbonaro, Esq.
> CARBONARO LAW, PC
> 757 Third Avenue, 20th Floor
> New York, New York 10017
> (212) 888-5200
> Fax: (212) 898-0394
> Email: joe@jcarbonarolaw.com
> www.JCarbonaroLaw.com
>
> Westchester Office:
> 2 Overhill Road, 4th Floor
> Scarsdale, New York 10583
> (914)222-9141
> Fax: (914) 840-1298

**From:** Joseph Carbonaro  [Forwarded to Dr. Farwell with the "see below" message in the  above email from Carbonaro to Dr. Farwell]
**Sent:** Tuesday, April 5, 2022 1:00:38 PM
**To:** Paul Tomkins <ptomkins@brainwavescience.com>
**Subject:** Farwell


Paul,

As one last courtesy to Dr. Farwell, may I ask that you send him a list of all documents or classes of documents that are to be produced.  You will recall that we produced documents on a Google drive quite a while ago.  If there is something else you are looking for, please specify.  I'd appreciate it.

Joe

Joseph W. Carbonaro, Esq.
CARBONARO LAW, PC
757 Third Avenue, 20th Floor
New York, New York 10017

T: 212.888.5200
T: 212.880.1535
F: 212.898.0394
E: joe@jcarbonarolaw.com

Westchester Office:
2 Overhill Road, 4th Floor
Scarsdale, New York 10583
T: 914.222.9141
F: 914.840.1298

51. As is clear from the above email thread, Mr. Carbonaro, my attorney at the time, assured me that he had provided Plaintiffs with the documents required in discovery on my behalf.  Both Mr. Carbonaro and I have repeatedly so stated to Mr. Tomkins and have repeatedly requested – beginning with my emails in April, 2022 – that Mr. Tomkins provide me with a statement of what documents or classes of documents he claims that he has demanded and we have not yet produced.  We have received no replies to said requests.

52. I have acted in good faith and appropriately in light of the information I have had at the time.

53. The premise that I am somehow attempting to avoid providing information to the Plaintiff is at odds with the fact that it is a matter of public record that I have provided a 200-page

narrative and over 100 pages of additional documents on almost entirely overlapping demands in another case, as described above.

54. Plaintiff's allegations regarding my compliance with the Preliminary Injunction are demonstrably false, have been previously answered and shown to be so, and in any case are not what is at issue with regard to my response to discovery demands.

55. I can only act on the information that I have been provided.  It is possible that I have been misinformed regarding my obligations in this case and what I am responsible for that has remained unfulfilled.  If so, Mr. Tomkins has had ample opportunity -- and repeated requests beginning April 24, 2022 --  to correct my misunderstanding and inform me or Mr. Carbonaro of what documents Mr. Tomkins has demanded that he claims I have not yet provided.  Mr. Tomkins has not done so.

56. In the absence of any response from Mr. Tomkins regarding what documents he has demanded that he claims I have not yet provided, I am now preparing a complete response to all of Plaintiff's original demands.  I will submit the same by the deadline set by the Court of August 23, 2022.

57. This is the best I can do, and the best I could reasonably be expected or required to do, given the information I have had throughout the process to date.

58. Therefore, I should not be held in contempt of court.

[Signature page immediately follows.]

x _Lawrence A Farwell_

_LAWRENCE A. FARWELL, DEFENDANT_          August 22, 2022

State of Washington

County of Kitsap

On this __22nd__ day of __August__ , 20 __22__ , before me a notary public, the undersigned, personally appeared __Lawrence A. Farwell__ , known to me (or satisfactorily proven) to be the person(s) whose name is subscribed to the within instrument, and acknowledged that he/she executed the same for the purposes therein contained.

In witness hereof, I hereunto set my hand and official seal.

_Caylee Rausch_
Notary Public

_Caylee Rausch_
Print Name

__07/21/2026__
Expiration Date

CAYLEE RAUSCH
EXP. 07-21-2026
NOTARY PUBLIC
COMM# 202678
STATE OF WASHINGTON

**Defendant Dr. Lawrence A. Farwell Affirmation in Response to Order to Show Cause**

**Exhibits**

**August 21, 2022**

Exhibit AR – Affidavit of General Donald Romfolo

Exhibit AR – Affidavit of Firas Hamdi

Exhibit AAK – Statement by General Adel Al Eid

Exhibit AAA - Dr. Farwell's Report to the FBI

Exhibit BAA – Dr. Snitily Notes 2022-05-17

Exhibit BAB – Exhibit BAB-Dr. Snitily Summary 2022-05-17

Exhibit BAC – Dr. Snitily Notes 2022-05-20

Exhibit BAD – Dr. Snitily Summary 2022-05-20

Exhibit BAE – Dr. Snitily Notes 2022-05-25

Exhibit BAF – Dr. Snitily Summary 2022-05-25

Exhibit BAG – Dr. Snitily Notes 2022-05-31

Exhibit BAH – Dr. Snitily Summary 2022-05-31

Exhibit BAI – Prescriptions For Drugs

Exhibit BAJ – MRI Rayus Radiology 2022-05-06

Exhibit BAK – MRI Seattle Radiology 2022-05-06

Exhibit BAL – Dr. Bailey Injection Consent

Exhibit BAM – Dr. Bailey Notes

Exhibit BAN – Dr. Snitily Prescription For Chiropractic Treatment

Exhibit BAO – Dr. Snitily Prescription For Physical Therapy

Exhibit BAP – Indigo Urgent Care 2022-04-03

Exhibit BAQ – Indigo Urgent Care 2022-04-09

Exhibit AR

Exhibit AR*

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AR_RomfoloAffidavitEditable1904.pdf

Affidavit of General Donald Romfolo of South Africa regarding fraud by Ika and Brainwave Science, Inc.

## Exhibit AR

### AFFIDAVIT

I, the undersigned,

**DONALD BUTI RAMFOLO**

Hereby state under oath as follows:

1. I am an adult male. I am a director and shareholder in Brain Scan (PTY) Ltd in South Africa and retired with the rank of Brigadier General from South African Defence Force in December 2002.

2. The facts contained in this affidavit are within my personal knowledge, and unless the contrary appears from the context, are to the best of my knowledge and belief, both true and correct.

3. My professional responsibilities in Military Intelligence in South Africa have prepared me to be highly qualified in evaluating threats to national security and justice.

4. On or about 11/28/2019, I participated in a Skype call with Krishna Ika ("Ika") of Brainwave Science, Inc. (BWS) plans were made to setup meetings with the South African Secret Service, Defence Intelligence and Crime Intelligence.

5. I witnessed Mr. Ika make the following statements to sell the South African government Brain Fingerprinting systems, training, and network integration of the system into the networks of the agencies mentioned above. That their Brain Fingerprinting product is used in several countries, is admissible in court, and they hold patents for the technology.

6. Marketing material provided by Brain Wave Science employee Mr Matt Adams on 10/17/2018, states in the opening paragraph that "Brainwave Science, LLC is the inventor and developer of a unique, proprietary solution to solve crimes, provide evidence to exonerate innocents, and identify terrorists accurately and scientifically before and after a terrorist act with over 99% accuracy." This statement proved to be false, as the Patent for Brain Fingerprinting was filled by Dr Larry Farwell more than a decade before Brain Wave Science existed. A review of academic literature shows that Dr Farwell and his associates published most of the research on Brain Fingerprinting.

7. In the same document the following claims are made regarding the competitive advantage of Brain fingerprinting: It is Scientific, tested in over 200 cases, peer-reviewed and proven, Accepted as a scientific evidence in US courts, Unique Intellectual Property with strong patents, Strong and experienced management team.

8. Our due diligence investigation revealed the following facts: Dr. Farwell invented Brain Fingerprinting; he presented Brain Fingerprinting in court where Dr. Farwell's Brain Fingerprinting science and technology and Dr. Farwell's testimony on it were ruled admissible in court; he published his Brain Fingerprinting research in prestigious peer-reviewed scientific journals; he applied his Brain Fingerprinting science in solving real-world criminal cases; he applied his Brain Fingerprinting science at the FBI, the CIA, and the US Navy; he applied his Brain Fingerprinting science to solve crimes, e.g., to exonerate and free Terry Harrington an innocent man falsely convicted of murder and to bring serial killer J.B.

1



Grinder to justice; he proved his Brain Fingerprinting science to be over 99% accurate, and published these findings in peer-reviewed scientific journals; he applied his Brain Fingerprinting science in counterterrorism and counterintelligence cases; he has been featured, along with his invention of Brain Fingerprinting, in major news media in the US and internationally. *TIME* magazine selected Dr. Farwell to the TIME 100: The Next Wave, the top innovators our time who may be "the Picassos or Einsteins of the 21st Century."

9.  When proof of the 200 court cases was requested from Mr Ika and Mr Matt Adams, only the abovementioned cases regarding JP Grinder and Terry Haringtom were supplied. Both these cases show Dr Farwell's technology and not the claimed technology developed be Brain Wave Science. The cases also predate the existence of Brain Wave Science as a company. The research evidence provided did not include any of the research publications of Dr Farwell. Some of the research evidence also predate the existence of Brain Wave Science as a company.

10. When Mr Ika and Mr Adams were pressed to supply more samples of the 200 cases they claim the technology was used in they responded in an e-mail on 03/04/2019 as follows "Brain Fingerprinting scientific technique invented by Dr. Farwell has been accepted under Daubert Standard in US courts. Of all the cases that have been supported by this scientific technique only few have been so far permitted to be released to public by law enforcement authorities. Please find the attached amicus brief filed in the court for the following case: In Harrington v. State, Case No. PCCV 073247 (Iowa District Court for Pottawattamie County, March 5, 2001), petitioner Terry Harrington sought to overturn a 1978 murder conviction on several grounds, including an allegation that newly discovered evidence in the form of Brain fingerprinting entitled him to a new trial. Please see the attached Amicus Brief in this case that explains the Standard of Review and grounds of acceptance of Brain Fingerprinting as evidence in court filed by petitioner Terry Harrington's attorney." This contradicts the claims made in the marketing material supplied by Mr Adams.

11. A subsequent search for patents held by Brain Wave Science shows that in 2013, for only a few months, the existing patent for the Brain Fingerprinting technology, originally filed by Dr Farwell, was assigned to Brain Wave Science, and subsequently reassigned to one of Dr Farwell's companies. This is the only record of a patent held by Brain Wave Science found. It predates the existence of Brain Wave science as a company, and refutes the claims made in Brain Wave Science marketing material.

12. Based on the above-mentioned statements, Brain Scan (Pty) Ltd terminated all agreements, arrangements, an NDA's with Brain Wave science on 03/20/2019. It became clear that Mr Ika and Mr Adams misrepresented themselves and Brain Wave Science as the inventors, patent holders, and developers of the Brain Fingerprinting technology.

13. The close association of Mr Ika to Mr Subu Kota and Mr Michael Flynn who were both implicated in illegal dealings with Russia, furthermore eroded the credibility of Brain Wave Science as a trust worthy company to conduct business with. Neither is Mr Ika.

Brig Gen (Ret)

**DEPONENT**

2



Thus signed and affirmed at _Garsho_,feei_ on this _23_ day of _May_ 2019, the deponent having acknowledged that he knows and understands the contents of this affidavit, having affirmed that the contents hereof are true and correct and that he considers the affirmation binding on his conscience.

COMMISSIONER OF OATHS

(HANDTEKENING COMMISSARIS VAN EDE
(SIGNATURE) COMMISSIONER OF OATHS

VOLLE VOORNAME EN VAN IN DRUKSKRIF
FULL FIRST NAMES AND SURNAME IN BLOCK LETTERS

BESIGHEIDSADRES (STRAATADRES)
BUSINESS ADDRESS (STREET ADDRESS)

*[Official stamp and details of the Commissioner of Oaths]*

SUID-AFRIKAANSE POLISIEDIENS
DIE STASIEBEVELVOERDER
THE STATION COMMANDER
2019 -05- 23
POSBUS/P.O. BOX 905 11
GARSFONTEIN 0042
SOUTH AFRICAN POLICE SERVICE

3

# Exhibit AS

Exhibit AS

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AS_FirasHamdiAffidavit2.pdf

Affidavit of Firas Hamdi of Pakistan regarding fraud by Ika and Brainwave Science, Inc.



Firas Hamdi, having been duly sworn, hereby deposes and says:

1. I am the CEO of Prime Technologies in Islamabad Pakistan.

2. Our business includes selling technology to national military, intelligence, and law enforcement agencies in Pakistan and elsewhere, and training personnel in the associated science and applications.

3. Our company, in collaboration with Dr. Lawrence Farwell, the inventor and world's leading expert on Brain Fingerprinting, has successfully sold Farwell Brain Fingerprinting technology to Pakistani government agencies and trained agency personnel in Farwell Brain Fingerprinting science and technology over the last three years.

4. I have twice successfully completed the Brain Fingerprinting Training Course taught by Dr. Farwell himself, once in the USA and once in Pakistan. I am a qualified expert in Brain Fingerprinting, certified by Dr. Farwell and affiliated agencies.

5. I have assisted Dr. Farwell in conducting training in the forensic neuroscience of Farwell Brain Fingerprinting for government agencies in Pakistan.

6. On or about April 4th, 2019, I witnessed an attempt by Krishna Ika ("Ika") and Brainwave Science, Inc. ("BWS") to defraud a Pakistan Directorate of Procurement Navy (DP-Navy)

7. On that date a representative of Ika and BWS, a Pakistani, appeared to present a response from Ika and BWS to a tender for Farwell Brain Fingerprinting issued by DP-Navy. I was present to present a response from Prime Technologies in collaboration with Dr. Farwell.

8. The agent of Ika and BWS falsely claimed that he represented Dr. Farwell. He stated the Ika had told him that he was representing Dr. Farwell and the genuine Farwell Brain Fingerprinting science and technology.

9. The agent of Ika and BWS told me that until he found out otherwise on the above date, he had sincerely believed that he represented Dr. Farwell, along with Ika and BWS, because Ika told him so.

10. The agent of Ika and BWS falsely and fraudulently claimed that the product from BWS that he was offering on behalf of BWS and Ika in response to the tender was the same as Dr. Farwell's genuine Brain Fingerprinting forensic neuroscience.

11. DP-Navy rejected the tender from Ika and BWS.

12. As an expert in Brain Fingerprinting, I have thoroughly examined the facts regarding the genuine Farwell Brain Fingerprinting and the counterfeit technology offered by Ika and BWS.

**ATTESTED**    Contd..........................P/2



1

-2-

13. My research has revealed that the counterfeit technology offered by Ika and BWS does not have any of the major features of the genuine Farwell Brain Fingerprinting, and has not achieved any of the major accomplishments of Farwell Brain Fingerprinting, e.g., being applied at the FBI, the CIA, and the US Navy; being ruled admissible in court; solving real-world criminal cases; being published in leading peer-reviewed scientific journals; being proven over 99% accurate in peer-reviewed scientific studies at the FBI, the CIA, and the US Navy; and being successfully applied – as we have here in Pakistan – in counterterrorism cases.

14. My research has revealed that Ika and the other employees of BWS do not have the training, credentials, certification, knowledge, experience, training, or expertise necessary to practice forensic neuroscience, specifically Brain Fingerprinting science, and certainly do not have the necessary qualifications to train anyone else to practice this highly technical and advanced forensic neuroscience.

15. My experience in applying the genuine Farwell Brain Fingerprinting in collaboration with Dr. Farwell and agencies of Pakistan leads me to the conclusion that if Ika and BWS ever succeeded in selling their counterfeit technology and training by unqualified personnel to any major intelligence, counterterrorism, or law enforcement agency, this would be a major threat to national security and justice.  There is no evidence that BWS' and Ika's counterfeit technology works at all, let alone with high accuracy.  Their "trainers" are not qualified to practice forensic neuroscience, specifically Brain Fingerprinting, let alone to train others to do so.  Applying such an unproven and untested technology, and attempting to apply training by such unqualified personnel, would in my opinion be likely to have disastrous consequences for counterterrorism, counterintelligence, and law enforcement efforts.

Islamabad, Pakistan

On this, the 14th day of May, 2019, before me, a notary public, the undersigned officer, personally appeared Firas Hamdi, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness hereof, I hereunto set my hand and official seal.

_____
Notary Public

**Exhibit AAA**



# Supplement #1 to

## United States Federal Bureau of Investigation (FBI) Report

### Re: Investigation of
### Suspects Krishna Ika and Paul Tomkins
### Regarding
### Racketeer Influenced and Corrupt Organizations (RICO) Act
### Original FBI Report: July 19, 2021
### Supplement: March 27, 2022

*This supplement presumes knowledge and understanding of the facts presented in the original July 19, 2021 FBI Report, which is attached hereto.*

*This Supplement refers to Exhibits A – AV incorporated in the original FBI Report as well as additional Exhibit AW.*

Summary of Evidence Submitted by:

**Dr. Lawrence A. Farwell**

https://farwellbrainfingerprinting.com

Email: brainwave@larryfarwell.com

8825 34th Ave NE, Suite L155

Quil Ceda Village, WA 98271

Phone: (+1)  206-905-1009

Mobile: (+1) 206-250-5516

This Supplement, the original FBI Report, and all Exhibits can be downloaded from this link:

https://www.dropbox.com/sh/29vhnwa7g3fjgvl/AAD-h6NmHlw9ePesIIQ9h5L0a?dl=0

## I.    SCOPE OF THIS SUPPLEMENT

The racketeering scheme and pattern of other associated crimes allegedly perpetrated by suspects Krishna Ika ("Ika") and Paul Tomkins ("Tomkins") that were described in the original FBI Report have continued to the present day. This Supplement presents the facts regarding developments since the issuance of the original FBI Report.

## II.    BRIEF HISTORY PRIOR TO THE ORIGINAL FBI REPORT (7/19/21)

**Chronology of Events Regarding Dr. Lawrence Farwell's Invention of Brain Fingerprinting and Subsequent Software Development**

1985. Dr. Lawrence Farwell invented Farwell Brain Fingerprinting comprising applying the P300 brain response in the detection of concealed information. The science and technology embodied therein, comprising the scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed, shall be referred to herein as "Farwell Brain Fingerprinting Information."

1986, 1998, 1991. Dr. Farwell and colleagues published scientific papers on Farwell Brain Fingerprinting Information, disclosing the scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed, and entering the same into the public domain.

1992.  Dr. Farwell provided the Brain Fingerprinting Information scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed, along with his source code, to the FBI, the CIA, and Westinghouse Electric Corporation (on a contract with the CIA).

1990, 1994, 1995. Dr. Farwell patented his Brain Fingerprinting invention, including the Farwell Brain Fingerprinting Information, scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed. The patents have now expired, thus once again releasing the Farwell Brain Fingerprinting Information to the public domain.

1997. Dr. Farwell provided the Farwell Brain Fingerprinting Information, including source code, to professor William Iacono for research purposes, and Dr. Iacono published the same in a public-domain scientific journal.

2013. Dr. Farwell provided the public-domain Farwell Brain Fingerprinting Information to Brainwave Science, LLC (BWS LLC). Dr. Farwell and Ika formed BWS LLC with Ika's company owning 51% and Dr. Farwell and his company owning 49%. Dr. Farwell engaged BWS LLC to assist with software development and international marketing of his invention.[i] Dr. Farwell was an owner of BWS LLC. He was never an employee of BWS LLC and did not have an employment or non-disclosure agreement.

2013. Dr. Farwell wrote the detailed specifications for the Farwell Brain Fingerprinting software to be coded by BWS LLC (and later BWS Inc.), and provided his source code for the same.

2014 – 2017. Dr. Thierry Maison coded the BWS software ("BWS Software") implementing the detailed specifications provided by Dr. Farwell.

Other events from 2017 – 2021 are as documented in the original FBI Report.

### III.    THE BWS SOFTWARE

In the BWS Software, all of the scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed comprised public-domain information provided by Dr. Farwell.

Dr. Maison implemented the BWS Software, the same through multiple public-domain software tools, as follows:

How the BWS Software was written with free and open-source software.

1) The Software components are written in Microsoft C# programing language.  C# (pronounced See-Sharp) is a popular and modern programming language created by Microsoft in 2000 alongside their .NET framework. They wanted a more flexible language to build a variety of secure and robust modern applications for Windows, web servers, tablets, and phones. It is now arguably one of the most valuable programming languages in the world to know. C# is an open-source programming language.
https://dotnet.microsoft.com/languages/csharp

2) Aside from the language itself, the building blocks of the application use the Microsoft .NET framework (pronounced as "dot net").  .NET framework is a free software developer open-source platform for building software applications.
https://dotnet.microsoft.com/

3) The software application uses two different Graphical User Interface (GUI).  The GUI is what dictates how the application will look on the computer screen.
We use Microsoft WinForms and Microsoft Windows Presentation Framework (WPF) both in the public domain and open software.
https://en.wikipedia.org/wiki/Windows_Forms
https://github.com/dotnet/wpf

4) To facilitate and speed up the development we used additional software components to create graphs and display data in tables.  The Graphical display software (Interactive Data Display created by Dmitry Voitsekhovskiy and Mikhail.) is open software and freely downloadable on the GitHub repository.
https://www.microsoft.com/en-us/research/project/interactive-data-display/
https://github.com/predictionmachines/InteractiveDataDisplay and
https://github.com/microsoft/InteractiveDataDisplay.WPF

5) The data table package is based on the Extended DataGrid open source project as mentioned in https://www.findbestopensource.com/tagged/datagrid?fq=Ms-PL
the project was so successful that it's now incorporated into Microsoft's open-source framework.
https://github.com/dotnet/DataGridExtensions

6) The internal data format for storing data uses the eXtended Markup Language (XML) as denied in open standard
https://www.w3.org/XML/
https://en.wikipedia.org/wiki/XML

3

7) Microsoft provides free of charge the necessary tools to create software for Windows or other platforms.  We used Microsoft Visual Studio.
   https://visualstudio.microsoft.com/vs/community/

## IV.    THE MAISON-FARWELL SOFTWARE

Dr. Maison and Dr. Farwell worked together to develop a new implementation of Farwell Brain Fingerprinting.

Dr. Maison had written the BWS Software while CTO of BWS Inc. When beginning development of the new version for application in collaboration with Dr. Farwell, Dr. Maison sought a public-domain source to form the basis for his new code.  Through an extensive search, he found the BWS Software in a public-domain source online.  This apparently came about because someone who was working on the software asked for help in an online forum, and uploaded the software so others could collaborate.  This is a common practice in software development.  Dr. Maison has documented the events where BWS Inc. uploaded the BWS Software to a public source, or allowed it to be uploaded.

The BWS Software included one portion – and only one portion – that might be construed as proprietary.  That is the section that communicated with the headset.  This is because BWS Inc. uses a different headset from other implementations of Farwell Brain Fingerprinting, so the software communicating with the headset must be different.  Everything else in the BWS Software that Dr. Maison downloaded from a public source online comprised the implementation Dr. Maison had made of the public-domain scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed provided by Dr. Farwell, implemented through open-source tools as described above.

Dr. Maison removed the part of the BWS Software that communicated with the Taiwan-made headset used by BWS Inc., and substituted code that communicated with a custom headset designed by Dr. Farwell and manufactured in the US.  He also made various other improvements to the code, some related to the superior features of the Farwell-Maison headset, and others related to other methods for improving the performance of the system.

## V.    AUTHORITIES IN FOUR COUNTRIES ACCUSE IKA AND BWS OF FRAUD

For half a dozen years, Ika attempted to market "Brain Fingerprinting."  However, no government agency hired him and his employees to effect a technology transfer of the science to the agency, train them to apply the science, and provide the necessary technology, because it was obvious to everyone in the field that Ika and his employees lacked that capability.  Still today, Ika and BWS Inc. have never successfully sold and implemented their system in any government agency.

Authorities in South Africa, Pakistan, Nigeria, and Thailand allegedly caught Ika attempting to defraud their agencies into engaging Ika and his employees to implement a technology transfer of Farwell Brain Fingerprinting to their agency, when neither Ika nor his employees had the necessary expertise, training, credentials to do so. For example, a General and former agency head in South Africa stated, in a sworn affidavit, that, when the General asked Ika to provide information regarding the acceptance in court that Ika, BWS LLC, and/or BWS Inc claimed that Ika Parties' Counterfeit Product (the BWS Software) had achieved, the only references Ika Parties Ika, BWS LLC, and/or BWS Inc provided were to court cases in which Dr. Lawrence

4

Farwell and his genuine Brain Fingerprinting science were involved, cases that predated the existence of BWS LLC and BWS Inc. and had nothing to do with Ika, BWS LLC, BWS Inc, and Ika Parties' Counterfeit Product (Exhibit AR).

Similarly, authorities in Thailand allegedly caught Ika attempting to defraud them by purporting to conduct Brain Fingerprinting brainwave testing and analysis, but instead displaying a graphics file with a picture of brainwave results, without actually conducting any actual brainwave testing. As expert Jose Kuruvilla stated, "When people are lying I don't need a lie detector.  I told my people we will not do business with [Ika and BWS Inc]." (This is documented in Exhibit AT.)

Ika reportedly engaged in similar fraudulent activities in ██████, as detailed in the original FBI Report, as follows.

According to Brain Fingerprinting expert ██████████ sworn affidavit ██████████, he witnessed an attempt by Ika Parties Ika, BWS LLC, and/or BWS Inc to defraud an intelligence agency of the ██████ government on or about April 15, 2019.

According to ████, Ika Parties Ika, BWS LLC, and/or BWS Inc through their representative attempted to sell said agency their counterfeit product, fraudulently represented that their product was the same as Dr. Farwell's Brain Fingerprinting, and fraudulently represented that they and their employees were qualified to practice forensic neuroscience, specifically Brain Fingerprinting, and to train others to do so.

According to ██████, Ika Parties Ika, BWS LLC, and/or BWS Inc' representative, on instructions from Ika Parties Ika, BWS LLC, and/or BWS Inc, falsely represented to the ██████ government that BWS represented Dr. Lawrence Farwell and his Brain Fingerprinting technology, whereas in fact Dr. Farwell has no relationship with BWS, and they do not have his Brain Fingerprinting technology.

According to Brain Fingerprinting expert █████ any attempt to apply Ika Parties' Counterfeit Product  (the BWS Software) in law enforcement, counterterrorism, or intelligence operations would have "disastrous consequences."  In his affidavit ████████████ stated the following: "My experience in applying the genuine Farwell Brain Fingerprinting in collaboration with Dr. Farwell and agencies of ██████ leads me to the conclusion that if Ika and BWS ever succeeded in selling their counterfeit technology and training by unqualified personnel to any major intelligence, counterterrorism, or law enforcement agency; this would be a major threat to national security and justice. There is no evidence that BWS' and Ika's counterfeit technology works at all, let alone with high accuracy. Their 'trainers' are not qualified to practice forensic neuroscience, specifically Brain Fingerprinting, let alone to train others to do so. Applying such an unproven and untested technology, and attempting to apply training by such unqualified personnel, would in my opinion be likely to have disastrous consequences for counterterrorism, counterintelligence, and law enforcement efforts."

## VI.    FRAUD LEADING TO THE RENAMING AND REBRANDING OF THE BWS SOFTWARE

In response to events reviewed very briefly herein and described in detail in the original FBI Report, Ika, Tomkins, and BWS Inc. changed the name of the BWS Software and the representations on the BWS Inc. website.  In the first few years, Ika had been attempting to market "Brain Fingerprinting" expertise and technology, and the website touted the connection with the

inventor of Brain Fingerprinting, Dr. Farwell, and the various achievements of Farwell Brain Fingerprinting – Dr. Farwell's publications in the scientific journals verifying the accuracy and reliability of Farwell Brain Fingerprinting, Dr. Farwell's applications of his invention at the FBI, the CIA, and the US Navy, etc.  Later, when Dr. Farwell parted company with BWS Inc., they removed all reference to Dr. Farwell, but retained the references to Dr. Farwell's invention of Brain Fingerprinting, including the name "Brain Fingerprinting."

When it became clear that any attempt by Ika and BWS Inc. to market "Brain Fingerprinting" science and technology would be quickly exposed as fraudulent, and after half a dozen years of attempting to defraud intelligence and law enforcement agencies into paying them for "Brain Fingerprinting," Ika and BWS Inc. changed the name of their software to "iCognative," (sic) without adding any functionality or features to the software.  Thus, "BWS Software" and "iCognative" have now become synonymous and are used interchangeably.

## VII.   DR. FARWELL AND DR. MAISON AS WITNESSES AGAINST IKA AND BWS IN PAST AND FUTURE FRAUD CASES

As described in detail in the original FBI Report, Dr. Farwell, in his role as the inventor and world's leading expert in Brain Fingerprinting, testified against Ika and BWS in a fraud case in Dubai that spread to multiple jurisdictions.  Dr. Farwell will almost certainly be a primary witness in all future cases arising from the accusations of fraud by Ika relating to Brain Fingerprinting, when and if Ika is brought to justice in Pakistan, South Africa, Thailand, or Nigeria, where he currently stands accused, or elsewhere.

As the former CTO of BWS LLC with extensive knowledge of the inner workings of the software and technology and the company, Dr. Maison is also a very likely witness any future cases arising out of the present accusations or future accusations.

Ika demanded that Dr. Farwell change his sworn testimony in the Dubai case.  As described in the original FBI Report, when Dr. Farwell refused, Ika retaliated by filing a barrage of six frivolous lawsuits in various jurisdictions designed to be as inconvenient and expensive as possible for Dr. Farwell and others involved with Farwell Brain Fingerprinting.  Three lawsuits have been dismissed.  A fourth is against third parties who were owners of the Brain Fingerprinting patents, and will almost certainly be dismissed shortly.

In 2021, Ika, Tomkins, and BWS Inc. filed the sixth lawsuit, as described below. The events of this Supplement in conjunction with this lawsuit took place after the original FBI Report had been completed.

Ika's and Tomkins' filing multiple lawsuits against the past and potential future witnesses against Ika in fraud trials, taken in conjunction with the multiple crimes described in the original FBI Report, reveal a pattern of attempts to eliminate the obstacles to their RICO scheme by intimidating, coercing, discrediting, retaliating against, and exhausting the resources of witnesses who are in the best position to testify and thereby contribute to the efforts of authorities to bring Ika to justice for fraud in at least four countries.

## VIII.   THE BWS LAWSUIT - BWS VS FARWELL, MAISON, AND OTHERS

In 2021, Ika, Tomkins, and BWS filed a lawsuit against Farwell, Maison, and others (Brainwave Science, Inc. v. Arshee, Inc. Dr. Lawrence A. Farwell, Dr. Thierry Maison, and Brain Fingerprinting Foundation, US District Court, Eastern District of New York, Civil Action No.: 21-cv-4402 [BMC-RLM]) claiming that the Farwell-Maison Software incorporated BWS Inc.'s

proprietary information and trade secrets and that Dr. Farwell's and Dr. Maison's actions damaged BWS Inc.'s business interests.

We shall not discuss the merits of that civil case here. This Supplement will focus solely on crimes committed by Ika and Tomkins in pursuing said lawsuit.

## IX. CRIMES COMMITTED BY IKA AND TOMKINS SINCE THE ORIGINAL FBI REPORT

**Ika committed perjury in his affidavit in said lawsuit, and Tomkins, who wrote Ika's affidavit, suborned perjury, as follows.**

Ika's Affidavit (Exhibit AW) made the following demonstrably false statements:

10.  The challenge in developing and marketing any P300 based system lies not within the concept of P300 measurement itself but in creating a system which, among other things,

> a) prompts testing personnel for appropriate stimuli;

> b) displays stimuli to testing subjects in optimal order and at optimal intervals;

> c) captures appropriate P300 brainwave responses;

> d) disregards and/or eliminates extraneous responses ("noise") which may produce false positive or false negative results;

> e) detects and disregards any attempted countermeasures by suspects or others involved in conducting testing;

> f) performs appropriate analysis of P300 measured responses utilizing statistical and machine learning algorithms and Artificial Intelligence;

> g) generates unbiased reports for use by examiners, investigating agencies and legal authorities.

11.  Brainwave [BWS Inc.] has expended substantial time and resources to address the afore-referenced challenges by developing proprietary software code, user interfaces, algorithms and hardware ("Brainwave Trade Secrets") to create a system that is accurate, scalable and more-readily utilized by field investigators without extensive scientific training.

Contrary to Ika's false statement, all of (a) – (g) were contained in the software design that Dr. Farwell provided and Dr. Maison implemented. Since Dr. Farwell provided detailed specifications for every part of the software, and Dr. Maison implemented it, they are familiar with every line of code in the BWS Software. Below is a brief account of where Dr. Farwell and his colleagues had already placed every part of (a) – (g) in the public domain before BWS Inc. existed. There is absolutely nothing in the BWS Software that was not already fully implemented by Dr. Farwell and others before BWS Inc. existed, and placed in the public domain, and then provided to BWS Inc., with the sole exception of the specific part of the code that communicated with the headset. The part of the code that communicates with the headset is not mentioned in (a) – (g).

