Received by Pro Se Office
on Aug 24, 2022, 11:17 PM
via Box.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

BRAINWAVE SCIENCE, INC.

      Plaintiff

Defendant Dr. Lawrence A. Farwell Response to Plaintiff's [82] Response to Order to Show Cause

      - against -

Civil Action No.: 21-cv-4402 (BMC-RLM)

ARSHEE, INC., DR. LAWRENCE A. FARWELL, DR. THIERRY MAISON and BRAIN FINGERPRINTING FOUNDATION

                        Defendants.

----------------------------------------------------------- X

1

I, Dr. Lawrence A. Farwell, am a Defendant in this case.

I am writing to provide additional arguments supporting my previous [78] Affirmation in Response and to correct misrepresentations in the affidavit of Plaintiff's attorney Paul Tomkins' [82] Affirmation.

First and foremost, the Court's expressed reasoning prior to my Affirmation in Response [78] was that my statement that my delay in providing disclosure documents was due my medical condition resulting from an injury was ""entirely unsubstantiated."

My Affirmation in Response provided ample evidence that my medical condition resulting from an accident was genuine and well substantiated.

Said medical condition alone provided sufficient reason for my delay in producing disclosure documents.

I have now complied with the Court's requirement to produce the same by the deadline of August 23 set by the Court.

Several other ancillary issues were raised in my Affirmation in Response.  These additional issues provided added strength to my already adequate argument based on my undisputed and substantiated medical condition due to an injury.

In his Affirmation, Mr. Tomkins discussed several of these ancillary issues.

Mr. Tomkins' characterization of my sworn statements in my Response bear little resemblance to the actual contents of my Response.

On P2 at (A.), Tomkins states "Defendant Farwell's sworn assertion that the undersigned failed to advise Defendant Farwell, or his former counsel, that disclosure was outstanding, is an outright  misrepresentation."

He specifies this further on P2 in ¶3: "Within his Affirmation in Response, Defendant Farwell alleges that he was prevented from producing documents as demanded by Plaintiff, and directed by the Court, because the undersigned failed to advise Defendant Farwell, or his former counsel, that disclosure was outstanding. (ECF #80 at Page 17, ¶37-40)."

He specifies this further in P.2 ¶ 6: "Defendant Farwell's sworn assertion that he was unaware of outstanding disclosure…"

Tomkins' statements regarding what I asserted grossly represent my actual assertions.  In the paragraph Tomkins references (P. 17, ¶ 37), what I actually said was: "The second circumstance beyond my control for the delay in my responding and producing documents as demanded resulted from breakdowns in communication and lack of cooperation from the Plaintiff's attorney, Mr. Paul Tomkins."

I did not make the patently absurd statement attributed to me, that Plaintiff's attorney had "failed to failed to advise Defendant Farwell, or his former counsel, that disclosure was outstanding.."

Tomkins provided evidence, which I have never disputed, that in November and January he repeated demands for disclosures. That has nothing to do with the issues I raised in my Response, or the time period of the delays at issue in my response.

Tomkins had vociferously and repeatedly stated that disclosures were outstanding. What he failed to do, as I explained in my Response, was to provide any response to my repeated recent requests that he provide an accounting of what he thought I was required to provide that I had not yet provided. I explained this in detail in my Response.

The "breakdowns in communication" that I mentioned in my Response were not only between Tomkins and myself or Tomkins and my attorney. They were also between myself and my attorney. For example:

I wrote the following email to Mr. Carbonaro on April 24:

> **From:** Dr. Larry Farwell
> **Sent:** Sunday, April 24, 2022 3:52 PM
> **To:** Joseph Carbonaro
> **Subject:** FW: BWS v. Arshee et al - 21-cv-4402 (BMC) - Discovery and Depositions
>
> Hi Joe,
>
> Please see below message from Tomkins. It is my understanding that you provided all of the information called for in their demands, and also that you made discovery demands to Tomkins to which they have never responded. Please clarify.
>
> Regards,
>
> Larry

