UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

BRAINWAVE SCIENCE, INC.

       Plaintiff

- against -

(BMC-RLM)


ARSHEE, INC., DR. LAWRENCE A.
FARWELL, DR. THIERRY MAISON and
BRAIN FINGERPRINTING FOUNDATION

                 Defendants.

----------------------------------------------------------- X

FILED
in the Clerk's Office
U.S. District Court, EDNY
Nov. 16, 2022
Brooklyn
Pro Se Office via Box.com

Letter from Defendant
Dr. Lawrence A. Farwell to
Magistrate Judge Roanne L. Mann in
Response to Order of Nov. 14, 2022

Civil Action No.: 21-cv-4402

Dear Judge Mann:

1. On November 14, 2022, this Court issued the following Order:

    SCHEDULING ORDER re [95] Affidavit filed by Brainwave Science, Inc. By Order dated November 8, 2022, this Court directed plaintiff to show cause why it should not be directed to execute the agreement proffered by defendant Farwell for comparative testing of the parties' respective P300-related software. In response, plaintiff proposed an alternative to the "Scope of Work" provision drafted by defendant Farwell, which appears to be a reasonable compromise between the parties' positions. By November 17, 2022, defendant Farwell must respond to plaintiff's alternate proposal (DE #95-1). Ordered by Magistrate Judge Roanne L. Mann on 11/14/2022.

2. This letter comprises the response of the undersigned, Defendant Dr. Lawrence A. Farwell.[1]

3. On December 13, 2021, Judge Cogan issued a Preliminary Injunction that stated as follows:

    1. Defendants must take any and all commercially-practicable actions to recall or replace

    any software containing plaintiff's "confidential or proprietary information" from third parties;

    2. Defendants must not sell or transfer plaintiff's "confidential or proprietary information;"

    3. Defendants must not use plaintiff's "confidential or proprietary information" in any software update or product demonstration; and,

    4. Defendants must provide to plaintiff, at plaintiff's sole expense, a report from an independent third party confirming that any P300-related software demonstration, sale, update, or transfer by defendants does not include plaintiff's "confidential or proprietary information."

---

[1] For the sake of clarity, I, Defendant Dr. Lawrence A. Farwell, shall in some cases herein refer to myself in the third person.

> For the purposes of this preliminary injunction, "confidential or proprietary information" is defined as any portion of the program plaintiff originally submitted to Codequiry as its code.

4. Defendant Dr. Lawrence Farwell has been carrying out his responsibilities and practicing his career as a forensic neuroscientist and the inventor and world's leading expert on Brain Fingerprinting since the 1980s, more than 25 years before Plaintiff Brainwave Science, Inc.'s CEO , Krishna Ika initially heard of Dr. Farwell's invention of Brain Fingerprinting and BWS Inc.'s predecessor Brainwave Science, LLC was founded in 2012.

5. Many of Dr. Farwell's scientific studies and scientific publications have involved a brain response known as the P300.  The P300 is a brain response that is used in Dr. Farwell's invention of Brain Fingerprinting.  It is used in many other related and unrelated applications, including the software used by Plaintiff Brainwave Science, Inc. that is involved in the current lawsuit. The P300 was discovered in the 1960s and has been featured in thousands of scientific studies.  Dr. Farwell's first paper on the P300 in 1988 alone has been cited over 3,000 times in the scientific literature.

6. In order for Defendant Dr. Farwell to carry out his responsibilities and practice his profession as a neuroscientist, it is necessary to for him to demonstrate, update, and transfer software implementing Dr. Farwell's invention of Brain Fingerprinting and other software involving the P300.

7. The Preliminary Injunction allowed for this by stating that any P300-related software that Dr. Farwell subsequently applied in a demonstration, sale, update, or transfer must not include Plaintiff's "confidential proprietary information."

8. To ensure Dr. Farwell's compliance with the above, the Preliminary Injunction stated that prior to any such demonstration, sale, update, or transfer, the software involved must be tested by an independent third party to ensure that it did not include Plaintiff's "proprietary information."