In a later, more detailed Supplement, we will specify every single line of code in the BWS Software, and provide details of exactly where the scientific protocols, experimental design,

algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed therein, and everything of substance in the BWS Software were previously placed in the public domain by Dr. Farwell and others (except the section of code for communication with the headset, since BWS Inc. used a different headset).

The following is a brief description of where in the public domain all of the scientific protocols, experimental design, algorithms, mathematics, statistics, parameters, methods, and procedures, as well as the data collected, displayed, stored, and analyzed in the BWS Software were in the public domain prior to the time that Dr. Farwell provided the same to BWS Inc. and Dr. Maison implemented the same.

a) "prompts testing personnel for appropriate stimuli;"   -- In the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AM, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.

b) "displays stimuli to testing subjects in optimal order and at optimal intervals;" In the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AM, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.

c) "captures appropriate P300 brainwave responses;" In the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AM, AN, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.

d) "disregards and/or eliminates extraneous responses ("noise") which may produce false positive or false negative results;" In the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777, and also in previous publications on digital filtering by Dr. Farwell and colleagues.

e) "detects and disregards any attempted countermeasures by suspects or others involved in conducting testing;" In the public domain in AG, AH, AI, AL, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.

f) "performs appropriate analysis of P300 measured responses utilizing statistical and machine learning algorithms and Artificial Intelligence;"   -- Everything that is included in the BWS Software that analysis of P300 measured responses, and everything that involved mathematics and statistics is in the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.  Dr. Farwell and Dr. Maison are experts in machine learning and AI, but did not include machine learning algorithms and AI in the BWS Software, and no machine learning and AI were in the software that Dr. Maison downloaded from the internet that formed the basis for the Maison-Farwell Software.

g) "generates unbiased reports for use by examiners, investigating agencies and legal authorities." – In the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AM, AN, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.

Ika's affidavit contains numerous other demonstrably false statements that have been addressed in the original FBI report.  These will not be further discussed here.

**In a hearing on November 30, 2021 in the referenced case, Ika lied under oath.**

In the above referenced hearing on November 30, 2021 in the present case, Krishna Ika ("Ika") lied under oath.  When asked both by our attorney Joseph Carbonaro and by Judge Cogan whether BWS Inc. system included any open-source or public domain components, Ika repeatedly answered "No."  There are dozens if not hundreds of instances in the software proving that Ika's statement is unequivocally and demonstrably false.

With respect to the scientific protocols, algorithms, mathematics, statistics, and every aspect of the procedures for conducting a Brain Fingerprinting test, everything in the BWS software was derived from information Dr. Farwell provided to BWS.  This is and was in the public domain due to my colleagues and myself having implemented all of the above in software in several iterations, beginning in 1986 when Dr. Farwell first invented the system, and including software that Dr. Farwell shared with many others over the years.  This includes colleagues including William Iacono at the University of Minnesota, my colleagues at the University of Illinois and Harvard, the FBI, the CIA, the US Navy, and many others.  All of above were also disclosed in patents wherein I am the inventor that have now expired.  All of the above were also disclosed in scientific publications by myself and colleagues on our research at the FBI, the CIA, the US Navy, and elsewhere. All of this is documented in In the public domain in Exhibits AG, AH, AI, AJ, AK, AL, AM, AN, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777.

The above features were implemented using several open-source and public-domain software packages, as explained above.

**In the same hearing referenced above, Tomkins lied to the judge.**

**Mr. Tomkins stated that his client had sold iCognative (BWS Software) systems for a cost of about $400,000 per license, and each sale included several licenses, and that more than one such sale had taken place.**

**All parts of that statement are entirely false.**

Mr. Tomkins knows his statement is false, and knew it at the time.

Brainwave Science, Inc. has never sold a license for an iCognative system (or any other brainwave system) for $400,000 (or anything remotely approaching that figure).  They have not sold multiple licenses to the same customer for that price, or for any price.  They have not made similar sales to multiple customers.

To my knowledge, Brainwave Science, Inc. has never sold any of their iCognative systems to anyone. As the inventor and world's leading expert in Brain Fingerprinting and the individual who has successfully implemented Brain Fingerprinting at the FBI, the CIA, the US Navy, and in national counterterrorism and law enforcement agencies around the world, I am in a position to know.   BWS Inc. has supplied some of their brainwave systems to a few potential clients for the purposes of demonstration, but nothing remotely resembling what Mr. Tomkins claimed has ever occurred.

Mr. Tomkins' false statement is material to the case at hand.  He made the statement in answer to the only question the judge asked during the hearing.  The hearing was about (false) allegations by Mr. Tomkins' client that the Defendants (including myself) had misappropriated his client's trade secrets embodied in the brainwave systems specified in Mr. Tomkins' false statement, and thereby

cost his clients potential sales and money. The amount of money accruing from sales was an important part of the judge's deliberations regarding alleged damages.

In reality, Mr. Tomkins' client's entire brainwave system was a copy of a system that I invented, patented, and developed, and had been using since the 1980s. In particular, I provided Mr. Tomkins' client with all the details of a system I developed in 2007. I provided his client with all the algorithms, experimental protocols, specifications, methods, and everything they needed to build the system to imitate what my original system accomplished. The central contention of this lawsuit is equivalent to some businessman with zero knowledge, expertise, experience, credentials, education, or aptitude in aeronautics or airplanes accusing the Wright brothers of stealing the intellectual property of the airplane from him. I would have no imaginable reason for misappropriating Mr. Tomkins' client's untested and unproven system, when I had a brainwave system of my own that I had developed, published in the scientific journals, tested and proven at the FBI, the CIA, and the US Navy, and successfully applied in the field, a system that had been ruled admissible as scientific evidence in court. Brainwave's system has achieved none of these.

The following relevant facts currently stand as undisputed. Mr. Tomkins has had multiple opportunities to dispute these facts, and never has done so. His response to being confronted with the facts has consistently been to obfuscate and attempt to redirect and change the subject, citing other, irrelevant or marginally relevant facts (and in some cases lies).

I. Regarding Dr. Lawrence Farwell:

    a. Dr. Farwell is a Harvard graduate with a PhD in biological psychology and a former research associate at Harvard Medical School.

    b. Dr. Farwell is the inventor of Brain Fingerprinting, as per the Patents and peer-reviewed publications cited below. Dr. Farwell has published extensively on Brain Fingerprinting in leading peer-reviewed scientific journals.

    c. Dr. Farwell was selected by *TIME* magazine as one of the top innovators this century, "the Picassos or Einsteins of the 21st Century."

    d. Dr. Farwell has conducted Brain Fingerprinting research at the FBI, the CIA, and the US Navy and published the results in peer-reviewed scientific journals.

    e. Dr. Farwell has successfully applied Brain Fingerprinting science in real-world criminal cases.

    f. The science and technology of Brain Fingerprinting that Dr. Farwell invented and developed and his expert testimony on it have been ruled admissible in court.

    g. Dr. Farwell has successfully practiced his profession as a forensic neuroscientist, and specifically as the world's leading expert in the Brain Fingerprinting science and technology that he invented, for over 25 years.

II. Regarding the BWS system: Unlike the genuine Farwell Brain Fingerprinting that Dr. Farwell has developed and implemented in the US and throughout the world, the BWS product that Mr. Tomkins, Brainwave Science, LLC, Brainwave Science, Inc., and Ika have been attempting to market, the BWS system:

a. Has not been shown to be an effective implementation of the Brain Fingerprinting scientific technology that was invented by Harvard-trained neuroscientist Dr. Farwell, who was selected by TIME magazine as one of the top innovators this century, "the Picassos or Einsteins of the 21st Century."

b. Has not been shown to meet the 20 Brain Fingerprinting Scientific Standards that Dr. Farwell has published and that are met by Dr. Farwell's versions of the technology.  There is no evidence anywhere that the counterfeit product and faux training by unqualified individuals that BWS Inc. is offering meet these standards.

c. Has not been tested and proven at the CIA, the FBI, and the US Navy.

d. Has never been applied in real-world criminal cases, including serial killer JB Grinder and innocent murder convict Terry Harrington.

e. Has not been proven over 99% accurate in research at the FBI, the CIA, the US Navy, and elsewhere published in the top peer-reviewed scientific journals.  There is no evidence anywhere that what BWS Inc is offering has achieved such accuracy in scientific studies or field applications.

f. Has never achieved 99% accuracy, or any other proven level of accuracy, in any published research, forensic applications, field applications, or in any other context.

g. Has not been featured in major national and international news media, including CBS Evening News, ABC World News, CNN, PBS, BBC, CBS 60 Minutes, ABC Good Morning America, the Discovery Channel, The New York Times, The Washington Post, TIME Magazine, and US News and World Report.

h. Has not been proven to be capable of detecting bomb makers, criminals, and terrorists, in peer-reviewed publications.

i. Lacks the qualities and achievements of the genuine Brain Fingerprinting invented and developed by Dr. Farwell, as listed herein and in the Exhibits.

j. Has produced no evidence that the unproven technology BWS Inc is offering achieves the same accuracy, reliability, or validity of the genuine Brain Fingerprinting practiced by Dr. Farwell and other competent, trained, and credentialed scientists.

III. Regarding Mr. Ika and the BWS employees: Neither Mr. Ika nor anyone else one employed by Brainwave Science, LLC, Brainwave Science, Inc.:

a. Has ever been trained in Brain Fingerprinting by a qualified Brain Fingerprinting expert such as Dr. Lawrence Farwell or FBI forensic scientist Dr. Drew Richardson;

b. Has ever conducted or published Brain Fingerprinting research;

c. Has ever successfully applied Brain Fingerprinting in real-world cases;

d. Has ever conducted Brain Fingerprinting research for the FBI, the CIA, or the US Navy;

e. Is qualified to conduct a scientific Brain Fingerprinting test that meets the Brain Fingerprinting Scientific Standards; or

    f.   Has been featured in any of the major news sources mentioned above that
        have featured Dr. Farwell and his genuine Brain Fingerprinting invention.

Mr. Tomkins' lie to the judge in the hearing described above was not an isolated, accidental, or random incident.  It was a carefully planned, strategic deception.  In Mr. Ika's affidavit, Mr. Ika's touting of  BWS Inc.'s success in the marketplace was confined to this:  "[unnamed and unspecified] Agencies and educational institutions within several countries have successfully conducted testing and validation studies on our system."  It is not an accident that Mr. Ika did not claim that BWS Inc. had sold its system to multiple customers, each one of which purchased multiple systems for $400,000 each, as Tomkins did.  Such a statement, in writing in an affidavit, would have inevitably been proven false, and Mr. Ika would have unquestionably committed perjury. (Mr. Ika made several other demonstrably and unequivocally false statements in his affidavit. These I will address elsewhere and will not discuss here, except for one, which is discussed immediately below.)  Tomkins strategically told his substantive and material lie in a situation where it would be heard and relied upon by the judge, and yet he was not under oath, and it was not in writing.

Two instances of perjury by an individual and one lie to a judge by his attorney and co-conspirator, taken alone, might not be considered to be of major importance.  However, these lies were a strategic part of the RICO conspiracy described in the original FBI Report wherein Ika, Tomkins, and their co-conspirators have attempted, and continue to attempt, to defraud government agencies by misrepresenting themselves as skilled forensic scientists with the necessary training, credentials, expertise, and experience to effect a technology transfer of brainwave-based technology for detection of concealed information to a government agency and train agency personnel in the same, whereas they totally lack said training, credentials, expertise, and experience.

**Virtually everything of substance regarding brainwave technology, the achievements of BWS Inc., and endorsements of others on the BWS Inc. website is false and fraudulent.**

Another aspect of this conspiracy to commit fraud is the BWS Inc. website.  The original FBI Report documented multiple instances where the BWS Inc. website presented false and fraudulent information in the past. Ika and BWS Inc. have now updated their website, and it now contains an entire new set of false and fraudulent information.

Everything, or virtually everything, of substance on the BWS website with respect to the science and technology that Ika and BWS Inc. purport to be offering is false and fraudulent.  The following are some of the most salient examples.

**As of March 28, 2022, the BWS website has three purported "Testimonials.". All three are totally false, fabricated, and fraudulent.**

At this link on the Brainwave Science, Inc. website https://brainwavescience.com/testimonial/, the statement is as follows.

---

**Testimonials**



**Dr Adel Al Eid (Former Brig. Gen at National Information in Ministry of Interior, Saudi Arabia)**

"iCognative empowers investigators to accurately measure information hidden in a suspect's brain, leading accurately to the terrorists who schemed, contributed or carried

out any act of terrorism or a criminal offence even before it happens. This technique enables counter terrorism officials to scientifically test suspected terrorists and to indict or exonerate them based on the information stored in their brains, even if a suspect has participated in a sleeper cell."

Dr. Adel Al Eid never made that statement, or any statement remotely similar to that statement, or any statement that might be construed as an endorsement of iCognative or Brainwave Science, Inc., or any statement at all that mentioned iCognative or Brainwave Science, Inc.

Dr. Al Eid is a long-time colleague and friend of the inventor of Brain Fingerprinting, Dr. Lawrence A. Farwell, with whom Dr. Farwell been working for years on implementing the genuine Farwell Brain Fingerprinting in Saudi Arabia. In addition to being a professional colleague, he is a personal friend of Dr. Farwell. He has entertained Dr. Farwell at his home in Riyadh, a rare honor in that closed, formal society.

He holds the rank of General as well as a PhD-level expert in biotechnology. He is a rare combination of a highly decorated General and a renowned scientist and technologist.

Dr. Farwell has spoken with him personally about the above quotation, and he has stated that he never did and never would make such a statement.

Dr. Al Eid has the necessary expertise in both biotechnology and counterterrorism to recognize the fact that the genuine Farwell Brain Fingerprinting is an effective and proven scientific technology, an iCognative is not.

Dr. Al Eid has spoken publicly on television and in other outlets about the value of Farwell Brain Fingerprinting (not iCognative) for law enforcement and counterterrorism in Saudi Arabia. The following are two examples:

https://twitter.com/yahalashow/status/1345424174274256898?s=24

https://aawsat.com/home/article/2662816/%C2%AB%D8%A8%D8%B5%D9%85%D8%A9-%D8%A7%D9%84%D8%AF%D9%85%D8%A7%D8%BA%C2%BB-%D8%AF%D9%82%D9%91%D8%A9-%D9%81%D9%8A-%D8%A5%D8%AB%D8%A8%D8%A7%D8%AA-%D8%A7%D9%84%D8%AC%D8%B1%D8%A7%D8%A6%D9%85-%D9%88%D9%83%D8%B4%D9%81-%D8%A7%D9%84%D9%82%D8%B6%D8%A7%D9%8A%D8%A7-%D8%A7%D9%84%D8%BA%D8%A7%D9%85%D8%B6%D8%A9

The second "Testimonial" on the BWS website is purportedly from Detective Sen-SGT Ron Iddles (Homicide Squad, Melbourne, Australia). It begins with ""iCognative has value as an investigative tool…" Mr. Iddles never made such a statement, or any endorsement of iCognative. He retired years ago from the Melbourne police.

The third "Testimonial" on the BWS website is a false quotation from the newspaper *Indian Express.* The quotation on the BWS website is as follows:

Indian Express and DNA India (Leading Newspapers in Indian Subcontinent)

"We are helping the CBI by using ***iCognative*** technology on the two suspects. This is a new technology in the country which is useful for cracking cases like this where the

police need to find out some clues," RSU Director and IPS officer Vikas Sahay told The Indian Express.

The actual quotation did not mention iCognative at all.  It was about the genuine Brain Fingerprinting technology, not about iCognative.  Here is the actual quotation:

> "We are helping the CBI by using ***brain fingerprinting*** technology on the two suspects. This is a new technology in the country which is useful for cracking cases like this where the police need to find out some clues," RSU Director and IPS officer Vikas Sahay told *The Indian Express*."

It is at this link as of March 28, 2022: https://indianexpress.com/article/india/india-news-india/2005-mssing-woman-kochi-smitha-george-suspect-brain-fingerprint-test-2870263/.

In summary, all three of the "Testimonials" on the BWS website are false, fabricated, and fraudulent.

**The Brainwave Science website https://brainwavescience.com/ makes the following false, fraudulent, and totally unsubstantiated claims regarding the science and technology purportedly offered by BWS.  Contrary to the statements on the BWS website, iCognative has never been proven in the scientific laboratory, in peer-reviewed scientific publications, or in real-world applications to have achieved any of these claims.**

Specific, quantifiable, numerical claims that are false and unsupported by any scientific evidence or field experience are noted in **bold and underlined.**

At this link: https://brainwavescience.com/icognative/

**RELIABLE**

A noteworthy advancement from the polygraph, iCognative® detects whether certain specific information is known to a suspect with **over 99% accuracy**. [This is true of Farwell Brain Fingerprinting, and false regarding iCognative.]

**HIGH VALUE**

The remarkable applications of iCognative® maximize intelligence collection disciplines across various security verticals. Unlike fingerprints and DNA that are available only in 1-2% of the cases, **iCognative® is applicable in over 85% of cases**. [This is true of Farwell Brain Fingerprinting, and false regarding iCognative.]

**INTELLIGENT DETECTION**

iCognative® collects an advanced scientific brain response called the P300 to analyze patterns of semantic memory recognition. Proprietary algorithm processes intelligently detect specific information stored in the brain.  [Except for the word "proprietary," this is true of Farwell Brain Fingerprinting.  It is false of iCognative, with or without that word.]

iCognative® technology scientifically, accurately, and humanely detects concealed information, such as the details of criminal or terrorist activities, stored in the brains of the perpetrators non-invasively, and eliminates torture in all investigations, be it civil or criminal. [This is true of Farwell Brain Fingerprinting, and false regarding iCognative.]

At this link: https://brainwavescience.com/why-icognative/

14

**PRECISION, ACCURACY, RELIABILITY**

**Results always have high accuracy rates with over 99% statistical confidence** [This is false regarding iCognative, and it is even false regarding the genuine Farwell Brain Fingerprinting. This statement exhibits a total lack of knowledge and understanding regarding "statistical confidence." Farwell Brain Fingerprinting has been shown in the peer-reviewed scientific literature to produce median statistical confidences of over 99%, but results do not "always" have "over 99% statistical confidence." iCognative has never been shown in any published scientific study or field application to have any statistical confidence at all, let alone "always" "over 99%."]

**Zero false positives and negatives** [This is true of Farwell Brain Fingerprinting, and false regarding iCognative.]

Purpose-built to eliminate countermeasures [This is false with respect to iCognative. This is advertising copy that doesn't make sense with respect to science and technology. Farwell Brain Fingerprinting has been shown to be highly resistant to countermeasures, but the phrase "eliminate countermeasures" does not accurately represent this.]

At this link: https://brainwavescience.com/icognativetraining/

**Get security experts with real-world experience.** [This is false with respect to BWS Inc. None of the employees of BWS Inc. have ever conducted and published a peer-reviewed scientific study, nor have any of them ever conducted a successful field test in detecting concealed information stored in the brain in any real-world situation. BWS Inc. may have advisors with real-world experience, but not with experience in conducting P300-based tests to detect concealed information in real-world situations. No one other than Dr. Farwell, his colleagues, and others trained by him has such experience and track record of success.]

A noteworthy advancement from the polygraph, **iCognative® detects whether certain specific information is known to a suspect with over 99.9% accuracy**. [This is false with respect to iCognative, and true with respect to Farwell Brain Fingerprinting.]

The technology pictured on the BWS Inc. website is fake, and does not actually conduct brainwave-based tests to detect concealed information stored in the brain. The following are some examples:

On this page https://brainwavescience.com/icognative/, this page https://brainwavescience.com/why-icognative/, and this page https://brainwavescience.com/press-kit/ , the site shows pictures of an Apple computer with an "iCognative" sticker on it. BWS Inc. does not have any software for brainwave data acquisition and analysis for detecting concealed information stored in the brain (the P300 method invented by Dr. Farwell) that runs on an Apple computer. The iCognative software runs on a PC, not the iPad and MacBook computers pictured. The videos on the home page https://brainwavescience.com/ show a screen with the sentence "I intend to commit a terrorist attack in the United States" with a subject holding a standard off-the-shelf game controller and pushing buttons, purportedly during a brainwave test responding to that screen, and then shows a

15

computer screen with simulated brainwave plots and results. BWS Inc. does not have any actual brainwave-based software that would make any meaningful measurements or conduct any meaningful brainwave analysis on brain responses in such a situation. Any legitimate scientist, or any knowledgeable layman with an elementary understanding of detection of concealed information with brainwaves, would immediately recognize that such an algorithm, if it existed in the scientific world, which it does not, would not be an effective means to elicit the P300 brain response or to detect concealed information in the brain. The scientific reasons why this is the case are presented in Exhibits AG, AH, AI, AJ, AK, AL, AM, AN, AO, and US Patents #4,941,477, #5,363,858, #5,406,956, and #5,467,777, and for the sake of brevity will not be repeated here.

**In short, everything or virtually everything of substance on the BWS Inc. website with respect to science and technology for detecting concealed information in the brain by measuring brainwaves comprises either demonstrably false claims or entirely false depictions of fake technology.**

Taken alone, this fact might not be significant. BWS Inc. is not the only company to present mock-ups of technology that they do not have and pretend they are real, and not the only company to make blatantly false claims about the capabilities of the technology that they actually have.

However, when this is taken together with other evidence, a more complete picture emerges. Tomkins lied to a judge when he falsely stated that BWS Inc. had sold their iCognative technology to multiple clients, each one purchasing multiple systems for $400,000 each. In fact, BWS Inc. has never sold even one such system to even one client at any price, let alone nearly half a million dollars. This presents the false impression that the sophisticated agencies whom BWS Inc. has been only attempting to defraud have evaluated BWS's technology and purchased it. It implies that BWS Inc. has a legitimate and successful business, outside of mere unsuccessful attempts to commit fraud.

Ika committed perjury when he stated that the BWS Software contained no open-source or public-domain material, and when he said that BWS Inc. had developed many proprietary features, when in fact all of these features were public domain and were provided to BWS Inc. by Dr. Farwell based on his successful development of Farwell Brain Fingerprinting over the previous 30 years.

The BWS Inc. website comprises a conglomeration of demonstrably false, totally baseless, and unproven claims, along with a fake depiction of technology.

Taken together, the existing evidence leads to the conclusion that Ika's and Tomkins recent crimes, like the pattern of fraud delineated and documented in the original FBI Report, are aspects of a conspiracy to defraud government agencies.

## X.     IMPLICATIONS FOR NATIONAL SECURITY

Fortunately, so far Ika, Tomkins, and their employees at BWS Inc. have totally failed in their efforts to defraud government agencies by misrepresenting themselves as skilled forensic scientists with the necessary training, credentials, expertise, and experience to effect a technology transfer of brainwave-based technology for detection of concealed information to a government agency and train agency personnel in the same, whereas they totally lack said training, credentials, expertise, and experience.

If Ika, Tomkins, and their co-conspirators every succeed in defrauding any government agency to engage them to effect a technology transfer of critical technology to detect concealed information

regarding major terrorist crimes, and said agency actually goes through with the training from BWS Inc. – by individuals who have never conducted a successful Brain Fingerprinting test either in the laboratory or the field, and are totally unqualified to conduct such a test, let alone train others to do so – the result will be a major disaster for national and global security.  To put it bluntly, if Ika, Tomkins, and their co-conspirators ever succeed in their scheme to defraud government agencies, the result will not only lead to a waste of money, a major miscarriage of justice, and a serious violation of human rights.  More importantly, the truth will not be detected or acted upon. It is not an exaggeration to say that if such a disaster occurs, it is highly likely that innocent people will be falsely imprisoned or executed, and terrorists will be provided false evidence of their innocence and freed to continue their terrorist crimes.

---

[i] Ika's affidavit contains numerous other demonstrably false statements that have been addressed in the original FBI report.  These will not be discussed in detail here. The following has been documented in detail in the original FBI Report, and will not be repeated except for a very brief summary here. Ika's attorney took an Unexecuted Draft Document, that was not executed by or even known to the undisputed patent owner at the time (American Scientific Innovations, LLC, "ASI"), and recorded it as a "patent assignment" at the USPTO. (It failed as a patent assignment not only because the undisputed patent owner did not execute it, but also because it included no consideration flowing to the purported assignor.)  Dr. Farwell, upon discovering that said document had been erroneously or fraudulently recorded, recorded a correction at the USPTO clarifying that ASI was and had never ceased to be the owner of the patents. BWS LLC's attorney acknowledged in writing at the time that BWS LLC never owned any part of the patents. Dr. Farwell, ASI, and every individual who has ever executed any patent assignment recorded at the USPTO since 1992 has stated in sworn affidavits that BWS LLC never had any ownership interest in the Brain Fingerprinting patents.  Ika purported to remove Dr. Farwell and his company from BWS LLC without due process and without any compensation for their 49% equity, which Ika unilaterally purported to transfer to a company he controlled. Ika formed BWS Inc., the purported successor in interest to BWS LLC, with himself as sole owner. BWS Inc. has never been even mentioned in any patent assignment recorded at the USPTO. As described in the original FBI Report, in 2019 BWS Inc. filed a lawsuit in New York attempting to rewrite history and claim that BWS Inc. (which was never even mentioned in any patent assignment ever recorded at the USPTO) somehow owned the Farwell Brain Fingerprinting patents.  Since the patents have expired, all of this is moot with respect to patent ownership.  It is still relevant, however, with respect to the crimes committed by Ika, as described in the original FBI Report.



# United States Federal Bureau of Investigation (FBI) Report

## Re: Investigation of
## Suspects Krishna Ika and Paul Tomkins

## Regarding
## Racketeer Influenced and Corrupt Organizations (RICO) Act

## July 19, 2021

Summary of Evidence Submitted by:

**Brain Fingerprinting Laboratories, Inc.**
**Dr. Lawrence A. Farwell**
Chief Science Officer and CEO
https://farwellbrainfingerprinting.com
Email: brainwave@larryfarwell.com

8825 34th Ave NE, Suite L155
Quil Ceda Village, WA 98271
Phone: (+1)  206-905-1009
Mobile: (+1) 206-250-5516

This Report and all Exhibits can be downloaded from this link:

https://www.dropbox.com/sh/29vhnwa7g3fjgvl/AAD-h6NmHlw9ePesIIQ9h5L0a?dl=0

## Executive Summary

### Statutes and Crimes

This Report constitutes evidence in the investigation of an ongoing racketeering scheme involving the following statutes and crimes investigated by the FBI:

1. Racketeering Influenced and Corrupt Organizations Act: 18 U.S.C. § 1961, Definitions; § 1962, Prohibited activities;
2. 18 U.S.C. § 1512, Tampering with a witness, victim, or an informant; §1513, Retaliating against a witness, victim, or an informant
3. Securities Act of 1933;
4. Securities Exchange Act of 1934;
5. International fraud constituting a threat to national security;
6. Theft of intellectual property constituting a threat to national security;
7. Theft of financial instruments involved in interstate and international commerce;

### Suspects

Krishna Ika
Home address:                                      Business address:
6 Wyndemere Dr.                                 257 Turnpike Road
Southborough, MA  01772                 Southborough, MA  01772

Paul Tomkins
Business address:
257 Turnpike Road
Southborough, MA  01772

### Witness

The primary witness in the present case is Dr. Lawrence A. Farwell, PhD, a forensic neuroscientist (contact information as above on page 1).

In Dr. Farwell's professional capacity as a forensic scientist and as the inventor and world's leading authority on the forensic science technique of Brain Fingerprinting, Dr. Farwell testified against suspect Ika in a fraud case in Dubai that spanned several jurisdictions, including the state of New Jersey in the USA.

In addition to that and the present case, Dr. Farwell will undoubtedly be called as a witness when and if Mr. Ika is brought to justice for additional fraud crimes of which he currently stands accused in Pakistan, South Africa, Nigeria, and Thailand.

Dr. Farwell was at one time involved in a business relationship with suspect Ika, but Dr. Farwell terminated the relationship when he discovered that Ika's partner at the time pleaded guilty and was convicted of attempting to sell stolen high-technology secrets to a foreign government agency – a crime similar to the crimes of which Ika now stands accused in Pakistan, South Africa, Nigeria, and Thailand. (Said partner is no longer involved with Ika and is not a subject of this investigation.)

### Locations

The primary locations for the subject crimes were the states of Washington, Massachusetts, and New York in the USA.  Related crimes took place overseas in various countries including Pakistan, South Africa, Nigeria, United Arab Emirates, and Thailand.

## I.     PARTIES REFERENCED HEREIN

1.1     Krishna Ika ("Ika") is a resident of Southborough, Massachusetts.
Business address: Brainwave Science, Inc., 257 Turnpike Road, Southborough, MA
01772; Tel: 774-760-1600.

1.2     Paul Tomkins ("Tomkins") is corporate attorney for BWS Inc. Business address:
Brainwave Science, Inc., 257 Turnpike Road, Southborough, MA 01772;
Tel: 774-760-1600.

1.3     Dr. Lawrence A. Farwell ("Dr. Farwell") is a resident of Tulalip, Snohomish County,
Washington.

1.4     Life Science and Technology, LLC is a Wyoming LLC with primary and only office in
Edmonds, Snohomish County, Washington.

1.5     Ron Kirkendorfer, a resident of Washington, is the President of Life Science and
Technology, LLC ("LST").

1.6     Brainwave Science, Inc. ("BWS Inc.") is a foreign corporation with offices in
Southborough, Massachusetts, solely owned by Ika.

1.7     eHealthcareWorks Corp. ("HCW") is a foreign corporation with offices in
Southborough, Massachusetts, controlled by Ika.

1.8     Brainwave Science, LLC ("BWS LLC") is a foreign corporation with offices in
Southborough, Massachusetts, with ownership as follows: 49% eHealthcare Works
Corp, 5% Dr. Farwell, and 44% Brain Fingerprinting Laboratories, Inc.

1.9     American Scientific Innovations, LLC ("ASI") was a foreign limited liability company
with offices in Seattle, Washington at the times of all transactions involving ASI
mentioned herein, whereof Ben Bryant, a resident of Washington, was the president and
only authorized representative.

1.10    Brain Fingerprinting Laboratories, Inc. ("BFL Inc.") is a foreign corporation with offices
in Seattle, Washington, controlled and largely owned by Dr. Farwell.

1.11    Brain Fingerprinting, LLC  ("BF LLC") is a foreign limited liability company with
offices in Seattle, Washington, controlled by Dr Farwell.

1.12    Government Works, Inc. ("GOV") is a foreign corporation with offices in
Southborough, Massachusetts, controlled by Ika.

1.13    Dr. Lawrence Farwell and Brain Fingerprinting Laboratories, Inc. collectively are
referred to herein as the "Minority Shareholders" or "Farwell Shareholders" in BWS
LLC.

1.14    Neuro Science Technologies, LLC ("NST") is an Iowa limited liability company, with
Kirkendorfer as its President.

1.15    Subu Kota ("Kota") is a resident of Boston, Massachusetts.

1.16    Krishna Ika, Brainwave Science, LLC, Brainwave Science, Inc., eHealthcareWorks
Corp., Government Works, Inc., Tomkins, one or more undisclosed silent partners
(hereinafter "Silent Partner," including singular and plural, to be revealed by Ika and/or
in discovery), one or more undisclosed financiers of BWS, LLC, BWS, Inc. and/or Ika

3

(hereinafter "Financier," including singular and plural, to be revealed by Ika and/or in discovery) shall all collectively be referred to herein as the "Ika Parties." Ika, BWS LLC, BWS Inc., HCW, and GOV are also referred to herein as the "Known Ika Parties."

## II.     SUMMARY AND INTRODUCTION

2.1 This Summary and Introduction summarizes the relevant facts. Details are provided in subsequent sections, along with ample documentation in the form of exhibits. These will demonstrate that all of the statements made in this Summary and Introduction are demonstrably and unequivocally true and factual. For clarity, I, Dr. Lawrence A. Farwell, shall generally refer to myself in the third person.

2.2 As the inventor and world's leading expert in Brain Fingerprinting, and the individual who has successfully implemented Brain Fingerprinting at the FBI, the CIA, the US Navy, and in law enforcement and counterterrorism agencies around the world, I, Dr. Lawrence Farwell, was the primary witness in a fraud suit against Ika, BWS LLC, and BWS Inc. spanning several countries and jurisdictions.

2.3 Ika and BWS Inc. also stand accused of fraud in South Africa, Pakistan, Nigeria, and Thailand, in each case involving Ika and his employees (a) falsely representing themselves as experts in forensic neuroscience, event-related brain potentials, and Brain Fingerprinting competent to implement a technology transfer of Brain Fingerprinting technology to government agencies and to train agency personnel in the same; and (b) attempting to sell a counterfeit "Brain Fingerprinting" training and technology that does not in fact meet the established Brain Fingerprinting Standards.