Mr. Carbonaro replied as follows:

> **From:** Joseph Carbonaro <joe@jcarbonarolaw.com>
> **Sent:** Monday, April 25, 2022 6:55 AM
> **To:** Dr. Larry Farwell <brainwave@larryfarwell.com>
> **Subject:** RE: BWS v. Arshee et al - 21-cv-4402 (BMC) - Discovery and Depositions
>
> Larry, my recollection is that we provided a large number of documents to the plaintiff via a drop box or google drive. However, we may not have provided a document that directly responds to their demands. So if demand number 1 provide all communications between

> plaintiff and defendant, we may have turned over the communications but not a written response saying, "see document attached Bates stamped 1-100." Ask him if that is what he means, ask him about the drop box/google drive.
>
> Joseph W. Carbonaro, Esq.

Based on what I knew from my Mr. Carbonaro -- who had been representing me as my attorney until shortly before this email exchange -- Mr. Carbonaro had already provided Mr. Tomkins with what he, Mr. Carbonaro, believed to be adequate responses to Plaintiff's demands.

I said so to Mr. Tomkins in my email of April 24 (emphasis added).

> **From:** Dr. Larry Farwell
> **Sent:** Sunday, April 24, 2022 8:19 PM
> **To:** Paul Tomkins <ptomkins@brainwavescience.com>
> **Subject:** RE: BWS v. Arshee et al - 21-cv-4402 (BMC) - Discovery and Depositions
>
> Mr. Tomkins:
> **My understanding from my attorney at the time, Joe Carbonaro, is that**
>
> **He provided you with all of the information specified in your demands – I know that I provided all of it to him** -- and
>
> He also served discovery demands to Plaintiff to which Plaintiff has not responded.
>
> I have emailed Mr. Carbonaro seeking clarification on both of these issues.
>
> Given that this is the first I have heard **that you claim there is something lacking in my response to your discovery demands,** and I have received nothing from you in response to ours, and tomorrow is the deadline, it appears that we will need to make further arrangements.
>
> **I respectfully suggest we work out an arrangement that works for both sides, rather than getting histrionic with the judge.**
>
> Sincerely,
>
> Dr. Lawrence A. Farwell

In my Affirmation, I stated that Mr. Tomkins had not replied to my April 24 email. What I intended to convey by that statement is that Mr. Tomkins had not addressed the essential message of my email, which was that he claimed that there was something lacking in my response (through Mr. Carbonaro) to his disclosure demands, and Mr. Carbonaro and I were unaware of what exactly he claimed was lacking. This is clearly what I sincerely believed, as witness my email exchange at the time with Mr. Carbonaro.

4

I also pointed out that we had not received his responses to our discovery demands at that time. My response to that situation was a suggestion that "we work out an arrangement that works for both sides, rather than getting histrionic with the judge." Mr. Tomkins chose the latter path.

Mr. Tomkins did not address my query regarding what he claimed was lacking in what Mr. Carbonaro and I believed (correctly or not) had already been received by Plaintiffs. He simply reiterated his often-repeated original demands for disclosures along with a history of when those demands had been previously repeated.

Mr. Tomkins did hit the "reply" button and send an email back to me. In that sense, he did "reply." What he did not do is to address the essential contents of my email or reply to my suggestion that we work out a solution to the breakdown in communications between ourselves. Nor did he provide me with the requested information that would have facilitated such a solution and my timely compliance with the disclosure demands.

There was, apparently, some confusion on my part between what I had provided to Mr. Carbonaro and he had provided to Plaintiffs regarding the NY Supreme Court case and what we had provided regarding this case. Hence my characterization of this as "breakdowns in communication."

Recall that this was a situation where an inexperienced pro se litigant was communicating with his recently-dismissed attorney regarding matters in one of nine cases involving Plaintiffs and Defendants, some of which had been ongoing for years.