9. In compliance with the intent of the Court as expressed in the Preliminary Injunction, I, Defendant Dr. Farwell, developed software that implements my Brain Fingerprinting invention and that I believe and claim does not include Plaintiff's "proprietary information."[2]

10. In compliance with the Preliminary Injunction, Dr. Farwell executed a contract (the "Executed Dr. Farwell-Mindfire Contract") with a highly qualified independent software testing company, Mindfire Technology ("Mindfire"), to conduct the testing of this software as required by the Preliminary Injunction. Said contract was fully executed by Dr. Farwell and Mindfire on March 7, 2022. Said fully executed contract, signed by Dr. Farwell and Mindfire Technologies, is attached hereto as Exhibit A.

11. Along with the fully executed contract, Dr. Farwell submitted his new software to be tested to Mindfire Technologies, as required by the Preliminary Injunction, prior to engaging in any demonstrations, sale, update, or transfer of the same.

12. Dr. Farwell then informed Plaintiff of said fully executed contract and of the software to be tested per the Preliminary Injunction, and notified Plaintiff BWS Inc. of BWS' obligation under the Preliminary Injunction to submit BWS' software to Mindfire for testing and to pay for the test.

13. BWS Inc. refused to comply with the requirement of the Preliminary Injunction to submit their software for testing and to pay for said testing.

14. BWS' attorney Paul Tomkins wrote an alternative proposed contract (the "BWS Unexecuted Proposed Contract," ECF 93-1) that, in addition to the report required by the order of the Court, added an additional report to be delivered by the evaluator to the Plaintiff that comprised the transfer of Defendant Farwell's intellectual property to Plaintiff by the evaluator providing to the Plaintiff specific details of Defendant Dr. Farwell's new software to be tested, including, among other things, screen shots.

15. Moreover, the BWS Unexecuted Proposed Contract usurped the responsibility of the independent evaluator to determine whether or not the software to be tested contained

---

[2] Defendants dispute Plaintiff's claim that the software previously submitted by Plaintiff for testing that forms the basis of this lawsuit contains Plaintiff's "proprietary information."

Plaintiff's "proprietary information," and transferred that power to Plaintiff BWS instead, stating "If *our [Plaintiff BWS'] staff* finds any portion of the code provided by Defendant(s) to contain any significant portion(s) of the code submitted by Brainwave, our office will suspend its comparison and provide a report on same." (ECF #93-1 at Page 5).

16. The BWS Unexecuted Proposed Contract proposed the following Scope of Work:

> **Preliminary Report:** Prior to conducting the code comparison, Mindfire will conduct a preliminary review of the source code submitted by Defendant. The purpose of this review is to ensure that the code submitted represents a functional code. Following this review, Mindfire will provide a Brief Preliminary Report addressing the following:
>
> ▪ The language the code is written in;
>
> ▪ The number of lines in the code;
>
> ▪ Confirmation that the code provided could be compiled into a workable format and
>
> ▪ Screenshots of exemplary user interfaces.
>
> **Code Comparison Report:** Once the Preliminary Report has been completed and submitted, Brainwave will advise Mindfire within two (2) business days to begin work on the code comparison. Pursuant to the Court's Order, the code comparison is being conducted to confirm whether the code provided by Defendant(s) contains any portion(s) of the code submitted by Plaintiff. If our staff finds any portion of the code provided by Defendant(s) to contain any significant portion(s) of the code submitted by Brainwave, our office will suspend its comparison and provide a report on same.

17. Plaintiff then lied to this Court in its Letter Motion of March 21 regarding the BWS Unexecuted Proposed Contract. Specifically, Plaintiff's statement that "the undersigned executed a retainer agreement for the third-party evaluator selected by Defendant Farwell to

5

conduct the code comparison directed by the Court's Temporary Injunction" is an out-and-out lie, as revealed by Plaintiff's own Exhibit A (ECF 93-1) to Plaintiff's Status Report (ECF 93). An examination of said Exhibit shows that BWS Unexecuted Proposed Contract was never fully executed, but rather was signed only by BWS and not by Mindfire. The preamble in the sentence quoted above, "At the request and urging of Defendant Farwell's former counsel…",…," is yet another lie. Defendants' former counsel, Joseph Carbonaro, was well aware that Dr. Farwell executed a satisfactory agreement with Mindfire, there was no reason for Plaintiff to attempt to execute an alternative contract with Mindfire, and in any case he certainly did not request or urge Plaintiff to sign a contract with Mindfire or anyone else that expanded the scope of the work to include a second report transferring Defendant's intellectual property to Plaintiff, or to include a clause transferring the power to make the critical decision regarding the software from the evaluator to the Plaintiff.