2.4 The current fraud that Ika and the other Ika Parties have been attempting to perpetrate in various countries is the continuation and culmination of a racketeering enterprise that Ika and some of the Ika Parties began in 2012 and 2013. The purpose of the enterprise was to fraudulently gain control of the patents for Dr. Farwell's invention of Brain Fingerprinting, eliminate Dr. Farwell from participation, and then defraud government agencies in various countries by Ika falsely representing himself and his employees as experts in forensic neuroscience, psychophysiology, event-related brain potentials, and Brain Fingerprinting capable of effecting a technology transfer of Brain Fingerprinting to said agencies, and to sell them a counterfeit system, and faux "training" thereon by unqualified "trainers," that did not meet the Brain Fingerprinting Scientific Standards established by Dr. Farwell and his colleagues in the scientific literature.

2.5 Tomkins and the Known Ika Parties set up BWS Inc. for fraudulent purposes as described herein, one of which was to file frivolous lawsuits against Dr. Farwell and the patent owners, knowing that BWS Inc had no chance of winning the suits. The suits served the purpose of forcing Dr. Farwell and the patent owners to expend money and other resources, while minimizing the risk to the Known Ika Parties, particularly Tomkins, Ika, BWS LLC, HCW, and GOV. Since BWS Inc. is a shill company with no legitimate business activities and no assets, losing a lawsuit with a substantial judgment against BWS Inc. would not actually cost the Ika Parties anything.

2.6 When Ika first contacted Dr. Farwell and proposed a business arrangement, he and the other Ika Parties concealed from Dr. Farwell the fact that Kota, an individual who had pleaded guilty and been convicted of attempting to sell stolen high-tech secrets to the Soviet Union – essentially the same crime for which Ika's original racketeering organization was founded and which it has since

attempted to perpetrate in multiple countries – would later be identified by BWS LLC as a board member and officer of BWS LLC.

2.7 The steps in said racketeering scheme were as follows:

2.7.1   Ika and other Ika Parties fraudulently induced Dr. Farwell and his company, Brain Fingerprinting Laboratories, Inc. to enter into an LLC agreement with BWS LLC, to be controlled by Ika, by among other things concealing the involvement of Kota and his criminal record and the plans to fraudulently gain control of the Patents and to misappropriate Dr. Farwell's and BFL Inc.'s equity in BWS LLC. (Tomkins was not yet involved.  However, he later participated in the furtherance of this same scheme.)

2.7.2   Ika and other Ika Parties fraudulently induced Dr. Farwell to sign three Draft Documents that outlined the terms for transfer of the Patents to BWS LLC, but did not yet include any consideration flowing to the apparent "assignors," because that had not yet been negotiated. The Draft Documents were never intended by Dr. Farwell, who signed them, or by ASI, the undisputed owner of the patents, to be patent assignments.  The Draft Documents were not executed by or even known to ASI.  Dr. Farwell was not a member, owner, officer, or agent of ASI and did not have authority to bind ASI.  Then Ika's attorney fraudulently recorded the Draft Documents at the USPTO as "patent assignments" to BWS LLC so as to gain control of the Patents without being required to execute any documents requiring compensation for the same.  Then Ika refused to sign any documents requiring any compensation to the patent owners (or anyone else) in exchange for ownership of the patents by BWS LLC, which he controlled.  When Dr. Farwell discovered the erroneous recording of the Draft Documents at the USPTO, he and BFL Inc. signed and recorded a Correction that clarified ASI's continuing, uninterrupted ownership of the Patents and the fact that the Draft Documents bearing his signature were null and void, were not valid patent assignments, and had no legal binding effect.  Thus, the ownership of the Patents always remained with ASI, and the Ika Parties' initial scheme to fraudulently gain control of the Patents failed. (Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.3   Ika and other Ika Parties purported to deprive the Minority Shareholders of some of their equity in BWS LLC by the following scheme. Dr. Farwell and BFL Inc. (the Minority Shareholders) initially owned 49% of BWS LLC. HCW, controlled by Ika, owned 51%.  The initial agreement required HCW, controlled by Ika, to provide sufficient financing for the LLC.  Ika told the Minority Shareholders that he and HCW had run out of money, that they would have to take on a Silent Partner and sell him equity to finance the company, and that HCW and BFL Inc. would both be diluted proportionally and would both give up ownership proportionally. (Dr. Farwell's ownership was non-dilutable.) Ika then purported to sell equity of BFL Inc. and HCW to an independent Silent Investor (who he implied was Kota).  In fact, however, said equity was transferred to an entity controlled and/or owned by Ika.  Thus Ika's scheme diluted BFL Inc. but in reality did not diminish Ika's effective ownership of BWS LLC.  BFL Inc.'s equity was apparently reduced from 44% to 16% by this scheme, leaving the Minority Shareholders with a total of 21%.      (Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.4   Ika and other Ika Parties then conspired to deprive the Minority Shareholders of their remaining equity in BWS LLC by the following additional scheme.  The BWS LLC agreement required consent of all members to any amendments. Ika purported to unilaterally amend the

BWS LLC agreement to allow himself as managing member, along with the majority members he controlled, to expel members if, in his sole and absolute discretion, they had done certain things that he interpreted as detrimental to the LLC. Then he called a meeting of the members – consisting solely of himself and Kota as corporate secretary – and purported to expel Dr. Farwell and BFL Inc. as members in BWS LLC, and to transfer their ownership interest to himself and entities that he controlled, all without consent or due process. (Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.5   Tomkins, Ika, and other Ika Parties then implemented yet another scheme to eliminate any ownership by Dr. Farwell and BFL Inc. of the functional entity and to fraudulently gain control of the Patents. They formed a new corporation, Brainwave Science, Inc. (BWS Inc.) BWS Inc. was formed for four purposes, all of them fraudulent, as follows.

2.7.5.1 Tomkins' first fraudulent purpose of establishing BWS Inc. was to eliminate the Minority Shareholders as owners of the functional corporate entity. (Ika must have known, and his attorney acknowledged, that his scheme to expel the Minority Shareholders without consent or due process was illegal and would not stand.) BWS Inc. had entirely non-overlapping ownership with BWS LLC. BWS LLC is owned by Dr. Farwell, BFL Inc., HCW, and an unidentified Silent Partner whose shares HCW held in trust. Ika has no ownership in BWS LLC. BWS Inc. is owned solely by Ika. By transferring the assets of BWS LLC to BWS Inc. without any compensation to the owners of BWS LLC, Ika purported to eliminate the Minority Shareholders as owners of the functional corporate entity. The assets of BWS LLC could be transferred to an entity solely owned by Ika without compensation to the owners of BWS LLC must constitute one of two scenarios: (a) Ika already owned or controlled all of the owners of BWS LLC except Dr. Farwell and BFL Inc., in which case sale of equity to the Silent Partner (and concomitant dilution of HCW along with BFL Inc.) was a sham set up by Ika to defraud Dr. Farwell and BFL Inc. of their equity, or (b) Ika also defrauded the Silent Partner out of his equity in BWS LLC by forming the new corporation and transferring the assets. In either case, Ika and other Ika Parties committed fraud by forming BWS Inc.

2.7.5.2 Reference is made to US Patents #7,689,272, #5,363,858, #5,406,956, and #5,467,777, (collectively, the "Patents"). Dr. Farwell, the inventor of the Patents, assigned the Patents and all associated intellectual property to ASI. He assigned #5,363,858, #5,406,956, and #5,467,777 (the "Brain Fingerprinting Patents" or the "Expired Patents") in 2003 and #7,689,272 in 2010. He has had no ownership in the Patents or any associated intellectual property since then. It is undisputed that ASI owned the Patents in 2013, prior to the Draft Documents.

2.7.5.3 Tomkins' second purpose of establishing BWS Inc. was to fraudulently gain ownership of the Patents. There are no documents filed at the USPTO (or anywhere else) that even mention BWS Inc. in connection with ownership of the Patents. There are no documents anywhere that might imaginably be construed as to assign the Patents to BWS Inc.

In different legal actions Ika, Tomkins, BWS LLC, and BWS Inc. have made contradictory claims regarding assignments the ownership of the Patents. Both of the contradictory accounts are demonstrably and unequivocally false.

The claims in the BWS Inc. – Farwell Arbitration are as follows. In this regard, it was not an accident that BWS Inc. had a similar name and identical initials to BWS LLC. In said arbitration and other legal actions described below, Ika and other Ika Parties have abbreviated

Brainwave Science Inc. as "BWS."  Then they have stated that "BWS" obtained the Patents in 2013 by assignment from ASI.  BWS Inc. stated the following in its Notice in the BWS Inc. – Farwell Arbitration: "Claimant Brainwave Science, Inc. ('BWS') is a Delaware corporation…" "American Scientific Innovations, LLC… assigned BWS all rights, title and interest in… patents [the Patents]… on June 17, 2013." "BWS maintains that it lawfully acquired the subject intellectual property [the Patents]…[through said transaction]."  Said statements are blatantly false.

Brainwave Science, Inc. ("BWS" in the definition of said Notice) was not even mentioned in the documents cited in the Notice as purportedly assigning the Patents to it.  Said documents referred to Brainwave Science, LLC.  "BWS" [Inc.] could not possibly have "lawfully acquired" the Patents in 2013 because it did not exist until several years later.  It is striking that Ika and his attorneys presume that the arbitrators and judges in the multiple lawsuits wherein Ika and Tomkins attempted similar verbal sleight of hand would not have the mental acuity to recognize the difference between two different entities with the same initials (and non-overlapping ownership).  BWS Inc. has no evidence whatsoever that BWS LLC, ASI, or any other entity ever assigned the Patents to it. No entity ever executed and recorded at the USPTO any documents – valid or not – that even mention BWS Inc.

The second false account Ika, Tomkins, and BWS Inc. have given regarding ownership of the Patents is that ASI assigned the Patents to BWS LLC (not BWS Inc.) in 2013, and at some later time BWS LLC assigned the Patents to BWS Inc.  This apparently is their contention in the present Motion to Intervene.  Neither of the alleged assignments in this account ever took place in reality.

(a) The Unexecuted ASI-BWS Draft Document purportedly assigning said Patents (to BWS **LLC**, not BWS **Inc.**) in 2013 was not executed by or even known to ASI, the undisputed owner of the Patents at that time, included no consideration flowing to the apparent "assignor," and could not possibly have transferred ASI's Patents to BWS LLC or any other entity.

(b) Even if the Patents had been assigned to BWS LLC by ASI (which they demonstrably were not), there is no evidence that BWS LLC ever assigned the same to BWS Inc.  There are no documents filed at the USPTO that even mention BWS Inc. in reference to the Patents.

2.7.5.4 Tomkins' third fraudulent purpose for establishing BWS Inc. was to provide a vehicle to defraud government agencies in various countries by Ika falsely representing himself and his employees as experts in forensic neuroscience, psychophysiology, event-related brain potentials, and Brain Fingerprinting capable of effecting a technology transfer of Brain Fingerprinting to said agencies, and to sell them a counterfeit system, along with faux "training" thereon by unqualified "trainers," that did not meet the Brain Fingerprinting Scientific Standards established by Dr. Farwell and his colleagues in the scientific literature.  Ika and BWS Inc. currently stand accused of such fraud in South Africa, Pakistan, Nigeria, and Thailand for attempting to implement this scheme.

2.7.5.5 Tomkins' fourth fraudulent purpose for establishing BWS Inc. was to file patently frivolous legal actions against Dr. Farwell, the primary witness in the first fraud case against Ika, BWS LLC, and BWS Inc. and, as the inventor and world's leading expert in Brain Fingerprinting, the potential expert witness best positioned to testify to expose the fraud that Ika and the Ika Parties have attempted and are attempting in various countries, including those named above, when and if said countries bring Ika and other Ika Parties to justice.  Said frivolous lawsuits

constitute witness tampering and an attempt, as part of the Ika Parties' racketeering crimes, to intimidate, coerce, silence, retaliate against, and discredit past and potential future witness Dr. Farwell.   Said frivolous lawsuits are based on two demonstrably and unequivocally false premises:

(a) That Brainwave Science, Inc. acquired the Patents in 2013 -- when it did not yet exist -- through an unexecuted draft document (the Unexecuted ASI-BWS Draft Document) that did not mention Brainwave Science, Inc., was not executed by or even known to the undisputed patent owner at the time (ASI), had no provisions for consideration flowing to the apparent "assignor," and was never intended by either the signer or the undisputed patent owner to be recorded at the USPTO or to constitute a patent assignment;

(b) That Dr. Farwell's unequivocally and demonstrably true – and also privileged – statements were libelous, statements made as a witness in a sworn affidavit in a fraud suit against Ika, BWS LLC, and BWS Inc.

2.8 The above described activities of Tomkins, Ika, and the Ika Parties constitute racketeering, as described below, because per 18 U.S.C. § 1961 they are "(B) indictable under…the following provisions of title 18, United States Code…section 1341 (relating to mail fraud)...section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice)...section 1510 (relating to obstruction of criminal investigations)...section 1512 (relating to tampering with a witness...victim, or an informant)...section 1513 (relating to retaliating against a witness...victim, or an informant)" or  "(D) any offense involving…fraud in the sale of securities…"

2.9 BWS Inc. has no business activities other than fraud, no lawful business activities, no clients, no customers, no revenues, no investors, no purchasers of equity, and no donors, and yet somehow has sufficient funds to maintain Ika in a lavish lifestyle and to finance overseas trips for Ika and others to attempt to defraud government agencies around the world, and to hire a full-time attorney, Tomkins, with virtually no other responsibilities other than filing frivolous lawsuits against Dr. Farwell, the owners of the Patents, and others who do business with Dr. Farwell.  The Financier, to be revealed in discovery, is the source of these funds.  If money laundering is involved (which we do not, as of now, allege, pending discovery of the source of BWS Inc.'s funds and the involvement of the Financier), then this is another instance of racketeering per 18 U.S.C. § 1961, because the Ika's and the other Ika Parties' actions are "indictable under…the following provisions of title 18, United States Code …section 1956 (relating to the laundering of monetary instruments)…"

2.10   Tomkins and all of the Ika Parties know that their claims under the five lawsuits that they have filed, all of which were pursuing the same claims with reference to the same facts, have no basis in fact or law.  Tomkins knows that they have no possibility of prevailing on the merits.  Their transparent strategy is to use the funds provided by the Financier to force Dr. Farwell and the patent owners to expend all of their available resources in time and money defending lawsuits, and then to prevail by default because they are unable to continue to finance his responses to the onslaught.

2.11   Tomkins and the other Ika Parties are attempting to abuse the US justice system to eliminate Dr. Farwell in two different roles. (a) Dr. Farwell, as an expert witness with unique expertise and experience, is the one person who stands in the way of their attempts to defraud government agencies, misrepresent themselves as forensic neuroscience experts when they are not, and sell counterfeit products and false and inadequate training. (b) Dr. Farwell, as the inventor of Brain

Fingerprinting and the individual who with his colleagues is successfully implementing Brain Fingerprinting in government law enforcement and counterterrorism agencies around the world, is also the one individual who is demonstrating by his actions the effective implementation of Brain Fingerprinting that the Ika Parties fraudulently claim to be capable of accomplishing, but never have accomplished and are in fact not capable of accomplishing. The Ika Parties recognize that until they eliminate from the scene the genuine expert in Brain Fingerprinting, Dr. Farwell, it will be virtually impossible to defraud government agencies into hiring them as experts in Brain Fingerprinting, when they in fact have no such expertise. This is because anyone who does adequate due diligence will discover – as authorities in South Africa, Pakistan, Nigeria, and Thailand did – that Dr. Farwell is the genuine expert and Ika and his employees are frauds.

2.12   As an attorney, Tomkins must be aware of the fact that all of BWS Inc.'s claims in the five lawsuits they have filed are false, frivolous, and entirely without basis in fact or law.

2.13   Tomkins' and Ika's actions constitute racketeering under the US RICO laws, as described in detail below.

2.14   Tomkins' and the Ika Parties' scheme to defraud government agencies in various countries also included Tomkins' writing and causing to be delivered a blatantly libelous letter to one of Dr. Farwell's Brain Fingerprinting clients, a government agency in India, attempting to interfere with Dr. Farwell's business and personal relationships, existing contracts, and business activities. Said letter made false, defamatory, and blatantly libelous statements about Dr. Farwell and threatened civil and criminal action against Dr. Farwell's client for doing legitimate and honest business with Dr. Farwell.

## III.   <u>FACTS</u>

3.1   As the inventor and world's leading expert in Brain Fingerprinting, and the individual who has successfully implemented Brain Fingerprinting at the FBI, the CIA, the US Navy, and in law enforcement and counterterrorism agencies around the world, Dr. Lawrence Farwell was the primary witness in a fraud suit against Ika, BWS LLC, and BWS Inc. in the United States District Court for the District of Delaware (*E. Hedinger AG and Hedinger Middle East DWC LLC vs. Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika*). Said fraud suit also was pursued in several other jurisdictions. In his privileged role as a witness, Dr. Farwell provided a sworn affidavit, the contents of which were truthful and within his knowledge and scientific field of expertise.

3.2   In addition to the above, government and non-government agencies have also accused Ika, BWS LLC, and BWS Inc. of fraud relating to false claims of expertise in Brain Fingerprinting science and ineffective and counterfeit related products in several other countries, including but not limited to ████████████████, South Africa (Exhibit AR), Thailand (Exhibit AT), and Nigeria (see below). In light of Dr. Farwell's unique expertise and his considerable knowledge of Ika's alleged crimes, Dr. Farwell may also be a witness in criminal prosecutions that are pursued against Ika, BWS LLC, and BWS Inc. in at least some and likely all of the above jurisdictions, if any, where such prosecutions occur.

3.3   Tomkins, Ika, and BWS Inc. have attempted to coerce and intimidate Dr. Farwell into changing his sworn testimony as a witness in Hedinger allegedly in order to conceal alleged fraud by Ika, BWS LLC, and BWS Inc.

3.4 Since Dr. Farwell refused, Tomkins has filed multiple patently frivolous lawsuits against Dr. Farwell and the owners of the Brain Fingerprinting patents, in a transparent attempt to coerce, intimidate, and discredit Dr. Farwell and to force him to expend his resources in time and money defending lawsuits so as to silence, compromise, intimidate, or discredit him as a witness against Ika in fraud cases in Pakistan, South Africa, Nigeria, Thailand, and/or other jurisdictions where Ika has been accused of fraud relating to Farwell's invention of Brain Fingerprinting.

3.5 The forum shopping and witness tampering that Tomkins is now attempting are part of a larger fraudulent scheme. Tomkins, Ika, BWS Inc., the Silent Partner, the Financier, Ika's various attorneys (including Tomkins in the later stages), and possibly one or more Co-conspirators (collectively, the Ika Parties) conspired to engage in racketeering and engaged in racketeering in the fraudulent scheme.  The main features of said fraudulent scheme are briefly summarized immediately below.  Details of said fraudulent scheme and exhibits documenting the same follow in subsequent sections.

3.5.1 The relevant portions of the federal RICO Act (18 U.S.C. §§ 1961–1968) are as follows:

### § 1961. Definitions

(1) racketeering activity means…

(B) any act which is indictable under any of the following provisions of title 18, United States Code…section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant).

### § 1962. Prohibited activities

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

### § 1964. Civil remedies

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering

dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorneys fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

3.5.2   The Ika Parties fraudulently induced two Washington state residents, Dr. Farwell and BFL Inc., to invest in a security, specifically ownership in BWS LLC, and to execute the BWS LLC Agreement.  They concealed several relevant facts that would have influenced Dr. Farwell's and BFL Inc.'s decision whether to purchase a security.  They did not disclose that they would later state on the BWS LLC website and in correspondence with Dr. Farwell that Subu Kota was an officer (Secretary) and board member of BWS LLC, or that Kota was otherwise involved.  This is relevant because Kota had pleaded guilty to attempting to sell stolen high-tech secrets to the Soviet Union, a crime very similar to the crimes of which Ika now stands accused in South Africa, Pakistan, Nigeria, and Thailand.  They did not disclose that they planned the other fraudulent acts described below with a design to obtain control of the Patents without having to pay for them and to defraud Dr. Farwell and BFL Inc. and misappropriate of all of their original 49% interest (Dr. Farwell 5% non-dilutable and BFL Inc. 44%) in BWS LLC.

3.5.3   The Ika Parties conspired, in the course of negotiations, to obtain Dr. Farwell's signatures on three preliminary documents that concerned terms for the transfer of the Patents to BWS LLC, but lacked any mention of the yet-to-be-negotiated consideration for the same that would flow to the assignors in the actual patent assignments that might be executed by the proper parties when and if the negotiations for consideration were successfully completed.  They then recorded these preliminary draft documents with the USPTO as "patent assignments," despite the facts that said documents were signed by undisputed non-owners of the Patents, the one document that mentioned the actual undisputed patent owner was not executed by or even known to the undisputed patent owner, and each of said documents failed on its face as a "patent assignment" because there was no consideration flowing to the apparent purported assignor.

3.5.4   When Ika had apparently succeeded in fraudulently obtaining ownership of the Patents without having to pay any consideration to the patent owner, he then refused to sign any documents calling for any consideration flowing from himself, BWS LLC, HCW, or any other entity in which he had ownership or control.  Ika defaulted on his agreement to provide sufficient financing for BWS LLC until the company became profitable.

3.5.5   Dr. Farwell was paid $11,000 per month on some months, $8,000 per month on other months, and nothing on some months over the next several years, not as compensation for the Patents (which Dr. Farwell did had not owned since 2003), but as compensation for his expertise as the inventor and world's leading expert in Brain Fingerprinting.

11

3.5.6    When Dr. Farwell discovered that documents bearing his signature had been falsely and erroneously recorded at the USPTO, he and BFL Inc. signed and recorded at the USPTO a correction that clarified the continuous, uninterrupted ownership of the Patents by ASI and corrected the erroneous information contained in the three Draft Documents.  (The Correction did not result in any change in ownership of the Patents, because ownership never ceased to rest with ASI.)

3.5.7    When the Ika Parties realized that their initial ploy to fraudulently obtain ownership of the Patents without paying any consideration had failed, they devised another scheme to accomplish essentially the same thing.  The Ika Parties committed fraud in the inducement against Dr. Farwell and BFL Inc. for a second time, in a second series of transactions, as follows.  Ika told Dr. Farwell that he did not have sufficient funds to fund the company as agreed, and that BFL Inc., Dr. Farwell, and HCW would have to sell equity to raise funds.  He stated that BFL Inc. and HCW would be proportionally diluted.  (Dr. Farwell's shares were non-dilutable.)  Ika then pretended to sell some of BFL's equity to a purported independent third party, the "Silent Partner," through HCW, and represented that HCW was doing the same.  Through this process, in a series of transactions, Ika purported to reduce BFL Inc.'s ownership of BWS LLC from 44% to 18%, as documented in exhibits below.  He purported in the same documents to reduce HCW's equity proportionally.  However, he in fact transferred BFL Inc.'s and HCW's "sold" equity to himself or an entity he owned and controlled, and concealed this fact from Dr. Farwell and BFL Inc.

3.5.8    It is at this point that Tomkins became actively involved.  Tomkins, Ika, and the other Ika Parties then devised a fraudulent scheme to deprive Dr. Farwell and BFL Inc. of their remaining equity in BWS LLC.  This comprised the following steps. The BWS LLC agreement clearly stated that it could be modified only by agreement of all members (Exhibit F). First, Ika purported to unilaterally change the LLC agreement to grant himself the authority to remove members from the LLC if, in his sole and absolute opinion, they had done certain things that in his opinion were detrimental to the company.  Then he called a meeting to remove the Farwell Shareholders as members.  Then he purported to remove the Farwell Shareholders as members, and to transfer all of their 21% interest in BWS LLC to himself and/or entities that he controlled, without due process and without any compensation to Dr. Farwell and BFL Inc. for their equity.  Ika lacked the authority to remove Dr. Farwell and BFL Inc. as members.  Moreover, there can be no question that neither Ika nor anyone else had the authority to misappropriate the Farwell Shareholders' equity and to transfer it to himself without compensation, whatever the purported justification.  The only mechanism through which Dr. Farwell's and BFL Inc.'s equity could be transferred to Ika or entities he controlled without consent, due process, or compensation is theft.  The above is delineated in detail in later sections of this document below and in the exhibits referred to herein.  This attempt to misappropriate Dr. Farwell's and BFL Inc.'s equity in BWS LLC failed, as there clearly was no legal basis for Ika's and the other Ika Parties' actions, and as Dr. Farwell pointed out at the time, Ika and other Ika Parties committed several felonies in the course of the implementing the scheme described above.

3.5.9    When their attempt to misappropriate Dr. Farwell's and BFL Inc.'s equity in BWS LLC failed, Tomkins and the other Ika Parties then devised yet another way to fraudulently deprive Dr. Farwell and BFL Inc. of their remaining equity in BWS LLC.  BWS LLC was owned 5% by Dr. Farwell, 49% by BFL Inc. (or, if one considers the fraudulent transfer of equity described

above to be legitimate, 16% by BFL Inc.),  approximately 25% by HCW, and the balance by the Silent Partner.  Ika personally owned none of BWS LLC.  The Ika Parties formed a new company, BWS Inc.  Ika and his attorneys told Dr. Farwell that this was a "reorganization," with no change in ownership, assets, or liabilities.  The entire formation of BWS Inc., however, was fraudulent.  Ika, who owned none of BWS LLC, owns all of BWS Inc.  This means that, in addition to fraudulently eliminating Dr. Farwell's and BFL Inc.'s equity in BWS LLC, either one of two things took place.  Either (1) Ika also defrauded the Silent Investor out of his equity in BWS LLC by forming a new entity, BWS Inc. in which the Silent Investor had no interest; or (2) the purported sales of equity that BFL Inc. was forced into by Ika's purported lack of funds to support the company's operations was a sham, and Ika was selling BFL Inc.'s equity to himself or an entity that he controlled, and pretending to sell HCW's equity proportionally, but actually only transferring it to an entity the same that he owned or controlled.  Then this sham entity disappeared when BWS Inc. was formed, leaving Ika with 100% of the equity.  In either case, this was a scheme to defraud Dr. Farwell and BFL Inc. of their equity in BWS LLC.

3.5.10   As described elsewhere herein, Tomkins established BWS Inc. for three additional fraudulent purposes in addition to the above: (a) to fraudulently gain control of the Patents; (b) to provide a vehicle to defraud government agencies by falsely marketing Ika and his employees as experts in Brain Fingerprinting and attempting to sell a counterfeit product that does not meet the relevant scientific standards along with training by unqualified "trainers"; and (c) to intimidate, coerce, retaliate against, and discredit Dr. Farwell as a past and likely future witness against Ika in fraud cases.

3.6   Ika and BWS LLC accused Kota of being a part of the above described fraudulent scheme.  On the BWS website, Kota was listed as being a member of the board (Exhibits W, X, Y, and Z).  In correspondence with Dr. Farwell, Ika and his attorney identified Kota as the "Secretary" of BWS LLC (Exhibit K).  Ika has implied – but never to the undersigned's knowledge directly stated – that Kota was the Silent Partner and a major owner of BWS LLC.  According to current knowledge and belief, Kota denies ever being an officer, board member, investor, owner, or member of BWS LLC or BWS Inc., and denies being involved in any way in any of the alleged fraud, alleged securities violations, alleged theft of the Minority Shareholders' equity, or any other alleged crimes of Ika, BWS LLC, and BWS Inc.

3.7   The demonstrably baseless and frivolous legal proceedings initiated by Tomkins, Ika, and BWS Inc. comprise the following:

3.7.1   (1) *Brainwave Science, Inc. vs. Farwell, et al., Supreme Ct. of the State of New York County of New York, Index No. 153867/2019* (the "New York Lawsuit").  This is the first lawsuit Tomkins filed.

3.7.2   (2) An Arbitration Under the Commercial Rules of Arbitration of the American Arbitration Association,  AAA Case Number: 01-20-0005-4534, between Brainwave Science, Inc. (Claimant) and Lawrence A. Farwell, Individually, and Life Science and Technology, LLC (Respondents) (the "BWS Inc.-Farwell Arbitration"), which Tomkins attempted unsuccessfully to commence.  The proposed arbitrators have refused to arbitrate the case on the basis of the fact that it is redundant with, and depends upon the outcome of, the New York Lawsuit, which is the appropriate venue.

13

3.7.3   (3) An attempt by Tomkins to re-litigate the same issues as the New York case by intervening in a settled arbitration case between NST and Dr. Farwell (Neuro Science Technologies, LLC vs. Farwell, Case No. 2:20-cv-1554, Fed Cir. 2020, the "NST vs. Farwell Arbitration" and the "Motion to Intervene" therein).  The Court vacated the original recording of the outcome of the arbitration between NST and Dr. Farwell and allowed BWS Inc. to intervene.   The Court then dismissed this case for lack of subject matter jurisdiction, again recognizing the fact that the New York case was the appropriate venue.

3.7.4   (4) A lawsuit filed by Tomkins on behalf of BWS Inc. against NST in the US District Court for Western Washington (*Brainwave Science, Inc. vs. Neuro Science Technologies, LLC and Ronald J. Kirkendorfer, no. 2:20-cv-01481*, the "BWS Inc. vs. NST Lawsuit." The Court dismissed this suit against NST with prejudice, and dismissal of the suit against Kirkendorfer is pending before the court.

3.7.5   (5) A case filed by Tomkins on behalf of Ika and BWS Inc. before the US District Court for Wyoming (*Brainwave Science, Inc. vs. Life Science and Technology, LLC, Case No. 19-CV-167-F* (the "Wyoming Lawsuit") which the Plaintiff dismissed without prejudice when it became obvious that the case was frivolous and filed in the wrong venue.

3.8   Tomkins, Ika, BWS LLC, and BWS Inc. have maintained two patently false propositions: (1) That BWS Inc. owns the exclusive rights to Dr. Farwell's invention of Brain Fingerprinting as embodied in the Brain Fingerprinting Patents based on the following events: (a) Without the knowledge or consent of ASI, the undisputed owner of the patents at the time, Ika's attorney recorded at the US Patent and Trademark Office ("USPTO") a document that was not executed by or even known to ASI, and was signed only by  a member of BWS LLC (Dr. Farwell) who had no authority to sign on behalf of the undisputed owner of the Patents; (b) BWS Inc. owns the patents because they were assigned to BWS **LLC** -- even though they have never been assigned to BWS **Inc.**, and BWS LLC and BWS Inc. have totally non-overlapping owners; and (c) BWS Inc. still has exclusive rights to the invention embodied, disclosed, and enabled in the Expired Patents even though the Expired Patents have expired; (2) Ika and entities he owns or controls wholly own BWS LLC and BWS Inc., and Ika, BWS LLC, and BWS Inc. owe nothing to the Minority Shareholders (Farwell and BFL Inc.) for misappropriating their 49% equity in BWS LLC, based on the following events: (a) Ika unilaterally purported to amend the BWS LLC agreement to grant himself the right to expel members at his sole and absolute discretion, despite clear language in said agreement that such modification could only be made with the consent of all members; (b) Ika purported to expel  Dr. Farwell and BFL Inc., the other minority member of BWS LLC, without consent or due process; (c) Ika, BFL LLC, and BFL Inc. paid no compensation to said expelled members for their 49% equity in said BFL LLC; and (d) BFL LLC was dissolved and its assets transferred to BWS Inc., which is solely owned by Ika and in which the minority shareholders, Dr. Farwell and BFL Inc., have no interest.

3.9   Tomkins, Ika, and BWS Inc. have engaged in a pattern of practice of forum shopping the courts of the United States to find a forum that is most inconvenient to Dr. Farwell, notwithstanding the fact that many of the facts that gave rise to the Parties' disputes in each of these four ongoing actions are identical.  Ika Parties know or should know that the four ongoing legal actions are without basis in fact or law, and that they have no chance of prevailing on the merits.  Said lawsuits and Ika's attempt to intervene in this case are filed in bad faith with the purpose of attempting to exhaust the limited resources of Dr. Farwell, LST (the former Patent owner), and NST (the current Patent owner), in order to gain control of Dr. Farwell's invention and eliminate

14

Dr. Farwell as a competitor in applying said invention and as an expert witness uniquely qualified to truthfully testify regarding the fraudulent nature of Ika's attempts to market himself and his employees as experts in Brain Fingerprinting capable of effecting a technology transfer of the same to a client.

3.9.1   For example, although the Wyoming Lawsuit was dismissed, it nevertheless served a purpose for Tomkins and the other Ika Parties as a planned part of their fraudulent scheme.  They filed the lawsuit against LST, in yet another inconvenient jurisdiction for Dr. Farwell, knowing that it was totally frivolous, and sought the same outcome as they sought in the New York case: a declaration that BWS Inc. had clear title to the Patents.  Despite the fact that BWS Inc.'s case was totally without merit, Dr. Farwell was required to spend money petitioning to intervene in the case to prevent a decision by default that BWS Inc. owned the Patents and could prevent Dr. Farwell from practicing his invention.  After Dr. Farwell had spent considerable time, effort, and money, but before the Court reached the inevitable conclusion that the case was frivolous, the Ika Parties dismissed the case.  In a similar ploy, the Ika Parties called a meeting in Boston, ostensibly to negotiate a resolution of the various lawsuits.  After Dr. Farwell had flown from London to Boston at his own expense and paid for his stay in Boston, they cancelled the meeting without reason or explanation, once again using trickery and deceit to cause Dr. Farwell to expend money.  All of this reveals Tomkins' and the Ika Parties' overall strategy, to exhaust Dr. Farwell's resources and thereby eliminate him as a witness in fraud cases against Ika and as a successful practitioner of his invention of Brain Fingerprinting (which, by contrast, Tomkins and Ika are not).