I will grant that my statement that "Mr. Tomkins has not replied to my April 24 email" and "he has not responded [to the same]" did not fully and accurately convey my meaning. A better phrasing would have been "Mr. Tomkins has not provided me with the information I sought in my April 24 email, and has not cooperated with my efforts to solve the discrepancies in our understandings through communication, but simply has repeated his original demands, which Mr. Carbonaro and I believed at the time had been at least partially met by Mr. Carbonaro when he was still representing me."

I apologize to the Court, and to the Plaintiffs, and to Mr. Tomkins for my inaccurate wording in these statements. By a very broad definition of the word "reply," Mr. Tomkins did reply to my email.

5

Case 1:21-cv-04402-BMC-RER   Document 86   Filed 08/24/22   Page 6 of 14 PageID #: 1148

Nevertheless, I made that and all other representations in my Affirmation in good faith and truthfully with respect to what I believed at the time, and had good reason to believe based on the communications I had received from Mr. Carbonaro.

In ¶ 14 Mr. Tomkins mentioned the Farwell Brain Fingerprinting that my colleagues and I developed for the CIA in 1993 (19 years prior to the existence of BWS LLC), and the CIA has been using since that time.  This system was developed under my supervision and according to my design.  I was working on contract with the CIA, as were my colleagues.

I stated that that, by the then current wording of the Preliminary Injunction, the CIA system contained about 80% material that is in the BWS software that BWS presumably states it submitted to Codequiry. This is because over 80% of everything in BWS' software is in the public domain, and was included in software that I and my colleagues had previously developed and implemented in many places, including the CIA.

At that time my Motion to modify the Preliminary Injunction to exclude software that existed prior to the existence of BWS from the Preliminary Injunction was pending.  It stated:

> "The following sentence shall be added immediately thereafter:
> "The above provisions 2, 3, and 4 shall not apply to software that Dr. Farwell and/or others developed and implemented before the founding of Brainwave Science, LLC in 2012."

I did not consider the possibility that said Motion would be denied, in light of the fact that it is logically impossible for any software that existed before BWS existed to have been obtained or copied from BWS.  The intent of the Preliminary Injunction was to prevent Defendants from taking advantage of software that was obtained from BWS.  Absent a time machine, the software that my colleagues and I delivered to the CIA in 1993 had not been previously developed by BWS and obtained from BWS, which did not exist until 2012.

My quoted in Tomkins' ¶ 14 was a *reductio ad absurdum* of the wording of the Preliminary Injunction, which I believed would imminently be amended to eliminate application to situations that could never exist in the real universe.

Nevertheless, my Motion to Amend the Preliminary Injunction has since been denied.

6

In Tomkins' ¶ 15 he noted that I advised the CIA that the CIA "is under no obligation to comply or even respond to it [the Preliminary Injunction]."

The following is what I actually wrote to my client, the CIA, in a letter to the CIA Director William J. Burns.