18. No legitimate, competent, and honest evaluator would execute a contract that so obviously contradicted the Preliminary Injunction and constituted unauthorized and illegal transfer of Defendant's intellectual property to Plaintiff, as well as a transfer of the responsibility for making the critical determination regarding the software from the evaluator to the Plaintiff. Contrary to the lies propagated by Plaintiff noted above, Mindfire refused to sign said contract. Plaintiff concealed from this Court the material fact that Mindfire had refused, for good reason, to execute the contract proposed by BWS, and that Mindfire had, also for good reason, executed the Executed Dr. Farwell-Mindfire Contract.

19. The BWS Unexecuted Proposed Contract contained the following two obvious "poison pills" that directly contradicted the Preliminary Injunction and would obviously be unacceptable to Defendant Dr. Farwell (or any other software developer in his position) and to any legitimate, competent, and honest evaluator such as Mindfire: (1) transferring Defendant Dr. Farwell's intellectual property to Plaintiff; and (2) transferring the power to make the critical determination – whether Dr. Farwell's new software contained Plaintiff's "proprietary information" – from the independent evaluator to the Plaintiff.

20. By acting in bad faith, refusing to abide by the Preliminary Injunction and perform according to the fully executed contract between Dr. Farwell and Mindfire, inserting obviously unacceptable terms in their proposed alternative contract, and lying about it to this Court,

Plaintiff used this Court to make it impossible for Dr. Farwell to practice his profession -- which necessarily involves demonstration, sale, update, and transfer of software implementing his Brain Fingerprinting invention -- from March, 2022 until the present time.

21. At Mr. Tomkins request, I executed a revised agreement with Mindfire that included the specifications he asked for with respect to the scope of work. On March 8, 2022, I wrote an email to Mr. Tomkins that stated:

> Mr. Mr. Tomkins:
>
> Per your request, I have executed a revised contract with Mindfire that strictly limits the scope of work to exactly the words in the preliminary injunction.
>
> I have attached the document, signed by both parties.
>
> The attached fully executed contract now not only meets the requirements of the court's preliminary injunction, but also gives you everything you asked for in the way of restricting the scope of work to the maximum possible extent.
>
> Kindly provide the iCognative software to Mindfire and pay their retainer without further delay.
>
> As a gesture of goodwill and cooperation, I also offer that you may feel free to provide Mindfire with any additional information you like that you think supports your case, and communicate freely with them during the course of their performance on the contract. I will forward any progress reports to you as soon as I receive them.
>
> Note that neither you nor I have the right to interfere with the comparison or prevent Mindfire from completing their work, whether we like the results or not. If either of us attempted to obtain such undue influence, the testing company would no longer be independent, but rather would be under the control of one party or the other. Such a situation would be in direct contradiction of the requirement of the court that the company I hire to provide me with the report that I then provide to you per the injunction must be an independent third party.
>
> Regards,
>
> Dr. Lawrence A. Farwell

22. Mr. Tomkins replied on March 8. His email stated, in part, as follows:

> Dr. Farwell,
>
> Your proposal is not acceptable to the Plaintiff for the following reasons:
>
> As I have previously advised, Brainwave is not amenable to releasing our code or remitting payment for the services of any evaluator/expert without *[1]* **a retainer agreement in place between Brainwave and the evaluator**. Again, this is neither unreasonable nor unusual when securing the services of an independent, third-party evaluator. This may be accomplished by way of a tri-parte retainer agreement or a retainer agreement between Brainwave and the evaluator with an NDA and full release in favor of submitting Defendant(s).
>
> As I have also previously advised, *[2]* **the "Scope of Work" provision must include some verification by the subject matter expert(s) that the code submitted by Defendant(s) represents a bona fide representation of <u>code to be demonstrated, sold or transferred by Defendant(s)</u>. I.E. the code should be able to be compiled into executable form and should be verified as a bona fide P300-related application.** I have been advised by our technical staff that this verification should take no more than 2-3 hours. Absent such a verification, we have no way of confirming that the code being submitted for evaluation relates to the software which is the subject of the Court's Temporary Injunction Order.
>
> As I also have previously advised, *[3]* **the retainer agreement should provide the names and qualifications of all persons to be conducting the code analysis**.
>
> *(Emphasis added: The three sections that delineate Plaintiff's stated requirements are in bold type and numbered [1], [2], and [3].)*

23. The "Executed Dr. Farwell-Mindfire Contract" fully addresses all of these issues, as follows. Requirements [1] and [3] are clearly included therein and are no longer in dispute.