3.10   Statutory law and legal precedent, not to mention elementary logic and common sense, confirm the following indisputable truths.  (1) If Person A legally assigns a patent to Person B, in a properly executed and undisputed transaction, properly recorded at the United States Patent and Trademark Office (USPTO), then Person B owns said patents and IP, and Person A cannot assign legally assign the same to Person C (or anyone). (2) If person D never has been assigned, never has had, never has claimed, and never has been said by anyone to have ownership of a patent and associated intellectual property, Person D cannot legally assign said patent to Person C (or anyone). (3) If Person B is the undisputed owner of a patent, said patent cannot be assigned by, and patent ownership is unaffected by, any document that is not executed by Person B. Specifically, patent ownership cannot be assigned to Person C by a document that is not executed by a member, equity holder, officer, employee, agent, or any authorized representative of Person B, wherein the existence of said document and even the existence of Person C and any surrounding circumstances are not known to Person B, and furthermore wherein said document could not be a valid patent assignment because there was no consideration flowing to Person B.  Statements (1), (2), and (3) remain true regardless of what anyone says.

3.10.1   The above statements apply to the present case as follows.  (1) Dr. Farwell, inventor, assigned the Patents and associated IP to ASI in 2003, in a properly executed and undisputed transaction, properly recorded at the United States Patent and Trademark Office (USPTO).  Dr. Farwell could not assign said Patents and associated IP to BWS LLC (or anyone) in 2013, because he had no ownership interest in the same. The "LF-BWS Draft Document" referenced below, signed by Dr. Farwell in 2013, did not transfer any Patent ownership to BWS LLC. (2) BFL Inc. never has been assigned, never has had, never has claimed, and never has been said by anyone to have ownership of the Patents and associated intellectual property. The "BFL – BWS Draft Document" referenced below, signed by Dr. Farwell as Chairman of BFL Inc. in

15

2013, did not transfer any Patent ownership to BWS LLC. (3) ASI was the undisputed Patent owner in 2013.  The "Unexecuted ASI – BWS Draft Document" was not signed by ASI, or by any member, equity holder, officer, employee, agent, or any authorized representative of ASI. It was signed by Dr. Farwell as a draft document in the course of negotiations, and was never intended by either Dr. Farwell or ASI to be recorded at the USPTO. The existence of said document and even the existence of BWS LLC (the apparent "assignee") and any surrounding circumstances were not known to ASI, ASI never made any representations that might have been construed as granting Dr. Farwell the authority to assign ASI's Patents to anyone or granting BWS LLC the stature of a possible assignee of said Patents. Furthermore, said document could not be a valid patent assignment because there was no consideration flowing to ASI.

3.11    In normal human discourse, both in legal proceedings and elsewhere, it is an established principle that when Party X makes a demonstrably and unequivocally false statement, and Party Y states and thoroughly documents the indisputable fact that said statement is demonstrably and unequivocally false, it is incumbent on Party X to do one of two things: (1) acknowledge that said statement is false; or (2) present some new evidence and some new argument based thereon to support the view that said statement may not be entirely false.  At a minimum, it is incumbent on Party X to stop simply repeating the same false statement without any reference to or acknowledgement of reality.

3.11.1   The above applies to Tomkins, Ika, and BWS Inc. as follows.  In the New York case, Tomkins made the patently false and frivolous statement that Dr. Farwell assigned the Patents in 2013 to BWS LLC by signing three preliminary draft documents that were never intended by Dr. Farwell to be patent assignments, that were not executed by or even known to the undisputed patent owner, and that in any case could not be construed as patent assignments because they contained no consideration flowing to the purported assignor.  Dr. Farwell's actions in signing the documents were as follows (a) signing the LF-BWS Draft Document on behalf of himself (an undisputed non-owner of the Patents); (b) signing the BFL – BWS Draft Document as Chairman of BFL Inc. (another undisputed non-owner of the Patents) and (c) signing the Unexecuted ASI – BWS Draft Document, whereas ASI (the undisputed Patent owner) was an entity in which he was not an owner, equity holder, member, officer, employee, agent, or any kind of authorized representative, and for which he had no authority or apparent authority to sign.  These are facts regarding which ASI had never made any representations that might possibly be construed to the contrary, and for which both ASI and Dr. Farwell have signed sworn affidavits.

3.11.2   Dr. Farwell stated and thoroughly documented, in the New York case, the indisputable fact that Tomkins' above statement was demonstrably and unequivocally false, as summarized above and explained in detail below with reference to the corresponding exhibits.

3.11.3   Tomkins has taken an aggressively fact-resistant stance regarding these realities.  Tomkins did not address the fact that his statement in the New York case had been definitively proven to be false.  He made no attempt to address reality or the proven facts of the situation. He simply repeated the same false and frivolous statement, virtually word for word, in four subsequent legal cases, the BWS Inc.-Farwell Arbitration, the Motion to Intervene in the NST vs. Farwell Arbitration, the BWS Inc. vs. NST Lawsuit, and the Wyoming Lawsuit.  When Dr. Farwell documented in all four of these cases that Tomkins' statement was demonstrably and unequivocally false, Tomkins again made no attempt to address the facts.  He simply repeated

16

the same false statement virtually word for word again in each each, with no mention of or reference to the actual proven facts of the situation.

3.11.4 Tomkins' continuing, again and again in different forums, to repeat his blatantly false statement, which has been exposed as unequivocally and demonstrably false, without any attempt to address -- or even acknowledge the existence of -- the proven facts of the situation, defies not only the relevant laws, legal precedent, and normal legal procedures, but also elementary logic and common sense.

3.12 Even if one accepts BWS Inc.'s clearly untenable and frivolous premise that the three Draft Documents specified above (referred to in BWS Inc.'s documents as "Intellectual Property Acknowledgment and Assignment Agreements of June 17, 2013") were legal patent assignments and transferred ownership of the Patents to BWS LLC – which they were not and did not – BWS Inc. still has provided absolutely no evidence that BWS Inc. has or ever had any ownership interest in the Patents and associated IP.

3.12.1 Tomkins and Ika have manufactured a fiction that BWS **Inc.** owns the patents. In reality it does not and never did. BWS **Inc.** has offered absolutely no evidence that any patents ever were assigned to it, because such evidence does not exist. In the absence of any evidence, BWS Inc. has resorted to verbal trickery as its only resource to support the fiction it generated. BWS Inc.'s Notice of Arbitration (Supplement) (the "Notice" in the Motion to Intervene in the the NST vs. Farwell Arbitration) conflated two different entities with similar names and identical initials (but different and non-overlapping ownership), Brainwave Science, **Inc.** and Brainwave Science, **LLC.** (For the sake of clarity and contrary to Tomkins' inconsistent and contradictory abbreviations, Brainwave Science, Inc. is referred to herein as "BWS Inc." and Brainwave Science LLC is referred to as "BWS LLC.")

3.12.2 **Said Notice stated the following: "Claimant Brainwave Science, Inc. ('BWS') is a Delaware corporation…"**

**"On or about June 27, 2012, non-party entities American Scientific Innovations, LLC, Inc., Brain Fingerprinting Laboratories, Inc. and Dr. Lawrence Farwell assigned BWS all rights, title and interest in… patents [the Patents]…The June 27, 2012 assignments were memorialized within Intellectual Property Acknowledgment and Assignment Agreements on June 17, 2013. True and accurate copies of the Intellectual Property Acknowledgment and Assignment Agreements are attached hereto as Exhibit B…**

**"BWS maintains that it lawfully acquired the subject intellectual property…"**

3.12.3 Setting aside the fact that said documents were not valid patent assignments (as described above), BWS **Inc.**'s above statements are a total fabrication that bears no resemblance to the demonstrable facts. **None of the documents that BWS Inc. says transferred the patents to it (BWS Inc.'s Exhibit B) even mentioned BWS Inc. The entity mentioned in said documents was Brainwave Science LLC, not Brainwave Science, Inc. (Brainwave Science, Inc. was "BWS" in Tomkins' terminology). "BWS" [Inc.] could not possibly have been the assignee of the Patents when those documents were recorded at the USPTO in 2013, because "BWS" [Inc.] did not exist in 2013. Tomkins and Ika structured it in 2016.**

3.12.4 BWS **Inc.** and BWS **LLC** are different entities with entirely non-overlapping ownership. Ika personally owns none of BWS LLC. Ika personally owns all of BWS Inc. BWS LLC is owned

17

by Dr. Farwell, BFL Inc., HCW, and an undisclosed Silent Partner of HCW. (Exhibits F and AV; note that the latter states the percentages of ownership based on purported dilution of BFL Inc. that BFL Inc. and Dr. Farwell dispute, as further discussed below.)

3.12.5   It is frankly insulting to the arbitrators and judges in the various cases for Tomkins and Ika to presume that said arbitrators and judges will not have the mental acuity to read abbreviations and distinguish between two different entities with the same initials and similar names (and non-overlapping ownership). Even if the patents had been assigned to BWS LLC (which they were not), that says nothing about their ever being assigned to BWS Inc. **Tomkins' trickery was to use the initials "BWS," which are common to BWS LLC and BWS Inc., to give the false impression that documents mentioning BWS LLC (and not BWS Inc.) assigned patents to BWS Inc.** (Note, once again, that said documents did not actually assign any patents to BWS LLC either.)

3.13   On or about May 8, 2013, the following members entered into a Restated Limited Liability Company Agreement (the "BWS LLC Agreement," Exhibit F): Dr. Lawrence A. Farwell, HCW (signatory: Krishna Ika), and Brain Fingerprinting Laboratories, Inc. (signatory: Dr. Lawrence A. Farwell).

3.14   For all five of the lawsuits filed by Tomkins in various state and federal jurisdictions designed to be as expensive and inconvenient as possible for Dr. Farwell and the owners of the Patents, the fundamental claim, on which all else depends, is the claim that three specific documents transferred ownership of the Patents either to BWS LLC or to BWS Inc. Even if that claim had merit – which, as described herein, it clearly does not – it would be an abuse of the justice system to file five identical cases in five jurisdictions.

In one of the five cases, Tomkins stated that the Patents were assigned to BWS Inc. in 2013, which is obviously false, because BWS Inc. did not exist until 2016. In the other four cases, Tomkins stated that the Patents were assigned to BWS LLC (by a document that was not executed by or even known to the undisputed patent owner and included no consideration flowing to the purported assignee), and then BWS Inc. somehow came to own the Patents through some undisclosed means despite the fact that BWS Inc. was never mentioned in any documents filed at the USPTO.

The five cases filed by Tomkins, and the central claim that is identical in all of them, are as follows. In all five cases the wording of the claim is almost identical, and the documents referred to are identical. (The only difference is that in one case Tomkins states that the Patents were assigned to BWS Inc., and in the other four cases he states that they were assigned to BWS LLC, but BWS Inc. somehow now owns them without ever having been mentioned in any documents filed at the USPTO. In fact, both of these narratives are false.) The respective cases, and the central claim that is identical in all of them, are as follows.

3.14.1   <u>BWS Inc.-Farwell Arbitration</u>

"17. On or about June 27, 2012, non-party entities American Scientific Innovations, LLC, Inc., Brain Fingerprinting Laboratories, Inc. and Dr. Lawrence Farwell assigned BWS [**Inc.**] all rights, title and interest in a) the software enabled invention referred to as "Brain Fingerprinting", b) patents and pending patents (including the right to renew or refresh patents) relating to "Brain Fingerprinting" c) all software and intangible assets relating to "Brain Fingerprinting", d) all modifications, including improvements and

18

derivative works relating to "Brain Fingerprinting, e) the exclusive right maintain any license, patent or copyright of, or relating to, Brain Fingerprinting and f) the right to sue for past, present or future infringement.

"18.   The June 27, 2012 assignments were memorialized within Intellectual Property Acknowledgment and Assignment Agreements on June 17, 2013. True and accurate copies of the Intellectual Property Acknowledgment and Assignment Agreements are attached hereto as Exhibit B.

"19.   Dr. Farwell executed the Intellectual Property Acknowledgment and Assignment Agreements in his individual capacity and as a Managing Partner and Chairman of non-party entities American Scientific Innovations, LLC, Inc. and Brain Fingerprinting Laboratories, Inc."

[Said "Exhibit B" comprises the three Draft Documents referenced herein.]

3.14.2   New York Lawsuit

Summons and Complaint

"7. On or about June 17, 2013, [BWS LLC] and Defendant Brain Fingerprinting Laboratories, Inc. entered into an IP Agreement assigning certain rights, title and interests in certain developed intellectual property, including patents, to [BWS LLC]."

Amended Complaint

"8. On or about June 17, 2013, [BWS LLC] and Defendant Brain Fingerprinting Laboratories, Inc. entered into an IP Agreement assigning certain rights, title and interests in certain developed intellectual property, including patents, to [BWS LLC]."

[Said "IP Agreement" comprises the BFL-BWS Draft Document referenced herein.]

"9. On or about June 17, 2013, [BWS LLC] and Defendant Lawrence Farwell, both individually and as Managing Partner of American Scientific Innovations, Inc. entered into an IP agreement assigning certain rights, title, and interest in certain developed intellectual property, including patents, to [BWS LLC]."

[Said "IP Agreement" comprises the Unexecuted ASI-BWS Draft Document and the LF-BWS Draft Document.]

Ika Affidavit:

"9. On or about June 27, 2012, Dr. Farwell agreed to, and did assign to the Company [BWS LLC], all of his rights, title and interest in a) the software enabled invention referred to as "Brain Fingerprinting", b) patents and pending patents (including the right to renew or refresh patents) relating to "Brain Fingerprinting" c) all software and intangible assets relating to "Brain Fingerprinting", d) all modifications, including improvements and derivative works, relating to "Brain Fingerprinting," e) the exclusive right maintain [sic] any license, patent or copyright of, or relating to, Brain Fingerprinting and f) the right to sue for past, present or future infringement.

"10. The June 27, 2012 agreement was memorialized within Intellectual Property Acknowledgment and Assignment Agreements on June 17, 2013.  Attached hereto as

19

Exhibit B are true and accurate copies of the Intellectual Property Acknowledgment and Assignment Agreements."

[Said "Agreements" comprise the three Draft Documents.]

"28. Dr. Farwell conveyed all interest in 'Brain Fingerprinting' technology to the Company [BWS LLC] in 2013."

O'Hara [attorney] Affidavit

"4. On June 17, 2013, Brain Fingerprinting entered into an IP Agreement with an effective date of June 27, 2012 transferring, conveying and assigning al rights, title and interests in certain brain fingerprinting intellectual property, including associated patents."

### 3.14.3 BWS Inc. vs. NST Lawsuit

"Farwell, in his individual capacity and as an authorized agent to ASI and BFL, assigned to BWS LLC all rights, title and interest in the "Brain Fingerprinting" Intellectual Property. This assignment was memorialized within Nunc Pro Tunc Intellectual Property Acknowledgement and Assignment Agreements dated June 17, 2013."

[Said "Nunc Pro Tunc Agreements" comprise the three Draft Documents referenced herein.]

### 3.14.4 Wyoming Lawsuit

"8.   On or about June 27, 2012, non-party entities American Scientific Innovations, LLC, Inc., Brain Fingerprinting Laboratories, Inc. and Dr. Larry Farwell assigned BWS all rights, title and interest in a) the software enabled invention referred to as "Brain Fingerprinting", b) patents and pending patents (including the right to renew or refresh patents) relating to "Brain Fingerprinting" c) all software and intangible assets relating to "Brain Fingerprinting", d) all modifications, including improvements and derivative works, relating to "Brain Fingerprinting, e) the exclusive right maintain any license, patent or copyright of, or relating to, Brain Fingerprinting and f) the right to sue for past, present or future infringement.

"9. The June 27, 2012 assignments were memorialized within Intellectual Property Acknowledgment and Assignment Agreements on June 17, 2013. True and accurate copies of the Intellectual Property Acknowledgment and Assignment Agreements are attached hereto as Exhibit A.

"10. Dr. Farwell executed the Intellectual Property Acknowledgment and Assignment Agreements in his individual capacity and as a Managing Partner and Chairman of non-party entities American Scientific Innovations, LLC, Inc. and Brain Fingerprinting Laboratories, Inc."

[Said "Exhibit A" comprises the three Draft Documents referenced herein.]

3.15   As an incentive to invest in BWS LLC and thereby purchase a security, Ika Parties Ika, HCW, GOV, and BWS LLC falsely and fraudulently told the Minority Shareholders that Ika and HCW would finance BWS LLC until either a buyout by a large company, or an IPO, or major funding at a reasonable company valuation was obtained, and the Minority Shareholders would realize a substantial profit unless the company failed and went bankrupt.

3.16   As an incentive to invest in BWS LLC and thereby purchase a security, Ika Parties Ika, HCW, GOV, and BWS LLC falsely and fraudulently told the Minority Shareholders that their equity in BWS LLC would be safe from being assigned to anyone else for any reason; that there was no risk of their equity being assigned to anyone else or otherwise forfeited for any reason; that, although their equity would lose value if the company failed, as long as the company was successful their equity would retain its value, they would continue to own said equity, and they would receive a substantial return on their investment; and that, although their equity could be diluted with their consent when and if additional investors joined the LLC, their equity would never be diluted without their consent.

3.17   At the time of the Minority Shareholders' initial investment and for years thereafter, Ika Parties Ika, HCW, GOV, and BWS LLC concealed from the Minority Shareholders the identity of Ika's Silent Partner, Financier, investor, and equity holder and said partner's history, thus concealing from the Minority Shareholders significant, relevant, material information that would have influenced Minority Shareholders' decision to invest in BWS LLC.

3.18   At the time of the Minority Shareholders' initial investment and for years thereafter, Ika Parties Ika, HCW, BWS LLC, and GOV concealed from the Minority Shareholders the fact that soliciting their investment was part of a scheme, in conspiracy with others, perhaps including the undisclosed Silent Partner and the Financier, to gain control of Dr. Farwell's invention of Brain Fingerprinting and associated patents and intellectual property, then to deprive Dr. Farwell and BFL Inc. of any equity in the entity that controlled said invention or any share in the profits of said entity, and then to attempt to fraudulently sell an imitation of Dr. Farwell's invention of Brain Fingerprinting to foreign governments.

3.19   Ika Parties Ika, HCW, BWS LLC, and GOV committed fraud in the inducement in inducing Dr. Farwell and BFL Inc. to sign the BWS LLC Agreement and other prior and subsequent related and similar agreements, amendments, and re-statements, as described above. (Tomkins was not yet involved.  However, he later participated in the furtherance of this same scheme.)

3.20   In executing the BWS LLC Agreement, the Minority Shareholders, both Washington residents at the time, purchased a security upon false and fraudulent representations by Ika Parties Ika, HCW, GOV, and BWS LLC.

3.21   an undisclosed Silent Partner became a shareholder in BWS LLC subsequent to its formation, without disclosure of the identity or history of said partner to the Minority Shareholders, such that Ika, HCW, and the Silent Partner collectively owned a controlling interest in BWS LLC.

3.22   Ika Parties Ika, HCW, GOV, BWS LLC, and likely others including the Silent Partner and the Financier, conspired to fraudulently deprive Minority Shareholders of their equity in BWS LLC. (Tomkins was not yet involved.  However, he later participated in the furtherance of this same scheme.)

3.23   The   BWS   LLC   Agreement   (Exhibit   F)   stated   the   following: "Section 26. Amendments. This Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Members."

3.24   Ika Parties Ika, GOV, and HCW, BWS LLC and likely other Ika Parties, unilaterally, without the consent of the Minority Shareholders, purported to amend the BWS LLC Agreement.  The purported amendment granted the Managing Member, Ika/HCW, the authority to remove the Minority Shareholders as members and to transfer all of the Minority Shareholders' equity to

Ika, HCW, the Silent Partner, and/or BWS LLC, without consent of the Minority Shareholders and without due process of law. The only stated requirement for so doing was that in the Managing Member's (Ika's) sole and absolute opinion the Minority Shareholders had engaged in certain actions – whether the Minority Shareholders had actually engaged in said actions or not, and whether Managing Member's opinion was in good faith or not.

3.25   Ika notified Dr. Farwell, but not Brain Fingerprinting Laboratories, Inc., of his intent to hold a meeting to grant himself the authority to expel the Minority Shareholders and misappropriate the Minority Shareholders' equity as described above.  (Exhibit G).

3.26   Dr. Farwell replied that he would not participate in such a meeting, because to do so would clearly be committing a felony (Exhibit H).

3.27   Ika notified Dr. Farwell, but not Brain Fingerprinting Laboratories, Inc., that he had held said meeting and had granted himself the authority to misappropriate the Minority Shareholders' equity without consent or due process (Exhibit I).

3.28   Dr. Farwell replied that Ika, in so doing, had committed a number of felonies (Exhibit J).

3.29   Ika notified Dr. Farwell, but not Brain Fingerprinting Laboratories, Inc., that he had exercised his purported authority to remove the Minority Shareholders as members of BWS LLC and misappropriate all of the Minority Shareholders' equity, and that Minority Shareholders were no longer members of BWS LLC and no longer had any equity in BWS LLC (Exhibit K).

3.30   Ika Parties paid no compensation to Dr. Farwell and BFL Inc. for Dr. Farwell's and BFL Inc.'s equity in BWS LLC that Ika Parties misappropriated without consent or due process of law (Exhibit K).

3.31   Farwell replied that in misappropriating Farwell's and BFL Inc.'s equity in BWS LLC, Ika Parties had committed a number of felonies and a number of torts, and the misappropriation of Minority Shareholders' equity was not valid and would not stand (Exhibit L).

3.32   Tomkins and Ika Parties Ika, HCW, GOV, and BWS LLC, and likely other Ika Parties, then conspired to further defraud Dr. Farwell and BFL Inc. by dissolving BWS LLC and transferring its assets to a new company, BWS Inc.  The apparent motive for this was that Ika Parties must have realized that their scheme to misappropriate Minority Members' equity as described above was illegal and would not stand up in court, and dissolving BWS LLC and transferring its assets to BWS Inc was a second method to defraud the Minority Shareholders of their equity.

3.33   The BWS LLC Agreement stated the following: "Section 10. Capital Contributions, etc. (a) Capital Contributions of Members. Notwithstanding anything herein to the contrary, the Managing Member [HCW] shall make capital contributions to the equity capital of the Company as determined from time to time by the Managing Member; provided that such capital contributions shall be in amounts sufficient to satisfy any obligations to make any required payment pursuant to the terms of that certain Consulting Agreement between the Company and Neuroscience Inventions, LLC dated July 5, 2012."

3.34   Ika and HCW defaulted on their agreement to provide said capital contributions.  In so doing they defaulted on the BWS LLC Agreement.

3.35   On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a preliminary draft document for intellectual property (the "Unexecuted ASI-BWS Draft Document," Exhibit M).  The purpose of the Unexecuted ASI-BWS Draft Document was to

22

outline the terms of an intellectual property assignment that could be executed by the authorized parties after all of the parties had reached an agreement on the compensation that would be exchanged for the assignment of intellectual property.  Dr. Farwell, acting in good faith but erroneously, and believing that (a) that this was simply a draft, as Ika Parties Ika, HCW, and GOV represented it, and (b) that he could persuade the authorized parties to execute a similar document once the compensation for the exchange of intellectual property had been agreed upon and the relevant documents executed, wrote his name on the Unexecuted ASI-BWS Draft Document without verifying who actually had the authority to execute the document.  In fact, Dr. Farwell did not have the authority to execute a document on behalf of American Scientific Innovations, LLC, the undisputed owner of the Patents at the time.  Dr. Farwell (Exhibit AE) and Ben Bryant, General Manager of ASI, (Exhibit AD) both executed sworn affidavits evidencing the same.

3.36    The Unexecuted ASI-BWS Draft Document was not notarized.  The signatures thereon were not witnessed.  This is consistent with the fact that the Unexecuted ASI-BWS Draft Document was a draft document and not a document intended to be recorded with the USPTO.

3.37    The spaces in the Unexecuted ASI-BWS Draft Document reserved for the description of ASI, the state where it was organized, and the address of ASI were left blank, as is common in an unexecuted draft document, and unheard-of in a legitimate document intended to be recorded with the USPTO.

3.38    On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a second preliminary draft document for intellectual property (the "BFL – BWS Draft Document," Exhibit N), which was signed by Ika representing HCW as general manager of BWS LLC and Dr. Farwell as chairman of BFL Inc..

3.39    On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a third preliminary draft document for intellectual property (the "LF – BWS Draft Document," Exhibit O), which was signed by Ika representing HCW as general manager of BWS LLC and Dr. Farwell.

3.40    Collectively, the Unexecuted ASI-BWS Draft Document, the BFL – BWS Draft Document, and the LF – BWS Draft Document, are referred to herein a the "Draft Documents."

3.41    At the time of the development of the Draft Documents, and for years thereafter and years before, Ika Parties Ika, HCW, BWS LLC, and GOV concealed from the Minority Shareholders the facts that a certain individual was Ika's Silent Partner and that they would later claim on the BWS LLC website and in correspondence that Subu Kota was also involved in BWS LLC, as described above. This is relevant because Kota had pleaded guilty to attempting to sell stolen high-tech secrets to the Soviet Union, a crime very similar to the crimes of which Ika now stands accused in South Africa, Pakistan, Nigeria, and Thailand.  The Ika Parties also did not disclose that fraudulently inducing Dr. Farwell and BFL Inc. to sign said documents was part of a scheme to gain control of Dr. Farwell's invention of Brain Fingerprinting and associated Patents, then to deprive Dr. Farwell and BFL Inc. of any equity in the entity that controlled said invention or any share in the profits of said entity, and then to fraudulently misrepresent themselves as experts in psychophysiology, forensic neuroscience, and specifically Brain Fingerprinting and to fraudulently attempt to sell an imitation, counterfeit version of Dr. Farwell's invention of Brain Fingerprinting to foreign governments.

23

3.42    American Scientific Innovations LLC, was founded in 2002, with Ben Bryant serving as General Manager.

3.43    At the time of the execution of all documents referenced herein that involve ASI, the only individual authorized to execute any agreement on behalf of ASI was the General Manager, Ben Bryant.  Dr. Farwell and Ben Bryant have executed sworn affidavits stating the same (Exhibits AE an AD respectively).

3.44    Dr. Lawrence Farwell has never been an employee, officer, agent, or member of ASI. Dr. Farwell and ASI General Manager Ben Bryant have executed sworn affidavits stating the same (Exhibits AE an AD respectively).

3.45    Dr. Lawrence Farwell has never been authorized to execute any agreement on behalf of ASI, nor did Dr. Farwell ever have apparent authority to do so. Dr. Farwell and ASI General Manager Ben Bryant have executed sworn affidavits stating the same (Exhibits AE an AD respectively).

3.46    On or about January 24, 2003, Dr. Lawrence A. Farwell, inventor, assigned his interest in the Brain Fingerprinting Patents and all associated "Brain Fingerprinting" intellectual property to ASI. (Exhibit P)  Dr. Farwell therefore subsequently had no ownership interest in said patents or associated "Brain Fingerprinting" intellectual property.  Any agreement between Dr. Farwell and Brainwave Science, LLC or any other party could not result in a change in ownership of said patents or any associated "Brain Fingerprinting" rights or intellectual property.

3.47    On or about April 2, 2010, Dr. Lawrence A. Farwell, inventor, assigned his interest in US Patent 7,689,272 and all associated intellectual property to ASI (Exhibit Q). Dr. Farwell therefore subsequently had no ownership interest in the Patents or associated intellectual property.  Any agreement between Dr. Farwell and Brainwave Science, LLC or any other party could not result in a change in ownership of the Patents or associated intellectual property.

3.48    Brain Fingerprinting Laboratories, Inc. has never claimed and has never had any ownership interest in the Patents and could not assign any ownership interest in the Patents to BWS LLC or any other party.

3.49    Brain Fingerprinting, LLC has never claimed and has never had any ownership interest in the Patents and could not assign ownership interest in the Patents to BWS LLC or any other party.

3.50    Upon information and belief, at the time of the Unexecuted ASI-BWS Draft Document, the compensation to ASI for the intellectual property, and compensation to Dr. Farwell for services rendered were still under negotiation.  Dr. Farwell signed several documents that Ika had led him to believe were non-binding drafts, on the level of a letter of intent, that would be replaced by binding, properly written and executed documents that would be executed by the authorized parties only after appropriate compensation had been agreed upon for both Dr. Farwell's services and ASI's intellectual property.

3.51    Dr. Farwell was not concerned at the time of the Unexecuted ASI-BWS Draft Document about the precise wording of the Unexecuted ASI-BWS Draft Document, or about who had standing at ASI, because Ika had led him to believe that before the actual licensing or transfers of Patents to BWS would take place, formal agreements providing for compensation to Dr. Farwell, BFL Inc., and ASI would be executed, and all details could be corrected at that time.  Dr. Farwell wrote his name on said document in good faith, believing that it was a draft that would not be recorded at the USPTO.

24

3.52    The Unexecuted ASI-BWS Draft Document is null and void and has no legally binding effect because the signatory thereon, Dr. Farwell, was not a member, officer, board member, equity holder, agent, or representative of ASI, the apparent assignor, and had no authority to execute any agreement on behalf of ASI.  Both Dr. Farwell (Exhibit AE) and Ben Bryant (Exhibit AD), the General Manager and only authorized signatory for ASI, executed sworn affidavits evidencing these facts.

3.53    The Unexecuted ASI-BWS Draft Document was written, signed, and recorded at the USPTO without the knowledge or consent of the apparent assignor, ASI. ASI, who owned the Patents, and Dr. Farwell, who signed said Draft Document, never intended it to be recorded at the USPTO or to be employed as a means transfer any interest in the Patents and associated intellectual property.

3.54    Contrary to Tomkins' assertions in the five lawsuits he filed on these identical issues, the Draft Documents are null and void for at least four additional reasons: (1) said documents provided for no quid pro quo, no compensation to the respective apparent assignors, ASI, BFL Inc., and Dr. Farwell;   (2) Ika Parties Ika, HCW, BWS LLC, and GOV committed fraud in the inducement in inducing Dr. Farwell and BFL Inc. to sign the Draft Documents, as described herein; (3) In furtherance of said fraudulent inducement, Ika and HCW defaulted on the BWS LLC Agreement, as described herein; and (4) said documents were preliminary drafts, were not intended by the respective apparent assignors – Dr. Farwell, BFL Inc., and ASI -- to be recorded at the USPTO, and were recorded at the USPTO by BWS LLC without the knowledge or consent of the apparent assignors.

3.55    Aside from the status of the BFL – BWS Draft Document described above, the BFL – BWS Draft Document did not in any case transfer any interest in the Patents and associated intellectual property because BFL Inc. had no such interest.  BWS Inc. had never received a transfer of the Patents and associated intellectual property and never had or claimed any interest in the Patents and associated "Brain Fingerprinting" intellectual property.

3.56    Aside from the status of the LF – BWS Draft Document described above, the LF – BWS Draft Document did not in any case transfer any interest in the Patents and associated intellectual property because at the time of said document Dr. Farwell had no interest in the Patents and associated "Brain Fingerprinting" intellectual property. He had previously transferred the same to ASI, as described above.

3.57    As a consequence of the above, no ownership interests in any Patents or intellectual property was transferred by the Draft Documents.  Consequently, BWS LLC never owned any Patents, any "Brain Fingerprinting" intellectual property, any other related intellectual property, or any intellectual property relevant to the disputes specified herein.  (As described herein, BWS Inc. was not even mentioned in any of said documents, any patent assignments, or any other documents ever filed at the USPTO.)

3.58    The false, invalid, and erroneous recording of the Unexecuted ASI-BWS Draft Document gave the false appearance that BWS LLC owned ASI's Patents, whereas in fact since Dr. Farwell did not have the standing to sign for ASI, the ownership of the Patents and associated intellectual property always continued to rest with ASI.

3.59    Apparently believing that he had obtained all of ASI's interest in the referenced Patents without giving anything in return for it – as evidenced by the lack of compensation in the Unexecuted

ASI-BWS Draft Document, the BFL – BWS Document, and the LF – BWS Document -- Ika then refused to sign any agreement for any compensation to ASI, Dr. Farwell, BFL Inc., or anyone else for the intellectual property embodied in the Patents.  (Tomkins was not yet involved.  However, he later participated in the furtherance of this same scheme.)

3.60   The Brain Fingerprinting Patents have all expired. U.S. Patent 5,363,858 expired May 5, 2013.  U.S. Patent #5,406,956 expired February 11, 2013.  U.S. Patent #5,467,777 expired September 15, 2014.