> In a civil case in US District Court for the Eastern District of New York (21-cv-4402), the following events transpired. I provided Ika's company Brainwave Science LLC / Inc. (BWS) with detailed specifications for software to implement Farwell Brain Fingerprinting, all of which I had previously released to the public domain. These are the same precise specifications that I provided in the design of the Brain Fingerprinting system now at the CIA. Dr. Thierry Maison, BWS' CTO at the time, implemented my public-domain specifications in the BWS Software, using open-source development tools. The BWS Software was released to a public domain source at 6:15 PM on 9/10/2017 from IP address 65.52.55.39 in Chicago, using the credentials of Ika's employee Karuna Raja, who was in Southborough, MA at the time.
>
> Dr. Maison later downloaded this software – which he had originally written – deleted the part that was specific to the BWS brainwave headset (the only part that might possibly be considered to be proprietary), and modified the code to develop an application (the "Maison-Farwell Software") that Dr. Maison and I have been using in conducting Brain Fingerprinting tests. Ika obtained the Maison-Farwell Software from Dr. Maison. His engineers then modified the BWS Software to be as similar as possible to the Maison-Farwell Software, generating the "Modified BWS Software." Ika submitted the two to a Codequiry similarity checker test. Not surprisingly, the two were found to be highly similar.
>
> Ika represented that the BWS Modified Software, which had been modified to appear as similar as possible to the Maison-Farwell software after BWS obtained the same from Maison – was the unmodified BWS Software that was uploaded to a public source on the internet and downloaded by Dr. Maison. In other words, the software comparison Ika used to attempt to show that Dr. Maison misappropriated BWS's software was faked and fraudulent.
>
> Ika's company then used the fraudulent comparison test results to filed a lawsuit against me, Dr. Maison – the individual other than myself best positioned and qualified to testify against Ika in criminal proceedings in Pakistan, South Africa, Nigeria, and Thailand – and others.
>
> Ika committed perjury in an affidavit and a hearing by stating that none of the BWS Software was open source, whereas virtually all of it was. He committed further perjury by stating that BWS had introduced seven specific technical innovations constituting "trade secrets," whereas in fact all of those were features that I had developed between

7

1985 and 2007, implemented in previous versions of the Brain Fingerprinting software – including the system now at the CIA – and released to the public domain in my patents and scientific publications.  Ika also committed perjury when he stated that BWS had made sure that the BWS Software was not released to any public-domain source. Ika's attorney Paul Tomkins also lied to the judge in stating that BWS had sold their brainwave systems to multiple clients, each buying multiple systems, and each system costing $400,000, whereas in fact BWS has never sold any of their systems to any government agency, and if they did to it would constitute fraud.

The claim of the lawsuit was that my invention had somehow become "trade secrets" of BWS, and Dr. Maison and I had stolen my invention from BWS.  In fact, virtually all of the BWS software was public domain material provided by me and implemented by Dr. Maison using open-source software tools, and in any case all of the BWS Software that Dr. Maison used was in the public domain because it was downloaded from a public-domain source online.

Taking into account the possibility, however remote, that Ika might not have been committing perjury when he claimed that none of the BWS Modified Software was public domain and that the innovations that I included in my previous scientific papers, patents, and previous software – including the CIA system – were developed by BWS in 2014 – 2017, the judge issued a preliminary injunction stating that any software that included any part of the BWS Modified Code that BWS has submitted to Codequiry was subject to "recall or replacement."

Since about 85% of the code in the CIA system implements the same identical scientific protocols, analysis methods, parameters, mathematics, statistics, algorithms, timing, and everything else of substance as the BWS Modified Code, this means that the CIA Brain Fingerprinting system is now subject to the "recall or replace" order.

Therefore, a second purpose of this letter is to comply with the court order requiring me to inform you (along with all others in possession of Farwell Brain Fingerprinting systems) that the CIA Brain Fingerprinting system is subject to a "replace or recall" order.  Of course, the order only affects me, as a party to the lawsuit, and the CIA has no obligation to comply or even respond to it.

If this occurs to you as beyond absurd and into the range of surreal, you are not alone. However, I suggest that we treat the judge with a level of respect and understanding. He has not yet been exposed to the actual facts regarding the software, the science, the intellectual property, and the technology.  He is also unaware of the relevant history, and as of yet has no idea whom he is dealing with on either side of the case.  In that light, the preliminary injunction may generously be looked upon and simply prudent. Once the facts come to light, the Court will be free to rule otherwise, and will inevitably do so.

As I clearly stated in my letter to my Director Burns of my client the CIA, "Of course, the order only affects me, as a party to the lawsuit, and the CIA has no obligation to comply or even respond to it."