21. Requirement [2] is addressed by the following language in the Scope of Work provision, as follows:

8

3.  SCOPE OF WORK

Mindfire to evaluate the defendants' software and determine whether it includes "confidential or proprietary information" of Brainwave Science, Inc. "Confidential or proprietary information" is defined as "any portion of the program Brainwave Science, Inc. originally submitted to Codequiry as its code," which shall constitute the code submitted by BWS to Mindfire, as per Preliminary Injunction in US District Court for the Eastern District of New York case 21-cv-4402.

Prior to conducting the code comparison, Mindfire will conduct a preliminary review of the code submitted by Dr. Farwell. The purpose of this review is to ensure that the code submitted represents a functional code. **Mindfire will either (A) provide confirmation to Dr. Farwell and BWS that in Mindfire's professional evaluation the code represents a viable functional code that can be implemented in a workable format,** and continue with the code comparison; or (B) provide confirmation to Dr. Farwell and BWS that in Mindfire's professional evaluation the code does not represent a viable functional code that can be implemented in a workable format, and cease further analysis. As per the terms of the Confidentiality Agreement herein, Mindfire shall not provide any part of Dr. Farwell's code or any additional information whatsoever about Dr. Farwell's code to BWS.

Pursuant to the Court's Order, the code comparison is being conducted to confirm whether the code provided by Defendant Dr. Farwell contains any portion(s) of the code submitted by Plaintiff BWS.  If Mindfire finds any portion of the code provided by Defendant Farwell to contain any significant portion(s) of the code submitted by Plaintiff BWS, Mindfire will suspend its comparison and provide a report on same to Dr. Farwell and BWS. Otherwise, Mindfire will complete its code comparison and submit a report on the same to Dr. Farwell and BWS.

*[Emphasis added: The section that addressed Mr. Tomkins' requirement [2] is in bold.]*

9

22. The bolded wording in the above Statement of Work is essentially what Plaintiff's attorney Mr. Tomkins asked for regarding requirement [2] in his above email outlining terms that are acceptable to Plaintiff.

23. In Plaintiff's Attorney's Affirmation in Response to Order to Show Cause of November 14, 2022 ("Plaintiff's Attorney's Affirmation"), Plaintiff's attorney Mr. Tomkins raises three objections to the above Scope of Work, one objection in each of three sentences, as follows:

> 9.  The Scope of Work provision within Defendant Farwell's proposed retainer agreement is unfair and unreasonable as it limits verification <u>exclusively</u> to whether the software submitted by Defendant Farwell "represents a viable functional code".
>
> 10. Defendant Farwell's counter-proposal is also unfair and unreasonable as it omits any mechanism by which the independent third-party evaluator can confirm that the code submitted by Defendant Farwell is <u>a bona fide version of his code.</u> Defendant Farwell's counter-proposal further prevents any third party from confirming or refuting whether his submission to the evaluator is genuine, or from requesting clarification or substantiation of findings of the evaluator, by explicitly restricting the evaluator from providing "any additional information whatsoever about [the code submitted by Defendant Farwell for comparison] to BWS".  (Id.)
>
> *[Emphasis in the original.]*

24. The provisions proposed by Mr. Tomkins go far beyond addressing the objections he raised, and also far beyond what he previously stated would be acceptable, and even further beyond the provisions of the Preliminary Injunction.