3.61   US Patent # 7,689,272 remains in force, and will expire June 7, 2022.

3.62   On or about October 29, 2013, in order to correct the erroneous, false, and unauthorized recording of the Draft Documents at the USPTO and to eliminate any doubt regarding the continued ownership of the Patents and all associated intellectual property by the rightful owner thereof, ASI, Dr. Farwell and BFL Inc. executed the Corrected Nunc Pro Tunc Intellectual Property Acknowledgement and Assignment (the "Correction," Exhibit A) and recorded it at the USPTO.

3.63   ASI's ownership of the Patents does not depend on the Correction.  Since BWS LLC never owned any of the Patents or associated intellectual property, the Correction was unnecessary to secure ASI's uninterrupted ownership thereof.  The Correction did, however, notify the USPTO of the correct situation regarding the same.

3.64   In correspondence with BWS LLC, Dr. Farwell acknowledged that ASI owned and had always owned the Patents, and that the Unexecuted ASI-BWS Draft Document did not transfer ownership in the Patents and associated intellectual property (Exhibit H).

3.65   In correspondence with Dr. Farwell, BWS LLC through its attorney Moreno acknowledged that ASI owned and had always owned the Patents and associated intellectual property, and that the Unexecuted ASI-BWS Draft Document did not transfer ownership in the Patents and associated intellectual property to BWS LLC, and that BWS LLC never had any ownership of the Patents and associated intellectual property.  The "SECTION 18(e)(i) NOTICE - VOTE TO REMOVE MEMBER" from BWS' attorney Moreno to Dr. Farwell (Exhibit G) admitted as follows:

a.   Said Letter acknowledges one fact that is in true and indisputable:

"…the transfer" [of ] "the Patents and the Fingerprinting IP to the Company"…"was invalid because Farwell and BFL were not the rightful owners with the requisite right, title and interest to the transferred assets." (page 3, paragraph 4).

One fact that the Letter clearly admits in the above section -- which is true, accurate, and indisputable -- is that there never existed a valid assignment of any of the Patents or IP to BWS LLC, and thus BWS LLC never owned any of the patents or IP.

b.   BWS LLC further admits this in said Letter in the following section.

"Company [BWS]…providing Farwell with equity in the Company, which has caused the Company substantial damage as it received no value in exchange for the equity provided to Farwell and BFL." (page 6, paragraph 1)

> The above statement admits one thing that is factual: The Company received no IP or interest in Patents in exchange for providing Dr. Farwell with equity in the company.  It is false, however, that the Company received no value.  On the contrary, the Company received the services and expertise of the inventor and world's leading expert in Brain Fingerprinting (Dr. Farwell).

3.66   In 2012-2016 BWS LLC and BWS Inc paid a retainer of between $8,000 and $11,000 per month to Dr. Farwell on some months, and nothing on other months.

3.67   Dr. Farwell was identified on BWS LLC's website as a Board Member and Officer (Chief Scientist) of BWS LLC (Exhibits V, W, X, Y, and Z).

3.68   In a transparent attempt to intimidate Dr. Farwell, BFL Inc., and ASI, Ika Parties Ika, GOV, and BWS LLC misrepresented the status in BWS LLC of two individuals on the BWS LLC website, www.brainwavescience.com. Said website misrepresented Trump advisor General Michael Flynn ("Flynn") and former FBI deputy director Brian McCauley ("McCauley") as being a members of the Board of Directors (Exhibit Y). This misrepresentation took place in 2016, when Ika and BWS LLC were issuing threats and demands to Dr. Farwell and ASI related to ownership of the Patents (Exhibits G, H, I, J, K, and L).

3.69   Apparently to the same end as described in the paragraph immediately above, Ika Parties Ika, GOV, and BWS LLC misrepresented the status in BWS LLC of Subu Kota. They misrepresented Kota on their website as being on the Board of Directors of BWS LLC (Exhibits W, X, Y, and Z). In correspondence and communications to Dr. Farwell and BWS LLC, Ika and BWS Inc. through their attorneys also misrepresented Kota as being an Officer (Secretary) of BWS LLC (Exhibit K) and investor in BWS LLC (BWS LLC's attorney Tompkins' allegations in Dr. Farwell's deposition in the King County, Washington case).  By falsely identifying Kota as being a board member, officer, a major equity holder, and by implication a participant in the alleged fraud and other alleged crimes of Ika and BWS LLC, BWS LLC and Ika damaged the reputation of Kota and attempted to defraud Dr. Farwell.

3.70   Upon information and belief, and contrary to information on the BWS LLC website (Exhibits W, X, Y, and Z) and in the news media (Exhibits AB and AC) and/or misinformation propagated to  Dr. Farwell by Ika Parties (Exhibit K and allegations of BWS Inc.'s attorney Tomkins in Dr. Farwell's deposition in the King County, Washington case), Kota has never been a member, board member, equity holder, investor, or officer of BWS LLC or BWS Inc., and did not participate in any of the alleged fraud or other alleged crimes of Ika, BWS LLC, or BWS Inc.  As described herein, Kota is not a part of this action or any other legal action involving the Dr. Farwell, or, to the knowledge of the Dr. Farwell, any other legal action involving any of the parties hereto.  Upon knowledge and belief, Kota has committed no crimes or torts related to any of the parties hereto.

3.71   The misinformation presented on the BWS LLC website regarding alleged connections between BWS LLC and Flynn, McCauley, and Kota (Exhibits V and Y), and alleged participation at least of Kota in some of the alleged crimes of Ika and BWS LLC (Exhibits H, J, and K), damaged the reputations of Flynn, McCauley, and Kota, as reported in the press (Exhibits AA, AB, and AC). The same misinformation regarding the alleged connection of Dr. Farwell to all of the above also damaged the reputation of Dr. Farwell (Exhibit AB).

3.72   On or about March 15, 2015, ASI assigned the Patents to Life Science and Technology, LLC. Said assignment was properly executed by Ben Bryant, the General Manager and sole authorized signatory for ASI, and recorded with the US Patent and Trademark Office (Exhibits B, C, D, and E).

3.73   Dr. Farwell is not a member, officer, equity holder, board member, employee, or agent of LST. Dr. Farwell and the President of LST, Ron Kirkendorfer have so stated in sworn affidavits (Exhibits AE and AF respectively).

3.74   Ika Parties BWS LLC, BWS Inc, and Krishna Ika have falsely and fraudulently claimed that they own the Patents and the associated "Brain Fingerprinting" intellectual property disclosed and enabled therein.

3.75   Tomkins, Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika have falsely and fraudulently claimed that they are offering for sale a viable product that embodies the intellectual property described in the Brain Fingerprinting Patents, whereas in fact they are attempting to market a counterfeit product that does effectively implement the invention embodied in the Brain Fingerprinting Patents and does not meet the published and peer-reviewed Brain Fingerprinting Scientific Standards.

3.76   Ika Parties Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika have made multiple false and fraudulent claims on their website (www.brainwavescience.com) and elsewhere regarding the Brain Fingerprinting science and technology that is embodied in the Brain Fingerprinting Patents and that Dr. Lawrence Farwell invented, developed, patented, published in the peer-reviewed scientific literature, successfully applied in criminal cases and in court, and continues to apply. This is documented in Exhibits S and U.

3.77   Tomkins, Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika are falsely and fraudulently attempting to market a counterfeit product that does not have the qualities and attributes of the genuine Brain Fingerprinting invented by Dr. Lawrence Farwell and embodied in the Patents, is equivalent to Dr. Farwell's invention of "Brain Fingerprinting," and was formerly called "Brain Fingerprinting" (Exhibits S, T, and U).

3.78   The counterfeit product that Tomkins, Brainwave Science, LLC, Brainwave Science, Inc., and Ika have been attempting to market (Exhibits S, AG, AH, AI, AJ, AK, AL, AM, AN, AO, and AP):

   a.   Is not the Brain Fingerprinting scientific technology that was invented by Harvard-trained neuroscientist Dr. Farwell, who was selected by *TIME* magazine as one of the top innovators of our time, "the Picassos or Einsteins of the 21st Century."

   b.   Is not the specific scientific technique of Brain Fingerprinting that meets the 20 Brain Fingerprinting Scientific Standards that Dr. Farwell has published. There is no evidence anywhere that the counterfeit product and faux training that BWS Inc. is offering meet these standards.

   c.   Has not been tested and proven at the CIA, the FBI, and the US Navy.

   d.   Has never been applied in real-world criminal cases, including serial killer JB Grinder and innocent murder convict Terry Harrington.

   e.   Has not been proven over 99% accurate in research at the FBI, the CIA, the US Navy, and elsewhere published in the top peer-reviewed scientific journals. There is no

28

evidence anywhere that what BWS Inc is offering has achieved such accuracy in scientific studies or field applications.

    f.  Has never achieved 99% accuracy, or any other proven level of accuracy, in any published research, forensic applications, field applications, or in any other context.

    g.  Has not been featured in major national and international news media, including *CBS Evening News, ABC World News, CNN, PBS, BBC, CBS 60 Minutes, ABC Good Morning America,* the *Discovery Channel, The New York Times, The Washington Post, TIME Magazine,* and *US News and World Report*.

    h.  Has not been proven to be capable of detecting bomb makers, criminals, and terrorists, in peer-reviewed publications.

    i.  Lacks the qualities and achievements of the genuine Brain Fingerprinting invented and developed by Dr. Farwell, as listed herein and in the Exhibits.

    j.  Has produced no evidence that the unproven technology BWS Inc is offering achieves the same accuracy, reliability, or validity of the genuine Brain Fingerprinting practiced by Dr. Farwell and other competent, trained, and credentialed scientists.

3.79    No one employed by or affiliated with Ika Parties Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika (Exhibits S, AG, AH, AI, AJ, AK, AL, AM, AN, AO, and AP):

    a.  has ever been trained in Brain Fingerprinting by a Brain Fingerprinting expert;

    b.  has ever conducted or published Brain Fingerprinting research;

    c.  has ever successfully applied Brain Fingerprinting in real-world cases;

    d.  has ever conducted Brain Fingerprinting research for the FBI, the CIA, or the US Navy;

    e.  is qualified to conduct a scientific Brain Fingerprinting test that meets the Brain Fingerprinting Scientific Standards; or

    f.  has been featured in any of the major news sources mentioned above that have featured Dr. Farwell and his genuine Brain Fingerprinting invention.

3.80    Ika Parties have purported to practice, make, and use, and have attempted to sell, the intellectual property embodied in the Brain Fingerprinting Patents without compensation to ASI, the rightful owner of the Patents from the founding of BWS LLC and BWS Inc. until March 15, 2015, or LST, the rightful owner of the Patents since March 15, 2015.

3.81    As a result of the Tomkins' and the other Ika Parties' actions and conduct, Dr. Farwell's ability to practice, market, and sell his invention, to perform on existing Brain Fingerprinting contracts with government agencies and others, and to practice his lifetime profession have been damaged.

3.82    From 2000 through 2006, Dr. Farwell held a service mark on "Brain Fingerprinting" registered with the USPTO (registration number 2308729).  Said mark was cancelled October 21, 2006.  Subsequently both Dr. Farwell and BWS LLC applied unsuccessfully for said mark (serial number 77247169 and serial number 85775316 respectively).  "Brain Fingerprinting" is now in the public domain.

3.83    Ika Parties should have known in 2013, and knew and admitted in 2016, the following facts, all of which remained undisputed until 2019: the Unexecuted ASI-BWS Draft Document was not executed by ASI, the apparent "assignor" therein, who was then the undisputed owner of the Patents and all associated Brain Fingerprinting intellectual property, and was written, signed, and recorded at the USPTO without the knowledge or consent of ASI, and which consequently transferred no intellectual property to the Ika Parties; the LF-BWS Draft Document was signed by an "assignor" who did not possess the Patents or any associated Brain Fingerprinting intellectual property, having previously assigned the same to ASI, and consequently transferred no intellectual property to the Ika Parties; the BFL-BWS Draft Document was signed by an "assignor" who never had and never claimed any ownership of the Patents and associated Brain Fingerprinting intellectual property, and consequently transferred no intellectual property to the Ika Parties; the Brain Fingerprinting Patents expired in 2013 and 2014 and consequently the Brain Fingerprinting intellectual property embodied and disclosed therein is now in the public domain.  In a transparent attempt to prevent Dr. Farwell from practicing his invention, his profession, and his business, and knowing all of the above facts, the Tomkins filed a false and frivolous lawsuit in federal court in Wyoming (the Wyoming Lawsuit) against LST, the owner of the Patents, based on false statements by Tomkins that directly contradicted the above indisputable and previously undisputed facts.

3.84    Dr. Farwell is a Harvard graduate with a PhD in biological psychology and a former research associate at Harvard Medical School. Dr. Farwell is the inventor of Brain Fingerprinting, as per the Patents and peer-reviewed publications cited below.  Dr. Farwell has published extensively on Brain Fingerprinting in leading peer-reviewed scientific journals (Exhibits AG, AH, AI, AJ, AK, AL, and AM).

3.85    Dr. Farwell has conducted Brain Fingerprinting research at the FBI, the CIA, and the US Navy and published the results in peer-reviewed scientific journals (Exhibits AG, AH, AI, AK, AL, and AM).

3.86    Dr. Farwell has successfully applied Brain Fingerprinting science in real-world criminal cases (Exhibits AG, AH, AI, AK, AL, and AN).

3.87    The science and technology of Brain Fingerprinting that Dr. Farwell invented and developed and his expert testimony on it have been ruled admissible in court (Exhibits AN, AO).

3.88    Dr. Farwell has successfully practiced his profession as a forensic neuroscientist, and specifically as the world's leading expert in the Brain Fingerprinting science and technology that he invented, for over 25 years (Exhibits AG, AH, AI, AJ, AK, AL, AM, AN, AO, and AP).

3.89    Forensic Science Laboratory, New Delhi, India ("FSL") is a client of Dr. Farwell, having purchased a Brain Fingerprinting system and associated training by Dr. Farwell.

3.90    On or about May 14, 2019 Tomkins falsely and fraudulently libeled Dr. Farwell in communications to Dr. Farwell's client FSL.  Tomkins falsely accused Dr. Farwell of fraud, theft, sabotage, lying, dishonesty, bad faith, duplicity, unethical business practices, and other illicit and undesirable actions.

3.91    On or about May 14, 2019 Tomkins wrote and caused to be delivered a letter ("Tomkins' Libelous Letter," Exhibit AU) to Dr. Farwell's client FSL.

30

3.92   Tomkins' Libelous Letter falsely, fraudulently, and libelously claimed that Dr. Farwell had stolen hardware comprising Ika Parties' Counterfeit Product from Defendant Brainwave Science, Inc.

3.93   Tomkins' Libelous Letter falsely, fraudulently, and libelously claimed that Dr. Farwell had sold to Dr. Farwell's client FSL said allegedly stolen hardware (comprising an EEG headset, as described in documents accompanying Tomkins' Libelous Letter).  It would be ludicrous for Dr. Farwell -- the inventor and developer of the genuine Brain Fingerprinting, who had been applying and selling his genuine Brain Fingerprinting system for decades before Ika Parties BWS LLC and BWS Inc existed -- would steal and attempt to sell a counterfeit system such as Ika Parties' Counterfeit Product. Moreover, such an accusation must be false for the following reason.  The headset that Dr. Farwell and his affiliated company Brain Fingerprinting, LLC sold to FSL (as part of the Farwell Brain Fingerprinting system purchased by FSL) was a custom headset ("Dr. Farwell's Custom Headset") designed by Dr. Farwell and custom manufactured in the USA. Based upon information and belief, Ika Parties Ika, BWS LLC, and BWS Inc. only use and only have ever possessed entirely different headsets manufactured in Taiwan, and all of their software works only with said Taiwanese headsets and not with Dr. Farwell's Custom Headset.  On information and belief, no one other than Dr. Farwell and his affiliated companies, Brain Fingerprinting, LLC and Brain Fingerprinting Laboratories, Inc., possesses Dr. Farwell's Custom Headset or any instantiation thereof. Ika Parties have never possessed any instantiation of Farwell's Custom Headset – the headset that Dr. Farwell sold to FSL. Consequently, any allegation that Dr. Farwell stole from Ika Parties the Farwell's Custom Headset that he sold to FSL (or anyone else) must be false, fraudulent, and libelous or slanderous.

3.94   Tomkins' allegation that Dr. Farwell stole a headset from Ika Parties Ika and Brainwave Science Inc. is false and libelous with regard to the false accusation of theft.

3.95   The allegation or implication in Tomkins' Libelous Letter that Dr. Farwell stole and then sold a headset from Ika Parties Ika and Brainwave Science Inc. is additionally false and libelous with regard to the false accusation that Dr. Farwell sold stolen goods.

3.96   Tomkins' allegation or implication in Tomkins' Libelous Letter that Dr. Farwell sold Ika Parties' Counterfeit Product to FSL is additionally false and libelous in that such a sale would never be undertaken by Dr. Farwell or any other legitimate forensic scientist with expertise in Brain Fingerprinting. In falsely alleging that Dr. Farwell sold Ika Parties' Counterfeit Product, Tomkins implies that in the course such sale Dr. Farwell must have misrepresented that Ika Parties' Counterfeit Product had value and was worth buying – which it does not and is not, and that Ika Parties' Counterfeit Product had his endorsement or was represented by him – which it does not and is not.  Such representations or implications are damaging to Dr. Farwell's reputation, stature, and professional success as a forensic scientist and expert in genuine Brain Fingerprinting.  No legitimate forensic scientist with expertise in Brain Fingerprinting would make such misrepresentations regarding Ika Parties' Counterfeit Product or any other product that fails to meet the Brian Fingerprinting Scientific Standards.

3.97   Tomkins' Libelous Letter also threatened Dr. Farwell's client FSL with criminal prosecution for possession of stolen property, on the basis of having purchased the same from Dr. Farwell.

3.98   Tomkins' Libelous Letter falsely and libelously stated that Dr. Farwell is being investigated by the FBI.  No such investigation exists.  Ika spoke to an FBI agent in 2016 regarding the various

disputes at the time.  No investigation ensued, and no investigation was taking place at the time of Tomkins' Libelous Letter.

3.99   Tomkins' Libelous Letter falsely stated that Brainwave Science, Inc. is actively and fully cooperating with a (non-existent) FBI investigation of Dr. Farwell.  No such cooperation is taking place.  No such investigation is taking place, and no such investigation or cooperation was taking place at the time of Tomkins' Libelous Letter.

3.100 In the context of security clearances, Dr. Farwell has been investigated by numerous national and international law enforcement, intelligence, counterterrorism, and military agencies around the world, beginning with the FBI and the CIA in the early 1990s.

3.101 Throughout the last quarter of a century, including over 20 years prior to the existence of Ika Parties BWS LLC and BWS Inc., Dr. Farwell has cooperated and collaborated with national and international law enforcement, intelligence, counterterrorism, and military agencies around the world, beginning with the FBI and the CIA in the early 1990s, and has provided said agencies with his professional expertise as a forensic neuroscientist as well as his invention of Brain Fingerprinting.

3.102 Based upon knowledge and belief and as described below and documented in the exhibits hereto, Ika Parties Ika, Tomkins, BWS LLC, BWS Inc. and their employees have never collaborated with national and international law enforcement, intelligence, counterterrorism, or military agencies and provided said agencies with professional expertise in forensic neuroscience, because Ika Parties lack any training, certification, qualification, credentials, education, knowledge, or expertise in forensic neuroscience, and specifically in the forensic neuroscience of Brain Fingerprinting.

3.103 Tomkins' Libelous Letter contained additional false, fabricated, and remarkably fanciful hearsay apparently designed to disparage and defame Dr. Farwell and his science and technology.

3.104 Tomkins' actions, including but not limited to libeling Dr. Farwell and threatening Dr. Farwell's client FSL with criminal prosecution for doing business with Dr. Farwell, can only reasonably be understood as an attempt to interfere with Dr. Farwell's contract and business relationship with FSL and Dr. Farwell's other clients, to defame Dr. Farwell, and to disparage Dr. Farwell's science and technology, and to weaken or intimidate Dr. Farwell as a potential witness in future criminal prosecutions of Ika based on authorities having accused Ika of fraud in Pakistan, South Africa, Nigeria, and Thailand, as Dr. Farwell has testified as a witness in a previous fraud case against Ika, as described herein.

3.105 In Dr. Farwell's professional opinion as the inventor of Brain Fingerprinting, the world's leading expert in the science of Brain Fingerprinting, and the most experienced expert in applying Brain Fingerprinting in criminal, counterterrorism, and counterintelligence cases with national law enforcement and national security agencies around the world, any misguided attempt by unqualified persons to apply counterfeit technology, such as Ika Parties' Counterfeit Product, which Ika Parties Ika, BWS LLC, and/or BWS Inc are attempting to market, in real criminal or counterterrorism cases would be a serious  threat to national security and justice.  Other experts agree with this opinion, as documented below, and no known Brain Fingerprinting expert disagrees with this assessment.

3.106 On or about March 18, 2019, Dr. Farwell received the first of a series of communications from Donald Buti Ramfolo ("Ramfolo"), and his associates Jacob Madikiza ("Madikiza"), and Christo

Botes in South Africa regarding their plans to collaborate with Dr. Farwell and Brain Fingerprinting, LLC to bring Dr. Farwell's Brain Fingerprinting technology to South Africa. General Ramfolo is a Brigadier General (ret) Military Intelligence in South Africa. Madikiza is a retired Deputy Director General, South African Secret Service. Some of these communications from General Ramfolo contained information regarding alleged fraud by Ika Parties Ika and BWS Inc involving the science and technology of Brain Fingerprinting that Dr. Farwell invented and developed. General Ramfolo provided the facts contained in his sworn affidavit (Exhibit AR). See the Exhibit for details. Madikiza did not provide an affidavit because he was not present at the meetings discussed, and all of the information he had constituted hearsay. The affidavit of General Ramfolo contains the following facts.

3.107 Based upon information and belief and according to General Ramfolo, Ika Parties Ika, BWS LLC, and/or BWS Inc made false and fraudulent claims regarding Brain Fingerprinting and the Ika Parties' Counterfeit Product in an attempt to sell Ika Parties' Counterfeit Product to the South African government.

3.108 Based upon information and belief and according to General Ramfolo, when General Ramfolo asked Ika to provide information regarding the acceptance in court that Ika Parties Ika, BWS LLC, and/or BWS Inc claimed that Ika Parties' Counterfeit Product had achieved, the only references Ika Parties Ika, BWS LLC, and/or BWS Inc provided were to court cases in which Dr. Lawrence Farwell and his genuine Brain Fingerprinting science were involved, cases that predated the existence of BWS LLC and BWS Inc. and had nothing to do with Ika, BWS LLC, BWS Inc, and Ika Parties' Counterfeit Product.



3.109 Over the last three years Dr. Farwell has collaborated with ███████████ ███████████████████████████████████████████ in several law enforcement, intelligence, and counterterrorism agencies in ██████ and assisted those agencies in solving criminal, counterterrorism, and counterintelligence cases. ████████ has twice successfully completed training in Brain Fingerprinting science and technology that Dr. Farwell conducted.

3.110 According to ███████████████████████ he witnessed an attempt by Ika Parties Ika, BWS LLC, and/or BWS Inc to defraud an intelligence agency of the ██████government on or about April 15, 2019.

3.111 Based upon information and belief and according to ██████, Ika Parties Ika, BWS LLC, and/or BWS Inc through their representative attempted to sell said agency their counterfeit product, fraudulently represented that their product was the same as Dr. Farwell's Brain Fingerprinting, and fraudulently represented that they and their employees were qualified to practice forensic neuroscience, specifically Brain Fingerprinting, and to train others to do so.

3.112 Based upon information and belief and according to ██████ Ika Parties Ika, BWS LLC, and/or BWS Inc' representative, on instructions from Ika Parties Ika, BWS LLC, and/or BWS Inc, falsely represented to the ██████ government that BWS represented Dr. Lawrence Farwell and his Brain Fingerprinting technology, whereas in fact Dr. Farwell has no relationship with BWS, and they do not have his Brain Fingerprinting technology.

3.113 Based upon information and belief and according to Brain Fingerprinting expert ██████, any attempt to apply Ika Parties' Counterfeit Product in law enforcement, counterterrorism, or intelligence operations would have "disastrous consequences." In his affidavit ███████████,

████ stated the following: "My experience in applying the genuine Farwell Brain Fingerprinting in collaboration with Dr. Farwell and agencies of ████ leads me to the conclusion that if Ika and BWS ever succeeded in selling their counterfeit technology and training by unqualified personnel to any major intelligence, counterterrorism, or law enforcement agency; this would be a major threat to national security and justice. There is no evidence that BWS' and Ika's counterfeit technology works at all, let alone with high accuracy. Their 'trainers' are not qualified to practice forensic neuroscience, specifically Brain Fingerprinting, let alone to train others to do so. Applying such an unproven and untested technology, and attempting to apply training by such unqualified personnel, would in my opinion be likely to have disastrous consequences for counterterrorism, counterintelligence, and law enforcement efforts."

3.114 On or about May 10, 2017, Dr. Farwell received the first of a series of communications regarding the science and technology of Brain Fingerprinting that Dr. Farwell invented and developed from Jose Kuruvilla ("Kuruvilla"), CEO of Mainland Security, Inc., with headquarters in Hong Kong and Thailand. Mr. Kuruvilla informed Dr. Farwell of the following facts.

3.115 Based upon information and belief and according to Kuruvilla, on or about May 1, 2017, Ika Parties Ika, BWS LLC, and/or BWS Inc attempted to defraud the government of Thailand by selling them their counterfeit technology and associated training by unqualified personnel.

3.116 Based upon information and belief and according to Kuruvilla, Ika gave a demonstration of their counterfeit technology in which he purported to be measuring and analyzing brainwaves and achieving an accurate result with Ika Parties' Counterfeit Product, which Ika misrepresented as genuine Brain Fingerprinting.

3.117 Based upon information and belief and according to Kuruvilla, after placing a headset on a subject and running the software, Ika told the government of Thailand that they had collected sufficient data, and now they would analyze the data.  He said the results of the analysis of the data they had just collected would appear on the screen.

3.118 Based upon information and belief and according to Kuruvilla, Kuruvilla observed that Ika did not attempt to analyze the data as he falsely represented to the government he was doing.  Instead, he simply accessed and displayed a previously developed graphics file that appeared to show the results of a brainwave test.  Ika fraudulently represented that the previously produced graphics file was actually a representation of the results of computer analysis of the data that they had just purportedly collected. This is documented in Exhibit AT.

3.119 Based upon information and belief and according to Kuruvilla, Ika told Kuruvilla that they had bought the system they were presenting from Dr. Farwell and that they were still paying royalties to Dr. Farwell.  Dr. Farwell knows both of these statements to be false and fraudulent. Neither of those events ever happened.

3.120 Based upon information and belief and according to Kuruvilla, Ika lied to Kuruvilla in an attempt to sell the Ika Parties' Counterfeit Product. In a phone conversation with Dr. Farwell on or about May 12, 2019, Kuruvilla stated, "When people are lying I don't need a lie detector.  I told my people we will not do business with [Ika Parties Ika, BWS LLC, and/or BWS Inc]."

3.121 On or about June 28, 2017, Dr. Farwell received the first of a series of communications regarding the science and technology of Brain Fingerprinting that Dr. Farwell invented and developed from Bolaji Oye ("Oye"), Chief Operating Officer of Piqure Solutions LTD in Nigeria. He informed Dr. Farwell of the following facts:

3.122 Based upon information and belief and according to Oye, Ika Parties Ika, BWS LLC, and/or BWS Inc attempted to defraud the Nigerian Defense Intelligence Agency by selling them Ika Parties' Counterfeit Product and associated training by unqualified personnel.

3.123 Based upon information and belief and according to Oye, the Nigerian NSA, the Nigerian Defense Intelligence Agency, and Oye detected and thwarted the attempted fraud by Ika Parties Ika, BWS LLC, and/or BWS Inc.

3.124 Oye stated the following in an email to Dr. Farwell on July 8, 2017. "Just for your information, the Nigerian Government is about to be fleeced by Brainwave Science...This meeting I am having this morning will be the start of pulling the plug on BrainWave Science in Nigeria. We have already contacted the Nigerian NSA on this matter, but we are also approaching the DEFENCE INTELLIGENCE AGENCY (institution that wants to buy the item) to make them aware that BRAINWAVE SCIENCE [BWS Inc.] is all a con." The Nigerian government recognized these facts, and did not purchase Ika Parties' Counterfeit Product.

# Exhibits

The following are brief descriptions of each of the Exhibits hereto, along with links where the Exhibits can be accessed online.

## A. List of All Exhibits, With Links

https://www.dropbox.com/sh/29vhnwa7g3fjgvl/AAD-h6NmHlw9ePesIIQ9h5L0a?dl=0

**or**

https://farwellbrainfingerprinting.com/pdf/Ex/List_of_Exhibits_FBI_Report_On_Suspects_Krishna_Ika_and_Paul_Tomkins2114.pdf

## B. All Exhibits in a Single Document

https://www.dropbox.com/sh/29vhnwa7g3fjgvl/AAD-h6NmHlw9ePesIIQ9h5L0a?dl=0

**or**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibits_FBI_Report_On_Suspects_Krishna_Ika_and_Paul_Tomkins2114.pdf

## C. Individual Exhibits With Separate Links

(The below list is the same as the list in the above document "List of All Exhibits With Links")

**Exhibit A**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_A_CorrectionUSPTO-BWS-ASI.pdf

A correction filed at the USPTO that informed the USPTO that the Draft Documents were filed in error and did not constitute patent assignments.

**Exhibits B, C, D, and E**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_B_AssignmentRecordationForm3OldUSPatentsAsRecordedUSPTO.pdf

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_C_PatentAssignmentASI-LST-OldUSPatents1501Signed.pdf

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_D_AssignmentRecordationFormCurrentUSPatent7689272AsRecordedUSPTO.pdf

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_E_PatentAssignmentASI-LST-CurrentUS-UKPatents1502Signed.pdf

March 15, 2015, Assignment of the three expired Patents from American Scientific Innovations, LLC to Life Science and Technology, LLC.  Said assignment was properly executed by Ben Bryant, the General Manager and sole authorized signatory for ASI, and recorded with the US Patent and Trademark Office.

**Exhibit F**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_F_BrainwaveScienceLLCRevisedAgreement-05-18-2013-SignedEditable.pdf

Brainwave Science, LLC Limited Liability Company agreement

**Exhibit G**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_G_LettertoFarwell-Section18eiNotice-VotetoRemove.pdf

A letter in which Ika's attorney Moreno told Dr. Farwell of Ika's intent to hold a meeting to unilaterally grant himself the authority to remove the Minority Shareholders and misappropriate the equity of the Minority Shareholders in Brainwave Science, LLC to himself.

**Exhibit H**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_H_DrFarwellReplyToNoticeOfAmendmentAndLetterToFarwellSection18-1603.pdf

Dr. Farwell's reply to Ika's attorney's letter (Exhibit G) in which Dr. Farwell declined to participate in Ika's proposed meeting, as doing so would involve committing a felony.

**Exhibit I**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_I_NoticeofAmendmenttoOperatingAgreementwExhibits.pdf

A letter in which Ika's attorney Moreno notified Farwell that Ika had held a meeting and had granted himself the authority to remove the Minority Shareholders in Brainwave Science, LLC and misappropriate the Minority Shareholders' equity to himself without consent or due process.

**Exhibit J**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_J_FarwellEmailReplyToMorenoNoticeOfAmendment1901.pdf

A letter in which Dr. Farwell replied that Ika, in taking the actions described by Ika's attorney Moreno in Exhibit I, had committed a number of felonies.

**Exhibit K**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_K_MemberRemovalPursuantToSection81OfTheOperatingAgt.pdf

A letter from Ika's attorney Moreno to Dr. Farwell in which he stated that Ika had removed the Minority Shareholders from Brainwave Science, LLC and had not paid them any compensation for their equity.

**Exhibit L**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_L_FarwellMorenoFinalFewEmails1601.pdf

Emails between Dr. Farwell and Brainwave Science, LLC's attorney Moreno regarding Ika's removal of the Minority Shareholders in Brainwave Science, LLC and misappropriation of their equity to himself without consent or due process.

**Exhibit M**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_M_UnexecutedDraftDocumentASI-BWS.pdf

On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a preliminary draft document for intellectual property (the "Unexecuted ASI-BWS Draft Document," Exhibit M, referred to in Brainwave Science, Inc.'s pleadings as the "Nunc Pro Tunc Intellectual Property Assignment"). The purpose of this document was to outline the terms of an intellectual property assignment that could be executed by the authorized parties after all of the parties had reached an agreement on the compensation that would be exchanged for the assignment of intellectual property. Ika's attorney erroneously recorded said document as a "patent assignment," even though it was not executed by or even known to the undisputed patent owner at the time, American Scientific Innovations, LLC, and contained no compensation flowing to the purported "assignor." This erroneous recording was later corrected at the USPTO by a document executed by Dr. Farwell and Brain Fingerprinting Laboratories, Inc.