My representation to Director Burns is obviously true. Whatever the Preliminary Injunction says, it is binding only on me, as a Defendant. Neither I nor the Plaintiffs have the right to bind the CIA to do anything, including "comply or even respond" to anything. If the Plaintiff wants to create an obligation for the CIA, then it must sue the CIA, not me.

In ¶ 16, Mr. Tomkins falsely states that "Defendant Farwell acknowledged under oath that software subject to the Preliminary Injunction is in possession of the Clinical Legal Studies Department at University of Canterbury, New Zealand." Tomkins correctly states that "Defendant Farwell acknowledged that the improvements, assistance and modifications provided to him by Plaintiff's former employee and co-defendant , Dr. Thierry Maison, were incorporated within the version of the "Farwell Brain Fingerprinting Program" provided by Farwell to the University of Canterbury in late 2019 (ECF #66-3 at Page 3 (Line 25) and 4 (Lines 1-6)."

I did not acknowledge under oath anything whatsoever about "software subject to the Preliminary Injunction" in connection with the University of Canterbury. Mr. Tomkins speculates that software that I developed with the assistance of Dr. Maison is "subject to the Preliminary Injunction." That is not what the Preliminary Injunction specifies. It specifies software that includes "any part of the code originally submitted by Plaintiff to Codequiry as its code." Until or unless Plaintiff provides actual evidence – not mere speculation – that any software possessed by any of my clients or anyone else is "subject to the Preliminary Injunction," Plaintiff must show that said software actually meets the standard set by the Preliminary Injunction – that it contains software that Plaintiff submitted to Codequiry as its code. So far, Plaintiff has not provided the software that Plaintiff submitted to Codequiry as its code for comparison with any other software, nor does Plaintiff possess any information regarding what is contained in the various Farwell Brain Fingerprinting systems in possession of my clients, other than the fact that they implement the Public Domain Farwell Brain Fingerprinting Invention that existed and was in the public domain before BWS existed.

Furthermore, Mr. Tomkins postulates that the Preliminary Injunction requires Defendants to "recall" software. That is not what it says. The Preliminary Injunction states "Defendants must take any and all commercially-practicable actions to recall or replace any software containing plaintiff's "confidential or proprietary information" from third parties;"

There are two operative phrases that Tomkins leaves out of his misrepresentation of the Preliminary Injunction. The first is "commercially viable." The second is "recall *or replace*" I explained in detail in my Affirmation, my clients have made it abundantly clear to me that it is not "commercially viable" for me to "recall" any software in their possession. Here is what I stated:

> 6. In order to comply with said preliminary injunction, I must have software that has been determined by an independent third party not to include "plaintiff's proprietary information." I have engaged one of the top independent companies in the world

9

for conducting such testing, Mindfire Technology. I have a fully executed contract in place for Mindfire to test some of my existing software. I have informed Plaintiff of their responsibility to provide their software and pay the retainer to Mindfire, per the court order. Plaintiff's attorney Paul Tomkins has requested some changes in my contract with Mindfire before his client complies with the court order. I have written Mr. Tomkins that I am amenable to modifying the contract in the ways that he requests, as long as his modifications do not countermand the intent of the Court's order. I am currently awaiting a reply from Mr. Tomkins regarding the specific modifications he requests.

7. In addition to the software that is currently awaiting testing, my colleagues and I are developing additional P300 software that does not contain plaintif's proprietary information.

8. Regarding "commercially-practicable solutions," I have discussed the situation with my clients. To understand their reply, it is necessary to understand who my clients are. My clients are some of the top government agencies in the world in the field of counterterrorism and law enforcement and their close business associates. They have an extremely high level of technical sophistication, expertise in forensic neuroscience, and knowledge of the technology, the international players in the field, and the capabilities (or lack of same) and track record (or lack
of same) of these players.