25. Mr. Tomkins proposed replacing the middle paragraph of the above Scope of Work with the following, and leaving the first and third paragraphs the same:

> **Dr. Farwell shall submit affidavits confirming that code submitted to Mindfire includes true and accurate copies of code he submitted to the Clinical Legal Studies Department at University of Canterbury, New Zealand and the Forensic Science Laboratory for the**

> **Government of Delhi, India and any other third parties to whom Dr. Farwell intends to convey code.  Prior to conducting the code comparison, Mindfire will conduct a preliminary review of the code submitted by Dr. Farwell. The purpose of this review is to ensure that the code submitted represents a true and accurate copies of code conveyed, or to be conveyed, by Dr. Farwell to the above referenced and/or other third parties. Mindfire shall conduct, implement and report upon this verification in a manner to be determined by Mindfire following input from both parties.**

26. Like Mr. Tomkins' previous proposal, the BWS Unexecuted Proposed Contract, this language contains a poison pill, albeit a less obvious one than the two in the previous document.

27. In his previous statement of acceptable terms as cited above, Mr. Tomkins only required that the new software be "**a bona fide representation of *code to be demonstrated, sold or transferred by Defendant(s)*.  I.E. the code should be able to be compiled into executable form and should be verified as a bona fide P300-related application.**"

28. There is no mention in Mr. Tomkins previous writings that Dr. Farwell's new software must be identical to any software that he may have provided to previous clients.

29. There is no argument in favor of such a requirement in Plaintiff's Attorney's Affirmation, nor is such a requirement even mentioned, except by adding language to that effect in the proposed modified Scope of Work.

30. There certainly is no mention in the Preliminary Injunction that the new software that Dr. Farwell develops and submits for testing must be identical to any previous code.

31. That would not make sense, and would be highly unfair and unreasonable.  A major feature of Dr. Farwell's practice of his profession is to develop new software and provide it to clients.  Per the Preliminary Injunction, this new software must be tested by an independent evaluator and cleared before he can demonstrate, sell, upgrade, or

11

transfer it. This is what Dr. Farwell has been seeking in good faith to do. Inclusion of the above-mentioned poison pill proposed by Plaintiff's Attorney's Affirmation would require Dr. Farwell to choose between (a) signing an affidavit that contains a demonstrably false statement, as the proposed wording in Plaintiff's Attorney's Affirmation demands, and (b) refusing to sign a court-ordered contract for software testing, and thereby allowing Plaintiffs to use this Court to prevent Dr. Farwell from accomplishing the testing called for in the Preliminary Injunction, resulting in Dr. Farwell being unable to practice his profession.

32. Mr. Tomkins is well aware that the software that Dr. Farwell submitted for testing along with the Executed Dr. Farwell-Mindfire Contract – the software that is the subject of the contract with Mindfire at issue here – is *not* the same as the software that Dr. Farwell may have submitted to previous clients. The requirement that Dr. Farwell submit an affidavit stating that the new software is identical to software that Dr. Farwell may have provided to others in the past is an obvious poison pill, and a clear indication of bad faith on the part of Plaintiff. Such a statement would be demonstrably false, and Dr. Farwell would never make such a statement.

33. Plaintiffs have not demanded or even suggested such a provision in any previous pleadings or correspondence. It was not necessary to include this third "poison pill" in the previous BWS Unexecuted Proposed Contract in order to accomplish Plaintiff's scheme of ensuring that the required testing would not take place and Dr. Farwell would be prevented from practicing his invention. This is because that scheme was accomplished by the two previously mentioned "poison pills" in said document. Once the previous two "poison pills" were eliminated, Plaintiff came up with a new "poison pill" in a transparent effort to once again ensure that the testing required by the Preliminary Injunction would not take place and Dr. Farwell would continue to be prevented from practicing his profession.

34. In a good-faith effort to make every possible accommodation to Plaintiffs in order to be able to proceed with the required testing, I, Defendant Dr. Lawrence Farwell, am willing to modify the Scope of Work to more precisely adhere to the wording that Plaintiff has previously specified. This will fully satisfy all of the concerns and

objections that Plaintiff has raised regarding the testing contract, using Plaintiff's attorney's own words for the solutions.

35. ¶ 9 of Plaintiff's Attorney's Affirmation quoted above states that the wording that "Mindfire will either (A) provide confirmation to Dr. Farwell and BWS that in Mindfire's professional evaluation the code represents a viable functional code that can be implemented in a workable format…" is inadequate, despite the fact that is very similar to the wording that Mr. Tomkins himself proposed previously.  Nevertheless, I am willing to change this wording to reflect exactly the wording that Mr. Tomkins proposed previously (see above), a provision that will ensure that the code submitted is, in Mr. Tomkins exact proposed wording, "a bona fide representation of code to be demonstrated, sold or transferred by Defendant(s).  I.E. the code should be able to be compiled into executable form and should be verified as a bona fide P300-related application."