**Exhibit N**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_N_PatentDocBFL-BWS.pdf

On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a second preliminary draft document for intellectual property (the "BFL – BWS Draft Document," Exhibit N). The purpose of this document was to outline the terms of an intellectual property assignment that could be executed by the authorized parties after all of the parties had reached an agreement on the compensation that would be exchanged for the assignment of intellectual property. Ika's attorney erroneously recorded said document as a "patent assignment," even though it was not executed by or even known to the undisputed patent owner at the time, American Scientific Innovations, LLC, and contained no compensation flowing to the purported "assignor." The apparent "assignor," Brain Fingerprinting Laboratories, Inc., never had and never claimed any interest in the Patents, and thus could not assign any interest to BWS LLC (or anyone). This erroneous recording was later corrected at the USPTO by a document executed by Dr. Farwell and Brain Fingerprinting Laboratories, Inc.

**Exhibit O**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_O_PatentDocLF-BWS.pdf

On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a third preliminary draft document for intellectual property (the "LF – BWS Draft Document," Exhibit O). The purpose of this document was to outline the terms of an intellectual property assignment that could be executed by the authorized parties after all of the parties had reached an agreement on the compensation that would be exchanged for the assignment of intellectual property. Ika's attorney erroneously recorded said document as a "patent assignment," even though it was not executed by or even known to the undisputed patent owner at the time, American Scientific Innovations, LLC, and contained no compensation flowing to the purported "assignor." The apparent "assignor," Dr. Farwell at this time had no ownership interest in the Patents, and thus could not assign them to BWS LLC (or anyone). This erroneous recording was later corrected at the USPTO by a document executed by Dr. Farwell and Brain Fingerprinting Laboratories, Inc.

**Exhibit P**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_P_AssignmentPatents1-3LF-ASI202.pdf

Patent assignment from Dr. Farwell to American Scientific Innovations, LLC (ASI). On or about January 24, 2003, Dr. Lawrence A. Farwell, inventor, assigned his interest in the Brain Fingerprinting Patents and all associated "Brain Fingerprinting" intellectual property to ASI.

**Exhibit Q**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_Q_AssignmentPatent4LF-ASI1001.pdf

On or about April 2, 2010, Dr. Lawrence A. Farwell, inventor, assigned his interest in US Patent 7,689,272 and all associated intellectual property to American Scientific Innovations, LLC.

**Exhibit S\***

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_S_DifferencesBetweenFarwellBrainFingerprintingAndBWS1905.pdf

Differences between genuine Farwell Brain Fingerprinting and Brainwave Science Inc.'s counterfeit product.

**Exhibit T**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_T_SummaryOfFraudOnBWSWebsiteGenNK1906.pdf

Summary of fraud on Brainwave Science, Inc.'s website as of December 5, 2018. (Note: Much of this material has since been removed.)

**Exhibit U**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_U_FraudulentClaimsOnCurrentBWSWebsiteGenNK1907.pdf

Fraudulent claims on Brainwave Science, Inc.'s website as of December 5, 2018. (Note: Much of this material has since been removed.)

**Exhibit V**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_V_BrainwaveScienceWebsiteArchivesWaybackMachine1901.pdf

Summary of previous versions of Brainwave Science, LLC's and Brainwave Science, Inc.'s website as per the Wayback Machine (http://www.wayback.com/).

**Exhibit W**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_W_BrainwaveScienceWebsiteBoardOfDirectors2016-06-23.pdf

Brainwave Science, LLC Board of Directors according to BWS LLC's website June 23, 2016: Krishna Ika, Dr. Lawrence Farwell, Ravi Ika, and Subu Kota.

**Exhibit X**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_X_BrainwaveScienceWebsiteBoardOfDirectors2016-07-08.pdf

Brainwave Science, LLC Board of Directors according to BWS LLC's website July 8, 2016: Krishna Ika, Dr. Lawrence Farwell, Ravi Ika, and Subu Kota.

**Exhibit Y**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_Y_BrainwaveScienceWebsiteBoardOfDir
ectors2016-07-24.pdf

Brainwave Science, LLC Board of Directors according to BWS LLC's website July 24, 2016:
Krishna Ika, Dr. Lawrence Farwell, General Michael Flynn, Brian McCauley, and Subu Kota.

**Exhibit Z**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_Z_BrainwaveScienceWebsiteBoardOfDir
ectors2016-08-24.pdf

Brainwave Science, LLC Board of Directors according to BWS LLC's website August 24, 2016:
Krishna Ika, Dr. Lawrence Farwell, and Subu Kota.

**Exhibit AA**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AA_FraudClaimsTrailBrainwaveCompan
yBostonBusinessJournal1902.pdf

*Boston Business Journal*, 01/05/2018, Brainwave Science: "Fraud claims trail 'brainwave'
company tied to Michael Flynn."

**Exhibit AB**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AB_BloombergOnFlynnArticle1602.pdf

*Bloomberg*, 12/23/2016, Brainwave Science: "Trump Aide Partnered With Firm Run by Man With
Alleged KGB Ties."

**Exhibit AC**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AC_Michael_Flynn_had_role_in_firm_co
-led_by_man_who_tried_to_sell.pdf

*The Washington Post / AP / Chicago Tribune,* 12/21/2016, Brainwave Science: "Michael Flynn
had role in firm co-led by man who tried to sell material to the KGB."

**Exhibit AD**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AD_BenBryantAffidavitNo2.pdf

Sworn affidavit of Ben Bryant, President and General Manager of American Scientific
Innovations, LLC (ASI), stating that Dr. Farwell assigned the Brain Fingerprinting Patents to ASI,
ASI never assigned said Patents to Brainwave Science LLC or Brainwave Science Inc., and ASI
assigned said Patents to Life Science and Technology, LLC, and Dr. Farwell has never been a
member, director, executive, officer, agent, or employee of ASI, and has never had any real or
apparent authority to bind or represent ASI.

**Exhibit AE**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AE_FarwellAffidavitBWSvsLSTIMotion
ToInterveneSignedNotarized1902.pdf

Sworn affidavit of Dr. Lawrence Farwell stating that he is not a member, equity holder, officer, employee,
board member, agent, or representative of American Scientific Innovations, LLC or Life Science and
Technology, LLC.

40

**Exhibit AF**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AF_KirkendorferAffidavitResizedFromP NG1902.pdf

Sworn affidavit of Ronald Kirkendorfer stating that Dr. Farwell is not a member, equity holder, officer, employee, board member, agent, or representative of Life Science and Technology, LLC.

**Exhibit AG**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AG_Dr_Lawrence_Farwell_Brain_Finger printing_Field_Studies.pdf

Farwell, L.A.., Richardson, D.C., & Richardson, G.M. (2013). Brain fingerprinting field studies comparing P300-MERMER and P300 brainwave responses in the detection of concealed information. DOI 10.1007/s11571-012-9230-0, *Cognitive Neurodynamics 7*(4): 263-299

**Exhibit AH**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AH_Farwell_et_al_2014_Brain_Fingerpri nting_US_Navy_Study.pdf

Farwell L.A., Richardson D.C., Richardson G.M .and Furedy J.J. (2014). Brain fingerprinting classification concealed information test detects US Navy military medical information with P300. *Frontiers in Neuroscience 8*:410. doi: 10.3389/fnins.2014.00410

**Exhibit AI**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AI_Dr-Lawrence-Farwell-Brain-Fingerprinting-P300-MERMER-Review.pdf

Farwell, L.A. (2012). Brain fingerprinting: a comprehensive tutorial review of detection of concealed information with event-related brain potentials, *Cognitive Neurodynamics 6*:115-154, DOI 10.1007/s11571-012-9192-2.

**Exhibit AJ**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AJ_Farwell-Donchin-1991-Psychophysiology-Brain-Fingerprinting.pdf

Farwell, L. A. and Donchin, E. (1991). The Truth Will Out: Interrogative Polygraphy ("Lie Detection") With Event-Related Brain Potentials. Psychophysiology, 28:531-547.

**Exhibit AK**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AK_LieDetectionEncyclopediaOfForensi cSciencesFarwellCorrectBFL.pdf

Farwell, L.A. (2013). Lie Detection. In *Encyclopedia of Forensic Sciences*, 2nd Edition.  Oxford: Elsevier.

**Exhibit AL**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AL_Dr-Lawrence-Farwell-Brain-Fingerprinting-Detection-of-Concealed.pdf

Farwell, L. (2014). Brain Fingerprinting: Detection of Concealed Information, in *Wiley Encyclopedia of Forensic Science*, A. Jamieson and A.A. Moenssens, eds. Chichester: John Wiley. DOI: 10.1002/9780470061589.fsa1013. Published 16th June 2014

**Exhibit AM**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AM_Farwell-Smith-Journal-of-Forensic-Sciences-Brain-Fingerprinting.pdf

Farwell, L. A. and Smith, S. S. (2001).  Using Brain MERMER Testing to Detect Concealed Knowledge Despite Efforts to Conceal.  *Journal of Forensic Sciences 46*,1: 135-143.

**Exhibit AN**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AN_OpenCourtFarwellMakeig-dr-larry-farwell-brain-fingerprinting.pdf

Farwell, L.A. and Makeig, T.H. (2005), Farwell Brain Fingerprinting in the case of Harrington v. State.  *Open Court, X [10]*:3, 7-10. Indiana State Bar Association, September 2005.

**Exhibit AO**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AO_Harrington_v_State_Iowa_Court_Opinion_and_Order.pdf

The Harrington case in which Farwell Brain Fingerprinting and Dr. Farwell's testimony on it were ruled admissible as scientific evidence in court. *Harrington v. State* (2001) Case No. PCCV 073247(Iowa District Court for Pottawattamie County, 5 March 2001

**Exhibit AP**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AP_Time-magazine-dr-larry-farwell-brain-fingerprinting-dr-lawrence-farwell.pdf

*TIME* magazine article announcing that Dr. Lawrence Farwell was selected to the TIME 100 Top Innovators, the "Picassos or Einsteins of the 21st Century."

**Exhibit AR***

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AR_RomfoloAffidavitEditable1904.pdf

Affidavit of General Donald Romfolo of South Africa regarding fraud by Ika and Brainwave Science, Inc.

██████████

████████████████████████████████████████████

████████████████████████████████

**Exhibit AT**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AT_JoseKuruvillaEmailReFraudByIkaBrainwaveScience2019-05-13BriefWithIntro.pdf

Communications from Jose Kuruvilla of Thailand regarding fraud by Ika and Brainwave Science, Inc.

**Exhibit AU**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AU_TomkinsLibelousLetter-BrainwaveScienceVsFarwellYadav.pdf

Letter from Tomkins to Dr. Farwell's client Forensic Science Laboratory of Delhi, India containing multiple false and defamatory statements about Dr. Farwell as well as false accusations and threats against a third party.

**Exhibit AV**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AV_StockPurchaseAgreement_EHC_BFL_07-07-2014LFSigned.pdf

Stock purchase agreement noting equity of Dr. Farwell and Brain Fingerprinting Laboratories, Inc. in Brainwave Science, LLC, equity that Ika later misappropriated and transferred to himself without compensation or due process.


# Exhibits to Supplement to FBI Report, March 29, 2022

**Exhibit AW**

Affidavit by Krishna Ika presenting evidence of perjury, as described in the Supplement.


*Note: There is no Exhibit R. There is no Exhibit AQ.

**Exhibit AAK**



مركز السمات للاستشارات الأمنية

Dr Lawrence A. Farwell It has come to my attention that a company called Brainwave Science run by an Indian named Krishna Ika has claimed and submitted a false and forged "certificate" on his company's website, https://brainwavescience.com/testimonial/.

Here, I confirm that I have not dealt with this company and have never approved Brainwave Science or its iCognative product.

I have worked with Dr Lawrence A. Farwell, inventor of brain fingerprinting, to carry out his invention of brain fingerprinting for Farwell. Farwell Brain has endorsed Fingerprinting in private meetings, public presentations, and television appearances. The original Farwell Brain Fingerprinting technology is the only technology I have endorsed and adopted

Dr AdIL AL Eid



General Manager of

Semaat  security consulting Center

tell + 966503281774  email aeid123@gmail.com   Saudi Arabia Riyadh

Case 1:21-cv-04402-BMC-RER   Document 80   Filed 08/22/22   Page 94 of 175 PageID #: 841

**Exhibit BAA**

Name: Lawrence A Farwell | DOB: 6/10/1949 | MRN: 60007403472 | PCP:

## Progress Notes

### Brian Kenneth Snitily at 05/17/22 1445

**Imaging Note:**

**Order:** XR L spine 4 view and left lateral hip

**Indication:** low back and hip pain

**Results:**
Images from a XR L spine 4 view and left lateral hip  performed 05/17/22
 were independently reviewed by me with the patient in clinic today.  They show mild
hip joint space degeneration. No fracture. There is multilevel disc degeneration, severe
at L1-2.

**Impression:**
As above

### Brian Kenneth Snitily at 05/17/22 1445

**HISTORY OF PRESENT ILLNESS:**

Lawrence A Farwell is a 72 y.o. male who presents with a chief complaint of left hip
pain.  He was referred by Dr. Kirby.

Symptoms onset:   4/30/22.
Was there an injury:  Was doing a roundhouse kick and landed on the left leg and
pivoted.
Symptoms are described as:   Aching with sharp twinges, stabbing
Intensity:  3-8/10.
Location of symptoms: left groin
Referral of symptoms:  left anterior proximal thigh
Symptoms are exacerbated by:  Stairs, sit <>stand, hip flexion, walking.
Symptoms are alleviated by:   rest.
Prior treatments have included:   NSAIDs, rest, activity modification.
Associated symptoms:  The patient denies significant low back pain, distal leg pain,
numbness or focal weakness

He was having some back pain but this resolved relatively quickly

History reviewed. No pertinent past medical history.

**Past Surgical History:**

| Procedure | Laterality | Date |
|---|---|---|
| • APPENDECTOMY | | |

• HERNIA REPAIR

**Medications:**

Current Outpatient Medications:
•  diazePAM (VALIUM) 5 mg tablet, TAKE 1 TABLET BY MOUTH ONCE EVERY EVENING AT BEDTIME AS NEEDED FOR MUSCLE SPASM, Disp: , Rfl:
•  docusate sodium (COLACE) 100 mg capsule, Take 100 mg by mouth 2 times daily., Disp: , Rfl:
•  HYDROcodone-acetaminophen (NORCO) 5-325 mg per tablet, TAKE 1 TABLET BY MOUTH ONCE EVERY 8 HOURS AS NEEDED FOR PAIN OR MODERATE PAIN FOR 3 DAYS, Disp: , Rfl:
No current facility-administered medications for this visit.

**Allergies:**
No Known Allergies

**Family History**:
His family history includes Cancer in his brother and father; Gout in his father.
Please see the electronic medical records for further details, which was reviewed.

**Social History:**
**Social History**

Socioeconomic History
 • Marital status:           Single
      Spouse name:       Not on file
 • Number of children:     Not on file
 • Years of education:      Not on file
 • Highest education level:   Not on file
Occupational History
 • Not on file
Tobacco Use
 • Smoking status:        Never Smoker
 • Smokeless tobacco:     Never Used
Substance and Sexual Activity
 • Alcohol use:          Not Currently
 • Drug use:            Not Currently
 • Sexual activity:        Not on file
Other Topics            Concern
 • Not on file
Social History Narrative
 • Not on file

**Social Determinants of Health**

Financial Resource Strain: Not on file
Food Insecurity: Not on file
Transportation Needs: Not on file
Physical Activity: Not on file

Case 1:21-cv-04402-BMC-RER   Document 80   Filed 08/22/22   Page 96 of 175 PageID #: 843

Stress: Not on file
Social Connections: Not on file
Intimate Partner Violence: Not on file

**REVIEW OF SYSTEMS:** The patient medical history questionnaire was reviewed and a 12-point review of systems was negative except for what is mentioned in the history of present illness. Further detail below.

Constitutional: No additions to above history
Eyes, Ears, Nose, Throat: No additions to above history
Cardiovascular: No additions to above history
Respiratory: No additions to above history
GI: No additions to above history
GU: No additions to above history
Skin/Neuro: No additions to above history
Endocrine/Heme/Lymph: No additions to above history
Immunologic: No additions to above history
Psychiatric: No additions to above history
Neurologic:  No additions to above history
Musculoskeletal:  No additions to above history

**PHYSICAL EXAMINATION:**

There is no height or weight on file to calculate BMI.
GEN:  Patient appears normally dressed and is in no distress.  Appears stated age. They are cooperative.
HEENT:  Sclera nonicteric.  Conjunctiva appear normal.  Hearing intact and participates in conversational speech without apparent difficulty.
RESPIRATORY:  Respirations are unlabored with no increased work of breathing.
CV:  Pulses are regular rate and rhythm to palpation of radial pulse.  Capillary refill is normal.
ABDOMEN: Nondistended.
EXTREMITIES:  There is no lymphedema in the distal extremities.
SKIN:  There is no rash or other lesion present on visible skin of the upper or lower limbs, neck, back or face.
PSYCH:  Alert and oriented to person, place, time and situation.  Mood is stable and affect is pleasant.  Behavior is appropriate.  Language comprehension is intact and speech is fluent.
MSK:
L-spine/pelvis/left hip
    Inspection: no atrophy, no asymmetry, no deformity, normal posture.
    Palpation: no spinous process tenderness, no paraspinal tenderness, no deep
        buttock tenderness, no posterior superior iliac spine tenderness, no iliac crest
        tenderness, no greater trochanteric tenderness
    ROM:
    -    flexion L-spine Normal without pain
    -    extension L-spine Normal without pain
    -    flexion hip Decreased with pain
    -    internal rotation hip Decreased with pain
    -    external rotation hip Decreased with pain

    Special Tests (a positive test recreates usual pain):
    • Seated slump test negative

Case 1:21-cv-04402-BMC-RER   Document 80   Filed 08/22/22   Page 97 of 175 PageID #: 844

- Log roll positive
- FADIR positive
- Stinchfield resisted hip flexion test positive
- Patrick's / FABER positive

**REVIEW OF IMAGING:**
Images from a XR L spine 4 view and left lateral hip  performed 05/17/22
 were independently reviewed by me with the patient in clinic today.  They show mild
hip joint space degeneration. No fracture. There is multilevel disc degeneration, severe
at L1-2.

Images from a MRIof the L spine  on 5/5/22 were independently reviewed and
interpreted by myself today. They show multilevel degenerative changes. There is a
small left central disc protrusion at T12-L1. There is severe disc degeneration at L1-2
with foraminal stenosis. There is moderate central stenosis at a few level, approaching
severe at L3-4 with moderate/severe foraminal stenosis at the left L4-5 level. The
images and findings were discussed with the patient.

**IMPRESSION:**
1. left hip pain
2. left hip impingement and likely labral tear
3. Lumbar spondylosis and stenosis

**ASSESSMENT/PLAN:**
Lawrence A Farwell is a 72 y.o. male who presents with left hip pain. Based on their
history, physical exam and imaging, their complaint is most consistent with a hip
impingement with probable underlying labral tear. Other possible causes include
atypical presentation of an upper lumbar radiculopathy. Treatment options were
discussed including oral medications, activity modification, physical therapy, further
diagnostic imaging and injections.  After discussing options and having all questions
answered, the patient would like to proceed with the following:

1. MRI of the left hip with arthrogram.  He has had radiographs performed and has
tried conservative treatments without improving of their condition, including:
medications, RICE, physical therapy.  This will provide important diagnostic information
and dictate future treatment.  We will discuss the results in a follow up visit.
2. US guided left hip joint injection
3. Activity modifications discussed

EDUCATION: The above assessment and plan was discussed with the patient in
detail. All patient questions were answered.

FOLLOW UP: for MRI review. The patient was instructed to call with any questions or
concerns

Brian Snitily, M.D.

Procedure: **left hip joint injection under ultrasound guidance**

Case 1:21-cv-04402-BMC-RER   Document 80   Filed 08/22/22   Page 98 of 175 PageID #: 845

Indication/Diagnosis:  left hip pain

Referring provider:  n/a

Physician: Dr. Snitily

Pre-procedure Pain Score:  9/10

Post-Procedure Pain Score:  3/10

Pre-Procedure Provocative Tests:  walking

Post-Procedure Provocative Tests:  same

**Procedure Note:  Intra-articular hip injection, left side**
The risks and alternatives of the procedure were discussed with the patient who agreed to proceed.

Because the low accuracy rate of palpation guided hip injections reported in the literature and because of the need to ensure that the medication is placed within the hip capsule to ensure effectiveness and to maintain diagnostic specificity, as well as reduce adverse outcomes, ultrasound guidance was used for medical necessity to ensure proper needle placement.  We elected to us ultrasound rather than fluoroscopic guidance for a number of logistical reasons.

The anterior aspect of the hip and proximal thigh was prepped with chloroprep solution.   His skin and underlying soft tissues were anesthetized with the dosages listed below. Under ultrasound, using a curvilinear probe, the neurovascular structures were identified medial to the target.  The hip joint space was identified in a long axis view.  Taking care to avoid neurovascular structures a 22 gauge 3½-inch needle was advanced into the joint space using an in-plane technique. No fluid was withdrawn. The injectate listed below was injected without difficulty.   The needle was withdrawn, the skin was cleaned and a Band-aid was placed over the injection site.  There were no immediate complications.

<u>Local anesthetic</u>:
2mL of 1% lidocaine

<u>Injectate</u>:
1mL of triamcinolone (40mg/mL)
4mL of 0.5% bupivacaine

Sterile gloves, a sterile transducer cover, and sterile ultrasound gel were used for the injection. Following the procedure, He reported improved symptoms.  No bleeding was seen.  He had no change in neurologic status after the procedure and tolerated the procedure well, and the procedure was technically straight-forward and successful.

Post injection instructions were provided to the patient.  He will call with any additional questions or concerns regarding the procedure performed today.

Brian Snitily, M.D.

Case 1:21-cv-04402-BMC-RER   Document 80   Filed 08/22/22   Page 99 of 175 PageID #: 846

**Exhibit BAB**

# AFTER VISIT SUMMARY



**Lawrence A. Farwell**  DoB: 6/10/1949  📅 5/17/2022  2:45 PM  📍 OPA FIRST HILL 206-386-2600

## What's Next
You currently have no upcoming appointments scheduled.

## Orders Completed Today & Future Orders to be Completed

Normal Orders This Visit

**PR ARTHROCENTESIS ASPIR&/INJ MAJOR JT/BURSA W/ US [20611 CPT(R)]**

**XR Hip Left 1 Vw [IMG6821 Custom]**

**XR Lumbar Spine 4 + Vw [IMG2261 Custom]**

# Recent Results

## Results
**None**

# Your Information on File

**Please review.  If corrections are required, please contact the office.**

## Allergies
No active allergies

## Intolerance
No active intolerances/contraindications

## Today's Visit

You saw Brian Kenneth Snitily, MD on Tuesday May 17, 2022. The following issues were addressed:
- Lumbar pain
- Left hip pain
- Other spondylosis with radiculopathy, lumbar region

### 🔬 Medications Given
triamcinolone acetonide (KENALOG-40) Last given at 3:53 PM

## MyChart®

**Have you heard about MyChart?**
MyChart is a free service that gives you secure online access to your medical information.  For more information about MyChart go to: https://wamt.myonlinechart.org/affiliate

## COVID 19 Instructions

The CDC provides the most up-to-date information in multiple languages about signs, symptoms and risk factors associated with COVID-19 and how to prevent its spread.  Please visit https://www.cdc.gov/coronavirus/2019-ncov/index.html to address any questions you might have.  For information about local COVID-19 infection prevention standards, infection rates, hospitalizations and vaccinations contact your local or state department of health.

# Your Medication List  as of May 17, 2022  4:52 PM

ⓘ Always use your most recent med list.

**diazePAM** 5 mg tablet
Commonly known as: VALIUM

TAKE 1 TABLET BY MOUTH ONCE EVERY EVENING AT BEDTIME AS NEEDED FOR MUSCLE SPASM

**docusate sodium** 100 mg capsule
Commonly known as: COLACE

Take 100 mg by mouth 2 times daily.

**HYDROcodone-acetaminophen** 5-325 mg per tablet
Commonly known as: NORCO

TAKE 1 TABLET BY MOUTH ONCE EVERY 8 HOURS AS NEEDED FOR PAIN OR MODERATE PAIN FOR 3 DAYS

# Thank You

## Thank you

Thank you for visiting our clinic today. Soon you may receive a patient satisfaction survey by mail or by email. The questions on the survey relate to your most recent visit. We always want to provide you excellent care and the best experience possible. Your input will help us learn what we are doing well and how we can improve. Thank you for taking the time to complete the survey.

Case 1:21-cv-04402-BMC-RER   Document 80   Filed 08/22/22   Page 103 of 175 PageID #: 850

**Exhibit BAC**

Name: Lawrence A Farwell | DOB: 6/10/1949 | MRN: 60007403472 | PCP:

## Telephone Encounter

MA Kiara M at 05/20/22 1151

Patient called to give follow up on how he felt after having a left hip injection on 5/17/22. Patient stated that for a few hours after the injection he noticed the pain to be significantly less and then after that he has noticed that it has started decreasing as time continues on.

MyChart® licensed from Epic Systems Corporation © 1999 - 2022

**Exhibit BAD**

Name: Lawrence A Farwell | DOB: 6/10/1949 | MRN: 60007403472 | PCP:

## AFTER VISIT SUMMARY



**Lawrence A. Farwell**  DoB: 6/10/1949

🗓 5/20/2022   📍 OPA FIRST HILL 206-386-2600

## What's Next

You currently have no upcoming appointments scheduled.

# Recent Results

## Results

**None**

# Your Information on File

**Please review.  If corrections are required, please contact the office.**

## Allergies

No active allergies

## Intolerance

No active intolerances/contraindications

## COVID 19 Instructions

The CDC provides the most up-to-date information in multiple languages about signs, symptoms and risk factors associated with COVID-19 and how to prevent its spread.  Please visit https://www.cdc.gov/coronavirus/2019-ncov/index.html to address any questions you might have.  For information about local COVID-19 infection prevention standards, infection rates, hospitalizations and vaccinations contact your local or state department of health.

Case 1:21-cv-04402-BMC-RER   Document 80   Filed 08/22/22   Page 106 of 175 PageID #: 853

# Your Medication List as of May 20, 2022 11:59 PM

ⓘ Always use your most recent med list.

| | |
|---|---|
| **diazePAM** 5 mg tablet<br>Commonly known as: VALIUM | TAKE 1 TABLET BY MOUTH ONCE EVERY EVENING AT BEDTIME AS NEEDED FOR MUSCLE SPASM |
| **docusate sodium** 100 mg capsule<br>Commonly known as: COLACE | Take 100 mg by mouth 2 times daily. |
| **HYDROcodone-acetaminophen** 5-325 mg per tablet<br>Commonly known as: NORCO | TAKE 1 TABLET BY MOUTH ONCE EVERY 8 HOURS AS NEEDED FOR PAIN OR MODERATE PAIN FOR 3 DAYS |

# Thank You

## Thank you

Thank you for visiting our clinic today. Soon you may receive a patient satisfaction survey by mail or by email. The questions on the survey relate to your most recent visit. We always want to provide you excellent care and the best experience possible. Your input will help us learn what we are doing well and how we can improve. Thank you for taking the time to complete the survey.

MyChart® licensed from Epic Systems Corporation © 1999 - 2022

**Exhibit BAE**

Name: Lawrence A Farwell | DOB: 6/10/1949 | MRN: 60007403472 | PCP:

## Progress Notes

### Brian Kenneth Snitily at 05/25/22 1315

**Identification/Chief Complaint:** Lawrence A Farwell is a 72 y.o. male who was last seen by me on 5/17/22 for left hip pain. Today, they are here for recheck and MRI review.

**History of Present Illness:**
He reports no significant change in symptoms. The pain continues to be located in the groin and anterior aspect of the left hip. The pain is aching with sharp twinges in character. Worse with walking, rotating the hip and hip flexion. The pain is 6-8/10 in general. He denies significant low back pain, distal leg pain, numbness or weakness.

I gave him a left hip injection hat gave him significant relief initially. This was 8 days ago relief.

**Interim Medical History:** Past medical history, surgical history, medications, allergies, social history and family history reviewed and any updates were documented in the electronic medical record.

**REVIEW OF SYSTEMS:** The patient medical history questionnaire was reviewed and a 12-point review of systems was negative except for what is mentioned in the history of present illness mentioned below. See below for additional details

Constitutional: No additions to above history
Eyes, Ears, Nose, Throat: No additions to above history
Cardiovascular: No additions to above history
Respiratory: No additions to above history
GI: No additions to above history
GU: No additions to above history
Skin/Neuro: No additions to above history
Endocrine/Heme/Lymph: No additions to above history
Immunologic: No additions to above history
Psychiatric: No additions to above history
Neurologic:  No additions to above history
Musculoskeletal:  No additions to above history

**PHYSICAL EXAMINATION:**
There is no height or weight on file to calculate BMI.

GEN:  Patient appears normally dressed and is in no distress.  Appears stated age. They are cooperative.
HEENT:  Sclera nonicteric.  Conjunctiva appear normal.  Neck is supple without lymphadenopathy.  Hearing intact and participates in conversational speech without apparent difficulty.
RESPIRATORY:  Respirations are unlabored with no increased work of breathing.
CV:  Pulses are regular rate and rhythm.  Capillary refill is normal.
ABDOMEN:  Nondistended.

Case 1:21-cv-04402-BMC-RER    Document 80    Filed 08/22/22    Page 108 of 175 PageID #: 855

EXTREMITIES: There is no lymphedema in the distal extremities.
SKIN: There is no rash or other lesion present on the visible skin of the upper limbs lower, limbs, neck, back or face.
PSYCH: Alert and oriented to person, place, time and situation. Mood is stable and affect is normal. Behavior is appropriate. Language comprehension is intact and speech is fluent.
MSK:
L-spine/pelvis/left hip
    Inspection: no atrophy, no asymmetry, no deformity, normal posture.
    Palpation: no spinous process tenderness, no paraspinal tenderness, no deep
        buttock tenderness, no posterior superior iliac spine tenderness, no iliac crest
        tenderness, no greater trochanteric tenderness
    ROM:
-   flexion L-spine Normal without pain
-   extension L-spine Normal without pain
-   flexion hip Decreased with pain
-   internal rotation hip Decreased with pain
-   external rotation hip Decreased with pain

    Special Tests (a positive test recreates usual pain):
- Seated slump test negative
- Log roll positive
- FADIR positive
- Stinchfield resisted hip flexion test positive
- Patrick's / FABER positive

**IMAGING:**
Images from a MRI of the left hip on 5/20/22 were independently reviewed and interpreted by myself with patient today. They show blunting of the anterosuperior labrum consistent with a tear. There is mild degeneration of the articular cartilage. No fracture.

Images from a XR L spine 4 view and left lateral hip performed 05/17/22
 were independently reviewed by me with the patient in clinic today. They show mild hip joint space degeneration. No fracture. There is multilevel disc degeneration, severe at L1-2.

Images from a MRIof the L spine on 5/5/22 were independently reviewed and interpreted by myself today. They show multilevel degenerative changes. There is a small left central disc protrusion at T12-L1. There is severe disc degeneration at L1-2 with foraminal stenosis. There is moderate central stenosis at a few level, approaching severe at L3-4 with moderate/severe foraminal stenosis at the left L4-5 level. The images and findings were discussed with the patient.

**IMPRESSION:**
1. left hip pain
2. left hip impingement and labral tear
3. Lumbar spondylosis and stenosis with possible atypical radicular pain
4. Myalgic pain

**ASSESSMENT AND PLAN:**

Case 1:21-cv-04402-BMC-RER   Document 80   Filed 08/22/22   Page 109 of 175 PageID #: 856

Lawrence A Farwell is a 72 y.o. male who presents for follow up of their left hip pain and for image review. The MRI reveals blunting of the anterosuperior labrum consistent with a tear, which is consistent with their symptoms, although his pain is greater than I would expect.  Other possible causes include an L1 radiculopathy related to the disc protrusion seen at that level. There is myalgic type pain, but this is not specific.  Again, there are no red flag signs. We went over the imaging and the natural history of this condition in detail. Treatment options were discussed again including oral medications, activity modification, physical therapy and injections including corticosteroid and PRP. After discussing options and having all questions answered, the patient would like to proceed with the following:

1. appropriate activity modifications discussed
2. Trigger point injections for myalgic pain
3. OK to start PT
4. Steroid may take up to 2 weeks to work. If no improvement, consider surgical consultation vs left L1-2 TFESI


EDUCATION: The above assessment and plan was discussed with the patient in detail. All patient questions were answered.

FOLLOW UP: PRN. The patient was instructed to call with any questions or concerns


Brian Snitily, M.D.