All of my clients are well aware of Brainwave Science, Inc., independent of anything to do with me or this lawsuit. All of my clients know that Brainwave Science, Inc. ("BWS") and Krishna Ika currently stand accused of fraud by authorities in at least four countries, and that the specific fraud alleged comprises, among many other alleged offenses, Ika and BWS falsely representing themselves as experts in forensic neuroscience qualified to effect a technology transfer of my brain fingerprinting invention to a government agency. This includes, for example, Mr. Ika allegedly faking demonstrations of his system by pretending to analyze brainwaves and in fact only displaying a pre-recorded graphics file purporting to represent brainwave analyses. All of my clients are aware that BWS has never sold its iCognative system to any government agency, has never tested it in the scientific laboratory and published the results in peer-reviewed journals, and has never successfully applied their system in the laboratory or the field. In fact, my clients are some of the same people who have detected alleged attempted fraud by Ika and BWS and accused them of the same. In light of these facts, it is not surprising that my clients have responded to any discussion of "recall" of any software they have received from me as follows:

10

```
a. They are not in possession of any software or hardware that
contains anything that might be construed as proprietary to BWS.
They have sufficient expertise to recognize the fact that any
such claims by BWS are totally spurious.

b. Even if they were in possession of such software or hardware,
there is no way I can force them to remit it to me; that is,
there is no way that I can force a "recall" of any software that
they possess, whether it came originally from me or not, and
whatever it contains.

c. If I ever delivered to them any software or hardware that
contained anything proprietary to BWS, they would reject it,
because they know BWS has nothing proprietary that contributes in
any way to the field of forensic neuroscience. They have
sufficient scientific and technical expertise to know this
definitively.

d. I am free to replace any software they have obtained from me,
provided only that the replacement software performs as well as
or better than what they now have.

9. The response of my clients eliminates the possibility of
"commercially-practicable" "recall," and leaves open the
possibility of "replace[ment]," but only if and when BWS
cooperates with the independent testing of my software by
providing their software and paying for the testing as ordered by
the Court, and only after I have had sufficient time to develop
software that is certain to meet the standard set by the Court.
```

Dr. Farwell's Affidavit [ECF #59] stated (P. 5):

```
In the Preliminary Injunction (ECF 30), the Court ordered me to
"take any and all commercially-practicable actions to recall or
replace any software containing plaintiff's 'confidential or
proprietary information' from third parties;" and has defined
"confidential or proprietary information" as "any portion of the
program plaintiff originally submitted to Codequiry as its code."
In my previous Affidavit [51], I stated the following: "The
response of my clients eliminates the possibility of
'commercially-practicable' 'recall,' and leaves open the
possibility of 'replace[ment],' but only if and when BWS
cooperates with the independent testing of my software by
providing their software and paying for the testing as ordered by
the Court, and only after I have had sufficient time to develop
software that is certain to meet the standard set by the Court."
The Court is crystal clear in said Preliminary Injunction. I have
two options: (1) recall said software, insofar is that is
"commercially practicable," or (2) replace the same, insofar as
that is "commercially practicable."
```

11

```
By elementary logic, if it is not "commercially practicable" to
"recall" said software, if any, then my only remaining option is
to "replace" the same. In that case, contrary to Tomkins'
statements in said Motion of March 21, my only remaining option
depends on Plaintiff (1) providing their software to the tester
that I engage to test my software against "the program plaintiff
originally submitted to Codequiry as its code," and (2) paying
for said testing. Plaintiff so far has refused to do so.
Plaintiff's contention that I must somehow be forced to comply
with the Preliminary Injunction, while Plaintiff refuses to
comply with the requirement that they submit their software for
testing and pay for the same, is without merit. Obviously, I
cannot "replace" existing software with software that has been
proven by a tester to not contain Plaintiff's confidential or
proprietary information so long as Plaintiff continues to refuse
to fulfill their obligations under the Preliminary Injunction to
do the actions from their side that are necessary for such
testing to take place.
```