36. I am also willing to sign an affidavit that the software is what I say it is, as per Mr. Tomkins' words "a true and accurate copy" of (again Mr. Tomkins' words) "code to be demonstrated, sold or transferred by Defendant(s)."

37. The above modifications fully satisfy the first and second concerns in ¶ 9 and ¶ 10 of Plaintiff's Attorney's Affirmation, as quoted above.  The following change fully satisfies the third concern raised therein.

38. I am willing to entirely eliminate the following wording to which Plaintiff objected: "Mindfire shall not provide any part of Dr. Farwell's code or any additional information whatsoever about Dr. Farwell's code to BWS."

39. The middle paragraph of the Scope of Work will then read as follows, comprised almost entirely of wording proposed by Mr. Tomkins himself.

> **Dr. Farwell shall submit affidavits confirming that code submitted to Mindfire represents a bona fide representation of code to be demonstrated, sold or transferred by Defendant(s).  I.E. the code should be able to be compiled into executable form and should be verified as a bona fide P300-related application, and is a true and accurate copy of the**

> **code to be conveyed to third parties. Prior to conducting the code comparison, Mindfire will conduct a preliminary review of the code submitted by Dr. Farwell. The purpose of this review is to ensure that the code submitted is able to be compiled into executable form and is verified as a bona fide P300-related application, and is a true and accurate copy of the code to be conveyed to third parties. Mindfire shall conduct, implement, and report upon this verification in a manner to be determined by Mindfire following input from both parties.**

40. Note that this fully eliminates all of the issues to which Plaintiff objected in Plaintiff's Attorney's Affirmation, using wording proposed by the Plaintiff's attorney himself.

41. With the Court's approval, I will immediately prepare, sign, and forward to Plaintiff and Mindfire a contract with the above wording for the Scope of Work. The rest of the wording will remain as per ECF #94-1, as agreed to by myself and by Plaintiff per Plaintiff's Attorney's Affirmation.

Sincerely,

*Lawrence A. Farwell*

Dr. Lawrence A. Farwell, Defendant

Date: November 16, 2022

Email: brainwave@larryfarwell.com
Website: https://farwellbrainfingerprinting.com
Phone: +1 206-905-1009
Mobile: +1 206-250-5516
Address: 28375 Sandy Beach Lane NE
　　　　 PO Box 547
　　　　 Kingston, WA 98346
cc: Paul Tomkins, Esq.
　　Dr. Thierry Maison
　　Arshee, Inc.
　　Andrew Black, Esq.



# Litigation Support
# and Consulting Services Agreement

This Litigation Support and Consulting Services Agreement (the "Agreement") is made and effective __March 7, 2022__ ,

**BETWEEN:**  __Dr. Lawrence A. Farwell__ (the "Company"), an individual residing in the state of __Washington__ , its head office located at:

Company Street Address: __28375 Sandy Beach Lane NE, PO Box 547__
Company City, State, Zip: __Kingston, WA 98346__

**AND:**  **Mindfire Consulting Group, LLC, dba Mindfire Technology** ("Mindfire"), a corporation organized and existing under the laws of the Utah, with its head office located at:

872 W Heritage Park Boulevard, Suite 200
Layton, UT, 84041

## 1. LITIGATION SUPPORT AND CONSULTING SERVICES

Litigation Support and Consulting Services (the "Services") when used in this Agreement consist of the performance of professional services that include but are not limited to software and technical consultation, technical strategy, courtroom strategy, courtroom testimony, source code analysis, source code comparison, manual and automated system analysis, creating analysis tools, writing code, source code abstraction, filtration and comparison, documentation, reporting, document review and document examination.

## 2. COMPANY'S RESPONSIBILITIES

Company may need to perform certain activities in order for Mindfire to fulfil its responsibilities under this Agreement including but not limited to meetings or interviews in person or by other electronic means, granting access to requirements, specifications, documents, files, test accounts, test devices, app store accounts, third party accounts and software demos and testing. Unnecessary or unreasonable delays attributable directly to Company which result in additional costs to Mindfire are subject to additional compensation to Mindfire.