More than 30 minutes of  this face-to-face visit was conducted with the patient **separate from any procedure** of which greater than 50% of the time was spent counseling patient regarding abnormal results, diagnosis possibilities, treatment options, risks and benefits, prognosis and return to activities.


**Procedure: trigger point injection**

We proceeded with a trigger point injection today after discussing risks, including bruising, bleeding, infection, medication allergy.

The tender muscle knots listed below were identified. The skin was cleaned with alcohol wipes. Using a 25-gauge needle, the injectate listed below was used. The medication was placed in a fanlike distribution throughout the muscles with the goal of eliciting local twitch responses. The needle was withdrawn, the skin was cleaned, and a Band-Aid was placed over the injection site. We discussed post-injection soreness for up to a few days.

Muscles (left side):
1. Lumbar paraspinals (1 level(s))
2. Quadratus lumborum
3. Psoas
4. Piriformis
5. Gluteus maximus


Injectate:
2.6mL of 1% lidocaine

Case 1:21-cv-04402-BMC-RER   Document 80   Filed 08/22/22   Page 110 of 175 PageID #: 857

Sterile gloves were used for the injection. Following the procedure, He reported  stable symptoms.  No bleeding was seen.  He had no change in neurologic status after the procedure and tolerated the procedure well, and procedure was technically straight-forward and successful.

Post injection instructions were provided to the patient.  He will call with any additional questions or concerns regarding the procedure performed today.

MyChart® licensed from Epic Systems Corporation © 1999 - 2022

# AFTER VISIT SUMMARY



**Lawrence A. Farwell**  DoB: 6/10/1949  📅 5/25/2022  1:15 PM  📍 OPA FIRST HILL 206-386-2600

## Today's Visit

You saw Brian Kenneth Snitily, MD on Wednesday May 25, 2022. The following issues were addressed:
- Tear of left acetabular labrum, initial encounter
- Other spondylosis with radiculopathy, lumbar region
- Myalgia, other site

## What's Next

**MAY 31 2022**  CC Office Visit (Short) with Brian Kenneth Snitily, MD
Tuesday May 31 12:00 PM

OPA FIRST HILL
601 BROADWAY STE 600/700
SEATTLE WA 98122-5330
206-386-2600

## Orders Completed Today & Future Orders to be Completed

Normal Orders This Visit

**PR INJECT TRIGGER POINT, 3+ MUSCLES [20553 CPT(R)]**

# Recent Results

## Results

**None**

# Your Information on File

**Please review.  If corrections are required, please contact the office.**

## Allergies

**No active allergies**

## Intolerance
No active intolerances/contraindications


### COVID 19 Instructions
The CDC provides the most up-to-date information in multiple languages about signs, symptoms and risk factors associated with COVID-19 and how to prevent its spread.  Please visit https://www.cdc.gov/coronavirus/2019-ncov/index.html to address any questions you might have.  For information about local COVID-19 infection prevention standards, infection rates, hospitalizations and vaccinations contact your local or state department of health.




**Have you heard about MyChart?**
MyChart is a free service that gives you secure online access to your medical information.  For more information about MyChart go to:
https://wamt.myonlinechart.org/affiliate

# Your Medication List as of May 25, 2022 11:59 PM

ⓘ Always use your most recent med list.

### diazePAM 5 mg tablet
Commonly known as: VALIUM

TAKE 1 TABLET BY MOUTH ONCE EVERY EVENING AT BEDTIME AS NEEDED FOR MUSCLE SPASM

### docusate sodium 100 mg capsule
Commonly known as: COLACE

Take 100 mg by mouth 2 times daily.

### HYDROcodone-acetaminophen 5-325 mg per tablet
Commonly known as: NORCO

TAKE 1 TABLET BY MOUTH ONCE EVERY 8 HOURS AS NEEDED FOR PAIN OR MODERATE PAIN FOR 3 DAYS

# Thank You

## Thank you

Thank you for visiting our clinic today. Soon you may receive a patient satisfaction survey by mail or by email. The questions on the survey relate to your most recent visit. We always want to provide you excellent care and the best experience possible. Your input will help us learn what we are doing well and how we can improve. Thank you for taking the time to complete the survey.

Case 1:21-cv-04402-BMC-RER   Document 80   Filed 08/22/22   Page 114 of 175 PageID #: 861

**Exhibit BAG**

Name: Lawrence A Farwell | DOB: 6/10/1949 | MRN: 60007403472 | PCP:

## Progress Notes

### Brian Kenneth Snitily at 05/31/22 1200

**Identification/Chief Complaint:**  Lawrence A Farwell is a 72 y.o. male who was last seen by me on 5/25/22 for left hip pain. Today, they are here for recheck.

**History of Present Illness:**
Since I saw him last, he has been slowly getting better. There is still anterior hip region pain with referral into the thigh, but he has also been getting some more gluteal pain and shin pain at times. He is better able to straighten up and walk. He has not started PT. The pain remains at least moderate.

**Interim Medical History:**  Past medical history, surgical history, medications, allergies, social history and family history reviewed and any updates were documented in the electronic medical record.

**REVIEW OF SYSTEMS:** The patient medical history questionnaire was reviewed and a 12-point review of systems was negative except for what is mentioned in the history of present illness mentioned below. See below for additional details

Constitutional: No additions to above history
Eyes, Ears, Nose, Throat: No additions to above history
Cardiovascular: No additions to above history
Respiratory: No additions to above history
GI: No additions to above history
GU: No additions to above history
Skin/Neuro: No additions to above history
Endocrine/Heme/Lymph: No additions to above history
Immunologic: No additions to above history
Psychiatric: No additions to above history
Neurologic:  No additions to above history
Musculoskeletal:  No additions to above history

**PHYSICAL EXAMINATION:**
There is no height or weight on file to calculate BMI.

GEN:  Patient appears normally dressed and is in no distress.  Appears stated age. They are cooperative.
HEENT:  Sclera nonicteric.  Conjunctiva appear normal.  Neck is supple without lymphadenopathy.  Hearing intact and participates in conversational speech without apparent difficulty.
RESPIRATORY:  Respirations are unlabored with no increased work of breathing.
CV:  Pulses are regular rate and rhythm.  Capillary refill is normal.
ABDOMEN:  Nondistended.
EXTREMITIES:  There is no lymphedema in the distal extremities.
SKIN:  There is no rash or other lesion present on the visible skin of the upper limbs lower, limbs, neck, back or face.

PSYCH: Alert and oriented to person, place, time and situation. Mood is stable and affect is normal. Behavior is appropriate. Language comprehension is intact and speech is fluent.

MSK:

<u>L-spine/pelvis/left hip</u>

Inspection: no atrophy, no asymmetry, no deformity, normal posture.

Palpation: no spinous process tenderness, no paraspinal tenderness, no deep buttock tenderness, no posterior superior iliac spine tenderness, no iliac crest tenderness, no greater trochanteric tenderness

ROM:
- flexion L-spine Normal without pain
- extension L-spine Normal without pain
- flexion hip Decreased with pain
- internal rotation hip Decreased with pain
- external rotation hip Decreased with pain

Special Tests (a positive test recreates usual pain):
- Seated slump test negative
- Log roll positive
- FADIR positive
- Stinchfield resisted hip flexion test positive
- Patrick's / FABER positive

**IMAGING:**

Images from a MRI of the left hip on 5/20/22 were independently reviewed and interpreted by myself with patient today. They show blunting of the anterosuperior labrum consistent with a tear. There is mild degeneration of the articular cartilage. No fracture.

Images from a XR L spine 4 view and left lateral hip  performed 05/17/22  were independently reviewed by me with the patient in clinic today.  They show mild hip joint space degeneration. No fracture. There is multilevel disc degeneration, severe at L1-2.

Images from a MRIof the L spine  on 5/5/22 were independently reviewed and interpreted by myself today. They show multilevel degenerative changes. There is a small left central disc protrusion at T12-L1. There is severe disc degeneration at L1-2 with foraminal stenosis. There is moderate central stenosis at a few level, approaching severe at L3-4 with moderate/severe foraminal stenosis at the left L4-5 level. The images and findings were discussed with the patient.

**IMPRESSION:**
1. left hip pain
2. left hip impingement and labral tear
3. Lumbar spondylosis and stenosis with possible atypical radicular pain
4. Myalgic pain

**ASSESSMENT AND PLAN:**

Lawrence A Farwell is a 72 y.o. male who presents for follow up of their left hip pain. As noted before, the hip MRI reveals blunting of the anterosuperior labrum consistent with a tear, which is consistent with their symptoms, although his pain is greater than I

would expect. An L1 radiculopathy related to the disc protrusion is still a consideration. There remains myalgic type pain. Again, there are no red flag signs. We went over the imaging and the natural history of this condition in detail. Treatment options were discussed again including oral medications, activity modification, physical therapy and injections. After discussing options and having all questions answered, the patient would like to proceed with the following:

1. appropriate activity modifications discussed
2. Trigger point injections for myalgic pain. Was helpful at last treatment
3. OK to start PT
4. Consider surgical consultation vs left L1-2 TFESI based on overall trajectory

EDUCATION: The above assessment and plan was discussed with the patient in detail. All patient questions were answered.

FOLLOW UP: PRN. The patient was instructed to call with any questions or concerns

Brian Snitily, M.D.

**Procedure: trigger point injection**

We proceeded with a trigger point injection today after discussing risks, including bruising, bleeding, infection, medication allergy.

The tender muscle knots listed below were identified. The skin was cleaned with alcohol wipes. Using a 25-gauge needle, the injectate listed below was used. The medication was placed in a fanlike distribution throughout the muscles with the goal of eliciting local twitch responses. The needle was withdrawn, the skin was cleaned, and a Band-Aid was placed over the injection site. We discussed post-injection soreness for up to a few days.

Muscles (left side):
1. Lumbar paraspinals (1 level(s))
2. Quadratus lumborum
3. Psoas
4. Piriformis
5. Gluteus maximus

Injectate:
2.8mL of 1% lidocaine

Sterile gloves were used for the injection. Following the procedure, He reported stable symptoms. No bleeding was seen. He had no change in neurologic status after the procedure and tolerated the procedure well, and procedure was technically straight-forward and successful.

Post injection instructions were provided to the patient. He will call with any additional questions or concerns regarding the procedure performed today.

Case 1:21-cv-04402-BMC-RER   Document 80   Filed 08/22/22   Page 117 of 175 PageID #: 864

Miscellaneous

Miscellaneous signed by Onbase Scan Wamt at 07/27/22 0850

MyChart® licensed from Epic Systems Corporation © 1999 - 2022

# AFTER VISIT SUMMARY



**Lawrence A. Farwell** DoB: 6/10/1949 📅 5/31/2022 12:00 PM  📍 OPA FIRST HILL 206-386-2600

## Today's Visit

You saw Brian Kenneth Snitily, MD on Tuesday May 31, 2022. The following issues were addressed:
- Other spondylosis with radiculopathy, lumbar region
- Myalgia, other site
- Tear of left acetabular labrum, subsequent encounter

## What's Next

You currently have no upcoming appointments scheduled.

## Orders Completed Today & Future Orders to be Completed

Normal Orders This Visit

**PR INJECT TRIGGER POINT, 3+ MUSCLES [20553 CPT(R)]**

# Recent Results

## Results

**None**

# Your Information on File

**Please review.  If corrections are required, please contact the office.**

## Allergies

No active allergies

## Intolerance

No active intolerances/contraindications

## COVID 19 Instructions

The CDC provides the most up-to-date information in multiple languages about signs, symptoms and risk factors associated with COVID-19 and how to prevent its spread.  Please visit https://www.cdc.gov/coronavirus/2019-ncov/index.html to address any questions you might have.  For information about local COVID-19 infection prevention standards, infection rates, hospitalizations and vaccinations contact your local or state department of health.



**Have you heard about MyChart?**
MyChart is a free service that gives you secure online access to your medical information.  For more information about MyChart go to:
https://wamt.myonlinechart.org/affiliate

# Your Medication List as of May 31, 2022  1:49 PM

ⓘ Always use your most recent med list.

**diazePAM** 5 mg tablet
Commonly known as: VALIUM

TAKE 1 TABLET BY MOUTH ONCE EVERY EVENING AT BEDTIME AS NEEDED FOR MUSCLE SPASM

---

**docusate sodium** 100 mg capsule
Commonly known as: COLACE

Take 100 mg by mouth 2 times daily.

---

**HYDROcodone-acetaminophen** 5-325 mg per tablet
Commonly known as: NORCO

TAKE 1 TABLET BY MOUTH ONCE EVERY 8 HOURS AS NEEDED FOR PAIN OR MODERATE PAIN FOR 3 DAYS

# Thank You

## Thank you

Thank you for visiting our clinic today. Soon you may receive a patient satisfaction survey by mail or by email. The questions on the survey relate to your most recent visit. We always want to provide you excellent care and the best experience possible. Your input will help us learn what we are doing well and how we can improve. Thank you for taking the time to complete the survey.

#0186   Exhibit B3f

**SAFEWAY**

8196 NE State Hwy 104
Kingston, WA 98346
**(360) 297-1811**

Rx #:2756118                                   NEW

# Farwel, Law

Pickup: Urgent

**FARWELL, Lawrence**

8825 34th Ave Ne Ste L155
Quil Ceda Village, WA 98271          Phone: (206) 905-1009

**WEILER, TRACY PA-C**          Fill Date:  05/03/2022

**Hydrocodone-Acetaminophen 5-325 MG TA**
NDC:00406-0123-01    Disp. Qty:9          Refills 0
Safety Caps:Yes
This medicine is a(n) white, oblong-shaped, scored tablet
imprinted with M365.

CASH: $18.69
## COPAY: $1.07

Ins 1: PTP 0052

Call your doctor for medical advice about side effects.  You may report side
effects to FDA at 1-800-FDA-1088.
Do not flush unused medications or pour down a sink or drain.

**SAFEWAY**

8196 NE State Hwy 104
Kingston, WA 98346
**(360) 297-1811**

Rx #:4747994                                      NEW

# Farwel, Law

Pickup: Urgent

**FARWELL, Lawrence**

8825 34th Ave Ne Ste L155
Quil Ceda Village, WA 98271          Phone: (206) 905-1009

**WEILER, TRACY PA-C**                    Fill Date:  05/03/2022

**DiazePAM 5 MG TAB TEVA**
NDC:00172-3926-60      Disp. Qty:6          Refills 0
Safety Caps:Yes

**This medicine is a(n) yellow, round-shaped, scored tablet
imprinted with TEVA on one side and 3926 on the other side.**

CASH: $13.99
# COPAY: $0.18

Ins 1: PTP 0052

**Call your doctor for medical advice about side effects.  You may report side
effects to FDA at 1-800-FDA-1088.**
**Do not flush unused medications or pour down a sink or drain.**



#0186

**8196 NE State Hwy 104**
**Kingston, WA 98346**
**(360) 297-1811**

Rx #:6933016                                         NEW

# Farwel, Law

Pickup: Urgent

**FARWELL, Lawrence**

8825 34th Ave Ne Ste L155

Quil Ceda Village, WA 98271                Phone: (206) 905-1009

**WEILER, TRACY PA-C**                      Fill Date:  05/03/2022

**Naproxen 500 MG TAB GLEN**

NDC:68462-0190-01     Disp. Qty:20          Refills 0

Safety Caps:Yes                             We can call your doctor for a refill.

**This medicine is a(n) light orange, oblong-shaped, scored**
**tablet imprinted with G  32 on one side and 500 on the other**
~~side.~~

CASH: $22.69
## COPAY: $1.41

Ins 1: PTP 0052

Call your doctor for medical advice about side effects.  You may report side effects to FDA at 1-800-FDA-1088.

Do not flush unused medications or pour down a sink or drain.



**SAFEWAY**

#0186
8196 NE State Hwy 104
Kingston, WA 98346
**(360) 297-1811**

NEW

**Rx #:6933765**

# Farwel, Law

Pickup: eScript

**FARWELL, Lawrence**

8825 34th Ave Ne Ste L155

Quil Ceda Village, WA 98271

Watson, Yelena

Cyclobenzaprine HCl 10 MG TAB TEVA

NDC:00093-3422-01    Disp. Qty:42

Safety Caps:Yes

This medicine is a(n) white, round-shaped, film-coated tablet
imprinted with TV on one side and W53 on the other side.

Phone: (206) 905-1009

Fill Date:  05/09/2022

Refills 0

**CASH: $43.69**
## COPAY: $0.92

Ins 1: PTP 0052

Call your doctor for medical advice about side effects.  You may report side
effects to FDA at 1-800-FDA-1088.
Do not flush unused medications or pour down a sink or drain.

#0186

**SAFEWAY**

8196 NE State Hwy 104
Kingston, WA 98346
**(360) 297-1811**

**Rx #:6933065**                                    NEW

# Farwel, Law

Pickup: eScript

**FARWELL, Lawrence**

**8825 34th Ave Ne Ste L155**
**Quil Ceda Village, WA 98271**          Phone: (206) 905-1009

**WEILER, TRACY PA-C**                    Fill Date:  05/04/2022

**PredniSONE 20 MG TAB CADI**
**NDC:59746-0175-06      Disp. Qty:10**        Refills 0
**Safety Caps:Yes**
**This medicine is a(n) peach, round-shaped, scored tablet imprinted with TL  175.**

**CASH: $25.69**
# COPAY: $1.05

**Ins 1: PTP 0052**

Call your doctor for medical advice about side effects.  You may report side effects to FDA at 1-800-FDA-1088.
Do not flush unused medications or pour down a sink or drain.

**SAFEWAY**

8196 NE State Hwy 104
Kingston, WA 98346
**(360) 297-1811**

**Rx #:6933017**                                              NEW

# Farwel, Law

Pickup: Urgent

**FARWELL, Lawrence**

8825 34th Ave Ne Ste L155
Quil Ceda Village, WA 98271                    Phone: (206) 905-1009

**WEILER, TRACY PA-C**                         Fill Date:  05/03/2022

Lidocaine 5 % PAD NORT
NDC:16714-0177-30      Disp. Qty:30         Refills 0
Safety Caps:Yes          We can call your doctor for a refill.

**This medicine is a(n) white, rectangular-shaped transdermal
system.**

CASH: $261.69
## COPAY: $30.31

Ins 1: PTP 0052

Call your doctor for medical advice about side effects.  You may report side
effects to FDA at 1-800-FDA-1088.

Do not flush unused medications or pour down a sink or drain.

**SAFEWAY**

#0186

8196 NE State Hwy 104
Kingston, WA 98346
**(360) 297-1811**

Rx #:6933018                                        **NEW**

# Farwel, Law

                                                    **Pickup: Urgent**

**FARWELL, Lawrence**

**8825 34th Ave Ne Ste L155**
**Quil Ceda Village, WA 98271**          **Phone: (206) 905-1009**

**WEILER, TRACY PA-C**                    **Fill Date:  05/03/2022**

**Docusate Sodium 100 MG CAP MAJO**
NDC:00904-6998-60     Disp. Qty:30        **Refills 0**
Safety Caps:Yes                          We can call your doctor for a refill.
**This medicine is a(n) translucent, orange-red, oval-shaped**
**capsule imprinted with P51. (White inkSoftgels)**

                    CASH: $7.99
                    **COPAY: $7.98**

 Ins 1: DSC 0062

Call your doctor for medical advice about side effects.  You may report side
effects to FDA at 1-800-FDA-1088.
Do not flush unused medications or pour down a sink or drain.

---

*Exciting*
pharmacy services offered.

Look inside to find out more!

---



**RAYUS Radiology Poulsbo**

20700 NE Bond Road Building B
Poulsbo,WA,98370
Phone: (360-598-3141) Fax: (360-598-3431)

| | |
|---|---|
| **To:** Joshua Bailey, D.C.<br>Suite 204<br>3830 A St SE Ste 204<br>Auburn,WA,98002<br>**Phone:** (253-245-1919)<br>**Fax:** (253-351-6437) | **Name:** Lawrence Farwell<br>**MRN:** 105778601      **Referring MRN:**<br>**Phone:** \*\*\*<br>**DOB:** 06/10/1949       **Gender:** Male<br>**Exam Date:** 05/03/2022<br>**Referring Phys.:** Joshua Bailey, D.C. |

**EXAM: MR LUMBAR SPINE WITHOUT CONTRAST**

**CLINICAL INFORMATION:** Severe back pain that radiates to his left leg, injured 3 days ago.

**COMPARISON:** None.

**TECHNIQUE:** Multiplanar, multisequence images of the lumbar spine were obtained without intravenous contrast on a 3T Magnetom Verio.

**FINDINGS:**

Straightening of the normal lumbar lordosis. Heterogeneous bone marrow signal throughout the lumbar spine, likely degenerative. Marked endplate changes at L1-2 with sclerosis and mild osteophytosis. Benign intraosseous hemangioma in T12 vertebra. No significant spondylolisthesis. No acute fracture.

Near-complete disc height loss at L1-2. Partial disc desiccation and mild height loss in the lower lumbar spine.

The conus medullaris demonstrates normal signal, contour, and position. The spinal canal is congenitally narrow.

No abnormality of the cauda equina.

There is no epidural hematoma or fluid collection.

No significant paraspinal soft tissue abnormality.

Findings at specific levels:

**T12-L1:** Left paracentral disc bulge causing mild central canal stenosis. Moderate left facet arthropathy. No significant right and mild left foraminal stenosis.

**L1-2:** Near-complete disc height loss and small disc osteophyte complex causing moderate central canal stenosis. Moderate bilateral foraminal stenosis.

**L2-3:** Broad-based disc bulge and ligamentum flavum hypertrophy causing moderate central canal stenosis. Mild bilateral foraminal stenosis.

Lawrence Farwell          DOB: 06/10/1949        MR Lumbar WO (Unpaired)                    MRN #: 105778601

L3-4: Broad-based disc bulge and ligamentum flavum hypertrophy causing moderate to severe central canal stenosis.  Mild bilateral foraminal stenosis.

L4-5: Broad-based disc bulge, ligamentum flavum hypertrophy, and severe bilateral facet arthropathy causing moderate central canal stenosis.  Moderate right and moderate to severe left foraminal stenosis.

L5-S1: Small broad-based disc bulge without significant central canal stenosis.  Moderate bilateral facet arthropathy.  Moderate bilateral foraminal stenosis.

**IMPRESSION:**

Multilevel degenerative disc disease with near complete disc height loss at L1-2.  Multiple lumbar levels with disc bulges and facet arthropathy.

The spinal canal is congenitally narrow and there are degenerative changes causing moderate central canal stenosis at L1-2, L2-3, and L4-5 as well as moderate to severe central canal stenosis at L3-4.

Moderate foraminal stenosis at bilateral L1-2, right L4-5, and bilateral L5-S1.  There is moderate to severe foraminal stenosis at left L4-5.

Interpreting Physician

Dr. Jeremy Samuel Paige M.D., PH.D
*Final Report Electronically Signed:* 5/5/22
10:45 am PT



**RAYUS Radiology Poulsbo**

20700 NE Bond Road Building B
Poulsbo,WA,98370
Phone: (360-598-3141) Fax: (360-598-3431)

| | |
|---|---|
| To:  Joshua Bailey, D.C. | **Name:** Lawrence  Farwell |
| Suite 204 | **MRN:** 105778601        **Referring MRN:** |
| 3830 A St SE Ste 204 | **Phone:** *** |
| Auburn,WA,98002 | **DOB:** 06/10/1949        **Gender:** Male |
| **Phone:** (253-245-1919) | **Exam Date:** 05/03/2022 |
| **Fax:** (253-351-6437) | **Referring Phys.:** Joshua Bailey, D.C. |

## EXAM: MR LUMBAR SPINE WITHOUT CONTRAST

**CLINICAL INFORMATION:** Severe back pain that radiates to his left leg, injured 3 days ago.

**COMPARISON:** None.

**TECHNIQUE:** Multiplanar, multisequence images of the lumbar spine were obtained without intravenous contrast on a 3T Magnetom Verio.

**FINDINGS:**

Straightening of the normal lumbar lordosis.  Heterogeneous bone marrow signal throughout the lumbar spine, likely degenerative.  Marked endplate changes at L1-2 with sclerosis and mild osteophytosis.  Benign intraosseous hemangioma in T12 vertebra.  No significant spondylolisthesis.  No acute fracture.

Near-complete disc height loss at L1-2.  Partial disc desiccation and mild height loss in the lower lumbar spine.

The conus medullaris demonstrates normal signal, contour, and position.  The spinal canal is congenitally narrow.

No abnormality of the cauda equina.

There is no epidural hematoma or fluid collection.

**No significant paraspinal soft tissue abnormality.**

Findings at specific levels:

**T12-L1:** Left paracentral disc bulge causing mild central canal stenosis.  Moderate left facet arthropathy.  No significant right and mild left foraminal stenosis.

**L1-2:** Near-complete disc height loss and small disc osteophyte complex causing moderate central canal stenosis.  Moderate bilateral foraminal stenosis.

**L2-3:** Broad-based disc bulge and ligamentum flavum hypertrophy causing moderate central canal stenosis.  Mild bilateral foraminal stenosis.

Lawrence Farwell          DOB: 06/10/1949        MR Lumbar WO (Unpaired)                    MRN #: 105778601

L3-4: Broad-based disc bulge and ligamentum flavum hypertrophy causing moderate
to severe central canal stenosis.  Mild bilateral foraminal stenosis.

L4-5: Broad-based disc bulge, ligamentum flavum hypertrophy, and severe bilateral
facet arthropathy causing moderate central canal stenosis.  Moderate right and
moderate to severe left foraminal stenosis.

L5-S1: Small broad-based disc bulge without significant central canal stenosis.
Moderate bilateral facet arthropathy.  Moderate bilateral foraminal stenosis.

**IMPRESSION:**

Multilevel degenerative disc disease with near complete disc height loss at L1-2.
    Multiple lumbar levels with disc bulges and facet arthropathy.

The spinal canal is congenitally narrow and there are degenerative changes causing
    moderate central canal stenosis at L1-2, L2-3, and L4-5 as well as moderate to
    severe central canal stenosis at L3-4.

Moderate foraminal stenosis at bilateral L1-2, right L4-5, and bilateral L5-S1.  There
    is moderate to severe foraminal stenosis at left L4-5.

Interpreting Physician

Dr. Jeremy Samuel Paige M.D., PH.D
*Final Report Electronically Signed: 5/5/22*
10:45 am PT

# Seattle Radiology

Exhibit BAK

## Medical Records
## P: 206-292-7744
## F: 206-292-6375

| Recipient: | *BENN, ROBIN* | Pages: | *2* |
|---|---|---|---|

Date / Time:  *05/20/2022 Fri / 12:49*

Fax Number:  *360-297-0420*

Subject:  FARWELL, LAWRENCE Dept OUTMR AP 1043307 AC 1878313 Desc MRI Hip Left without Contrast

*The documents accompanying this facsimile transmittal are intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under law. If the reader of this message is not the intended recipient, you are notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient, you are hereby notified that law strictly prohibits any disclosure, copying, distribution or action taken in reliance on the contents of these documents. If you have received this fax in error, please notify 206-292-7744 immediately to arrange for return or destruction of these documents.*



# SOC Seattle Orthopedic Center

# PROLIANCE
a division of Surgeons®

2409 North 45th Street • Seattle, WA 98103
Phone: 206-633-8100 Fax: 206-633-6107

www.seattleorthopediccenter.com

Attn: ROBIN L. BENN, ARNP
1800 NW MYHRE RD
SILVERDALE, WA 98383

| | |
|---|---|
| **NAME:** | **FARWELL, LAWRENCE** |
| **Exam Date:** | **May 20 2022** |
| DOB: | 06-10-1949 |
| MRN: | 1878313 |
| ACCESSION: | 1043307 |
| Referring Phys: | ROBIN L. BENN, ARNP |
| **Report Status:** | **FINAL** |

EXAM:
LEFT HIP MRI WITHOUT CONTRAST

EXAM DATE: 05/20/2022 09:00 AM.

CLINICAL HISTORY: Recent Jujitsu injury. Unable to straighten left leg.

COMPARISON: None.

TECHNIQUE: Multiplanar, multisequence T1-weighted and fluid-sensitive, small field-of-view sequences of the hip and large field-of-view sequences of the pelvis without contrast. Other: None.

FINDINGS:
Bones and articular surfaces: No significant left hip joint effusion. Truncation and irregular shape of the superior left hip labrum suspicious for tear and degeneration. Margins of the labrum are not well visualized in the absence of intra-articular contrast. Mild cartilage thinning at the anterosuperior aspect of the left hip joint. No full-thickness articular cartilage defect. No evidence of acute fracture or stress reaction. No evidence of femoral head AVN. Sacroiliac joints and pubic symphysis unremarkable.

Musculotendinous structures: Small areas of fatty atrophy at the left greater than right gluteus minimus. No evidence of significant muscle tear, tendinosis or bursitis.

IMPRESSION:
1. Mild left hip osteoarthritis.
2. Truncated irregular appearance of the superior left hip labrum suspicious for labral tear and degeneration. Evaluation limited.

RADIA

Reviewed and electronically signed by: John McGowan 05/20/2022 12:47

Patients are advised to discuss imaging findings and recommendations with the ordering provider.



**Proliance**
S U R G E O N S
Seattle Orthopedic Center

| | |
|---|---|
| **Seattle Orthopedic Center** | |
| (206) 633-8100 | |
| Fax (206) 633-6107 | |
| **Ambulatory Surgery Center** | |
| (206) 633-8100 | |
| Fax (206) 633-6073 | |
| **Physical Therapy** | |
| (206) 633-8100 | |
| Fax (206) 632-1420 | |
| **MRI** | |
| (206) 633-8100 | |
| Fax (206) 632-1657 | |

**Herbert R. Clark, M.D.**
Sports Medicine, Arthroscopy
Joint Reconstruction

**Philip R. Downer, M.D.**
Orthopedic & Sports Medicine
Hip Preservation & Replacement

**Grant H. Garcia, M.D.**
Sports Medicine
Shoulder, Knee & Elbow Surgery
Biological Therapies

**Stewart M. Kerr, M.D.**
Comprehensive Neck
& Spine Surgery
Trauma & Fracture Repair
Joint Reconstruction

**Charles Peterson II, M.D.**
Sports Medicine
Orthopaedic & Fracture Surgery
Total Joint Replacement

**Mark A. Reed, M.D.**
Orthopedic & Sports Medicine
Foot & Ankle Surgery

**Scott D. Ruhlman, M.D.**
Orthopedic & Sports Medicine
Hand Shoulder & Elbow Surgery

**Joel A. Shapiro, M.D.**
Orthopedic & Sports Medicine
Shoulder & Elbow Surgery

**Wayne M. Weil, M.D.**
Orthopedic & Sports Medicine
Hand & Microvascular Surgery

**Anthony Yi, M.D.**
Orthopedic Surgeon
Foot & Ankle Specialist
Minimally Invasive Surgery

2409 North 45th Street, Seattle, WA 98103

# FAX SHEET

**FAX# YOU ARE CALLING**

360 297 0420

Today's Date: _5/20/22_

FAX TO: _ROBIN RENN_

FAX From: _SEATTLE ORTHO_

Re: _LAWRENCE FARWELL_

Comments: _MRI (L) HIP_

_2_ Page(s) Plus this one

The information contained in this message is intended only for the addressee to the addressee's agent. This may contain information that is privileged, confidential, or otherwise exempt from disclosure. If the reader of this message is not the intended recipient or recipient's authorized agent, then you are notified that any dissemination, distribution or copying of this message is prohibited. If you have received this message in error, please notify the sender by telephone.

# Report

Patient: **Farwell, Lawrence, A, SOCMRI22265**
Date of birth: **6/10/1949**
Accession number: **SOCMRI16222043**
Examinations: **0**
Preliminary signature:
Final signature: **John, Mcgowan (1962480897), 5/20/2022 9:00 AM**

Report created 5/20/2022, 12:47 PM by John, Mcgowan
Printed from Sectra IDS7 on 5/20/2022, 1:20 PM by OSS - Becraft, Jim

---

Physician Name: ROBIN, BENN
Patient Name: FARWELL , LAWRENCE
MRN:SOCMRI22265
DOB: 19490610
Exam Date: 20220520124759

EXAM:
LEFT HIP MRI WITHOUT CONTRAST

EXAM DATE: 05/20/2022 09:00 AM.

CLINICAL HISTORY: Recent Jujitsu injury. Unable to straighten left leg.

COMPARISON: None.

TECHNIQUE: Multiplanar, multisequence T1-weighted and fluid-sensitive, small field-of-view sequences of the hip and large field-of-view sequences of the pelvis without contrast. Other: None.

FINDINGS:
Bones and articular surfaces: No significant left hip joint effusion. Truncation and irregular shape of the superior left hip labrum suspicious for tear and degeneration. Margins of the labrum are not well visualized in the absence of intra-articular contrast. Mild cartilage thinning at the anterosuperior aspect of the left hip joint. No full-thickness articular cartilage defect. No evidence of acute fracture or stress reaction. No evidence of femoral head AVN. Sacroiliac joints and pubic symphysis unremarkable.