In ¶ 17, Tomkins leaves out the most important part of my response to his question in ECF 66-3. I told the same thing to my colleagues at the University of Canterbury as I said to my clients at the CIA: with respect to my client the CIA, as follows:

```
I informed them of the -- of the wording
5 of the court order, and if -- if they believe that
6 they are bound by that to send me system, they can
7 do so. If they believe that they are bound to do
8 anything else, that -- then they can do so. I -- I
9 don't have the ability to force them to do anything.
```

On P. 6 ¶ 18 Mr. Tomkins states that my allegation that the Preliminary Injunction was obtained by fraud upon this Court is "demonstrably false." I stand by my statement that BWS fraudulently modified its code prior to submission to Codequiry, and I can and will prove it. In his Order of August 21, 2022, Judge Cogan stated: "If Dr. Farwell's allegations about BWS fraudulently modifying its software prior to its submission to Codequiry are true, a fact that will only be known once discovery is concluded, then sanctions will be levied against BWS and the preliminary injunction will be lifted." As Judge Cogan stated, the truth will not be known until the process of discovery is completed.

In ¶ 19, Tomkins denied that he "lied to the judge." I stand by my statement (ECF #80, P. 41, ¶ 4 – 8.) Mr. Tomkins statements in ¶ 19 and ¶ 21 provide no evidence to the contrary. I stated: "Mr. Tomkins stated that his client had sold iCognative (BWS Software) systems for a cost of about $400,000 per license, and each sale included several licenses, and that more than one such sale had taken place."

If Mr. Tomkins did not lie, then, prior to the time that Tomkins made the statement inquestion BWS, had sold at least three systems at least $400,000 each to each of several clients. By simple mathematics, that is $400,000 x 3 = $1,200,000 per client times at least three clients, for a total of $3,600,000. Mr. Tomkins claims (without evidence) to have confirmation of *one* sales order,

12

to *one* alleged client for $465,000. That is not 3 sales to each of 3 clients for a total of $3,600,000. In short, even if Mr. Tomkins is telling the truth with respect to the one sales order, he lied to the judge.

Moreover, Mr. Tomkins does not state that the sales order took place prior to his statement in question to the judge. Nor does he provide any information regarding what was allegedly sold or to whom, or any documentation or confirmation other than his own unsubstantiated and vague statement.

That said, with respect to the unsubstantiated sales documentation claimed by Mr. Tomkins, I will no longer state that BWS has never sold a system to any client at any price approaching $400,000.

As the inventor and world's leading expert on Farwell Brain Fingerprinting, I am in contact with many of the agencies around the world who are in a position to purchase such a system or who might have an interest in such a purchase. I have heard nothing about such a sale by BWS. I had excellent reason to believe that if such a sale had been made, I would have heard about it. That said, as a precaution in case Mr. Tomkins is now telling the truth even though he earlier lied to the judge, I will cease making statements that BWS has never sold such a system. I made that statement in good faith, with excellent reason to believe that it was true. Neither I nor the court has any reason not to believe that my statement was true, other than the word of Mr. Tomkins, who has previously told demonstrable lies, as explained above.

Returning to the issue at hand, namely the question of whether or not to hold me in contempt of court for my delay in producing discovery documents, I respectfully submit that my undisputed reasons with respect to my medical condition due to an injury provide sufficient reason not to hold me in contempt. As soon as I was medically able, I have fully complied with Plaintiff's discovery demands. I have done so before the deadline of August 23, 2022 set by this Court.

Moreover, I respectfully request that this Court take into consideration the above facts regarding the breakdown in communication that exacerbated the situation and contributed to the delay, as explained above.

Sincerely,

*Lawrence A. Farwell*

Dr. Lawrence A. Farwell

Defendant

28375 Sandy Beach Lane NE
PO Box 547
Kingston, WA 98346
email: brainwave@larryfarwell.com
phone (206) 905-1009
mobile (206) 250-5516

Case 1:21-cv-04402-BMC-RER   Document 86   Filed 08/24/22   Page 14 of 14 PageID #: 1156