## 3. TERM OF THE AGREEMENT

This Agreement is effective as of the date it is signed by both parties. The terms and conditions of the Agreement will remain in effect until terminated by either party. In no event shall this Agreement be in effect for more than five (5) years unless both parties execute an amendment which extends the term of this Agreement. The expiration of this Agreement shall not affect the obligations of either party to the other with respect to those obligations established under this Agreement. Either party may terminate this Agreement for any reason upon prior written notice.  Both parties agree that they will give as much notice as possible in the event of early termination of this agreement.

4. SURVIVAL BEYOND COMPLETION

The provisions herein and Services performed under this Agreement as well as confidentiality, use, indemnification, assignment, reproduction, warranty, ownership, return or destruction shall survive the delivery of the Services and the payment of associated charges.

5. CONFIDENTIALITY AND SECURITY OF THE SYSTEMS

Each party acknowledges that all material and information which has or will come into the possession and knowledge of each in connection with this Agreement or the performance hereof, consists of confidential and proprietary data, whose disclosure to or use by third parties could be damaging. Both parties, therefore, agree to hold such material and information in strictest confidence, not to make use thereof other than for the performance of this Agreement, to release it only to individuals requiring such information, and not to release or disclose it to any other party, except as approved by the parties or required by law.

6. NON-DISCLOSURE / CONFIDENTIALITY

This Agreement shall govern the conditions of disclosure by the Company to Mindfire of certain "Confidential Information" including but not limited to prototypes, drawings, data, trade secrets and intellectual property relating to the business of Company.

With regard to the Confidential Information, Mindfire hereby agrees:

A. To safeguard the information against disclosure to others with the same degree of care as exercised with its own information of a similar nature.
B. Not to disclose the information to others, without the express written permission of Company, except that:
   a. which Mindfire can demonstrate by written records was previously known;
   b. which are now, or become in the future, public knowledge other than through acts or omissions of Mindfire;
   c. which are lawfully obtained by Mindfire from sources independent of Company;
C. That Mindfire shall not directly or indirectly acquire any interest in, or design, create, manufacture, sell or otherwise deal with any item or product, containing, based upon or derived from the information, except as may be expressly agreed to in writing by Company.
D. That the non-disclosure and confidentiality obligations of Mindfire with respect to the information shall continue for a period ending two years from the termination date of this Agreement.

7. COMPANY'S RIGHT TO CONTRACT FOR SIMILAR WORK

Company reserves the right to contract with other parties for work similar to that being performed under this Agreement so long as that work does not violate its covenant of non-disclosure.

8. CANCELLATION

In the event that Company, at its option, elects to cancel this Agreement, by written notice to Mindfire; in such event, Company will pay Mindfire the amount equal to the actual time and materials charges incurred for that work so cancelled through the day of receipt of written notice of cancellation and any further work required to transfer work or services from Mindfire to Company at the agreed upon Rate as set forth in Attachment A.

9.  INVOICES AND PAYMENTS

In consideration of the Services to be performed hereunder Company shall pay Mindfire as follows:

A.  As full compensation for the Services performed in association with this Agreement, Company agrees to pay Mindfire the applicable Rate per consultant engaged in the Services, as set forth in Attachment A.

B.  Company shall pay Mindfire a ("Retainer") in the amount set forth in Attachment A. Retainer will be held by Mindfire in a trust account and will not earn interest. Upon the issuance of each invoice, Mindfire is authorized to debit the amount of funds indicated on the invoice from the Retainer. Client agrees to remit the amount of the invoice to replenish the Retainer such that the Retainer account shall at all times remain positive. If the balance of the Retainer account drops below zero, Mindfire may suspend its performance of Services and delivery of any work product until the balance is restored. Final invoice will be applied against the funds in deposit. If total invoices do not exhaust the Retainer, Mindfire will refund the balance to Company at the conclusion of the engagement and upon clearance of expected costs. Any payment made by credit card, is subject to a 2.5% credit card processing fee.