Musculotendinous structures: Small areas of fatty atrophy at the left greater than right gluteus minimus. No evidence of significant muscle tear, tendinosis or bursitis.

IMPRESSION:
1. Mild left hip osteoarthritis.
2. Truncated irregular appearance of the superior left hip labrum suspicious for labral tear and degeneration. Evaluation limited.

RADIA

Reviewed and electronically signed by: John McGowan 05/20/2022 12:47

---

Patients are advised to discuss imaging findings and recommendations with the ordering provider.

Interpreting Physician: John McGowan, M.D.

Exhibit BAL

# Consent and Authorization for Injections

Patient Name: _Lawrence Farrell_  DOB: _6-10-49_  Procedure Date: _5/2/22_

Procedure: _TPI (L) lower back_

Do you have an infection or skin disease in the area where injection will be given? Yes_ No_✗

Do you have a known allergy to Lidocaine? Yes_ No_✗

1. Kingston Crossing Wellness Clinic provides knee, trigger point, tendon, and other injections. You have the right to be informed of the procedure, any feasible alternative options, the risks and the benefits. Except in emergencies, procedures are not performed until you have had an opportunity to receive such information and to give your informed consent.

   a. The procedure involves inserting a needle into the joint space and/or muscle and injecting the formula described by your physician (Platelet Rich Plasma, Exosomes, Stem Cells, Ozone, Cortisone and/or Supartz and/or Lidocaine).

   b. Risks of injections include:
      Injection site reaction (pain, swelling, bruising, redness, warmth, joint pain)
      Joint pain, back pain with or without evidence of inflammation
      Headache
      Allergic reaction
      Fainting
      Lung Collapse
      Infection (redness, heat, swelling, pain, fever)

2. You have the right to consent to or refuse any proposed treatment at any time prior to its performance. Your signature on this form affirms that you have given consent to the procedure described above with any different or further procedures which, in the opinion of your physician, may be indicated.

3. I have been advised that there is a favorable likelihood of success, but I understand that a completely successful outcome may not be achievable, and there are no guarantees regarding the outcome. I also understand that certain adverse events could occur as a result of the performance of the procedure or treatment, including allergic reaction, pain, hypotension and possible consequences thereof. I understand that care by health professional may be needed following the procedure or treatment, related to full recovery. I understand the alternatives to this procedure including my right to refuse to consent to it and I nevertheless have decided to consent to performance of the procedure or treatment.

Your signature below means that you understand the information provided and have had the chance to ask your provider any questions and agree to the injection.

Patient Signature: _Lawrence A Farrell_  Date: _5/2/22_

Witness Signature: _____  Date: _5/2/22_

**Chart Notes**

**Exhibit BAM**

Larry Farwell

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| | | |
|---|---|---|
| **Patient: Farwell, Lawrence A** | **Acct #: 36275** | **DOB:  06/10/1949** |
| **Ins Co:** Medicare | **Pol #:** | **Insured ID: 6JE7A24RH47** |

**Date**    05/02/2022

**Provider**   Josh Green

**Subjective:**

Lawrence presented to the office for an evaluation. The main region of pain/discomfort was :left sacroiliac, left pelvic, left buttock, sacral and left lumbar

Pt. reports going to martial arts event over the weekend. Was performing a twisting jump kick and landed wrong. Pain was immediate in/around SI joint, hip low back on left side.

Pt. reports then having to get on several hour airplane to return home. Pt. reports being unable to straighten leg and walks very much bent over due to sever pain.

Patient stated that the chief complaint was:sacraliliac, lumbosacral and sacral, and the pain was described as: sharp, stabbing, dull, aching and severe

Chief complaint pain was rated at:8-10. (10 being the worst).

Pain was aggravated by: almost any movement

Patient also stated that the activities that alleviate pain included:

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB: 06/10/1949 |
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

| Date | 05/02/2022 | |
| Provider | Josh Green | *** *continued from previous page* *** |

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:      min
Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim
Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim
Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim
Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture   2 x/week for   2-4   weeks then reevaluate.

| Diagnosis | S39.012A: Strain of  lower back |
| | M99.03: lumbar Seg and somatic dysf of lumbar reg |
| | M99.04: Seg and somatic dysf of sacral reg |
| | M99.05: pelvic Segmental and somatic dysfunction of pelvic region |
| | M99.06: lower Seg and somatic dysf of lower extremity |
| | M54.50: Low back pain, unspecified |

**Chart Notes**

**Larry Farwell**

Kingston Crossing Wellness
8202 NE State Hwy 104 Ste 105
Kingston, WA 98346-9454
Phone: (360) 297-0037
Fax: (360) 297-0420

| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB: 06/10/1949 |
|---|---|---|
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

| Date | 05/03/2022 |
|---|---|
| Provider | Joshua Bailey, DC |

**Subjective:**

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:    min
Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| | | |
|---|---|---|
| **Patient:  Farwell, Lawrence A** | **Acct #: 36275** | **DOB:  06/10/1949** |
| **Ins Co: Medicare** | **Pol #:** | **Insured ID: 6JE7A24RH47** |

**Date    05/03/2022**

| | |
|---|---|
| **Provider   Joshua Bailey, DC** | *** continued from previous page *** |

+2ahshi estim
Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33
+2ahshi estim
Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33
+2ahshi estim
Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture    2 x/week for    2-4   weeks then reevaluate.

**Diagnosis**    S39.012A: Strain of  lower back
M99.03: lumbar Seg and somatic dysf of lumbar reg
M99.04: Seg and somatic dysf of sacral reg
M99.05: pelvic Segmental and somatic dysfunction of pelvic region
M99.06: lower Seg and somatic dysf of lower extremity

**Chart Notes**

**Larry Farwell**

Kingston Crossing Wellness
8202 NE State Hwy 104 Ste 105
Kingston, WA 98346-9454
Phone: (360) 297-0037
Fax: (360) 297-0420

| | | |
|---|---|---|
| **Patient:** Farwell, Lawrence A | **Acct #:** 36275 | **DOB:** 06/10/1949 |
| **Ins Co:** Medicare | **Pol #:** | **Insured ID: 6JE7A24RH47** |

**Date** 05/06/2022

**Provider** Joshua Bailey, DC

**Subjective:**

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:    min
Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| | | |
|---|---|---|
| **Patient:  Farwell, Lawrence A** | **Acct #: 36275** | **DOB:  06/10/1949** |
| **Ins Co: Medicare** | **Pol #:** | **Insured ID: 6JE7A24RH47** |

**Date     05/06/2022**

**Provider   Joshua Bailey, DC**                                           *** continued from previous page ***

+2ahshi estim
Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33
+2ahshi estim
Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33
+2ahshi estim
Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture   2 x/week for    2-4   weeks then reevaluate.

**Diagnosis**     S39.012A: Strain of  lower back
                 M99.03: lumbar Seg and somatic dysf of lumbar reg
                 M99.04: Seg and somatic dysf of sacral reg
                 M99.05: pelvic Segmental and somatic dysfunction of pelvic region
                 M99.06: lower Seg and somatic dysf of lower extremity

**Chart Notes**

**Larry Farwell**

Kingston Crossing Wellness
8202 NE State Hwy 104 Ste 105
Kingston, WA 98346-9454
Phone: (360) 297-0037
Fax: (360) 297-0420

| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB:  06/10/1949 |
|---|---|---|
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

Date     06/01/2022

Provider   Joshua Bailey, DC

**Subjective:**
Larry reported today that he is experiencing pain in his S1 - L5 due to an injury. His hip has a major tear and is being treated with PT, massage and chiropractic care

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:    min

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| | | |
|---|---|---|
| **Patient: Farwell, Lawrence A** | **Acct #: 36275** | **DOB:** 06/10/1949 |
| **Ins Co: Medicare** | **Pol #:** | **Insured ID: 6JE7A24RH47** |

**Date** 06/01/2022

**Provider** Joshua Bailey, DC                                    ***\*\*\* continued from previous page \*\*\****

Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture    2 x/week for    2-4   weeks then reevaluate.

**Diagnosis**      S39.012A: Strain of  lower back
M99.03: lumbar Seg and somatic dysf of lumbar reg
M99.04: Seg and somatic dysf of sacral reg
M99.05: pelvic Segmental and somatic dysfunction of pelvic region
M99.06: lower Seg and somatic dysf of lower extremity

**Chart Notes**

**Larry Farwell**

Kingston Crossing Wellness
8202 NE State Hwy 104 Ste 105
Kingston, WA 98346-9454
Phone: (360) 297-0037
Fax: (360) 297-0420

| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB: 06/10/1949 |
|---|---|---|
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

| Date | 06/03/2022 |
|---|---|
| Provider | Joshua Bailey, DC |

**Subjective:**

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:    min
Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB: 06/10/1949 |
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

**Date** 06/03/2022

**Provider Joshua Bailey, DC**                    *** *continued from previous page* ***

Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture   2 x/week for   2-4   weeks then reevaluate.

**Diagnosis**    S39.012A: Strain of  lower back
M99.03: lumbar Seg and somatic dysf of lumbar reg
M99.04: Seg and somatic dysf of sacral reg
M99.05: pelvic Segmental and somatic dysfunction of pelvic region
M99.06: lower Seg and somatic dysf of lower extremity

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB: 06/10/1949 |
|---|---|---|
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

**Date** 06/06/2022

**Provider** Joshua Bailey, DC

**Subjective:**
Larry reported today that he is experiencing low back and hip pain but his leg has better mobility than he did last Friday

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:     min

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| | | |
|---|---|---|
| **Patient: Farwell, Lawrence A** | **Acct #: 36275** | **DOB: 06/10/1949** |
| **Ins Co: Medicare** | **Pol #:** | **Insured ID: 6JE7A24RH47** |

**Date    06/06/2022**

**Provider   Joshua Bailey, DC**                                    *** *continued from previous page* ***

Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture   2 x/week for   2-4   weeks then reevaluate.

**Diagnosis**   S39.012A: Strain of  lower back
M99.03: lumbar Seg and somatic dysf of lumbar reg
M99.04: Seg and somatic dysf of sacral reg
M99.05: pelvic Segmental and somatic dysfunction of pelvic region
M99.06: lower Seg and somatic dysf of lower extremity

**Chart Notes**

**Larry Farwell**

Kingston Crossing Wellness
8202 NE State Hwy 104 Ste 105
Kingston, WA 98346-9454
Phone: (360) 297-0037
Fax: (360) 297-0420

| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB: 06/10/1949 |
|---|---|---|
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

| Date | 06/08/2022 |
|---|---|
| Provider | Joshua Bailey, DC |

**Subjective:**
Larry reported today that he is experiencing pain in his thoracic and lumbar spine due to his accident. His hip is killing him in any position

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:     min

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB: 06/10/1949 |
|---|---|---|
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

**Date    06/08/2022**

**Provider   Joshua Bailey, DC**                                    *** *continued from previous page* ***

Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture   2 x/week for   2-4   weeks then reevaluate.

**Diagnosis**     S39.012A: Strain of  lower back
M99.03: lumbar Seg and somatic dysf of lumbar reg
M99.04: Seg and somatic dysf of sacral reg
M99.05: pelvic Segmental and somatic dysfunction of pelvic region
M99.06: lower Seg and somatic dysf of lower extremity

**Chart Notes**

**Larry Farwell**

Kingston Crossing Wellness
8202 NE State Hwy 104 Ste 105
Kingston, WA 98346-9454
Phone: (360) 297-0037
Fax: (360) 297-0420

| | | |
|---|---|---|
| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB:  06/10/1949 |
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

Date     06/13/2022

Provider   Joshua Bailey, DC

**Subjective:**
Larry reported today that he is experiencing low and mid back pain making it difficult to stand upright, twist or turn while he walks, and difficult to get up and / or down

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:    min

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB: 06/10/1949 |
|---|---|---|
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

**Date**   06/13/2022

**Provider**   **Joshua Bailey, DC**                                       *** *continued from previous page* ***

Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture   2 x/week for   2-4   weeks then reevaluate.

**Diagnosis**   S39.012A: Strain of  lower back
                M99.03: lumbar Seg and somatic dysf of lumbar reg
                M99.04: Seg and somatic dysf of sacral reg
                M99.05: pelvic Segmental and somatic dysfunction of pelvic region
                M99.06: lower Seg and somatic dysf of lower extremity

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| | | |
|---|---|---|
| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB:  06/10/1949 |
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

Date    06/17/2022

Provider   Joshua Bailey, DC

**Subjective:**

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:    min
Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB: 06/10/1949 |
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

**Date** 06/17/2022

**Provider** **Joshua Bailey, DC** *** continued from previous page ***

Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture    2 x/week for    2-4   weeks then reevaluate.

**Diagnosis**    S39.012A: Strain of  lower back
M99.03: lumbar Seg and somatic dysf of lumbar reg
M99.04: Seg and somatic dysf of sacral reg
M99.05: pelvic Segmental and somatic dysfunction of pelvic region
M99.06: lower Seg and somatic dysf of lower extremity

**Chart Notes**

**Larry Farwell**

Kingston Crossing Wellness
8202 NE State Hwy 104 Ste 105
Kingston, WA 98346-9454
Phone: (360) 297-0037
Fax: (360) 297-0420

| | | |
|---|---|---|
| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB: 06/10/1949 |
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

Date    06/20/2022

Provider   Joshua Bailey, DC

**Subjective:**
Larry reported today that he is experiencing extreme low back pain though it is beginning to hurt less with each visit and while he stretches muscles surrounding the throacic spine

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:    min

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| | | |
|---|---|---|
| **Patient: Farwell, Lawrence A** | **Acct #: 36275** | **DOB: 06/10/1949** |
| **Ins Co: Medicare** | **Pol #:** | **Insured ID: 6JE7A24RH47** |

**Date    06/20/2022**

**Provider   Joshua Bailey, DC**                                                    *** continued from previous page ***

Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture   2 x/week for   2-4   weeks then reevaluate.

**Diagnosis**     S39.012A: Strain of  lower back
                  M99.03: lumbar Seg and somatic dysf of lumbar reg
                  M99.04: Seg and somatic dysf of sacral reg
                  M99.05: pelvic Segmental and somatic dysfunction of pelvic region
                  M99.06: lower Seg and somatic dysf of lower extremity

**Chart Notes**

**Larry Farwell**

Kingston Crossing Wellness
8202 NE State Hwy 104 Ste 105
Kingston, WA 98346-9454
Phone: (360) 297-0037
Fax: (360) 297-0420

| | | |
|---|---|---|
| **Patient:** Farwell, Lawrence A | **Acct #:** 36275 | **DOB:** 06/10/1949 |
| **Ins Co:** Medicare | **Pol #:** | **Insured ID: 6JE7A24RH47** |

**Date** 06/24/2022

**Provider** Joshua Bailey, DC

**Subjective:**
X ***Sacral Apex Pressure for Local Low back and SI Pain****

Today Larry reports having low back and hip pain

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| | | |
|---|---|---|
| Patient:  Farwell, Lawrence A | Acct #: 36275 | DOB:  06/10/1949 |
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

Date     06/24/2022

| Provider   Joshua Bailey, DC | *** *continued from previous page* *** |
|---|---|

Intake face to face:     min
Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim
Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim
Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim
Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture    2 x/week for    2-4   weeks then reevaluate.

**Diagnosis**    S39.012A: Strain of  lower back
M99.03: lumbar Seg and somatic dysf of lumbar reg
M99.04: Seg and somatic dysf of sacral reg
M99.05: pelvic Segmental and somatic dysfunction of pelvic region
M99.06: lower Seg and somatic dysf of lower extremity

**Chart Notes**

**Larry Farwell**

Kingston Crossing Wellness
8202 NE State Hwy 104 Ste 105
Kingston, WA 98346-9454
Phone: (360) 297-0037
Fax: (360) 297-0420

| | | |
|---|---|---|
| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB: 06/10/1949 |
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

Date     06/27/2022

Provider   Joshua Bailey, DC

**Subjective:**
Larry reported today that he is experiencing spinal stenosis and he goes to PT normally prior to his adjustments, but he feels like it's causing agitation to his hip

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:    min

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| | | |
|---|---|---|
| **Patient: Farwell, Lawrence A** | **Acct #: 36275** | **DOB: 06/10/1949** |
| **Ins Co: Medicare** | **Pol #:** | **Insured ID: 6JE7A24RH47** |

**Date   06/27/2022**

**Provider   Joshua Bailey, DC**                                   *** *continued from previous page* ***

Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture   2 x/week for   2-4   weeks then reevaluate.

**Diagnosis**   S39.012A: Strain of  lower back
M99.03: lumbar Seg and somatic dysf of lumbar reg
M99.04: Seg and somatic dysf of sacral reg
M99.05: pelvic Segmental and somatic dysfunction of pelvic region
M99.06: lower Seg and somatic dysf of lower extremity

**Chart Notes**

**Larry Farwell**

Kingston Crossing Wellness
8202 NE State Hwy 104 Ste 105
Kingston, WA 98346-9454
Phone: (360) 297-0037
Fax: (360) 297-0420

| Patient: Farwell, Lawrence A | Acct #: 36275 | DOB: 06/10/1949 |
| Ins Co: Medicare | Pol #: | Insured ID: 6JE7A24RH47 |

| Date | 07/06/2022 |
| Provider | Joshua Bailey, DC |

**Subjective:**

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:    min
Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| | | |
|---|---|---|
| **Patient: Farwell, Lawrence A** | **Acct #: 36275** | **DOB: 06/10/1949** |
| **Ins Co: Medicare** | **Pol #:** | **Insured ID: 6JE7A24RH47** |

**Date    07/06/2022**

**Provider   Joshua Bailey, DC**                                    *** continued from previous page ***

Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33 +2ahshi estim

Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture    2 x/week for    2-4   weeks then reevaluate.

**Diagnosis**     S39.012A: Strain of  lower back
M99.03: lumbar Seg and somatic dysf of lumbar reg
M99.04: Seg and somatic dysf of sacral reg
M99.05: pelvic Segmental and somatic dysfunction of pelvic region
M99.06: lower Seg and somatic dysf of lower extremity

**Chart Notes**

**Larry Farwell**

Kingston Crossing Wellness
8202 NE State Hwy 104 Ste 105
Kingston, WA 98346-9454
Phone: (360) 297-0037
Fax: (360) 297-0420

| | | |
|---|---|---|
| **Patient:** Farwell, Lawrence A | **Acct #:** 36275 | **DOB:** 06/10/1949 |
| **Ins Co:** Medicare | **Pol #:** | **Insured ID:** 6JE7A24RH47 |

**Date**   07/08/2022

**Provider**   Joshua Bailey, DC

**Subjective:**
Larry reported today that he is experiencing hip, thoracic and lumbar spine pain

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:    min
Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| | | |
|---|---|---|
| **Patient:** Farwell, Lawrence A | **Acct #: 36275** | **DOB:** 06/10/1949 |
| **Ins Co:** Medicare | **Pol #:** | **Insured ID: 6JE7A24RH47** |

**Date**    07/08/2022

**Provider   Joshua Bailey, DC**                                        *** continued from previous page ***

+2ahshi estim
Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33
+2ahshi estim
Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33
+2ahshi estim
Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture    2 x/week for    2-4   weeks then reevaluate.

**Diagnosis**    S39.012A: Strain of  lower back
M99.03: lumbar Seg and somatic dysf of lumbar reg
M99.04: Seg and somatic dysf of sacral reg
M99.05: pelvic Segmental and somatic dysfunction of pelvic region
M99.06: lower Seg and somatic dysf of lower extremity

**Chart Notes**

**Larry Farwell**

Kingston Crossing Wellness
8202 NE State Hwy 104 Ste 105
Kingston, WA 98346-9454
Phone: (360) 297-0037
Fax: (360) 297-0420

| | | |
|---|---|---|
| **Patient:** Farwell, Lawrence A | **Acct #:** 36275 | **DOB:** 06/10/1949 |
| **Ins Co:** Medicare | **Pol #:** | **Insured ID: 6JE7A24RH47** |

**Date** 07/11/2022

**Provider** Joshua Bailey, DC

**Subjective:**
Larry reported today that he is experiencing low back pain as well as his hip feels out of

**Objective:**
Tenderness, tingling, radiculopathy down the legs and hypertonicity when palpating at and around left acupoint GB30, which is located on the lateral aspect of the posterior hip and superficial to the gluteus maximus, minimus and piriformis MM.

+ Sacral Apex Pressure for local low back pain and SI pain.

Lawrence's Pulse is thin and thready and weak in the kidney positions bilaterally.

Pulse registered as slippery in quality overall.

**Assessment:**
Qi and blood stagnation along gall bladder foot shaoyang and bladder foot taiyang meridians.

KI def. / Liver blood deficiency

**Plan:**
TREATMENT PLAN

Treatment plan will consist of: Acupuncture, muscle work, and dietary advice.
Goals of care will consist of reduction of pain, improvement of range of motion, increased circulation, and increased function with ADL's.

Specific goals and outcome measures will consist of: Decrease muscle pain and tenderness and Decrease inflammation and increase mobilization.

Acupuncture treatment consisted of insertion of single use sterile needles inserted following clean needle technique. Needle locations were established using published locations informed by specific patient sensations at points and palpation of local connective tissue features. Needles were inserted to the depths and directions appropriate to the presentation and stimulated to achieve deqi sensation. Further stimulation and retention were dependent on patient's specific complaints.

Today's Visit (60)MIN :
Intake face to face:     min
Acu set #1 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33

**Chart Notes**

**Larry Farwell**

**Kingston Crossing Wellness**
**8202 NE State Hwy 104 Ste 105**
**Kingston, WA 98346-9454**
**Phone: (360) 297-0037**
**Fax: (360) 297-0420**

| | | |
|---|---|---|
| **Patient: Farwell, Lawrence A** | **Acct #: 36275** | **DOB: 06/10/1949** |
| **Ins Co: Medicare** | **Pol #:** | **Insured ID: 6JE7A24RH47** |

**Date    07/11/2022**

**Provider   Joshua Bailey, DC** *** continued from previous page ***

+2ahshi estim
Acu set #2 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33
+2ahshi estim
Acu set #3 15min: Yaoyan, GB30,34  Left: UB40 Glute med max piriformis UB25,34,33
+2ahshi estim
Other:

Herbs:

Patient unable to straighten leg or lay flat on table due to pain.

Plan: Acupuncture   2 x/week for   2-4   weeks then reevaluate.

**Diagnosis**     S39.012A: Strain of  lower back
M99.03: lumbar Seg and somatic dysf of lumbar reg
M99.04: Seg and somatic dysf of sacral reg
M99.05: pelvic Segmental and somatic dysfunction of pelvic region
M99.06: lower Seg and somatic dysf of lower extremity

**OPA FIRST HILL**
601 BROADWAY STE 600/700
SEATTLE WA 98122-5330
Phone: 206-386-2600
Fax: 206-622-1644

**Exhibit BAN**



Chiropractor Prescription for Lawrence A Farwell

Diagnosis: Left hip labral tear
Treatment: Hip girdle (especially hip abductor/extensor) hip range of motion, hamstring/ITB/hip abductor stretching and core strengthening with neuromuscular control training. Home exercise program.
Frequency: 1-2 times per week.
Duration: 8-12 visits
Precautions: Probable lumbar disc herniation

Brian Snitily, M.D.

**OPA FIRST HILL**
601 BROADWAY STE 600/700       **Exhibit BAO**
SEATTLE WA 98122-5330
Phone: 206-386-2600
Fax: 206-622-1644



Physical Therapy Prescription for Lawrence A Farwell

Diagnosis: Left hip labral tear
Treatment: Hip girdle (especially hip abductor/extensor) hip range of motion, hamstring/ITB/hip abductor stretching and core strengthening with neuromuscular control training. Home exercise program.
Frequency: 1-2 times per week.
Duration: 8-12 visits
Precautions:Probable lumbar disc herniation

Brian Snitily, M.D.

**Exhibit BAP**



# AFTER VISIT SUMMARY

**Lawrence A. Farwell** DoB: 6/10/1949

📅 5/3/2022  2:40 PM  📍 MultiCare Indigo Urgent Care - Poulsbo 360-779-7011

## Instructions  from Tracy D Weiler, PA-C

Take meds as prescribed (and continue all of your current medications as well).  Please be careful while taking the narcotic pain medication and the Valium for muscle relaxation as this can make you less steady on your feet and prone to falls.  Please take the stool softener and ensure that you drink plenty of fluids and increase your fiber intake while taking the narcotic pain medication as this can cause constipation.

Recommend warm and moist compresses (if cold feels better you can use cold as well (alternating)) to the area with gentle massage throughout the day.  Also attempt stretches as often as possible throughout the day (use of a FOAM ROLLER will also be helpful).

Also try using BenGay, CBD oil, or Tiger balm with massage.  If possible follow-up with your primary care to discuss possible physical therapy evaluation.

Return to the clinic after ONE week if symptoms are not improving or go to the emergency department earlier if symptoms worsen.

 **Today's medication changes**

➡ START taking:

**diazepam** (Valium)

**docusate sodium** (Colace)

**hydrocodone-acetaminophen** (Norco)

**lidocaine** (LIDODERM)

**naproxen** (Naprosyn)

Accurate as of May 3, 2022  4:19 PM.
**See the end of the After Visit Summary for your complete, current medication list.**

**Pick up these medications at SAFEWAY PHARMACY #0186 - KINGSTON, WA**

docusate sodium • lidocaine • naproxen

Address:  8196 S.R. 104, KINGSTON WA 98346
Hours:    M-F 9-9, SAT 9-7, SUN 10-4
Phone:    360-297-1811

## Today's Visit

You saw Tracy D Weiler, PA-C on Tuesday May 3, 2022 for: Back Pain.
The following issues were addressed:

- Left hip pain
- Low back strain, initial encounter
- Sciatica of left side
- Spasm of back muscles

| | | | |
|---|---|---|---|
|  Blood Pressure **109/62** | |  BMI **24.46** | |
| Weight **170 lb 8 oz** | | Temperature (Temporal) **97.8 °F** | |
|  Pulse **70** | |  Oxygen Saturation **97%** | |

nstructions (continued)  from Tracy D Weiler, PA-C

**Pick up these medications from any pharmacy with your printed prescription**
diazepam • hydrocodone-acetaminophen

**Return if symptoms worsen or fail to improve, for follow up with your Primary Care Doctor.**

## What's Next

ou currently have no upcoming appointments scheduled.

## CP

rimary Care Provider
ected No Pcp

F YOU DO NOT HAVE A PRIMARY CARE PROVIDER, YOU CAN CALL OUR MEDICAL REFERRAL LINE: IN PUGET
SOUND REGION CALL 1-866-636-8584; IN INLAND NORTHWEST REGION CALL 1-509-233-5102

## llergies as of 5/3/2022

Known Allergies

## MyChart Activation

MyChart is a free, secure online way for you to schedule your appointments, see your test results, review and refill
your medications, get trusted health advice, contact your provider, pay bills, and do so much more.

**Go to** https://mychart.multicare.org/mymulticare/

**Click the "Sign Up Now" link**. For security reasons, when you first sign up, you must provide your date of birth, e-
mail address, and the following access code:

**C8SC2-CK8JS**
**Expires: 8/1/2022  2:39 PM**

or more information visit MyChart at https://mychart.multicare.org/mymulticare/

# Your Medication List as of May 3, 2022  4:19 PM

ⓘ Always use your most recent med list.

**diazepam** 5 MG Tabs
Commonly known as: Valium
Quantity: 6 Tablet

Take 1 Tablet by mouth at bedtime as needed (muscle spasm).

**docusate sodium** 100 MG Caps
Commonly known as: Colace
Quantity: 30 Capsule

Take 1 Capsule by mouth twice daily.

**hydrocodone-acetaminophen** 5-325 mg Tabs
Commonly known as: Norco
Quantity: 9 Tablet

Take 1 Tablet by mouth every 8 hours as needed for pain or moderate pain for up to 3 days.

**lidocaine** 5 % Ptch
Commonly known as: LIDODERM
Quantity: 30 Patch

Place 1 Patch onto the skin once daily.

**naproxen** 500 MG Tabs
Commonly known as: Naprosyn
Quantity: 20 Tablet

Take 1 Tablet by mouth twice daily with meals.

**Please review your updated medication list with care.  Note changes.  Take this list with you to your next doctor's appointment.  Review it with your doctor.  Call your doctor if you have any medication questions.**

**Always update your medication list if you or your doctor:**
• **Change the type of medication you take**
• **Change a medication dose**
• **Stop a medication**
• **Start a new medication**

**Be sure to include over-the-counter and herbal medications on your list.  Keep a copy of your medication list with you at all times. You will need it in case of an emergency.**

**MultiCare Indigo Urgent Care - Poulsbo**
19835 10th Ave NE Suite B
POULSBO WA 98370-7451

**Exhibit BAQ**



# AFTER VISIT SUMMARY

**Lawrence A. Farwell**  DoB: 6/10/1949

📅 5/9/2022  1:15 PM   📍 MultiCare Indigo Urgent Care - Poulsbo 360-779-7011

## Instructions  from Yelena Watson, ARNP

 **Today's medication changes**

➡ START taking:
**cyclobenzaprine** (Flexeril)
**gabapentin** (Neurontin)

Accurate as of May 9, 2022  2:42 PM.
**See the end of the After Visit Summary for your complete, current medication list.**

 **Pick up these medications at SAFEWAY PHARMACY #0186 - KINGSTON, WA**

cyclobenzaprine • gabapentin

Address:  8196 S.R. 104, KINGSTON WA 98346
Hours:    M-F 9-9, SAT 9-7, SUN 10-4
Phone:    360-297-1811

**REFERRAL TO ORTHOPEDICS**
Multiple visits requested (expires 5/9/2023)

## Today's Visit

You saw Yelena Watson, ARNP on Monday May 9, 2022 for: Back Pain and Hip Pain. The following issue was addressed: Acute left-sided low back pain with left-sided sciatica.

 Blood Pressure
**105/58**

 BMI
**23.68**

 Weight
**165 lb**

 Temperature (Temporal)
**98.2 °F**

 Pulse
**65**

 Respiration
**17**

 Oxygen Saturation
**95%**

## What's Next

You currently have no upcoming appointments scheduled.

## Medications You Will Be Given

MAY
**9**
2022

**ketorolac (Toradol)**
Next due Monday May 9
Expected: **one time only** (1 dose remaining)

## PCP

Primary Care Provider
Selected No Pcp

IF YOU DO NOT HAVE A PRIMARY CARE PROVIDER, YOU CAN CALL OUR MEDICAL REFERRAL LINE: IN PUGET SOUND REGION CALL 1-866-636-8584; IN INLAND NORTHWEST REGION CALL 1-509-233-5102

## Allergies as of 5/9/2022
No Known Allergies

## MyChart Activation

MyChart is a free, secure online way for you to schedule your appointments, see your test results, review and refill your medications, get trusted health advice, contact your provider, pay bills, and do so much more.

**Go to** https://mychart.multicare.org/mymulticare/

**Click the "Sign Up Now" link**. For security reasons, when you first sign up, you must provide your date of birth, e-mail address, and the following access code:

**C8SC2-CK8JS**
**Expires: 8/1/2022  2:39 PM**

For more information visit MyChart at https://mychart.multicare.org/mymulticare/

# Your Medication List as of May 9, 2022  2:42 PM

ⓘ Always use your most recent med list.

**cyclobenzaprine** 10 MG Tabs
Commonly known as: Flexeril
Quantity: 42 Tablet

Take 1 Tablet by mouth three times a day as needed for muscle spasm.

**diazepam** 5 MG Tabs
Commonly known as: Valium
Quantity: 6 Tablet

Take 1 Tablet by mouth at bedtime as needed (muscle spasm).

**docusate sodium** 100 MG Caps
Commonly known as: Colace
Quantity: 30 Capsule

Take 1 Capsule by mouth twice daily.

**gabapentin** 100 MG Caps
Commonly known as: Neurontin
Quantity: 30 Capsule

Take 1 Capsule by mouth three times a day for 10 days.

**lidocaine** 5 % Ptch
Commonly known as: LIDODERM
Quantity: 30 Patch

Place 1 Patch onto the skin once daily.

**naproxen** 500 MG Tabs
Commonly known as: Naprosyn
Quantity: 20 Tablet

Take 1 Tablet by mouth twice daily with meals.

**predniSONE** 20 MG Tabs
Quantity: 10 Tablet

Take 2 Tablets by mouth once daily.

**Please review your updated medication list with care.  Note changes.  Take this list with you to your next doctor's appointment.  Review it with your doctor.  Call your doctor if you have any medication questions.**

**Always update your medication list if you or your doctor:**
• **Change the type of medication you take**
• **Change a medication dose**
• **Stop a medication**
• **Start a new medication**

**Be sure to include over-the-counter and herbal medications on your list.  Keep a copy of your medication list with you at all times. You will need it in case of an emergency.**

**MultiCare Indigo Urgent Care - Poulsbo**
19835 10th Ave NE Suite B
POULSBO WA 98370-7451