10. ATTORNEYS' FEES

If any dispute arises under this Agreement, Mindfire and Company shall negotiate in good faith to settle such dispute. If the parties cannot resolve such disputes themselves, then either party may submit the dispute to mediation by a mediator approved by both parties. If either party does not wish to abide by any decision of the mediator, they shall submit the dispute to litigation. The jurisdiction for any dispute shall be administered in Davis County, State of Utah. Prevailing party shall be entitled to attorneys' fees, court costs, accrued interest (18% per annum) in addition to any other relief it may be awarded, and any other costs to resolve such dispute.

11. GOVERNING LAW & JURISDICTION

This Agreement shall be governed by and construed in accordance with the laws of the state of Utah. All parties agree to the exclusive jurisdiction and venue of the Second Judicial District, Davis County Justice Court in the State of Utah.

12. INDEMNIFICATION INCLUSION OF COSTS

Each party hereunder agrees to indemnify the other against all losses, costs, expenses (including reasonable counsel fees) which may occur by reason of the breach of any term, provision, warranty or representation contained herein and/or in connection with the enforcement of this Agreement or any provision thereof.

13. ALL AMENDMENTS IN WRITING

No amendments to this Agreement shall be effective unless it is in writing and signed by duly authorized representative of both parties.

14. NON-SOLICITATION

Both Company and Mindfire agree not to solicit employees or subcontractors from either company nor will solicitation be made to key business partners, suppliers, etc.

## 15. SEVERABILITY

If any term or provision of this Agreement is found by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to affect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

## 16. SUCCESSORS & ASSIGNS

This Agreement shall inure to the benefit of and be binding upon the Company and Mindfire hereto and their respective permitted successors and permitted assigns. Mindfire shall not assign any of its rights or delegate any of its obligations under this Agreement to any person or entity without Company's prior written consent, which may be given or withheld in Company's sole discretion. Any purported assignment or delegation by Mindfire in violation of this Section shall be null and void and without any legal or binding effect.

## 17. HEADINGS

The headings of articles, sections, and subsections in this Agreement are included for convenience and reference only and do not affect the interpretation of this Agreement.

## 18. ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties with respect to the subject matter; all prior agreements, representations, statements, negotiations and undertakings are superseded hereby.

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates set forth first above, with full knowledge of its content and significance and intending to be legally bound by the terms hereof.

COMPANY

*Lawrence A. Farwell*
Authorized Signature

Dr. Lawrence A. Farwell
Print Name and Title

MINDFIRE

*[signature]*
Authorized Signature

Shane Willard, CEO
Print Name and Title



# Attachment A

1. RATE SCHEDULE

$600 per hour: Dr David August or any other testifying witness affiliated with Mindfire.

$400 per hour: Any software engineer or project manager affiliated with Mindfire with more than 10 years' experience.

$275 per hour: Any software engineer or project manager affiliated with Mindfire with more than three but less than 10 years' experience.

$200 per hour: Any software engineer or project manager affiliated with Mindfire with less than three years' experience.

$150 per hour: Any time spent by non-engineer or non-project manager professionals associated with Mindfire.

2. RETAINER

Company shall pay Mindfire an initial Retainer in the amount of $5,000.

3. SCOPE OF WORK

Mindfire to evaluate the defendants' software and determine whether it includes "confidential or proprietary information" of Brainwave Science, Inc. "Confidential or proprietary information" is defined as "any portion of the program Brainwave Science, Inc. originally submitted to Codequiry as its code" as per Preliminary Injunction in US District Court for the Eastern District of New York case 21-cv-4402.

# Billing Information Form

| Field | Value |
|---|---|
| Business Name | Business Name |
| Project Name | Project Name |
| Project Number/Code | Project Number |
| Project Contact Name | Project Contact Name |
| Client Project Manager (if different) | Client Project Manager |
| Physical Street Address | Physical Street Address |
| Physical City | Physical City |
| Physical State | Physical State |
| Physical Zip | Physical Zip |
| Main Phone | Main Phone |
| Alternate Phone | Alternate Phone |
| Main Email | Main Email |
| Additional Email | Additional Email |
| Billing Point of Contact | Billing POC |
| Billing POC Main Phone | Billing POC Main Phone |
| Billing POC Alternate Phone | Billing POC Alternate Phone |
| Billing POC Email | Billing POC Email |
| Other | Other |