**FILED**
**in the Clerk's Office**
**U.S. District Court,**
**EDNY, Brooklyn**
**Dec 30, 2022, 6:41 PM**
**Pro Se Office via**
**Box.com**
*Rec. in p drive 1/10/23 rg

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

BRAINWAVE SCIENCE, INC.

Plaintiff

                                           Affidavit of Defendant Dr. Lawrence A. Farwell
                                           in Response to Plaintiff's Motion for Partial
                                           Summary Judgment of December 16, 2022

                   - against -

                                           Civil Action No.: 21-cv-4402 (BMC-RLM)

ARSHEE, INC., DR. LAWRENCE A.
FARWELL, DR. THIERRY MAISON and
BRAIN FINGERPRINTING FOUNDATION

                        Defendants.

---------------------------------------------------------- X

1

Dr. Lawrence A. Farwell[1], being duly sworn, declares under penalty of perjury as follows:

1. This document refers to six software programs that are now before this Court as evidence in this case, cited along with the source where the  evidence is located.

2. Dr. Larry Farwell's Application is located in two places.  Dr. Larry Farwell's Application is integrated into the Visual Studio /Microsoft .NET framework is located on Dr. Maison's TFS/ DevOps, to which Dr. Farwell no longer has access (Dr. Maison TFS).  This is provided to Mindfire by Dr. Maison granting access to his TFS to Mindfire, which Dr. Farwell has requested. Dr. Larry Farwell's Application that is not integrated into said environment is in a folder transmitted  by Dr. Farwell to Mindfire by uploading to Dropbox and providing Mindfire with the link ("Dr. Farwell Dropbox"). Note that this is "Confidential Information" of Dr. Farwell per the Consulting Agreement with Mindfire, and consequently neither BWS not anyone else other than Mindfire is given access.

3. The six software programs now before this Court as evidence in this case are as follows.

   a. Farwell Brain Fingerprinting 3.0 (Dr. Farwell Dropbox) is a version of Dr. Farwell's Brain Fingerprinting software developed by Dr. Farwell in the early 1990s that Dr. Farwell applied at the FBI, the CIA, the US Navy, and in scientific research, scientific publications, and field applications in criminal investigations and counterterrorism operations around the world.

   b. Farwell Brain Fingerprinting 4.0 (Dr. Farwell Dropbox) is a version of Dr. Farwell's Brain Fingerprinting software developed by Dr. Farwell in the early 2000s that Dr. Farwell applied in scientific research, scientific publications, and field applications in criminal investigations and counterterrorism operations around the world. It comprised the addition to 3.0 of a more advanced data analysis section.

   c. Farwell Brain Fingerprinting 5.0, aka Neurodyne (Dr. Maison TFS) is a newer version of the Farwell Brain Fingerprinting software ported from versions 3.0 and 4.0 to the Visual Studio / Microsoft .NET environment and translated to the C# language.  Dr. Maison developed it and gave it to Dr. Farwell.  This is the software labeled "Dr. Larry Farwell's Application" in Plaintiff's CEO's Affidavit (EFS 20-2, Exhibits B, C, and D).

   d. Farwell Brain Fingerprinting 6.0 (Dr. Maison TFS) is the software that Dr. Farwell sold, transferred, or demonstrated to clients and allowed scientific colleagues at the University of Canterbury to use in conducting research in collaboration with Dr. Farwell.

   e. Dr. Maison BWS Software, aka "iCognative" (Brainwave Science TFS) is the version of the software developed by Dr. Maison for BWS **before BWS obtained a copy of "Farwell Brain Fingerprinting 5.0" / "Neurodyne" / "Dr. Larry Farwell's Application" from Dr. Maison** on June 29, 2021.

   f. BWS Fraudulently Modified Software, also aka "iCognative" (Brainwave Science TFS) is the version of the software that BWS modified to make it appear more similar to "Dr. Larry Farwell's Application" **after BWS obtained a copy of "Dr. Larry**

---

[1] For the sake of clarity, I shall in some cases herein refer to myself in the third person.

**Farwell's Application" / "Farwell Brain Fingerprinting 5.0" / "Neurodyne" from Dr. Maison** on June 29, 2021.

4. **The most obvious and easily detectable modification that BWS made to the Dr. Maison BWS Software in creating the BWS Fraudulently Modified Software was changing the background color from blue to green.** The various versions of the software and revision histories, which are now in evidence before this Court (BWS TFS, Dr. Maison TFS), will reveal what other changes BWS made in order to make the BWS Fraudulently Modified Software more similar to Dr. Larry Farwell's Application than Dr. Maison BWS Software is to Dr. Larry Farwell's Application.

5. The essential material statements bearing on the major facts at issue in this case in BWS' Statement of Undisputed Material Facts (EFS #106-1) are false. They are not facts, and they are certainly not undisputed.

6. Even if essential material statements bearing on the major facts at issue in this case in BWS' Statement of Undisputed Facts were true – which they are not – and they were undisputed – which they are not – these would be insufficient facts to warrant a summary judgment. To make a summary judgment in favor of Plaintiffs, this Court would have to accept as fact two other major things that are not facts, but rather false fabrications and fraud by BWS. The first of these is as follows.

   a. The foundation of Plaintiff's case in this lawsuit is a comparison between two sets of software code with respect to user interfaces and comparison in Codequiry.

   b. One set of code is "Farwell Brain Fingerprinting 5.0" / "Dr. Maison BWS Software," "Neurodyne," the code developed by Dr. Maison and conveyed to Dr. Farwell, (Dr. Maison TFS), referred to in Plaintiff's documents as "Dr. Larry Farwell's Application" (EFS #20, #20-2, and Exhibits B, C, and D). An examination of Dr. Maison TFS will show, presumably, that this is in fact what Plaintiff Brainwave Science (BWS) represented it to be.

   c. The other set of code Plaintiff represented as Dr. Maison BWS Software, aka "iCognative" (Brainwave Science TFS), the version of the software developed by Dr. Maison for BWS **before BWS obtained a copy of "Farwell Brain Fingerprinting 5.0" / "Neurodyne" / "Dr. Larry Farwell's Application" from Dr. Maison** on June 29, 2021.

   d. In fact, an examination of the relevant evidence now before this Court in BWS TFS will show that the second set of software that BWS submitted for the comparison was NOT the software described in ¶ 3c above that BWS represented it to be. Rather, it was "BWS Fraudulently Modified Software," (BWS TFS) which BWS also called "iCognative" (BWS TFS). This is the version of the software that BWS <u>modified to make it appear more similar to "Dr. Larry Farwell's Application"</u> **after BWS obtained a copy of "Dr. Larry Farwell's Application" / "Farwell Brain Fingerprinting 5.0" / "Neurodyne" from Dr. Maison** on June 29, 2021. (BWS TFS).

   e. **The most obvious and easily detectable modification that BWS made to the Dr. Maison BWS Software in creating the BWS Fraudulently Modified Software was changing the background color of the user interface from blue to green.** The revision histories and different versions of the two software programs, which are now

3

in evidence before this Court (BWS TFS, Dr. Maison TFS), will reveal what other changes BWS made in order to make the BWS Fraudulently Modified Software more similar to Dr. Larry Farwell's Application than Dr. Maison BWS Software is to Dr. Larry Farwell's Application.

7. Because of the facts stated in above, the entire foundation of Plaintiff's claims in this lawsuit is based on fraud.  Even if all of the statements that Plaintiff claims are "Undisputed Facts" (EFS #106-1) were true and undisputed – which they are not – that would not constitute grounds for a partial summary judgment, because the more fundamental "facts" on which such a judgment would be based are fraudulent fabrications by BWS, not facts.

8. In Judge Cogan's Order of 8/21/2022 the Court stated: "If Dr. Farwell's allegations about BWS fraudulently modifying its software prior to its submission to Codequiry are true, a fact that will only be known once discovery is concluded, then sanctions will be levied against BWS and the preliminary injunction will be lifted." Said allegations are true.  Evidence now before this Court (Dr. Maison TFS, BWS TFS) will prove that said allegations are true.  Therefore, whereas at the time of the preliminary injunction it was appropriate to provisionally take Plaintiff's demonstrably false statements regarding the software in question as fact, at this stage of the case the Court must consider the actual facts before the Court, which are in evidence now before this Court in Dr. Maison TFS and BWS TFS. In light of the actual facts now in evidence before this Court (Dr. Maison TFS, BWS TFS), a partial summary judgment in favor of Plaintiffs cannot be granted, since the evidence now before this court proves that Plaintiff's entire case is based on fraud.

9. A second reason that, even if the statements that Plaintiff claims are "Undisputed Facts" (EFS #106-1) were true and undisputed – which they are not – this still would not constitute grounds for a partial summary judgment is as follows. In order for there to be grounds for a summary judgment, the software that Dr. Maison conveyed to Dr. Farwell – referred to variously as "Farwell Brain Fingerprinting 5.0," "Dr. Maison BWS Software,"  "Neurodyne," and "Dr. Larry Farwell's Application" – must contain BWS' proprietary information, which it does not.  This document  (Dr. Farwell's Affidavit of 2022/12/27) provides ample evidence that said Farwell Brain Fingerprinting software does not contain BWS' proprietary information, evidence that is now before this Court (Dr. Maison TFS, BWS TFS) and is scheduled to be analyzed and evaluated shortly.  At a minimum, this issue is not an "undisputed fact." It is disputed.  Without this false contention of BWS being accepted as fact, there are no grounds for a partial summary judgment.

10. A third reason why grounds for a summary judgment in favor of Plaintiffs are lacking in this case will be discussed below.

11. The available evidence comprises two types of software.  Farwell Brain Fingerprinting 3.0 and 4.0 comprise source code that can be printed in a document and executable code that can be stored on a computer hard drive, uploaded to a repository like Dropbox, and downloaded in its entirety.  Farwell Brain Fingerprinting 5.0, Dr. Maison BWS Software, and BWS Fraudulently Modified Software are integrated into the Visual Studio Environment and Microsoft .NET.  A complete account of the software cannot be simply downloaded as a text or executable file, incorporated in a document, and distributed.  The full account of the software, including all the versions and the revision history, must be accessed in the environment in which it exists.  For Farwell Brain Fingerprinting 5.0 / Dr. Larry Farwell's Application this is Dr. Maison's TFS repository.  For the Dr. Maison BWS Software and the BWS Fraudulently Modified Software this is BWS' TFS repository.  The only way to access this software for testing, evidence, or any other

purpose is for Dr. Maison and Brainwave Science to provide access to their respective TFS repositories to Mindfire.  This is a simple process that takes less than five minutes.

12. In its original Complaint (EFS #1) and MOL in Support of Motion for Summary Judgment (EFS #20) and Ika's Affidavit (EFS #20-2 and Exhibits B and D thereto), Plaintiff Brainwave Science defrauded this Court in the following way.

    a. Plaintiff had Dr. Maison BWS Software in their TFS repository, as Dr. Maison had developed it for BWS (EFS #20).

    b. BWS obtained from Dr. Maison a copy of "Brain Fingerprinting 5.0" / "Neurodyne" / "Dr. Larry Farwell's Application" from Dr. Maison (EFS #20).

    c. Then BWS fraudulently modified "Dr. Maison BWS Software" /  "iCognative" to make it more similar to "Dr. Larry Farwell's Application" (BWS TFS, Dr. Maison TFS, EFS #24, Dr. Farwell 12/27/2022 Affidavit).

    d. One way in which the software was modified was to change the background  color of the user interface.  All versions of "Maison BWS Software" / "iCognative" before June 29, 2021 when BWS obtained "Dr. Larry Farwell's Application" from Dr. Maison (EFS #89 p. 1:26 - 28), had a blue background (EFS #89 1:20 – 2:9).  "Dr. Larry Farwell's Application" had a green background.  BWS Modified "iCognative" to change the background from blue to green to match "Dr. Larry Farwell's Application"  (Dr. Farwell 12/27/2022 Affidavit; EFS #89 1:20 – 2:9).

    *e.* Then Ika developed Ika Affidavit (EFS 20-2) and Exhibit D thereto to show the two user interfaces side by side.  BWS falsely represented that the software compared to "Dr. Larry Farwell's Application" (Dr. Maison TFS) was the original, unmodified "iCognative" (BWS TFS) developed by Dr. Maison for BWS.  In fact, **the software actually compared was the Fraudulently Modified BWS Software (which BWS also called "iCognative"), which had been specifically modified to more closely resemble "Dr. Larry Farwell's Application".** This can be readily proven with evidence now before this Court, by Mindfire comparing the various versions, dates, and modification histories of "Dr. Larry Farwell's Application" in Dr. Maison's TFS with the  various versions, dates, and modification histories of "iCognative" in BWS' TFS.  Mindfire already has, or will shortly have, access to Dr. Maison's TFS and BWS' TFS in order to accomplish the court-ordered comparison.  This is a necessary step for Mindfire to accomplish the comparison task described in the Scope of Work, because to compare different software programs Mindfire must know and be able to prove definitively which software programs were compared.

    *f.* Examining the modification histories and identifying the several versions of each software program in Dr. Maison TFS and BWS TFS is a necessary prerequisite for Mindfire conducting its comparison tests.  Otherwise, Mindfire will not know what is being compared to what. It is necessary for Mindfire to differentiate between "Dr. Maison BWS Software" and "BWS Fraudulently Modified Software" in order to know what is actually being compared to Dr. Farwell's software. (Dr. Maison TFS, BWS TFS).  Otherwise, any comparison would be meaningless or worse.  If a comparison based on false representations by BWS regarding what software is being compared – as the original comparison that formed the foundation of Plaintiff's Complaint was – then the comparison would be fraudulent, like the original comparison that formed the foundation of Plaintiff's case.

**g.** BWS also submitted "Dr. Larry Farwell's Application" (Dr. Maison TFS) and the "Fraudulently Modified BWS Software" (BWS TFS) to Codequiry to test the similarity between the two.  Again, BWS falsely represented that the software compared to "Dr. Larry Farwell's Application" was the original, unmodified software (Dr. Maison BWS Software) developed by Dr. Maison for BWS.  In fact, **the software actually compared was the Fraudulently Modified BWS Software (which BWS called "iCognative"), which had been specifically modified to more closely resemble "Dr. Larry Farwell's Application".**

**h.** BWS also submitted only part of the "iCognative" (BWS TFS) and "Dr. Larry Farwell's Application" (Dr. Maison TFS) code to Codequiry (Ika Affidavit EFS #20-2, Exhibit D, pages 7, 8.).  BWS did not submit for comparison the parts of the software that were totally different between the two, namely the parts that communicated with the two different headsets used by BWS and Dr. Farwell (BWS TFS, Dr. Maison TFS).

**i.** In the Ika Affidavit (EFS 20-2, Exhibit D, p. 8) the navigation page has been changed from blue to green in the BWS software on the left of the page.  The Replay function that overlays the navigation page still has a blue background, like all screens in all versions of BWS Software before BWS obtained the code with the green background from Dr. Maison and modified their code to match.  This may be because the Replay function involves real-time activities (such as displaying ongoing EEG), and no one at BWS after Dr. Maison's exit has the necessary software development skill to modify this complicated code.  The trivial navigation and data entry pages are easy to modify; the actual functional pages are more difficult. In any case, this screenshot illustrates that BWS modified the Dr. Maison BWS Software to change the blue background to a green background to make it appear more similar to Dr. Larry Farwell's Application. (The Replay function was copied from the "Demo" function in Farwell Brain Fingerprinting 3.0, and has an identical user interface to the same.) (Dr. Maison TFS, BWS TFS).

13. **The fraud by BWS in generating BWS' Fraudulently Modified Software can readily be exposed in the course of Mindfire's court-ordered comparisons of the software by examining the dates and version history in BWS TFS and Dr. Maison TFS, which is an integral and necessary part of the court-ordered comparison**. This is a prerequisite for Mindfire to make any software comparisons.  Mindfire cannot make meaningful comparisons until they have determined which software is being compared. (Dr. Farwell 12/27/2022 Affidavit, Dr. Maison TFS, BWS TFS).

14. **BWS can defraud this court a second time only if the Court cooperates in this fraud by allowing BWS to refuse to provide Mindfire access to BWS TFS and instead proffers the Fraudulently Modified BWS Software and falsely represents that it is the original, unmodified Dr. Maison BWS Software that Dr. Maison provided to Dr. Farwell.**  This would simply be a repeat of the fraud perpetrated by BWS that forms the foundation of this lawsuit. Note that it is easy to fabricate or fake source code and executable files stored on computer disk or transferred electronically.  **Both the content and the dates of such files can be fraudulently altered.  However, the versions, version history, and modification history in Brainwave TFS and Dr. Maison TFS cannot be faked or fraudulently modified.  The version history is embedded in the TFS data, and cannot be modified.  For this reason, it is necessary for**

**Mindfire to directly access BWS TFS and Dr. Maison TFS, and not simply assume that BWS' representations regarding the software they may proffer outside TFS are truthful.**

15. **Ika and Tomkins lied about the software in the documents that are the foundation of this case (EFS #1, EFS #20, EFS #24) – as can now be readily proven with evidence now before this Court in the BWS TFS and the Dr. Maison TFS. Ika and Tomkins could certainly defraud this Court again if this Court takes their lies as fact rather than considering the actual evidence that is now before this Court in Dr. Maison TFS and BWS TFS.**

    ***a.*** In the Codequiry test and screenshots that are the foundation of Plaintiff's Complaint, Plaintiff lied to this Court and falsely represented that the code submitted to Codequiry was Dr. Maison's BWS Code, the software that Dr. Maison developed for BWS. In fact, the code submitted to Codequiry and represented in the screenshots (EFS #20, Exhibit D) was BWS Fraudulently Modified Software, which had been changed from a blue background to a green background to more closely match Dr. Larry Farwell's Application to which it was compared.

    ***b.*** The only way to prevent BWS from defrauding this Court again is to use the actual software in BWS TFS for the comparisons, since the TFS environment contains a record of the software, dates, and versions that, unlike files stored on BWS' disks, cannot be faked.

16. The specific method for proving that the foundation of this lawsuit presented by BWS is fraudulent is to show that BWS did not have any version of iCognative with a green background before June 29, 2021, as follows.

    a. June 29,2021 is the date BWS received "Dr. Larry Farwell's Application" from Dr. Maison – and subsequently modified their "iCognative" code to have a green background to match Dr. Larry Farwell's Application (EFS #89, page 2, 1 – 9).

17. To be valid, the proof must include Visual Studio access to the files that create the visual interface (XAML files) with a review of the TFS change history of those files. Brainwave Science is using an on-premises TFS server. To be valid, the proof must also include a validation of the application installer program analyzed for digital signature, modified and creation date, and installed to verify the background color. The digital certificate used for code-signing is provided by DigiCert (a Microsoft-approved code-signing certificate vendor) and is timestamped with web time service. This means, in practice, that the time of different modifications and versions cannot be faked if the proper procedure outlined here to find the facts is followed by the finder of fact. (EFS # 89, 1:20 – 2:20).

    a. Any failure of BWS providing a functioning application with a green background properly traceable to Brainwave Science development environment (TFS), properly dated before June 29, 2021, with a digital signature, will provide proof that Ika's Affidavit (EFS #20-2, Exhibit D), and the entire foundation of this lawsuit were fabricated and fraudulent.

    b. Any excuses from BWS as to why they will not allow this Court, through Mindfire, to access the definitive evidence now before this Court, as described above – and any demands that this Court should simply accept BWS' representations as fact, regarding the substantive matters at hand, rather than accessing the actual evidence and determining the actual facts – will be easily recognized as a transparent attempt by Ika and Tomkins to obstruct this Court's mission as a finder of fact.

18. There is a second reason, in addition to the above-described fraud by BWS, why Dr. Larry Farwell's Application is similar to and has similar user interfaces to various versions of BWS Software. The reason is this: Both the software designed by Maison for BWS and the software designed by Maison for Dr. Farwell were accomplished by porting Dr. Farwell's pre-existing Farwell Brain Fingerprinting 3.0 and 4.0 to a different development environment and programming language.

    a. BWS stated "BWS' technology team members located an online demonstration video wherein Farwell is depicted demonstrating a system with a nearly identical user interface to that designed by Maison for BWS" (EFS 20, P. 3, 1 – 9). The reason for this is described below.

    b. All versions of software that implement Dr. Farwell's Brain Fingerprinting invention, including Dr. Larry Farwell's Application (the version that BWS compared with BWS Software) and the Maison BWS Software, had the same two functions: 1. Measuring brainwaves; and 2. Analyzing brainwaves (Dr. Maison TFS, Dr. Farwell's 12/27/2022 Affidavit).

    c. All versions of the software have two user interfaces that correspond to the two functions of the program: the Brainwave Measurement User Interface and the Brainwave Analysis User Interface (Dr. Maison TFS, Dr. Farwell Dropbox, Dr. Farwell's 12/27/2022 Affidavit).

    d. The Brainwave Measurement User Interface and the Brainwave Analysis User Interface for all versions of such software at issue in this case display all of the brainwave data and other data that are measured, analyzed, computed, concluded, determined, and recorded. These data include subjects' brainwaves, subjects' reaction times and accuracy, conclusions regarding whether the tested information is stored in the subject's brain, etc. In short, everything of substance in the entire program is displayed on these two user interfaces (Dr. Maison TFS, Dr. Farwell's 12/27/2022 Affidavit).

    e. **All of the data that are measured, analyzed, computed, concluded, determined, and recorded, in all versions of the BWS Software, are identical to the same in Dr. Farwell's Farwell Brain Fingerprinting 3.0 and Farwell Brain Fingerprinting 4.0, both of which existed before Brainwave Science was founded in 2012.** The software Dr. Maison produced for Brainwave Science was simply a copy and translation to a new language and platform of Farwell Brain Fingerprinting 3.0 (for data analysis) and Farwell Brain Fingerprinting 4.0 (for brainwave measurement) (Dr. Maison TFS, Dr. Farwell Dropbox, Dr. Farwell's 12/27/2022 Affidavit).

    *f.* **The Brainwave Measurement User Interface for all versions of the BWS Software is identical to the Brainwave Measurement User Interface of Farwell Brain Fingerprinting 4.0, which existed before BWS was founded** (BWS TFS, Dr. Maison TFS, Dr. Farwell Dropbox).

    g. **The Brainwave Analysis User Interface for all versions of the BWS Software is identical to the Brainwave Analysis User Interface of Farwell Brain Fingerprinting 3.0, which existed before BWS was founded.**

19. The Farwell Brain Fingerprinting 4.0 Brainwave Measurement User Interface (Maison TFS, Dr. Farwell Dropbox, and screenshots below) and the Brainwave Measurement User Interface in the

Dr. Maison BWS Software – the "Dr. Larry Farwell's Application" that BWS used in its comparisons (EFS #20, EFS 20-2, Exhibit D) – contain 7 identical plots of brainwaves and 38 identical entries in tables. All of these are in the same layout on the page. There are only very minor differences: Farwell Brain Fingerprinting 4.0 contains three additional rows of algorithms for eliminating noise that are not included in BWS. Each of the two contains 2 – 3 additional buttons for navigation or adjustment. Background colors and relative sizes of features vary.

20. The Farwell Brain Fingerprinting 3.0 Brainwave Analysis User Interface and the BWS Brainwave Analysis User Interface Data Display Section both include the following exact same items, in the same layout on the page:

    a. A brainwave plot with the three types of brain responses displayed in the same respective colors and format;

    b. Two summary results, a Determination and a Statistical Confidence, displayed in the same format.

    c. Tables with a total of 30 cells, all containing the same information in Farwell Brain Fingerprinting 3.0 and Dr. Maison BWS Software, with minor differences in the layout (rows and columns reversed).

21. ***Long before BWS existed there were numerous "online demonstrations in which Farwell is depicted demonstrating a system with a nearly identical user interface to that designed by Maison for BWS."*** These online demonstrations were of Farwell Brain Fingerprinting 3.0 and 4.0 (Dr. Farwell Dropbox). This includes both of the two user interfaces that display the two functions of all versions of such software and all of the data that are measured, analyzed, computed, concluded, determined, and recorded by all of the software programs at issue in this case. Both Brainwave Measurement and Brainwave Analysis User Interfaces were virtually identical between multiple online demonstrations by Dr. Farwell that took place before BWS existed and the user interface of the software that Dr. Maison developed for BWS (and also the Farwell Brain Fingerprinting 5.0 software that Dr. Maison developed for Dr. Farwell and the BWS Fraudulently Modified Software). This document (Dr. Farwell's Affidavit of 2022/12/27) at ¶ 117 lists 12 examples of such online demonstrations, with links to online sources.

22. If "identical user interfaces" means that there has been plagiarism, then all versions of BWS Software are plagiarized from Farwell Brain Fingerprinting 3.0 and 4.0, which existed before BWS did. If the software that Dr. Maison provided to Dr. Farwell ("Farwell Brain Fingerprinting 5.0" / "Dr. Larry Farwell's Application") was plagiarized from anywhere, then it was plagiarized from Farwell Brain Fingerprinting 3.0 and 4.0, and not from BWS (Dr. Maison TFS, BWS TFS, Dr. Farwell Dropbox).

23. There is controversy over the timing of the development of Farwell Brain Fingerprinting 5.0 and the Dr. Maison BWS Software – which came first, if they overlapped, if one contributed to the other, etc. Regardless of these considerations, both Farwell Brain Fingerprinting 5.0 and Dr. Maison BWS Software comprise simply porting Farwell Brain Fingerprinting 3.0 and 4.0, according to the Brain Fingerprinting Specifications (Exhibits CAA, CAB, and CAC) provided by Dr. Farwell to Dr. Maison to a different platform and a different language. Everything in both Brain Fingerprinting 5.0 and Dr. Maison BWS Software is open source and in the public domain, except for the respective sections that communicate with the respective different headsets. Everything that the two programs have in common is in the public domain, so the discussions about the relationship between the two programs do not

change the fact that Dr. Maison's entire contribution to Dr. Larry Farwell's Application is in the public domain and does not comprise anything developed at BWS (except the headset communication developed by Dr. Maison for Dr. Farwell, which is not open source but has no relationship to BWS' software). (Dr. Maison TFS, BWS TFS, Farwell Dropbox).

24. Plaintiff claims that "Brainwave took reasonable steps to keep its trade secret information which derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by other persons." (EFS #106-6, p. 11) That statement is not supported by the evidence. The BWS Software was released to a public domain source at 6:15 PM on 9/10/2017 from IP address 65.52.55.39 in Chicago, using the credentials of BWS employee Karuna Raja, who was in Southborough, MA at the time. (EFS #80, p. 4). This is documented in Exhibit CAD to this document. In his Affidavit (EFS 20), Ika admitted that the BWS Software was uploaded to the internet, but falsely stated that it was uploaded to a secure cloud server.  Dr. Maison later downloaded the software from a public source on the Internet (EFS #106-3, Exhibit A, p. 11 – 12).

25. Dr. Lawrence Farwell invented Farwell Brain Fingerprinting in 1985 and developed the first Farwell Brain Fingerprinting system, Farwell Brain Fingerprinting 1.0.  Software was written in Fortran and assembly code.  Hardware comprised two computers, a DEC PDP11-73 with custom digital signal-processing and display boards for brainwave measurement and a Harris 800 for brainwave analysis, plus Grass EEG amplifiers to amplify the brainwaves. (Farwell and Donchin 1991[2]).  There was no headset; electrodes were glued to the head of the subject, as was the standard procedure at the time, before Dr. Farwell developed and patented his first headset.  Electrodes communicated through wires to Grass EEG amplifiers, which in turn communicated through wires to the digital signal-processing board in the computer.

26. Farwell Brain Fingerprinting 1.0 and all subsequent software discussed herein had two functions: (1) measuring and recording brainwaves; and (2) analyzing brainwaves.

27. Farwell Brain Fingerprinting 1.0 and all subsequent versions measure the P300 brain response in the EEG.  The P300 is an event-related brain potential (ERP); that is, a pattern of EEG that is elicited by a particular event, generally the presentation of a stimulus (such as a word or phrase presented on a computer screen) and the subject's cognitive processing of the same. The P300 was discovered in the 1960s and has been published in thousands of scientific studies.  Dr. Farwell's first scientific paper on the P300 alone (Farwell and Donchin 1988[3]) has been cited by over 4,000 other papers in the scientific literature (https://scholar.google.com/citations?user=wgZhgc0AAAAJ&hl=en).  Dr. Farwell's first paper on Farwell Brain Fingerprinting (Farwell and Donchin 1991) has been cited by over 800 other papers in the scientific literature (https://scholar.google.com/citations?user=wgZhgc0AAAAJ&hl=en ).

28. Farwell Brain Fingerprinting also measures the P300-MERMER (memory and encoding related multifaceted electroencephalographic response), a more comprehensive brainwave

---

[2] Farwell, L. A. and Donchin, E. (1991).  The Truth Will Out: Interrogative Polygraphy ("Lie Detection") With Event-Related Brain Potentials. *Psychophysiology, 28:531-547; Psychophysiology website*

[3] Farwell, L. A. and Donchin, E. (1988).  Talking off the top of your head: Toward a mental prosthesis utilizing event-related brain potentials. *Electroencephalography and Clinical Neurophysiology, 70*: 510-513.

pattern that includes the P300 and additional related brainwave patterns.  It was discovered, published, and patented by Dr. Farwell (Farwell and Smith 2001; Farwell 2012; Farwell et al. 2013; 2014; 2022; US Patents #5,363,858, #5,406,956, #5,467,777, and # 7,689,272).

29. Dr. Farwell developed Farwell Brain Fingerprinting 2.0 in the late 1980s and early 1990s. Hardware and software were similar to Farwell Brain Fingerprinting 1.0, except for the addition of a new patented headset that contained embedded sensors to measure brainwaves. Amplification was still accomplished separately from the headset by the EEG amplifiers.

30. Dr. Farwell, Brian Foote, and Himansu Desai developed Farwell Brain Fingerprinting 3.0 in 1993. This comprised the same methods, algorithms, and data for brainwave measurement and analysis as the previous versions.  The code was written in C++.  The hardware comprised a PC tower computer with a special digital signal-processing board and a special display board. The headset was the same as previous versions.  At various times the system used several different custom and manufactured EEG amplifiers.

31. All of the above versions of Farwell Brain Fingerprinting were developed according to the Farwell Brain Fingerprinting Specifications, comprising two sections: Brainwave Measurement Specifications and Brainwave Analysis Specifications (Farwell Dropbox).

32. Dr. Farwell patented the Farwell Brain Fingerprinting System, including the Farwell Brain Fingerprinting Specifications (US Patents #5,363,858, #5,406,956, #5,467,777, and # 7,689,272).

33. Dr. Farwell published the Farwell Brain Fingerprinting System, including the Farwell Brain Fingerprinting Specifications, in the peer-reviewed scientific literature (Farwell and Donchin 1991; Farwell and Smith 2001[4]; Farwell 2012[5]; Farwell et al. 2013[6]; Farwell et al. 2014[7]; Farwell and Richardson 2022[8]).

---

[4] Farwell, L. A. and Smith, S. S. (2001).  Using Brain MERMER Testing to Detect Concealed Knowledge Despite Efforts to Conceal.  *Journal of Forensic Sciences 46*,1: 135-143. https://larryfarwell.com/pdf/Farwell-Smith-Journal-of-Forensic-Sciences-Brain-Fingerprinting-P300-MERMER-dr-larry-farwell-dr-lawrence-farwell.pdf

[5] Farwell, L.A., 2012. Brain fingerprinting: a comprehensive tutorial review of detection of concealed information with event-related brain potentials, *Cognitive Neurodynamics 6*:115-154, DOI 10.1007/s11571-012-9192-2.  Available at https://larryfarwell.com/pdf/Dr-Lawrence-Farwell-Brain-Fingerprinting-P300-MERMER-Review-Cognitive-Neurodynamics-Dr-Larry-Farwell.pdf  or from the National Institutes of Health: http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3311838/

[6] Farwell, L.A., Richardson, D.C., & Richardson, G.M. (2013). Brain fingerprinting field studies comparing P300-MERMER and P300 brainwave responses in the detection of concealed information. DOI 10.1007/s11571-012-9230-0, *Cogn Neurodyn. 7*(4): 263-299. Available at: http://link.springer.com/article/10.1007/s11571-012-9230-0 .

[7] Farwell L.A., Richardson D.C., Richardson G.M .and Furedy J.J. (2014). Brain fingerprinting classification concealed information test detects US Navy military medical information with P300. *Front. Neurosci. 8*:410. doi: 10.3389/fnins.2014.00410. Available at: http://journal.frontiersin.org/article/10.3389/fnins.2014.00410/abstract

[8] Farwell, L.A. & Richardson, D.C. (2022). Brain fingerprinting field study on major, terrorist crimes supports the brain fingerprinting scientific standards hypothesis: classification concealed information test with P300 and P300-MERMER succeeds; comparison CIT fails. *Cogn Neurodyn*.  1 March 2022. DOI 10.1007/s11571-022-09795-1. Available at: https://farwellbrainfingerprinting.com/pdf/Ex/Farwell_Richardson_2022_Brain_Fingerprinting_on_Major_Ter

34. Other scientists have developed similar systems using the Farwell Brain Fingerprinting patents and scientific publications, and in some cases source code provided by Dr. Farwell to fellow scientists who replicated his research.

35. Dr. Farwell and others developed Farwell Brain Fingerprinting 4.0 in or about 2007.  This included the same brainwave measurement hardware and software as version 3.0, with a new version of the data analysis module written in IDL code (Dr. Farwell Dropbox, Farwell 2012; Farwell et al. 2013; Farwell et al. 2014; Farwell and Richardson 2022).

36. All of the versions Farwell Brain Fingerprinting and all similar systems for brainwave-based detection of concealed information have two and only two functions: (1) measuring brainwaves; and (2) analyzing brainwaves.

37. In order to measure brainwaves, the software must have a section that communicates with the headset (or digital signal-processing board, for systems in which this is separate from the headset).  This portion of the software code execution takes place in the background and is invisible to the user.  This portion of the code is different for each headset, and is often custom code that may be proprietary.

38. As a preparation for performing its two functions, the program must have identifying information about the subject (subject number, name, etc.) and information regarding what words or pictures ("stimuli") will be displayed to elicit the brainwave responses.  These are input through a standard keyboard and data entry screens.  The appearance of the data entry screens will vary depending on which open-source software packages are used for this purpose.  Data entry is essentially the same for all programs for detection of concealed information, and for that matter for almost all programs that involve any kind of measurements of EEG or any other measurements related to cognitive processing.  When it is implemented using open-source software development tools, as all versions of the software at issue in this case have been, there is nothing that might be construed as proprietary in this data-entry process or the software it involves.

39. Similarly, virtually all software programs have navigation pages, tabs, navigation buttons, etc. that allow the user to access and activate the actual functions of the program – in this case, the two functions of measuring brainwaves and analyzing brainwaves.  All versions of Farwell Brain Fingerprinting and all versions of Brainwave Science software have such navigation pages, tabs, navigation buttons, etc.  All of these are similar in function.  They differ in appearance in the different programs depending on the open-source software used to implement them.  All of this is in the public domain, and none of these ancillary navigation pages could be considered proprietary.

40. The Farwell Brain Fingerprinting Specifications and all the methods, algorithms, functions, and software of Farwell Brain Fingerprinting 4.0 for (1) brainwave measurement; and (2) brainwave analysis are all in the public domain, having been published in Dr. Farwell's patents and scientific publications as well as shared with other scientists.

41. All software for brainwave-based detection of concealed information, and in fact all software for brainwave measurement involving responses to stimuli, include several standard methods

_____

rorist_Crimes_Cognitive_Neurodynamics.pdf  and https://link.springer.com/article/10.1007/s11571-022-09795-1.

12

for detecting and removing "noise" from the system.  These are included in all versions of Farwell Brain Fingerprinting, in the Farwell Brain Fingerprinting Specifications, and in Dr. Farwell's patents and scientific publications.  These include the following:

    a.  Signal averaging.  This involves presenting the same or similar stimuli repeatedly and averaging the responses.  This is a fundamental aspect of the method for all such programs.

    b.  A "Range" function for rejection of noise generated by eye blinks and other eye movements.  The eyes are electrically charged.  When a person blinks, the eyes move and generate electrical voltage signals that interfere with the brainwaves being measured.  These are eliminated by a simple procedure.  One or more sensors are applied to measure the electrical signals coming from eye movements.  If this surpasses a certain maximum range, then the corresponding data are rejected. The software for implementing this is open source and involves a few lines of code.

42. Almost all event-related brain potential EEG research applies digital filters to eliminate high-frequency noise in the signal. (This is produced primarily by muscle movements, which generate electrical impulses that interfere with the brainwaves being measured.)  The standard digital filters used in P300 research and all event-related brain potential research are optimal digital filters that were introduced to the field by Dr. Farwell and his colleagues (Farwell et al. 1993[9]).  These are included in all versions of Farwell Brain Fingerprinting.

43. Dr. Farwell and his colleagues developed a specific open-source software program (FILTER.FOR) that implements said optimal digital filters.  This program is translated into the appropriate software languages and included in all Farwell Brain Fingerprinting versions. Dr. Farwell and his colleagues also updated and modified a pre-existing open-source program (PMFILT.FOR) that generates the digital filters according to parameters specified by the user. This program or its equivalent has been translated into many other software languages and ported to many other software platforms that are in common use.

44. Said optimal digital filters as a method for eliminating noise in the EEG signal were included in the Farwell Brain Fingerprinting specifications, patents, and scientific publications.

45. In addition to the "Range" criterion for eliminating eye movements and the standard optimal digital filters, Farwell Brain Fingerprinting 3.0 included the following four additional methods for eliminating noise in the EEG signal during brainwave measurement. "Clip" indicated that the EEG signal had saturated the digitizer at a particular channel.  "Threshold" indicated that the EEG signal had exceeded an amplitude threshold at a particular channel.  "Slope" indicated that the slope of the waveform exceeded a criterion.  MAD or mean absolute deviation indicated that the overall amplitude of the EEG waveform exceeded a criterion.

46. In addition to the "Range" criterion for eliminating eye movements and the standard optimal digital filters, Farwell Brain Fingerprinting 4.0 included the following additional methods for eliminating noise in the EEG signal during brainwave analysis. "Threshold" as defined above; "Slope" as defined above; "Variance" indicating excessive variation in the EEG signal; "Instantaneous slope" indicating changes in the EEG voltage that are both large and fast; "Flatline" indicating that a segment of the signal is a flat line; i.e., no brainwaves are present

---

[9] Farwell, L. A., Martinerie, J. M., Bashore, T. R., Rapp, P. E., and Goddard, P.H. (1993).  Optimal digital filters for long latency event-related brain potentials. *Psychophysiology, 30*, 3, 306-315

during a time segment where brainwaves are being measured, which results in rejection of the corresponding brain-response data.

47. In or about 2018, Dr. Farwell desired to develop Farwell Brain Fingerprinting 5.0.  There are several purposes for this.  Dr. Farwell had obtained a headset built by Cognionics / CGX to Dr. Farwell's specifications.  This had several advantages over previous versions of the headset.  This new headset contained not only sensors to pick up the EEG signal from the head, but also amplifiers and digital signal processors built into the headset.  It communicated wirelessly with the computer through Bluetooth.  This resulted in a more user-friendly experience for both the subject and the scientist applying the technology. Another purpose was to port Dr. Farwell's open-source software embodied in Farwell Brain Fingerprinting 4.0 to another open-source platform and another language, using several modern open-source software development tools.  Farwell Brain Fingerprinting 4.0 was written primarily in C++.  Some algorithms were written by Dr. Farwell in Fortran, in particular, the FORTRAN.FOR code that implemented the optimal digital filters for eliminating noise from the signal.

48. Dr. Thierry Maison volunteered to port Farwell Brain Fingerprinting 4.0 to the Microsoft Visual Studio platform using Microsoft .NET and the C # programming language, all implemented with open-source software tools.  Dr. Maison neither asked for nor received any compensation for this.  His motivation was simply to learn from the undertaking and to help to make Farwell Brain Fingerprinting more available for counterterrorism and criminal investigations around the world.

49. With one exception noted below, all of the Farwell Brain Fingerprinting 5.0 code developed by Dr. Maison was open source, and all of it was simply ported or translated from Dr. Farwell's existing code in Farwell Brain Fingerprinting 3.0 and 4.0 and the detailed specifications provided to Dr. Maison by Dr. Farwell.  These were also fully disclosed in Dr. Farwell's Brain Fingerprinting patents and scientific publications.

50. The one segment of the Farwell Brain Fingerprinting 5.0 code that was not open source and was not ported from Farwell Brain Fingerprinting 4.0 was the code that interfaced with the new Cognionics headset.  Since the digital signal processors and communication protocols in this headset were different from the ones previously used by Dr. Farwell – and from other wireless headsets from other companies – Dr. Maison wrote custom code for interfacing with the Cognionics headset that became a part of Farwell Brain Fingerprinting 5.0.

51. Dr. Maison's task in porting Farwell Brain Fingerprinting 4.0 to Farwell Brain Fingerprinting 5.0 involved integration or stitching together of open-source software from various sources.  This integration task is accomplished according to a blueprint or software development specifications. The integration task performed by Dr. Maison in porting Farwell Brain Fingerprinting 4.0 to Farwell Brain Fingerprinting 5.0 was specified in detail in the open-source Brain Fingerprinting Brainwave Measurement Specifications (Exhibit CAA) and the open-source Brain Fingerprinting Brainwave Analysis Specifications (Exhibit CAB) and open-source Randomization Algorithm (Exhibit CAC) provided by Dr. Farwell to Dr. Maison, as well as in the structure and integration of Farwell Brain Fingerprinting 4.0 and 3.0, which was also provided to Dr. Maison by Dr. Farwell. The software integration involved in Dr. Maison's development of Farwell Brain Fingerprinting 5.0, aka the Dr. Maison BWS Software, was open source and in the public domain.

52. Like all previous versions, Farwell Brain Fingerprinting 5.0 included algorithms for eliminating noise from the signal.  Farwell Brain Fingerprinting 5.0 included some, but not

14

all, of the algorithms for eliminating noise from the signal that were included in Farwell Brain Fingerprinting 4.0.

53. The following algorithms for eliminating noise were included in Farwell Brain Fingerprinting 5.0.

   a. The standard signal averaging included in all P300 and other event-related brain potential programs.

   b. The standard "Range" method for eliminating noise produced by eye movements that is included in almost all P300 and other event-related brain potential programs.

   c. The optimal digital (low-pass) filters that were included in Farwell Brain Fingerprinting 4.0. These are the standard optimal digital filters that Dr. Farwell and his colleagues introduced to the field in a scientific publication (Farwell et al 1993[10]). These filters are public domain and also commonly used in many other digital signal-processing applications across a wide range of fields. Specifically, Dr. Maison translated Dr. Farwell's FORTRAN.FOR program line for line from Fortran to C # to implement the optimal digital filters in Farwell Brain Fingerprinting 5.0.

54. The other algorithms in Farwell Brain Fingerprinting 4.0 that are described above were not included in Farwell Brain Fingerprinting 5.0.

55. One additional algorithm for eliminating noise was included in Farwell Brain Fingerprinting 5.0 that was not included in Farwell Brain Fingerprinting 4.0. This is a standard, open-source high-pass digital filter used to counteract electrode voltage drift. (This was not necessary for Farwell Brain Fingerprinting 4.0 software, because it was handled by the digital signal processor hardware.)

56. Farwell Brain Fingerprinting 5.0, like all previous versions, had two functions (1) measuring brainwaves while presenting stimuli (words or pictures on a computer screen) to elicit the EEG brain response; and (2) analyzing brainwaves.

57. For both measuring brainwaves and analyzing brainwaves, Farwell Brain Fingerprinting 5.0 included all the same computations as Farwell Brain Fingerprinting 4.0. The only difference was the programming language and the corresponding development platform. Farwell Brain Fingerprinting 5.0 was simply Farwell Brain Fingerprinting 4.0 ported and translated to a new platform and a new language, using different open-source programming tools.

58. For brainwave measurements, the output of these functions and algorithms was displayed on the Farwell Brain Fingerprinting 4.0 Brainwave Measurement User Interface. This had the following design.

   a. At the upper left is a plot of the ongoing brainwaves in four channels from four scalp locations. One of these is the eye-movement channel, and three are EEG from three scalp locations, named Fz, Cz, and Pz.

   b. Below that is a plot of the average brain responses to three types of stimuli (words or pictures presented to the subject). Brain responses to "target," "irrelevant," and "probe" are plotted respectively with red, green, and blue lines. These are the standard colors used in all Farwell Brain Fingerprinting versions and all BWS software.

---

[10] Farwell, L. A., Martinerie, J. M., Bashore, T. R., Rapp, P. E., and Goddard, P.H. (1993). Optimal digital filters for long latency event-related brain potentials. *Psychophysiology, 30*, 3, 306-315

    c. At the upper right is a table that lists the following essential output: the type of stimulus, the stimulus, and the reaction time.  (This table also has two non-essential items, the number of the channel being displayed in the brainwave plots and the scale of the plots).

    d. Below that is a table that has columns for three stimulus types: Target, Probe, and Irrelevant.  It has rows for the following:

        i. Trials (total number of trials; a trial is comprises one stimulus presentation and the corresponding brain responses);

        ii. Good trials (total number of trials that do not have noise in the data);

        iii. Required trials (number of trials required to complete the test);

        iv. RT or Reaction Time (the subject's average button-press response time);

        v. Accuracy (the percentage accuracy of the subject's button presses).

    e. Below that is a table that tabulates the result of the algorithms for eliminating noise from the data.  The columns are the four channels; i.e., three EEG channels and one eye-movement (EOG) channel.  The rows display the numbers for the different algorithms for eliminating noise.  These comprise the standard "Range" algorithm plus four additional ones: "Clip," "Threshold," "Slope," and "MAD." (These are described above.)

59. The Farwell Brain Fingerprinting 5.0 Brainwave Measurement User Interface is identical to the Farwell Brain Fingerprinting 4.0 Brainwave Measurement User Interface in all essential features. Even the standard Farwell Brain Fingerprinting colors for the "Target," "Probe," and "Irrelevant" brainwave plots are identical.

    a. The only differences are trivial and not related to the essential functions and data displayed, as follows: minor cosmetic differences like the color of the background and the relative size of the plots; a couple different navigation buttons; an extra non-essential channel plotted in the ongoing brainwaves in 5.0; and the number of rows in the table on noise-elimination algorithms.   (The 4.0 table has four rows corresponding to the four noise-elimination algorithms, and the 5.0 table has only one row because only the standard "Range" algorithm was implemented in 5.0.)

    b. Note that Dr. Maison changed the user-interface background color to green in 5.0. This is discussed elsewhere in this document in reference to different versions and modifications of the software.

60. The Farwell Brain Fingerprinting 4.0 and 5.0 Brainwave Measurement User Interfaces are virtually identical.  Both contain 7 identical plots of brainwaves and 38 identical entries in tables.  Farwell Brain Fingerprinting 4.0 contains three additional rows of algorithms for eliminating noise that are not included in 5.0.  Each of the two contains 2 – 3 additional buttons for navigation or adjustment.

61. In summary, the respective brainwave-measurement functions and algorithms are identical for Farwell Brain Fingerprinting 4.0 and 5.0.  The user interfaces for version 4.0 and 5.0 report all of the same data, and display the data in virtually identical ways.  This is because Dr. Maison copied Dr. Farwell's Farwell Brain Fingerprinting 4.0 code and detailed specifications – which were also included in Dr. Farwell's patents and prior scientific publications – in developing Farwell Brain Fingerprinting 5.0.  Farwell Brain Fingerprinting 5.0 comprised

simply porting Farwell Brain Fingerprinting 4.0 to a different platform and a different language, using different open-source software development tools.

a. Only the respective software sections for communicating with the headset or digital signal processing board are different; these do not show in the user interface.

**Farwell Brain Fingerprinting 4.0 Brainwave Measurement User Interface**



**Farwell Brain Fingerprinting 5.0 Brainwave Measurement User Interface**



62. The brainwave analysis, and the output of the brainwave analysis, are identical for Farwell Brain Fingerprinting 3.0 and Farwell Brain Fingerprinting 5.0. (Farwell Brain Fingerprinting 4.0

contains all of the same analysis and output, plus several additional analysis algorithms and several additional algorithms for eliminating noise in the data.)

63. The Farwell Brain Fingerprinting 3.0 data analysis screen displays all of the essential output of the data analysis.  It has the following design.

   a.  Centered on the screen is a plot of the average brainwaves essentially identical to the plot of the same in the Brainwave Measurement User Interface 4.0 reproduced above. Brain responses to "Target," "Irrelevant," and "Probe" stimuli are plotted in the same respective colors, red, green, and blue as in all Farwell Brain Fingerprinting versions (and all BWS versions).

   b.  Below that is a "Determination" regarding the outcome of the test.  This is either "Information present" – the subject knows the information being tested, such as the details of a crime – or "information absent" – the subject does not know the tested information.

   c.  Beside the determination is a statistical confidence (or "bootstrap index" in technical language), a number between 0% and 100%.  This is the statistical probability that the determination is correct.

   d.  Below that is a table containing the details of the results of the test. This is an essential table providing the scientist with needed information regarding these results.  It has columns for the three stimulus types: "Targets," "Probes," and "Irrelevants."  It has rows for counts of "Good" trials (free from noise); "Bad" trials (data contaminated with noise); "RTs" (average reaction time); and "Accuracy."  This provides the same information as the corresponding table in the Brainwave Measurement User Interface.

64. Farwell Brain Fingerprinting 5.0 made the exact same computations for data analysis as Farwell Brain Fingerprinting 3.0.   Farwell Brain Fingerprinting displayed the identical results in the user interface as 3.0, in the identical format.

65. All of the methods for elimination of noise in Farwell Brain Fingerprinting 5.0 were public domain and were copied directly from Farwell Brain Fingerprinting 3.0 and associated code and documents provided by Dr. Farwell to Dr. Maison.[11] Specifically with respect to elimination of noise, Dr. Maison translated Dr. Farwell's Fortran program FILTER.FOR for implementing the optimal digital filters into C # for Farwell Brain Fingerprinting 5.0.  This is the exact same code, line for line, that was implemented in C++ in Farwell Brain Fingerprinting 3.0 and in the IDL language in Farwell Brain Fingerprinting 4.0.  The "Range" algorithm is also identical in the Farwell Brain Fingerprinting 3.0, 4.0, and 5.0 codes, except for being implemented in a different language.

66. In creating the Farwell Brain Fingerprinting 5.0 Brainwave Analysis User Interface data display section, Dr. Maison made a nearly exact copy of the Farwell Brain Fingerprinting 3.0 Brainwave Analysis User Interface .[12]

---

[11] In later versions of Farwell Brain Fingerprinting 5.0, Dr. Maison added an additional high-pass digital filter to counteract electrode drift. This is a standard public-domain filter that is well known and widely used in the signal-processing applications.  It was not needed in 3.0 or 4.0 because this task was accomplished by hardware filters in the digital signal-processing board.

[12] Dr. Maison did not use the layout of Farwell Brain Fingerprinting 4.0 for Farwell Brain Fingerprinting 5.0, because 4.0 computed and displayed not only all of the information that is in 5.0, but also  extensive information that was not included in 5.0.  This included several additional algorithms for eliminating noise in the data and several different algorithms for

a. Centered at the top is the same brainwave plot, with "Target," "Irrelevant," and "Probe" brain responses plotted respectively in the same respective colors, red, green, and blue.

b. Below that is the same "Determination" as in 3.0, which is "Information Present" in the case displayed (or "Information Absent" in other cases).

c. Below that is the exact same table as in 3.0, except that the rows and columns are reversed and the same information in the single table in 3.0 is divided into two tables in 5.0.

  i. "Targets," "Probes," and "Irrelevants" are columns in 3.0 and rows in 5.0. Columns for "Captured trials," "Analyzed trials," and "Rejected trials" (in 5.0) tabulate respectively the identical items, labeled "Total," "Good," and "Bad" trials (in 4.0).

  ii. "Accuracy" and "Reaction Time" are columns in 5.0 and rows in 4.0.

d. In copying the Farwell Brain Fingerprinting 3.0 Brainwave Analysis User Interface to Farwell Brain Fingerprinting 5.0, Dr. Maison changed the background color from blue to green, as is discussed elsewhere in this document.

67. The Farwell Brain Fingerprinting 3.0 Brainwave Analysis User Interface and the Farwell Brain Fingerprinting 5.0 Brainwave Analysis User Interface Data Display Section both included the following exact same items:

a. A brainwave plot with the three types of brain responses displayed in the same respective colors and format;

b. Two summary results, a Determination and a Statistical Confidence, displayed in the same format.

c. Tables with a total of 30 cells, all containing the same information in 3.0 and 5.0, with minor differences in the layout (rows and columns reversed).

68. In summary, the Brainwave Analysis User Interfaces for Farwell Brain Fingerprinting 3.0 and 5.0 are virtually identical.

a. However, Dr. Maison changed the background color from blue in 3.0 to green in 5.0.

69. Before producing Farwell Brain Fingerprinting 5.0, Dr. Maison developed another version, the Dr. Maison BWS Software, that was almost identical to Brain Fingerprinting 3.0 and 5.0, with the differences described below.

70. All of the methods, algorithms and computations for the two functions of the program, Brainwave Measurement and Brainwave Analysis, were identical in the Dr. Maison BWS Software to Farwell Brain Fingerprinting 3.0 and 5.0.  This is because Dr. Maison did the same thing to produce the Dr. Maison BWS Software as he did to produce 5.0: He ported Dr. Farwell's code from Farwell Brain Fingerprinting 3.0 and 4.0 and associated detailed specifications, patents, and publications to a different language – C # – and a different environment – Microsoft Visual Studio and Microsoft .NET – and used different open-source

---

computing the statistical results.  Thus, the display section of 4.0 was much more extensive and complicated than 3.0 and 5.0.

software tools.  The language, environment, and tools for the Dr. Maison BWS Software were identical to those of Farwell Brain Fingerprinting 5.0.

71. The one segment of the Dr. Maison BWS code that was not open source and was not ported from Farwell Brain Fingerprinting 4.0 was the code that interfaced with the headset used by BWS, which was manufactured in Taiwan.  Since the digital signal processors and communication protocols in this headset were different from the ones previously used by Dr. Farwell – and from other headsets and digital signal processors from other companies – Dr. Maison wrote custom code for interfacing with the Taiwanese headset that became a part of the Dr. Maison BWS Software system.

72. Dr. Maison's task in porting Farwell Brain Fingerprinting 4.0 to Dr. Maison BWS Software involved integration or stitching together of open-source software from various sources.  This integration task is accomplished according to a blueprint or software development specifications. The integration task performed by Dr. Maison in porting Farwell Brain Fingerprinting 4.0 to Dr. Maison BWS Software was specified in detail in the open-source Brain Fingerprinting Measurement Specifications (Exhibit CAA) and the open-source Brain Fingerprinting Analysis Specifications (Exhibit CAB) provided by Dr. Farwell to Dr. Maison, as well as in the structure and integration of Farwell Brain Fingerprinting 4.0 and 3.0, which was also provided to Dr. Maison by Dr. Farwell. The integration or stitching together performed by Dr. Maison in developing Dr. Maison BWS Software was in the public domain and open source.

73. The user interfaces for the two functions of the program, Brainwave Measurement and Brainwave Analysis, were also virtually identical between Farwell Brain Fingerprinting 3.0, 5.0, and the Dr. Maison BWS Software.  This is because Dr. Maison copied the user interfaces for Brainwave Measurement and Brainwave Analysis from Farwell Brain Fingerprinting 3.0 to the Dr. Maison BWS Software, just as he did for Brain Fingerprinting 5.0.

74. There was one major difference between the Dr. Maison BWS Software that Dr. Maison provided to Brainwave Science and the Farwell Brain Fingerprinting 5.0 software that Dr. Maison provided to Dr. Farwell.  That is, the software sections for communicating with the two respective headsets used by the two programs were totally different, because BWS and Dr. Farwell used two totally different headsets.  In both cases, this is the only part of the software that is not in the public domain.

75. Dr. Maison did not give Dr. Farwell the section of the Dr. Maison BWS Software that communicated with the headset, since the Farwell Brain Fingerprinting 5.0 system used a totally different headset.  The rest of the Dr. Maison BWS Software and Farwell Brain Fingerprinting 5.0 were extremely similar – and in the open-source public domain – as both resulted from Dr. Maison porting and translating Farwell Brain Fingerprinting 3.0 and 4.0 to the respective newer versions, Farwell Brain Fingerprinting 5.0 and the Dr. Maison BWS Software.

76. All of the methods for eliminating noise in the signal in the Dr. Maison BWS Software were the same public-domain methods from Farwell Brain Fingerprinting 3.0 and 4.0 that Dr. Maison implemented in Farwell Brain Fingerprinting 5.0.

77. There were a few minor differences between Farwell Brain Fingerprinting 5.0 and the Dr. Maison BWS Software, as follows.

a.  The Dr. Maison BWS Software measured, computed, and displayed only one EEG channel, whereas Farwell Brain Fingerprinting 5.0 measured, computed, and displayed three EEG channels.  Both measured one eye-movement (EOG) channel.  Therefore there were two channels total displayed in the average brain response plots for the Dr. Maison BWS Software and four channels total displayed in the corresponding brainwave displays in Farwell Brain Fingerprinting 5.0.

b.  Although both the Dr. Maison BWS Software and Farwell Brain Fingerprinting 5.0 applied the optimal digital filters – which Maison translated from Dr. Farwell's FILTER.FOR program – in the Brainwave Analysis, only Brain Fingerprinting 5.0 applied these filters in the Brainwave Measurement.  This resulted in clearer EEG displays in Farwell Brain Fingerprinting 5.0 than in the Dr. Maison BWS Software.

c.  In later versions of Brain Fingerprinting 5.0, Dr. Maison implemented one additional algorithm for eliminating noise in the data that was not included in the Dr. Maison BWS Software, namely a high-pass digital filter for eliminating electrode drift.

78. Other than the above minor differences, the user interfaces for the Dr. Maison BWS Software for both functions, Brainwave Measurement and Brainwave Analysis, were identical to the user interfaces for the same in Farwell Brain Fingerprinting 3.0 and 5.0.  This is because Dr. Maison copied the Farwell Brain Fingerprinting 3.0 interfaces for both Farwell Brain Fingerprinting 5.0 and the Dr. Maison BWS Software.  All the brainwave measurements and computations that produced the results displayed were also identical for Farwell Brain Fingerprinting 3.0, Farwell Brain Fingerprinting 4.0, Farwell Brain Fingerprinting 5.0, and the Dr. Maison BWS Software.

79. Like all Farwell Brain Fingerprinting versions – and all software for brainwave-based detection of concealed information, and in fact all software for measuring P300 or any other event-related brain potentials – the Dr. Maison BWS Software had multiple data-entry screens, the purpose of which was for the user to enter details such as the subject name and number, the words to be displayed, etc.  All of this is in the public domain.  The appearance of these displays depends on which open-source software tools are used for the data entry functions.  Since Farwell Brain Fingerprinting 5.0 and the Dr. Maison BWS Software used the same open-source tools to perform the same open-source data entry tasks, the displays were similar.  Nothing in these data-entry screens or keyboards for data entry could be considered proprietary.

80. There was one noticeable difference between the user interfaces for Farwell Brain Fingerprinting 3.0 and the Dr. Maison BWS Software on the one hand, and Farwell Brain Fingerprinting 5.0 on the other.  The Dr. Maison BWS Software retained the blue background of Farwell Brain Fingerprinting 3.0 and 4.0 user interfaces.  For Brain Fingerprinting 5.0, Dr. Maison changed the background color to green.

81. The following illustrates that the Dr. Maison BWS Software Brainwave Measurement user interface, like the Farwell Brain Fingerprinting 5.0 Brainwave Measurement user interface, was copied almost exactly from the Farwell Brain Fingerprinting 4.0 Brainwave Measurement user interface.  This graphic is from Plaintiff's EFS 20-2, Exhibit B.  "Farwell's application" refers to Neurodyne / Farwell Brain Fingerprinting 5.0, the Maison BWS Software.

From Plaintiff's Exhibit B





**Farwell Brain Fingerprinting 4.0  Brainwave Measurement User Interface**



82. Comparing Farwell Brain Fingerprinting 4.0 Brainwave Measurement user interface with the Maison BWS Brainwave Measurement user interface reveals the following.

83. For both measuring brainwaves and analyzing brainwaves, the Dr. Maison BWS Software included all the same computations as Farwell Brain Fingerprinting 4.0 and 3.0.  The only difference was the programming language and the corresponding development platform.  The Dr. Maison BWS Software was simply Farwell Brain Fingerprinting 4.0 ported and translated to a new platform and a new language, using different open-source programming tools.

84. For brainwave measurements, the output of these functions and algorithms was displayed on the Farwell Brain Fingerprinting 4.0 Brainwave Measurement User Interface and the Dr. Maison BWS Software Brainwave Measurement User Interface.  **Both of these have the <u>identical</u> following design.**

    a. At the upper left is a plot of the ongoing brainwaves.  Farwell Brain Fingerprinting 4.0 displays four channels from four scalp locations.  One of these is the eye-movement (EOG) channel, and three are EEG from three scalp locations, named Fz, Cz, and Pz.  In the Dr. Maison BWS Software, there are only two channels, one EEG at Pz and one EOG.

    b. Below that is a plot of the average brain responses to three types of stimuli (words or pictures presented to the subject). Brain responses to "target," "irrelevant," and "probe" are plotted respectively with red, green, and blue lines.  These are the standard colors used in all Farwell Brain Fingerprinting versions.  Plots are identical in Farwell Brain Fingerprinting 4.0 and Dr. Maison BWS Software.

    c. In both versions, at the upper right is a table that lists the following essential output: the type of stimulus, the stimulus, and the reaction time.  (In Farwell Brain Fingerprinting 4.0  this table also has two non-essential items, the number of the channel being displayed in the brainwave plots and the scale of the plots).

    d. Below that in both versions is a table that has columns for three stimulus types: Target, Probe, and Irrelevant.  It has rows for the following:

        i. Trials (total number of trials; a trial is comprises one stimulus presentation and the corresponding brain responses);

        ii. Good trials (total number of trials that do not have noise in the data);

        iii. Required trials (number of trials required to complete the test);

        iv. RT or Reaction Time (the subject's average button-press response time);

        v. Accuracy (the percentage accuracy of the subject's button presses).

    e. Below that is a table that tabulates the result of the algorithms for eliminating noise from the data.  In Farwell Brain Fingerprinting 4.0 the columns are the four channels; i.e., three EEG channels and one eye-movement (EOG) channel.  In the Dr. Maison BWS Software there are only two channels. The rows display the numbers for the different algorithms for eliminating noise.  For Farwell Brain Fingerprinting 4.0 these comprise the standard "Range" algorithm plus four additional ones: "Clip," "Threshold," "Slope," and "MAD." (These are described above.)  In the Dr. Maison BWS Software, only one method, "Range," is applied and displayed.

      i. With respect to eliminating noise, the Dr. Maison BWS Software includes nothing other than what is already in Farwell Brain Fingerprinting 4.0. Farwell Brain Fingerprinting 4.0 also includes four more advanced methods that are not included in Dr. Maison BWS Software.

85. The Maison BWS Brainwave Measurement User Interface is identical to the Farwell Brain Fingerprinting 4.0 Brainwave Measurement User Interface in all essential features. Even the standard Farwell Brain Fingerprinting colors for the "Target," "Probe," and "Irrelevant" brainwave plots are identical. All of the tables display the same information in both versions.

86. The only differences are trivial and not related to the essential functions and data displayed, as follows: minor cosmetic differences like the color of the background and the relative size of the plots; a couple different navigation buttons; an extra non-essential channel plotted in the ongoing brainwaves in 5.0; and the number of rows in the table on noise-elimination algorithms. (The Farwell Brain Fingerprinting 4.0 table has four rows corresponding to the four noise-elimination algorithms, and the Dr. Maison BWS table has only one row because only the standard "Range" algorithm was implemented in it.)

87. The Farwell Brain Fingerprinting 4.0 interface and the Maison BWS Brainwave Measurement user interfaces contain 5 identical plots of brainwaves and 38 identical entries in tables. (Two additional brainwave channels are included in Farwell Brain Fingerprinting 4.0 displays, because it measured 3 channels of EEG and the Dr. Maison BWS Software measured only one.) Farwell Brain Fingerprinting 4.0 contains three additional rows of algorithms for eliminating noise that are not included in the Dr. Maison BWS Software. Each of the two contains 2 – 3 additional buttons for navigation or adjustment.

88. In summary, the respective brainwave-measurement functions and algorithms are identical for Farwell Brain Fingerprinting 4.0 and the Dr. Maison BWS Software. The user interfaces for Farwell Brain Fingerprinting 4.0 and the Dr. Maison BWS Software report all of the same data (except for the fewer EEG channels and fewer algorithms for eliminating noise in the data in the Maison BWS software). The two programs display the data in virtually identical ways. This is because Dr. Maison copied Dr. Farwell's Farwell Brain Fingerprinting 4.0 code, user interface, and detailed specifications – which were also included in Dr. Farwell's patents and prior scientific publications – in developing the Dr. Maison BWS Software. The Dr. Maison BWS Software comprised simply porting Farwell Brain Fingerprinting 4.0 to a different platform and a different language, using different open-source software development tools.

      a. Only the respective software sections for communicating with the headset or digital signal processing board are different between Farwell Brain Fingerprinting 4.0 and the Dr. Maison BWS Software; these do not show in the user interface.

89. In creating the Maison BWS Brainwave Analysis User Interface data display section, Dr. Maison made a nearly exact copy of the Farwell Brain Fingerprinting 3.0 Brainwave Analysis User Interface .[13]

---

[13] Dr. Maison did not use the layout of Farwell Brain Fingerprinting 4.0 for Farwell Brain Fingerprinting 5.0, because 4.0 computed and displayed not only all of the information that is in 5.0, but also extensive information that was not included in 5.0. This included several additional algorithms for eliminating noise in the data and several different algorithms for computing the statistical results. Thus, the display section of 4.0 was much more extensive and complicated than 3.0 and 5.0.

     a.   Centered at the top is the same brainwave plot, with "Target," "Irrelevant," and "Probe" brain responses plotted respectively in the same respective colors, red, green, and blue.

     b.   Below that is the same "Determination" as in 3.0, which is "Information Present" in the case displayed (or "Information Absent" in other cases).

     c.   Below that is the exact same table as in 3.0, except that the rows and columns are reversed and the same information in the single table in 3.0 is divided into two tables in Dr. Maison BWS.

         i.   "Targets," "Probes," and "Irrelevants" are columns in 3.0 and rows in Dr. Maison BWS.  Columns for "Captured trials," "Analyzed trials," and "Rejected trials" (in Dr. Maison BWS) tabulate respectively the identical items, labeled "Total," "Good," and "Bad" trials (in 3.0).

        ii.   "Accuracy" and "Reaction Time" are columns in Dr. Maison BWS and rows in Farwell Brain Fingerprinting 3.0.

     d.   In copying the Farwell Brain Fingerprinting 3.0 Brainwave Analysis User Interface  to Dr. Maison BWS, Dr. Maison did NOT change the background color from blue to green, as is discussed elsewhere in this document. The background color for the user interface for Dr. Maison BWS is blue.

90. The Farwell Brain Fingerprinting 3.0 Brainwave Analysis User Interface and the Dr. Maison BWS Brainwave Analysis User Interface Data Display Section both included the following exact same items:

     a.   A brainwave plot with the three types of brain responses displayed in the same respective colors and format;

     b.   Two summary results, a Determination and a Statistical Confidence, displayed in the same format.

     c.   Tables with a total of 30 cells, all containing the same information in Farwell Brain Fingerprinting 3.0 and Dr. Maison BWS, with minor differences in the layout (rows and columns reversed).

91. In summary, the Brainwave Analysis User Interfaces for Farwell Brain Fingerprinting 3.0 and Dr. Maison BWS are virtually identical.

     a.   Unlike Farwell Brain Fingerprinting 5.0, Dr. Maison did NOT change the background color from blue in 3.0 to green in Dr. Maison BWS.  Dr. Maison BWS user interface has a blue background color.

92. The exhibits to Plaintiff's CEO Ika's Affidavit (EFS #20-2) that contain the screenshots of the BWS software do not include a screenshot of the Dr. Maison BWS Software Brainwave Analysis User Interface or the corresponding user interface in the software that BWS submitted to Codequiry as its code.  The below analysis is based on Farwell Brain Fingerprinting 5.0, which is believed to be very similar to the Dr. Maison BWS Software that Dr. Maison downloaded from a public source on the internet (EFS #106-3, Exhibit A, p. 11 – 12), except that in the below version the background color has been changed from blue to green by Dr. Maison in producing Farwell Brain Fingerprinting 5.0 ("Dr. Larry Farwell's Application").  The corresponding user interface in the code that BWS submitted to Codequiry was also changed from blue to green – fraudulently – after BWS obtained a copy

of Dr. Farwell's software from Dr. Maison and modified the Dr. Maison BWS Software to make it more similar to Dr. Larry Farwell's Application by changing the background color from blue to green (and other undisclosed modifications).

**Farwell Brain Fingerprinting 3.0 Brainwave Analysis User Interface - Data Display Section**



**Dr. Maison BWS Software Brainwave Analysis User Interface - Data Display Section**



93. The brainwave analysis, and the output of the brainwave analysis, are identical for Farwell Brain Fingerprinting 3.0 and Dr. Maison BWS Software. (Farwell Brain Fingerprinting 4.0 contains all

of the same analysis and output, plus several additional analysis algorithms and several additional algorithms for eliminating noise in the data.)

94. In creating the Dr. Maison BWS Software Brainwave Analysis User Interface data display section, Dr. Maison made a nearly exact copy of the Farwell Brain Fingerprinting 3.0 Brainwave Analysis User Interface

   a. Centered at the top is the same brainwave plot, with "Target," "Irrelevant," and "Probe" brain responses plotted respectively in the same colors, red, green, and blue.

   b. Below that is the same "Determination" as in 3.0, which is "Information Present" in the case displayed (and "Information Absent" in other cases).

   c. Below that is the exact same table as in 3.0, except that the rows and columns are reversed and the same information in the single table in 3.0 is divided into two tables in Dr. Maison BWS Software.

      i. "Targets," "Probes," and "Irrelevants" are columns in 3.0 and rows in Dr. Maison BWS Software.  Columns for "Captured trials," "Analyzed trials," and "Rejected trials" (in Dr. Maison BWS Software) tabulate respectively the identical items, labeled "Total," "Good," and "Bad" trials (in Farwell Brain Fingerprinting 3.0).

      ii. "Accuracy" and "Reaction Time" are columns in Dr. Maison BWS Software and rows in Farwell Brain Fingerprinting 3.0.

   d. In copying the Farwell Brain Fingerprinting 3.0 Brainwave Analysis User Interface  to Dr. Maison BWS Software, Dr. Maison did not change the background color from blue to green. The Dr. Maison BWS Software maintained the blue background of Farwell Brain Fingerprinting 3.0.

95. The Farwell Brain Fingerprinting 3.0 Brainwave Analysis User Interface and the Dr. Maison BWS Brainwave Analysis User Interface Data Display Section both include the following exact same items:

   a. A brainwave plot with the three types of brain responses displayed in the same respective colors and format;

   b. Two summary results, a Determination and a Statistical Confidence, displayed in the same format.

   c. Tables with a total of 30 cells, all containing the same information in Farwell Brain Fingerprinting 3.0 and Dr. Maison BWS Software, with minor differences in the layout (rows and columns reversed).

96. In summary, the respective brainwave-analysis functions and algorithms are identical for Farwell Brain Fingerprinting 3.0 and the Dr. Maison BWS Software.  The user interfaces for Farwell Brain Fingerprinting 3.0 and the Dr. Maison BWS Software report all of the same data. The two programs display the data in virtually identical ways.  This is because Dr. Maison copied Dr. Farwell's Farwell Brain Fingerprinting 3.0 code and detailed specifications – which were also included in Dr. Farwell's patents and prior scientific publications – in developing the Dr. Maison BWS Software.  The Dr. Maison BWS Software comprised simply porting Farwell Brain Fingerprinting 4.0 and the data analysis section of 3.0 to a different platform and a different language, using different open-source software development tools.

    a.   Only the respective software sections for communicating with the headset or digital signal processing board are different between Farwell Brain Fingerprinting 3.0 and the Dr. Maison BWS Software; these do not show in the user interface.

97. Farwell Brain Fingerprinting 5.0 was also known as Neurodyne. The Neurodyne program is integrated into the Microsoft Visual Studio and Microsoft .NET environments and stored in Dr. Maison's TFS. Dr. Maison provided Dr. Farwell access to Farwell Brain Fingerprinting 5.0 by allowing Dr. Farwell access to Dr. Maison's TFS.

98. After the current lawsuit was filed, Dr. Maison revoked Dr. Farwell's access to Dr. Maison's TFS. Consequently, Dr. Farwell no longer has access to Farwell Brain Fingerprinting 5.0. The only way to access it is for Dr. Maison to provide access to his TFS to someone, in this case Mindfire.

99. 100% of the Neurodyne program comprises implementation by Dr. Maison of Dr. Farwell's pre-existing open-source material – including Farwell Brain Fingerprinting 3.0 and 4.0, detailed specifications provided to Dr. Maison by Dr. Farwell, and Dr. Farwell's patents and scientific publications – with one exception. The exception is the code Dr. Maison developed to communicate with the Cognionics headset. This is custom code.

100.    The Farwell Brain Fingerprinting 5.0 / Neurodyne code provided to Dr. Farwell by Dr. Maison does not include any code for communicating with any other headset or digital signal processor, other than the code for communicating with the Cognionics headset.

101.    As a preparation for performing its two functions of Brainwave Measurement and Brainwave Analysis, the program must have identifying information about the subject (subject number, name, etc.) and information regarding what words or pictures ("stimuli") will be displayed to elicit the brainwave responses. These are input through a standard keyboard and data entry screens. The appearance of the data entry user-interface screens will vary depending on which open-source software packages are used for this purpose. Data entry is essentially the same for all programs for detection of concealed information, and for that matter for almost all programs that involve any kind of measurements of EEG or any other measurements related to cognitive processing. There is nothing that might be construed as proprietary in this data-entry process or the software and user interfaces it involves.

102.    Similarly, virtually all software programs have navigation pages, tabs, navigation buttons, etc. that allow the user to access and activate the actual functions of the program – in this case, the two functions of measuring brainwaves and analyzing brainwaves. All versions of Farwell Brain Fingerprinting and all versions of Brainwave Science software have such navigation pages, tabs, navigation buttons, etc. All of these are similar in function. They differ in appearance in the different programs depending on the open-source software used to implement them. All of this is in the public domain, and none of these ancillary navigation pages could be considered proprietary.

103.    Since both Farwell Brain Fingerprinting 5.0 and Dr. Maison BWS Software were ported from the same source, Farwell Brain Fingerprinting 3.0 (brainwave analysis) and 4.0 (brainwave measurement), and both programs were ported to the same platform and language with the same open-source development tools, the data entry screens and the navigation screens inevitably look very similar for Farwell Brain Fingerprinting 5.0 and Dr. Maison BWS Software. These are all common screens found in a multitude of programs, are all public domain, and could in no way be considered proprietary.

104.    The Dr. Maison BWS Software was released to a public domain source at 6:15 PM on 9/10/2017 from IP address 65.52.55.39 in Chicago, using the credentials of Ika's employee Karuna Raja, who was in Southborough, MA at the time (EFS #87).  This is documented with screenshots in Exhibit CAD to this document.

105.    Dr. Maison later downloaded this software from a public source (EFS #106-3, Exhibit A, p. 11 – 12.).  Thus, all of the Dr. Maison BWS Software that Dr. Maison used for any purpose was and is in the public domain.  This fact shall be set aside in the below discussion, which will proceed on the premise that not all of the Dr. Maison BWS Software was in the public domain.

106.    Plaintiff's CEO Ika initially stated under oath in a hearing in this case on November 30, 2021 that none of the Dr. Maison BWS Software was public domain or open source. Plaintiff now acknowledges that Ika lied under oath, and in fact 90% of the Maison BWS Software is open source (Tomkins Affirmation, Exhibit A, 37:9-37:12).

107.    100% of the software that Dr. Maison provided to Dr. Farwell for Farwell Brain Fingerprinting 5.0 is open source, due to Dr. Maison having deleted the proprietary portion of the Dr. Maison BWS software before providing software to Dr. Farwell. (This remains true regardless of whether or not Dr. Maison downloaded Dr. Maison BWS Software from a public source on the internet, as he has stated.)  (Tomkins Affirmation, Exhibit A, 7:8-24)

108.    Plaintiff has maintained Dr. Maison BWS Software in its possession in BWS' TFS repository since Dr. Maison originally created it (BWS TFS).

109.    Plaintiff BWS obtained a copy of Farwell Brain Fingerprinting 5.0 (also known as Neurodyne and Dr. Larry Farwell's Application) from Dr. Maison (Ika Affidavit, EFS 20-2 p. 6 par 22).

110.    Plaintiff Modified the Dr. Maison BWS code (later called iCognative by BWS) and user interface to look more similar to the Farwell Brain Fingerprinting 5.0 / Dr. Larry Farwell's Application user interface.  Specifically, the Maison BWS Software had a user interface with a blue background.  Plaintiff modified the Dr. Maison BWS code produced by Dr. Maison.  This modification produced a new software version, the Fraudulently Modified BWS Software.  The modifications were specifically designed to make this software look more similar to Dr. Larry Farwell's Application, Brain Fingerprinting 5.0.

111.    Plaintiff then submitted the Fraudulently Modified BWS Software, aka "iCognative," to a software analysis in Codequiry.

112.    Before submitting the code to Codequiry, BWS also eliminated sections of the code that were totally different between the Fraudulently Modified BWS Software and Dr. Larry Farwell's Application, Farwell Brain Fingerprinting 5.0, namely the parts that communicated with the two different respective headsets.  These also were the only parts of the code that were proprietary and not open source and public domain.

113.    Plaintiff falsely and fraudulently stated that the Codequiry comparison was between software developed by BWS (i.e., the Dr. Maison BWS Software) and Dr. Larry Farwell's Application, Farwell Brain Fingerprinting 5.0, whereas in fact the comparison was between the Fraudulently Modified BWS Software – modified to look more similar to Dr. Larry Farwell's Application, Farwell Brain Fingerprinting 5.0 after BWS obtained it from Dr. Maison.

114.    The software analysis in Codequiry showed a high degree of similarity between the Fraudulently Modified BWS Software and Dr. Larry Farwell's Application, Farwell Brain Fingerprinting 5.0.  There are two reasons for this.

> a. Everything (except the section that communicated with the headset) in the Dr. Maison BWS Software, of which the Fraudulently Modified BWS was a modification, was in the public domain, and was obtained by Dr. Maison from Dr. Farwell in the form of Farwell Brain Fingerprinting 3.0 and 4.0, the Brain Fingerprinting Specifications, and Dr. Farwell's patents and scientific publications. Dr. Larry Farwell's Application, Farwell Brain Fingerprinting 5.0, was developed by Dr. Maison from of the same public domain sources. Both the Dr. Maison BWS Software and Farwell Brain Fingerprinting 5.0 were developed by Dr. Maison porting Farwell Brain Fingerprinting 3.0 and 4.0 to a new platform and language.
>
> b. BWS modified the Dr. Maison BWS Software to produce the Fraudulently Modified BWS Software specifically to make it appear more similar to Dr. Larry Farwell's Application, Farwell Brain Fingerprinting 5.0, in particular by changing the background color from blue to green.

115. If the Codequiry analysis had been conducted on the Dr. Maison BWS Software, rather than the Fraudulently Modified BWS Software, and conducted on all of the software rather than only part of the software – by BWS omitting the parts that were clearly different – the results would undoubtedly have been different.

116. Plaintiff stated that they had located an online demonstration where Dr. Farwell demonstrated software with a nearly identical user interface to that of BWS' Software (Ika affidavit doc 20-2), and cited this as evidence that Dr. Farwell had received stolen BWS software from Dr. Maison. For both of the functions of all versions of BWS' Software, the user interfaces are identical to Farwell Brain Fingerprinting 4.0 for Brainwave Measurement and Farwell Brain Fingerprinting 3.0 for Brainwave Analysis. Dr. Farwell developed Farwell Brain Fingerprinting 3.0 and 4.0 before Brainwave Science was founded in 2012. Both of these were in the public domain.

117. Dr. Farwell conducted online demonstrations of Farwell Brain Fingerprinting 3.0 and 4.0 between 1999 and 2011 – before BWS existed – that presented user interfaces that were identical to the Dr. Maison BWS Software and the BWS Fraudulently Modified Software (except for minor cosmetic differences like the background color). The following are online demonstrations of software with identical user interfaces to the BWS software, for both of the functions of the software, Brainwave Measurement and Brainwave Analysis, that were online before BWS existed.

> a. CBS 60 Minutes https://www.youtube.com/watch?v=4KivDqinwbs
>
> b. ABC Good Morning America https://www.youtube.com/watch?v=KnjzFdxIKCM
>
> c. KOMO News https://www.youtube.com/watch?v=1Co8JC7Qk84
>
> d. PBS https://www.youtube.com/watch?v=LKdCEvdBqJA
>
> e. Fox News https://www.youtube.com/watch?v=AKnNEB6uwec
>
> f. Discovery Channel "Wild Tech" https://www.youtube.com/watch?v=1Q9BfAVM5os
>
> g. Discovery Channel Science https://www.youtube.com/watch?v=mLnVvXGrDdc
>
> h. Fox 5 News https://www.youtube.com/watch?v=Mz1ZrKFsjzQ
>
> i. CNN https://www.youtube.com/watch?v=Qwme8wiUTu8
>
> j. BBC https://www.youtube.com/watch?v=RTS_b_SacI4

     k. Seattle Post Intelligencer https://farwellbrainfingerprinting.com/brain-fingerprinting-touted-as-truth-meter/

     l. Chemistry and Industry https://farwellbrainfingerprinting.com/chemistry-and-industry-on-farwell-brain-fingerprinting/

118.    For Brainwave Measurement, the above online demonstrations from before Brainwave Science existed had the following identical features with the BWS Software.

119.    For brainwave measurements, Dr. Farwell's online demonstrations of Farwell Brain Fingerprinting 4.0 from before Brainwave Science existed displayed the following on the Brainwave Measurement User Interface screen.

     a. At the upper left is a plot of the ongoing brainwaves in four channels from four scalp locations.  One of these is the eye-movement channel, and three are EEG from three scalp locations, named Fz, Cz, and Pz.

     b. Below that is a plot of the average brain responses to three types of stimuli (words or pictures presented to the subject). Brain responses to "target," "irrelevant," and "probe" are plotted respectively with red, green, and blue lines.  These are the standard colors used in all Farwell Brain Fingerprinting versions.

     c. At the upper right is a table that lists the following essential output: the type of stimulus, the stimulus, and the reaction time.  (This table also has two non-essential items, the number of the channel being displayed in the brainwave plots and the scale of the plots).

     d. Below that is a table that has columns for three stimulus types: Target, Probe, and Irrelevant.  It has rows for the following:

         i. Trials (total number of trials; a trial is comprises one stimulus presentation and the corresponding brain responses);

         ii. Good trials (total number of trials that do not have noise in the data);

         iii. Required trials (number of trials required to complete the test);

         iv. RT or Reaction Time (the subject's average button-press response time);

         v. Accuracy (the percentage accuracy of the subject's button presses).

     e. Below that is a table that tabulates the result of the algorithms for eliminating noise from the data.  The columns are the four channels; i.e., three EEG channels and one eye-movement (EOG) channel.  The rows display the numbers for the different algorithms for eliminating noise.  These comprise the standard "Range" algorithm plus four additional ones: "Clip," "Threshold," "Slope," and "MAD." (These are described above in paragraph 20.)

120.    The BWS Software Brainwave Measurement User Interface (all versions) is identical to the Farwell Brain Fingerprinting 4.0 Brainwave Measurement User Interface in the above online demonstrations from before Brainwave Science existed in all essential features.  Even the standard Farwell Brain Fingerprinting colors for the "Target," "Probe," and "Irrelevant" brainwave plots are identical.

     a. The only differences are trivial and not related to the essential functions and data displayed, as follows: minor cosmetic differences like the color of the background and

the relative size of the plots; a couple different navigation buttons; and the number of rows in the table on noise-elimination algorithms.   (The online demonstration table has four rows corresponding to the four noise-elimination algorithms, and the BWS table has only one row because only the standard "Range" algorithm was implemented in the BWS Software.)

121.   The Farwell Brain Fingerprinting 4.0 demonstrated online before BWS existed and BWS Brainwave Measurement User interfaces contain 7 identical plots of brainwaves and 38 identical entries in tables.  Farwell Brain Fingerprinting 4.0 contains three additional rows of algorithms for eliminating noise that are not included in BWS.  Each of the two contains 2 – 3 additional buttons for navigation or adjustment.

122.   For Brainwave Analysis, the above online demonstrations from before Brainwave Science existed had the following identical features with the BWS Software.

123.   BWS Software Brainwave Analysis User Interface data display section and the Farwell Brain Fingerprinting 3.0 Brainwave Analysis User Interface displayed in the above online demonstrations from before Brainwave Science existed had the following identical features.

    a.   Centered at the top is the same brainwave plot, with "Target," "Irrelevant," and "Probe" brain responses plotted respectively in the same colors, red, green, and blue.

    b.   Below that is the same "Determination" as in 3.0, which is "Information Present" in the case displayed in 3.0 and "Information Absent" in the case displayed in Dr. Maison BWS Software.

    c.   Below that is the exact same table as in 3.0 as displayed online and Dr. Maison BWS Software, except that the rows and columns are reversed and the same information in the single table in 3.0 is divided into two tables in Dr. Maison BWS Software.

        i.   "Targets," "Probes," and "Irrelevants" are columns in 3.0 online demonstrations and rows in Dr. Maison BWS Software.  Columns for "Captured trials," "Analyzed trials," and "Rejected trials" (in Dr. Maison BWS Software) tabulate respectively the identical items, labeled "Total," "Good," and "Bad" trials (in Farwell Brain Fingerprinting 3.0).

        ii.   "Accuracy" and "Reaction Time" are columns in Dr. Maison BWS Software and rows in Farwell Brain Fingerprinting 3.0 online demonstrations.

124.   The Farwell Brain Fingerprinting 3.0 Brainwave Analysis User Interface as it appeared in online demonstrations before BWS existed and the BWS Brainwave Analysis User Interface Data Display Section both include the following exact same items, in the same layout on the page:

    a.   A brainwave plot with the three types of brain responses displayed in the same respective colors and format;

    b.   Two summary results, a Determination and a Statistical Confidence, displayed in the same format.

    c.   Tables with a total of 30 cells, all containing the same information in Farwell Brain Fingerprinting 3.0 and Dr. Maison BWS Software, with minor differences in the layout (rows and columns reversed).

125.   With respect to purported new developments in software by Brainwave Science, the "Undisputed Facts" in BWS' Statement of Undisputed Material Facts (EFS #106-1) refer only to

the false claim that BWS developed methods for eliminating noise from the signals.  In Ika's Affidavit he makes additional false claims regarding developments by BWS.  Ika stated the following Ika Affidavit, EFS 20-2, p. 4, par. 10 – 11.

> 10.  The challenge in developing and marketing any P300 based system lies not within the concept of  P300 measurement itself but in creating a system which, among other things,
>
> a) prompts testing personnel for appropriate stimuli;
>
> b) displays stimuli to testing subjects in optimal order and at optimal intervals;
>
> c) captures appropriate P300 brainwave responses;
>
> d) disregards and/or eliminates extraneous responses ("noise") which may produce false  positive or false negative results;
>
> e) detects and disregards any attempted countermeasures by suspects or others involved in  conducting testing;
>
> f) performs appropriate analysis of P300 measured responses utilizing statistical and machine  learning algorithms and Artificial Intelligence;
>
> g) generates unbiased reports for use by examiners, investigating agencies and legal authorities.
>
> 11. Brainwave has expended substantial time and resources to address the afore-referenced challenges  by developing proprietary software code, user interfaces, algorithms and hardware ("Brainwave Trade  Secrets") to create a system that is accurate, scalable and more-readily utilized by field investigators  without extensive scientific training.

126.   All of the above claims by Ika are demonstrably and unequivocally false, as follows.

   a.  "prompts testing personnel for appropriate stimuli;" is contained in Farwell Brain Fingerprinting 3.0 and 4.0, the Brain Fingerprinting Specifications, and Dr. Farwell's patents and scientific publications (Farwell's Dropbox) in at least as comprehensive a manner as in Dr. Maison BWS Software (BWS TFS).

   b.  "displays stimuli to testing subjects in optimal order and at optimal intervals;" is contained in Farwell Brain Fingerprinting 3.0 and 4.0, the Brain Fingerprinting Specifications, and Dr. Farwell's patents and scientific publications (Farwell's Dropbox) in at least as comprehensive a manner as in Dr. Maison BWS Software (BWS TFS).  This is also found in many of the over 800 other published scientific publications wherein other scientists have discussed and replicated Dr. Farwell's Brain Fingerprinting research and results (https://scholar.google.com/citations?user=wgZhgc0AAAAJ&hl=en ).

   c.  "captures appropriate P300 brainwave responses;" is contained in Farwell Brain Fingerprinting 3.0 and 4.0, the Brain Fingerprinting Specifications, and Dr. Farwell's patents and scientific publications (Farwell's Dropbox) in at least as comprehensive a manner as in Dr. Maison BWS Software (BWS TFS).  This is also found in many of the over 4,000 other published scientific publications wherein other scientists have discussed and replicated Dr. Farwell's research and results on several different applications of the P300.

d. "disregards and/or eliminates extraneous responses ("noise") which may produce false positive or false negative results;" was contained in Farwell Brain Fingerprinting 3.0 and 4.0 and many other public domain sources, as discussed above.  Everything in the BWS software that eliminated noise was copied directly from Farwell Brain Fingerprinting 3.0 and 4.0, both of which also contained additional, more advanced methods for eliminating noise than those that Dr. Maison ported to the BWS software.

e. "detects and disregards any attempted countermeasures by suspects or others involved in  conducting testing;"  Everything that the Dr. Maison BWS Software  (BWS TFS) does to counteract countermeasures is derived directly from Farwell Brain Fingerprinting 4.0.  BWS added absolutely nothing to the software relevant to countermeasures (BWS TFS). The methods that make Farwell Brain Fingerprinting 4.0 highly resistant to countermeasures are discussed in detail in Farwell 2012, Farwell et al. 2013, Farwell et al. 2014, and Farwell and Richardson 2022 (Farwell Dropbox).

f. "performs appropriate analysis of P300 measured responses utilizing statistical and machine  learning algorithms and Artificial Intelligence;"   The data analysis in Dr. Maison's BWS Software was copied directly from Farwell Brain Fingerprinting 3.0. This does involve statistical algorithms, which Dr. Farwell discusses extensively in his scientific publications, in particular Farwell 2012. It does not involve machine learning or artificial intelligence.  There is no machine learning or artificial intelligence in Dr. Maison BWS Software or any software that Dr. Maison or Dr. Farwell obtained from BWS.  Dr. Farwell has conducted research in machine learning and artificial intelligence; however, none of it is included in the Farwell Brain Fingerprinting software or the BWS programs, which were developed by porting the Farwell Brain Fingerprinting software.  The BWS software that Dr. Maison downloaded contained absolutely no developments by BWS of machine learning or artificial intelligence. The reference to machine learning and artificial intelligence is simply a fabrication by Ika.

g. "generates unbiased reports for use by examiners, investigating agencies and legal authorities."  This is contained in Farwell Brain Fingerprinting 3.0 and 4.0.  It is simply a matter of printing out the same output that is displayed on the Brainwave Analysis User Interface, in both Farwell Brain Fingerprinting 3.0/4.0 and the BWS Software. This is open source and in the public domain.

127.    In summary, all of the claims regarding software development by BWS in Ika's affidavit (Ika Affidavit, EFT 20-2, p. 4, par. 10 – 11) are totally, unequivocally, and demonstrably false. Brainwave Science did not develop any of the features, functions, methods, or capabilities that Ika describes (BWS TFS).  All of these were simply copied from open-source and public-domain sources, including Farwell Brain Fingerprinting 3.0 and 4.0, the Brain Fingerprinting Specifications, and Dr. Farwell's patents and publications (Farwell Dropbox).

128.    Ika's statement "Brainwave has expended substantial time and resources to address the afore-referenced challenges  by developing proprietary software code, user interfaces, algorithms and hardware ('Brainwave Trade  Secrets')" is totally false in every respect.  Brainwave Science did not develop any of the specific items that Ika claims. All of the "above-referenced challenges" were effectively "address[ed]" by Dr. Farwell and others before Brainwave Science existed. In any case, whether these challenges were fully addressed before Brainwave Science existed,

Brainwave Science did absolutely nothing to address them other than copy the pre-existing solutions provided to Dr. Maison by Dr. Farwell.

    a.   The only thing that Brainwave Science developed that might be considered proprietary is the software code for communicating with the headset that Brainwave uses, a standard headset manufactured in Taiwan.  Dr. Maison deleted this section of the code and did not use it in the development of Dr. Larry Farwell's Application, Farwell Brain Fingerprinting 5.0, the code he developed for and conveyed to Dr. Farwell.

129.    If there are any "Trade Secrets" in the "software code, user interfaces, algorithms" (Ika Affidavit, EFT 20-2, p. 4, par. 10 – 11) – or any of the computations, measurements, methods, statistics, mathematics, know-how, features, results, or data in the BWS Software – then these are Trade Secrets of Dr. Farwell embodied in Farwell Brain Fingerprinting 3.0 and 4.0 and his documents constituting the specifications for the same (Farwell Dropbox, BWS TFS, Dr. Maison TFS).

130.    Another reason, in addition to the above, why grounds do not exist for a summary judgment in favor of Plaintiffs is as follows. In order for there to be grounds for a summary judgment in favor of Plaintiffs for damages, Plaintiffs must have a legitimate, non-fraudulent business that can be damaged.  Plaintiffs have no business other than fraud.  This is documented extensively in Dr. Farwell's Report to the FBI and Supplement (EFS #80, Exhibit AAA).  Despite numerous challenges to do so, Plaintiffs have never cited a single non-fraudulent business transaction that they have undertaken with any government agency or company or anyone else.  BWS and its CEO Krishna Ika currently stand accused of fraud by authorities in four countries.  These include a sworn affidavit by a South African General (EFS #80, Exhibit AR) regarding attempted fraud by Ika and BWS in South Africa,  a sworn affidavit by one of the top experts in Brain Fingerprinting in the Middle East regarding fraud in by Ika and BWS in South Asia (EFS #80, Exhibit AR).  Since BWS does not have and never has had any business other than fraud, any interference that the actions of Dr. Farwell may have on BWS' activities would serve to prevent crimes, not to damage legitimate business practices.

131.    The following statements in Plaintiff's Statement of Undisputed Material Facts (EFS #106-1) are demonstrably false, or at least disputed.

132.    BWS Statement #2 is false, or at least is disputed.  "Brainwave is in the business of development, marketing and sales of technology solutions to international   government agencies,   and   their   respective   vendors,   in   the   National   Security,   Counterterrorism, Border Security, Human and Drug Trafficking, Criminal Justice, and Immigration Control sectors. (Complaint ¶9, Answer ¶9)."

133.    Brainwave is not in said business.  Brainwave does not have and never has had any  legitimate business activities.  Brainwave is in the business of attempting to defraud government agencies into engaging Ika and his employees to effect a technology transfer of Dr. Farwell's invention of Brain Fingerprinting, whereas in fact they lack the necessary training, expertise, knowledge, and experience to do so. All of the following are thoroughly documented in Dr. Farwell's Report to the FBI (EFS #80, Exhibit AAA and the other Exhibits thereto).  Neither Ika nor any of his employees has ever conducted a successful forensic science test in a real-world situation in the "National   Security, Counterterrorism, Border Security, Human and Drug Trafficking, Criminal Justice, and Immigration Control sectors" or in the investigation of a real-world crime or terrorist act.  Brainwave has not provided any evidence that they have ever conducted a single legitimate,

non-fraudulent business transaction with "international government agencies" or anyone else (Exhibit DAAI, Exhibit DAAJ hereto, EFS #80, Exhibit AAA).

134.    On the other hand, there is considerable evidence of fraud by Ika and Brainwave.  This is documented extensively in Dr. Farwell's Report to the FBI and Supplement (EFS #80, Exhibit AAA). Despite numerous challenges to do so, Plaintiffs have never cited a single non-fraudulent business transaction that they have undertaken with any government agency or company or anyone else (Exhibit DAAI, Exhibit DAAJ hereto, EFS #80, Exhibit AAA).

135.    Contrary to BWS Statement #2, BWS and its CEO Krishna Ika currently stand accused of fraud by authorities in four countries (EFS #80, Exhibit AAA).

136.    BWS statement #2 is disputed in a sworn affidavit by a South African General who is a witness to fraud by Ika and BWS in South Africa (EFS #80, Exhibit AR).

137.    BWS statement #2 is disputed in a sworn affidavit by one of the top experts in Brain Fingerprinting in the Middle East who is a witness to fraud by Ika and BWS in South Asia (EFS #80, Exhibit AR).

138.    BWS Statement #2 is disputed by authorities in Thailand (EFS #80, p. 34: 3.114 – 3.120) and Nigeria (EFS #80, p. 34: 3.121 – 35: 3.124) who are witnesses to fraud by Ika in those countries.

139.    BWS statement #2 is contradicted by the following facts.  In Ika's Affidavit (EFS #20-2) Plaintiff's CEO Ika initially stated under oath in a hearing in this case on November 30, 2021 that none of the Dr. Maison BWS Software was public domain or open source. Plaintiff now acknowledges that Ika lied under oath, and in fact 90% of the Maison BWS Software is open source (Tomkins Affirmation, Exhibit A, 37:9-37:12).  In that same hearing, when Judge Cogan asked Ika (who was under oath) about BWS' business activities, Ika did not answer.  Tomkins (who was not under oath) lied to the judge and falsely stated that BWS had sold at least three iCognative systems to each of at least three clients, at a cost of $400,000 per system. When confronted with the falsehood of that statement in a complaint to the Washington State Office of Disciplinary Counsel (ODC File #21-01031) that Dr. Farwell filed against Tomkins, Tomkins failed to provide a single example of any legitimate business activity, let alone the large, multiple transactions he had falsely claimed (Exhibit DAAI, Exhibit DAAJ, p. 3, ¶ 1 – 4 ¶ 1).

140.    BWS Statement #4, second sentence, is false, or at least is disputed. "Defendant Dr. Lawrence A. Farwell (hereinafter 'Farwell') is an adult resident of the State of Washington (Complaint ¶3, Answer ¶3).  Farwell served as BWS, LLC's Chief Scientific Officer from 2012 until November, 2016."

141.    Dr. Farwell never had a contract to work for BWS as Chief Scientific Officer or in any other capacity. Dr. Farwell and his company Brain Fingerprinting Laboratories, Inc. owned 49% of Brainwave Science as founders' equity when it was formed.  Ika attempted unsuccessfully to transfer the Brain Fingerprinting patents to the company without compensation by recording at the USPTO a document that was not executed by or even known to the undisputed owner of the patents at the time, American Scientific Innovations.  It is undisputed that said document also failed as a patent assignment because it lacked any considerations flowing to the purported assignor.  It is undisputed that every individual who has ever executed a patent assignment of said patents since 2002 has stated, in sworn affidavits, that Brainwave Science was never been assigned and has never owned said patents.  It is undisputed that BWS's attorney Moreno at the time also said that BWS was never assigned any interest in said patents. It is undisputed that Brainwave Science, Inc. (the entity that BWS has falsely claimed owns said patents) has never

been mentioned in any patent assignment recorded at the USPTO. All of this is documented in EFS #80, Exhibit AAA.  Dr. Farwell parted company with Ika and BWS when he discovered that Ika's partner had been convicted in the US of essentially the same crime of which Ika now stands accused by authorities in Pakistan, South Africa, Nigeria, and Thailand – attempting to sell stolen high-tech secrets to a foreign government – and when Dr. Farwell observed illegal, unethical, and dishonest behavior by Ika.  Ika unilaterally expelled the 49% minority shareholders in BWS LLC, including Dr. Farwell and his company, without consent or due process, and transferred their equity to himself without any compensation to the minority shareholders.  Said transactions constitute felony theft as well as violations of securities laws.  All of this is documented in EFS #80, Exhibit AAA.  Ika told demonstrable lies about all of this in his Affidavit (EFS 20-2). Ika's perjury in said document is relevant to the present discussion regarding the software, because it speaks to Ika's honesty, which is at issue with respect to his statements about the software and fraudulent modification thereof.

142.    BWS Statement #5 is false, or at least is disputed. "Brainwave has developed a technology to assist authorities in conducting humane questioning of subjects and exonerating wrongfully accused or convicted persons. The technology, iCognative®, involves measuring 'P300' brainwave responses to confirm that certain information is or is not present within a person's brain. (Complaint ¶10, Answer ¶10)."

143.    Brainwave did not develop said technology.  Everything of substance in the Dr. Maison BWS Software was simply copied and translated from Dr. Farwell's Farwell Brain Fingerprinting 3.0 and 4.0.  All of this was in the public domain. This is thoroughly documented in this document and in EFS #24 and Dr. Maison Affidavit (EFS #89).

144.    BWS Statement #6 is false, or at least is disputed, except for the first sentence. "6. The underlying technology utilizing P300 'brainwaves' is not proprietary to Brainwave. (Complaint ¶11, Answer ¶11). However, the proprietary system developed by Brainwave has successfully addressed a number of problems which had previously prevented the effective use of P300-related technology by field agents. For instance, the code/algorithms developed by Brainwave's technology team, led by Maison, eliminated 'noise' which could provide false positive or negative responses.  (Complaint ¶14, Answer ¶14)."

145.    "The proprietary system developed by Brainwave addressed a number of problems…"  Every method, algorithm, and technique contained in the code Dr. Maison developed for BWS was ported directly from Dr. Farwell's pre-existing Farwell Brain Fingerprinting 3.0 and 4.0. This has been thoroughly discussed in this document (Dr. Farwell 12/27/2022 Affidavit) and  Dr. Farwell Affidavit (EFS #24) and Dr. Maison Affidavit (EFS #89).  An examination of the evidence now before this Court – in BWS TFS and Dr. Maison TFS now being subjected to software comparisons by Mindfire – will show that all of the code/algorithms for eliminating "noise" were copied directly from code provided to Dr. Maison by Dr. Farwell. In fact, the only algorithm for eliminating "noise" that is not common to several thousand other programs is the optimal digital filters that were first published in the field of event-related brain potential research by Dr. Farwell (Farwell et al. 1993) and were translated line-for-line by Dr. Maison from Dr. Farwell's code to BWS code.  Moreover, the statement that "problems" had "previously prevented the effective use of P300-related technology by field agents" is patently false.  Dr. Farwell and his colleagues, including other field agents with intelligence and counterterrorism agencies such as the FBI and the CIA, have been successfully using the Farwell Brain Fingerprinting P300-related technology in the field for over 20 years.

146.    BWS statement #9 is true but misleading. *"The source code developed by Maison for Brainwave consisted of approximately 1,000,000 lines of code (Tomkins Affirmation, Exhibit A, 51:3-51:12)."

147.    Said source code did consist of approximately 1,000,000 lines of code.  However, the code that BWS submitted to Codequiry was not all of the developed code.  BWS left out of the comparison the code where Dr. Larry Farwell's Application was totally different from BWS Software (both the original Dr. Maison BWS Software and the Fraudulently Modified BWS Software) because it communicated with a different headset. This resulted in a falsely exaggerated finding by Codequiry regarding the similarity of the two software programs.

148.    BWS statement #11 is incomplete and therefore disputed. "Maison's job at Brainwave wasn't necessarily to create every piece of code needed for Brainwave's system but to locate appropriate pieces of code and 'stitch' them together. (Tomkins Affirmation, Exhibit A, 37:13-38:9).  Stitching together code is referred to as 'integration' of software code (Tomkins Affirmation, Exhibit A, 54:17-54:22)."

149.    The integration or stitching together of open-source code undertaken by Dr. Maison involved implementing open-source software integration specifications provided by Dr. Farwell to Dr. Maison in the form of the integrated Farwell Brain Fingerprinting 4.0 and 3.0 and also the Brain Fingerprinting Specifications that Dr. Farwell provided to Dr. Maison (Dr. Farwell Dropbox). Mindfire's court-ordered software comparison according to the Statement of Work will necessarily involve accessing Dr. Maison TFS, Dr. Farwell Dropbox, and BWS TFS and noting what software programs reside there. This will definitively show that that he know-how for the software integration was open-source and provided by Dr. Farwell to Dr. Maison, and that it did not originate at BWS and was not developed by BWS.

150.    BWS statement #12 admits that "Approximately ninety percent of the time spent by Maison in the development of Brainwave's code consisted of testing of the integrated code. (Tomkins Affirmation, Exhibit A, 53:6-53:21)."

151.    90% of the development time spent in testing is typical when code is being translated or ported from an existing application, as was the case here, where Dr. Maison was porting the pre-existing code of Farwell Brain Fingerprinting 3.0 and 4.0 to a new platform and language to produce Dr. Maison BWS Software. When developing new software, the time spent in testing ranges from 10% to 35% of the total time (https://devm.io/testing/time-estimation-for-software-testing-128078 ).

152.    BWS statement #19 is not entirely false; however, it is misleading and is disputed. "The improvements, assistance, modifications and assistance provided by Maison in 2019 were incorporated in the copy of the 'Farwell Brain Fingerprinting Program' provided by Farwell to the University at Canterbury in Christchurch, New Zealand for their continued use in late 2019 (Tomkins Affirmation, Exhibit B, 59:25-60:6)."

153.    Dr. Maison ported Dr. Farwell's Farwell Brain Fingerprinting 4.0 to a new platform and translated it into a new language to produce Farwell Brain Fingerprinting 5.0, the Dr. Maison BWS Software.  All of algorithms, methods, statistics, mathematics, know-how, features, computations, results, data, measurement, and analysis in the Dr. Maison BWS Software -- and even the entire content and layout of the user interfaces for both of the functions of the software, Brainwave Measurement User Interface and Brainwave Analysis User Interface –all of this was in the public domain and was provided by Dr. Farwell to Dr. Maison in the form of Farwell Brain Fingerprinting 3.0 and 4.0, the Brain Fingerprinting Specifications, and Dr. Farwell's publications and the now

40

expired patents on his inventions (Farwell Dropbox, BWS TFS, Dr. Maison TFS).[14] In summary, everything that Dr. Maison provided Dr. Farwell with assistance on was in the public domain, and was provided to Dr. Maison by Dr. Farwell, not developed at BWS. All of this is definitively proven by evidence now before this Court in Dr. Farwell's 12/27/2022 Affidavit, Dr. Farwell's Dropbox, Dr. Maison TFS, and BWS TFS.

154.    For the same reasons specified immediately above, BWS statement #23 is misleading and is disputed. "The modifications provided by Maison in 2019 were also incorporated in the copy of the 'Farwell Brain Fingerprinting Program' provided by Farwell to the Forensic Science Laboratory in Delhi, India.   (Tomkins Affirmation, Exhibit B, 116:5-116:13)."

155.    BWS statement #25 is misleading and is disputed. "Brainwave and Farwell submitted competing bids for sale of P-300 systems to the Bangladesh government (Tomkins Affirmation, Exhibit B, 96:16-96:19)."

156.    The tender from the RAB of the Bangladesh government was for a Farwell Brain Fingerprinting System, not BWS' iCognative product.  BWS bid for selling the government an iCognative system instead was fraudulent.  BWS' headset also had only one EEG channel, and the tender specified the three EEG channels contained in the Farwell Brain Fingerprinting System and specified by Bangladesh.  BWS' iCognative system fails to meet 26 of the specific Farwell Brain Fingerprinting Specifications that were specified by the Bangladesh government as requirements for the system to be bought (Exhibit CAE).  Like all of BWS' other activities, this bid by BWS constituted fraud.

157.    BWS statement #27 is misleading and is disputed. "Following their bid, Arshee and Farwell received notification from Brainwave that the software submitted in connection with the Bangladesh bid contained software proprietary to Brainwave (ECF #19-1), (Tomkins Affirmation, Exhibit B, 111:1-113:5)."

158.    The word "notification" is inaccurate and misleading.  "Notification" implies that whatever was being stated was a fact.  Arshee will speak for themselves on this point. BWS wrote to Dr. Farwell and falsely claimed – without any evidence whatsoever – that "the software submitted in connection with the Bangladesh bid contained software proprietary to Brainwave."  This was on the basis of hearsay from an unidentified source based on observation of the user interface.  Note that the user interface for the software in the Bangladesh bid was not only identical to BWS software for both of the functions, Brainwave Measurement and Brainwave Analysis, the user interface presented in the Bangladesh bid for both of the program's functions was also identical to the Brainwave Measurement User Interface and the Brainwave Analysis User Interface of Farwell Brain Fingerprinting 3.0 and 4.0, which existed years before BWS existed, and which had been in online demonstrations years before BWS existed.  Not only was the "notification" based solely on hearsay from an unidentified source, but the purported fact to which the "notification" referred was not a fact at all. It was a false accusation by BWS. It had no authority other than BWS' unsupported statement.  Evidence now before this Court in BWS TFS, Farwell Dropbox, and Maison TFS will definitively prove that BWS' unfounded accusation in said "notification" was false.  In any case, it is disputed.

[Signature page immediately follows.]

---

[14] The only part of the Dr. Maison BWS Software that was not in the public domain was the section that communicates with the BWS headset.  Farwell Brain Fingerprinting 5.0 (and all other Dr. Farwell's versions) uses a different headset, and does not include that code.

Dated:  Kingston, WA
        December 28, 2022

Dr. Lawrence A. Farwell, Defendant

Sworn to before me this ___day of December, 2022

State of <u>Washington</u>
County of <u>Kitsap</u>

On this, the _28_ day of December, 2022, before me, a notary public, the undersigned officer, personally appeared <u>Lawrence A. Farwell</u>, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness hereof, I hereunto set my hand and official seal.

Notary Public

## Exhibit CAA

### Brain Fingerprinting Brainwave Measurement Specifications

## Brain Fingerprinting Data Acquisition Software Specs

**Dr. Larry Farwell**
8/17/2012

**Basic Requirements:**

1. Sense, amplify, and digitize EEG.
2. Wirelessly transmit EEG data from the amp/DSP to the computer.
3. Display and record EEG and other data.
4. Present two separate windows that can be displayed on two monitors.  The subject's window presents stimuli (text or pictures) to the subject.  The operator's window displays ongoing EEG, continually updated average event-related brain potentials, and other data updated with each stimulus presentation (trial).
5. Extract event-related brain potential (ERP) responses from the EEG data, accurately time locked to the onset of each stimulus displayed on the subject display.  Update average ERP responses on each trial, and overplot responses to three types of stimuli in three colors.
6. Measure, record, and display subject's reaction time.  Capture subject's manual response in pressing one of two buttons (either on a mouse or an alternative input device), and compute reaction time (time from stimulus onset until subject presses the button).   Compute and display average reaction times to each of three types of stimuli, updated on each trial.
7. Write data to two output files:
   a. Continuous EEG data
   b. Single-trial ERPs extracted from the ongoing data, time-locked to each stimulus presentation, along with reaction time and other data that change with each trial (e.g., stimulus presented).
8. Provide two alternatives for sensors:
   a. Dry electrodes and the necessary connectors to the amp/DSP/wireless transmitter.
   b. A standard male DB9 connector to connect from our existing headband with wet electrodes to the amp/DSP/wireless transmitter.

**Overview of the Brain Fingerprinting Test**

Home screen on the operator display allows operator to choose "Set Parameters,"  "Run a Test," or "Analyze Data."  Alternatively, in a simple implementation, these can be three separate programs.  The "Analyze Data" program is a separate module, not to be considered in this document.  Optional: Also include a program to set parameters on the amplifier/DSP/wireless transmitter.

**"Set Parameters"**

A. Program opens standard parameter files. (Optional: operator can specify different parameter files.)

B. Operator interacts with the operator display, a window that can is ordinarily positioned on the main screen.  The subject display is in a separate window that is positioned on a second monitor.

C. Stimuli: operator inputs stimuli from keyboard, or stimuli are read from a stimulus file produced by another program.

   1. Operator may specify a stimulus file to be opened.  Stimulus file is generated by another program, and will contain all stimuli and other IDs.  Each stimulus file contains 1 – 20 stimulus sets, each set contains 1 – 8 groups, each group contains 1 target stimulus, one probe stimulus, and 4 – 8 irrelevant stimuli.

   2. Word stimuli: operator inputs words to be displayed (or these are read from stimulus file). Maximum length of a text stimulus is 32 letters (including spaces and any punctuation).

   3. Picture stimuli: operator inputs filenames of .jpg files (optional: other graphics files) (or these are read from stimulus file).

   4. Video stimuli: operator inputs filenames of video files (or these are read from stimulus file). Video files include audio. Video stimuli may be up to 2 seconds long.

   5. Auditory stimuli: operator inputs filenames of video files (or these are read from stimulus file). Auditory stimuli may be played either solo or along with pictures, text, or videos.  (With videos, audio track is part of the video file.)  Auditory stimuli may be up to 2 seconds long.

   6. ERPs are synchronized with onset of stimulus (for all stimulus types).

   7. Stimuli are of 3 types: target, probe, irrelevant

   8. Each stimulus group includes 1 target, 1 probe, and 4 irrelevants

   9. Each test ("block") includes 1 to 8 stimulus groups: 6 to 48 unique stimuli.  (Each block ordinarily includes one stimulus "set" from stimulus file.

   10. A testing session ordinarily includes 9 – 12 blocks, each lasting about 4 minutes.

D. Write stimuli to the standard parameter file on disk (at operator command to save).

E. Operator inputs 4-digit subject number, 3-digit experiment number, and 3-digit block (test) number

F. Optional: operator inputs other subject data (age, sex, group, etc.)

G. Operator sets other parameters

   1. Open parameter files containing defaults or previously set parameters

   2. Required number of good target trials (default: 12)

   3. Required number of good probe trials (default: 12)

   4. Required number of good irrelevant trials for complete test (default: 36 – [not 48, although 48 are expected to occur])

   5. Max allowable range for EOG channel artifact detection (default = 100 microvolts)

   6. Max allowable range for EEG channels artifact detection (default = 100 microvolts)

   7. Inter-stimulus interval (default = 3000 msec).

   8. Data epoch post-stimulus (default: 1800 msec)

   9. Baseline epoch (default: 250 msec)

   10. Write parameters to default parameter files (to be read in next time a test is run)

**"Run a Test"**

2

A. Open parameter files and read parameters – stimuli from the stimuli file, subject IDs and data acquisition parameters as set above (or defaults) from the standard parameter files.  Use default file names Stimuli.prm and Data.prm. (Optional: allow operator to open specific alternative parameter files.)

B. Open raw data output file, named Dxxxx-yyy-zzz.bin, where xxxx = subject number, yyy= experiment number, zzz = block number. (Optional: allow experimenter to name file.)

C. Open event-related potential (ERP) data output file, named Dxxxx-yyy-zzz.erp, where xxxx = subject number, yyy = experiment number,  zzz = block number.

D. Write a header with all the parameters for this block to the ERP data output file.

E. Write a header with all the parameters for this block to the raw EEG data output file.

F. Operator hits "R" key to run test, or begins with a mouse click on a "Run" button.

G. Start recording continuous data for all 4 channels (3 EEG, 1 EOG).  Write this to raw data output file on disk either periodically or at the end of the block.  At the beginning of the raw data output file, write a header with all parameters for this block to the raw data output file.

H. Display the operator display in the main window (some values blank until the first stimulus has been presented)

    1. 4 channels of real-time ongoing data (3 EEG, 1 EOG)

    2. Overplotted averages of target (red), probe (blue), and irrelevant (green) brainwave responses at one channel (default: Pz) (Optional: allow operator to switch to a different channel while test is running.)  Display data epoch from 250 msec before stimulus onset to 1800 msec after stimulus onset.

    3. Counts of targets, probes, irrelevants, and all 3 trial types combined

        a. Total targets, probes, irrelevants, and all trials presented

        b. Good targets, probes, irrelevants, and all good trials

        c. Required targets, probes, irrelevants (no required # of total trials) (The required number does not change during the block; other numbers are incremented trial by trial.)

    4. Average reaction times for targets, probes, irrelevants

    5. Accuracy (percent correct) for targets, probes, irrelevants

    6. Data for each trial:

        d. Which stimulus was presented

        e. What type of stimulus (target, probe, irrelevant)

        f. Artifact-detection results for each of 4 EEG/EOG channels

            i. Data range for target, probe, irrelevant (defined below) – 3 digits in microvolts

            ii. Optional: other artifact-detection results

I. Display a blue rectangle in the middle of the subject screen approximately 320 x 240.  This box is on the whole time when the stimuli are words, and the words appear in white text in the box.   When the stimuli will be pictures, the box disappears one second before the first stimulus, when the small square (described below) appears.

J. Randomize the order of stimulus presentation

    a. There will be approximately 72 to 120 trials (individual stimulus presentations and the associated brain and reaction-time responses) in each block (block = individual test).  If there are, say, 36 unique stimuli, all 36 will be presented in random order, then the same 36 stimuli will be presented in a different random order, and this process is repeated until the required number of good trials (defined below) is reached.  Stimuli can be randomized several times before the test begins, or can be randomized once before the test begins and again after all stimuli have been presented once, etc.

K. Zero all counts and totals

L. Wait 10 seconds from the time the operator enters the "start test" command by keystroke or mouse click, then present the first stimulus

M. Run trials, with stimulus onset of each trial delayed by a specific time from onset of previous trial. (parameter, default = 3000 msec)

N. For each trial

    a. For 1000 msec before the stimulus onset, display a warning stimulus

        i. For words, an "X" in the middle of the blue rectangle

        ii. For pictures, a small square (about the size of one letter) in the center of the screen

    b. Display the stimulus on the subject display for a specific stimulus duration. (Parameter, default 400 msec, to be set by operator before test.)  Stimulus is either a word or phrase displayed in text (default: white on the blue rectangle in the center of the subject screen), or a picture (default size 320 x 240.  Note that this is displayed in the center of the screen, and does not cover the whole monitor.)

    c. Increment the counts of total trials presented of each trial type (target, probe and irrelevant) and of all 3 trial types combined, and update these on the operator display

    d. Extract a specific trial epoch from the ongoing EEG and EOG data. (Usually 2100 msec, parameter).  Epoch consists of baseline (usually 250 msec) plus post-stimulus epoch (usually 1800 msec).  Post-stimulus epoch begins at the onset of the stimulus on the subject display. Note: Timing must be such that beginning of the post-stimulus epoch in the EEG data aligns with the onset of the stimulus on the subject display.  Depending on the hardware, it may be necessary or desirable for the computer to send a signal to the amp or DSP marking stimulus onset so that this can be time-stamped in the incoming data stream.

    e. Compute the minimum and maximum data value in the trial epoch for each channel, subtract to get the data range for each channel.

        i. If range is less than the max allowable range for all 3 EEG channels and EOG channel, trial is classified as "good"; otherwise, "bad".  (Optional: compute and display other artifact-detection values.)

        ii. Display the range for each channel on the operator display.  Display in normal font if trial is good.  Display with a red background if trial is bad.

    f. If the trial is good:

        i. Compute the average of the baseline, and subtract it from every point in the waveform for the entire epoch (to center the displays on the screen)

      ii. Increment the count of good trials – either target, probe, or irrelevant, depending on which type of stimulus was presented

      iii. Increment the count of total good trials of all 3 trial types combined

      iv. Re-compute the average brain response for either target, or probe, or irrelevant depending on stimulus type presented.  Average is computed using good trials only.  (Sum of all good waveforms of this trial type (vector) /  number of good waveforms of this trial type)

      v. Update the display of the average waveform for this trial type on the operator display

g. Compute the reaction time, classify the response, and update reaction time and accuracy results (Note: criteria for legal/illegal/correct/incorrect for reaction times are independent of "good" or "bad" with respect to artifacts in waveforms.)

      i. Subject is instructed to press one of two response buttons in response to the stimulus.  (Currently we are using the mouse; a response device connected to the amp/DSP would be better)

      ii. Classify the response as

            1. Illegal, miss: subject does not press either button or subject presses one or both buttons before stimulus presentation (during baseline period) or after the end of the data epoch.  (Note: trials are presented every 3000 msec (default), and data are recorded continuously, but the default data epoch consists of only 250 msec before the stimulus and 1800 msec after the stimulus; reaction time must be less than 1800 msec to be legal).

            2. Illegal, double response: subject presses both buttons during the data epoch

            3. Legal, incorrect.  Subject presses the wrong button (button 2 for targets or button 1 for probes or irrelevants)

            4. If the trial is illegal, set reaction time to zero for this trial

            5. Legal, correct: Subject presses the correct button (button1 for targets or button 2 for probes or irrelevants) during the data epoch

            6. If legal, correct:

                  a. Increment count of correct trials of this type (target, probe, or irrelevant)

                  b. Increment the count of legal trials of this trial type

                  c. Update the total and average reaction time for this trial type (target, probe, or irrelevant) to include the present trial. (Note: average reaction time includes only legal correct and legal incorrect trials, not illegal trials.  The denominator is the number of correct and incorrect legal trials, not the total number of trials.)

                  d. Update the accuracy for this trial type to include the present trial (accuracy = # of correct trials of this trial type / total # of

trials of this trial type, whether legal or not – note that denominator is different from below computation of reaction time)

7. If legal, incorrect:
   a. Increment the count of legal trials of this trial type
   b. Update the total and average reaction time for this trial type (target, probe, or irrelevant) to include the present trial. (Note: average reaction time includes only legal correct and legal incorrect trials, not illegal trials. The denominator is the number of correct plus incorrect legal trials, not the total number of trials.)

   iii. Update the display of reaction time and accuracy for this trial type on the operator display.

h. Write the parameters for this trial to the ERP data output file, including the stimulus presented (phrase or picture file name), stimulus type, and all single-trial variables computed above, followed by the ERP data for the data epoch. (ERP and reaction time averages are not written for each trial, just the data specific to this trial.)

O. Continue presenting trials until either
   a. Operator hits the "E" key for "End Block."
   b. The counts of good target trials, good probe trials, and good irrelevant trials have all reached the minimum allowable values
   c. Optional: Operator hits the "P" key. Pause. Resume when the operator hits the "R" key.

P. Write continuous raw EEG data (multiplexed) to EEG output file.

Q. Write ERP data to ERP output file.
   a. Demultiplexed.
   b. Default epoch: 1000 msec pre-stimulus to 2800 mesc post-stimulus.
   c. Note that 1000 pre-stim to 2800  post-stimulus are written to output file even though the pre-stimulus epoch is 250 msec and post-stimulus epoch is 1800 msec for display of ERP averages and for artifact detection (artifacts detected in +100 to +1800 msec window).
   d. Note that the epochs written to the ERP output file are overlapping, i.e., 3800 msec of data are written to output with a 3000 msec inter-stimulus interval.

R. Increment block number and write it to the standard parameter file, so the next test will start with the next higher block number (unless operator overrides it by setting the parameter in between blocks). This helps to ensure that the data are not overwritten by mistake, since the subject, experiment, and block number determine the output file name.

S. On operator command ( <CR>), return to the "Set Parameters,"  "Run a Test," "Demo Mode" or "Analyze Data" choice screen

**"Demo Mode"**

6

A. This works exactly the same as "Run a Test," except that instead of acquiring data from the headset, it reads previously acquired data from the disk, and then acts exactly as if it were recording data.  All displays and timing are identical to the "Run a Test" mode.

**"Analyze Data"**

A. This is done off-line through a separate module.

## Exhibit CAB

## Brain Fingerprinting Brainwave Analysis Specifications

## Specifications for Data Analysis Program

Dr. Larry Farwell

7/8/2013

1. Read input file, as per file format in **ERPFileFormatExtended1306.xlsx.**

2. Go to the line after the line that begins with:

    **%%%BF-ERP%%% End of data acquisition IDs for this block**

3. Read the character ID. (To be implemented later: Display the Probe stimuli, and allow user to choose which probes are included in the data analysis.)

4. Read the integer IDs 1 – 14 (ID #1 is blank).  Here are the important IDs for data analysis:

    | | | |
    |---|---|---|
    | 6 | Stimulus Type | 0 = Target, 1 = Probe, 2 = Irrelevant |
    | 7 | Reaction Time (msec) | 0 – 1800 (If no response or both buttons pressed, RT = 0) |
    | 8 | Response Type | 0 = No Response, 1 = Right Button, 2 = Left Button, 3 = Both |

5. Read the ERP data.

6. Each trial will contain 1946 data points for each of 4 channels. Each trial type will either be Probe, Target, or Irrelevant.

7. Data are digitized at 512 Hz.  Time epoch is from -1000 msec (0 = stimulus onset; -1000 = 1000 msec before stimulus onset) to 2800 msec post-stimulus, a total of 3800 msec. Since there are only 3000 msec between stimuli, the last 800 msec in each trial overlaps with the first 800 msec in the pre-stimulus period of the subsequent trial.

8. Put the Target trials in a matrix, the Probe trials in a separate matrix, and the Irrelevant trials in a third matrix, along with the identifying IDs for each single trial.

9. Conduct the artifact rejection

    a. User selects which channels are to be checked for artifacts.  Default: check EOG channel (4) and EEG Pz channel (3).

1

b. User selects which channel is to be analyzed.  Default: Pz (3).

c. User selects range criterion for EEG and for EOG.  Default = 125 microvolts for both.

d. Find the highest and lowest point in the range of -250 – 1800 msec, points 383 to 1433 (at 512 Hz).  Subtract the lowest from the highest point to get the range for each channel that is being checked for artifacts.

e. If range is greater than the criterion in either the EEG or the EOG channel, reject the trial.

f. If a trial is rejected, it is not included in the data analysis for the purposes of computing the bootstrapping statistic.

g. ALL trials are included in the reaction time and accuracy computations, however.

10. Filter the data for the channel being analyzed, for each single trial.

a. User selects 4Hz, 6Hz, or no filter.  Default = 4 Hz.

b. Apply the filter through convolution to the entire waveform from point 129 – 1818 (750 msec pre-stimulus to 2550  msec post-stimulus).

11.  Subtract the baseline for each single trial.  (This should be done after filtering.)

a. Compute the average of the 250 msec before stimulus onset, points 383 – 512.

b. Subtract this average from every point in the waveform.

12. Bootstrapping

a. Use only the epoch selected by the user for the bootstrapping.  Default = 300 msec post-stimulus to 1800 msec post stimulus.

b. Sample with replacement nProbe trials, nTarget trials, and nIrrelevant trials 1,000 iterations.  (nProbe = the total number of good probe trials; nTarget = the total number of target trials, nIrrelevant = the total number of irrelevant trials).

c. In each iteration, compute the following 4 correlations for Probe – Target and Probe – Irrelevant.

   i. Pearson correlation

   ii. Double-centered grand mean adjusted correlation

      1. Compute the grand mean of all waveforms selected this iteration, of all types combined

      2. Subtract this grand mean from each single-trial waveform, point by point

2

3. compute Pearson correlations on the adjusted waveforms: Probe – Target and Probe - Irrelevant

iii. Double-centered unweighted mean adjusted correlation

1. Compute the mean of all probe waveforms selected this iteration, the mean of all target waveforms selected this iteration, and the mean of all irrelevant waveforms selected this iteration. Compute the mean of these three means.

2. Subtract this unweighted mean from each single-trial waveform, point by point

3. compute Pearson correlations on the adjusted waveforms: Probe – Target and Probe – Irrelevant

iv. Take the average of the above 3 correlations, which we will refer to as the "average correlation."

d. For each of the above 4 correlations, count the number of times that the Probe-Target correlation is greater than the probe-irrelevant correlation.

e. The bootstrap statistic computes the probability that the Probe-Target correlation is greater than the Probe-Irrelevant correlation. 100% minus this figure is the probability that the Probe-Irrelevant correlation is greater than the Probe-Target correlation.

i. If the bootstrap statistic is greater than 50%, then we will use it as is, and the statistic represents the probability that information present is the correct determination.

ii. If the bootstrap statistic is less than 50%, we will subtract it from 100%, and this new number will represent the probability that information-absent is the correct determination. (Thus we will always be using a probability that is greater than 50%.)

iii. There are three possibilities:

1. Information present: The original bootstrap probability is greater than 50%, and also greater than the "information-present" criterion (default = 90%). In this case, the determination is "information present," e.g., "Determination: Information Present, Statistical Confidence 99.8%."

2. Information absent: The original bootstrap probability is less than 50%, so we subtract it from 100%, and the resulting probability for an information-absent determination is greater than the information-absent criterion (default = 70%). The determination is

3

information absent, e.g., "Determination: Information Absent; Statistical Confidence: 98%."

3. Indeterminate, which is either one of the following:

    a. The original bootstrap probability is greater than 50%, but less than the information-present criterion. The outcome is "indeterminate," in the information-present direction. This is represented as "Indeterminate, 85% (P)."

    b. The original bootstrap probability is less than 50%, so we subtract it from 100%, and the resulting probability for an information-absent determination is less than the information-absent criterion (default = 70%). The outcome is "indeterminate," in the information-absent direction. This is represented as "Indeterminate, 65% (A)."

    iv. User selects which of the four types of correlation will be used, and which result will be displayed. Default = Double-centered, grand mean adjusted correlation.

13. Compute the average reaction time and accuracy for targets, probes, and irrelevants.

    a. Use all trials, whether they were rejected for ERP analysis or not. (Note: criteria for legal/illegal/correct/incorrect for reaction times are independent of "good" or "bad" with respect to artifacts in waveforms.)

    b. Use IDs 6, 7, and 8 (see above) for the reaction time and accuracy computations.

    c. Subject is instructed to press one of two response buttons in response to the stimulus.

    d. Classify the response as:

        i. Illegal, miss: subject does not press either button or subject presses one or both buttons before stimulus presentation (during baseline period) or after the end of the data epoch. (Note: trials are presented every 3000 msec (default), and data are recorded continuously, but the default data epoch consists of only 250 msec before the stimulus and 1800 msec after the stimulus; reaction time must be greater than 0 msec post-stimulus and less than 1800 msec to be legal).

        ii. Illegal, double response: subject presses both buttons during the data epoch.

        iii. Legal, incorrect. Subject presses the wrong button (button 2 for targets or button 1 for probes or irrelevants)

        iv. If the trial is illegal, set reaction time to zero for this trial

4

    v.   Legal, correct: Subject presses the correct button (button1 for targets or button 2 for probes or irrelevants) during the data epoch – 0 to 1800 msec.

    vi.   If legal, correct:

        1.   Increment count of correct trials of this type (target, probe, or irrelevant)

        2.   Increment the count of legal trials of this trial type

        3.   Update the total reaction time for this trial type (target, probe, or irrelevant) to include the present trial.  When all appropriate trials have been included, divide by the appropriate number of trials to get the average. (Note: average reaction time includes only legal correct and legal incorrect trials, not illegal trials.  The denominator is the number of correct and incorrect legal trials, not the total number of trials.)

        4.   Update the total for computing accuracy for this trial type to include the present trial (accuracy = # of correct trials of this trial type / total # of trials of this trial type, whether legal or not – note that denominator is different from the denominator in the computation of reaction time). When all appropriate trials have been included, divide by the appropriate number of trials to get the average.

    vii.   If legal, incorrect:

        1.   Increment the count of legal trials of this trial type

        2.   Update the total and average reaction time for this trial type (target, probe, or irrelevant) to include the present trial. (Note: average reaction time includes only legal correct and legal incorrect trials, not illegal trials.  The denominator is the number of correct plus incorrect legal trials, not the total number of trials.) When all appropriate trials have been included, divide by the appropriate number of trials to get the average.

14. Compute the average waveform for each trial type, Probe, Target, and Irrelevant.  This includes all "good" (artifact-free) trials.  Display the waveforms overplotted, Target = red, Probe = blue, Irrelevant = Green.   Display the epoch from -250 msec (250 msec before stimulus, point 383) to 1800 msec post-stimulus (point 1434).

15. Display the determination:

    <span style="color:red">Determination: Information Present</span>
    <span style="color:red">Statistical Confidence: 99.9%</span>
    or
    <span style="color:green">Determination: Information Absent</span>
    <span style="color:green">Statistical Confidence: 99.9%</span>

or

Indeterminate (P 85.4%)

or

Indeterminate (A 56.5%)

16. Display the reaction times, accuracy, and number of good and presented trials, same display as the real-time program.

17. Write the results to an output file, along with identifying data for the subject (same as identifying data in the input file).

18. Write all parameters to an output file.

**Exhibit CAC**

Randomization Algorithm

Randomization Algorithm

Take 3 Probes, 3 Targets, 12 Irrelevants (may be as many as 5 P, 5 T, 20 I)

Pick one Irrelevant at random.  This is the first trial.

Take 3 Probes, 3 Targets, 11 Irrelevants and randomize them.

Apply the contiguous rule:  Go through the trials sequentially, if there are two targets or two probes in a row, switch the second stimulus with the next one following it that is not match (target with target or probe with probe).  This will be the next stimulus, except when there are 3 targets in a row or three probes in a row, in which case it will be the next one after that.

Algorithm 1 (two Targets in a row) : Target1 – Target2 – Non-Target => Target – Non-Target – Target

Algorithm 2 (three targets in a row):

Step 1: Target1 – Target2 – Target3 – Non-Target=> Target1 – Irrelevant – Target3 – Target2, Step 2: now move on to the "Target3-Target2" sequence and implement the same Algorithm 1:

Target3 – Target 2- Non-Target => Target3 – Non-Target– Target2.

"Non-Target" means either Probe or Irrelevant

The same is to be done with 2 or 3 probes in a row, substituting Probe for Target and Non-Probe for Non-Target in the above algorithms.

We now have the first 18 stimuli to be presented.

For the second 18 stimuli, do the same, except that the first does not have to be an irrelevant.

Take 3 Probes, 3 Targets, 12 Irrelevants and randomize them.

Apply the Contiguous Rule.

Do this same thing for the third 18 stimuli to be presented, and again for the fourth 18, etc.,

We should do this 8 times, for a total of 144 trials.

For stimulus presentation, keep presenting until we have 12 good probes and 12 good targets, then present more stimuli until we end with an irrelevant.  Do not mark stimuli that have been rejected.

**Exhibit CAD**

The Dr. Maison BWS Software was released to a public domain source at 6:15 PM on 9/10/2017 from IP address 65.52.55.39 in Chicago, using the credentials of Ika's employee Karuna Raja, who was in Southborough, MA at the time.

This is documented in the below screenshots.





**Brain Fingerprinting, LLC – Farwell Brain Fingerprinting: Meets All RAB Requirements**
**Brainwave Science – iCognative: Fails 26 Requirements**
**Axxonet – BEOS: Fails 13 Requirements**

**SPECIFICATIONS SUBMISSION AND COMPLIANCE SHEET (FORM PG4-4)**

Invitation for Tender No:   **RAB FORCES HQ/INT/INFO/2020-2021/1001/02**   Date:   12-03-2021
                            **DATE: 11-03-2021**
Tender Package No:   **GD-6/2020-2021**   Package Description:   PROCUREMENT OF BRAIN FINGER PRINT
Tender Lot No:                            Lot Description:   PROCUREMENT OF BRAIN FINGER PRINT

| Requirement | Brain Fingerprinting LLC – Farwell Brain Fingerprinting | Brainwave Science – iCognative | Axxonet – BEOS |
|---|---|---|---|
| 4 a. New scientific computer-based, patented technology to detect whether specific information is stored in a person's brain or not. | Meets 4 a. New scientific computer-based, technology patented by Dr. Lawrence Farwell to detect whether specific information is stored in a person's brain or not.  Dr. Farwell is the inventor and patent owner, according to the US Patent Office. | Fails 4 a. Not patented. Does not implement the invention described in Dr. Farwell's patents.  Has never been shown to detect concealed information in any scientific study or field application. | Fails 4 a.  Is not patented. (At least, no patents are mentioned on the Axxonet website.) |
| 4 c. It must reveal objectively whether information is present in the brain or not, regardless of whether any false or truthful statements are made by the subject. | Meets 4 c.  It reveals objectively whether information is present in the brain or not, regardless of whether any false or truthful statements are made by the subject. | Fails 4 c. Has never been shown to detect concealed information in any scientific study or field application. | |
| 9 b. Extremely accurate. | Meets 9 b. Extremely accurate. | Fails 9 b. Has never been shown to be accurate in any scientific study or field application. | |

| | | | |
|---|---|---|---|
| 10 a. **Personal/Violent Crimes:** Aggravated assault, Forcible rape, Murder, Robbery | Meets 10 a. Aggravated assault, Forcible rape, Murder, Robbery, as proven in peer-reviewed publications and field applications. | Fails 10 a. Has never been shown to be capable of solving any crimes in any scientific study. Has never successfully solved any crimes in the field. | |
| 10 b. **Property Crimes:** Arson, Burglary, Larceny-theft, Motor vehicle theft. | Meets 10 b. Arson, Burglary, Larceny-theft, Motor vehicle theft, as proven in peer-reviewed publications and field applications. | Fails 10 b. Has never been shown to be capable of solving any crimes in any scientific study. Has never successfully solved any crimes in the field. | |
| 10 c. **Other Offenses:** Curfew violation/ loitering, Disorderly conduct, Driving under the influence, Drug law violations, Embezzlement, Forgery and counterfeiting, Fraud Gambling, Liquor-law violations, Offenses against the family, Prostitution and related offenses, Public drunkenness, Runaways, Sex offenses, Simple assault, Stolen property, Vandalism, Weapons, Vagrancy. | Meets 10 c. **Other Offenses:** Curfew violation/ loitering, Disorderly conduct, Driving under the influence, Drug law violations, Embezzlement, Forgery and counterfeiting, Fraud Gambling, Liquor-law violations, Offenses against the family, Prostitution and related offenses, Public drunkenness, Runaways, Sex offenses, Simple assault, Stolen property, Vandalism, Weapons, Vagrancy, , as proven in peer-reviewed publications and field applications. | Fails 10 c. Has never been shown to be capable of solving any crimes in any scientific study. Has never successfully solved any crimes in the field. | |
| 10 d. **Other Crimes:** Corporate/white-collar crimes, Financial Crimes, Hate crimes, Identity theft, Organized crime, Cyber Crime, Medical Crime, Terrorism, Spousal Conflicts, Infidelity. | Meets 10 d. **Other Crimes:** Corporate/white-collar crimes, Financial Crimes, Hate crimes, Identity theft, Organized crime, Cyber Crime, Medical Crime, Terrorism, Spousal Conflicts, Infidelity, , as proven in peer-reviewed publications and field applications. | Fails 10 d. Has never been shown to be capable of solving any crimes in any scientific study. Has never successfully solved any crimes in the field. | |

| | | | |
|---|---|---|---|
| 12 a. Technique must detect concealed information test regarding a person's guilty knowledge of a crime, unlike the traditional polygraph or other non-scientific methods of investigation. | Meets 12 a. Dr. Farwell's Brain Fingerprinting System detects concealed information regarding a person's guilty knowledge of a crime, unlike the traditional polygraph or other non-scientific methods of investigation. Only the genuine Farwell Brain Fingerprinting has been proven in the scientific laboratory and real-world cases to accomplish this. Counterfeit and imitation systems that claim to be similar to Farwell Brain Fingerprinting have not been proven in the laboratory or the field, and are not accurate, reliable, or scientific. | Fails 12 a. Has never been shown to be capable of detecting concealed information in any scientific study. Has never successfully detected concealed information in any crimes in the field. | |
| 13 a. Specific issue tests: detects details of life events, including major crimes, which occurred at a specific place and time. | 13 a. Specific issue tests: detects details of life events, including major crimes, which occurred at a specific place and time. | Fails 13 a. Has never been shown to be capable of specific issue tests for detecting details of life events in any scientific study. Has never successfully detected any information in any crimes in the field. | |
| 13 b. Specific screening tests: detects information known only to people with particular affiliations or expertise, who did not necessarily participate in any particular event at any particular time | Meets 13 b. Specific screening tests: detects information known only to people with particular affiliations or expertise, who did not necessarily participate in any particular event at any particular time, as proven in peer-reviewed studies on bomb makers and US Navy military medica experts. | Fails 13 b. Has never been shown to be capable of specific screening tests for detecting details of life events in any scientific study. Has never successfully detected any details in any crimes in the field. | Fails 13 b. Has never been shown to be capable of specific screening tests for detecting details of life events in any scientific study. Has never successfully detected any details in any crimes in the field. |

| | | | |
|---|---|---|---|
| 13 c. Detects information known only to those with inside knowledge of a major national or international agency or group, such as intelligence, military, or law enforcement agency. | Meets 13 c. Detects information known only to those with inside knowledge of a major national or international agency or group, such as intelligence, military, or law enforcement agency, as proven in peer-reviewed studies on FBI agents and US Navy. | Fails 13 c. Has never been shown to be capable of specific screening tests for detecting inside knowledge in any scientific study. Has never successfully detected any inside knowledge in any crimes in the field. | Fails 13 c. Has never been shown to be capable of specific screening tests for detecting inside knowledge in any scientific study. Has never successfully detected any inside knowledge in any crimes in the field. |
| 13 d. Detects information characteristic of individuals with specific training and expertise (e.g. bomb makers). | Meets 13 d. Detects information characteristic of individuals with specific training and expertise (e.g. bomb makers), as proven in peer-reviewed studies where Farwell Brain Fingerprinting detected bomb makers. | Fails 13 d. Has never been shown to be capable of specific screening tests for detecting specific training and expertise in any scientific study. Has never successfully detected specific training and expertise in any crimes in the field. | Fails 13 d. Has never been shown to be capable of specific screening tests for detecting specific training and expertise in any scientific study. Has never successfully detected specific training and expertise in any crimes in the field. |
| 14 a. Identify criminals quickly and scientifically. | Meets 14 a. Identify criminals quickly and scientifically. | Fails 14 a. Has never been shown to be capable of Identifying criminals in any scientific study. Has never identified any criminals in real-world crimes. | |
| 14 b. Exonerate the innocent and prevent lawsuits from false accusations. | Meets 14 b. Exonerate the innocent and prevent lawsuits from false accusations, as proven in real-world cases where Farwell Brain Fingerprinting exonerated innocents including Terry Harrington, a man falsely convicted or murder. | Fails 14 b. Has never been shown to be capable of exonerating innocents in any scientific study. Has never exonerated any innocents in real-world crimes. | |

| | | | |
|---|---|---|---|
| 14 c. Gather intelligence information and uncover espionage and terrorists plots. | Meets 14 c. Gather intelligence information and uncover espionage and terrorists plots. | Fails 14 c. Has never been shown to be able to gather intelligence information in any scientific study. Has never successfully gathered intelligence information in any espionage or terrorist plots. | |
| 14 d. Detect accomplices and members of gangs and criminal organizations. | Meets 14 d. Detect accomplices and members of gangs and criminal organizations, another example of specific screening for detecting inside knowledge. | Fails 14 d. Has never been shown to be capable of specific screening tests for detecting inside knowledge in any scientific study. Has never successfully detected any inside knowledge in any crimes in the field. | Fails 14 d. Has never been shown to be capable of specific screening tests for detecting inside knowledge in any scientific study. Has never successfully detected any inside knowledge in any crimes in the field. |
| 14 f. Very effective in Counterintelligence activities and cases. | Meets 14 f. Very effective in Counterintelligence activities and cases, as shown in successful applications in intelligence agencies in the US and overseas as well as peer-reviewed research. | Fails 14 f. Has never been shown to be effective in counterintelligence in any scientific study. Has never been successfully applied in counterintelligence in the field. | |
| 14 g. Must be patented. | Meets 14 g.  Dr. Lawrence Farwell is the inventor and owner of 4 US and one UK patents on Brain Fingerprinting, according to the US Patent Office. | Fails 14 g. Is not patented. | Fails 14 g.  Is not patented. (At least, no patents are mentioned on the Axxonet website.) |

| 14 i. Shows no false positives or false negatives. | Meets 14 i. Shows no false positives or false negatives, in peer-reviewed scientific publications and field applications in real-world crimes.  Brain Fingerprinting has never produced an error in any peer-reviewed scientific studies or real-world applications. | Has not been proven to show no false positives or false negatives. Since it has never been tested in the scientific laboratory or the field, it is unknown whether false positives or false negatives will occur when and if it is ever scientifically tested or applied in real-world cases. | Fails 14 i.  The developer's own research has shown false negatives and false positives.  Even the most optimistic estimates of accuracy acknowledge some false positives and false negatives – at least 5%. |
|---|---|---|---|
| 14 k. It must highly accurate over 95%. | Meets 14 k. Only Farwell Brain Fingerprinting has proven over 99% accurate in tests at the FBI, the CIA, and the US Navy, published in the leading scientific journals. | Fails 14 k. Has never been shown to have any level of accuracy in scientific tests or field applications. | Has not been proven to meet 14 k. Only about 10% of suspects who failed the test have confessed.  The other 90% may be errors, or may be correct. It is unknown what percentage of results were accurate. Estimates of accuracy and reports of results have varied. |
| 14 l. It must be published and peer-reviewed in relevant scientific journals. | Meets 14 l.  Dr. Farwell and colleagues have published Farwell Brain Fingerprinting in major peer-reviewed scientific journals including *Journal of Forensic Sciences, Cognitive Neurodynamics, Frontiers in Neuroscience*, and *Psychophysiology*, as well as the *Wiley Encyclopedia of Forensic Science* | Fails 14 l. Brainwave Science's product iCognative has never been published in peer-reviewed scientific journals.  (Any representation that the peer-reviewed studies on Farwell Brain Fingerprinting were actually on Brainwave Science's iCognative product would be false. The same applies to all imitations of Dr. Farwell's methods by others.) | |

| | | | |
|---|---|---|---|
| 14 n. It exonerates innocents. | Meets 14 n. Scientifically detects terrorists and criminals and exonerates the innocent by measuring brainwaves, including innocent convict Terry Harrington, who was exonerated by Dr. Farwell's Brain Fingerprinting test and ultimately freed after being previously convicted of murder. | Fails 14 n. Has never exonerated any innocents in real-world crimes. Has never been shown to be capable of exonerating innocents in scientific research. | |
| 15 This patented Brain Fingerprinting technology must be | Meets 15 (all sections).  "Patented Brain Fingerprinting technology" Dr. Farwell is the inventor and patent owner of Brain Fingerprinting, according to the US Patent Office. | Fails 15. Is not patented. Does not implement the invention described in Dr. Farwell's Brain Fingerprinting patents. | Is not patented. (At least, no patents are mentioned on the Axxonet website.) |
| 15 g. Has been researched and peer-reviewed for two decades. | Meets 15 g. Only the genuine Farwell Brain Fingerprinting has been researched and peer-reviewed for two decades (in fact, three decades, since 1991), as published in *Journal of Forensic Sciences, Cognitive Neurodynamics, Frontiers in Neuroscience*, and *Psychophysiology*, as well as the *Wiley Encyclopedia of Forensic Science*, and ruled admissible in court in the US based on this scientific research | Fails 15 g. Has never been researched and peer-reviewed. (Any representation that the peer-reviewed studies on Farwell Brain Fingerprinting were actually on Brainwave Science's iCognative product would be false.  (Even the studies by other authors attempting to imitate Farwell Brain Fingerprinting were on their own methods, not Brainwave Science's iCognative product, which has never been researched or peer-reviewed.) | The developer has been conducting research for several decades.  However, the research on the Axxonet BEOS system being offered in their bid has been researched for less than two decades. |

| | | | |
|---|---|---|---|
| 16 a. Aid in determining who has participated in terrorist's acts, directly or indirectly. | Meets 16 a. Dr. Larry Farwell's Brain Fingerprinting can accurately detect terrorists, even before they strike, by detecting the record of terrorist crimes, training, and planning stored in their brains. Detecting those who are guilty of "Indirectly" participating is another example of specific screening, which is a unique capability of Farwell Brain Fingerprinting. | Fails 16 a.  Has never been shown in the laboratory or the field to be able to detect terrorists. | Fails 16 a. Purports to detect "experiential knowledge." Even if it did this successfully – which has never been proven, and is not based on any established scientific phenomenon in neuroscience – it would not be able to detect those who participated "indirectly." because they would not have such "experiential" knowledge. |
| 16 b. Support investigators in identifying potential trained terrorists, even if they are in a "sleeper" cell and have not been active in years. | Meets 16 b. It can detect terrorists, members of a sleeper cell, terrorist masterminds, and terrorist plans, even before the terrorists' strike, by detecting the record of terrorist training, plans, and/or inside knowledge of a terrorist organization stored in their brains.  This is another example of "specific screening," a unique capability of Farwell Brain Fingerprinting. | Fails 16 b. Has never been shown in the laboratory or the field to be able to detect the record of training, plans or inside knowledge. | Fails 16 b.  The Axxonet system is not capable of "specific screening" to detect inside knowledge or specific training.  It purports to detect "experiential knowledge," which is different.  It has never been shown in the laboratory or the field to be able to detect inside knowledge or training, because it lacks this capability. |

| | | | |
|---|---|---|---|
| 16 c. Help to pinpoint those who maintain a leadership role within a terrorist organization. | Meets 16 c. Help to pinpoint those who maintain a leadership role within a terrorist organization.  This is another example of "specific screening," a unique capability of Farwell Brain Fingerprinting. | Fails 16 c.  Has never been shown in the laboratory or the field to be able to detect any information of this or any other kind. | Fails 16 c.  This is another example of "specific screening," a capability that the Axxonet system lacks because it requires detection of a type of information that Axxonet BEOS does not detect. |
| 16 f. Drug, Arms and Human traffickers can not get away from Brain Finger printing. It must help in catching with 95% accuracy. It can must also identify with great accuracy people behind all these operations. | Meets 16 f. Drug, Arms and Human traffickers can not get away from Brain Finger printing. It must help in catching with 95% accuracy. It can must also identify with great accuracy people behind all these operations. This high accuracy is another unique feature of genuine Farwell Brain Fingerprinting that imitation and counterfeit technologies lack. | Fails 16 f. Has never been shown in the laboratory or the field to be able to detect any information of this or any other kind | |

Note: Exhibits AX and AZ are Exhibits to this Exhibit.
The next Exhibit to Dr. Farwell's Affidavit is Exhibit DAAJ

# Complaint by Dr. Lawrence Farwell
## Against
## Attorney Paul Tomkins
## and Attorney Brett Wieburg

**August 4, 2021**

**Revised November 21,2021**

ODC File: 21-01031

This document comprises the following:

1. Dr. Farwell's original Complaint of August 4, 2021;

2. Addendum 1: Dr. Farwell's Update of September 23, 2021;

3. Addendum 2: Dr. Farwell's Response of November 21, 2021 to Mr. Tomkins' Response of November 8, 2021.

4. Addendum 3: The Exhibits to Dr. Farwell's Response of November 21, 2021

Submitted by:

**Dr. Lawrence A. Farwell**
Chief Science Officer and CEO
**Brain Fingerprinting Laboratories, Inc.**
**Brain Fingerprinting, LLC**
https://farwellbrainfingerprinting.com
Email: brainwave@larryfarwell.com

8825 34th Ave NE, Suite L155

Quil Ceda Village, WA 98271
Phone: (+1)  206-905-1009
Mobile: (+1) 206-250-5516

**Paul Tomkins** resides in Massachusetts and has filed relevant lawsuits in state court in New York and federal court in Wyoming and Washington state, as well as an AAA arbitration in New York.

Tomkins is in-house corporate attorney for: Brainwave Science, Inc., Brainwave Science, LLC, and Krishna Ika, President of both entities.

**Brett Wieburg** is an attorney licensed in Washington state with offices in Issaquah, Washington who has represented Ika, Tomkins, Brainwave Science, LLC, and Brainwave Science, Inc., in various lawsuits in Washington state and federal courts, with Tomkins appearing pro hac vice.

**Primary Parties**

Paul Tomkins
Business address:
257 Turnpike Road
Southborough, MA  01772

Brett M. Wieburg
Wieburg Law Offices, PLLC
605 E. Sunset Way
Issaquah, WA 98027

Krishna Ika
Home address:                              Business address:
6 Wyndemere Dr.                            257 Turnpike Road
Southborough, MA  01772          Southborough, MA  01772

Brainwave Science, LLC
257 Turnpike Road
Southborough, MA  01772

Brainwave Science, Inc.
257 Turnpike Road
Southborough, MA  01772

## Executive Summary

**Statutes and Crimes**

**This Complaint documents the fact that Paul Tomkins has perpetrated a racketeering scheme in conspiracy with Krishna Ika involving the following statutes and crimes, among others.  He has also violated the Washington State Rules of Professional Conduct, as delineated in detail below.  Brett M. Wieburg has been either a knowing co-conspirator with Ika and Tomkins, or has failed to conduct adequate due diligence and has allowed himself to be used as a tool to abuse the courts in Washington and to harm Washington residents.**

1. Racketeering Influenced and Corrupt Organizations Act: 18 U.S.C. § 1961, Definitions; § 1962, Prohibited activities;
2. 18 U.S.C. § 1512, Tampering with a witness, victim, or an informant; §1513, Retaliating against a witness, victim, or an informant
3. Securities Act of 1933;
4. Securities Exchange Act of 1934;
5. International fraud constituting a threat to national security;
6. Theft of intellectual property constituting a threat to national security;
7. Theft of financial instruments involved in interstate and international commerce;

**Brief Background**

The primary witness in said racketeering case is Dr. Lawrence A. Farwell, PhD, a forensic neuroscientist (contact information as above on page 1).

In Dr. Farwell's professional capacity as a forensic scientist and as the inventor and world's leading authority on the forensic science technique of Brain Fingerprinting, Dr. Farwell testified against suspect Ika in a fraud case in Dubai that spanned several jurisdictions, including the state of New Jersey in the USA.

In addition to that and the present case, Dr. Farwell will undoubtedly be called as a witness when and if Mr. Ika is brought to justice for additional fraud crimes of which he currently stands accused in Pakistan, South Africa, Nigeria, and Thailand.

Dr. Farwell was at one time involved in a business relationship with suspect Ika, but Dr. Farwell terminated the relationship after he discovered that Ika's partner at the time pleaded guilty and was convicted of attempting to sell stolen high-technology secrets to a foreign government agency – a crime similar to the crimes of which Ika now stands accused in Pakistan, South Africa, Nigeria, and Thailand. (Said partner is no longer involved with Ika and is not a subject of this investigation.)

Wieburg's involvement has consisted of representing Ika and his RICO companies Brainwave Science, LLC, Brainwave Science, Inc. in actions in Washington state, with Tomkins appearing pro hac vice.

**Locations**

The primary locations for the subject crimes were the states of Washington, Massachusetts, and New York in the USA.  Related crimes took place overseas in various countries including Pakistan, South Africa, Nigeria, United Arab Emirates, and Thailand.

4

**Violations of Rules of Professional Conduct by Tomkins and Wieburg**

**The facts cited herein will demonstrate that Paul Tomkins violated the following Washington State Rules of Professional Conduct.  To the extent that he was involved, Wieburg also violated the same.  Investigation will reveal whether Wieburg was a knowing co-conspirator with Ika and Tomkins, or simply failed to conduct the necessary due diligence to avoid being used in a criminal scheme perpetrated by them.**

RPC 3.1

MERITORIOUS CLAIMS AND CONTENTIONS

A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.

RPC 3.3

CANDOR TOWARD THE TRIBUNAL

(a)  A lawyer shall not knowingly:

   (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

   (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client unless such disclosure is prohibited by Rule 1.6;

(4)  offer evidence that the lawyer knows to be false.

(c) If the lawyer has offered material evidence and comes to know of its falsity, the lawyer shall promptly disclose this fact to the tribunal unless such disclosure is prohibited by Rule 1.6.

(d) If the lawyer has offered material evidence and comes to know of its falsity, and disclosure of this fact is prohibited by Rule 1.6, the lawyer shall promptly make reasonable efforts to convince the client to consent to disclosure. If the client refuses to consent to disclosure, the lawyer may seek to withdraw from the representation in accordance with Rule 1.16.

RPC 3.4

FAIRNESS TO OPPOSING PARTY

A lawyer shall not:

(b) falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law;

(e) in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence

RPC 8.4

MISCONDUCT

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

(f) knowingly

   (i) commit any act involving…corruption, or any unjustified act of assault or other act which reflects disregard for the rule of law, whether the same be committed in the course of his or her conduct as a lawyer, or otherwise, and whether the same constitutes a felony or misdemeanor or not; and if the act constitutes a felony or misdemeanor, conviction  thereof in a criminal proceeding shall not be a condition precedent to disciplinary action, nor shall acquittal or dismissal thereof preclude the commencement of a disciplinary proceeding;

(m) violate the Code of Judicial Conduct; or

(n) engage in conduct demonstrating unfitness to practice law.

## I.  PARTIES REFERENCED HEREIN

1.1  Dr. Lawrence A. Farwell ("Dr. Farwell") is a resident of Tulalip, Snohomish County, Washington.

1.2  Upon information and belief, Life Science and Technology, LLC is a Wyoming LLC with primary and only office in Edmonds, Snohomish County, Washington.

1.3  Upon information and belief, Ron Kirkendorfer, a resident of Washington, is the President of Life Science and Technology, LLC ("LST").

1.4  Upon information and belief, Krishna Ika ("Ika") is a resident of Southborough, Massachusetts.

1.5  Upon information and belief, Brainwave Science, Inc. ("BWS Inc.") is a foreign corporation with offices in Southborough, Massachusetts, solely owned by Ika.

1.6  Upon information and belief, eHealthcareWorks Corp. ("HCW") is a foreign corporation with offices in Southborough, Massachusetts, controlled by Ika.

1.7  Upon information and belief, Brainwave Science, LLC ("BWS LLC") is a foreign corporation with offices in Southborough, Massachusetts, with ownership as follows: 49% eHealthcare Works Corp, 5% Dr. Farwell, and 44% Brain Fingerprinting Laboratories, Inc.

1.8  Upon information and belief, American Scientific Innovations, LLC ("ASI") was a foreign limited liability company with offices in Seattle, Washington at the times of all transactions involving ASI mentioned herein, whereof Ben Bryant, a resident of Washington, was the president and only authorized representative.

1.9  Upon information and belief, Brain Fingerprinting Laboratories, Inc. ("BFL Inc.") is a foreign corporation with offices in Seattle, Washington, controlled and largely owned by Dr. Farwell.

1.10  Upon information and belief, Brain Fingerprinting, LLC  ("BF LLC") is a foreign limited liability company with offices in Seattle, Washington, controlled by Dr Farwell.

1.11  Upon information and belief, Government Works, Inc. ("GOV") is a foreign corporation with offices in Southborough, Massachusetts, controlled by Ika.

1.12  Dr. Lawrence Farwell and Brain Fingerprinting Laboratories, Inc. collectively are referred to herein as the "Minority Shareholders" or "Farwell Shareholders" in BWS LLC.

1.13  Upon information and belief, Paul Tomkins ("Tomkins") is corporate attorney for BWS Inc.

1.14  Upon information and belief, Neuro Science Technologies, LLC ("NST") is an Iowa limited liability company, with Kirkendorfer as its President.

1.15  Upon information and belief, Subu Kota ("Kota") is a resident of Boston, Massachusetts.

7

1.16    Krishna Ika, Brainwave Science, LLC, Brainwave Science, Inc., eHealthcareWorks Corp., Government Works, Inc., Tomkins, one or more undisclosed silent partners (hereinafter "Silent Partner," including singular and plural, to be revealed by Ika and/or in discovery), one or more undisclosed financiers of BWS, LLC, BWS, Inc. and/or Ika (hereinafter "Financier," including singular and plural, to be revealed by Ika and/or in discovery) shall  all collectively be referred to herein as the "Ika Parties."  Ika, BWS LLC, BWS Inc., HCW, and GOV are also referred to herein as the "Known Ika Parties."

## II.    SUMMARY AND INTRODUCTION

2.1 This Summary and Introduction summarizes the relevant facts.  Details are provided in subsequent sections, along with ample documentation in the form of exhibits.  These will demonstrate that all of the statements made in this Summary and Introduction are demonstrably and unequivocally true and factual.  For clarity, I, Dr. Lawrence A. Farwell, shall generally refer to myself in the third person.

2.2 As the inventor and world's leading expert in Brain Fingerprinting, and the individual who has successfully implemented Brain Fingerprinting at the FBI, the CIA, the US Navy, and in law enforcement and counterterrorism agencies around the world, I, Dr. Lawrence Farwell, was the primary witness in a fraud suit against Ika, BWS LLC, and BWS Inc. spanning several countries and jurisdictions.

2.3 Ika and BWS Inc. also stand accused of fraud in South Africa, Pakistan, Nigeria, and Thailand, in each case involving Ika and his employees (a) falsely representing themselves as experts in forensic neuroscience, event-related brain potentials, and Brain Fingerprinting competent to implement a technology transfer of Brain Fingerprinting technology to government agencies and to train agency personnel in the same; and (b) attempting to sell a counterfeit "Brain Fingerprinting" training and technology that does not in fact meet the established Brain Fingerprinting Standards.

2.4 The current fraud that Ika and the other Ika Parties have been attempting to perpetrate in various countries is the continuation and culmination of a racketeering enterprise that Ika and some of the Ika Parties began in 2012 and 2013.  The purpose of the enterprise was to fraudulently gain control of the patents for Dr. Farwell's invention of Brain Fingerprinting, eliminate Dr. Farwell from participation, and then defraud government agencies in various countries by Ika falsely representing himself and his employees as experts in forensic neuroscience, psychophysiology, event-related brain potentials, and Brain Fingerprinting capable of effecting a technology transfer of Brain Fingerprinting to said agencies, and to sell them a counterfeit system, and faux "training" thereon by unqualified "trainers," that did not meet the Brain Fingerprinting Scientific Standards established by Dr. Farwell and his colleagues in the scientific literature.

2.5 Tomkins and the Known Ika Parties set up BWS Inc. for fraudulent purposes as described herein, one of which was to file frivolous lawsuits against Dr. Farwell and the patent owners, knowing that BWS Inc had no chance of winning the suits. The suits served the purpose of forcing Dr. Farwell and the patent owners to expend money and other resources, while minimizing the risk to the Known Ika Parties, particularly Tomkins, Ika, BWS LLC, HCW, and GOV.  Since BWS Inc. is a shill company with no legitimate business activities and no assets, losing a lawsuit with a substantial judgment against BWS Inc. would not actually cost the Ika Parties anything.

2.6 When Ika first contacted Dr. Farwell and proposed a business arrangement, he and the other Ika Parties concealed from Dr. Farwell the fact that Kota, an individual who had pleaded guilty and been convicted of attempting to sell stolen high-tech secrets to the Soviet Union – essentially the same crime for which Ika's original racketeering organization was founded and which it has since attempted to perpetrate in multiple countries – would later be identified by BWS LLC as a board member and officer of BWS LLC.

2.7 The steps in said racketeering scheme were as follows:

2.7.1 Ika and other Ika Parties fraudulently induced Dr. Farwell and his company, Brain Fingerprinting Laboratories, Inc. to enter into an LLC agreement with BWS LLC, to be controlled by Ika, by among other things concealing the involvement of Kota and his criminal record and the plans to fraudulently gain control of the Patents and to misappropriate Dr. Farwell's and BFL Inc.'s equity in BWS LLC. (Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.2 Ika and other Ika Parties fraudulently induced Dr. Farwell to sign three Draft Documents that outlined the terms for transfer of the Patents to BWS LLC, but did not yet include any consideration flowing to the apparent "assignors," because that had not yet been negotiated. The Draft Documents were never intended by Dr. Farwell, who signed them, or by ASI, the undisputed owner of the patents, to be patent assignments. The Draft Documents were not executed by or even known to ASI. Dr. Farwell was not a member, owner, officer, or agent of ASI and did not have authority to bind ASI. Then Ika's attorney fraudulently recorded the Draft Documents at the USPTO as "patent assignments" to BWS LLC so as to gain control of the Patents without being required to execute any documents requiring compensation for the same. Then Ika refused to sign any documents requiring any compensation to the patent owners (or anyone else) in exchange for ownership of the patents by BWS LLC, which he controlled. When Dr. Farwell discovered the erroneous recording of the Draft Documents at the USPTO, he and BFL Inc. signed and recorded a Correction that clarified ASI's continuing, uninterrupted ownership of the Patents and the fact that the Draft Documents bearing his signature were null and void, were not valid patent assignments, and had no legal binding effect. Thus, the ownership of the Patents always remained with ASI, and the Ika Parties' initial scheme to fraudulently gain control of the Patents failed. (Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.3 Ika and other Ika Parties purported to deprive the Minority Shareholders of some of their equity in BWS LLC by the following scheme. Dr. Farwell and BFL Inc. (the Minority Shareholders) initially owned 49% of BWS LLC. HCW, controlled by Ika, owned 51%. The initial agreement required HCW, controlled by Ika, to provide sufficient financing for the LLC. Ika told the Minority Shareholders that he and HCW had run out of money, that they would have to take on a Silent Partner and sell him equity to finance the company, and that HCW and BFL Inc. would both be diluted proportionally and would both give up ownership proportionally. (Dr. Farwell's ownership was non-dilutable.) Ika then purported to sell equity of BFL Inc. and HCW to an independent Silent Investor (who he implied was Kota). In fact, however, said equity was transferred to an entity controlled and/or owned by Ika. Thus Ika's scheme diluted BFL Inc. but in reality did not diminish Ika's effective ownership of BWS LLC. BFL Inc.'s equity was apparently reduced from 44% to 16% by this scheme, leaving the Minority Shareholders with a total of 21%. (Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.4  Ika and other Ika Parties then conspired to deprive the Minority Shareholders of their remaining equity in BWS LLC by the following additional scheme. The BWS LLC agreement required consent of all members to any amendments. Ika purported to unilaterally amend the BWS LLC agreement to allow himself as managing member, along with the majority members he controlled, to expel members if, in his sole and absolute discretion, they had done certain things that he interpreted as detrimental to the LLC. Then he called a meeting of the members – consisting solely of himself and Kota as corporate secretary – and purported to expel Dr. Farwell and BFL Inc. as members in BWS LLC, and to transfer their ownership interest to himself and entities that he controlled, all without consent or due process. (Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.5  Tomkins, Ika, and other Ika Parties then implemented yet another scheme to eliminate any ownership by Dr. Farwell and BFL Inc. of the functional entity and to fraudulently gain control of the Patents. They formed a new corporation, Brainwave Science, Inc. (BWS Inc.) BWS Inc. was formed for four purposes, all of them fraudulent, as follows.

2.7.5.1 Ika's first fraudulent purpose of establishing BWS Inc. was to eliminate the Minority Shareholders as owners of the functional corporate entity. (Ika must have known, and his attorney acknowledged, that his scheme to expel the Minority Shareholders without consent or due process was illegal and would not stand.) BWS Inc. had entirely non-overlapping ownership with BWS LLC. BWS LLC is owned by Dr. Farwell, BFL Inc., HCW, and an unidentified Silent Partner whose shares HCW held in trust. Ika has no ownership in BWS LLC. BWS Inc. is owned solely by Ika. By transferring the assets of BWS LLC to BWS Inc. without any compensation to the owners of BWS LLC, Ika purported to eliminate the Minority Shareholders as owners of the functional corporate entity. The assets of BWS LLC could be transferred to an entity solely owned by Ika without compensation to the owners of BWS LLC must constitute one of two scenarios: (a) Ika already owned or controlled all of the owners of BWS LLC except Dr. Farwell and BFL Inc., in which case sale of equity to the Silent Partner (and concomitant dilution of HCW along with BFL Inc.) was a sham set up by Ika to defraud Dr. Farwell and BFL Inc. of their equity, or (b) Ika also defrauded the Silent Partner out of his equity in BWS LLC by forming the new corporation and transferring the assets. In either case, Ika and other Ika Parties committed fraud by forming BWS Inc.

2.7.5.2 Reference is made to US Patents #7,689,272, #5,363,858, #5,406,956, and #5,467,777, (collectively, the "Patents"). Dr. Farwell, the inventor of the Patents, assigned the Patents and all associated intellectual property to ASI. He assigned #5,363,858, #5,406,956, and #5,467,777 (the "Brain Fingerprinting Patents" or the "Expired Patents") in 2003 and #7,689,272 in 2010. He has had no ownership in the Patents or any associated intellectual property since then. It is undisputed that ASI owned the Patents in 2013, prior to the Draft Documents.

2.7.5.3 Ika's second fraudulent purpose of establishing BWS Inc. was to fraudulently gain ownership of the Patents. There are no documents filed at the USPTO (or anywhere else) that even mention BWS Inc. in connection with ownership of the Patents. There are no documents anywhere that might imaginably be construed as to assign the Patents to BWS Inc.

In different legal actions Ika, Tomkins, BWS LLC, and BWS Inc. have made contradictory claims regarding assignments the ownership of the Patents. Both of the contradictory accounts are demonstrably and unequivocally false.

10

The claims in the BWS Inc. – Farwell Arbitration are as follows.  In this regard, it was not an accident that BWS Inc. had a similar name and identical initials to BWS LLC.  In said arbitration and other legal actions described below, Ika and other Ika Parties have abbreviated Brainwave Science Inc. as "BWS."  Then they have stated that "BWS" obtained the Patents in 2013 by assignment from ASI.  BWS Inc. stated the following in its Notice in the BWS Inc. – Farwell Arbitration: "Claimant Brainwave Science, Inc. ('BWS') is a Delaware corporation…" "American Scientific Innovations, LLC… assigned BWS all rights, title and interest in… patents [the Patents]… on June 17, 2013." "BWS maintains that it lawfully acquired the subject intellectual property [the Patents]…[through said transaction]."  Said statements are blatantly false.

Brainwave Science, Inc. ("BWS" in the definition of said Notice) was not even mentioned in the documents cited in the Notice as purportedly assigning the Patents to it.  Said documents referred to Brainwave Science, LLC.  "BWS" [Inc.] could not possibly have "lawfully acquired" the Patents in 2013 because it did not exist until several years later.  It is striking that Ika and his attorneys presume that the arbitrators and judges in the multiple lawsuits wherein Ika and Tomkins attempted similar verbal sleight of hand would not have the mental acuity to recognize the difference between two different entities with the same initials (and non-overlapping ownership).  BWS Inc. has no evidence whatsoever that BWS LLC, ASI, or any other entity ever assigned the Patents to it. No entity ever executed and recorded at the USPTO any documents – valid or not – that even mention BWS Inc.

The second false account Ika, Tomkins, and BWS Inc. have given regarding ownership of the Patents is that ASI assigned the Patents to BWS LLC (not BWS Inc.) in 2013, and at some later time BWS LLC assigned the Patents to BWS Inc.  This apparently is their contention in the present Motion to Intervene.  Neither of the alleged assignments in this account ever took place in reality.

(a) The Unexecuted ASI-BWS Draft Document purportedly assigning said Patents (to BWS **LLC**, not BWS **Inc.**) in 2013 was not executed by or even known to ASI, the undisputed owner of the Patents at that time, included no consideration flowing to the apparent "assignor," and could not possibly have transferred ASI's Patents to BWS LLC or any other entity.

(b) Even if the Patents had been assigned to BWS LLC by ASI (which they demonstrably were not), there is no evidence that BWS LLC ever assigned the same to BWS Inc.  There are no documents filed at the USPTO that even mention BWS Inc. in reference to the Patents.

2.7.5.4 Ika's third fraudulent purpose for establishing BWS Inc. was to provide a vehicle to defraud government agencies in various countries by Ika falsely representing himself and his employees as experts in forensic neuroscience, psychophysiology, event-related brain potentials, and Brain Fingerprinting capable of effecting a technology transfer of Brain Fingerprinting to said agencies, and to sell them a counterfeit system, along with faux "training" thereon by unqualified "trainers," that did not meet the Brain Fingerprinting Scientific Standards established by Dr. Farwell and his colleagues in the scientific literature. Ika and BWS Inc. currently stand accused of such fraud in South Africa, Pakistan, Nigeria, and Thailand for attempting to implement this scheme.

2.7.5.5 Ika's fourth fraudulent purpose for establishing BWS Inc. was to file patently frivolous legal actions against Dr. Farwell, the primary witness in the first fraud case against Ika, BWS LLC, and BWS Inc. and, as the inventor and world's leading expert in Brain Fingerprinting, the

11

potential expert witness best positioned to testify to expose the fraud that Ika and the Ika Parties have attempted and are attempting in various countries, including those named above, when and if said countries bring Ika and other Ika Parties to justice. Said frivolous lawsuits constitute witness tampering and an attempt, as part of the Ika Parties' racketeering crimes, to intimidate, coerce, silence, retaliate against, and discredit past and potential future witness Dr. Farwell. Said frivolous lawsuits are based on two demonstrably and unequivocally false premises:

(a) That Brainwave Science, Inc. acquired the Patents in 2013 -- when it did not yet exist -- through an unexecuted draft document (the Unexecuted ASI-BWS Draft Document) that did not mention Brainwave Science, Inc., was not executed by or even known to the undisputed patent owner at the time (ASI), had no provisions for consideration flowing to the apparent "assignor," and was never intended by either the signer or the undisputed patent owner to be recorded at the USPTO or to constitute a patent assignment;

(b) That Dr. Farwell's unequivocally and demonstrably true – and also privileged – statements were libelous, statements made as a witness in a sworn affidavit in a fraud suit against Ika, BWS LLC, and BWS Inc.

2.8  The activities  described herein of Tomkins, Ika, and the Ika Parties constitute racketeering, as described below, because per 18 U.S.C. § 1961 they are "(B) indictable under…the following provisions of title 18, United States Code…section 1341 (relating to mail fraud)...section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice)...section 1510 (relating to obstruction of criminal investigations)...section 1512 (relating to tampering with a witness...victim, or an informant)...section 1513 (relating to retaliating against a witness...victim, or an informant)" or  "(D) any offense involving…fraud in the sale of securities…"

2.9  BWS Inc. has no business activities other than fraud, no lawful business activities, no clients, no customers, no revenues, no investors, no purchasers of equity, and no donors, and yet somehow has sufficient funds to maintain Ika in a lavish lifestyle and to finance overseas trips for Ika and others to attempt to defraud government agencies around the world, and to hire a full-time attorney, Tomkins, with virtually no other responsibilities other than filing frivolous lawsuits against Dr. Farwell, the owners of the Patents, and others who do business with Dr. Farwell.  The Financier, to be revealed in discovery, is the source of these funds.  If money laundering is involved (which we do not, as of now, allege, pending discovery of the source of BWS Inc.'s funds and the involvement of the Financier), then this is another instance of racketeering per 18 U.S.C. § 1961, because the Ika's and the other Ika Parties' actions are "indictable under…the following provisions of title 18, United States Code …section 1956 (relating to the laundering of monetary instruments)…"

2.10   Tomkins and all of the Ika Parties know that their claims under the five lawsuits that they have filed, all of which were pursuing the same claims with reference to the same facts, have no basis in fact or law.  Tomkins knows that they have no possibility of prevailing on the merits.  Their transparent strategy is to use the funds provided by the Financier to force Dr. Farwell and the patent owners to expend all of their available resources in time and money defending lawsuits, and then to prevail by default because they are unable to continue to finance his responses to the onslaught.

2.11   Tomkins and the other Ika Parties are attempting to abuse the US justice system to eliminate Dr. Farwell in two different roles. (a) Dr. Farwell, as an expert witness with unique expertise and experience, is the one person who stands in the way of their attempts to defraud government

agencies, misrepresent themselves as forensic neuroscience experts when they are not, and sell counterfeit products and false and inadequate training. (b) Dr. Farwell, as the inventor of Brain Fingerprinting and the individual who with his colleagues is successfully implementing Brain Fingerprinting in government law enforcement and counterterrorism agencies around the world, is also the one individual who is demonstrating by his actions the effective implementation of Brain Fingerprinting that the Ika Parties fraudulently claim to be capable of accomplishing, but never have accomplished and are in fact not capable of accomplishing. The Ika Parties recognize that until they eliminate from the scene the genuine expert in Brain Fingerprinting, Dr. Farwell, it will be virtually impossible to defraud government agencies into hiring them as experts in Brain Fingerprinting, when they in fact have no such expertise. This is because anyone who does adequate due diligence will discover – as authorities in South Africa, Pakistan, Nigeria, and Thailand did – that Dr. Farwell is the genuine expert and Ika and his employees are frauds.

2.12   As an attorney, Tomkins must be aware of the fact that all of BWS Inc.'s claims in the five lawsuits they have filed are false, frivolous, and entirely without basis in fact or law.

2.13   Tomkins' and Ika's actions constitute racketeering under the US RICO laws, as described in detail below.

2.14   Tomkins' and the Ika Parties' scheme to defraud government agencies in various countries also included Tomkins' writing and causing to be delivered a blatantly libelous letter to one of Dr. Farwell's Brain Fingerprinting clients, a government agency in India, attempting to interfere with Dr. Farwell's business and personal relationships, existing contracts, and business activities. Said letter made false, defamatory, and blatantly libelous statements about Dr. Farwell and threatened civil and criminal action against Dr. Farwell's client for doing legitimate and honest business with Dr. Farwell.

2.15   Frivolous Lawsuits and Arbitrations Initiated or Attempted by Tomkins

The relevant cases are as follows. These comprise five attempts by Tomkins to litigate the identical issues of fact and law in different venues and jurisdictions designed to be as inconvenient and expensive as possible for Dr. Farwell and the owners of the relevant patents. Said five lawsuits constituted Tomkins' attempts to intimidate, coerce, silence, retaliate against, and discredit Dr. Lawrence Farwell as past and potential future witness against Tomkins' client Krishna Ika in fraud cases; to interfere with attempts to bring Ika to justice for fraud in at least four countries; to misappropriate equity of minority shareholders in a company controlled by Ika; and to illegally obtain control of intellectual property.

2.15.1 *Brainwave Science, Inc. vs. Farwell, et al., Supreme Ct. of the State of New York County of New York, Index No. 153867/2019* (the "New York Lawsuit"). This is the first lawsuit Tomkins filed, and the only one filed in an appropriate venue. All other cases constitute attempts to re-litigate the same issues of fact and law in additional jurisdictions.

2.15.2 An Arbitration Under the Commercial Rules of Arbitration of the American Arbitration Association, AAA Case Number: 01-20-0005-4534, between Brainwave Science, Inc. (Claimant) and Lawrence A. Farwell, Individually, and Life Science and Technology, LLC (Respondents) (the "BWS Inc.-Farwell Arbitration"), which Tomkins attempted unsuccessfully to commence. The proposed arbitrators have refused to arbitrate the case on the basis of the fact that it is redundant with, and depends upon the outcome of, the New York Lawsuit, which is the appropriate venue.

13

2.15.3   An attempt by Tomkins to re-litigate the same issues as the New York case by intervening in a settled arbitration case between NST and Dr. Farwell (Neuro Science Technologies, LLC vs. Farwell, Case No. 2:20-cv-1554, Fed Cir. 2020, the "NST vs. Farwell Arbitration" and the "Motion to Intervene" therein).  The Court vacated the original recording of the outcome of the arbitration between NST and Dr. Farwell and allowed BWS Inc. to intervene.   The Court then dismissed this case for lack of subject matter jurisdiction, again recognizing the fact that the New York case was the appropriate venue.

2.15.4   A lawsuit filed by Tomkins on behalf of BWS Inc. against NST in the US District Court for Western Washington, Brainwave Science, Inc. vs. Neuro Science Technologies, LLC and Ronald J. Kirkendorfer, no. 2:20-cv-01481 (the "BWS Inc. vs. NST Lawsuit"). The Court dismissed this suit against NST with prejudice, and dismissal of the suit against Kirkendorfer is pending before the court.

2.15.5   A case filed by Tomkins on behalf of Ika and BWS Inc. before the US District Court for Wyoming (Brainwave Science, Inc. vs. Life Science and Technology, LLC, Case No. 19-CV-167-F, D. Wyo (the "Wyoming Lawsuit"), which the Plaintiff dismissed without prejudice when it became obvious that the case was frivolous and filed in the wrong jurisdiction and venue.

## III.   FACTS

3.1   As the inventor and world's leading expert in Brain Fingerprinting, and the individual who has successfully implemented Brain Fingerprinting at the FBI, the CIA, the US Navy, and in law enforcement and counterterrorism agencies around the world, Dr. Lawrence Farwell was the primary witness in a fraud suit against Ika, BWS LLC, and BWS Inc. in the United States District Court for the District of Delaware (*E. Hedinger AG and Hedinger Middle East DWC LLC  vs. Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika*).  Said fraud suit also was pursued in several other jurisdictions.  In his privileged role as a witness, Dr. Farwell provided a sworn affidavit, the contents of which were truthful and within his knowledge and scientific field of expertise.

3.2   In addition to the above, government and non-government agencies have also accused Ika, BWS LLC, and BWS Inc. of fraud relating to false claims of expertise in Brain Fingerprinting science and ineffective and counterfeit related products in several other countries, including but not limited to Pakistan (Exhibit AS), South Africa (Exhibit AR), Thailand (Exhibit AT), and Nigeria (see below).  In light of Dr. Farwell's unique expertise and his considerable knowledge of Ika's alleged crimes, Dr. Farwell may also be a witness in criminal prosecutions that are pursued against Ika, BWS LLC, and BWS Inc. in at least some and likely all of the above jurisdictions, if any, where such prosecutions occur.

3.3   Tomkins, Ika, and BWS Inc. have attempted to coerce and intimidate Dr. Farwell into changing his sworn testimony as a witness in Hedinger allegedly in order to conceal alleged fraud by Ika, BWS LLC, and BWS Inc.

3.4   Since Dr. Farwell refused, Tomkins has filed multiple patently frivolous lawsuits against Dr. Farwell and the owners of the Brain Fingerprinting patents, in a transparent attempt to coerce, intimidate, and discredit Dr. Farwell and to force him to expend his resources in time and money defending lawsuits so as to silence, compromise, intimidate, or discredit him as a witness against Ika in fraud cases in Pakistan, South Africa, Nigeria, Thailand, and/or other jurisdictions where Ika has been accused of fraud relating to Farwell's invention of Brain Fingerprinting.

14

3.5      The forum shopping and witness tampering that Tomkins is now attempting are part of a larger fraudulent scheme. Tomkins, Ika, BWS Inc., the Silent Partner, the Financier, Ika's various attorneys (including Tomkins in the later stages), and possibly one or more Co-conspirators (collectively, the Ika Parties) conspired to engage in racketeering and engaged in racketeering in the fraudulent scheme. The main features of said fraudulent scheme are briefly summarized immediately below. Details of said fraudulent scheme and exhibits documenting the same follow in subsequent sections.

3.5.1    The relevant portions of the federal RICO Act (18 U.S.C. §§ 1961–1968) are as follows:

**§ 1961. Definitions**

(1) racketeering activity means…

(B) any act which is indictable under any of the following provisions of title 18, United States Code…section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant).

**§ 1962. Prohibited activities**

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**§ 1964. Civil remedies**

(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorneys fee, except that no person may rely upon

any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

3.5.2   The Ika Parties fraudulently induced two Washington state residents, Dr. Farwell and BFL Inc., to invest in a security, specifically ownership in BWS LLC, and to execute the BWS LLC Agreement.  They concealed several relevant facts that would have influenced Dr. Farwell's and BFL Inc.'s decision whether to purchase a security.  They did not disclose that they would later state on the BWS LLC website and in correspondence with Dr. Farwell that Subu Kota was an officer (Secretary) and board member of BWS LLC, or that Kota was otherwise involved.  This is relevant because Kota had pleaded guilty to attempting to sell stolen high-tech secrets to the Soviet Union, a crime very similar to the crimes of which Ika now stands accused in South Africa, Pakistan, Nigeria, and Thailand.  They did not disclose that they planned the other fraudulent acts described below with a design to obtain control of the Patents without having to pay for them and to defraud Dr. Farwell and BFL Inc. and misappropriate of all of their original 49% interest (Dr. Farwell 5% non-dilutable and BFL Inc. 44%) in BWS LLC.

3.5.3   The Ika Parties conspired, in the course of negotiations, to obtain Dr. Farwell's signatures on three preliminary documents that concerned terms for the transfer of the Patents to BWS LLC, but lacked any mention of the yet-to-be-negotiated consideration for the same that would flow to the assignors in the actual patent assignments that might be executed by the proper parties when and if the negotiations for consideration were successfully completed.  They then recorded these preliminary draft documents with the USPTO as "patent assignments," despite the facts that said documents were signed by undisputed non-owners of the Patents, the one document that mentioned the actual undisputed patent owner was not executed by or even known to the undisputed patent owner, and each of said documents failed on its face as a "patent assignment" because there was no consideration flowing to the apparent purported assignor.

3.5.4   When Ika had apparently succeeded in fraudulently obtaining ownership of the Patents without having to pay any consideration to the patent owner, he then refused to sign any documents calling for any consideration flowing from himself, BWS LLC, HCW, or any other entity in which he had ownership or control.  Ika defaulted on his agreement to provide sufficient financing for BWS LLC until the company became profitable.

3.5.5   Dr. Farwell was paid $11,000 per month on some months, $8,000 per month on other months, and nothing on some months over the next several years, not as compensation for the Patents (which Dr. Farwell did had not owned since 2003), but as compensation for his expertise as the inventor and world's leading expert in Brain Fingerprinting.

3.5.6   When Dr. Farwell discovered that documents bearing his signature had been falsely and erroneously recorded at the USPTO, he and BFL Inc. signed and recorded at the USPTO a correction that clarified the continuous, uninterrupted ownership of the Patents by ASI and corrected the erroneous information contained in the three Draft Documents.  (The Correction did not result in any change in ownership of the Patents, because ownership never ceased to rest with ASI.)

3.5.7   When the Ika Parties realized that their initial ploy to fraudulently obtain ownership of the Patents without paying any consideration had failed, they devised another scheme to accomplish essentially the same thing. The Ika Parties committed fraud in the inducement against Dr. Farwell and BFL Inc. for a second time, in a second series of transactions, as follows. Ika told Dr. Farwell that he did not have sufficient funds to fund the company as agreed, and that BFL Inc., Dr. Farwell, and HCW would have to sell equity to raise funds. He stated that BFL Inc. and HCW would be proportionally diluted. (Dr. Farwell's shares were non-dilutable.) Ika then pretended to sell some of BFL's equity to a purported independent third party, the "Silent Partner," through HCW, and represented that HCW was doing the same. Through this process, in a series of transactions, Ika purported to reduce BFL Inc.'s ownership of BWS LLC from 44% to 18%, as documented in exhibits below. He purported in the same documents to reduce HCW's equity proportionally. However, he in fact transferred BFL Inc.'s and HCW's "sold" equity to himself or an entity he owned and controlled, and concealed this fact from Dr. Farwell and BFL Inc.

3.5.8   It is at this point that Tomkins became actively involved. Tomkins, Ika, and the other Ika Parties then devised a fraudulent scheme to deprive Dr. Farwell and BFL Inc. of their remaining equity in BWS LLC. This comprised the following steps. The BWS LLC agreement clearly stated that it could be modified only by agreement of all members (Exhibit F). First, Ika purported to unilaterally change the LLC agreement to grant himself the authority to remove members from the LLC if, in his sole and absolute opinion, they had done certain things that in his opinion were detrimental to the company. Then he called a meeting to remove the Farwell Shareholders as members. Then he purported to remove the Farwell Shareholders as members, and to transfer all of their 21% interest in BWS LLC to himself and/or entities that he controlled, without due process and without any compensation to Dr. Farwell and BFL Inc. for their equity. Ika lacked the authority to remove Dr. Farwell and BFL Inc. as members. Moreover, there can be no question that neither Ika nor anyone else had the authority to misappropriate the Farwell Shareholders' equity and to transfer it to himself without compensation, whatever the purported justification. The only mechanism through which Dr. Farwell's and BFL Inc.'s equity could be transferred to Ika or entities he controlled without consent, due process, or compensation is theft. The above is delineated in detail in later sections of this document below and in the exhibits referred to herein. This attempt to misappropriate Dr. Farwell's and BFL Inc.'s equity in BWS LLC failed, as there clearly was no legal basis for Ika's and the other Ika Parties' actions, and as Dr. Farwell pointed out at the time, Ika and other Ika Parties committed several felonies in the course of the implementing the scheme described above.

3.5.9   When their attempt to misappropriate Dr. Farwell's and BFL Inc.'s equity in BWS LLC failed, Tomkins and the other Ika Parties then devised yet another way to fraudulently deprive Dr. Farwell and BFL Inc. of their remaining equity in BWS LLC. BWS LLC was owned 5% by Dr. Farwell, 49% by BFL Inc. (or, if one considers the fraudulent transfer of equity described above to be legitimate, 16% by BFL Inc.), approximately 25% by HCW, and the balance by the Silent Partner. Ika personally owned none of BWS LLC. The Ika Parties formed a new company, BWS Inc. Ika and his attorneys told Dr. Farwell that this was a "reorganization," with no change in ownership, assets, or liabilities. The entire formation of BWS Inc., however, was fraudulent. Ika, who owned none of BWS LLC, owns all of BWS Inc. This means that, in addition to fraudulently eliminating Dr. Farwell's and BFL Inc.'s equity in BWS LLC, either one of two things took place. Either (1) Ika also defrauded the Silent Investor out of his equity

in BWS LLC by forming a new entity, BWS Inc. in which the Silent Investor had no interest; or (2) the purported sales of equity that BFL Inc. was forced into by Ika's purported lack of funds to support the company's operations was a sham, and Ika was selling BFL Inc.'s equity to himself or an entity that he controlled, and pretending to sell HCW's equity proportionally, but actually only transferring it to an entity the same that he owned or controlled.  Then this sham entity disappeared when BWS Inc. was formed, leaving Ika with 100% of the equity.  In either case, this was a scheme to defraud Dr. Farwell and BFL Inc. of their equity in BWS LLC.

3.5.10   As described elsewhere herein, Tomkins established BWS Inc. for three additional fraudulent purposes in addition to the above: (a) to fraudulently gain control of the Patents; (b) to provide a vehicle to defraud government agencies by falsely marketing Ika and his employees as experts in Brain Fingerprinting and attempting to sell a counterfeit product that does not meet the relevant scientific standards along with training by unqualified "trainers"; and (c) to intimidate, coerce, retaliate against, and discredit Dr. Farwell as a past and likely future witness against Ika in fraud cases.

3.6      Ika and BWS LLC accused Kota of being a part of the above described fraudulent scheme.  On the BWS website, Kota was listed as being a member of the board (Exhibits W, X, Y, and Z). In correspondence with Dr. Farwell, Ika and his attorney identified Kota as the "Secretary" of BWS LLC (Exhibit K).  Ika has implied – but never to the undersigned's knowledge directly stated – that Kota was the Silent Partner and a major owner of BWS LLC.  According to current knowledge and belief, Kota denies ever being an officer, board member, investor, owner, or member of BWS LLC or BWS Inc., and denies being involved in any way in any of the alleged fraud, alleged securities violations, alleged theft of the Minority Shareholders' equity, or any other alleged crimes of Ika, BWS LLC, and BWS Inc.

3.7      The demonstrably baseless and frivolous legal proceedings initiated by Tomkins, Ika, and BWS Inc. comprise the following:

3.7.1    (1) *Brainwave Science, Inc. vs. Farwell, et al., Supreme Ct. of the State of New York County of New York, Index No. 153867/2019* (the "New York Lawsuit").  This is the first lawsuit Tomkins filed.

3.7.2    (2) An Arbitration Under the Commercial Rules of Arbitration of the American Arbitration Association,  AAA Case Number: 01-20-0005-4534, between Brainwave Science, Inc. (Claimant) and Lawrence A. Farwell, Individually, and Life Science and Technology, LLC (Respondents) (the "BWS Inc.-Farwell Arbitration"), which Tomkins attempted unsuccessfully to commence.  The proposed arbitrators have refused to arbitrate the case on the basis of the fact that it is redundant with, and depends upon the outcome of, the New York Lawsuit, which is the appropriate venue.

3.7.3    (3) An attempt by Tomkins to re-litigate the same issues as the New York case by intervening in a settled arbitration case between NST and Dr. Farwell (Neuro Science Technologies, LLC vs. Farwell, Case No. 2:20-cv-1554, Fed Cir. 2020, the "NST vs. Farwell Arbitration" and the "Motion to Intervene" therein).  The Court vacated the original recording of the outcome of the arbitration between NST and Dr. Farwell and allowed BWS Inc. to intervene.  The Court then dismissed this case for lack of subject matter jurisdiction, again recognizing the fact that the New York case was the appropriate venue.

18

3.7.4    (4) A lawsuit filed by Tomkins on behalf of BWS Inc. against NST in the US District Court for Western Washington (*Brainwave Science, Inc. vs. Neuro Science Technologies, LLC and Ronald J. Kirkendorfer, no. 2:20-cv-01481*, the "BWS Inc. vs. NST Lawsuit." The Court dismissed this suit against NST with prejudice, and dismissal of the suit against Kirkendorfer is pending before the court.

3.7.5    (5) A case filed by Tomkins on behalf of Ika and BWS Inc. before the US District Court for Wyoming (*Brainwave Science, Inc. vs. Life Science and Technology, LLC, Case No. 19-CV-167-F* (the "Wyoming Lawsuit") which the Plaintiff dismissed without prejudice when it became obvious that the case was frivolous and filed in the wrong venue.

3.8    Tomkins, Ika, BWS LLC, and BWS Inc. have maintained two patently false propositions: (1) That BWS Inc. owns the exclusive rights to Dr. Farwell's invention of Brain Fingerprinting as embodied in the Brain Fingerprinting Patents based on the following events: (a) Without the knowledge or consent of ASI, the undisputed owner of the patents at the time, Ika's attorney recorded at the US Patent and Trademark Office ("USPTO") a document that was not executed by or even known to ASI, and was signed only by  a member of BWS LLC (Dr. Farwell) who had no authority to sign on behalf of the undisputed owner of the Patents; (b) BWS Inc. owns the patents because they were assigned to BWS **LLC** -- even though they have never been assigned to BWS **Inc.**, and BWS LLC and BWS Inc. have totally non-overlapping owners; and (c) BWS Inc. still has exclusive rights to the invention embodied, disclosed, and enabled in the Expired Patents even though the Expired Patents have expired; (2) Ika and entities he owns or controls wholly own BWS LLC and BWS Inc., and Ika, BWS LLC, and BWS Inc. owe nothing to the Minority Shareholders (Farwell and BFL Inc.) for misappropriating their 49% equity in BWS LLC, based on the following events: (a) Ika unilaterally purported to amend the BWS LLC agreement to grant himself the right to expel members at his sole and absolute discretion, despite clear language in said agreement that such modification could only be made with the consent of all members; (b) Ika purported to expel  Dr. Farwell and BFL Inc., the other minority member of BWS LLC, without consent or due process; (c) Ika, BFL LLC, and BFL Inc. paid no compensation to said expelled members for their 49% equity in said BFL LLC; and (d) BFL LLC was dissolved and its assets transferred to BWS Inc., which is solely owned by Ika and in which the minority shareholders, Dr. Farwell and BFL Inc., have no interest.

3.9    Tomkins, Ika, and BWS Inc. have engaged in a pattern of practice of forum shopping the courts of the United States to find a forum that is most inconvenient to Dr. Farwell, notwithstanding the fact that many of the facts that gave rise to the Parties' disputes in each of these four ongoing actions are identical.  Ika Parties know or should know that the four ongoing legal actions are without basis in fact or law, and that they have no chance of prevailing on the merits.  Said lawsuits and Ika's attempt to intervene in this case are filed in bad faith with the purpose of attempting to exhaust the limited resources of Dr. Farwell, LST (the former Patent owner), and NST (the current Patent owner), in order to gain control of Dr. Farwell's invention and eliminate Dr. Farwell as a competitor in applying said invention and as an expert witness uniquely qualified to truthfully testify regarding the fraudulent nature of Ika's attempts to market himself and his employees as experts in Brain Fingerprinting capable of effecting a technology transfer of the same to a client.

3.9.1    For example, although the Wyoming Lawsuit was dismissed, it nevertheless served a purpose for Tomkins and the other Ika Parties as a planned part of their fraudulent scheme.  They filed the lawsuit against LST, in yet another inconvenient jurisdiction for Dr. Farwell, knowing that

it was totally frivolous, and sought the same outcome as they sought in the New York case: a declaration that BWS Inc. had clear title to the Patents. Despite the fact that BWS Inc.'s case was totally without merit, Dr. Farwell was required to spend money petitioning to intervene in the case to prevent a decision by default that BWS Inc. owned the Patents and could prevent Dr. Farwell from practicing his invention. After Dr. Farwell had spent considerable time, effort, and money, but before the Court reached the inevitable conclusion that the case was frivolous, the Ika Parties dismissed the case. In a similar ploy, the Ika Parties called a meeting in Boston, ostensibly to negotiate a resolution of the various lawsuits. After Dr. Farwell had flown from London to Boston at his own expense and paid for his stay in Boston, they cancelled the meeting without reason or explanation, once again using trickery and deceit to cause Dr. Farwell to expend money. All of this reveals Tomkins' and the Ika Parties' overall strategy, to exhaust Dr. Farwell's resources and thereby eliminate him as a witness in fraud cases against Ika and as a successful practitioner of his invention of Brain Fingerprinting (which, by contrast, Tomkins and Ika are not).

3.10   Statutory law and legal precedent, not to mention elementary logic and common sense, confirm the following indisputable truths. (1) If Person A legally assigns a patent to Person B, in a properly executed and undisputed transaction, properly recorded at the United States Patent and Trademark Office (USPTO), then Person B owns said patents and IP, and Person A cannot assign legally assign the same to Person C (or anyone). (2) If person D never has been assigned, never has had, never has claimed, and never has been said by anyone to have ownership of a patent and associated intellectual property, Person D cannot legally assign said patent to Person C (or anyone). (3) If Person B is the undisputed owner of a patent, said patent cannot be assigned by, and patent ownership is unaffected by, any document that is not executed by Person B. Specifically, patent ownership cannot be assigned to Person C by a document that is not executed by a member, equity holder, officer, employee, agent, or any authorized representative of Person B, wherein the existence of said document and even the existence of Person C and any surrounding circumstances are not known to Person B, and furthermore wherein said document could not be a valid patent assignment because there was no consideration flowing to Person B. Statements (1), (2), and (3) remain true regardless of what anyone says.

3.10.1   The above statements apply to the present case as follows. (1) Dr. Farwell, inventor, assigned the Patents and associated IP to ASI in 2003, in a properly executed and undisputed transaction, properly recorded at the United States Patent and Trademark Office (USPTO). Dr. Farwell could not assign said Patents and associated IP to BWS LLC (or anyone) in 2013, because he had no ownership interest in the same. The "LF-BWS Draft Document" referenced below, signed by Dr. Farwell in 2013, did not transfer any Patent ownership to BWS LLC. (2) BFL Inc. never has been assigned, never has had, never has claimed, and never has been said by anyone to have ownership of the Patents and associated intellectual property. The "BFL – BWS Draft Document" referenced below, signed by Dr. Farwell as Chairman of BFL Inc. in 2013, did not transfer any Patent ownership to BWS LLC. (3) ASI was the undisputed Patent owner in 2013. The "Unexecuted ASI – BWS Draft Document" was not signed by ASI, or by any member, equity holder, officer, employee, agent, or any authorized representative of ASI. It was signed by Dr. Farwell as a draft document in the course of negotiations, and was never intended by either Dr. Farwell or ASI to be recorded at the USPTO. The existence of said document and even the existence of BWS LLC (the apparent "assignee") and any surrounding circumstances were not known to ASI, ASI never made any representations that might have been construed as granting Dr. Farwell the authority to assign ASI's Patents to anyone or

20

granting BWS LLC the stature of a possible assignee of said Patents. Furthermore, said document could not be a valid patent assignment because there was no consideration flowing to ASI.

3.11     In normal human discourse, both in legal proceedings and elsewhere, it is an established principle that when Party X makes a demonstrably and unequivocally false statement, and Party Y states and thoroughly documents the indisputable fact that said statement is demonstrably and unequivocally false, it is incumbent on Party X to do one of two things: (1) acknowledge that said statement is false; or (2) present some new evidence and some new argument based thereon to support the view that said statement may not be entirely false. At a minimum, it is incumbent on Party X to stop simply repeating the same false statement without any reference to or acknowledgement of reality.

3.11.1   The above applies to Tomkins, Ika, and BWS Inc. as follows. In the New York case, Tomkins made the patently false and frivolous statement that Dr. Farwell assigned the Patents in 2013 to BWS LLC by signing three preliminary draft documents that were never intended by Dr. Farwell to be patent assignments, that were not executed by or even known to the undisputed patent owner, and that in any case could not be construed as patent assignments because they contained no consideration flowing to the purported assignor. Dr. Farwell's actions in signing the documents were as follows (a) signing the LF-BWS Draft Document on behalf of himself (an undisputed non-owner of the Patents); (b) signing the BFL – BWS Draft Document as Chairman of BFL Inc. (another undisputed non-owner of the Patents) and (c) signing the Unexecuted ASI – BWS Draft Document, whereas ASI (the undisputed Patent owner) was an entity in which he was not an owner, equity holder, member, officer, employee, agent, or any kind of authorized representative, and for which he had no authority or apparent authority to sign. These are facts regarding which ASI had never made any representations that might possibly be construed to the contrary, and for which both ASI and Dr. Farwell have signed sworn affidavits.

3.11.2   Dr. Farwell stated and thoroughly documented, in the New York case, the indisputable fact that Tomkins' above statement was demonstrably and unequivocally false, as summarized above and explained in detail below with reference to the corresponding exhibits.

3.11.3   Tomkins has taken an aggressively fact-resistant stance regarding these realities. Tomkins did not address the fact that his statement in the New York case had been definitively proven to be false. He made no attempt to address reality or the proven facts of the situation. He simply repeated the same false and frivolous statement, virtually word for word, in four subsequent legal cases, the BWS Inc.-Farwell Arbitration, the Motion to Intervene in the NST vs. Farwell Arbitration, the BWS Inc. vs. NST Lawsuit, and the Wyoming Lawsuit. When Dr. Farwell documented in all four of these cases that Tomkins' statement was demonstrably and unequivocally false, Tomkins again made no attempt to address the facts. He simply repeated the same false statement virtually word for word again in each Woy, with no mention of or reference to the actual proven facts of the situation.

3.11.4   Tomkins' continuing, again and again in different forums, to repeat his blatantly false statement, which has been exposed as unequivocally and demonstrably false, without any attempt to address -- or even acknowledge the existence of -- the proven facts of the situation, defies not only the relevant laws, legal precedent, and normal legal procedures, but also elementary logic and common sense.

3.12     Even if one accepts BWS Inc.'s clearly untenable and frivolous premise that the three Draft Documents specified above (referred to in BWS Inc.'s documents as "Intellectual Property Acknowledgment and Assignment Agreements of June 17, 2013") were legal patent assignments and transferred ownership of the Patents to BWS LLC – which they were not and did not – BWS Inc. still has provided absolutely no evidence that BWS Inc. has or ever had any ownership interest in the Patents and associated IP.

3.12.1  Tomkins and Ika have manufactured a fiction that BWS **Inc.** owns the patents. In reality it does not and never did.  BWS **Inc.** has offered absolutely no evidence that any patents ever were assigned to it, because such evidence does not exist.  In the absence of any evidence, BWS Inc. has resorted to verbal trickery as its only resource to support the fiction it generated. BWS Inc.'s Notice of Arbitration (Supplement) (the "Notice" in the Motion to Intervene in the Woy NST vs. Farwell Arbitration) conflated two different entities with similar names and identical initials (but different and non-overlapping ownership), Brainwave Science, **Inc.** and Brainwave Science, **LLC.**  (For the sake of clarity and contrary to Tomkins' inconsistent and contradictory abbreviations, Brainwave Science, Inc. is referred to herein as "BWS Inc." and Brainwave Science LLC is referred to as "BWS LLC.")

3.12.2  **Said Notice stated the following: "Claimant Brainwave Science, Inc. ('BWS') is a Delaware corporation…"**

**"On or about June 27, 2012, non-party entities American Scientific Innovations, LLC, Inc., Brain Fingerprinting Laboratories, Inc. and Dr. Lawrence Farwell assigned BWS all rights, title and interest in… patents [the Patents]…The June 27, 2012 assignments were memorialized within Intellectual Property Acknowledgment and Assignment Agreements on June 17, 2013. True and accurate copies of the Intellectual Property Acknowledgment and Assignment Agreements are attached hereto as Exhibit B…**

**"BWS maintains that it lawfully acquired the subject intellectual property…"**

3.12.3  Setting aside the fact that said documents were not valid patent assignments (as described above), BWS **Inc.**'s above statements are a total fabrication that bears no resemblance to the demonstrable facts.  **None of the documents that BWS Inc. says transferred the patents to it (BWS Inc.'s Exhibit B) even mentioned BWS Inc.  The entity mentioned in said documents was Brainwave Science LLC, not Brainwave Science, Inc. (Brainwave Science, Inc. was "BWS" in Tomkins' terminology). "BWS" [Inc.] could not possibly have been the assignee of the Patents when those documents were recorded at the USPTO in 2013, because "BWS" [Inc.] did not exist in 2013. Tomkins and Ika structured it in 2016.**

3.12.4  BWS **Inc.** and BWS **LLC** are different entities with entirely non-overlapping ownership.  Ika personally owns none of BWS LLC.  Ika personally owns all of BWS Inc.  BWS LLC is owned by Dr. Farwell, BFL Inc., HCW, and an undisclosed Silent Partner of HCW. (Exhibits F and AV; note that the latter states the percentages of ownership based on purported dilution of BFL Inc. that BFL Inc. and Dr. Farwell dispute, as further discussed below.)

3.12.5  It is frankly insulting to the arbitrators and judges in the various cases for Tomkins and Ika to presume that said arbitrators and judges will not have the mental acuity to read abbreviations and distinguish between two different entities with the same initials and similar names (and non-overlapping ownership).  Even if the patents had been assigned to BWS LLC (which they

were not), that says nothing about their ever being assigned to BWS Inc. **Tomkins' trickery was to use the initials "BWS," which are common to BWS LLC and BWS Inc., to give the false impression that documents mentioning BWS LLC (and not BWS Inc.) assigned patents to BWS Inc.** (Note, once again, that said documents did not actually assign any patents to BWS LLC either.)

3.13   On or about May 8, 2013, the following members entered into a Restated Limited Liability Company Agreement (the "BWS LLC Agreement," Exhibit F): Dr. Lawrence A. Farwell, HCW (signatory: Krishna Ika), and Brain Fingerprinting Laboratories, Inc. (signatory: Dr. Lawrence A. Farwell).

3.14   For all five of the lawsuits filed by Tomkins in various state and federal jurisdictions designed to be as expensive and inconvenient as possible for Dr. Farwell and the owners of the Patents, the fundamental claim, on which all else depends, is the claim that three specific documents transferred ownership of the Patents either to BWS LLC or to BWS Inc. Even if that claim had merit – which, as described herein, it clearly does not – it would be an abuse of the justice system to file five identical cases in five jurisdictions.

In one of the five cases, Tomkins stated that the Patents were assigned to BWS Inc. in 2013, which is obviously false, because BWS Inc. did not exist until 2016.  In the other four cases, Tomkins stated that the Patents were assigned to BWS LLC (by a document that was not executed by or even known to the undisputed patent owner and included no consideration flowing to the purported assignee), and then BWS Inc. somehow came to own the Patents through some undisclosed means despite the fact that BWS Inc. was never mentioned in any documents filed at the USPTO.

The five cases filed by Tomkins, and the central claim that is identical in all of them, are as follows. In all five cases the wording of the claim is almost identical, and the documents referred to are identical.  (The only difference is that in one case Tomkins states that the Patents were assigned to BWS Inc., and in the other four cases he states that they were assigned to BWS LLC, but BWS Inc. somehow now owns them without ever having been mentioned in any documents filed at the USPTO. In fact, both of these narratives are false.) The respective cases, and the central claim that is identical in all of them, are as follows.

3.14.1   BWS Inc.-Farwell Arbitration

"17. On or about June 27, 2012, non-party entities American Scientific Innovations, LLC, Inc., Brain Fingerprinting Laboratories, Inc. and Dr. Lawrence Farwell assigned BWS [**Inc**.] all rights, title and interest in a) the software enabled invention referred to as "Brain Fingerprinting", b) patents and pending patents (including the right to renew or refresh patents) relating to "Brain Fingerprinting" c) all software and intangible assets relating to "Brain Fingerprinting", d) all modifications, including improvements and derivative works relating to "Brain Fingerprinting, e) the exclusive right maintain any license, patent or copyright of, or relating to, Brain Fingerprinting and f) the right to sue for past, present or future infringement.

"18.   The June 27, 2012 assignments were memorialized within Intellectual Property Acknowledgment and Assignment Agreements on June 17, 2013. True and accurate copies of the Intellectual Property Acknowledgment and Assignment Agreements are attached hereto as Exhibit B.

"19.   Dr. Farwell executed the Intellectual Property Acknowledgment and Assignment Agreements in his individual capacity and as a Managing Partner and Chairman of non-party entities American Scientific Innovations, LLC, Inc. and Brain Fingerprinting Laboratories, Inc."

[Said "Exhibit B" comprises the three Draft Documents referenced herein.]

### 3.14.2   New York Lawsuit

Summons and Complaint

"7. On or about June 17, 2013, [BWS LLC] and Defendant Brain Fingerprinting Laboratories, Inc. entered into an IP Agreement assigning certain rights, title and interests in certain developed intellectual property, including patents, to [BWS LLC]."

Amended Complaint

"8. On or about June 17, 2013, [BWS LLC] and Defendant Brain Fingerprinting Laboratories, Inc. entered into an IP Agreement assigning certain rights, title and interests in certain developed intellectual property, including patents, to [BWS LLC]."

[Said "IP Agreement" comprises the BFL-BWS Draft Document referenced herein.]

"9. On or about June 17, 2013, [BWS LLC] and Defendant Lawrence Farwell, both individually and as Managing Partner of American Scientific Innovations, Inc. entered into an IP agreement assigning certain rights, title, and interest in certain developed intellectual property, including patents, to [BWS LLC]."

[Said "IP Agreement" comprises the Unexecuted ASI-BWS Draft Document and the LF-BWS Draft Document.]

Ika Affidavit:

"9. On or about June 27, 2012, Dr. Farwell agreed to, and did assign to the Company [BWS LLC], all of his rights, title and interest in a) the software enabled invention referred to as "Brain Fingerprinting", b) patents and pending patents (including the right to renew or refresh patents) relating to "Brain Fingerprinting" c) all software and intangible assets relating to "Brain Fingerprinting", d) all modifications, including improvements and derivative works, relating to "Brain Fingerprinting," e) the exclusive right maintain [sic] any license, patent or copyright of, or relating to, Brain Fingerprinting and f) the right to sue for past, present or future infringement.

"10. The June 27, 2012 agreement was memorialized within Intellectual Property Acknowledgment and Assignment Agreements on June 17, 2013.  Attached hereto as Exhibit B are true and accurate copies of the Intellectual Property Acknowledgment and Assignment Agreements."

[Said "Agreements" comprise the three Draft Documents.]

"28. Dr. Farwell conveyed all interest in 'Brain Fingerprinting' technology to the Company [BWS LLC] in 2013."

O'Hara [attorney] Affidavit

"4. On June 17, 2013, Brain Fingerprinting entered into an IP Agreement with an effective date of June 27, 2012 transferring, conveying and assigning al rights, title and

interests in certain brain fingerprinting intellectual property, including associated patents."

### 3.14.3 BWS Inc. vs. NST Lawsuit

"Farwell, in his individual capacity and as an authorized agent to ASI and BFL, assigned to BWS LLC all rights, title and interest in the "Brain Fingerprinting" Intellectual Property. This assignment was memorialized within Nunc Pro Tunc Intellectual Property Acknowledgement and Assignment Agreements dated June 17, 2013."

[Said "Nunc Pro Tunc Agreements" comprise the three Draft Documents referenced herein.]

### 3.14.4 Wyoming Lawsuit

"8.   On or about June 27, 2012, non-party entities American Scientific Innovations, LLC, Inc., Brain Fingerprinting Laboratories, Inc. and Dr. Larry Farwell assigned BWS all rights, title and interest in a) the software enabled invention referred to as "Brain Fingerprinting", b) patents and pending patents (including the right to renew or refresh patents) relating to "Brain Fingerprinting" c) all software and intangible assets relating to "Brain Fingerprinting", d) all modifications, including improvements and derivative works, relating to "Brain Fingerprinting, e) the exclusive right maintain any license, patent or copyright of, or relating to, Brain Fingerprinting and f) the right to sue for past, present or future infringement.

"9. The June 27, 2012 assignments were memorialized within Intellectual Property Acknowledgment and Assignment Agreements on June 17, 2013. True and accurate copies of the Intellectual Property Acknowledgment and Assignment Agreements are attached hereto as Exhibit A.

"10. Dr. Farwell executed the Intellectual Property Acknowledgment and Assignment Agreements in his individual capacity and as a Managing Partner and Chairman of non-party entities American Scientific Innovations, LLC, Inc. and Brain Fingerprinting Laboratories, Inc."

[Said "Exhibit A" comprises the three Draft Documents referenced herein.]

3.15   As an incentive to invest in BWS LLC and thereby purchase a security, Ika Parties Ika, HCW, GOV, and BWS LLC falsely and fraudulently told the Minority Shareholders that Ika and HCW would finance BWS LLC until either a buyout by a large company, or an IPO, or major funding at a reasonable company valuation was obtained, and the Minority Shareholders would realize a substantial profit unless the company failed and went bankrupt.

3.16   As an incentive to invest in BWS LLC and thereby purchase a security, Ika Parties Ika, HCW, GOV, and BWS LLC falsely and fraudulently told the Minority Shareholders that their equity in BWS LLC would be safe from being assigned to anyone else for any reason; that there was no risk of their equity being assigned to anyone else or otherwise forfeited for any reason; that, although their equity would lose value if the company failed, as long as the company was successful their equity would retain its value, they would continue to own said equity, and they would receive a substantial return on their investment; and that, although their equity could be diluted with their consent when and if additional investors joined the LLC, their equity would never be diluted without their consent.

3.17    At the time of the Minority Shareholders' initial investment and for years thereafter, Ika Parties Ika, HCW, GOV, and BWS LLC concealed from the Minority Shareholders the identity of Ika's Silent Partner, Financier, investor, and equity holder and said partner's history, thus concealing from the Minority Shareholders significant, relevant, material information that would have influenced Minority Shareholders' decision to invest in BWS LLC.

3.18    At the time of the Minority Shareholders' initial investment and for years thereafter, Ika Parties Ika, HCW, BWS LLC, and GOV concealed from the Minority Shareholders the fact that soliciting their investment was part of a scheme, in conspiracy with others, perhaps including the undisclosed Silent Partner and the Financier, to gain control of Dr. Farwell's invention of Brain Fingerprinting and associated patents and intellectual property, then to deprive Dr. Farwell and BFL Inc. of any equity in the entity that controlled said invention or any share in the profits of said entity, and then to attempt to fraudulently sell an imitation of Dr. Farwell's invention of Brain Fingerprinting to foreign governments.

3.19    Ika Parties Ika, HCW, BWS LLC, and GOV committed fraud in the inducement in inducing Dr. Farwell and BFL Inc. to sign the BWS LLC Agreement and other prior and subsequent related and similar agreements, amendments, and re-statements, as described above. (Tomkins was not yet involved.  However, he later participated in the furtherance of this same scheme.)

3.20    In executing the BWS LLC Agreement, the Minority Shareholders, both Washington residents at the time, purchased a security upon false and fraudulent representations by Ika Parties Ika, HCW, GOV, and BWS LLC.

3.21    Upon information and belief, an undisclosed Silent Partner became a shareholder in BWS LLC subsequent to its formation, without disclosure of the identity or history of said partner to the Minority Shareholders, such that Ika, HCW, and the Silent Partner collectively owned a controlling interest in BWS LLC.

3.22    Ika Parties Ika, HCW, GOV, BWS LLC, and likely others including the Silent Partner and the Financier, conspired to fraudulently deprive Minority Shareholders of their equity in BWS LLC. (Tomkins was not yet involved.  However, he later participated in the furtherance of this same scheme.)

3.23    The    BWS    LLC    Agreement    (Exhibit F)    stated    the    following: "Section 26. Amendments. This Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Members."

3.24    Ika Parties Ika, GOV, and HCW, BWS LLC and likely other Ika Parties, unilaterally, without the consent of the Minority Shareholders, purported to amend the BWS LLC Agreement. The purported amendment granted the Managing Member, Ika/HCW, the authority to remove the Minority Shareholders as members and to transfer all of the Minority Shareholders' equity to Ika, HCW, the Silent Partner, and/or BWS LLC, without consent of the Minority Shareholders and without due process of law.  The only stated requirement for so doing was that in the Managing Member's (Ika's) sole and absolute opinion the Minority Shareholders had engaged in certain actions – whether the Minority Shareholders had actually engaged in said actions or not, and whether Managing Member's opinion was in good faith or not.

3.25    Ika notified Dr. Farwell, but not Brain Fingerprinting Laboratories, Inc., of his intent to hold a meeting to grant himself the authority to expel the Minority Shareholders and misappropriate the Minority Shareholders' equity as described above.  (Exhibit G).

3.26    Dr. Farwell replied that he would not participate in such a meeting, because to do so would clearly be committing a felony (Exhibit H).

3.27    Ika notified Dr. Farwell, but not Brain Fingerprinting Laboratories, Inc., that he had held said meeting and had granted himself the authority to misappropriate the Minority Shareholders' equity without consent or due process (Exhibit I).

3.28    Dr. Farwell replied that Ika, in so doing, had committed a number of felonies (Exhibit J).

3.29    Ika notified Dr. Farwell, but not Brain Fingerprinting Laboratories, Inc., that he had exercised his purported authority to remove the Minority Shareholders as members of BWS LLC and misappropriate all of the Minority Shareholders' equity, and that Minority Shareholders were no longer members of BWS LLC and no longer had any equity in BWS LLC (Exhibit K).

3.30    Ika Parties paid no compensation to Dr. Farwell and BFL Inc. for Dr. Farwell's and BFL Inc.'s equity in BWS LLC that Ika Parties misappropriated without consent or due process of law (Exhibit K).

3.31    Farwell replied that in misappropriating Farwell's and BFL Inc.'s equity in BWS LLC, Ika Parties had committed a number of felonies and a number of torts, and the misappropriation of Minority Shareholders' equity was not valid and would not stand (Exhibit L).

3.32    Upon information and belief, Tomkins and Ika Parties Ika, HCW, GOV, and BWS LLC, and likely other Ika Parties, then conspired to further defraud Dr. Farwell and BFL Inc. by dissolving BWS LLC and transferring its assets to a new company, BWS Inc.  The apparent motive for this was that Ika Parties must have realized that their scheme to misappropriate Minority Members' equity as described above was illegal and would not stand up in court, and dissolving BWS LLC and transferring its assets to BWS Inc was a second method to defraud the Minority Shareholders of their equity.

3.33    The BWS LLC Agreement stated the following: "Section 10. Capital Contributions, etc. (a) Capital Contributions of Members. Notwithstanding anything herein to the contrary, the Managing Member [HCW] shall make capital contributions to the equity capital of the Company as determined from time to time by the Managing Member; provided that such capital contributions shall be in amounts sufficient to satisfy any obligations to make any required payment pursuant to the terms of that certain Consulting Agreement between the Company and Neuroscience Inventions, LLC dated July 5, 2012."

3.34    Ika and HCW defaulted on their agreement to provide said capital contributions.  In so doing they defaulted on the BWS LLC Agreement.

3.35    On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a preliminary draft document for intellectual property (the "Unexecuted ASI-BWS Draft Document," Exhibit M).  The purpose of the Unexecuted ASI-BWS Draft Document was to outline the terms of an intellectual property assignment that could be executed by the authorized parties after all of the parties had reached an agreement on the compensation that would be exchanged for the assignment of intellectual property.  Dr. Farwell, acting in good faith but erroneously, and believing that (a) that this was simply a draft, as Ika Parties Ika, HCW, and GOV represented it, and (b) that he could persuade the authorized parties to execute a similar document once the compensation for the exchange of intellectual property had been agreed upon and the relevant documents executed, wrote his name on the Unexecuted ASI-BWS Draft Document without verifying who actually had the authority to execute the document.  In fact,

Dr. Farwell did not have the authority to execute a document on behalf of American Scientific Innovations, LLC, the undisputed owner of the Patents at the time. Dr. Farwell (Exhibit AE) and Ben Bryant, General Manager of ASI, (Exhibit AD) both executed sworn affidavits evidencing the same.

3.36    The Unexecuted ASI-BWS Draft Document was not notarized. The signatures thereon were not witnessed. This is consistent with the fact that the Unexecuted ASI-BWS Draft Document was a draft document and not a document intended to be recorded with the USPTO.

3.37    The spaces in the Unexecuted ASI-BWS Draft Document reserved for the description of ASI, the state where it was organized, and the address of ASI were left blank, as is common in an unexecuted draft document, and unheard-of in a legitimate document intended to be recorded with the USPTO.

3.38    On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a second preliminary draft document for intellectual property (the "BFL – BWS Draft Document," Exhibit N), which was signed by Ika representing HCW as general manager of BWS LLC and Dr. Farwell as chairman of BFL Inc..

3.39    On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a third preliminary draft document for intellectual property (the "LF – BWS Draft Document," Exhibit O), which was signed by Ika representing HCW as general manager of BWS LLC and Dr. Farwell.

3.40    Collectively, the Unexecuted ASI-BWS Draft Document, the BFL – BWS Draft Document, and the LF – BWS Draft Document, are referred to herein a the "Draft Documents."

3.41    At the time of the development of the Draft Documents, and for years thereafter and years before, Ika Parties Ika, HCW, BWS LLC, and GOV concealed from the Minority Shareholders the facts that a certain individual was Ika's Silent Partner and that they would later claim on the BWS LLC website and in correspondence that Subu Kota was also involved in BWS LLC, as described above. This is relevant because Kota had pleaded guilty to attempting to sell stolen high-tech secrets to the Soviet Union, a crime very similar to the crimes of which Ika now stands accused in South Africa, Pakistan, Nigeria, and Thailand. The Ika Parties also did not disclose that fraudulently inducing Dr. Farwell and BFL Inc. to sign said documents was part of a scheme to gain control of Dr. Farwell's invention of Brain Fingerprinting and associated Patents, then to deprive Dr. Farwell and BFL Inc. of any equity in the entity that controlled said invention or any share in the profits of said entity, and then to fraudulently misrepresent themselves as experts in psychophysiology, forensic neuroscience, and specifically Brain Fingerprinting and to fraudulently attempt to sell an imitation, counterfeit version of Dr. Farwell's invention of Brain Fingerprinting to foreign governments.

3.42    Upon information and belief, American Scientific Innovations LLC, was founded in 2002, with Ben Bryant serving as General Manager.

3.43    At the time of the execution of all documents referenced herein that involve ASI, the only individual authorized to execute any agreement on behalf of ASI was the General Manager, Ben Bryant. Dr. Farwell and Ben Bryant have executed sworn affidavits stating the same (Exhibits AE an AD respectively).

28

3.44    Dr. Lawrence Farwell has never been an employee, officer, agent, or member of ASI. Dr. Farwell and ASI General Manager Ben Bryant have executed sworn affidavits stating the same (Exhibits AE an AD respectively).

3.45    Dr. Lawrence Farwell has never been authorized to execute any agreement on behalf of ASI, nor did Dr. Farwell ever have apparent authority to do so. Dr. Farwell and ASI General Manager Ben Bryant have executed sworn affidavits stating the same (Exhibits AE an AD respectively).

3.46    On or about January 24, 2003, Dr. Lawrence A. Farwell, inventor, assigned his interest in the Brain Fingerprinting Patents and all associated "Brain Fingerprinting" intellectual property to ASI. (Exhibit P).  Dr. Farwell therefore subsequently had no ownership interest in said patents or associated "Brain Fingerprinting" intellectual property.  Any agreement between Dr. Farwell and Brainwave Science, LLC or any other party could not result in a change in ownership of said patents or any associated "Brain Fingerprinting" rights or intellectual property.

3.47    On or about April 2, 2010, Dr. Lawrence A. Farwell, inventor, assigned his interest in US Patent 7,689,272 and all associated intellectual property to ASI (Exhibit Q). Dr. Farwell therefore subsequently had no ownership interest in the Patents or associated intellectual property.  Any agreement between Dr. Farwell and Brainwave Science, LLC or any other party could not result in a change in ownership of the Patents or associated intellectual property.

3.48    Brain Fingerprinting Laboratories, Inc. has never claimed and has never had any ownership interest in the Patents and could not assign any ownership interest in the Patents to BWS LLC or any other party.

3.49    Brain Fingerprinting, LLC has never claimed and has never had any ownership interest in the Patents and could not assign ownership interest in the Patents to BWS LLC or any other party.

3.50    Upon information and belief, at the time of the Unexecuted ASI-BWS Draft Document, the compensation to ASI for the intellectual property, and compensation to Dr. Farwell for services rendered were still under negotiation.  Dr. Farwell signed several documents that Ika had led him to believe were non-binding drafts, on the level of a letter of intent, that would be replaced by binding, properly written and executed documents that would be executed by the authorized parties only after appropriate compensation had been agreed upon for both Dr. Farwell's services and ASI's intellectual property.

3.51    Dr. Farwell was not concerned at the time of the Unexecuted ASI-BWS Draft Document about the precise wording of the Unexecuted ASI-BWS Draft Document, or about who had standing at ASI, because Ika had led him to believe that before the actual licensing or transfers of Patents to BWS would take place, formal agreements providing for compensation to Dr. Farwell, BFL Inc., and ASI would be executed, and all details could be corrected at that time.  Dr. Farwell wrote his name on said document in good faith, believing that it was a draft that would not be recorded at the USPTO.

3.52    The Unexecuted ASI-BWS Draft Document is null and void and has no legally binding effect because the signatory thereon, Dr. Farwell, was not a member, officer, board member, equity holder, agent, or representative of ASI, the apparent assignor, and had no authority to execute any agreement on behalf of ASI.  Both Dr. Farwell (Exhibit AE) and Ben Bryant (Exhibit AD), the General Manager and only authorized signatory for ASI, executed sworn affidavits evidencing these facts.

3.53    The Unexecuted ASI-BWS Draft Document was written, signed, and recorded at the USPTO without the knowledge or consent of the apparent assignor, ASI. ASI, who owned the Patents, and Dr. Farwell, who signed said Draft Document, never intended it to be recorded at the USPTO or to be employed as a means transfer any interest in the Patents and associated intellectual property.

3.54    Contrary to Tomkins' assertions in the five lawsuits he filed on these identical issues, the Draft Documents are null and void for at least four additional reasons: (1) said documents provided for no quid pro quo, no compensation to the respective apparent assignors, ASI, BFL Inc., and Dr. Farwell;   (2) Ika Parties Ika, HCW, BWS LLC, and GOV committed fraud in the inducement in inducing Dr. Farwell and BFL Inc. to sign the Draft Documents, as described herein; (3) In furtherance of said fraudulent inducement, Ika and HCW defaulted on the BWS LLC Agreement, as described herein; and (4) said documents were preliminary drafts, were not intended by the respective apparent assignors – Dr. Farwell, BFL Inc., and ASI -- to be recorded at the USPTO, and were recorded at the USPTO by BWS LLC without the knowledge or consent of the apparent assignors.

3.55    Aside from the status of the BFL – BWS Draft Document described above, the BFL – BWS Draft Document did not in any case transfer any interest in the Patents and associated intellectual property because BFL Inc. had no such interest.  BWS Inc. had never received a transfer of the Patents and associated intellectual property and never had or claimed any interest in the Patents and associated "Brain Fingerprinting" intellectual property.

3.56    Aside from the status of the LF – BWS Draft Document described above, the LF – BWS Draft Document did not in any case transfer any interest in the Patents and associated intellectual property because at the time of said document Dr. Farwell had no interest in the Patents and associated "Brain Fingerprinting" intellectual property. He had previously transferred the same to ASI, as described above.

3.57    As a consequence of the above, no ownership interests in any Patents or intellectual property was transferred by the Draft Documents.  Consequently, BWS LLC never owned any Patents, any "Brain Fingerprinting" intellectual property, any other related intellectual property, or any intellectual property relevant to the disputes specified herein.  (As described herein, BWS Inc. was not even mentioned in any of said documents, any patent assignments, or any other documents ever filed at the USPTO.)

3.58    The false, invalid, and erroneous recording of the Unexecuted ASI-BWS Draft Document gave the false appearance that BWS LLC owned ASI's Patents, whereas in fact since Dr. Farwell did not have the standing to sign for ASI, the ownership of the Patents and associated intellectual property always continued to rest with ASI.

3.59    Apparently believing that he had obtained all of ASI's interest in the referenced Patents without giving anything in return for it – as evidenced by the lack of compensation in the Unexecuted ASI-BWS Draft Document, the BFL – BWS Document, and the LF – BWS Document -- Ika then refused to sign any agreement for any compensation to ASI, Dr. Farwell, BFL Inc., or anyone else for the intellectual property embodied in the Patents.  (Tomkins was not yet involved.  However, he later participated in the furtherance of this same scheme.)

3.60    The Brain Fingerprinting Patents have all expired. U.S. Patent 5,363,858 expired May 5, 2013. U.S. Patent #5,406,956 expired February 11, 2013.  U.S. Patent #5,467,777 expired September 15, 2014.

3.61    US Patent # 7,689,272 remains in force, and will expire June 7, 2022.

3.62    On or about October 29, 2013, in order to correct the erroneous, false, and unauthorized recording of the Draft Documents at the USPTO and to eliminate any doubt regarding the continued ownership of the Patents and all associated intellectual property by the rightful owner thereof, ASI, Dr. Farwell and BFL Inc. executed the Corrected Nunc Pro Tunc Intellectual Property Acknowledgement and Assignment (the "Correction," Exhibit A) and recorded it at the USPTO.

3.63    ASI's ownership of the Patents does not depend on the Correction.  Since BWS LLC never owned any of the Patents or associated intellectual property, the Correction was unnecessary to secure ASI's uninterrupted ownership thereof.  The Correction did, however, notify the USPTO of the correct situation regarding the same.

3.64    In correspondence with BWS LLC, Dr. Farwell acknowledged that ASI owned and had always owned the Patents, and that the Unexecuted ASI-BWS Draft Document did not transfer ownership in the Patents and associated intellectual property (Exhibit H).

3.65    In correspondence with Dr. Farwell, BWS LLC through its attorney Moreno acknowledged that ASI owned and had always owned the Patents and associated intellectual property, and that the Unexecuted ASI-BWS Draft Document did not transfer ownership in the Patents and associated intellectual property to BWS LLC, and that BWS LLC never had any ownership of the Patents and associated intellectual property.  The "SECTION 18(e)(i) NOTICE - VOTE TO REMOVE MEMBER" from BWS' attorney Moreno to Dr. Farwell (Exhibit G) admitted as follows:

   a.   Said Letter acknowledges one fact that is in true and indisputable:

        "…the transfer" [of ] "the Patents and the Fingerprinting IP to the Company"…"was invalid because Farwell and BFL were not the rightful owners with the requisite right, title and interest to the transferred assets." (page 3, paragraph 4).

        One fact that the Letter clearly admits in the above section -- which is true, accurate, and indisputable -- is that there never existed a valid assignment of any of the Patents or IP to BWS LLC, and thus BWS LLC never owned any of the patents or IP.

   b.   BWS LLC further admits this in said Letter in the following section.

        "Company [BWS]…providing Farwell with equity in the Company, which has caused the Company substantial damage as it received no value in exchange for the equity provided to Farwell and BFL." (page 6, paragraph 1)

        The above statement admits one thing that is factual: The Company received no IP or interest in Patents in exchange for providing Dr. Farwell with equity in the company.  It is false, however, that the Company received no value.  On the contrary, the Company received the services and expertise of the inventor and world's leading expert in Brain Fingerprinting (Dr. Farwell).

31

3.66    In 2012-2016 BWS LLC and BWS Inc paid a retainer of between $8,000 and $11,000 per month to Dr. Farwell on some months, and nothing on other months.

3.67    Dr. Farwell was identified on BWS LLC's website as a Board Member and Officer (Chief Scientist) of BWS LLC (Exhibits V, W, X, Y, and Z).

3.68    In a transparent attempt to intimidate Dr. Farwell, BFL Inc., and ASI, Ika Parties Ika, GOV, and BWS LLC misrepresented the status in BWS LLC of two individuals on the BWS LLC website, www.brainwavescience.com. Said website misrepresented Trump advisor General Michael Flynn ("Flynn") and former FBI deputy director Brian McCauley ("McCauley") as being a members of the Board of Directors (Exhibit Y). This misrepresentation took place in 2016, when Ika and BWS LLC were issuing threats and demands to Dr. Farwell and ASI related to ownership of the Patents (Exhibits G, H, I, J, K, and L).

3.69    Apparently to the same end as described in the paragraph immediately above, Ika Parties Ika, GOV, and BWS LLC misrepresented the status in BWS LLC of Subu Kota. They misrepresented Kota on their website as being on the Board of Directors of BWS LLC (Exhibits W, X, Y, and Z). In correspondence and communications to Dr. Farwell and BWS LLC, Ika and BWS Inc. through their attorneys also misrepresented Kota as being an Officer (Secretary) of BWS LLC (Exhibit K) and investor in BWS LLC (BWS LLC's attorney Tompkins' allegations in Dr. Farwell's deposition in the King County, Washington case). By falsely identifying Kota as being a board member, officer, a major equity holder, and by implication a participant in the alleged fraud and other alleged crimes of Ika and BWS LLC, BWS LLC and Ika damaged the reputation of Kota and attempted to defraud Dr. Farwell.

3.70    Upon information and belief, and contrary to information on the BWS LLC website (Exhibits W, X, Y, and Z) and in the news media (Exhibits AB and AC) and/or misinformation propagated to  Dr. Farwell by Ika Parties (Exhibit K and allegations of BWS Inc.'s attorney Tomkins in Dr. Farwell's deposition in the King County, Washington case), Kota has never been a member, board member, equity holder, investor, or officer of BWS LLC or BWS Inc., and did not participate in any of the alleged fraud or other alleged crimes of Ika, BWS LLC, or BWS Inc. As described herein, Kota is not a part of this action or any other legal action involving the Dr. Farwell, or, to the knowledge of the Dr. Farwell, any other legal action involving any of the parties hereto. Upon knowledge and belief, Kota has committed no crimes or torts related to any of the parties hereto.

3.71    The misinformation presented on the BWS LLC website regarding alleged connections between BWS LLC and Flynn, McCauley, and Kota (Exhibits V and Y), and alleged participation at least of Kota in some of the alleged crimes of Ika and BWS LLC (Exhibits H, J, and K), damaged the reputations of Flynn, McCauley, and Kota, as reported in the press (Exhibits AA, AB, and AC). The same misinformation regarding the alleged connection of Dr. Farwell to all of the above also damaged the reputation of Dr. Farwell (Exhibit AB).

3.72    On or about March 15, 2015, ASI assigned the Patents to Life Science and Technology, LLC. Said assignment was properly executed by Ben Bryant, the General Manager and sole authorized signatory for ASI, and recorded with the US Patent and Trademark Office (Exhibits B, C, D, and E).

3.73   Dr. Farwell is not a member, officer, equity holder, board member, employee, or agent of LST. Dr. Farwell and the President of LST, Ron Kirkendorfer have so stated in sworn affidavits (Exhibits AE and AF respectively).

3.74   Ika Parties BWS LLC, BWS Inc, and Krishna Ika have falsely and fraudulently claimed that they own the Patents and the associated "Brain Fingerprinting" intellectual property disclosed and enabled therein.

3.75   Tomkins, Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika have falsely and fraudulently claimed that they are offering for sale a viable product that embodies the intellectual property described in the Brain Fingerprinting Patents, whereas in fact they are attempting to market a counterfeit product that does effectively implement the invention embodied in the Brain Fingerprinting Patents and does not meet the published and peer-reviewed Brain Fingerprinting Scientific Standards.

3.76   Ika Parties Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika have made multiple false and fraudulent claims on their website (www.brainwavescience.com) and elsewhere regarding the Brain Fingerprinting science and technology that is embodied in the Brain Fingerprinting Patents and that Dr. Lawrence Farwell invented, developed, patented, published in the peer-reviewed scientific literature, successfully applied in criminal cases and in court, and continues to apply. This is documented in Exhibits S and U.

3.77   Tomkins, Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika are falsely and fraudulently attempting to market a counterfeit product that does not have the qualities and attributes of the genuine Brain Fingerprinting invented by Dr. Lawrence Farwell and embodied in the Patents, falsely stating that it is equivalent to Dr. Farwell's invention of "Brain Fingerprinting" and was formerly called "Brain Fingerprinting" (Exhibits S, T, and U).

3.78   Unlike the genuine Farwell Brain Fingerprinting that Dr. Farwell has developed and implemented in the US and throughout the world, the BWS product that Tomkins, Brainwave Science, LLC, Brainwave Science, Inc., and Ika have been attempting to market (Exhibits S, AG, AH, AI, AJ, AK, AL, AM, AN, AO, and AP),:

a.   Has not been shown to be an effective implementation of the Brain Fingerprinting scientific technology that was invented by Harvard-trained neuroscientist Dr. Farwell, who was selected by *TIME* magazine as one of the top innovators this century, "the Picassos or Einsteins of the 21st Century."

b.   Has not been shown to meet the 20 Brain Fingerprinting Scientific Standards that Dr. Farwell has published and that are met by Dr. Farwell's versions of the technology. There is no evidence anywhere that the counterfeit product and faux training by unqualified individuals that BWS Inc. is offering meet these standards.

c.   Has not been tested and proven at the CIA, the FBI, and the US Navy.

d.   Has never been applied in real-world criminal cases, including serial killer JB Grinder and innocent murder convict Terry Harrington.

e.   Has not been proven over 99% accurate in research at the FBI, the CIA, the US Navy, and elsewhere published in the top peer-reviewed scientific journals. There is no evidence anywhere that what BWS Inc is offering has achieved such accuracy in scientific studies or field applications.

    f.  Has never achieved 99% accuracy, or any other proven level of accuracy, in any published research, forensic applications, field applications, or in any other context.

    g.  Has not been featured in major national and international news media, including *CBS Evening News, ABC World News, CNN, PBS, BBC, CBS 60 Minutes, ABC Good Morning America,* the *Discovery Channel, The New York Times, The Washington Post, TIME Magazine,* and *US News and World Report*.

    h.  Has not been proven to be capable of detecting bomb makers, criminals, and terrorists, in peer-reviewed publications.

    i.  Lacks the qualities and achievements of the genuine Brain Fingerprinting invented and developed by Dr. Farwell, as listed herein and in the Exhibits.

    j.  Has produced no evidence that the unproven technology BWS Inc is offering achieves the same accuracy, reliability, or validity of the genuine Brain Fingerprinting practiced by Dr. Farwell and other competent, trained, and credentialed scientists.

3.79  No one employed by or affiliated with Ika Parties Brainwave Science, LLC, Brainwave Science, Inc., and Krishna Ika (Exhibits S, AG, AH, AI, AJ, AK, AL, AM, AN, AO, and AP):

    a.  has ever been trained in Brain Fingerprinting by a Brain Fingerprinting expert;

    b.  has ever conducted or published Brain Fingerprinting research;

    c.  has ever successfully applied Brain Fingerprinting in real-world cases;

    d.  has ever conducted Brain Fingerprinting research for the FBI, the CIA, or the US Navy;

    e.  is qualified to conduct a scientific Brain Fingerprinting test that meets the Brain Fingerprinting Scientific Standards; or

    f.  has been featured in any of the major news sources mentioned above that have featured Dr. Farwell and his genuine Brain Fingerprinting invention.

3.80  Ika Parties have purported to practice, make, and use, and have attempted to sell, the intellectual property embodied in the Brain Fingerprinting Patents without compensation to ASI, the rightful owner of the Patents from the founding of BWS LLC and BWS Inc. until March 15, 2015, or LST, the rightful owner of the Patents since March 15, 2015.

3.81  As a result of the Tomkins' and the other Ika Parties' actions and conduct, Dr. Farwell's ability to practice, market, and sell his invention, to perform on existing Brain Fingerprinting contracts with government agencies and others, and to practice his lifetime profession have been damaged.

3.82  From 2000 through 2006, Dr. Farwell held a service mark on "Brain Fingerprinting" registered with the USPTO (registration number 2308729). Said mark was cancelled October 21, 2006. Subsequently both Dr. Farwell and BWS LLC applied unsuccessfully for said mark (serial number 77247169 and serial number 85775316 respectively). "Brain Fingerprinting" is now in the public domain.

3.83  Ika Parties should have known in 2013, and knew and admitted in 2016, the following facts, all of which remained undisputed until 2019: the Unexecuted ASI-BWS Draft Document was not

executed by ASI, the apparent "assignor" therein, who was then the undisputed owner of the Patents and all associated Brain Fingerprinting intellectual property, and was written, signed, and recorded at the USPTO without the knowledge or consent of ASI, and which consequently transferred no intellectual property to the Ika Parties; the LF-BWS Draft Document was signed by an "assignor" who did not possess the Patents or any associated Brain Fingerprinting intellectual property, having previously assigned the same to ASI, and consequently transferred no intellectual property to the Ika Parties; the BFL-BWS Draft Document was signed by an "assignor" who never had and never claimed any ownership of the Patents and associated Brain Fingerprinting intellectual property, and consequently transferred no intellectual property to the Ika Parties; the Brain Fingerprinting Patents expired in 2013 and 2014 and consequently the Brain Fingerprinting intellectual property embodied and disclosed therein is now in the public domain.  In a transparent attempt to prevent Dr. Farwell from practicing his invention, his profession, and his business, and knowing all of the above facts, the Tomkins filed a false and frivolous lawsuit in federal court in Wyoming (the Wyoming Lawsuit) against LST, the owner of the Patents, based on false statements by Tomkins that directly contradicted the above indisputable and previously undisputed facts.

3.84   Dr. Farwell is a Harvard graduate with a PhD in biological psychology and a former research associate at Harvard Medical School. Dr. Farwell is the inventor of Brain Fingerprinting, as per the Patents and peer-reviewed publications cited below.  Dr. Farwell has published extensively on Brain Fingerprinting in leading peer-reviewed scientific journals (Exhibits AG, AH, AI, AJ, AK, AL, and AM).

3.85   Dr. Farwell has conducted Brain Fingerprinting research at the FBI, the CIA, and the US Navy and published the results in peer-reviewed scientific journals (Exhibits AG, AH, AI, AK, AL, and AM).

3.86   Dr. Farwell has successfully applied Brain Fingerprinting science in real-world criminal cases (Exhibits AG, AH, AI, AK, AL, and AN).

3.87   The science and technology of Brain Fingerprinting that Dr. Farwell invented and developed and his expert testimony on it have been ruled admissible in court (Exhibits AN, AO).

3.88   Dr. Farwell has successfully practiced his profession as a forensic neuroscientist, and specifically as the world's leading expert in the Brain Fingerprinting science and technology that he invented, for over 25 years (Exhibits AG, AH, AI, AJ, AK, AL, AM, AN, AO, and AP).

3.89   Forensic Science Laboratory, New Delhi, India ("FSL") is a client of Dr. Farwell, having purchased a Brain Fingerprinting system and associated training by Dr. Farwell.

3.90   On or about May 14, 2019 Tomkins falsely and fraudulently libeled Dr. Farwell in communications to Dr. Farwell's client FSL.  Tomkins falsely accused Dr. Farwell of fraud, theft, sabotage, lying, dishonesty, bad faith, duplicity, unethical business practices, and other illicit and undesirable actions.

3.91   On or about May 14, 2019 Tomkins wrote and caused to be delivered a letter ("Tomkins' Libelous Letter," Exhibit AU) to Dr. Farwell's client FSL.

3.92   Tomkins' Libelous Letter falsely, fraudulently, and libelously claimed that Dr. Farwell had stolen hardware comprising Ika Parties' Counterfeit Product from Defendant Brainwave Science, Inc.

3.93    Tomkins' Libelous Letter falsely, fraudulently, and libelously claimed that Dr. Farwell had sold to Dr. Farwell's client FSL said allegedly stolen hardware (comprising an EEG headset, as described in documents accompanying Tomkins' Libelous Letter). It would be ludicrous for Dr. Farwell -- the inventor and developer of the genuine Brain Fingerprinting, who had been applying and selling his genuine Brain Fingerprinting system for decades before Ika Parties BWS LLC and BWS Inc existed -- would steal and attempt to sell a counterfeit system such as Ika Parties' Counterfeit Product. Moreover, such an accusation must be false for the following reason. The headset that Dr. Farwell and his affiliated company Brain Fingerprinting, LLC sold to FSL (as part of the Farwell Brain Fingerprinting system purchased by FSL) was a custom headset ("Dr. Farwell's Custom Headset") designed by Dr. Farwell and custom manufactured in the USA. Based upon information and belief, Ika Parties Ika, BWS LLC, and BWS Inc. only use and only have ever possessed entirely different headsets manufactured in Taiwan, and all of their software works only with said Taiwanese headsets and not with Dr. Farwell's Custom Headset. On information and belief, no one other than Dr. Farwell and his affiliated companies, Brain Fingerprinting, LLC and Brain Fingerprinting Laboratories, Inc., possesses Dr. Farwell's Custom Headset or any instantiation thereof. Ika Parties have never possessed any instantiation of Farwell's Custom Headset – the headset that Dr. Farwell sold to FSL. Consequently, any allegation that Dr. Farwell stole from Ika Parties the Farwell's Custom Headset that he sold to FSL (or anyone else) must be false, fraudulent, and libelous or slanderous.

3.94    Tomkins' allegation that Dr. Farwell stole a headset from Ika Parties Ika and Brainwave Science Inc. is false and libelous with regard to the false accusation of theft.

3.95    The allegation or implication in Tomkins' Libelous Letter that Dr. Farwell stole and then sold a headset from Ika Parties Ika and Brainwave Science Inc. is additionally false and libelous with regard to the false accusation that Dr. Farwell sold stolen goods.

3.96    Tomkins' allegation or implication in Tomkins' Libelous Letter that Dr. Farwell sold Ika Parties' Counterfeit Product to FSL is additionally false and libelous in that such a sale would never be undertaken by Dr. Farwell or any other legitimate forensic scientist with expertise in Brain Fingerprinting. In falsely alleging that Dr. Farwell sold Ika Parties' Counterfeit Product, Tomkins implies that in the course such sale Dr. Farwell must have misrepresented that Ika Parties' Counterfeit Product had value and was worth buying – which it does not and is not, and that Ika Parties' Counterfeit Product had his endorsement or was represented by him – which it does not and is not. Such representations or implications are damaging to Dr. Farwell's reputation, stature, and professional success as a forensic scientist and expert in genuine Brain Fingerprinting. No legitimate forensic scientist with expertise in Brain Fingerprinting would make such misrepresentations regarding Ika Parties' Counterfeit Product or any other product that fails to meet the Brian Fingerprinting Scientific Standards.

3.97    Tomkins' Libelous Letter also threatened Dr. Farwell's client FSL with criminal prosecution for possession of stolen property, on the basis of having purchased the same from Dr. Farwell.

3.98    Tomkins' Libelous Letter falsely and libelously stated that Dr. Farwell is being investigated by the FBI. No such investigation exists. Ika spoke to an FBI agent in 2016 regarding the various disputes at the time. No investigation ensued, and no investigation was taking place at the time of Tomkins' Libelous Letter.

3.99    Tomkins' Libelous Letter falsely stated that Brainwave Science, Inc. is actively and fully cooperating with a (non-existent) FBI investigation of Dr. Farwell. No such cooperation is taking

place. No such investigation is taking place, and no such investigation or cooperation was taking place at the time of Tomkins' Libelous Letter.

3.100 In the context of security clearances, Dr. Farwell has been investigated by numerous national and international law enforcement, intelligence, counterterrorism, and military agencies around the world, beginning with the FBI and the CIA in the early 1990s.

3.101 Throughout the last quarter of a century, including over 20 years prior to the existence of Ika Parties BWS LLC and BWS Inc., Dr. Farwell has cooperated and collaborated with national and international law enforcement, intelligence, counterterrorism, and military agencies around the world, beginning with the FBI and the CIA in the early 1990s, and has provided said agencies with his professional expertise as a forensic neuroscientist as well as his invention of Brain Fingerprinting.

3.102 Based upon knowledge and belief and as described below and documented in the exhibits hereto, Ika Parties Ika, Tomkins, BWS LLC, BWS Inc. and their employees have never collaborated with national and international law enforcement, intelligence, counterterrorism, or military agencies and provided said agencies with professional expertise in forensic neuroscience, because Ika Parties lack any training, certification, qualification, credentials, education, knowledge, or expertise in forensic neuroscience, and specifically in the forensic neuroscience of Brain Fingerprinting.

3.103 Tomkins' Libelous Letter contained additional false, fabricated, and remarkably fanciful hearsay apparently designed to disparage and defame Dr. Farwell and his science and technology.

3.104 Tomkins' actions, including but not limited to libeling Dr. Farwell and threatening Dr. Farwell's client FSL with criminal prosecution for doing business with Dr. Farwell, can only reasonably be understood as an attempt to interfere with Dr. Farwell's contract and business relationship with FSL and Dr. Farwell's other clients, to defame Dr. Farwell, and to disparage Dr. Farwell's science and technology, and to weaken or intimidate Dr. Farwell as a potential witness in future criminal prosecutions of Ika based on authorities having accused Ika of fraud in Pakistan, South Africa, Nigeria, and Thailand, as Dr. Farwell has testified as a witness in a previous fraud case against Ika, as described herein.

3.105 In Dr. Farwell's professional opinion as the inventor of Brain Fingerprinting, the world's leading expert in the science of Brain Fingerprinting, and the most experienced expert in applying Brain Fingerprinting in criminal, counterterrorism, and counterintelligence cases with national law enforcement and national security agencies around the world, any misguided attempt by unqualified persons to apply counterfeit technology, such as Ika Parties' Counterfeit Product, which Ika Parties Ika, BWS LLC, and/or BWS Inc are attempting to market, in real criminal or counterterrorism cases would be a serious threat to national security and justice. Other experts agree with this opinion, as documented below, and no known Brain Fingerprinting expert disagrees with this assessment.

3.106 On or about March 18, 2019, Dr. Farwell received the first of a series of communications from Donald Buti Ramfolo ("Ramfolo"), and his associates Jacob Madikiza ("Madikiza"), and Christo Botes in South Africa regarding their plans to collaborate with Dr. Farwell and Brain Fingerprinting, LLC to bring Dr. Farwell's Brain Fingerprinting technology to South Africa. General Ramfolo is a Brigadier General (ret) Military Intelligence in South Africa. Madikiza is a retired Deputy Director General, South African Secret Service. Some of these communications

from General Ramfolo contained information regarding alleged fraud by Ika Parties Ika and BWS Inc involving the science and technology of Brain Fingerprinting that Dr. Farwell invented and developed. General Ramfolo provided the facts contained in his sworn affidavit (Exhibit AR). See the Exhibit for details. Madikiza did not provide an affidavit because he was not present at the meetings discussed, and all of the information he had constituted hearsay. The affidavit of General Ramfolo contains the following facts.

3.107 Based upon information and belief and according to General Ramfolo, Ika Parties Ika, BWS LLC, and/or BWS Inc made false and fraudulent claims regarding Brain Fingerprinting and the Ika Parties' Counterfeit Product in an attempt to sell Ika Parties' Counterfeit Product to the South African government.

3.108 Based upon information and belief and according to General Ramfolo, when General Ramfolo asked Ika to provide information regarding the acceptance in court that Ika Parties Ika, BWS LLC, and/or BWS Inc claimed that Ika Parties' Counterfeit Product had achieved, the only references Ika Parties Ika, BWS LLC, and/or BWS Inc provided were to court cases in which Dr. Lawrence Farwell and his genuine Brain Fingerprinting science were involved, cases that predated the existence of BWS LLC and BWS Inc. and had nothing to do with Ika, BWS LLC, BWS Inc, and Ika Parties' Counterfeit Product.

3.109 Over the last three years Dr. Farwell has collaborated with Waqar Aslam and Firas Hamdi ("Hamdi") the principals of Prime Technologies in Pakistan. Together they have successfully implemented Brain Fingerprinting science and technology in several law enforcement, intelligence, and counterterrorism agencies in Pakistan and assisted those agencies in solving criminal, counterterrorism, and counterintelligence cases. Mr. Hamdi has twice successfully completed training in Brain Fingerprinting science and technology that Dr. Farwell conducted.

3.110 According to Hamdi's sworn affidavit (Exhibit AS), he witnessed an attempt by Ika Parties Ika, BWS LLC, and/or BWS Inc to defraud an intelligence agency of the Pakistani government on or about April 15, 2019.

3.111 Based upon information and belief and according to Hamdi, Ika Parties Ika, BWS LLC, and/or BWS Inc through their representative attempted to sell said agency their counterfeit product, fraudulently represented that their product was the same as Dr. Farwell's Brain Fingerprinting, and fraudulently represented that they and their employees were qualified to practice forensic neuroscience, specifically Brain Fingerprinting, and to train others to do so.

3.112 Based upon information and belief and according to Hamdi, Ika Parties Ika, BWS LLC, and/or BWS Inc' representative, on instructions from Ika Parties Ika, BWS LLC, and/or BWS Inc, falsely represented to the Pakistani government that BWS represented Dr. Lawrence Farwell and his Brain Fingerprinting technology, whereas in fact Dr. Farwell has no relationship with BWS, and they do not have his Brain Fingerprinting technology.

3.113 Based upon information and belief and according to Brain Fingerprinting expert Hamdi, any attempt to apply Ika Parties' Counterfeit Product in law enforcement, counterterrorism, or intelligence operations would have "disastrous consequences." In his affidavit (Exhibit AS), Hamdi stated the following: "My experience in applying the genuine Farwell Brain Fingerprinting in collaboration with Dr. Farwell and agencies of Pakistan leads me to the conclusion that if Ika and BWS ever succeeded in selling their counterfeit technology and training by unqualified personnel to any major intelligence, counterterrorism, or law enforcement agency; this would be

a major threat to national security and justice. There is no evidence that BWS' and Ika's counterfeit technology works at all, let alone with high accuracy. Their 'trainers' are not qualified to practice forensic neuroscience, specifically Brain Fingerprinting, let alone to train others to do so. Applying such an unproven and untested technology, and attempting to apply training by such unqualified personnel, would in my opinion be likely to have disastrous consequences for counterterrorism, counterintelligence, and law enforcement efforts."

3.114 On or about May 10, 2017, Dr. Farwell received the first of a series of communications regarding the science and technology of Brain Fingerprinting that Dr. Farwell invented and developed from Jose Kuruvilla ("Kuruvilla"), CEO of Mainland Security, Inc., with headquarters in Hong Kong and Thailand. Mr. Kuruvilla informed Dr. Farwell of the following facts.

3.115 Based upon information and belief and according to Kuruvilla, on or about May 1, 2017, Ika Parties Ika, BWS LLC, and/or BWS Inc attempted to defraud the government of Thailand by selling them their counterfeit technology and associated training by unqualified personnel.

3.116 Based upon information and belief and according to Kuruvilla, Ika gave a demonstration of their counterfeit technology in which he purported to be measuring and analyzing brainwaves and achieving an accurate result with Ika Parties' Counterfeit Product, which Ika misrepresented as genuine Brain Fingerprinting.

3.117 Based upon information and belief and according to Kuruvilla, after placing a headset on a subject and running the software, Ika told the government of Thailand that they had collected sufficient data, and now they would analyze the data.  He said the results of the analysis of the data they had just collected would appear on the screen.

3.118 Based upon information and belief and according to Kuruvilla, Kuruvilla observed that Ika did not attempt to analyze the data as he falsely represented to the government he was doing.  Instead, he simply accessed and displayed a previously developed graphics file that appeared to show the results of a brainwave test.  Ika fraudulently represented that the previously produced graphics file was actually a representation of the results of computer analysis of the data that they had just purportedly collected. This is documented in Exhibit AT.

3.119 Based upon information and belief and according to Kuruvilla, Ika told Kuruvilla that they had bought the system they were presenting from Dr. Farwell and that they were still paying royalties to Dr. Farwell.  Dr. Farwell knows both of these statements to be false and fraudulent. Neither of those events ever happened.

3.120 Based upon information and belief and according to Kuruvilla, Ika lied to Kuruvilla in an attempt to sell the Ika Parties' Counterfeit Product. In a phone conversation with Dr. Farwell on or about May 12, 2019, Kuruvilla stated, "When people are lying I don't need a lie detector.  I told my people we will not do business with [Ika Parties Ika, BWS LLC, and/or BWS Inc]."

3.121 On or about June 28, 2017, Dr. Farwell received the first of a series of communications regarding the science and technology of Brain Fingerprinting that Dr. Farwell invented and developed from Bolaji Oye ("Oye"), Chief Operating Officer of Piqure Solutions LTD in Nigeria. He informed Dr. Farwell of the following facts:

3.122 Based upon information and belief and according to Oye, Ika Parties Ika, BWS LLC, and/or BWS Inc attempted to defraud the Nigerian Defense Intelligence Agency by selling them Ika Parties' Counterfeit Product and associated training by unqualified personnel.

3.123 Based upon information and belief and according to Oye, the Nigerian NSA, the Nigerian Defense Intelligence Agency, and Oye detected and thwarted the attempted fraud by Ika Parties Ika, BWS LLC, and/or BWS Inc.

3.124 Oye stated the following in an email to Dr. Farwell on July 8, 2017.  "Just for your information, the Nigerian Government is about to be fleeced by Brainwave Science...This meeting I am having this morning will be the start of pulling the plug on BrainWave Science in Nigeria. We have already contacted the Nigerian NSA on this matter, but we are also approaching the DEFENCE INTELLIGENCE AGENCY (institution that wants to buy the item) to make them aware that BRAINWAVE SCIENCE [BWS Inc.] is all a con."  The Nigerian government recognized these facts, and did not purchase Ika Parties' Counterfeit Product.

**Signature Page Immediately Follows**

DATED this __ day of __, 2021

_____

**Dr. Lawrence A. Farwell**

1825 34th Ave NE
Suite L-155
Quil Ceda Village, WA 98271
email: brainwave@larryfarwell.com
phone (206) 905-1009
mobile (206) 250-5516

**Addendum September 23, 2021**

Mr. Chris Chang
Washington State Bar Association
Office of Disciplinary Counsel
September 23, 2021

Re: ODC File: 21-01031

Dear Mr. Chang:

I have received your letter of September 17, 2021.

There have been two major developments in the case against attorneys Brett Wieburg and Paul Tomkins since my original complaint. I have also been informed of another possible crime and ethics violation by Tomkins and Wieburg, or at least by their client, Krishna Ika, presumably with their knowledge and/or cooperation. This latest accusation came from a reliable source, although I have not independently verified it.

Federal courts have dismissed yet another patently frivolous lawsuit filed by Tomkins and Wieburg, the BWS Inc. vs. NST Lawsuit in the US District Court for Western Washington described in my original complaint.

Apparently this fourth failed case, along with the imminent likely dismissal of the New York case, have not deterred Tomkins – and, to the degree that he is involved, Wieburg -- from the strategy of attempting to keep his employer out of prison by attacking the expert witnesses whose testimony will be key in criminal fraud cases against Ika in South Africa, Pakistan, Thailand, and Nigeria, where Ika currently stands accused of fraud (and likely other similar cases in other jurisdictions), when and if Ika is brought to justice.

Ika and Tomkins have filed yet another patently frivolous lawsuit, Case Number CV 21-4402 in the US District Court for the Eastern District of New York (where, incidentally, none of the parties reside or do business),.

This new lawsuit borders on the absurd, and is even more frivolous and fanciful than the several previous cases that have been dismissed. The central premise of the case is that Dr. Farwell, the inventor and world's leading expert on Brain Fingerprinting, and Dr. Thierry Maison, former CTO of Brainwave Science, LLC ("BWS") have stolen BWS' "trade secrets" regarding Brain Fingerprinting. This is the equivalent of some businessman with zero knowledge or expertise in aeronautics -- who had never designed, built, or flown an airplane -- accusing the Wright brothers of stealing the intellectual property of the airplane from him.

Dr. Farwell developed and patented the original systems for Brain Fingerprinting, including the first one at the University of Illinois, another system developed in collaboration with Westinghouse with Dr. Farwell as a consultant, the system developed under CIA contract and applied at the CIA and the FBI, and another system developed at Human Brain Laboratories, Inc. before BWS existed. The patents have now expired, and all of the substantive information required to implement Dr. Farwell's Brain Fingerprinting invention is also in the public domain due to disclosure in the scientific literature, white papers, and other widely circulated information. Many other laboratories around the world have implemented the Brain Fingerprinting system using information readily available in the public domain.

BWS, too, produced a somewhat similar system. Like all the others, it was based on the information that Dr. Farwell had developed and placed in the public domain. Unlike various other systems developed in various laboratories around the world, however, the BWS system was not effective, valid, scientifically and technologically sound, or successful. Dr. Farwell and other experts have accused BWS, in sworn affidavits, of producing a counterfeit system that (a) attempted and failed to adequately implement the Brain Fingerprinting algorithms; (b) failed to

meet the established Brain Fingerprinting scientific standards; (c) has never been tested in a scientific laboratory or published in the scientific journals; (d) has never conducted a successful Brain Fingerprinting field test; and (e) has never been successfully marketed or sold to any client or implemented in any country.

The absurd premise of BWS latest lawsuit is that Dr. Farwell and Dr. Maison stole BWS' failed, untested, unproven, and counterfeit system from BWS.

Dr. Farwell and Dr. Maison have developed a new implementation of Dr. Farwell's invention, using totally different components – a US-made EEG headset and associated sensors, amplifiers, and digital signal processors that are fundamentally different and totally incompatible with the software used by BWS to collect brainwaves from the headsets in their system, which they bought from a company in Taiwan.

The central claim of Ika and Tomkins new suit is that in order to develop their latest system Dr. Farwell's and Dr. Maison's stole "trade secrets" from BWS.   It is unimaginable that Dr. Farwell, the inventor and developer of four other successful, proven, and effective Brain Fingerprinting systems, would have any reason to steal BWS' failed, untested, counterfeit system.  Moreover, everything of substance in the BWS system was either in the public domain before BWS existed or is disclosed in the expired patents, so there was nothing there to steal.

I can document that the one summary paragraph in the complaint alone contained five demonstrably and unequivocally false statements, comprising the only substantive statements in the case summary.

To support their absurd claim, Ika and Tomkins faked tests and fabricated imaginary test results, the same crime that Ika stands accused of in the criminal system by authorities in other countries (notably Thailand).

This latest crime by Ika and Tomkins is a continuation and elaboration of the RICO scheme described in my original complaint.

The role of Wieburg, if any, in this latest crime by Ika and Tomkins and the entire RICO scheme is unknown at this time, and remains to be discovered in the relevant investigations.

One additional, as yet unproven, accusation has come to my attention: That Ika and Tomkins have fraudulently sought and/or obtained government contracts for Government Works, Inc. and/or eHealthCare Works Corp (both associated with BWS LLC and the latter a 51% owner thereof) based on a false representation that the company was a woman-owned business owned and controlled by Ika's wife.  The accusations stated that the company may have at one time been principally owned and controlled by Ika's wife, but at the time of recent applications and contracts was not.  This crime, if proven, is relevant to the investigation of Wieburg and Tomkins because such a scheme would be a means for Ika to finance BWS' frivolous lawsuits, which is a necessity because BWS has never made any money in legitimate business operations.

Sincerely,

Dr. Lawrence A. Farwell, PhD

44

**Exhibits**

**The following are brief descriptions of each of the Exhibits hereto, along with links where the Exhibits can be accessed online.**

**A.  List of All Exhibits, With Links**

https://farwellbrainfingerprinting.com/pdf/Ex/DrFarwellComplaintReTomkinsListOfExhibits2102.pdf

**B.  All Exhibits in a Single Document**

https://farwellbrainfingerprinting.com/pdf/Ex/DrFarwellComplaintReTomkinsAllExhibits2101.pdf

**C.  Individual Exhibits With Separate Links**

(The below list is the same as the list in the above document "List of All Exhibits With Links")

**Exhibit A**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_A_CorrectionUSPTO-BWS-ASI.pdf

A correction filed at the USPTO that informed the USPTO that the Draft Documents were filed in error and did not constitute patent assignments.

**Exhibits B, C, D, and E**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_B_AssignmentRecordationForm3OldUSPatentsAsRecordedUSPTO.pdf

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_C_PatentAssignmentASI-LST-OldUSPatents1501Signed.pdf

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_D_AssignmentRecordationFormCurrentUSPatent7689272AsRecordedUSPTO.pdf

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_E_PatentAssignmentASI-LST-CurrentUS-UKPatents1502Signed.pdf

March 15, 2015, Assignment of the three expired Patents from American Scientific Innovations, LLC to Life Science and Technology, LLC.  Said assignment was properly executed by Ben Bryant, the General Manager and sole authorized signatory for ASI, and recorded with the US Patent and Trademark Office.

**Exhibit F**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_F_BrainwaveScienceLLCRevisedAgreement-05-18-2013-SignedEditable.pdf

Brainwave Science, LLC Limited Liability Company agreement

45

**Exhibit G**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_G_LettertoFarwell-Section18eiNotice-VotetoRemove.pdf

A letter in which Ika's attorney Moreno told Dr. Farwell of Ika's intent to hold a meeting to unilaterally grant himself the authority to remove the Minority Shareholders and misappropriate the equity of the Minority Shareholders in Brainwave Science, LLC to himself.

**Exhibit H**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_H_DrFarwellReplyToNoticeOfAmendmentAndLetterToFarwellSection18-1603.pdf

Dr. Farwell's reply to Ika's attorney's letter (Exhibit G) in which Dr. Farwell declined to participate in Ika's proposed meeting, as doing so would involve committing a felony.

**Exhibit I**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_I_NoticeofAmendmenttoOperatingAgreementwExhibits.pdf

A letter in which Ika's attorney Moreno notified Farwell that Ika had held a meeting and had granted himself the authority to remove the Minority Shareholders in Brainwave Science, LLC and misappropriate the Minority Shareholders' equity to himself without consent or due process.

**Exhibit J**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_J_FarwellEmailReplyToMorenoNoticeOfAmendment1901.pdf

A letter in which Dr. Farwell replied that Ika, in taking the actions described by Ika's attorney Moreno in Exhibit I, had committed a number of felonies.

**Exhibit K**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_K_MemberRemovalPursuantToSection81OfTheOperatingAgt.pdf

A letter from Ika's attorney Moreno to Dr. Farwell in which he stated that Ika had removed the Minority Shareholders from Brainwave Science, LLC and had not paid them any compensation for their equity.

**Exhibit L**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_L_FarwellMorenoFinalFewEmails1601.pdf

Emails between Dr. Farwell and Brainwave Science, LLC's attorney Moreno regarding Ika's removal of the Minority Shareholders in Brainwave Science, LLC and misappropriation of their equity to himself without consent or due process.

**Exhibit M**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_M_UnexecutedDraftDocumentASI-BWS.pdf

On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a preliminary draft document for intellectual property (the "Unexecuted ASI-BWS Draft Document," Exhibit M, referred to in Brainwave Science, Inc.'s pleadings as the "Nunc Pro Tunc Intellectual Property Assignment").  The purpose of this document was to outline the terms of an intellectual property assignment that could be executed by the authorized parties after all of the parties had reached an agreement on the compensation that would be exchanged for the assignment of intellectual property.  Ika's attorney erroneously recorded said document as a "patent assignment," even though it was not executed by or even known to the undisputed patent owner at the time, American Scientific Innovations, LLC, and contained no compensation flowing to the purported "assignor." This erroneous recording was later corrected at the USPTO by a document executed by Dr. Farwell and Brain Fingerprinting Laboratories, Inc.

**Exhibit N**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_N_PatentDocBFL-BWS.pdf

On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a second preliminary draft document for intellectual property (the "BFL – BWS Draft Document," Exhibit N). The purpose of this document was to outline the terms of an intellectual property assignment that could be executed by the authorized parties after all of the parties had reached an agreement on the compensation that would be exchanged for the assignment of intellectual property.  Ika's attorney erroneously recorded said document as a "patent assignment," even though it was not executed by or even known to the undisputed patent owner at the time, American Scientific Innovations, LLC, and contained no compensation flowing to the purported "assignor." The apparent "assignor," Brain Fingerprinting Laboratories, Inc., never had and never claimed any interest in the Patents, and thus could not assign any interest to BWS LLC (or anyone). This erroneous recording was later corrected at the USPTO by a document executed by Dr. Farwell and Brain Fingerprinting Laboratories, Inc.

**Exhibit O**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_O_PatentDocLF-BWS.pdf

On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a third preliminary draft document for intellectual property (the "LF – BWS Draft Document," Exhibit O). The purpose of this document was to outline the terms of an intellectual property assignment that could be executed by the authorized parties after all of the parties had reached an agreement on the compensation that would be exchanged for the assignment of intellectual property.  Ika's attorney erroneously recorded said document as a "patent assignment," even though it was not executed by or even known to the undisputed patent owner at the time, American Scientific Innovations, LLC, and contained no compensation flowing to the purported "assignor." The apparent "assignor," Dr. Farwell at this time had no ownership interest in the Patents, and thus could not assign them to BWS LLC (or anyone). This erroneous recording was later corrected at the USPTO by a document executed by Dr. Farwell and Brain Fingerprinting Laboratories, Inc.

**Exhibit P**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_P_AssignmentPatents1-3LF-ASI202.pdf

Patent assignment from Dr. Farwell to American Scientific Innovations, LLC (ASI). On or about January 24, 2003, Dr. Lawrence A. Farwell, inventor, assigned his interest in the Brain Fingerprinting Patents and all associated "Brain Fingerprinting" intellectual property to ASI.

**Exhibit Q**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_Q_AssignmentPatent4LF-ASI1001.pdf

On or about April 2, 2010, Dr. Lawrence A. Farwell, inventor, assigned his interest in US Patent 7,689,272 and all associated intellectual property to American Scientific Innovations, LLC.


**Exhibit S\***

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_S_DifferencesBetweenFarwellBrainFingerprintingAndBWS1905.pdf

Differences between genuine Farwell Brain Fingerprinting and Brainwave Science Inc.'s counterfeit product.

**Exhibit T**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_T_SummaryOfFraudOnBWSWebsiteGenNK1906.pdf

Summary of fraud on Brainwave Science, Inc.'s website as of December 5, 2018. (Note: Much of this material has since been removed.)

**Exhibit U**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_U_FraudulentClaimsOnCurrentBWSWebsiteGenNK1907.pdf

Fraudulent claims on Brainwave Science, Inc.'s website as of December 5, 2018. (Note: Much of this material has since been removed.)

**Exhibit V**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_V_BrainwaveScienceWebsiteArchivesWaybackMachine1901.pdf

Summary of previous versions of Brainwave Science, LLC's and Brainwave Science, Inc.'s website as per the Wayback Machine (http://www.wayback.com/).

**Exhibit W**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_W_BrainwaveScienceWebsiteBoardOfDirectors2016-06-23.pdf

Brainwave Science, LLC Board of Directors according to BWS LLC's website June 23, 2016: Krishna Ika, Dr. Lawrence Farwell, Ravi Ika, and Subu Kota.

**Exhibit X**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_X_BrainwaveScienceWebsiteBoardOfDirectors2016-07-08.pdf

Brainwave Science, LLC Board of Directors according to BWS LLC's website July 8, 2016: Krishna Ika, Dr. Lawrence Farwell, Ravi Ika, and Subu Kota.

**Exhibit Y**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_Y_BrainwaveScienceWebsiteBoardOfDirectors2016-07-24.pdf

Brainwave Science, LLC Board of Directors according to BWS LLC's website July 24, 2016: Krishna Ika, Dr. Lawrence Farwell, General Michael Flynn, Brian McCauley, and Subu Kota.

**Exhibit Z**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_Z_BrainwaveScienceWebsiteBoardOfDirectors2016-08-24.pdf

Brainwave Science, LLC Board of Directors according to BWS LLC's website August 24, 2016: Krishna Ika, Dr. Lawrence Farwell, and Subu Kota.

**Exhibit AA**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AA_FraudClaimsTrailBrainwaveCompanyBostonBusinessJournal1902.pdf

*Boston Business Journal*, 01/05/2018, Brainwave Science: "Fraud claims trail 'brainwave' company tied to Michael Flynn."

**Exhibit AB**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AB_BloombergOnFlynnArticle1602.pdf

*Bloomberg*, 12/23/2016, Brainwave Science: "Trump Aide Partnered With Firm Run by Man With Alleged KGB Ties."

**Exhibit AC**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AC_Michael_Flynn_had_role_in_firm_co-led_by_man_who_tried_to_sell.pdf

*The Washington Post / AP / Chicago Tribune,* 12/21/2016, Brainwave Science: "Michael Flynn had role in firm co-led by man who tried to sell material to the KGB."

**Exhibit AD**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AD_BenBryantAffidavitNo2.pdf

Sworn affidavit of Ben Bryant, President and General Manager of American Scientific Innovations, LLC (ASI), stating that Dr. Farwell assigned the Brain Fingerprinting Patents to ASI, ASI never assigned said Patents to Brainwave Science LLC or Brainwave Science Inc., and ASI assigned said Patents to Life Science and Technology, LLC, and Dr. Farwell has never been a

member, director, executive, officer, agent, or employee of ASI, and has never had any real or apparent authority to bind or represent ASI.

**Exhibit AE**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AE_FarwellAffidavitBWSvsLSTIMotion ToInterveneSignedNotarized1902.pdf

Sworn affidavit of Dr. Lawrence Farwell stating that he is not a member, equity holder, officer, employee, board member, agent, or representative of American Scientific Innovations, LLC or Life Science and Technology, LLC.

**Exhibit AF**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AF_KirkendorferAffidavitResizedFromP NG1902.pdf

Sworn affidavit of Ronald Kirkendorfer stating that Dr. Farwell is not a member, equity holder, officer, employee, board member, agent, or representative of Life Science and Technology, LLC.

**Exhibit AG**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AG_Dr_Lawrence_Farwell_Brain_Finger printing_Field_Studies.pdf

Farwell, L.A.., Richardson, D.C., & Richardson, G.M. (2013). Brain fingerprinting field studies comparing P300-MERMER and P300 brainwave responses in the detection of concealed information. DOI 10.1007/s11571-012-9230-0, *Cognitive Neurodynamics 7*(4): 263-299

**Exhibit AH**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AH_Farwell_et_al_2014_Brain_Fingerpri nting_US_Navy_Study.pdf

Farwell L.A., Richardson D.C., Richardson G.M .and Furedy J.J. (2014). Brain fingerprinting classification concealed information test detects US Navy military medical information with P300. *Frontiers in Neuroscience 8*:410. doi: 10.3389/fnins.2014.00410

**Exhibit AI**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AI_Dr-Lawrence-Farwell-Brain-Fingerprinting-P300-MERMER-Review.pdf

Farwell, L.A. (2012). Brain fingerprinting: a comprehensive tutorial review of detection of concealed information with event-related brain potentials, *Cognitive Neurodynamics 6*:115-154, DOI 10.1007/s11571-012-9192-2.

**Exhibit AJ**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AJ_Farwell-Donchin-1991-Psychophysiology-Brain-Fingerprinting.pdf

Farwell, L. A. and Donchin, E. (1991). The Truth Will Out: Interrogative Polygraphy ("Lie Detection") With Event-Related Brain Potentials. Psychophysiology, 28:531-547.

**Exhibit AK**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AK_LieDetectionEncyclopediaOfForensicSciencesFarwellCorrectBFL.pdf

Farwell, L.A. (2013). Lie Detection. In *Encyclopedia of Forensic Sciences*, 2nd Edition. Oxford: Elsevier.

**Exhibit AL**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AL_Dr-Lawrence-Farwell-Brain-Fingerprinting-Detection-of-Concealed.pdf

Farwell, L. (2014). Brain Fingerprinting: Detection of Concealed Information, in *Wiley Encyclopedia of Forensic Science*, A. Jamieson and A.A. Moenssens, eds. Chichester: John Wiley. DOI: 10.1002/9780470061589.fsa1013. Published 16th June 2014

**Exhibit AM**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AM_Farwell-Smith-Journal-of-Forensic-Sciences-Brain-Fingerprinting.pdf

Farwell, L. A. and Smith, S. S. (2001). Using Brain MERMER Testing to Detect Concealed Knowledge Despite Efforts to Conceal. *Journal of Forensic Sciences 46*,1: 135-143.

**Exhibit AN**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AN_OpenCourtFarwellMakeig-dr-larry-farwell-brain-fingerprinting.pdf

Farwell, L.A. and Makeig, T.H. (2005), Farwell Brain Fingerprinting in the case of Harrington v. State. *Open Court, X [10]:3, 7-10*. Indiana State Bar Association, September 2005.

**Exhibit AO**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AO_Harrington_v_State_Iowa_Court_Opinion_and_Order.pdf

The Harrington case in which Farwell Brain Fingerprinting and Dr. Farwell's testimony on it were ruled admissible as scientific evidence in court. *Harrington v. State* (2001) Case No. PCCV 073247(Iowa District Court for Pottawattamie County, 5 March 2001

**Exhibit AP**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AP_Time-magazine-dr-larry-farwell-brain-fingerprinting-dr-lawrence-farwell.pdf

*TIME* magazine article announcing that Dr. Lawrence Farwell was selected to the TIME 100 Top Innovators, the "Picassos or Einsteins of the 21st Century."

**Exhibit AR***

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AR_RomfoloAffidavitEditable1904.pdf

Affidavit of General Donald Romfolo of South Africa regarding fraud by Ika and Brainwave Science, Inc.

**Exhibit AS**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AS_FirasHamdiAffidavit2.pdf

Affidavit of Firas Hamdi of Pakistan regarding fraud by Ika and Brainwave Science, Inc.

**Exhibit AT**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AT_JoseKuruvillaEmailReFraudByIkaBrainwaveScience2019-05-13BriefWithIntro.pdf

Communications from Jose Kuruvilla of Thailand regarding fraud by Ika and Brainwave Science, Inc.

**Exhibit AU**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AU_TomkinsLibelousLetter-BrainwaveScienceVsFarwellYadav.pdf

Letter from Tomkins to Dr. Farwell's client Forensic Science Laboratory of Delhi, India containing multiple false and defamatory statements about Dr. Farwell as well as false accusations and threats against a third party.

**Exhibit AV**

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AV_StockPurchaseAgreement_EHC_BFL_07-07-2014LFSigned.pdf

Stock purchase agreement noting equity of Dr. Farwell and Brain Fingerprinting Laboratories, Inc. in Brainwave Science, LLC, equity that Ika later misappropriated and transferred to himself without compensation or due process.

*Note: There is no Exhibit R. There is no Exhibit AQ.

# Exhibit Re-sent in PDF Format via Email November 21, 2021

**Exhibit AU**

"Tomkins' [first] Libelous Letter."  Letter from Tomkins to Dr. Farwell's client Forensic Science Laboratory of Delhi, India containing multiple false and defamatory statements about Dr. Farwell as well as false accusations and threats against a third party.

# Additional Exhibits Added November 21, 2021

The following Exhibits were added on November 21, 2021 in conjunction with Dr. Farwell's Response of November 21, 2021 in response to Mr. Tomkins Response of November 8, 2021. These were delivered by email to ODC on November 21, 2021.

**Exhibit AW**

Dr. Lawrence Farwell's Affidavit in the BWS vs. Dr. Farwell, Dr. Maison, and Arshee, Inc. case (*Brainwave Science, Inc. v. Arshee, Inc. et al* (1:21-cv-04402-BMC) (EDNY August 5, 2021).

**Exhibit AX**

Dr. Thierry Maison's Affidavit in the BWS vs. Dr. Farwell, Dr. Maison, and Arshee, Inc. case (*Brainwave Science, Inc. v. Arshee, Inc. et al* (1:21-cv-04402-BMC) (EDNY August 5, 2021).

**Exhibit AY**

Defendant's attorney Joseph Carbonaro's Memorandum of Law in the BWS vs. Dr. Farwell, Dr. Maison, and Arshee, Inc. case (*Brainwave Science, Inc. v. Arshee, Inc. et al* (1:21-cv-04402-BMC) (EDNY August 5, 2021).

**Exhibit AZ**

"Tomkins Second Libelous Letter," a blatantly libelous letter from Mr. Tomkins to officials at the University of Canterbury (UC) in Christchurch, New Zealand. One addressee was Professor Robin Palmer, a professor with whom I am currently collaborating in scientific research on my invention of Brain Fingerprinting. In this letter Mr. Tomkins not only made several demonstrably false and defamatory statements about Dr. Farwell and his colleagues at UC, he also threatened Dr. Farwell's colleagues with false prosecution for imaginary crimes that Mr. Tomkins fabricated.

**Addendum 1**

**Dr. Farwell's Update of September 23, 2021**

Mr. Chris Chang
Washington State Bar Association
Office of Disciplinary Counsel
September 23, 2021

Re: ODC File: 21-01031

Dear Mr. Chang:

I have received your letter of September 17, 2021.

There have been two major developments in the case against attorneys Brett Wieburg and Paul Tomkins since my original complaint.  I have also been informed of another possible crime and ethics violation by Tomkins and Wieburg, or at least by their client, Krishna Ika, presumably with their knowledge and/or cooperation.  This latest accusation came from a reliable source, although I have not independently verified it.

Federal courts have dismissed yet another patently frivolous lawsuit filed by Tomkins and Wieburg, the BWS Inc. vs. NST Lawsuit in the US District Court for Western Washington described in my original complaint.

Apparently this fourth failed case, along with the imminent likely dismissal of the New York case, have not deterred Tomkins – and, to the degree that he is involved, Wieburg -- from the strategy of attempting to keep his employer out of prison by attacking the expert witnesses whose testimony will be key in criminal fraud cases against Ika in South Africa, Pakistan, Thailand, and Nigeria, where Ika currently stands accused of fraud (and likely other similar cases in other jurisdictions), when and if Ika is brought to justice.

Ika and Tomkins have filed yet another patently frivolous lawsuit, Case Number CV 21-4402 in the US District Court for the Eastern District of New York (where, incidentally, none of the parties reside or do business),.

This new lawsuit borders on the absurd, and is even more frivolous and fanciful than the several previous cases that have been dismissed.  The central premise of the case is that Dr. Farwell, the inventor and world's leading expert on Brain Fingerprinting, and Dr. Thierry Maison, former CTO of Brainwave Science, LLC ("BWS") have stolen BWS' "trade secrets" regarding Brain Fingerprinting. This is the equivalent of some businessman with zero knowledge or expertise in aeronautics -- who had never designed, built, or flown an airplane -- accusing the Wright brothers of stealing the intellectual property of the airplane from him.

Dr. Farwell developed and patented the original systems for Brain Fingerprinting, including the first one at the University of Illinois, another system developed in collaboration with Westinghouse with Dr. Farwell as a consultant, the system developed under CIA contract and applied at the CIA and the FBI, and another system developed at Human Brain Laboratories, Inc. before BWS existed.  The patents have now expired, and all of the substantive information required to implement Dr. Farwell's Brain Fingerprinting invention is also in the public domain due to disclosure in the scientific literature, white papers, and other widely circulated information.  Many other laboratories around the world have implemented the Brain Fingerprinting system using information readily available in the public domain.

BWS, too, produced a somewhat similar system.  Like all the others, it was based on the information that Dr. Farwell had developed and placed in the public domain.  Unlike various other systems developed in various laboratories around the world, however, the BWS system was not effective, valid, scientifically and technologically sound, or successful.  Dr. Farwell and other experts have accused BWS, in sworn affidavits, of producing a counterfeit system that (a)

1

attempted and failed to adequately implement the Brain Fingerprinting algorithms; (b) failed to meet the established Brain Fingerprinting scientific standards; (c) has never been tested in a scientific laboratory or published in the scientific journals; (d) has never conducted a successful Brain Fingerprinting field test; and (e) has never been successfully marketed or sold to any client or implemented in any country.

The absurd premise of BWS latest lawsuit is that Dr. Farwell and Dr. Maison stole BWS' failed, untested, unproven, and counterfeit system from BWS.

Dr. Farwell and Dr. Maison have developed a new implementation of Dr. Farwell's invention, using totally different components – a US-made EEG headset and associated sensors, amplifiers, and digital signal processors that are fundamentally different and totally incompatible with the software used by BWS to collect brainwaves from the headsets in their system, which they bought from a company in Taiwan.

The central claim of Ika and Tomkins new suit is that in order to develop their latest system Dr. Farwell's and Dr. Maison's stole "trade secrets" from BWS.   It is unimaginable that Dr. Farwell, the inventor and developer of four other successful, proven, and effective Brain Fingerprinting systems, would have any reason to steal BWS' failed, untested, counterfeit system.  Moreover, everything of substance in the BWS system was either in the public domain before BWS existed or is disclosed in the expired patents, so there was nothing there to steal.

I can document that the one summary paragraph in the complaint alone contained five demonstrably and unequivocally false statements, comprising the only substantive statements in the case summary.

To support their absurd claim, Ika and Tomkins faked tests and fabricated imaginary test results, the same crime that Ika stands accused of in the criminal system by authorities in other countries (notably Thailand).

This latest crime by Ika and Tomkins is a continuation and elaboration of the RICO scheme described in my original complaint.

The role of Wieburg, if any, in this latest crime by Ika and Tomkins and the entire RICO scheme is unknown at this time, and remains to be discovered in the relevant investigations.

One additional, as yet unproven, accusation has come to my attention: That Ika and Tomkins have fraudulently sought and/or obtained government contracts for Government Works, Inc. and/or eHealthCare Works Corp (both associated with BWS LLC and the latter a 51% owner thereof) based on a false representation that the company was a woman-owned business owned and controlled by Ika's wife.  The accusations stated that the company may have at one time been principally owned and controlled by Ika's wife, but at the time of recent applications and contracts was not.  This crime, if proven, is relevant to the investigation of Wieburg and Tomkins because such a scheme would be a means for Ika to finance BWS' frivolous lawsuits, which is a necessity because BWS has never made any money in legitimate business operations.

Sincerely,

Dr. Lawrence A. Farwell, PhD

2

**Addendum 2**

**Dr. Farwell's Response of November 21, 2021**

**to Mr. Tomkins' Response of November 8, 2021**

M. Craig Bray
Washington State Bar Association
Office of Disciplinary Counsel
1325 4th Ave.
Suite 600
Seattle, WA 98101-2539
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
Via Email Only caa@wsba.org

November 21, 2021

Re: ODC File: 21-01032

Dr. Lawrence Farwell's complaint against lawyer Paul F. Tomkins ESQ


Dear M. Craig Bray:

In response to your letter of November 10, 2021, I am submitting herewith my response to attorney Tomkins' Preliminary Response dated November 8, 2021.

On November 12, 2021 I sent you PDF hard copy versions of the Exhibits to my grievance, as you requested. Mr. Tomkins already has copies of said Exhibits, as they also constitute exhibits in ongoing civil cases referenced in my grievance.

I will send four additional Exhibits referenced herein via a separate email today. I will also send you a PDF version via email of Exhibit AU, "Tomkins' Libelous Letter" (to Dr. Farwell's client FSL), which was previously sent only in hard copy.

In addition, I will send via email a revised version of my Complaint that contains the additional material presented in this response as well as a few minor changes to the original Complaint.

This letter is being delivered by email on November 21, 2021.

.

Sincerely,

*Lawrence A. Farwell*

Dr. Lawrence A. Farwell

**Dr. Lawrence A. Farwell**
Chief Science Officer and CEO
**Brain Fingerprinting Laboratories, Inc.**
**Brain Fingerprinting, LLC**
https://farwellbrainfingerprinting.com
Email: brainwave@larryfarwell.com
8825 34th Ave NE, Suite L155
Quil Ceda Village, WA 98271
Phone: (+1) 206-905-1009
Mobile: (+1) 206-250-5516

1

**Dr. Lawrence Farwell's Response to Attorney Paul Tomkins' Preliminary Response of 11/8/2021.**

(For the sake of clarity, I will in some cases refer to myself in the third person herein.)

The ODC now has a detailed statement of the facts pertaining to Mr. Tomkins activities and Dr. Farwell's complaints regarding the same, and a Preliminary Response from Mr. Tomkins proposing an entirely different and contradictory set of alternative "facts."

There is one fundamental difference between these two sets of statements. The facts stated in Dr. Farwell's complaint are documented and proven by Exhibits that eliminate any doubt that these facts are true, accurate, and indisputable. The "facts" stated in Mr. Tomkins account are based only on Mr. Tomkins' unsupported statements, without proof other than his assertions. Mr. Tomkins' alternative "facts" in many cases are directly contradicted by the documented evidence contained in the Exhibits submitted by Dr. Farwell.

Mr. Tomkins categorically denies all of the allegations in my complaint in ¶ A – I. He does not, however, deny the extensive facts that inexorably lead to the conclusion that my allegations are true and my grievances valid.

In ¶ I Mr. Tomkins states: "I categorically deny having made any false or fraudulent statements about Dr. Farwell to any third party."

Many instances of Mr. Tomkins' false and fraudulent statements about Dr. Farwell are contained my complaint and the Exhibits thereto. Mr. Tomkins' Preliminary Response alone contains numerous false and fraudulent statements about Dr. Farwell.

A document outlining all of the demonstrably and unequivocally false statements Mr. Tomkins has made relevant to the issues discussed in my Complaint would be voluminous indeed. In this response, I will focus on a few of the most salient and relevant false statements that Mr. Tomkins has made.

My original Complaint contained the following demonstrable facts. Mr. Tomkins has had multiple opportunities to dispute these facts. He has never explicitly disputed each or any of these facts numbered 1 – 21 below. He did not explicitly dispute these facts in his Preliminary Response. He made general, blanket denials that contradicted these facts, but he did not dispute, confirm, or address the actual facts stated below.

**Until or unless Mr. Tomkins disputes the below facts 1 - 21 individually and explicitly and provides relevant evidence, the following facts 1 - 21 stand as established and remain undisputed.**

A.  False statements by Mr. Tomkins in a letter to a client of myself and my company, and the relevant facts.

    I.        On or about May 14, 2019 Tomkins wrote and caused to be delivered a letter ("Tomkins' Libelous Letter," Exhibit AU to my Complaint) to Dr. Farwell's client FSL, previously submitted in print form and also submitted in PDF format under separate cover via email on November 17, 2021.

Tomkins Libelous Letter

        i.      Falsely stated that I stole a headset from BWS and sold it to my client FSL.

ii.    Further falsely stated that I was under investigation by the FBI,

a.    Further falsely stated that in 2019 BWS was cooperating with the FBI in said (non-existent) investigation.

iii.   Further falsely stated that I fled through a trailer park and locked myself in a trailer to avoid service of process.

iv.   **In addition to said false statements, Tomkins in Tomkins Libelous Letter threatened my client FSL with prosecution for being in possession of stolen property, without any basis in fact or law.**

A.  II. The Relevant Facts

The following facts A. II 1 - 3 refer to the facts stated in my Complaint in ¶s 3.89 – 3.105.  In light of these facts, Mr. Tomkins statements i. – iii. in Tomkins' Libelous Letter are false.  They are also obviously defamatory.  In addition, Tomkins based his threat of false prosecution of my client FSL (iv.) on his own false statements in direct contradiction of the demonstrable facts.

**Mr. Tomkins has never disputed any of these facts in the various lawsuits he has filed, nor did he discuss or dispute them in his Preliminary Response to my Complaint.**  Whatever Tomkins does or says, the following facts remain demonstrable and indisputable.

1.  I did not sell a headset stolen from BWS, Inc. to my client Forensic Science Laboratory, Delhi (FSL).  I have never sold any headset of the type used by BWS to anyone, let alone a stolen one.

    a.  My client FSL was never in possession of stolen property (specifically, the headset specified above) obtained from me.

    b.  The BWS headset and the one I use are manufactured by two different third parties and are available for anyone to purchase. The headsets I use in my Brain Fingerprinting system are totally different from the headsets used in BWS' system, so it is logically impossible for me to have sold a BWS headset (however obtained) to anyone as a part my Brain Fingerprinting system.  BWS has never possessed a headset of the type that I use and have sold to clients such as FSL. FSL has never had in its possession a headset of the type used by BWS.

2.  I am not under investigation by the FBI, and was not under investigation by the FBI in 2016 or 2019.

    a.  There is no evidence that I am, or was in 2016 or 2019, under investigation by the FBI.

    b.  I have never been under investigation by the FBI or any other federal agency, except for standard investigations for the purpose of security clearances.

    c.  There is no evidence that I have even been under investigation by the FBI or any other federal agency, except for standard investigations for the purpose of security clearances.

3.  I did not flee through a trailer park and lock myself in a trailer to avoid service of process.

    a.  There is no evidence that I fled through a trailer park and locked myself in a trailer to avoid service of process or for any other purpose.

B.    The following B. 4 – 7 refer to the facts stated in my Complaint in ¶s 3.34 – 3.58.  These facts are also referred to in ¶s 3.10 – 3.12 and ¶s 3.5.2 – 3.5.4.

Mr. Tomkins states in his Preliminary Response: "On or about June 27, 2012, Dr. Farwell, in his individual capacity and as agent for two other companies he claimed to own or control, agreed to, and did assign to Brainwave Science, LLC, all rights, title and interest in said intellectual property."

That statement is demonstrably and unequivocally false, as explained in the referenced paragraphs in my Complaint.

Tomkins has made that same statement before.  I have confronted Tomkins on multiple occasions in multiple legal forums with the demonstrable facts and the undeniable conclusion that his statement is false.  Given many opportunities, **Mr. Tomkins has never denied or disputed (or even discussed) the following indisputable, established facts, which are in direct contradiction to his false statements:**

4.  The document that Tomkins relies upon to demonstrate that the Farwell Brain Fingerprinting Patents were assigned to BWS was not executed by or even known to the undisputed patent owner at the time, American Scientific Innovations, LLC.

5.  Every individual who has ever signed any document filed at the USPTO regarding the Patents has stated, in sworn affidavits, that no Patents or associated IP were ever assigned to BWS, and BWS never had any ownership of the Patents and associated IP.

6.  The document that Tomkins relies upon to demonstrate that the Farwell Brain Fingerprinting Patents were assigned to BWS failed as a "patent assignment" because it provided no consideration flowing to the purported assignor from the purported assignee.

7.  The document that Tomkins relies upon to demonstrate that the Farwell Brain Fingerprinting Patents were assigned to BWS was a preliminary draft document produced in the course of ongoing negotiations and was never intended by the signatory thereon to be a patent assignment, according to sworn affidavits.

Tomkins' response to being confronted with the demonstrable facts has not been to deny the facts, but simply to ignore them.  He has repeatedly made no reference to the actual, proven facts 4 – 7 above, and simply repeated the same false statement as if the actual proven contrary facts did not exist or he hadn't been informed of them yet.

The above is one of many instances in which Tomkins and his client Ika have been aggressively fact resistant.

C. The following facts C. 8 – 10  refer to the facts in my Complaint in ¶s 3.5.7 -3.5.10.

They involve Brainwave Science, LLC (BWS LLC) which was founded in 2012, dissolved in 2016, and owned 51% by eHealthCare Works (controlled by Ika) and 49% by Dr. Farwell and his company Brain Fingerprinting Laboratories, Inc. (BFL Inc.), the Minority Shareholders; and BWS

Inc., which was founded in 2016 and solely owned by Ika as an individual. Upon dissolution, the assets of BWS LLC were apparently transferred to BWS Inc.

Mr. Tomkins' purpose was to provide evidence that the Farwell Brain Fingerprinting Patents on my invention of Brain Fingerprinting belonged to his client, Brainwave Science, Inc. (BWS Inc.).

In some pleadings, Tomkins falsely stated (as described in B above) that the Patents were transferred to BWS LLC, and somehow through an undisclosed method they became the property of BWS Inc., his client.

In the events described in my Complaint in ¶s 3.5.7 -3.5.10, Mr. Tomkins used verbal trickery to make a different (and even more absurd) false statement: that the Patents were transferred to BWS Inc. directly in 2013, three years before BWS Inc. existed. This is not merely an oversight or a typo.  If his argument had been that BWS Inc. owned the patents because the Patents had been assigned to BWS LLC and then transferred to BWS Inc., he would of necessity been required to describe some mechanism through which the patents were transferred from BWS LLC to BWS Inc.  Instead, he simply stated that the patents were transferred directly to BWS Inc. in 2013.  The details of the verbal trickery involved in this false statement are in the referenced paragraphs of my Complaint.

Mr. Tomkins has never denied, in his many relevant pleadings, the following indisputable facts. He also did not deny them in his Preliminary Response to my Complaint.  **Until or unless Mr. Tomkins denies or disputes the following facts and provides convincing evidence, these facts remain established and undisputed.**

8. Tomkins' client Brainwave Science, Inc. is never mentioned in any document relevant to the Patents ever filed with the USPTO at any time by anyone.

9. There is no evidence of the existence of any patent assignment of the Patents to BWS Inc. by any party at any time.

10. Every individual who has ever signed any document recorded at the USPTO relevant to the Patents has stated, in sworn affidavits, that BWS Inc. never was assigned and never owned any interest in the Patents.

Despite these established facts, Mr. Tomkins  falsely stated in his Preliminary Response that BWS Inc. owned the Patents, and that my use of the intellectual property disclosed therein – my own invention – violated BWS' rights.

D. Here is another example of a false statement in Tomkins' Preliminary Response.  Footnote 2 page 4 reads as follows: "Dr. Farwell subsequently admitted within deposition testimony that he had not advised Brainwave LLC membership  or management of this 2013 'correction', or the basis thereof, prior to collecting substantial sums in salary from, or selling a portion of his membership interests in, Brainwave Science, LLC.

11. Contrary to Mr. Tomkins statement above, the transcript of the referenced deposition, P. 51 line 14, reads as follows:

14    *Q. [Mr. Tomkins]  Did you advise Mr. Ika at any time that you had*

15    *corresponded  with the U.S. Patent Office to correct what you*

> 16   *characterized as an error? [The context establishes that Tomkins and Dr. Farwell are referring to the same document as the one referred to in the footnote in Tomkins' Preliminary Response above.]*
>
> 17      *A. [Dr. Farwell]  Yes, I did.*

Mr. Tomkins has made the same false statement in pleadings in the various civil cases between the parties.

E.   The following refer to the facts stated in my Complaint in ¶s 3.12 – 3.12.5 and in in ¶s 3.5.7 -3.5.10.   These describe the events surrounding Ika's theft of the equity in BWS LLC of the minority shareholders, including myself, and associated violations of securities laws and other state and federal statutes.

In this regard, Mr. Tomkins has never denied the following:

12. Brainwave Science, LLC (BWS LLC) was formed in 2012 with three members: eHealthCare Works Corp., 51% (HCW; controlled by Mr. Ika), Dr. Farwell (5%, non-dilutable), and Brain Fingerprinting Laboratories, Inc., (BFL; 44%, controlled by Dr. Farwell).

13. Dr. Farwell and his company, the "Minority Shareholders," collectively owned 49%.

14. The BWS LLC operating agreement stated that the agreement could be modified only by unanimous decision of the members.

15. Ika unilaterally modified the agreement to grant himself the authority to remove members at his sole and absolute discretion.

16. Ika removed the Minority Shareholders Dr. Farwell and BFL without consent or due process.

17. Ika transferred the equity of the Minority Shareholders to his company HCW without consent or due process.

18. Ika formed a new corporation, Brainwave Science, Inc. (BWS Inc.), solely owned by himself as an individual (with no common management but no ownership in common with BWS LLC).

19. Ika transferred the assets of BWS LLC to BWS Inc., thus giving himself personal ownership of all of the equity and assets formerly owned by the Minority Shareholders, without due process or consent.

20. Mr. Ika's actions in the above sequence of events were not legal and will not stand up in court.  They took place before Mr. Ika hired Mr. Tomkins.

21. Absent illegal acts by Mr. Ika that in the end will not stand up in court, Dr. Farwell and BFL are still Minority Shareholders, 49% owners of the entity that owns all of the property, assets, and rights that Mr. Tomkins is attempting to deprive the Minority Shareholders of through the six lawsuits, all on the identical issues of fact, that Mr. Tomkins has initiated against Dr. Farwell and his associates in various jurisdictions across the country.

Tomkins has stated correctly that he was not employed by BWS at the time of Mr. Ika's attempted theft of the patents and equity of the Minority Shareholders.[1]  Nevertheless, as an attorney employed full time by Mr. Ika, he must be aware of facts 12 – 21.

Despite his not being complicit in the scheme at its beginning, Mr. Tomkins is nevertheless not abusing the justice system to attempt to deprive the Minority Shareholders in the company of what is rightfully theirs.

Mr. Tomkins is employed full time by the company that is attempting to deprive the Minority Shareholders of the rights and property that are rightfully theirs. He cannot deny that he benefits from the illegal actions of Ika, even though he did not commit the acts himself.  He cannot deny that he lied about these same actions, including the false narrative presented in his Preliminary Response.

In order to be a co-conspirator in a RICO scheme, as Mr. Tomkins is, it is not necessary to participate in all of the crimes involved therein. It is only necessary to conspire to benefit from those crimes along with the other co-conspirators.  This Tomkins has done, and to date has not denied.

F.      The discussion in the next section G centers on the relative scientific and technological expertise and accomplishments of Dr. Farwell and Dr. Maison on the one hand versus Mr. Tomkins, Mr. Ika, and the other BWS employees on the other, and on the relative qualities and features of the several Brain Fingerprinting systems developed by Dr. Farwell from 1985 through the present time and the BWS system developed in the last several years. An understanding of these factors is important for evaluating the false claims that Mr. Tomkins and Mr. Ika have made regarding their version of the system, as compared with Dr. Farwell's and Dr. Maison's versions.

In this regard, the following facts were stated in my original Complaint.  I have stated the same facts repeatedly in the various civil cases.  **Mr. Tomkins has not previously, and did not in his Preliminary Response, dispute any of the following specific fact**s (except to make blanket denials that he had done nothing wrong, which did not refer to these specific facts).

**The relevant undisputed and indisputable facts are as follows:**

I.   Regarding Dr. Farwell, as per ¶s 3.84 – 3. 88 of my Complaint and the associated Exhibits:

   a.  Dr. Farwell is a Harvard graduate with a PhD in biological psychology and a former research associate at Harvard Medical School.

   b.  Dr. Farwell is the inventor of Brain Fingerprinting, as per the Patents and peer-reviewed publications cited below.  Dr. Farwell has published extensively on Brain Fingerprinting in leading peer-reviewed scientific journals.

   c.  Dr. Farwell was selected by *TIME* magazine as one of the top innovators this century, "the Picassos or Einsteins of the 21st Century."

---

[1] I acknowledge that at the time that I prepared my complaint I had been misinformed about the timing of his initial involvement in the company, and which crimes Tomkins was actively involved in. I have made the necessary corrections to my complaint in a revised version.

7

d.  Dr. Farwell has conducted Brain Fingerprinting research at the FBI, the CIA, and the US Navy and published the results in peer-reviewed scientific journals.

e.  Dr. Farwell has successfully applied Brain Fingerprinting science in real-world criminal cases.

f.  The science and technology of Brain Fingerprinting that Dr. Farwell invented and developed and his expert testimony on it have been ruled admissible in court.

g.  Dr. Farwell has successfully practiced his profession as a forensic neuroscientist, and specifically as the world's leading expert in the Brain Fingerprinting science and technology that he invented, for over 25 years.

II.  Regarding the BWS system, as per ¶ 3.78: Unlike the genuine Farwell Brain Fingerprinting that Dr. Farwell has developed and implemented in the US and throughout the world, the BWS product that Tomkins, Brainwave Science, LLC, Brainwave Science, Inc., and Ika have been attempting to market, the BWS system:

h.  Has not been shown to be an effective implementation of the Brain Fingerprinting scientific technology that was invented by Harvard-trained neuroscientist Dr. Farwell, who was selected by TIME magazine as one of the top innovators this century, "the Picassos or Einsteins of the 21st Century."

i.  Has not been shown to meet the 20 Brain Fingerprinting Scientific Standards that Dr. Farwell has published and that are met by Dr. Farwell's versions of the technology.  There is no evidence anywhere that the counterfeit product and faux training by unqualified individuals that BWS Inc. is offering meet these standards.

j.  Has not been tested and proven at the CIA, the FBI, and the US Navy.

k.  Has never been applied in real-world criminal cases, including serial killer JB Grinder and innocent murder convict Terry Harrington.

l.  Has not been proven over 99% accurate in research at the FBI, the CIA, the US Navy, and elsewhere published in the top peer-reviewed scientific journals.  There is no evidence anywhere that what BWS Inc is offering has achieved such accuracy in scientific studies or field applications.

m.  Has never achieved 99% accuracy, or any other proven level of accuracy, in any published research, forensic applications, field applications, or in any other context.

n.  Has not been featured in major national and international news media, including CBS Evening News, ABC World News, CNN, PBS, BBC, CBS 60 Minutes, ABC Good Morning America, the Discovery Channel, The New York Times, The Washington Post, TIME Magazine, and US News and World Report.

o.  Has not been proven to be capable of detecting bomb makers, criminals, and terrorists, in peer-reviewed publications.

p.  Lacks the qualities and achievements of the genuine Brain Fingerprinting invented and developed by Dr. Farwell, as listed herein and in the Exhibits.

q.  Has produced no evidence that the unproven technology BWS Inc is offering achieves the same accuracy, reliability, or validity of the genuine Brain Fingerprinting practiced by Dr. Farwell and other competent, trained, and credentialed scientists.

III.  Regarding Mr. Ika and the BWS employees as per ¶ 3.79: Neither Mr. Ika nor anyone else one employed by Brainwave Science, LLC, Brainwave Science, Inc., and Ika:

r.  Has ever been trained in Brain Fingerprinting by a Brain Fingerprinting expert;

s.  Has ever conducted or published Brain Fingerprinting research;

t.  Has ever successfully applied Brain Fingerprinting in real-world cases;

u.  Has ever conducted Brain Fingerprinting research for the FBI, the CIA, or the US Navy;

v.  Is qualified to conduct a scientific Brain Fingerprinting test that meets the Brain Fingerprinting Scientific Standards; or

w.  Has been featured in any of the major news sources mentioned above that have featured Dr. Farwell and his genuine Brain Fingerprinting invention.

An understanding of facts a. – w. is useful in order to understand the background of the parties and the science and technology of my Brain Fingerprinting invention,  particularly that involved in the following section G.  Although Mr. Tomkins has misled various people and misrepresented the situation with regard to facts F. a – w, these are not among the facts regarding which Tomkins has the made the specific, demonstrable false statements that formed the basis for my Complaint and that I have documented in my Complaint and herein.  Therefore, they are not included in my list of 21 established, undisputed, and indisputable facts that Mr. Tomkins has directly contradicted with false statements documented in my Complaint and herein – i.e., those facts that Tomkins must explicitly address in any response that might be considered responsive to questions and concerns raised by the issues at hand.

G.     The following section refers to the Brainwave Science, Inc. vs. Farwell, Maison, and Arshee, Inc. case[2] filed August 5, 2021 and described in Mr. Tomkins Preliminary Response.  This took place after my original Complaint had been filed, and consequently was not discussed therein.

I have herewith added the following three additional Exhibits to my Complaint: my Affidavit in that case (Exhibit AW), Defendant Dr. Thierry Maison's Affidavit (Exhibit AX), and the MOL prepared by our attorney, Joseph Carbonaro (Exhibit AY).

There are two problems with this lawsuit.  First of all, it is a blatant case of forum shopping. Tomkins knows that he has zero chance of prevailing on the merits in any of the six lawsuits he has initiated, as all of the lawsuits are litigating the same claims, and all of his arguments are based on demonstrably false representations of the facts.  The above are only a few of many examples. His only hope of prevailing is to keep filing frivolous lawsuits against Dr. Farwell and everyone he does business with, in order to exhaust Dr. Farwell's limited resources in time and money.

---

[2] *Brainwave Science, Inc. v. Arshee, Inc. et al* (1:21-cv-04402-BMC) (EDNY August 5, 2021).

Tomkins filed the BWS vs. Farwell, Maison, and Arshee, Inc. case in federal court in New York. Plaintiff BWS Inc., and Defendant Dr. Maison live in Massachusetts. All of the actions at issue took place in Massachusetts. Defendants Dr. Farwell and his company reside in Washington state.  Arshee, Inc. and its owner Mr. Azad reside in Washington State.  There is no imaginable reason, other than Tomkins' forum shopping, to file the case in New York.

This case is one in a long string of forum shopping by Tomkins.  Tomkins has filed six lawsuits against Dr. Farwell and his associates, all litigating the same issues of fact. Four of these cases are filed in four different jurisdictions where none of the parties reside, none have ever done business, and none of the activities at issue took place.  This is described in detail for all the cases except the BWS vs. Farwell, Maison, and Arshee, Inc. case in my original Complaint.  The alleged "facts" in the various cases are essentially cut and pasted from the original New York case, and the same arguments are made in each case regarding ownership of intellectual property and the other issues at hand.

I am not an attorney; however, my attorney friends and associates tell me that they have never encountered such a blatant and extensive case of forum shopping.

I filed two countersuits in Washington state on different facets of the dispute.  I then filed a third that consolidated and replaced the other two, with the stated intention of dismissing the other two. I then dismissed all three cases with prejudice, because Mr. Tomkins convinced me that we had come to an agreement on everything except what was at issue in the original New York case he had filed. After I dismissed my lawsuits, then Tomkins, acting in obvious bad faith, proceeded to file four additional lawsuits in four different jurisdictions litigating the same facts and issues as his two previously filed cases.

The original case, *Brainwave Science, Inc. vs. Farwell, et al., Supreme Ct. of the State of New York County of New York, Index No. 153867/2019*, was filed in New York, despite the facts that none of the parties resided or did business in New York and none of the actions in question took place there.  Then Tomkins filed a case in federal court in Wyoming (the Wyoming Lawsuit referenced in my Complaint), where none of the parties had ever resided or done business, and none of the activities in question took place. Defendant Life Science and Technology, LLC was registered there, but had offices, officers, and business only in Washington state.  That case was dismissed because it was clearly in the wrong jurisdiction.  Another attempt by Tomkins in federal court in Washington state was dismissed by the judge for lack of subject matter jurisdiction, as described in my Complaint.

Tomkins attempted to initiate an arbitration under AAA in New York (the BWS Inc.-Farwell Arbitration described in my Complaint).  The issues were identical to those of the original New York case.  The reason to file the additional action to litigate the same issues was obvious: The arbitration called for a panel of three arbitrators, which would have been prohibitively expensive for Dr. Farwell.  Also, because Dr. Farwell's corporation was involved, Dr. Farwell could not appear pro se, so that additional major attorneys' fees would ensue if an arbitration, no matter how frivolous, was commenced.  My position from the beginning was that, although there was an arbitration agreement between the parties, the preconditions for arbitration had not been met, because the arbitration agreement specified that only issues different from those of the original New York case would be arbitrated.  I maintained throughout that the preconditions for arbitration to commence had not been met, and BWS' attempt to initiate an arbitration was disingenuous, in bad faith, and an attempt to abuse the system.   After several preliminary phone meetings, the

arbitrators agreed with that assessment.  They refused to schedule any meetings to commence the arbitration on the merits because the same fundamental issues were extant in the New York case and had not yet been settled there.

Although patently frivolous, the Wyoming and AAA cases still served a major purpose for Mr. Tomkins and Mr. Ika: to cost me time, effort, and money.  It is just as expensive in time and money for me and my associates to defend a totally frivolous and disingenuous case such as those two, as to defend a legitimate case.  Tomkins did not have to win on the merits in order to cost me time and money.  Since Tomkins knows that he has zero chance of prevailing on the merits in any of the six frivolous cases he has filed, the purpose of these cases from the beginning was to cost me time and money and exhaust my limited financial resources, and also to discrediting, coerce, intimidate, and retaliate against me as a competitor and a past and likely future witness against Mr. Ika in potential criminal cases in the four countries where currently stands accused of fraud.

Mr. Tomkins and Mr. Ika continue to demand that the patent owners assign the patents to them, or they will keep on filing legal cases in multiple jurisdictions around the US.   This is particularly absurd in light of the fact that Tomkins has claimed and continues to claim in multiple different lawsuits in multiple jurisdictions that BWS Inc. already owns the patents, despite never having been assigned them and never been named at all in any documents ever filed at the USPTO.  For the last several years, Mr. Tomkins and Mr. Ika have consistently delivered on that threat, filing six cases litigating the same facts and issues in forums designed to be as inconvenient and expensive as possible for Dr. Farwell and his associates.

Mr. Tomkins is abusing the justice system to attempt to eliminate, intimidate, exhaust, and discredit a competitor in the Brain Fingerprinting business and a witness against his client.

A second motivation for discrediting me and exhausting my resources is that, as the inventor and world's leading expert on Brain Fingerprinting, I testified against Mr. Ika and BWS in a fraud case in Dubai (the Hedinger case), and I will undoubtedly be a major witness when and if Mr. Ika is brought to justice in Pakistan, South Africa, Nigeria, and/or Thailand, where authorities have accused him of fraud relating to Brain Fingerprinting.

The second major flaw in Mr. Tomkins' lawsuit is that it is totally lacking in merit from the scientific, technological, and intellectual property standpoint.   Mr. Tomkins' Preliminary Response states the following: "In the video [pictured in an Exhibit], Dr. Farwell is seen demonstrating a system with a nearly identical user interface to that designed by our former employee, Dr. Thierry Maison, for our company." This is proffered as evidence that their "trade secrets" were stolen and misappropriated.

First of all, it is ludicrous to imagine that Dr. Farwell or Dr. Maison would have any motive to steal BWS' system.  Dr. Farwell invented Brain Fingerprinting in 1985.  He has created his own Farwell Brain Fingerprinting systems in the years since then, and has successfully applied these systems in scientific research and publications, at the FBI, the CIA, and the US Navy, and in court cases including those wherein his system was ruled admissible. The BWS system has achieved none of this. The Farwell systems have substantial advantages over the BWS system, as Dr. Farwell has repeatedly and publicly stated.

Tomkins' and Ika's claim of "theft of trade secrets" is as ridiculous as some businessman with zero knowledge, expertise, experience, credentials, education, training, achievements, or aptitude in aeronautics or technology of any kind accusing the Wright Brothers of stealing the idea of the

airplane from him, along with his implementation of a totally untested and unproven contraption that had never gotten off the ground.

The respective user interfaces in the BWS system and the Maison/Farwell system are similar. However, the reason for this is different from – and in fact opposite to – what Mr. Tomkins attempts to use it to prove. Mr. Tomkins' account leaves out vital facts that are provided by my Declaration and Mr. Maison's. In my Declaration and the Exhibits thereto I document the fact that all of the functions, algorithms, mathematical formulas, and design protocols contained in the BWS software were previously included in several software implementations of my Brain Fingerprinting system, beginning with the original program that I wrote in 1985 when I invented the system.

Specifically, my Exhibit 3 displays photographs of the screens of two Farwell Brain Fingerprinting systems that existed before BWS was founded in 2012, one in 2007 and one in 1993. Both of these are virtually identical to the user interface screen illustrated in the above referenced video and the corresponding photo of the BWS system provided by Mr. Tomkins. In other words, the "proprietary, trade secret" user interface that Tomkins illustrated in BWS' complaint was the same as the user interface of my Farwell Brain Fingerprinting system that predated the existence of BWS. It had the same brainwave plots, with the same labels, in the same colors, and the same data tables, with the same row and column labels and the identical structure and function.

My Declaration and Dr. Maison's document the fact that not only the displays, but all of the algorithms, mathematical formulas, experimental protocols, procedures, and functions of the BWS system were already contained in my previous systems.

This is because the foundation for the BWS system that Dr. Maison developed for BWS was my previous 2007 system, all the details of which I provided to BWS in 2012. If any party has a right to say that their trade secrets had been copied, I have that right with respect to BWS copying my 2007 system. However, as Dr. Maison and I documented, all of the essential components of the BWS system (and my previous system) were already in the public domain. They comprised information that I had made public in my scientific publications and elsewhere, as well as open-source development programs that were used by BWS.

The one part of the BWS program that was not in the public domain was the specific software for communicating with the EEG headset. This is different for each headset. The Farwell 2007, BWS, and Maison/Farwell programs used different headsets, so that part is different in the software. Farwell/Maison could not have copied this part from BWS, because the BWS software would not work with the Farwell/Maison headset (and vice versa). (Both headsets were produced by third parties and are readily available on the market to anyone.)

With respect to the Codequiry result purportedly finding "plagiarism," BWS falsely stated that they compared all of their results with the code of the Farwell/Maison system pictured in the video. That is false in two ways. First, *after BWS received the Farwell/Maison code from Dr. Maison* (the code that BWS claimed was copied from theirs), *they fraudulently modified the BWS code to appear to be more similar to the Farwell/Maison code, and then ran the comparison*. This comparison and its purported results are thus fraudulent. Second, BWS did NOT compare "all" of the respective software programs. They left out of the comparison the parts of the respective software applications that were different, specifically the software for controlling the headset (which makes no difference anyway, because Farwell/Maison did not use and would have no use

12

for the software designed specifically only for the BWS headset).   In short, BWS' entire comparison was fraudulent.

In Mr. Ika's affidavit, which was written by Mr. Tomkins, he makes a false statement that Dr. Farwell is under investigation by the FBI.  This statement is false and without any basis in fact. Dr. Farwell is not under investigation by the FBI.  Tomkins provides the name of an FBI agent as a potential witness to the (non-existent) investigation.  That FBI agent is not investigating Dr. Farwell. There is no evidence that any of Tomkins' statements regarding Dr. Farwell and the FBI are anything other than total fabrications, and they are clearly defamatory.

Even if the FBI were investigating Dr. Farwell – which they are not – they would not disclose anything about any ongoing investigation to the public, least of all to an attorney who works full time for an individual who currently stands accused of fraud by authorities in at least four countries. that cooperate with the FBI in criminal investigations.

The entire lawsuit rests on fraudulent comparisons, falsified evidence, false information, false accusations, and the omission or misrepresentation of the relevant facts.  The allegations therein have no basis in fact or law, or for that matter in common sense.  Its only purpose is forum shopping and to exhaust the resources of myself and my colleagues, clients, customers, and associates.

I. I recently received a copy of a letter from Mr. Tomkins ("Tomkins Second Libelous Letter," Exhibit AZ) to officials at the University of Canterbury (UC) in Christchurch, New Zealand.  One addressee was Professor Robin Palmer, a professor with whom I am currently collaborating in scientific research on my invention of Brain Fingerprinting.

Tomkins Second Libelous Letter contained the following false and defamatory statements about Dr. Farwell, among others:

    (a) " It has come to our attention that Brainwave Science, Inc's Trade Secrets (including, but not limited to, scientific, technical, and engineering information) have been surreptitiously and illegally transferred by the company's former Chief Technology Officer, Dr. Thierry Maison, to individuals and entities including the Brain Fingerprinting Foundation, Dr. Lawrence Farwell, …"

    (b) "Our ongoing investigation revealed that certain of these corporate and individual actors are actively marketing, and attempting to distribute, software which infringes upon the trade dress, trademarks and/or other intellectual property owned by Brainwave Science, Inc."

    (c) "Dr. Maison has admitted to, and provided evidence of, his transfer of the afore-referenced trade secrets to a Dr. Lawrence Farwell."

    (d) **"Codequery's [sic: correct spelling is 'Codquiry'] analysis indicates a 98-99% likelihood of " plagiarism " by Dr. Farwell's software."** (emphasis in the original).

    (e) "It has come to our attention that one or more of these individuals or entities has provided intellectual property encompassing the afore-referenced stolen Trade Secrets to the University of Canterbury."

Statement (a) falsely accuses Dr. Farwell and Dr. Maison of a serious crime, one that they demonstrably did not commit, as outlined in G. above and described in detail my Affidavit in that

13

case (Exhibit AW), Defendant Dr. Thierry Maison's Affidavit (Exhibit AX), and the MOL prepared by our attorney, Joseph Carbonaro (Exhibit AY).  In any case, Dr. Maison and Dr. Farwell are innocent of that alleged crime until or unless convicted, and they have not been investigated for or charged with any such crime, let alone convicted of it.

Statement (b) states as a fact that software that Dr. Farwell provided to his colleague Mr. Palmer constitutes the intellectual property of BWS Inc.  That statement is false, and in any case no court has ever made such a determination, as described in G. above and the referenced Exhibits.

Statement (c) falsely states that Dr. Maison admitted to transfer of trade secrets.  As Dr. Maison's Affidavit (Exhibit AX) clearly states, Dr. Maison emphatically denied having transferred any trade secrets, and the document that Mr. Tomkins offered was misrepresented by Mr. Tomkins and in fact contained no such admission.

Statement (d) is false, as explained in G. above and the Exhibits described above.  BWS conducted the Codequiry analysis fraudulently, not analyzing the BWS code that Mr. Tomkins falsely said was stolen, but substituting a modified version that BWS produced to make it look more like the Maison/Farwell program after receiving that from Dr. Maison.  Moreover, they left out key parts of the software from the comparison.

Statement (e) is false, as explained with reference to statements (a) and (b).  It inherently falsely accuses Dr. Farwell and Dr. Maison of a crime, and, particularly in light of the threats described below, also accuses Mr. Palmer of crimes.

Mr. Tomkins then went on to threaten Dr. Farwell's colleague Dr. Palmer and UC with criminal prosecution, just as Mr. Tomkins had done in Tomkins' [first] Libelous Letter to a client of Dr. Farwell's. Tomkins Second Libelous Letter stated:

> "The Theft of Trade Secrets Act (18 U.S. Code § 1832) provides for fines (up to $5,000,000) and/or imprisonment (up to 10 years) for any person or entity who … **(3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;** (4) attempts to commit any offense described in paragraphs (1) through (3); or **(5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy.**  (18 U.S. Code § 1832(a)(1-5) (emphasis added))."

Note that Mr. Tomkins has emphasized (**bold**) the sections of the criminal code that he has falsely accused specifically Mr. Palmer, and not only Dr. Farwell and Dr. Maison, of violating.

Consistent with Mr. Tomkins and Mr. Ika's abuse of the justice system to attempt to eliminate Dr. Farwell as a competitor, and as a past and likely future witness against Mr. Ika in criminal prosecutions in multiple countries, Tomkins' Second Libelous Letter goes on to state:

> "**While we recognize that your institution was unaware that subject system incorporates stolen intellectual property, we must respectfully insist that your institution immediately cease and desist from further use, depiction or distribution of the "Brain Fingerprinting" system. …**Brainwave Science, Inc. would certainly be open to discussing an additional collaboration with University of Canterbury." (emphasis in the original).

14

H. The above constitutes a brief reply to some of the major issues raised by Mr. Tomkins Preliminary Response.

My original Complaint contains many additional allegations, none of which Mr. Tomkins has addressed except by blanket denials unsupported by any evidence. By contrast to his Preliminary Reply, my Complaint and the Exhibits thereto contain extensive evidence that my allegations are true and have merit. These allegations, and the corresponding evidence, remain unanswered by Mr. Tomkins.

If past experience is any indication, Mr. Tomkins in his next response will do what he has done in his Preliminary Response and in many previous documents, as described below. He knows he cannot deny the facts stated above, specifically 1 - 21, because they are demonstrably and unequivocally true.

He cannot deny the facts 1 – 21 delineated above. If he fails to deny said facts, however, as he has failed in the past given multiple opportunities, this amounts to an admission that the statements he has demonstrably made that directly contradict these proven facts have been false.

Any attempt to justify his false statements, while referring to the relevant facts 1 - 21, will inevitably fail, because Mr. Tomkins' statements are directly contradicted by the demonstrable facts.

The strategy he has followed consistently in the past is not to deny the indisputable facts, but simply to ignore them. He used verbal trickery to persist in repeating his false statements, surrounded by verbiage designed to distract the reader, verbiage that makes his false statements appear plausible as long as one does not refer to the actual facts of the situation.

It can be expected that Mr. Tomkins will do what he has done on previous occasions when the same facts have been brought to light: to refuse to directly address each of the specific facts stated above, specifically facts 1 - 21 (along with the corresponding sections of my original Complaint). Instead, if past behavior is a predictor, he can be expected to engage in an extensive and mostly irrelevant narrative that sidesteps any discussion of the proven facts, attempts to discredit me and my colleagues in various ways and to justify his pattern of forum shopping, and repeats his previous false statements in the midst of various verbiage without ever actually addressing the proven facts that stand in absolute contradiction to his false statements. This verbiage can be expected to be articulate and internally consistent, and may appear to be reasonable until or unless one considers it in light of the proven contradictory facts 1 – 21 that are specified herein, the corresponding sections of my Complaint, and other facts documented therein.

**Please take into consideration that until or unless Tomkins specifically addresses each and every one of the particular facts specified as 1 - 21 above, those 21 facts remain undisputed, and his false statements that are contrary to these facts are indefensible and established as false.**

# Exhibits

**Exhibit AW**

Dr. Lawrence Farwell's Affidavit in the BWS vs. Dr. Farwell, Dr. Maison, and Arshee, Inc. case (*Brainwave Science, Inc. v. Arshee, Inc. et al* (1:21-cv-04402-BMC) (EDNY August 5, 2021).

**Exhibit AX**

Dr. Thierry Maison's Affidavit in the BWS vs. Dr. Farwell, Dr. Maison, and Arshee, Inc. case (*Brainwave Science, Inc. v. Arshee, Inc. et al* (1:21-cv-04402-BMC) (EDNY August 5, 2021).

**Exhibit AY**

Defendant's attorney Joseph Carbonaro's Memorandum of Law in the BWS vs. Dr. Farwell, Dr. Maison, and Arshee, Inc. case (*Brainwave Science, Inc. v. Arshee, Inc. et al* (1:21-cv-04402-BMC) (EDNY August 5, 2021).

**Exhibit AZ**

A blatantly letter from Mr. Tomkins ("Tomkins Second Libelous Letter") to officials at the University of Canterbury (UC) in Christchurch, New Zealand.  One addressee was Professor Robin Palmer, a professor with whom I am currently collaborating in scientific research on my invention of Brain Fingerprinting.  In this letter Mr. Tomkins not only made several demonstrably false and defamatory statements about Dr. Farwell, he also threatened Dr. Farwell's colleagues with false prosecution for imaginary crimes that Mr. Tomkins fabricated.

# Addendum 3

# Exhibits to Dr. Farwell's Response of November 21, 2021

**Exhibit AU**

Exhibit AU

https://farwellbrainfingerprinting.com/pdf/Ex/Exhibit_AU_TomkinsLibelousLetter-BrainwaveScienceVsFarwell Yadav.pdf

Letter from Tomkins to Dr. Farwell's client Forensic Science Laboratory of Delhi, India containing multiple false and defamatory statements about Dr. Farwell as well as threats against a third party.



**Exhibit AU**

May 14, 2019

**Sh. Aman Kumar Yadav**
**SSO Lie-Detection**
**Forensic Science Laboratory**
**Government of National Capital Territory of Delhi**
**Sector 14, Rohini Delhi 110085**
**Via Email: aman1972yadav@gmail.com**

RE:  Farwell Litigation

**To Whom It May Concern**

I am writing at this time in order to provide an update regarding pending litigation between Brainwave Science, Inc. (formerly Brainwave Science, LLC) and Lawrence A. Farwell (Farwell) and his companies, Brain Fingerprinting, Laboratories, Inc., Brain Fingerprinting Laboratories, LLC.

Brainwave Science, Inc. has filed a lawsuit against Lawrence Farwell and his above-mentioned companies in the Supreme Court of the State of New York (Index Number 153867/2019).  Papers filed with the New York State Supreme Court consist of two (2) concurrent filings. The first filing is a Summons and Complaint against Lawrence Farwell and his companies. **The Complaint seeks $10,000,000 (USD 10 Million) in damages from Farwell and his companies for theft of Brainwave's technology (including software and hardware/proprietary headsets), theft of intellectual property and fraud**.  The second filing, an "Order to Show Cause", requests an immediate injunction barring Farwell from making false and libelous claims regarding his ownership of "Brain Fingerprinting" technology.   (See filing documents attached for reference)

**As directed by the Court and required by law, Brainwave Science has made several attempts to serve Farwell personally.**  The Summons Server/officer charged with serving Farwell with the Summons and other legal papers went to the address provided by Farwell to our outside counsel several weeks ago.  The address provided was within an RV PARK CAMPGROUND in Tulalip, Washington. Upon information and belief, the cabin/camper is Farwell's place of residence. **Reportedly, when the summons server arrived at the camping ground address, Farwell fled and locked himself in a trailer nearby.** The summons server knocked on the trailer door for several minutes, but Farwell refused to answer the door.

Brainwave Science, as well as potential customers/clients of Farwell, are left to speculate as to why a party being sued would avoid service of legal process.  **Farwell's evasion of service will require Brainwave Science, Inc. pursue an alternate means of service and may require intervention by the court.**  Upon being served, Farwell or his attorney will be required to answer to the Court in an

257 Turnpike Road
Southborough MA 01772      T 508.251.4100
www.brainwavescience.com    F 508.624.8539



expedited manner.  Farwell's attempts to evade service may cause delay resolution of this legal matter.  **It is not clear why Farwell, or any party purporting to maintain a meritorious legal argument or defense, would avoid service of legal process.**

Prior to filing this lawsuit against Lawrence Farwell, **Brainwave Science filed a complaint regarding Lawrence Farwell's theft and fraud with the United States Federal Bureau of Investigation (FBI).** The FBI investigation in the case is ongoing. Brainwave Science Inc. is actively and fully cooperating with this ongoing investigation (FBI) but is not able to provide additional information at this time.

Brainwave Science has reason to believe that Farwell is still in possession of their stolen software and hardware (Brainwave Science's property that should not be used/sold by any person).  **Within the US legal system, mere possession of stolen goods may constitute a criminal and/or civil offense.  In many jurisdictions, individuals can be prosecuted or subject to civil penalties for possession of stolen property - even if the person(s) in possession of the property were not involved in the theft.**  Brainwave Science and its principals are committed to fostering long-term relationships with our sales partners and clients.  We are deeply concerned that our potential partners or clients might be harmed by the purchase or possession of any such stolen property.

Additional information will be provided upon receipt.  In the meantime, any questions or concerns regarding these matters should be directed to the undersigned at ptomkins@brainwavescience.com

Sincerely,

Paul F. Tomkins

_____

**Paul Tomkins Esq.**
Corporate Counsel
**Brainwave Science, Inc.**
257 Turnpike Road,
Southborough, MA 01772
Phone: +1 508–251-4100
www.brainwavescience.com

cc: Krishna Ika

257 Turnpike Road
Southborough MA 01772     T 508.251.4100
www.brainwavescience.com   F 508.624.8539

Exhibit AY

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
BRAINWAVE SCIENCE, INC.
        Plaintiff

        - against -

                                  Civil Action No.: 21-cv-4402 (BMC)


ARSHEE, INC., DR. LAWRENCE A.
FARWELL, DR. THIERRY MAISON and
BRAIN FINGERPRINTING FOUNDATION

                Defendants.
-------------------------------------------------------- X


## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION


                        RESPECTFULLY SUBMITTED

                        CARBONARO LAW, PC
                        Attorneys for the Defendants
                        Dr. Lawrence A. Farwell
                        Dr. Thierry Maison
                        Mr. Abul Kalam Azad
                        757 Third Avenue, 20th Floor
                        New York, New York 10017
                        (212)888-5200
                        Fax: (212) 898-0394
                        Email: joe@jcarbonarolaw.com

1

INTRODUCTORY STATEMENT

This memorandum of law is submitted in opposition to Plaintiff Brainwave Science ("BWS"), Inc.'s motion for a preliminary injunction. For the reasons set forth below and in the attached declarations of Dr. Lawrence A. Farwell ("Farwell"), Dr. Thierry Maison ("Maison") and Mr. Abul Kalam Azad ("Azad"), the motion should be denied in its entirety.

STATEMENT OF FACTS

The facts of this case are indeed in dispute.  The above-cited declarations make clear that the facts surrounding the alleged existence of protected trade secrets pursuant to the federal Defend Trade Secrets Act, 18 USC Sections 1832-1839 ("DTSA").  This is the only cause of action pleaded in the Complaint.

The Plaintiff BWS is a Delaware corporation that transacts business from the State of Massachusetts.  See, Compl. ¶1.  Defendant Farwell is a resident of the State of Washington. Compl. ¶3; Defendant Maison is a resident of the State of Massachusetts. See Compl. ¶¶ 3-4. Defendant Azad is the sole owner and operator of Defendant Arshee, Inc. See, Azad Declaration. Azad is a resident of the State of Washington. Since 2016, Arshee has had no presence nor contacts with the State of New York.  See, Azad Declaration.  It is alleged that Arshee is a New York corporation with its principal place of business in Jamaica, Queens.  See, Compl. ¶2.  This allegation is disputed.

Plaintiff alleges, in sum and substance, that Defendants violated the DTSA by misappropriating alleged trade secrets, specifically its "iCognataive" [sic] software.  As Drs.

Farwell and Maison explain in great detail in their respective Declarations, "iCognative"

software is comprised almost exclusively of technology and software that was in the public

domain long before BWS even existed.

As the Farwell and Maison Declarations also make clear, brainwave science was invented

by Dr. Farwell in 1985.  The science has developed since and become more accepted, including

use by the military, other governments, the FBI, CIA and US Navy.  See, Farwell Decl. at ¶23.

The idea behind brainwave science, or "Brain Fingerprinting," is succinctly explained in the

Farwell Declaration at ¶8 as an

> …investigative technique which measures recognition of familiar stimuli by measuring electrical brain wave responses to words, phrases, or pictures that are presented on a computer screen. Brain fingerprinting was invented by Lawrence Farwell. Its theory explains that the suspect's reaction to the details of an event or activity will reflect if the suspect had prior knowledge of the event or activity…quoting Dhiraj Ahuja and Bharat Singh, *Journal of Engineering and Technology Research Vol. 4(6)*, pp. 98-103, November 2012.

Brain Fingerprinting, as invented by Dr. Farwell, uses a headset which is placed on the subject

and conveys brain waves to a computer that analyzes them for certain criteria which enables the

user to understand whether the relevant information is known to the subject.  It is this software

that connects and interprets the brainwaves that is at the heart of this case.  BWS alleges that the

inventor of the technology misappropriated the technology that BWS uses to conduct brain

fingerprinting.  This is patently absurd and incorrect.

As Dr. Farwell and Dr. Maison explain, they use a different headset than does BWS and

accordingly to interpret the information that the headset sends to the computer for analysis.  It

may be that a portion of the software used by BWS for this purpose is proprietary to them.  This

is of no matter to Farwell and Maison, who use a different headset with which BWS software would be incompatible.

But much more is involved in brain fingerprinting than this portion of the software.  As Drs. Farwell and Maison state, there are numerous algorithms, extensive code and fairly complex formulas used in the BWS and Farwell/Maison systems that are, and have been for many years, in the public domain.  Software that is "open-source" is used in both the Farwell and BWS systems.  Dr. Maison describes the open-source software he used when he worked for BWS.  At ¶¶ 8-9, 11, 16, 21, 22, and 24.  Dr. Maison details the public sources of the software used on the now-iCognative system (Dr. Maison did not work at BWS when the product was named or marketed as such.  See, Decl. ¶7).

Perhaps most important, Dr. Maison describes the similarities and distinction between the BWS and Farwell/Maison systems at ¶18, stating that the only similarity between the systems could be the headset and the software interface design.  However, he also states that these designs were "very specifically excluded from the Farwell brain fingerprinting design." Likewise, the headset is different in that the BWS system uses two channels while the Farwell system uses four.  Both headsets are manufactured by different third-party companies and sold respectively to Farwell, BWS and anyone else who cares to purchase them.  See, Farwell Decl. at ¶¶ 24-25.

## LEGAL ARGUMENT

I.   *Plaintiff is Not Entitled to a Preliminary Injunction Because the Likelihood of Success on the Merits is Slim.*

In *Ali v. Barr*, 464 F. Supp. 3d 549, 556 (S.D.N.Y. 2020), the Court explained that

'A preliminary injunction is an extraordinary remedy never awarded as of right.' <u>Winter v. Nat. Resources Def. Council, Inc.</u>, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). 'In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.' <u>Id.</u> (internal quotation marks omitted). 'To receive a preliminary injunction, the plaintiff must show (1) a likelihood of success on the merits, (2) that the plaintiff is likely to suffer irreparable injury in the absence of an injunction, (3) that the balance of hardships tips in the plaintiff's favor, and (4) that the public interest would not be disserved by the issuance of the injunction.' *Capstone Logistics Holdings, Inc. v. Navarrete*, 736 F. App'x 25, 26 (2d Cir. 2018) (internal quotation marks omitted). 'The burden is even higher on a party ... that seeks a mandatory preliminary injunction *that alters the status quo* by commanding some positive act, as opposed to a prohibitory injunction seeking only to maintain the status quo.' [emphasis added] *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (internal quotation marks omitted). 'A mandatory preliminary injunction should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.' *Id.*

While any type of injunction should be issued carefully, a mandatory injunction requires even more care.  In this case, on its face, it seems Plaintiff is seeking to enjoin Defendants from doing something, selling brainwave technology, which is the Defendants' livelihood.  Issuing an injunction preventing them from doing changes the status quo drastically.  Moreover, the injunction that Plaintiff seeks would require the Defendants to turn over the names of every customer with which it has done brain fingerprinting business; in other words, Plaintiff wants Defendants to give them their customer list, an item which would customarily be considered confidential.  Perhaps worst of all, the injunction sought would require Defendants to essentially get permission from the Plaintiff each time it wished to sell any type of P300[1] (which includes all

---

[1] All brainwave fingerprinting is comprised of P300 technology.  Crafting an injunction that includes all P300-related technology would be sweeping, overbroad and highly detrimental to the Defendants' businesses.  It would effectively prevent Defendants from selling anything.

brain fingerprinting) software by turning the software over to a third-party expert for examination to ensure it contained no trade secrets before the sale could be made.  Plaintiff characterizes this injunctive relief as "narrowly tailored."  That characterization is disingenuous and false.  If anything, the requested injunction is overbroad and incredibly burdensome.  No third party would do business with Drs. Farwell and Maison if they knew the software technology they were purchasing had to go through an unknown third party, or that their contact information might be disclosed to a corporate entity with whom they were completely unfamiliar.  It would destroy Defendants' business, which quite frankly, is exactly the point of this action.

Plaintiff should be required to compete in the free market, not use the judicial system to knock off its competitors.  As if this weren't enough, the Plaintiff's "narrowly tailored" injunction would require Defendants to recall all software embodying BWS's purported trade secrets.  This assumes the conclusion: that Defendants have ever sold software embodying BWS trade secrets.  There would be no practical enforcement mechanism for this prong of the injunction either.

All of these many requests in the motion for a preliminary injunction are based on a single aborted sale in which BWS claims Defendants tried to sell their system, or parts of their system they consider trade secrets.  No other businesses are afforded this type of relief on claims as thin and unsubstantiated as this one.

A.  The Court Lacks Personal Jurisdiction Over All Defendants.

In the Complaint, BWS relies on the claim that "a substantial part of the events or or omissions giving rise to the claim occurred with the judicial district of this Court" as a basis for jurisdiction.  The Complaint fails to allege that any of the occurrences alleged took place in

6

New York.  Consider that BWS is a Massachusetts company with its headquarters and offices in

Southborough.  The work alleged to have been done by Maison and Farwell all took place in that

office.  The security BWS allegedly used to safeguard the technology includes security systems

at its Southborough office.  Nowhere in the Complaint does BWS allege any act or omission

occurred in the State of New York, let alone in this District.

Maison is a resident of Massachusetts as alleged the Complaint at ¶4; Farwell is a

Washington State resident as alleged at ¶3; the Brain Fingerprinting Foundation is alleged to

have its principal place of business in Washington State at the same address as Farwell's.  See,

Compl. ¶5.  While Defendant Arshee is alleged to be a New York corporation with offices in

Jamaica, Queens, the evidence belies that claim.  See, Azad Declaration, ¶¶8-10; see Defense

Exhibit 5, State of Washington Corporations filing system showing date of incorporation in

Washington State.

In short, Plaintiff erroneously claims that acts and omissions relevant to this action took

place in New York State, yet fails to specify any; and no Defendant resides nor does business in

the State of New York.  Accordingly, minimum contacts to this State do not exist. See,

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945); *McGee v. International Life*

*Insurance Co.*, 355 U.S. 220 (1957).

In the alternative, Plaintiff relies on 28 USC Sections 1391(b)(2) and (b)(3).  They

provide that a civil action may be brought in

> (2) a judicial district in which a substantial part of the events or
> omissions giving rise to the claim occurred, or a substantial part of
> property that is the subject of the action is situated; or
> (3) if there is no district in which an action may otherwise be
> brought as provided in this section, any judicial district in which
> any defendant is subject to the court's personal jurisdiction with
> respect to such action.

Having reasoned that Section (b)(2) does not provide jurisdiction, and if, as seems clear, there is no jurisdiction over any Defendant, the Plaintiff seeks jurisdiction on the theory that jurisdiction over Dr. Farwell and Dr. Maison exists because jurisdiction over Arshee exists.  The fact that no Defendant, including Arshee, is subject to the Court's jurisdiction should end the inquiry with respect to personal jurisdiction.  Moreover, there are likely other jurisdictions which have jurisdiction over the Defendants, such as the District of Massachusetts where Dr. Maison resides and where BWS has its principal place of business.  Frankly, it is odd that BWS chose this District to bring suit.  Without speculating as to BWS's motivation to do so, it seems reasonable to infer that it is forum shopping.

Accordingly, this action has no likelihood of success on the merits because this Court does not have personal jurisdiction over any defendant, making it impossible to survive a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction.[2]

B. <u>The Disputed Software was Compiled with Software Already in the Public Domain and is Not a Trade Secret.</u>

In *Elsevier Inc. v. Dr. Evidence, LLC,* No. 17-CV-5540 (KBF), 2018 WL 557906, at *3 (S.D.N.Y. Jan. 23, 2018), the Court discussed the DTSA and explained that

> under the federal Defend Trade Secrets Act, "a party must show 'an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.' " *In re Document Techs. Litig.*, No. 17-cv-2405, 2017 WL 2895945, at *5 (S.D.N.Y. July 6, 2017) (quoting *Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc.,* No. 15-cv-0211, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016)); see also 18 U.S.C. § 1839(3)(A)-

---

[2] Defendant Arshee will bring such a motion due for filing on November 30, 2021.  If granted, then Defendant will bring a similar motion with respect to Dr. Farwell and Dr. Maison, if need be since the issue of whether any defendant resides within this Court's jurisdiction will be fully and finally resolved.

(B); *Broker Genius, Inc. v. Zalta*, No. 17-cv-2099, 2017 WL
5991831, at *11 (S.D.N.Y. Dec. 4, 2017) "'The DTSA (codified in
18 U.S.C. § 1831, et seq.), which created a federal cause of action
for the misappropriation of trade secrets used in interstate
commerce, requires that the plaintiff establish 'an unconsented
disclosure or use of a trade secret by one who (i) used improper
means to acquire the secret, or (ii) at the time of disclosure, knew
or had reason to know that the trade secret was acquired through
improper means, under circumstances giving rise to a duty to
maintain the secrecy of the trade secret, or derived from or through
a person who owed such a duty.'" (quoting *Free Country Ltd. v.
Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016))).

The purported trade secret that Plaintiff claims is a combination of various open-source

software designs which run the Farwell system.  There may be a significant number of open-

source software applications in the BWS system, but there is virtually no similarity to the

Farwell system. See, Maison Declaration at ¶18, Farwell Declaration ¶¶23-26.  Moreover,

Dr. Farwell invented the system originally by using open-source software or software he

created but placed into the public domain.

In *Schroeder v. Pinterest Inc.,* 133 A.D.3d 12, 28–29, 17 N.Y.S.3d 678, 691–92 (2015)

the New York State Appellate Division, First Department, interpreting New York law, held

that

Although we uphold the misappropriation of trade secrets cause of
action against Cohen, the claim should be limited to the
confidential information referenced in the complaint, and cannot
extend to information in the public domain. "[A] trade secret must
first of all be secret"  (*Ashland Mgt.,* 82 N.Y.2d at 407, 604
N.Y.S.2d 912, 624 N.E.2d 1007), *i.e.,* "somethin[g] known to only
one or a few and kept from the general public" (*Leo Silfen, Inc. v.
Cream,* 29 N.Y.2d 387, 394–395, 328 N.Y.S.2d 423, 278 N.E.2d
636 [1972] ). Thus, information that is readily available from
public sources is not entitled to trade secret protection (*JAD Corp.
of Am. v. Lewis,* 305 A.D.2d 545, 546, 759 N.Y.S.2d 388 [2d
Dept.2003]; *Newton Garment Carriers v. Consolidated Carriers
Corp.,* 250 A.D.2d 482, 482, 673 N.Y.S.2d 631 [1st Dept.1998] ).

9

In *Elsevier, id.,* at *3–4 (S.D.N.Y. Jan. 23, 2018), the Court interpreted the DFTA in the context of New York trade secret law, citing a Second Circuit case and, reasoning that

> Trade secrets can "exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable trade secret." *Integrated Cash Mgmt. Serv., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) (citations omitted). As the Court said in another case interpreting the federal Defend Trade Secrets Act ("DTSA"),
> Although there is no one-size-fits all definition to a trade secret, New York courts generally consider the following factors to determine its contours:
> "(1) the extent to which the information is known outside of the business;
> (2) the extent to which it is known by employees and others involved in the business;
> (3) the extent of measures taken by the business to guard the secrecy of the information;
> (4) the value of the information to the business and its competitors;
> (5) the amount of effort or money expended by the business in developing the information; [and]
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."

Applying the relevant factors to the instant case, the technology for which BWS seeks injunctive relief is not a trade secret. Having said that, Defendants wish to be clear that they do not wish to use and will not use (nor have they used) any of BWS's purported trade secrets or any of its proprietary technology. As Dr. Farwell and Dr. Maison explain, they use a different headset than does BWS, and accordingly use different software to communicate with the headset and to interpret the information that the headset sends to the computer for analysis. It may be that a portion of the software used by BWS for this purpose is proprietary to them. But this is of no matter to Farwell and Maison, who use a different headset with which BWS software would be incompatible. In other words, if the Court wishes to enjoin Defendants from using BWS's

actual, established trade secrets, the Defendants do not object.  However, what the Plaintiffs seek to do is use the established, open-source software used by Farwell and many others, add one or two components to it, and then claim Defendants cannot use what is open source and publicly available because Plaintiff has used it in conjunction with its own proprietary software.  It is as if a chef were making a recipe using mayonnaise and added other unusual (proprietary) spices to it and then sought trade secret protection for the mayonnaise alone.  Surely this is not the intent of the DTSA.

The vast majority of the BWS software is derived from open sources and is widely known by many who work in the field, including Farwell and Maison.[3]  This is made clear in the Farwell and Maison Declarations which include many citations to the public sources of the BWS and Farwell software.  Whether anyone knows about component of the software BWS claims is a trade secret is unknown to Defendants.  It would seem likely that all BWS employees are aware of such secrets, if they exist.

The Court also considered the value of the trade secret to the business (BWS) and its competitors (Drs. Farwell and Maison).  As also made clear in both the Farwell and Maison affidavits, there is no value to them in the iCognative software.  They do not use it, do not need it and believe it to be inferior to the brain fingerprinting product they sell to their customers.  BWS may believe the purported trade secrets are quite valuable to them.  But that is of no matter because they are of no value to Drs. Farwell and Maison.

As the Second Circuit said in *Boisson v. Banian, Ltd,* 273 F.3d 262, 268–69 (2d Cir. 2001) in the context of a copyrighted work,

> Likewise an element within a work may be unprotectible even if other elements, or the work as a whole, warrant protection. Some material is unprotectible because it is in the public domain, which

_____

[3] As opposed to Arshee which is not in the technology or software design business but is merely a broker.

11

> means that it "is free for the taking and cannot be appropriated by a
> single author even though it is included in a copyrighted
> work." *Computer Assocs. *269 Int'l, Inc. v. Altai, Inc.,* 982 F.2d
> 693, 710 (2d Cir.1992).

It would be unlikely that Congress intended trade secrets, which have no separate statutory

protection, to have more protection than patented or copyrighted works.  It makes sense that

Congress intended to protect the trade secret itself and the product as a whole which contains the

trade secret; it was developed and brought to market by the business, such as iCognative.  But

protecting the parts divisible of iCognative that derive from open source and suddenly giving

them protection is contrary to cases such as *Computer Assocs.*, *id*.

II.     *Plaintiff Has Not Demonstrated Irreparable Harm that Cannot be Cured by Money*
        *Damages Alone.*

To establish irreparable harm, Plaintiff makes the conclusory and unsupported claim that

> injunctive relief is necessary to prevent further unlawful
> dissemination and distribution of BWS' proprietary software code,
> user interfaces, algorithms and hardware ("Brainwave Trade
> Secrets"). BWS' proprietary software code, user interfaces,
> algorithms and hardware are the very information upon which
> BWS' business is based. Furthermore, although BWS' damages
> associated with losing its trade secrets would alone be incalculable,
> Defendants are also inflicting irreparable harm to BWS' business
> relationships and damaging its goodwill. "[P]rospective loss of
> goodwill alone is sufficient to support a finding of irreparable
> harm." *Bulman. V. 2BKCO, Inc., 882 F.Supp.2d 551, 560
> (S.D.N.Y., 2012).*

First, BWS's claim that further dissemination of its alleged proprietary software will constitute

irreparable harm.  The only instance in which Plaintiff has alleged sale or distribution of the

iCognative system was a sale brokered by Arshee to the Bangladeshi government.  That sale was

stopped because the government learned of a dispute over the software.  In other words, Plaintiff

has failed to allege even a single instance where the iCognative system was actually sold to a

third party.  Its supposition that there would be further dissemination of proprietary software is just that and is utterly lacking in factual basis.  While BWS claims "upon information and belief" that sales were made to a university in New Zealand, it has no facts to support such a sale was made or, if made, that it was in some way improper.

BWS fears that it may lose out on a future deal with the Bangladeshi government if the Court does not enjoin Defendants from use of its software.  While Defendants have no intention of doing so, obviously, Plaintiff has insight into prospective sales of brain fingerprinting systems since it is in the business of selling such systems.  More likely, BWS is simply trying to take out its main competitor, Drs. Farwell and Maison, so it can effectively corner the market on brain fingerprinting systems, circumventing the free-market through judicial action.

Having no intention nor need to misappropriate the derivative iCognative system given that Farwell has invented his own (and refined it many times), the likelihood that Dr. Farwell and/or Dr. Maison would do so now seems far-fetched.  Farwell has been practicing his brain fingerprinting system since 1985.  He has no need to copy a system being sold by a company with little to no experience in brain fingerprinting other than what it may have derived from Farwell himself.  Preventing Farwell from selling his own version of brain fingerprinting technology while allowing BWS to do so would put Farwell and Maison out of business. Ironically, BWS would be selling software and algorithms that Farwell developed over the past 35 years while Farwell would be prevented from doing so.

Even if Defendants did sell the BWS iCognative system containing trade secrets to a customer, all they would have sold is an executable program (i.e., a program that can be run on a computer), as opposed to the code that is compiled to make the executable version.  The customer could not break into the executable version to obtain the code and thereby further

disseminate the alleged trade secrets.  This is equivalent to installing an unauthorized copy of a common program such as Microsoft Word, which would not expose Microsoft's trade secrets that were used to develop it.  Therefore, the threat of unlimited dissemination that the Plaintiff seems to fear does not exist.

Finally, even if Defendants were to sell Plaintiff's trade secrets, the damage done could easily be measured and money damages awarded by merely looking to the price of the product and requiring the Defendants to pay, as damages, the profit made on the sale to BWS.  However, BWS seeks the easy way out, that is by obtaining an injunction preventing the sale all together.  Contrary to its blanket assertions, money damages are ascertainable and can be awarded if need be.

<u>CONCLUSION</u>

BWS may have indeed created a trade secret, something which might be determined at a hearing.  However, even if it did, the secret is limited to the complete product, here, the iCognative system and any portion of it which is proprietary.  However, the divisible parts remain in the public domain for anyone to use.  Defendants have no objection to an injunction that prevents them from selling iCognative software or any portion thereof shown to be a trade secret, but Plaintiff cannot prevent Defendants Farwell and Maison from distributing, marketing, or selling their products which do not include iCognative software or any portion of it which is a trade secret.  Should the Court believe an injunction is necessary, it should be tailored so as not to prevent the Defendants from conducting their business.  Conditions such as providing lists of customers to whom Defendants may have sold iCognative software, requiring the Defendants to go through a screening process each time they wish to make a sale or returning from their

customers any product that might contain a trade secret is unduly burdensome and essentially puts Farwell and Maison out of business.

Likewise the Plaintiff has not asserted a single fact that Arshee knew that the Bangladeshi sale he tried to broker involved alleged BWS software.  All the Complaint alleges is that Arshee was involved in the sale, nothing more.  Arshee should not be enjoined from conducting business involving P300 technology.  The injunction, as outlined by Plaintiff, does not even align with what Arshee does as a broker.

For the reasons set forth above, in the Declarations of Drs. Farwell and Maison and Mr. Azad, the Court should deny the motion for a preliminary injunction in all respects.

Dated: New York, New York
        November 15, 2021

                              RESPECTFULLY SUBMITTED

                              CARBONARO LAW, PC
                              Attorneys for the Defendants
                              Dr. Lawrence A. Farwell
                              Dr. Thierry Maison
                              Mr. Abul Kalam Azad
                              757 Third Avenue, 20th Floor
                              New York, New York 10017
                              (212)888-5200
                              Fax: (212) 898-0394
                              Email: joe@jcarbonarolaw.com


                              By:  _____Joseph W. Carbonaro_____
                                   Joseph W. Carbonaro
                                   New York 2061455


To: Mr. Paul F. Tomkins
    Attorney for the Plaintiff
    11 Broadway, Suite 615
    New York, New York 10004

Exhibit AW

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BRAINWAVE SCIENCE, INC.

                Plaintiff

                - against -

ARSHEE, INC., DR. LAWRENCE A.
FARWELL, DR. THIERRY MAISON and
BRAIN FINGERPRINTING FOUNDATION

                Defendants.
------------------------------------------------------------ X

Declaration of Dr. Lawrence A. Farwell
in Opposition to Plaintiff's Motion for a
Preliminary Injunction

Civil Action No.: 21-cv-4402 (BMC)

Dr. Lawrence A. Farwell, being duly sworn declares under penalty of perjury as follows:

1. I am a Defendant in the above action.

2. I am also the founder and President of Defendant Brain Fingerprinting Foundation.

3. I make this Declaration based upon my own person knowledge and belief.

4. I am a neuroscientist and have been practicing neuroscience since 1981.

5. I received BA from Harvard University in 1973; I received a PhD from University of Illinois in 1992; I was a research associate at Harvard from 1994 through 1996.

6. My further and other qualifications are contained in my curriculum vitae which is attached as *Defense Exhibit 1*.

7. In or around 1985, I became involved in the practice of brain fingerprinting when I invented it.

8. One scientific journal fairly and accurately, if succinctly, described brain fingerprinting as follows:

> Brain fingerprinting is an investigative technique which measures recognition of familiar stimuli by measuring electrical brain wave responses to words, phrases, or pictures that are presented on a computer screen. Brain fingerprinting was invented by Lawrence Farwell. Its theory explains that the suspect's reaction to the details of an event or activity will reflect if the suspect had prior knowledge of the event or activity (Farwell and Donchin, 1991). Farwell's brain fingerprinting originally used the well known P300 brain response to detect the brain's recognition of the known information (Farwell and Donchin, 1986, 1991; Farwell 1995. Later Farwell discovered the "memory and encoding related multifaceted electroencephalographic response" (MERMER), which includes the P300 and additional features and is reported to provide a higher level of accuracy than the P300 alone (Farwell and Smith, 2001; Farwell, 1994, 1995). *Journal of Engineering and Technology Research Vol. 4(6)*, pp. 98-103, November 2012 Available online at http://www.academicjournals.org/JETR

9.  This technique has been successfully used on many occasions. It is not new and much has been written about it in scientific literature, including by the affiant.

10. I have tested brain fingerprinting technology with the FBI, CIA and the US Navy.  I have also applied it successfully in criminal investigations, authored articles about it  in many peer-reviewed scientific  journals and its results were ruled admissible in a criminal trial in the State of Iowa.  See *Harrington v. State of Iowa*, No. 01-0653 (Supreme Court, State of Iowa).   See, https://larryfarwell.com/pdf/OpenCourtFarwellMakeig-dr-larry-farwell-brain-fingerprinting-dr-lawrence-farwell.pdf, Farwell, L.A. and Makeig, T.H. (2005), Farwell Brain Fingerprinting in the case of *Harrington v. State.  Open Court, X [10]:3*, 7-10. Indiana State Bar Association, September 2005.  ]

11. The iCognative system, which is much different and less effective than the system I developed, has achieved none of these landmarks.  There is no evidence that iCognative has ever successfully done what Mr. Krishna Ika claims in his affidavit at ¶3 other than

unsubstantiated claims by non-scientists (including Mr. Ika) with no relevant scientific knowledge or expertise.

12. Mr. Ika makes a number of claims in his Declaration that must be addressed specifically and directly.

13. First, at ¶4 of his Declaration, Mr. Ika claims that the affiant was "employed by Brainwave's predecessor in interest, Brainwave Science, LLC ("BWS, LLC") as Chief Scientific Officer from 2012 to 2016." This is inaccurate. The undersigned was never "employed" by BWS LLC. I was given no employment agreement or consulting contract. Rather, I worked with BWS, LLC personnel at the time referenced and was paid sporadically, with no contract granting me the "CSO" title. Contrary to BWS, LLC's operating agreement (See *Defense Exhibit 2* at ¶10(a)) there was no consulting agreement between BWS and me.

14. In the same paragraph, Mr. Ika alleges that I conveyed several patents relating to the P300 technology to BWS, LLC in 2013. I did not. In fact, on numerous occasions in the recent past, BWS has actually requested that I convey these now, long after they have expired.

15. To my knowledge, when the patents were recorded at the United States Patent and Trademark Office ("USPTO"), each person who so recorded the patents signed sworn statements that the patents were not transferred to BWS, LLC or BWS.

16. It is my further understanding that the now-expired patents belonged to American Scientific Innovations, LLC ("ASI").

17. Moreover, I did not receive any consideration to assign the patents to BWS, LLC or BWS nor was there any final agreement as to the terms of any transfer of the patents.

18. Although counsel for BWS, LLC recorded the assignment with USPTO, upon learning he had done so, I recorded a correction that clarified this error.

19. While BWS characterizes this recording as "covert," this is far from true.  Upon learning that a document bearing my name had been erroneously recorded at the USPTO that purported to transfer patents that were owned by a third party---ASI----I recorded the correction.  There could be no valid re-assignment of the patents because BWS never owned them in the first place.  The true owner was ASI, which later transferred ownership to another party.  Furthermore, while I did get some payment from BWS, LLC, no employment agreement or consulting contract was ever agreed upon even though one was specified in the BWS LLC Agreement (See, *Defense Exhibit 2*).

20. Mr. Ika alleges that I was removed from BWS, LLC "for fraud."  The facts surrounding my purported (and illegal) removal from BWS, LLC indeed involve fraud, but by Mr. Ika alone.

*21.* In sum and substance, I was unilaterally removed by Mr. Ika, the majority shareholder in BWS, LLC without the consent of the minority shareholders, including myself and Brain Fingerprinting Laboratories, Inc. ("BFL")  Mr. Ika changed the BWS, LLC operating agreement which had originally included a provision that it could be modified by a written agreement "executed and delivered by the members" to allow Mr. Ika, as majority shareholder, to unilaterally remove minority shareholders (including myself and BFL).  See, *Defense Exhibit 2* at ¶26.  He then transferred the minority shareholders' stock----me and BFL---to the majority shareholder---Mr. Ika's other company, "eHealthcareWorks Corp"--- without consideration, which was also not authorized.  My and BFL's shares were

essentially stolen since Mr. Ika changed the rules in mid-game to his benefit to expel us, then transferred our shares to himself without due process and without paying for them.

22. Further proof of Mr. Ika's consciousness of guilt can be seen by virtue of his having dissolved BWS, LLC and then forming a new company, BWS, Inc., to which all equity in BWS, LLC was transferred, and which is, upon information and belief, owned solely by Mr. Ika.

23. In paragraph 10, Mr. Ika describes several "challenges" in developing any P300 based system. However, all of the listed challenges were resolved and implemented in numerous other P-300-based brainwave systems, including the original system I developed in 1985; the system developed by Westinghouse Corporation (with me as consultant) in 1992; the system I developed with Mr. Brian Foote in 1993, which has been used by the FBI, CIA and US Navy (as well as the Harrington case cited above), and the Farwell 2007 system pictured in *Defense Exhibit 3*, as well as numerous other systems developed in other laboratories based on my original system. The methods for overcoming the "challenges" in ¶10 a-g were published by myself and others in many journals available in the public domain.[1] There is nothing unique or proprietary about the BWS system's way of dealing with them. All of these methods were implemented in the Farwell 2007 system referenced below, and all of the algorithms, mathematical formulas, experimental design features, and everything else of substance in the BWS application had previously been implemented by me in the Farwell 2007 system and others. In fact, the Farwell 2007 system formed the

---

[1] Contrary to Mr. Ika's claim in ¶ 10 (f), the BWS system did not implement "machine learning algorithms and Artificial Intelligence." My colleagues and I have, however, implemented these in other systems, but not in the Farwell 2007 system from which I brought the algorithms, mathematical formulas, experimental design, etc. that formed the basis for the BWS system.

basis for BWS' development work on the BWS system after I provided these to BWS in 2012.  These methods as provided to BWS are also within the public domain and cannot to my understanding be considered trade secrets to me or BWS.

24. All the algorithms used in the BWS system were developed and applied by others before BWS even existed, including those incorrectly labeled "brainwave trade secrets" in ¶ 11 of Mr. Ika's Declaration.  The term "proprietary software code" is not defined as to content and scope and is therefore illusory.  The hardware used comprised an "off the shelf" PC computer and a headset developed by National Yangming Jiaotong University ("NYJU") in Taiwan.  None of the systems I had previously developed used this headset, and the system Dr. Maison and I later developed did not use it either.

25. If BWS's claim is that the software that communicates with that headset is proprietary it is of no matter because the Farwell/Maison system does not use it since it employs a different headset.

26. Regarding "user interface," BWS's was developed using open-source software packages that largely determine what the interface looks like and how it operates.

27. In response to the claim that BWS has created a system that is accurate, there is simply no proof of this; the BWS system has never been tested in a scientific laboratory or successfully applied in real-world cases.  There is no evidence that the system is accurate.

28. The only available proof of accuracy of brainwave-based systems for detection of concealed information stored in the brain are the scientific papers and real-world applications of systems I developed, and which were proven to be highly accurate, even admissible in a criminal proceeding, as well as scientific research papers by numerous other scientists based on my original invention and scientific publications.

6

29. There are two substantive things that all programs for detecting concealed information with brainwaves, including the BWS software, do: a) Collect brainwaves along with other data such as ongoing counts of the types of stimuli that have been presented to elicit the brainwaves.  The brainwaves are displayed as plots of colored lines. The other data are displayed in tabular form; b) Analyze brainwaves: In the displays of this function, the brainwaves are again presented with colored lines, and the data about the results of the analysis are presented in tabular form.

30. The only screenshot Mr. Ika has presented of the essential function of collecting brainwaves in the BWS software is *BWS Exhibit B*.  (Also, in *BWS Exhibit D* on the "Replay Test" screen, the same brainwaves and data are displayed during a replay of the test that looks essentially identical to display during the original recording but displays previously recorded data rather than real-time data while being originally collected.)

31. The first photo in *Defense Exhibit 3* was taken in 2007.  It depicts my Farwell Brain Fingerprinting system that I developed with Mr. Brian Foote.  The second photo was taken in 1993.  It shows a previous version of this system that we developed and used for research at the FBI, the CIA, the US Navy, and in criminal cases, including the Harrington case wherein Farwell Brain Fingerprinting was ruled admissible in court, and in several publications in peer-reviewed scientific journals.  This is essentially identical to the Farwell 2007 system except for the respective labels for the name of the system ("Farwell Brain Fingerprinting" in 2007 and "Farwell MERA System" in 1993).

32. Comparing Dr. Farwell's 2007 program with the BWS program reveals the following:

a) The brainwave plots in my 2007 program (before BWS was founded in 2012), shown on the screen in the upper right of the photo, are identical to the brainwave plots in the BWS

program.  The only differences are the number of EEG channels and minor cosmetic differences in the shape of the windows, background color of the display, etc. The brainwaves collected and displayed therein and the experimental protocols and algorithms for collecting them are also the same in the BWS software as in my earlier software.

b)  The data tables in this Farwell 2007 program are also identical to the data tables in the BWS program, displaying the same data with the same labels, and even have the same columns and rows in the same order.

33. This is because the BWS program was developed to emulate as closely as possible my earlier programs that performed all the same functions, based on public-domain information and specifications I provided to BWS (and to many others before BWS existed).

34. Specifically, the brainwave plots in both the BWS system and my Farwell 2007 system display the three types of brainwaves as described by Dr. Maison in his declaration: Targets, Probes, and Irrelevants.  These are labeled as Targets, Probes, and Irrelevant in both programs and plotted respectively in red, blue, and green lines in both programs. The only differences between the plots are minor cosmetic differences resulting from different open-source programs used to generate the displays.  The underlying data, algorithms, mathematical formulas, and experimental protocols for producing them are also identical in my 2007 and BWS software.  I know, because I wrote them for the Farwell 2007 program (and earlier ones including the 1993 version) and provided them to BWS in the course of my consulting with BWS.

35. Regarding the data tables, the BWS program and the Farwell 2007 program display the same data with the same labels.  One data table in both programs display counts of the stimuli (words or pictures) presented to the subject.  The BWS table has identical rows and columns, labeled identically, to those of the Farwell 2007 program (columns: Target, Probe, Irrelevant, Total; rows: Trials, Good, Required, RT, Accuracy).

36. A second data table in the BWS program is identical in labels and content to one row of the corresponding data table in Farwell 2007, except for the difference in columns corresponding to EEG channels (2 for BWS, 4 for Farwell 2007).

37. The Farwell 2007 program has more rows in this data table because it implements additional methods for detecting noise or artifacts in the data that are not included in the BWS program.  Note that Ika falsely claimed that the BWS program implemented proprietary trade secrets to detect noise in the EEG data, whereas in fact the BWS program only included one of the four methods for that purpose applied in the Farwell 2007 program, as displayed here.

38.  The algorithms, mathematical formulas, and experimental protocols for producing the data displayed are also identical in the Farwell 2007 and BWS programs.  I know this, because I wrote them for the Farwell 2007 and 1993 programs and gave them to BWS to form the basis of the BWS program.

39. Above these two data tables, both the BWS and Farwell 2007 programs display "stimulus type," "stimulus," and "reaction time," and a few other items.

40. If any program is "plagiarized" from any other, then the BWS program is "plagiarized" from my Farwell 2007 program and/or my Farwell 1993 program.

41. Mr. Ika did not provide a screenshot of the data analysis screen of the BWS program.  However, the data analysis screen in the BWS software is virtually identical to the data analysis screen at the upper left in the photo of my 2007 program.  This includes both identical brainwave plots and identical data tables of the data relevant to the analysis.  Here again, the only differences are cosmetic differences in the size and shape of the windows and other minor differences in the layout of the display.  The data analysis algorithms that produced the data displayed on the BWS data analysis screen are the same as the data analysis algorithms in my previous Farwell 200 application (except that my application performed several additional analyses that were not included in the BWS application).

42. This also is because the BWS program was developed to emulate as closely as possible my earlier programs that performed the same functions, based on public-domain information provided to BWS by myself.

43. Mr. Ika's claim that features described in ¶10 (a – g) are BWS' trade secrets is directly contradicted by the fact that all of these features in the BWS software were contained in in my pre-existing Farwell 2007 software and numerous other software applications by myself and others based on my original Brain Fingerprinting invention and the original software I developed to implemented it.  I know this because I wrote the code in several previous versions such as my 2007 and 1993 versions, I am also familiar with the code implementing these features in the BWS software.

44. Everything of substance in the BWS software had already been implemented by me and others in previous software programs.  If there were grounds for a lawsuit, then I would have grounds to sue BWS for stealing his my "trade secrets" as implemented in 1993 and

10

2007. However, everything of substance was already in the public domain. I had shared it with scientific colleagues and others as explained herein and in Dr. Maison's declaration.

45. The BWS program adds nothing to the value of the programs already in the public domain, including the programs I invented and developed.

46. Mr. Ika and BWS are taking ideas that have been publicly available for years (at least since 1985, when I made them publicly available and merely putting them together to try to prevent others from using the publicly available ideas by claiming that they now are entitled to protection as a trade secret.

47. By way of analogy, this is comparable to claiming that a person who creates a sauce using mayonnaise, herbs and a "secret ingredient" has trade secret protection covering not only the secret ingredient, but the components too. Under this theory, mayonnaise and the herbs, both within the public domain, would now be considered trade secrets.

48. The only part of the BWS program that is different from all the previous ones is the specific software that communicates with the headset. My previous programs used different headsets (and associated amplifiers and digital signal processors) from those used by the BWS software. The Farwell/Maison program also uses a different headset from that of the BWS program, so these parts of the respective software programs are totally different. In other words, the only unique part of the BWS program is not included in the Farwell/Maison program.

46. In ¶19 of his Declaration, Mr. Ika references an online demonstration video in which I am depicted along with two computer screens. See, *BWS Exhibit B*.

47. *BWS Exhibit B* is a photograph of two computer screens. On the left is a plot of brainwaves and some tabular information as displayed by the BWS software. On the right is a plot of brainwaves and tabular information displayed by the Maison/Farwell software.

48. The images that are displayed on the screen on the left comprise the following two elements.

49. A) **Brainwave plots**: These plot the same brainwave data that have been plotted in all public-domain applications since I wrote the first Brain Fingerprinting program in 1985. Plotting brainwave data is not a trade secret and is not proprietary to anyone. The appearance of the plots is dictated by the output of the open-source software described below. Anyone who plots these same public-domain data using these same open-source software packages will come up with essentially the same appearance on the screen. None of this is proprietary, and none of it is a trade secret.

50. B) **Data tables**: These display the same data, comprising counts of the number of stimuli presented and brain responses measured, the reaction time of the subject, the accuracy of responses, and other data common to all programs for implementing Brain Fingerprinting. Like brainwave plots, these tables comprise the same data that have been displayed in all public-domain applications since I wrote the first Brain Fingerprinting program in 1985. Displaying data in tabular form is not a trade secret and is not proprietary to anyone. The appearance of the tables is dictated by the output of the open-source software described below, which was used for this application. Anyone who plots these same public-domain data using these same open-source software packages will come up with essentially the same appearance on the screen. None of this is proprietary, and none of it is a trade secret.

12

51. In fact, both the brainwave displays and the data display tables in these photos are virtually identical to the data display tables in the software developed by Brian Foote and myself that I used beginning in the early 1990s (see above discussion of the Farwell 1993 and Farwell 2007 programs and *Defense Exhibit 3*),and very similar to the same the original Brain Fingerprinting software that I developed at the University of Illinois and used in my research there in the 1980s.

52. The open-source software that was used in this application dictated the appearance on the screen of these standard, common, well-known, public-domain data (brainwaves and tabular results – the same ones as in all the other Brain Fingerprinting applications that predated the existence of BWS). The open-source software that was used, which determined the appearance of this screen displayed in the screenshot, is the C# programming language, a very common open-source language (https://dotnet.microsoft.com/languages/csharp).

53. The building blocks of this application use the Microsoft .NET framework. .NET framework is a free software developer open-source platform for building software applications. See, https://dotnet.microsoft.com/

54. This software application uses two different Graphical User Interface (GUI). The GUI is what dictates how the application will look on the computer screen. This software uses Microsoft WinForms and Microsoft Windows Presentation Framework (WPF) both in the public domain and open software. See, https://en.wikipedia.org/wiki/Windows_Forms; https://github.com/dotnet/wpf

55. To facilitate and speed up the development, the programmer (Dr. Maison, when affiliated with BWS) used additional software components to create graphs and display data in

tables. The Graphical display software (Interactive Data Display created by Dmitry Voitsekhovskiy and Mikhail.) is open software and freely downloadable on the GitHub repository. See, https://www.microsoft.com/en-us/research/project/interactive-data-display/;https://github.com/predictionmachines/InteractiveDataDisplay and https://github.com/microsoft/InteractiveDataDisplay.WPF

56. When these open-source software components are used, the display looks like the one on the left in *BWS Exhibit B*. The appearance is automatic, except for a few minor adjustments such as the color.

57. The data table package is based on the Extended DataGrid open-source project as mentioned in https://www.findbestopensource.com/tagged/datagrid?fq=Ms-PL the project was so successful that it's now incorporated into Microsoft's open-source framework. See, https://github.com/dotnet/DataGridExtensions

58. Using this package, as the BWS developers did, further dictates how the data tables will look when displayed on the screen.

59. Any software displaying essentially the same public-domain data (the standard brainwaves measured in all applications for detecting concealed information with brainwaves) and tabular results (the standard parameters tabulated in all applications for detecting concealed information with brainwaves), using the same open-source software packages used here, will inevitably look like the screen in this photograph. The software that produced the displays and determined how they look is open source. The data displayed are the same standard data displayed in every program for detecting concealed information with brainwaves since my original implementation in 1985, including the Farwell 2007 and Farwell 1993 programs depicted in *Defense Exhibit 3*.

14

60. There is nothing whatsoever proprietary about any of the above, and there are no trade secrets depicted in *BWS Exhibit B*.

61. The picture on the right in *BWS Exhibit B* of a screen from the Maison/Farwell application looks similar to the picture of the BWS application, as will inevitably be the case when the same public domain data are displayed through the same open-source software packages that dictate the appearance of the display.

62. There are two features of the respective pictures, however, that are noteworthy.

63. The BWS software displayed here measures only two channels, so there are only two lines on the graph.    The headset used by BWS can only measure two channels. The Maison/Farwell headset and software measure four channels, so there are four lines on the graph.  All BWS software measures only two channels, and all Maison/Farwell software measures four channels, as dictated by the respective headsets.

64. The background color of the BWS screen is blue.  All of the screens in all of the software produced by BWS software had a blue background.  The Maison/Farwell software always has a green background.

65. *After* BWS obtained the Maison/Farwell software from Dr. Maison, however, and before they submitted it to the Codequiry comparison, *BWS modified their software to look more like the Maison/Farwell software*.  One of the modifications was changing the background color of the screen.   All of the purported "BWS Software" in all of the comparisons except this one has a green screen, like the (later produced) Maison/Farwell software, and unlike the actual BWS software that pre-existed the Maison/Farwell program. This can be verified by examining the dates for the modifications in Microsoft Visual Studio.

66. This one screen is the only one in all of the exhibits that actually comes from the real, unmodified BWS program.  And note that the similarities on the screen between this and the Maison/Farwell software are inevitably produced by displaying the same public-domain data using the same open-source software packages that dictate the appearance of the screen.  These same data are displayed in the same way, except for minor cosmetic differences based on the different open-source software packages used, in my 2007 and 1993 programs, as noted above.

67. One obvious difference between the two is that Maison/Farwell used four channels and BWS used only two, according to the requirements of their respective headsets.  Other differences are discussed below.

68.  How extensive the additional modifications made by BWS, if any, will be revealed in discovery through an in-person analysis of the BWS software.  In any case, the software that BWS represents as the software that Dr. Maison copied – the screens with the green background and unknown additional modifications implemented later by BWS – *did not exist at the time that BWS says Maison obtained it.  It was created* (that is, modified from the original BWS program) *after BWS had obtained the Maison/Farwell software*, in order to make the purported BWS software look more like the Maison/Farwell software.

*69.* Contrary to their claims, BWS could not have compared the BWS software that pre-existed the Maison/Farwell software with the Maison/Farwell software.  More likely, BWS compared a modified version of its software, made to look more like the Maison/Farwell software, with the Maison/Farwell software.  Consequently, *all of the claims regarding similarity of the two respective software programs are based on a flawed and disingenuous comparison by BWS.*

16

70. At ¶22, BWS touts its use of a Codequiry software to prove that Dr. Maison and I plagiarized BWS software.  First, neither Dr. Maison nor I need or want to plagiarize BWS software since we are both leading experts in the field of brain fingerprinting and are more than capable of developing our own software that is more effective than anything BWS could ever create.  My 2007 and 1993 programs are examples.

71. *BWS Exhibit C* is the Codequiry analysis, which I will discuss in detail.  Page numbers referenced below are from *BWS Exhibit C*.

72. Page 1 contains a definition of plagiarism and a discussion of "How to determine if your proprietarily [sic] software is stolen and used by someone else." Obviously, no trade secrets are contained in this information.

73. Page 2 states "We submitted Brainwave Science software and Brain Fingerprinting software to the Codequiry engine."

74. The package on the left, titled "All the software projects developed by Brainwave Science for iCognative Software," was purportedly compared with the package on the right, titled "The software projects that is [sic] used by Brain Fingerprinting LLC. for NeuroDyne software."

75. That description is unequivocally and demonstrably wrong.

76. There are two misstatements here:

77. First, BWS manipulated the code that they submitted for comparison. BWS had the original code developed by Dr. Maison when he was affiliated with BWS, which they were using in their application.  This is what they claim as proprietary.  They did NOT, however, submit that code to the Codequiry engine.  BWS first obtained from Dr. Maison a copy of the code that he and I jointly developed ("NeuroDyne"), then modified their code to appear

similar to the Maison/Farwell code and submitted the two respective codes for comparison**. This can be proven by examining the dates for the modifications in Microsoft Visual Studio.**

78. Second, BWS did not submit "All the software projects…"  They only submitted a portion of the software, and did not include the actual software for measuring brainwaves through the headset – the essential part of a brainwave program. The only software that was not open source and might be considered proprietary is the software that measures the brainwaves through the headset.  The headset used by BWS is totally different from the headset used by me and Dr. Maison.  The respective headsets are developed and marketed by different third parties (BWS' is from NCTU in Taiwan; Maison/Farwell's is from CGX in the USA).  BWS' headset measures two channels of EEG, Maison/Farwell's measures four channels.  More importantly, the software for measuring brainwaves through a headset – the essential constituent of any brainwave program – is complex, extensive, voluminous, and unique to each headset.  The Maison/Farwell software for this portion of the code is totally different from the BWS software.  The BWS software will not work with the Maison/Farwell headset and vice versa.  If BWS had compared the actual respective software applications that measure the brainwaves through the two different headsets, there would have been close to a 0% match.  BWS reported a 99% match.  This could not possibly have been achieved if the actual software for measuring the brainwaves through the headset were evaluated.

79. Accordingly, there are no trade secrets on Page 2.

80. Pages 3 – 5 contain the results of the misleading and disingenuous analysis on the wrong software.

81. Since this analysis comprised essentially a fake comparison, the summary statement is false: "99% of Brainwave Science's …proprietary files are used…"

82. Actually, only 3% of the code showed matching information, as per the Codequiry figures for "total matches" compared to "lines of code."

83. Given that the code was developed on the same platform by the same developer (Dr. Maison) and performed a similar function, inevitably there will be at least that number of matches.

84. There is no indication in the Codequiry report that any of these matches on 3% of the code were in code that might be construed as proprietary to BWS.

85. In any case, nothing actually contained on this Page constitutes trade secrets.

86. Page 6 misrepresents what is displayed on Pages 7 and 8.

87. As with Page 1, the side-by-side comparison is represented as being BWS's code versus Maison/Farwell code, whereas in fact the code on the left is BWS's modified version of their code, modified to look more like the Farwell/Maison code after BWS received it from Dr. Maison.

88. Pages 7 and 8 contain lists of folder names taken from screenshots taken in visual studio, an open-source development environment.

89. The open-source development environment and tools used to create that are described in Dr. Maison's declaration.

90. The lists of folder names on Pages 7 and 8 are the digital equivalent of taking a photograph of a file cabinet drawer containing labeled folders, and then claiming that the papers in the folders and the information on the papers in the folders are proven to be trade secrets. I can on request produce an identical screenshot, with all the same folder names, where the

files in the folders contain only software developed by Mr. Brian Foote and me to implement a version of my Brain Fingerprinting invention that preceded the existence of BWS. Anyone can make a list of file folders. Recall that BWS had a copy of the Maison/Farwell code, including all the folder names. A list of file folder names says nothing about whether the folders contain relevant files, or whether or not the code or other information in those files constitutes trade secrets.

91. Many of the file folder names on both lists are standard, default file folder names of visual studio in the .NET development environment (e.g., Controls, Resources, Login, Themes, Updates, etc.).

92. In any case, a list of the names of file folders provides no information, let alone proof, that any of the files in the folders, or the information or code in the files, is proprietary or constitutes trade secrets.

93. There are no trade secrets on Pages 7 and 8 of *BWS Exhibit C*.

94. In summary, there are no trade secrets anywhere in *BWS Exhibit C*.

95. *BWS Exhibit D* was produced by applying the same open-source software packages as described in the discussion above of **BWS Exhibit B** to more of the same standard information that is displayed in many previous applications for measuring brainwaves for the detection of concealed information. Much of the same information, such as subject demographics, is also collected in other kinds of applications. As in *Defense Exhibit 3*, the appearance of the screens is dictated by displaying the same public domain data through the software packages discussed below.

96. The Software components are written in Microsoft C# programing language. C# (pronounced See-Sharp) is a popular and modern programming language created by

Microsoft in 2000 alongside their .NET framework. They wanted a more flexible language to build a variety of secure and robust modern applications for Windows, web servers, tablets, and phones. It is now arguably one of the most valuable programming languages in the world to know. C# is an open-source programming language. See, https://dotnet.microsoft.com/languages/csharp .

97. Aside from the language itself, the building blocks of the application use the Microsoft .NET framework (pronounced as "dot net").  .NET framework is a free software developer open-source platform for building software applications.   See, https://dotnet.microsoft.com/

98. The software application uses two different Graphical User Interface (GUI).  The GUI is what dictates how the application will look on the computer screen.

99. We use Microsoft WinForms and Microsoft Windows Presentation Framework (WPF) both in the public domain and open software. https://en.wikipedia.org/wiki/Windows_Forms; https://github.com/dotnet/wpf

100. To facilitate and speed up the development we used additional software components to create graphs and display data in tables.  The Graphical display software (Interactive Data Display created by Dmitry Voitsekhovskiy and Mikhail.) is open software and freely downloadable on the GitHub repository. See, https://www.microsoft.com/en-us/research/project/interactive-data-display/; https://github.com/predictionmachines/InteractiveDataDisplay and https://github.com/microsoft/InteractiveDataDisplay.WPF

101. The data table package is based on the Extended DataGrid open-source project as mentioned in https://www.findbestopensource.com/tagged/datagrid?fq=Ms-PL .

102.     The project was so successful that it's now incorporated into Microsoft's open-source framework. See, https://github.com/dotnet/DataGridExtensions .

103.     The internal data format for storing data uses the extended Markup Language (XML) as described in open standard. See, https://www.w3.org/XML/ https://en.wikipedia.org/wiki/XML .

104.     Microsoft provides free of charge the necessary tools to create software for Windows or other platforms.   We used Microsoft Visual Studio. See, https://visualstudio.microsoft.com/vs/community/ .

105.     As with *BWS Exhibit B*, *in BWS Exhibit D*, there is nothing proprietary about either the information displayed – the common, public-domain information displayed in all such programs – or the appearance of the displays – which is dictated by the open-source software packages used to display the information.

106.     *BWS Exhibit D* contains no proprietary information and no trade secrets.

107.     Moreover, as discussed above with reference to *BWS Exhibit B*, all of *BWS Exhibit D* is misleading and disingenuous.  The screens shown in *BWS Exhibit D* that purport to be the original BWS screens are not in fact what BWS has represented them to be.  All of these screens have been modified to look more like the Thierry/Farwell software. This can be proven by examining the dates of the modifications in Microsoft Visual Studio.

108.     The most obvious modification is to change the background color from blue to green.  All BWS software that pre-existed the Maison/Farwell software – that is, all of the software that BWS claims Maison/Farwell copied – had blue backgrounds.  All of the screens shown in Exhibit D for both the purported BWS software, and the Maison/Farwell software have green background.

22

109.     This indisputable fact has three implications: (1) BWS manipulated the code they submitted to the Codequiry comparison; (2) BWS manipulated the code that generated the screenshots in *BWS Exhibit D*; (3) we will not know how much BWS modified the "BWS code" to make it look more like the Maison/Farwell code until after an in-person, live analysis of the BWS software through discovery.

110.     At the present time there is no evidence that the Maison/Farwell code is similar to the pre-existing BWS code, because the pre-existing BWS code is not what was submitted to Codequiry or represented in the Exhibits and Mr. Ika's affidavit.

111.     At ¶29, Mr. Ika expresses his frustration at our success by complaining that Dr. Maison and I have "surreptitiously distributed or licensed copies of a system, incorporating the Brainwave Trade Secrets, to the Clinical Legal Studies Department at University of Canterbury, New Zealand and to the Forensic Science Laboratory for the Government of Delhi, India."  There is nothing surreptitious in our scientific collaborations with the University of Canterbury or our working with the Forensic Science Laboratory for the Government of Delhi, India. Neither of these involved any trade secrets of BWS.  I have successfully applied my Brain Fingerprinting invention in the laboratory and the field and in collaboration with academic and government agencies since his collaboration with the CIA, the FBI, and the US Navy in the early 1990s and my prior research at Harvard and the University of Illinois.

112.     Since, as established above, Defendants have not misappropriated any trade secrets, there can be nothing "surreptitious" about Dr. Maison and I marketing our successful application of Farwell Brain Fingerprinting to governments, universities, and law enforcement agencies.  BWS is free to do that same, that is, to compete in the free market.

23

Instead, by bringing this action, it seeks to circumvent the free market by nullifying a competitor.

113.     For the reasons set forth above and all Defendants' submissions, I request that the Court deny BWS's motion for a preliminary injunction in all respects.

Dated:  Kingston, WA
        November 15, 2021

_____
Dr. Lawrence A. Farwell

Sworn to before me this 15 day of November, 2021

State of  WASHINGTON
County of  KITSAP

On this, the  15  day of November, 2021, before me, a notary public, the undersigned officer, personally appeared Lawrence A. Farwell, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness hereof, I hereunto set my hand and official seal.

_____
Notary Public  Erin Patton
EXP  January 24 2022

ERIN PATTON
EXP. 01-24-2022
NOTARY PUBLIC
COMM# 170172
STATE OF WASHINGTON

24

Exhibit AX

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
BRAINWAVE SCIENCE, INC.
        Plaintiff,

- against -

ARSHEE, INC., DR. LAWRENCE A.
FARWELL, DR. THIERRY MAISON and
BRAIN FINGERPRINTING FOUNDATION

                              Defendants.
--------------------------------------------------------- X

       Dr. Thierry Maison, being duly sworn, deposes and says as follows:

1. I am a Defendant in the above action.

2. I make this declaration in opposition to the motion for a preliminary injunction brought by the Plaintiff, Brainwave Science, Inc. ("BWS").

3. This declaration is made primarily to rebut and respond to many of the claims made in the declaration of Krishna Ika in support of BWS's motion.

4. I will specifically address many of the errors and misstatements made in Mr. Ika's declaration.

5. In terms of my background and experience as it relates to the matters raised in this action, I respectfully refer the Court to my curriculum vitae attached as Exhibit A.

6. References will be made to the ECF page ID# and the paragraph numbers of Mr. Ika's declaration so that the Court can examine each side by side to more easily discern the conflicting facts alleged in each declaration.

7. At page ID #85 ¶ 8, Mr. Ika claims I acted as the "chief architect for the iCognitive system. However, this product name or market was created after I departed from BWS.

1

8. At Page ID #86, ¶ 10 (c), contrary to what Mr. Ika claims, the capture of P300 brainwave response is the capture of Electro Encephalogram (EEG) measurements, a technique created by Hans Berger in 1924 - https://en.wikipedia.org/wiki/Electroencephalography. There is nothing proprietary to BWS in regard to this technique. Many EEG capture devices existed before BWS created their own.

9. Page ID #86 ¶ 10 – (d): "Noise" is a random signal. Removing noise is a very old technique used in many advanced digital signal processing processes. By adding multiple frames to eliminate the random signal, it leaves intact the real signal. It is a basic property of random numbers and was not created explicitly for BWS. It is used in radio, image processing, and very low signal processing. I refer the Court to these publicly available sources that explain the noise elimination technique:

https://4nsi.com/optimizing-image-signal-to-noise-ratio-using-frame-averaging/

https://terpconnect.umd.edu/~toh/spectrum/SignalsAndNoise.html

http://www.columbia.edu/cu/appliedneuroshp/Fall2017/signalprocess.pdf


10. Page ID #86 Paragraph 10(f): I did not design Machine Learning (ML) or Artificial Intelligence (AI) algorithms in the Brainwave Science system. Using ML and AI for such analysis would require a powerful computer that is only available in Cloud computing.

11. Page ID #86 ¶ 11: The algorithm for Brain Fingerprinting analysis is a simple mathematical comparison of three signal curves captured under three stimulus conditions.

12. First, establish a "baseline" by presenting stimuli that have nothing to do with the fact or facts under investigation. We call those facts "Irrelevant" in the Brain Fingerprinting lingo.

2

13. Second, we qualify the typical response of the subject brain by presenting facts that we are certain are known and familiar to the subject. Those facts are called "Targets".

14. Third and last, the investigator prepares a fact that only the perpetrator would know. The investigator must ensure that this fact is not publicly divulged and therefore cannot corrupt any measurement on innocent or other subjects. Those specific facts are called "Probes".

15. Then facts are presented randomly to the subject and the corresponding measurements are created.

16. The analysis consists of a simple comparison of the three types of curves. Public domain mathematical algorithms like Pearson Correlation are used. I respectfully refer the Court to https://en.wikipedia.org/wiki/Pearson_correlation_coefficient.

17. Contrary to what BWS claims, there is nothing proprietary about data analysis. Simply explained, if the Probe looks like more to a Target, the fact is known. If the Probe resembles more as an Irrelevant, the fact is unknown. We give the investigator a percentage ratio of the comparison. Brain Fingerprinting does not establish a guilty/innocent judgment. Only the investigator determines that.

18. The only device that could be considered unique to BWS is the EEG headset and its software interface design. However, that design was very specifically excluded from the Farwell Brain Fingerprinting design.

19. Page ID #86 ¶ 13: Contrary to Mr. Ika's claim that the system was created on a cloud-based server, during my tenure with BWS, the application was developed in a company-hosted development environment server, not a cloud-based environment.

20. Page ID #86, ¶ 20: The referenced Google Drive was created at the request of Mr. Paul Tomkins, attorney for BWS, and was a copy of my note directory. This directory and/or its

3

content were never supplied to Farwell. Nothing contained in the Google Drive is proprietary to the BWS application; rather, it includes only copies of open-source programs and applications that inspire me in creating new features in the Farwell Brain Fingerprinting application.

21. I found the entire BWS source code located in a publicly accessible directory with a Google search. I created a copy and hosted it in a Visual Studio cloud-based development environment, with a link I later shared with Mr. Tomkins. Recognizing the [publicly accessible] software, I admitted to Mr. Tomkins only that I made a copy of it and used the non-proprietary portion of the software.

22. Page ID #86 ¶ 22: The Proprietary portion of BWS software was deleted and replaced with our development, in particular note our capture software uses a 4 channel EEG, while BWS uses only two. Sharing this link demonstrates that the allegedly proprietary software was not used. Our software includes a new DC (direct current) removal to combat the galvanic problem of EEG electrodes (not in BWS software) and Digital Signal filtering for ERP display (not in BWS software). The Codequery software comparison of the BWS proprietary software and our proprietary software was conveniently omitted.

23. Page ID #86,¶ 23: It is clear to me that the BWS software and Codequery were manipulated to make it appear that we had plagiarized BWS software. Our User interface utilizes a green color background, while BWS uses a blue background (Page ID #86 ¶ 22 – Exhibit B) and the side-by-side windows view demonstrates that they modified their code to use the same color to influence the Exhibit. Additionally, the comparison of the proprietary software was never provided. (Exhibit D)

24. As a general matter, there is very little about the BWS system that could be considered new or proprietary. Nothing incorporated into the Farwell system was unique or proprietary to the BWS system.

25. To the extent that Mr. Ika's affidavit is based on his own scientific knowledge, I would respond that Mr. Ika is not a scientist and has little to no understanding of the brainwave technology. This is why he looked to outsiders to attempt to manipulate the existing technology.

26. His purpose is to exploit the brainwave technology solely for monetary reasons. While that may be a legitimate motive, it calls his credibility into question.

27. To the extent my declaration conflicts with Mr. Ika's declaration, a hearing should be held where Dr. Farwell and I can testify more specifically to the workings of the BWS system as compared to our system.

28. At such a hearing I believe the Court will see that there is very little that could be considered proprietary about the BWS system.

Dated: Franklin, Massachusetts
     November 12, 2021

Dr. Thierry Maison

Sworn to before me this *13* day of November 2021

Notary Public


KERI A. BAKER
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS
MY COMMISSION EXPIRES
JUNE 23, 2028

# Paul Forrest Tomkins, Esq.

11 Broadway, Suite 615, New York, NY 10004
607-221-1279 - pault@pftlaw.com

June 30, 2021

Ms. Adela Kardos
General Counsel and Registrar
**University of Canterbury**
Ilam Road, Ilam,
Christchurch 8041, New Zealand
**VIA EMAIL: adela.kardos@canterbury.ac.nz**

Prof Robin Palmer
Director of Clinical Legal Studies
**University of Canterbury**
**Ilam Road, Ilam,**
**Christchurch 8041, New Zealand**
**VIA EMAIL:  robin.palmer@canterbury.ac.nz**

RE:    **"Brain Fingerprinting"**
**Theft of Trade Secrets**

Dear Ms. Kardos and Professor Palmer,

The undersigned serves as In House and Outside Counsel to Brainwave Science, Inc.  My office has recently been retained in connection with a potential claim to be filed for Theft of Trade Secrets (18 U.S. Code § 1832).  It has come to our attention that Brainwave Science, Inc's Trade Secrets (including, but not limited to, scientific, technical, and engineering information) have been surreptitiously and illegally transferred by the company's former Chief Technology Officer, Dr. Thierry Maison, to individuals and entities including the Brain Fingerprinting Foundation, Dr. Lawrence Farwell, Mr. Ernest Robinson and/or Mr. Harold Higgs.   Our ongoing investigation revealed that certain of these corporate and individual actors are actively marketing, and attempting to distribute, software which infringes upon the trade dress, trademarks and/or other

intellectual property owned by Brainwave Science, Inc.  On Monday, June 28, 2021, upon being confronted with the findings of our investigation, Dr. Maison has admitted to, and provided evidence of, his transfer of the afore-referenced trade secrets to a Dr. Lawrence Farwell.  A screenshot of Dr. Maison's written acknowledgement is attached hereto for your reference.  Side-by-side screenshots of the Windows® version of our own system and systems being marketed and distributed by the afore-referenced individuals are also attached.   Our development team subsequently engaged an outside Code Similarity Checker, codequiry®, to perform a "Measure of Software Similarity" analysis to confirm whether and/or the degree to which Dr. Farwell's "Brain Fingerprinting" software is copied from Brainwave Science, Inc's iCognative®. **Codequery's analysis indicates a 98-99% likelihood of "plagiarism" by Dr. Farwell's software.**

The Theft of Trade Secrets Act (18 U.S. Code § 1832) provides for fines (up to $5,000,000) and/or imprisonment (up to 10 years) for any person or entity who 1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information; 2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information; (**3**) **receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;** (4) attempts to commit any offense described in paragraphs (1) through (3); or (**5**) **conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy.**  (18 U.S. Code § 1832(a)(1-5) (emphasis added)) Additionally, the law allows for a private cause of action by owners of misappropriated Trade Secrets with remedies including civil seizure by law enforcement, injunction, actual damages and/or royalties (18 U.S. Code § 1836).

It has come to our attention that one or more of these individuals or entities has provided intellectual property encompassing the afore-referenced stolen Trade Secrets to the University of Canterbury.  Several web postings of your institution's collaboration with the afore-referenced

individuals depict the use of the infringing software – including an interface nearly identical to that developed by our company[1].

**While we recognize that your institution was unaware that subject system incorporates stolen intellectual property, we must respectfully insist that your institution immediately cease and desist from further use, depiction or distribution of the "Brain Fingerprinting" system.**  Furthermore, since we have reason to believe that paper files and/or electronic communications in your possession are relevant to actions presently pending and/or to be filed against one or more of the above-referenced parties,  Brainwave Science, Inc., respectfully requests that you preserve all electronically stored information, copies and backup, as defined by Rule 34 of the Federal Rules of Civil Procedure, along with any paper files which you maintain regarding communications and business transacted with the above-referenced individuals and entities. Brainwave Science, Inc. will be seeking in discovery all electronic data in your custody and control that is relevant to this action, including, without limitation, emails and other information contained on your respective computer systems and any electronic storage systems. Brainwave Science, Inc. considers this electronic data and paper files to be valuable and irreplaceable sources of discoverable information in this matter. Brainwave Science, Inc. hereby places you on notice to preserve all documents regarding this matter. In addition, Brainwave Science, Inc. places you on notice not to allow the deletion of any electronic communications, such as emails, relating to this subject of this controversy.

I and my client sincerely regret the inconveniences now caused by what appears to be your institution's unknowing utilization of a plagiarized version of our system.  Brainwave Science, Inc. regularly partners with distinguished international research institutions like the University of Canterbury.  Brainwave Science's P300 technology, "iCognative®, incorporates research by and collaboration with the late Dr. Peter Rosenfeld. Dr. Rosenfeld, who served as our Company Scientific Advisor until his passing, was one of the world's leading experts on lie detection, a

---

1.  https://www.stuff.co.nz/science/116427307/brain-fingerprinting-testing-the-tech-that-couldve-freed-teina-pora-earlier

Paul F. Tomkins, Esq.
Admitted New York State Supreme Court, Appellate Division (Reg. 4195632)
United States Federal District Court (NDNY, Bar Roll No. 513006)

highly respected ERP researcher and Full Professor at Northwestern University.[2]  Upon resolution of this issue within the United States Federal Courts with the afore-referenced individuals and entities, Brainwave Science, Inc. would certainly be open to discussing an additional collaboration with University of Canterbury.

Please do not hesitate to contact me directly should you have any questions pertaining to this matter.  I may be reached at ptomkins@brainwavescience.com or (607) 221-1279.

Sincerely,

Paul F. Tomkins

Paul F. Tomkins, Esq.
In House Counsel
Brainwave Science, Inc.

cc:    Brainwave Science, Inc

---

[2] More information about Dr. Rosenfeld and his team's continued research can be found on Northwestern University's website: https://news.northwestern.edu/stories/2021/03/j-peter-rosenfeld-dies-at-81/

Paul F. Tomkins, Esq.
Admitted New York State Supreme Court, Appellate Division (Reg. 4195632)
United States Federal District Court (NDNY, Bar Roll No. 513006)

**Exhibit DAAJ**

28375 Sandy Beach Lane NE
PO Box 547
Kingston, WA 98346
brainwave@larryfarwell.com
Phone +1 206-905-1009
Mobile +1 206-250-5516

Washington State Bar
Association Office of
Disciplinary Counsel Attention
Henry Cruz, Esq.
1325 4th Avenue, Suite 600
Seattle, WA 98101-2539
**VIA EMAIL:  Henryc@wsba.org**

Re:      ODC File: 21-01032
Grievance filed by Lawrence Farwell

**Dr. Farwell's Response to Paul Mr. Tomkins' Response of December 22, 2021**
**Dr. Lawrence A. Farwell**
**January 15, 2022**

In this Response I reply to Mr. Tomkins' Response of December 22, 2021.

In addition, I report herein two new violations of the Rules of Professional Conduct by Mr. Tomkins that have occurred recently.

For the convenience of the reader, I have in some cases reproduced below a few short relevant portions of my original Complaint and my previous Response, sections to which I refer in this Response.  These sections are clearly marked and indented.

My response comprises individual sections that:

- Expose one of Mr. Tomkins' most recent violations of RPC, in which he lied to a judge about major material fact that is relevant to this inquiry and to an ongoing lawsuit;

- Address Mr. Tomkins' failure to respond to a series of 24 lettered statements of fact included in my previous Response, statements that now stand as undisputed, true, and factual.  In light of the truth of these statements, the conclusion is inevitable that Mr. Tomkins is not only a defender but also a perpetrator of fraud, racketeering, and other crimes and transgressions, as specified in my original Complaint.

- Address Mr. Tomkins' failure to provide any evidence that the 21 numbered statements of fact included in my previous Response are anything other than true and factual.  In fact, due to the evasiveness of his responses, almost all of my 21 statements remain undisputed.  The truth of these statements leads to the inevitable conclusion Mr. Tomkins has made numerous false statements to a tribunal and to others, in direct contradiction of the established facts and in violation of RPC.

1

- Expose a second recent violation of RPC by Mr. Tomkins.

- Provide a brief background on the science, technology, and computer software at issue in the recent case[1] cited by Mr. Tomkins in his response.

- Shed light on the issues in said case, specifically:

  - o  Correct Mr. Tomkins' mischaracterization of the current Order in the case and its implications;

  - o  Show that Mr. Tomkins' statement that "Brainwave's DTSA claims are fully supported," is false; and

  - o  Show how Mr. Tomkins' demonstrable lies and Mr. Ika's perjury were designed to deceive the judge, and how they contributed to the current ruling in the case.

- Demonstrate that Mr. Tomkins demonstrable (and demonstrated) lies comprise part of a larger, coordinated pattern of fraud and racketeering by Mr. Tomkins and Mr. Ika.

If you have any questions, please feel free to contact me.

Sincerely,

Dr. Lawrence A. Farwell

brainwave@larryfarwell.com
phone +1 206-250-5516
mobile +1 206-905-1009

---

[1] **Brainwave Science, Inc. v. Arshee, Inc. et al** (1:21-cv-04402-BMC) (EDNY August 5, 2021).

2

### Mr. Tomkins First New Violation of the Rules of Professional Contact

In the following incident, Paul Mr. Tomkins violated the following Rules of Professional Conduct:

*RPC 3.3 CANDOR TOWARD THE TRIBUNAL*

*(a)  A lawyer shall not knowingly:*

  *(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;*

In a hearing on November 30, 2021 in the New York Supreme Court case referenced in my Complaint and Mr. Tomkins Response, Judge Cogan asked how much profit accrued from sale of iCognative brainwave systems by Mr. Tomkins' client, Brainwave Science, Inc.

**Mr. Tomkins stated that his client had sold iCognative systems for a cost of about $400,000 per license, and each sale included several licenses, and that more than one such sale had taken place.**

**All parts of that statement are entirely false.**

Mr. Tomkins knows his statement is false, and knew it at the time.

Brainwave Science, Inc. has never sold a license for an iCognative system (or any other brainwave system) for $400,000 (or anything remotely approaching that figure).  They have not sold multiple licenses to the same customer for that price.  They have not made similar sales to multiple customers.

To my knowledge, Brainwave Science, Inc. has never sold any of their iCognative systems to anyone.  They have supplied some of their brainwave systems to a few potential clients for the purposes of demonstration, but nothing remotely resembling what Mr. Tomkins claimed has ever occurred.

Mr. Tomkins' false statement is material to the case at hand.  He made the statement in answer to the only question the judge asked during the hearing.  The hearing was about (false) allegations by Mr. Tomkins' client that the Defendants (including myself) had misappropriated his client's trade secrets embodied in the brainwave systems specified in Mr. Tomkins' false statement, and thereby cost his clients potential sales and money.  The amount of money accruing from sales was an important part of the judge's deliberations regarding alleged damages.

In reality, Mr. Tomkins' client's entire brainwave system was a copy of a system that I invented, patented, and developed, and had been using since the 1980s.  In particular, I provided Mr. Tomkins' client with all the details of a system I developed in 2007. I provided his client with all the algorithms, experimental protocols, specifications, methods, and everything they needed to build the system to imitate what my original system accomplished.  This is like some businessman with zero knowledge, expertise, experience, credentials, education, or aptitude in aeronautics or airplanes accusing the Wright brothers of stealing the intellectual property of the airplane from him. I would have no imaginable reason for misappropriating Mr. Tomkins' client's untested and unproven system, when I had a brainwave system of my own that I had developed, published in the scientific journals, tested and proven at the FBI, the CIA, and the US Navy, and successfully applied in the field, a system that had been ruled admissible as scientific evidence in court.  Brainwave's system has achieved none of these.

In any case, regardless of the merits of the case, Mr. Tomkins' statement was unequivocally and demonstrably false, and was material to the case at hand, to the deliberations and ruling of the judge, and to my Complaint against Mr. Tomkins.

## Mr. Tomkins Obfuscation and Attempted Deception in His Response

Throughout his Response, Mr. Tomkins has done exactly what I predicted he would do in my previous Response.  I wrote:

> The strategy he has followed consistently in the past is not to deny the indisputable facts, but simply to ignore them.  He used verbal trickery to persist in repeating his false statements, surrounded by verbiage designed to distract the reader, verbiage that makes his false statements appear plausible as long as one does not refer to the actual facts of the situation.

> It can be expected that Mr. Tomkins will do what he has done on previous occasions when the same facts have been brought to light: to refuse to directly address each of the specific facts stated above, specifically facts 1 - 21 (along with the corresponding sections of my original Complaint).  Instead, if past behavior is a predictor, he can be expected to engage in an extensive and mostly irrelevant narrative that sidesteps any discussion of the proven facts, attempts to discredit me and my colleagues in various ways and to justify his pattern of forum shopping, and repeats his previous false statements in the midst of various verbiage without ever actually addressing the proven facts that stand in absolute contradiction to his false statements.  This verbiage can be expected to be articulate and internally consistent, and may appear to be reasonable until or unless one considers it in light of the proven contradictory facts 1 – 21 that are specified herein, the corresponding sections of my Complaint, and other facts documented therein.

> **Please take into consideration that until or unless Mr. Tomkins specifically addresses each and every one of the particular facts specified as 1 - 21 above, those 21 facts remain undisputed, and his false statements that are contrary to these facts are indefensible and established as false.**

This is exactly what Mr. Tomkins has done in his latest Response. Below I will discuss how Mr. Tomkins applied the above described strategy in his responses to the 21 numbered statements in my previous Response.  The inevitable conclusion, in light of the evidence, is that my 21 specific statements still stand as true and undisputed (except, of course, by Mr. Tomkins' generalized denials of ever doing anything duplicitous, dishonest, or unethical).

Before discussing that, I will discuss Mr. Tomkins response to the other two multi-part statements I made immediately following the 21 numbered statements.  These are the **24 Lettered Statements a. – w.,** to which Mr. Tomkins apparently referred when he stated that I had made 23 allegations (rather than 21).

There are two competing narratives here.  One of them is true, and one of them is false. According to Mr. Tomkins' narrative, he is the attorney for a successful, legitimate, competent forensic neuroscience company.  Mr. Ika and his employees have expertise, experience, training, and competence in forensic neuroscience.  They have developed technology that is proven in the field and published in the scientific journals. They have been successfully practicing forensic neuroscience, and have multiple contracts, each one of which involves several systems each sold

4

for about $400,000. Mr. Tomkins' false statement to Judge Cogan was the keystone of this narrative.

My narrative is that the entire business plan of Brainwave Science constitutes fraud, and that Mr. Tomkins is not simply the attorney to Mr. Ika and his co-conspirators in a racketeering scheme to falsely claim expertise as forensic neuroscientists and falsely purport to be capable and experienced in practicing forensic science in the laboratory in the field, and training others to do so, in order to defraud government agencies into paying them money. This scheme also involved illegally depriving minority shareholders in an LLC of their equity without due process and without any compensation, and gaining control of patents through documents that contain no consideration flowing to the purported assignor in exchange for the patents. In addition, this scheme involved filing a barrage of half a dozen baseless lawsuits against a past witness against Ika in a fraud case (myself) -- who will also almost certainly be a key witness in the future when and if Mr. Ika is brought to justice for the fraud of which he is accused in at least four countries – in a transparent attempt to coerce, intimidate, retaliate against, and discredit said witness. The crimes of which Mr. Ika currently stands accused in at least four countries are essentially the same as the crime for which his partner has already pleaded guilty in US federal court, namely attempting to sell stolen high technology secrets to a foreign government. In my narrative, Mr. Tomkins is not just an attorney who represents the perpetrators. He is one of the architects, perpetrators, and financial beneficiaries of that scheme.

As I stated in my Complaint,

> 2.9 BWS Inc. has no business activities other than fraud, no lawful business activities, no clients, no customers, no revenues, no investors, no purchasers of equity, and no donors, and yet somehow has sufficient funds to maintain Ika in a lavish lifestyle and to finance overseas trips for Ika and others to attempt to defraud government agencies around the world, and to hire a full-time attorney, Mr. Tomkins, with virtually no other responsibilities other than filing frivolous lawsuits against Dr. Farwell, the owners of the Patents, and others who do business with Dr. Farwell.

### Mr. Tomkins' Response to the 24 Lettered Statements a. – w.

Specific critical facts regarding which narrative is true and which narrative is false were outlined in my previous Response as follows, immediately after the 21 numbered statements referenced in my previous Reply and Mr. Tomkins' Response.

In this regard, the following facts were stated in my original Complaint. I have stated the same facts repeatedly in the various civil cases. **Mr. Tomkins has not previously, and did not in his Preliminary Response or his second Response, dispute any of the following specific fact**s (except to make blanket denials that he had done nothing wrong, which did not refer to these specific facts).

### The relevant undisputed and indisputable facts are as follows:

I.   Regarding Dr. Farwell, as per ¶s 3.84 – 3. 88 of my Complaint and the associated Exhibits:

    a.   Dr. Farwell is a Harvard graduate with a PhD in biological psychology and a former research associate at Harvard Medical School.

    b.   Dr. Farwell is the inventor of Brain Fingerprinting, as per the Patents and peer-reviewed publications cited below. Dr. Farwell has published

extensively on Brain Fingerprinting in leading peer-reviewed scientific journals.

c. Dr. Farwell was selected by *TIME* magazine as one of the top innovators this century, "the Picassos or Einsteins of the 21st Century."

d. Dr. Farwell has conducted Brain Fingerprinting research at the FBI, the CIA, and the US Navy and published the results in peer-reviewed scientific journals.

e. Dr. Farwell has successfully applied Brain Fingerprinting science in real-world criminal cases.

f. The science and technology of Brain Fingerprinting that Dr. Farwell invented and developed and his expert testimony on it have been ruled admissible in court.

g. Dr. Farwell has successfully practiced his profession as a forensic neuroscientist, and specifically as the world's leading expert in the Brain Fingerprinting science and technology that he invented, for over 25 years.

II. Regarding the BWS system, as per ¶ 3.78: Unlike the genuine Farwell Brain Fingerprinting that Dr. Farwell has developed and implemented in the US and throughout the world, the BWS product that Mr. Tomkins, Brainwave Science, LLC, Brainwave Science, Inc., and Ika have been attempting to market, the BWS system:

h. Has not been shown to be an effective implementation of the Brain Fingerprinting scientific technology that was invented by Harvard-trained neuroscientist Dr. Farwell, who was selected by TIME magazine as one of the top innovators this century, "the Picassos or Einsteins of the 21st Century."

i. Has not been shown to meet the 20 Brain Fingerprinting Scientific Standards that Dr. Farwell has published and that are met by Dr. Farwell's versions of the technology. There is no evidence anywhere that the counterfeit product and faux training by unqualified individuals that BWS Inc. is offering meet these standards.

j. Has not been tested and proven at the CIA, the FBI, and the US Navy.

k. Has never been applied in real-world criminal cases, including serial killer JB Grinder and innocent murder convict Terry Harrington.

l. Has not been proven over 99% accurate in research at the FBI, the CIA, the US Navy, and elsewhere published in the top peer-reviewed scientific journals. There is no evidence anywhere that what BWS Inc is offering has achieved such accuracy in scientific studies or field applications.

m. Has never achieved 99% accuracy, or any other proven level of accuracy, in any published research, forensic applications, field applications, or in any other context.

n. Has not been featured in major national and international news media, including CBS Evening News, ABC World News, CNN, PBS, BBC, CBS 60 Minutes, ABC Good Morning America, the Discovery Channel, The New York Times, The Washington Post, TIME Magazine, and US News and World Report.

o. Has not been proven to be capable of detecting bomb makers, criminals, and terrorists, in peer-reviewed publications.

p. Lacks the qualities and achievements of the genuine Brain Fingerprinting invented and developed by Dr. Farwell, as listed herein and in the Exhibits.

q. Has produced no evidence that the unproven technology BWS Inc is offering achieves the same accuracy, reliability, or validity of the genuine Brain Fingerprinting practiced by Dr. Farwell and other competent, trained, and credentialed scientists.

III. Regarding Mr. Ika and the BWS employees as per ¶ 3.79: Neither Mr. Ika nor anyone else one employed by Brainwave Science, LLC, Brainwave Science, Inc., and Ika:

r. Has ever been trained in Brain Fingerprinting by a Brain Fingerprinting expert;

s. Has ever conducted or published Brain Fingerprinting research;

t. Has ever successfully applied Brain Fingerprinting in real-world cases;

u. Has ever conducted Brain Fingerprinting research for the FBI, the CIA, or the US Navy;

v. Is qualified to conduct a scientific Brain Fingerprinting test that meets the Brain Fingerprinting Scientific Standards; or

w. Has been featured in any of the major news sources mentioned above that have featured Dr. Farwell and his genuine Brain Fingerprinting invention.

**The same statement I made with respect to the 21 numbered statements applies to lettered statements a – w: Please take into consideration that until or unless Mr. Tomkins specifically addresses each and every one of the particular facts specified as a. – w. above, those 24 facts remain undisputed, and his false statements that are contrary to these facts are indefensible and established as false.**

Said false statements include not only Mr. Tomkins' false statement to Judge Cogan discussed above, but his entire narrative that Brainwave Science is a legitimate, competent, honest, and successful company, rather than a central feature of RICO scheme set up for the purpose of fraud.

Mr. Tomkins has had multiple opportunities, in multiple cases and in two previous responses to my Complaint, to present evidence contrary to these 24 lettered facts. He has never done so. **As of now, all of these 24 lettered statements stand as true and undisputed facts.**

**In light of these 24 lettered statements, as well as the voluminous evidence presented in my Complaint, my previous Response, and this Response, the inevitable conclusion is that of the two totally contradictory narratives regarding Brainwave Science, Inc., Mr. Ika, and Mr. Tomkins, mine is the only one that is true, and Mr. Tomkins' narrative is false.**

The following section comprises my response to Mr. Tomkins' response to my 21 Numbered Statements.

**Dr. Farwell's Response to
Mr. Tomkins' Addendum: Responses to Numbered Allegations**

1. **I did not sell a headset stolen from BWS, Inc. to my client Forensic Science Laboratory, Delhi (FSL). I have never sold any headset of the type used by BWS to anyone, let alone a stolen one.**

   **Mr. Tomkins' Response:**  As I had no involvement with this matter prior to March 2017, the synopsis contained within this response is provided based upon my information and belief formed upon my reasonable inquiry.

   Dr. Farwell, while employed with Brainwave Science, Inc.'s predecessor in interest, Brainwave Science, LLC, obtained proprietary equipment (headsets) from a company vendor by falsely claiming that he was an authorized representative of the company.  Dr. Farwell concealed his actions by having the invoice sent to his email address and specifically instructing the manufacturer to ship the equipment to his <u>home address</u>.  Dr. Farwell neither paid, nor reimbursed, the company for the equipment.  (See April 12, 2019 Affidavit of Krishna Ika (¶15-18) and Fedex Airbill attached hereto as **Exhibits F and G** respectively).

   **Dr. Farwell's Response:**  My statement #1 stands.  Mr. Tomkins has provided no evidence to the contrary.  Even if his statement were true, which it is not, it does not contradict my statement.  The company in question (NCTU) was a client and colleague of mine before Ika and BWS LLC had ever heard of them.  I introduced them to BWS LLC.  I never represented that I was an authorized representative of BWS LLC.  The headsets provided by NCTU were never "proprietary" to BWS LLC.  I provided NCTU with the specifications for the headsets, and BWS LLC.  Dealings between myself and my pre-existing business associates are none of BWS LLC's business, and cannot by any stretch of the imagination be considered "stolen" from BWS LLC (or anyone).  Moreover, as my original statement points out – and Mr. Tomkins does not contradict – I never sold any headset of the type used by BWS to anyone, let alone a stolen one.  In short, my statement stands, and Mr. Tomkins' false statements to the contrary in his letter and in court documents remain demonstrably false.

2. **I am not under investigation by the FBI, and was not under investigation by the FBI in 2016 or 2019.**

   **Mr. Tomkins' Response**: The undersigned has personally coordinated interviews of company representatives and provided information to agents of the Federal Bureau of Investigation in 2019 and 2021 relating to alleged theft of corporate property and economic espionage by Dr. Farwell.

   **Dr. Farwell's Response:**  My statement #2 stands.  Mr. Tomkins' original false statement was highly specific.  He falsely stated that I was under investigation by the FBI, which I was not, am not, and never have been.  He stated that a specific, named FBI agent was investigating me, which he was not, is not, and never has been.   Whether Mr. Tomkins' response is true or not, it is so vague as to be meaningless, and is totally irrelevant.  His response is that an unspecified person or persons spoke with an unspecified FBI agent or

agents at an unspecified location at an unspecified time spanning a period of two years.  Since I first began working with the FBI in 1992, I have had literally thousands of conversations with FBI agents. That does not mean that the individuals I discussed were under investigation by the FBI.  Anyone can talk to an FBI agent. That says nothing about whether the FBI is conducting an investigation or not. In short, my statement #2 stands, and Mr. Tomkins' prior false statements to the contrary remain demonstrably false.

**3.  I did not flee through a trailer park and lock myself in a trailer to avoid service of process.**

**Mr. Tomkins' Response**:  An affidavit confirming Dr. Farwell's evasion of service at the Port Susan Camp Ground in Snohomish County, Washington is attached hereto as **Exhibit H**.

**Dr. Farwell's Response:**  Exhibit H says nothing about "Dr. Farwell's evasion of service."  It does not provide evidence of Mr. Tomkins' false allegation that I "fled through a trailer park and locked [myself] in a trailer."  It states that a "tall Caucasian male with gray hair…dashed into the camper that is attached to the cabin" and did not answer the door.  I am not tall, and I do not have any gray hair at all.  I do own two campsites at Port Susan Camping Club, and 858 is one of them. It is not my "home."
My statement #3 remains true. Mr. Tomkins' response does not change this.  Mr. Tomkins' prior false statements to the contrary remain false.

**4.   The document that Mr. Tomkins relies upon to demonstrate that the Farwell Brain Fingerprinting Patents were assigned to BWS was not executed by or even known to the undisputed patent owner at the time, American Scientific Innovations, LLC.**

**Mr. Tomkins' Response:**     This statement is demonstrably false. The Intellectual Property Acknowledgement and Assignment Agreements which serve as the basis for Brainwave's claims were executed by Dr. Farwell himself.  Dr. Farwell executed the agreements in his individual capacity, as "Chairman" for Brain Fingerprinting Laboratories and "Managing Partner" for American Scientific Innovations, LLC.  Prior to executing same, Dr. Farwell personally represented in written responses to purchaser's representatives that "Farwell is the Founder and General Manager of American and has full control and signatory authority for American".

Within his own sworn testimony, Dr. Farwell acknowledged that he affirmatively represented he had authority to act on behalf of American Scientific Innovations, LLC. The following is a true and accurate excerpt of Dr. Farwell's sworn deposition testimony:

> Q.  Okay.  And you affirmatively represent that you had the authority to act on behalf of one of those entities that has - -that would be American and that's just false?  This is what you're testifying to now?

```
A. [By Dr. Farwell] Well, yes, and I'm mean what
it comes down to, what you're essentially asking
me is, Were you lying, or were you just really
stupid?  And I'm afraid I'm going to have to go
with really stupid.  I mean I made an error.
It's [] a ridiculous error.  I simply didn't
remember who was responsible for what, who had
authority to do what.  I – in good faith I
believed I could bring all the necessary parties
to the table and come to the—the terms that we
were  discussing,  and  I  was  careless  in  []
representing how much authority that I had.  And
– I mean if I were sitting in your shoes, I would
have a very hard time believing that, but that's
[] the truth.
```

The afore-referenced agreements are the subject of litigation presently pending before the New York Supreme Court, New York County.  Dr. Farwell has been represented by New York Counsel since the inception of that litigation.  Dr. Farwell, by and though his counsel, was served with a Notice to Admit dated June 26, 2019.  (A true and accurate copy of the Notice to Admit, including copies of the afore-referenced agreements, is attached hereto as **Exhibit I**).  By operation of law (CPLR 3123), Dr. Farwell and the other answering defendants have admitted that, at the time the afore-referenced agreement was executed by the parties, Dr. Farwell represented that "he was the Managing Partner of American Scientific Innovations, LLC" and that he "was particularly authorized to sign agreements on behalf of American Scientific Innovations, LLC."

**Dr. Farwell's Response:**    The relevant facts are summarized in Dr. Farwell's Complaint at 2.7.2 as follows, and elaborated at 3.35 – 3.59, portions of which follow.

2.7.2   **Ika and other Ika Parties fraudulently induced Dr. Farwell to sign three Draft Documents that outlined the terms for transfer of the Patents to BWS LLC, but did not yet include any consideration flowing to the apparent "assignors," because that had not yet been negotiated.  The Draft Documents were never intended by Dr. Farwell, who signed them, or by ASI, the undisputed owner of the patents, to be patent assignments.**  The Draft Documents were not executed by or even known to ASI.  Dr. Farwell was not a member, owner, officer, or agent of ASI and did not have authority to bind ASI.  Then Ika's attorney fraudulently recorded the Draft Documents at the USPTO as "patent assignments" to BWS LLC so as to gain control of the Patents without being required to execute any documents requiring compensation for the same.   Then Ika refused to sign any documents requiring any compensation to the patent owners (or anyone else) in exchange for ownership of the patents by BWS LLC, which he controlled.  When Dr. Farwell discovered the erroneous recording of the Draft Documents at the USPTO, he and BFL Inc. signed and recorded a Correction that clarified ASI's continuing, uninterrupted ownership of the Patents and the fact that the Draft Documents bearing his signature were null and void, were not valid patent assignments, and

had no legal binding effect.  Thus, the ownership of the Patents always remained with ASI, and
the Ika Parties' initial scheme to fraudulently gain control of the Patents failed. (Mr. Tomkins
was not yet involved. However, he later participated in the furtherance of this same scheme.)

3.35     On or about June 17, 2013, Ika Parties Ika, BWS LLC, HCW, and GOV developed a
preliminary draft document for intellectual property (the "Unexecuted ASI-BWS Draft Document,"
Exhibit M).  The purpose of the Unexecuted ASI-BWS Draft Document was to outline the terms
of an intellectual property assignment that could be executed by the authorized parties after all of
the parties had reached an agreement on the compensation that would be exchanged for the
assignment of intellectual property.  Dr. Farwell, acting in good faith but erroneously, and believing
that (a) that this was simply a draft, as Ika Parties Ika, HCW, and GOV represented it, and (b) that
he could persuade the authorized parties to execute a similar document once the compensation for
the exchange of intellectual property had been agreed upon and the relevant documents executed,
wrote his name on the Unexecuted ASI-BWS Draft Document without verifying who actually had
the authority to execute the document.  In fact, Dr. Farwell did not have the authority to execute a
document on behalf of American Scientific Innovations, LLC, the undisputed owner of the Patents
at the time.  Dr. Farwell (Exhibit AE) and Ben Bryant, General Manager of ASI, (Exhibit AD) both
executed sworn affidavits evidencing the same.

3.36     The Unexecuted ASI-BWS Draft Document was not notarized.  The signatures thereon were
not witnessed.  This is consistent with the fact that the Unexecuted ASI-BWS Draft Document was
a draft document and not a document intended to be recorded with the USPTO.

3.37     The spaces in the Unexecuted ASI-BWS Draft Document reserved for the description of ASI,
the state where it was organized, and the address of ASI were left blank, as is common in an
unexecuted draft document, and unheard-of in a legitimate document intended to be recorded with
the USPTO.

3.53     The Unexecuted ASI-BWS Draft Document was written, signed, and recorded at the USPTO
without the knowledge or consent of the apparent assignor, ASI.  ASI, who owned the Patents, and
Dr. Farwell, who signed said Draft Document, never intended it to be recorded at the USPTO or to
be employed as a means transfer any interest in the Patents and associated intellectual property.

3.54     Contrary to Mr. Tomkins' assertions in the five lawsuits he filed on these identical issues, the
Draft Documents are null and void for at least four additional reasons: (1) said documents provided
for no quid pro quo, no compensation to the respective apparent assignors, ASI, BFL Inc., and Dr.
Farwell;  (2) Ika Parties Ika, HCW, BWS LLC, and GOV committed fraud in the inducement in
inducing Dr. Farwell and BFL Inc. to sign the Draft Documents, as described herein; (3) In
furtherance of said fraudulent inducement, Ika and HCW defaulted on the BWS LLC Agreement,
as described herein; and (4) said documents were preliminary drafts, were not intended by the
respective apparent assignors – Dr. Farwell, BFL Inc., and ASI -- to be recorded at the USPTO,
and were recorded at the USPTO by BWS LLC without the knowledge or consent of the apparent
assignors.

What I actually said in my deposition was true, and did not contradict my statement #4. I stated:
"in good faith I believed I could bring all the necessary parties
to the table and come to the—the terms that we were discussing,
and I was careless in [] representing how much authority that I
had."

My statement was true.  However, I was mistaken in my evaluation of my role and my ability and authority to persuade the various parties to come to terms.  In fact, the  only person who had the authority to bind ASI – the undisputed owner of the patents at the time – was  Ben Bryant, the General Manager.  Ben Bryant and ASI knew nothing about the negotiations between myself and BWS LLC.  I planned to  inform them – and convince them to agree – after we had successfully negotiated not only the transfer of the patents, which was included in the preliminary draft documents referenced in my Complaint and in the various lawsuits, but also the consideration flowing to the assignors, which had not yet been negotiated and was not included in those documents.  ASI did not execute or know anything about the documents that BWS LLC's attorney fraudulently recorded at the USPTO as "patent assignments."

I was unconcerned at the time about the details of who had authority for what, because I believed that I could bring all the parties to the table once we had reached an agreement that included compensation to the patent owners for the patents.  I had no idea that Ika and his representatives would attempt to obtain the relevant intellectual property without any consideration flowing to the (undisputed) patent owners by recording the Draft Documents as "patent assignments."

Both ASI, by its only authorized representative, Ben Bryant, and I have executed sworn affidavits that I was not a member, owner, officer, or agent of ASI and did not have the authority to bind ASI (Exhibits AD and AE to my original Complaint).

I realize that I made mistakes in the above interactions. Nevertheless, my statement #4  stands. Whatever anyone says – and even if one takes the most extreme negative posture regarding what I represented to BWS LLC in my negotiations at the time – it remains undisputed and indisputable that ASI was the undisputed owner of the patents at the time, ASI did not execute the document that Mr. Tomkins relies upon to claim that BWS LLC was assigned the patents, and ASI did not know about that document at the time.

5. **Every individual who has ever signed any document filed at the USPTO regarding the Patents has stated, in sworn affidavits, that no Patents or associated IP were ever assigned to BWS, and BWS never had any ownership of the Patents and associated IP.**

   **Mr. Tomkins' Response:**  This statement is demonstrably false.  In or about May of 2016, Brainwave's predecessor in interest learned that Dr. Farwell, without the knowledge of  company management, had attempted to covertly transfer Company-owned patents into a corporation he owned and/or controlled. Brainwave's CEO thereafter filed a sworn statement with the USPTO confirming that the purported transfer was made without the authority of the company.  A true and accurate copy of this sworn statement, filed with the USPTO on or about June 22, 2016, is attached hereto as **Exhibit J**.

   **Dr. Farwell's Response:**  In response to Mr. Tomkins' obfuscation, I hereby modify my statement 5 as follows:

5. **Every individual who has ever signed any document <u>recorded by</u> the USPTO regarding the Patents has stated, in sworn affidavits, that no Patents or associated IP were ever assigned to BWS, and BWS never had any ownership of the Patents and associated IP.**

The term "filed" that I used in the previous wording of #5 was ambiguous. In my previous statement, I intended to refer to documents that were recorded by the USPTO, not simply documents that were mailed to the USPTO. Just as anyone can talk to an FBI agent (see #2 above), anyone can write a letter to the USPTO and say that it has been "filed." Mr. Ika's letter to the USPTO has no more relevance to the USPTO, or to Mr. Tomkins' transgressions that are the subject of my Complaint, than a letter to Santa Claus. My revised statement stands.

6.  **The document that Mr. Tomkins relies upon to demonstrate that the Farwell Brain Fingerprinting Patents were assigned to BWS failed as a "patent assignment" because it provided no consideration flowing to the purported assignor from the purported assignee.**

    **Mr. Tomkins' Response:** Dr. Farwell acknowledges receipt of substantial consideration from Brainwave in exchange for the subject patents. The validity and enforceability of the patent assignment agreement is a question of fact and law presently before the New York Court.[2]

    **Dr. Farwell's Response:** I have never acknowledged any such thing. I was not the owner of the patents – ASI was the undisputed owner of the patents at the time – so in principle I could not receive anything in exchange for the patents. I have never acknowledged receiving anything in exchange for assignment of ownership of the patents, because I, being an undisputed non-owner of the patents, never did, and never could, assign ownership of the patents. I received substantial compensation for my services as the inventor and world's leading expert on Farwell Brain Fingerprinting. I provided said services. Even if Mr. Tomkins' response were true, which it is not, there still would be no consideration in flowing to the purported assignor in the document in question (the Unexecuted ASI-BWS Draft Document referenced in my Complaint). My statement #6 stands.

7.  **The document that Mr. Tomkins relies upon to demonstrate that the Farwell Brain Fingerprinting Patents were assigned to BWS was a preliminary draft document produced in the course of ongoing negotiations and was never intended by the signatory thereon to be a patent assignment, according to sworn affidavits.**

    **Mr. Tomkins' Response:** Said sworn statements by Dr. Farwell and his associates are without evidentiary support and demonstrably false. See response #4 herein. Dr. Farwell's assertions are further belied by a counterclaim, filed by and through Dr. Farwell's New York counsel, wherein Dr. Farwell acknowledges conveying the subject patents. Specifically, Dr. Farwell alleges that

    > 55. Farwell was granted an equity interest in Plaintiff BWS equal to
    > 49% of the value of the Plaintiff corporation;

56. The ownership interest so granted was in exchange for Farwell's exchange of certain patents he owned which BWS wished to utilize and exploit for its own benefit;

57. Despite Farwell's agreement to provide the patent rights to BWS, he was not compensated as agreed;[3]

[2] Brainwave Science, Inc. v. Farwell et al; (153867/2019) (New York State Supreme Court, April 15, 2019

**Dr. Farwell's Response:** The facts are outlined in my response to #4 above. The above statements #56 and #57 were indeed included in a document filed by my New York attorney, in a document that I did not see until after it had been filed. At that time my New York attorney was not up to speed on the facts of the case. Immediately upon reading the document, I informed my attorney in writing that the statements were entirely false. I provided the evidence of the actual facts of the case, as outlined later in several court cases and in my Complaint. Mr. Tomkins falsely states that the sworn statements by myself and by the undisputed patent owner at the time, ASI, which presented the actual relevant facts, are "without evidentiary support." My response to #4 above, and the paragraphs in my Complaint referenced therein and exhibits thereto provide ample evidentiary support.

The following is the text of my email to my attorney upon reading the document in question:
    **From:** Dr. Larry Farwell <brainwave@larryfarwell.com>
    **Sent:** Tuesday, October 19, 2021 6:50 PM
    **To:** Joseph Carbonaro <joe@jcarbonarolaw.com>; Thierry Maison
    <me@thierrymaison.com>
    **Subject:** RE: BWS v. Arshee et al - 21-cv-4402(BMC) - Rule 26 Disclosures

    Hi Joe,

    You really need to spend an hour reading my account of the entire situation, which is attached. "**DrLawrenceFarwellCountersuitForBWSVsFarwellMaison2101.doc" (the "Farwell Countersuit" document)** contains all of the relevant facts. I will refer to sections of that document below in my comments on your document "**Farwell Maison answer to Complaint.pdf**" (the "Answer"), which I have attached as document **"FarwellCommentsOnFarwellMaisonAnswerToComplaint2101.docx."**

    Several of the things you say in "Farwell Maison answer to Complaint.pdf" document are repeating demonstrably and unequivocally false statements that have been made by Ika and Mr. Tomkins, statements that I have corrected and provided documentation that my account is true and theirs is false. This proof is provided in the attached "Farwell countersuit" document, along with a lot of other things that we can pursue further later.

For the moment, what is critical is that Some of the false narrative statements of theirs that you repeat comprise critical arguments that we must win in order to win this case and the NY case.  You have restated their false arguments as facts, which, if we do not correct them before submitting the documents to the court, will be potentially fatal to both this case and the NY case.  There are also some other facts in your Answer that are not of critical importance, but that are a matter of undisputed record and that we must get correct (such as the official nature of the meeting where Ika transferred my interest in BWS to himself and the communications in both directions about that meeting.)

Regards,

Larry

Here is the reply by Mr. Carbonaro, my attorney.
**From:** Joseph Carbonaro <joe@jcarbonarolaw.com>
**Sent:** Wednesday, October 20, 2021 1:30 PM
**To:** Dr. Larry Farwell <brainwave@larryfarwell.com>; Thierry Maison <me@thierrymaison.com>
**Subject:** RE: BWS v. Arshee et al - 21-cv-4402(BMC) - Rule 26 Disclosures

Larry, I don't know what you mean by this.  All the answer did is to deny or admit allegations in their Complaint.  The admits relate mostly to things like where you live, etc.  We denied everything of any importance to the case.  An answer is not a narrative; it is a compilation of one word admissions or denials of the claims made in the Complaint.  You have made this point before and I thought we had straightened it out.  The Answer does not repeat anything.  It is simply an answer to the claims denying them to the maximum extent possible.  The answer is no place to provide detailed information or to create our own narrative.

Here are the relevant sections of a letter I wrote in reply and sent via email attachment on the same day, October 20, 2021.

Dear Joe,
You stated "The Answer does not repeat anything. It is simply an answer to the claims denying them to the maximum extent possible."   That appears to me to be accurate with respect to point 1 – 42.

However, in the affirmative defenses and the counterclaims, you repeat statements previously made by Mr. Tomkins that are unequivocally and demonstrably false, and that contain the key facts that are contested in this and the NY case.  Please read the brief document I sent outlining the necessary changes in the Answer for specific examples.

I'll explain one of them in a little more detail, as follows.  First, here are the facts.  These are outlined in detail, with reference to exhibits providing proof, in the **"DrLawrenceFarwellCountersuitForBWSVsFarwellMaison2101.doc"** document that I sent. I made specific reference to the paragraphs in that document in the brief

"**FarwellCommentsOnFarwellMaisonAnswerToComplaint2101.docx**" document that I sent.  The facts:

Ika's attorney prepared three preliminary draft documents outlining the proposed terms for an agreement for exchange of the patents and associated intellectual property for not-yet-determined consideration flowing to the patent owners and Farwell.  These documents were not executed by, or even known to, the undisputed patent owner at the time, American Scientific Innovations, LLC (ASI).  Ika's attorney fraudulently recorded these documents as "patent assignments."  (Even if they had been executed by the patent owner, which they were not, they would have failed as patent assignments because there was no consideration flowing to the purported assignor from the purported assignee.) No intellectual property was transferred by these documents.  At the time, Ika and BWS admitted, in writing, that no intellectual property was exchanged by these documents, and that BWS never received owned any patents or intellectual property.  Farwell filed a correction with the USPTO that stated the relevant facts, and made it clear that ASI was still the owner of the patents.   ASI later assigned the patents and associated intellectual property to Life Science and Technology, LLC (LST).

What you stated as fact in the Answer in points 55 – 57 is in direct contradiction of the actual facts, as follows:

55.  Farwell was granted an equity interest in Plaintiff BWS equal to 49% of the value of the Plaintiff corporation;

56.  The ownership interest so granted was in exchange for Farwell's exchange of certain patents he owned which BWS wished to utilize and exploit for its own benefit;

57.  Despite Farwell's agreement to provide the patent rights to BWS, he was not compensated as agreed;

The above constitutes repeating the statements made by Ika and Mr. Tomkins in this and other lawsuits, statements that are false and completely in contradiction to the actual facts.

Mr. Tomkins is smart.  When we state, in any document, that his account of the purported transfer of the patents and associated intellectual property is true, and the account we have given elsewhere (including my sworn affidavits) is false, Mr. Tomkins will take advantage of that and – correctly – point out that sometimes we admit that his version of the facts is true, and sometimes we contradict ourselves and say something else.  This weakens our case.

I am beseeching you to spend an hour reading the **DrLawrenceFarwellCountersuitForBWSVsFarwellMaison2101.doc,** that I sent, to take note of the facts summarized therein, and to produce documents in the future that are consistent with – and at least do not directly contradict – the facts as documented therein.

I am also beseeching you to read the briefer document I sent with respect to the Answer, and to make the necessary changes – either in the original Answer, or, if you have already sent it, immediately in an amended one.

Regards,

16

Larry

**8.  Mr. Tomkins' client Brainwave Science, Inc. is never mentioned in any document relevant to the Patents ever filed with the USPTO at any time by anyone.**

**Mr. Tomkins' Response:**  Brainwave's predecessor in interest, Brainwave Science, LLC, is particularly referenced within documents executed by Dr. Farwell and filed with the USPTO.

**Dr. Farwell's Response:** Mr. Tomkins' response does not address (and does not deny) my statement #8. My statement clearly specifies Brainwave Science, Inc., Mr. Tomkins' client.

Here, an observation that I made in my previous response to Mr. Tomkins' previous response was prescient:

"The strategy he has followed consistently in the past is not to deny the indisputable facts, but simply to ignore them.  He used verbal trickery to persist in repeating his false statements, surrounded by verbiage designed to distract the reader, verbiage that makes his false statements appear plausible as long as one does not refer to the actual facts of the situation.  It can be expected that Mr. Tomkins will do what he has done on previous occasions when the same facts have been brought to light: to refuse to directly address each of the specific facts stated above, specifically facts 1 - 21 (along with the corresponding sections of my original Complaint)."

That is exactly what Mr. Tomkins has done in response to #8.

Mr. Tomkins used verbal trickery, based on the identical initials and similar names of the two entities, to attempt to show that the patents had been assigned to his client, Brainwave Science, Inc.  The relevant documents – which, as described above, were not patent assignments – mentioned only Brainwave Science, LLC.  Even if Brainwave Science, LLC had at one time obtained an interest in the patents – which it never did, as described above – Mr. Tomkins has never shown any evidence that such an interest was ever transferred to Brainwave Science, Inc.  BWS LLC and BWS Inc. have similar names and similar management; however, they have totally non-overlapping ownership. The facts are outlined in my Complaint at 3.12.  Despite Mr. Tomkins' obfuscation, my statement #8 stands.  Here are the relevant sections of my Complaint.

3.12    Even if one accepts BWS Inc.'s clearly untenable and frivolous premise that the three Draft Documents specified above (referred to in BWS Inc.'s documents as "Intellectual Property Acknowledgment and Assignment Agreements of June 17, 2013") were legal patent assignments and transferred ownership of the Patents to BWS LLC – which they were not and did not – BWS Inc. still has provided absolutely no evidence that BWS Inc. has or ever had any ownership interest in the Patents and associated IP.

3.12.1 Mr. Tomkins and Ika have manufactured a fiction that BWS **Inc.** owns the patents. In reality it does not and never did.  BWS **Inc.** has offered absolutely no evidence that any patents

ever were assigned to it, because such evidence does not exist.  In the absence of any evidence, BWS Inc. has resorted to verbal trickery as its only resource to support the fiction it generated. BWS Inc.'s Notice of Arbitration (Supplement) (the "Notice" in the Motion to Intervene in the Woy NST vs. Farwell Arbitration) conflated two different entities with similar names and identical initials (but different and non-overlapping ownership), Brainwave Science, **Inc.** and Brainwave Science, **LLC.**  (For the sake of clarity and contrary to Mr. Tomkins' inconsistent and contradictory abbreviations, Brainwave Science, Inc. is referred to herein as "BWS Inc." and Brainwave Science LLC is referred to as "BWS LLC.")

**3.12.2   Said Notice stated the following: "Claimant Brainwave Science, Inc. ('BWS') is a Delaware corporation…"**

> **"On or about June 27, 2012, non-party entities American Scientific Innovations, LLC, Inc., Brain Fingerprinting Laboratories, Inc. and Dr. Lawrence Farwell assigned BWS all rights, title and interest in… patents [the Patents]…The June 27, 2012 assignments were memorialized within Intellectual Property Acknowledgment and Assignment Agreements on June 17, 2013. True and accurate copies of the Intellectual Property Acknowledgment and Assignment Agreements are attached hereto as Exhibit B…**

> **"BWS maintains that it lawfully acquired the subject intellectual property…"**

**3.12.3** Setting aside the fact that said documents were not valid patent assignments (as described below), BWS **Inc.**'s above statements are a total fabrication that bears no resemblance to the demonstrable facts.  **None of the documents that BWS Inc. says transferred the patents to it (BWS Inc.'s Exhibit B) even mentioned BWS Inc.  The entity mentioned in said documents was Brainwave Science LLC, not Brainwave Science, Inc. (Brainwave Science, Inc. was "BWS" in Mr. Tomkins' terminology). "BWS" [Inc.] could not possibly have been the assignee of the Patents when those documents were recorded at the USPTO in 2013, because "BWS" [Inc.] did not exist in 2013. Mr. Tomkins and Ika structured it in 2016.**

**3.12.4** BWS **Inc.** and BWS **LLC** are different entities with entirely non-overlapping ownership.  Ika personally owns none of BWS LLC.  Ika personally owns all of BWS Inc.  BWS LLC is owned by Dr. Farwell, BFL Inc., HCW, and an undisclosed Silent Partner of HCW. (Exhibits F and AV; note that the latter states the percentages of ownership based on purported dilution of BFL Inc. that BFL Inc. and Dr. Farwell dispute, as further discussed below.)

**Despite Mr. Tomkins' obfuscation, my statement #8 stands.**

---

[3] **Brainwave Science, Inc. v. Arshee, Inc. et al** (1:21-cv-04402-BMC) (EDNY August 5, 2021), Document 13

9. **There is no evidence of the existence of any patent assignment of the Patents to BWS Inc. by any party at any time.**

   **Mr. Tomkins' Response:**  Brainwave's predecessor in interest, Brainwave Science, LLC, is particularly referenced within documents executed by Dr. Farwell and filed with the USPTO.

   **Despite Mr. Tomkins' obfuscation, my statement #9 stands,** as explained above at #8. Statement #9, which Mr. Tomkins does not deny, clearly refers to BWS Inc., not BWS LLC.  Here again, Mr. Tomkins has ignored and sidestepped the facts, when the facts cannot be denied and the same facts directly contradict his previous false statements.

10. **Every individual who has ever signed any document recorded at the USPTO relevant to the Patents has stated, in sworn affidavits, that BWS Inc. never was assigned and never owned any interest in the Patents.**

    **Mr. Tomkins' Response:**  To the extent that such statements relate to Brainwave's predecessor in interest, Brainwave Science, LLC, the statements are without evidentiary support and demonstrably false.

    **Dr. Farwell's Response:** The statement clearly referenced BWS Inc., not BWS LLC.  The statement #10 stands, and Mr. Tomkins does not deny it as stated.  Here for a third time in a row, Mr. Tomkins ignores and sidesteps the facts, when faced with facts that he cannot deny and that bring to light his previous false statements.

    (Contrary to Mr. Tomkins' response, the same statement, with reference to BWS LLC, is also true.  The referenced sworn statements, by every individual who has ever signed any document recorded at the USPTO relevant to the patents, apply to BWS LLC as well as BWS Inc., and are included as Exhibits AD, AE, and AF to my Complaint.)

*11.* **Here is another example of a false statement in Mr. Tomkins' Preliminary Mr. Tomkins' Response.**
    **Footnote 2 page 4 reads as follows: "Dr. Farwell subsequently admitted within deposition testimony that he had not advised Brainwave LLC membership or management of this 2013 'correction', or the basis thereof, prior to collecting substantial sums in salary from, or selling a portion of his membership interests in, Brainwave Science, LLC.**

    **Contrary to Mr. Tomkins statement above, the transcript of the referenced deposition, 51 line 14, reads as follows:**

    *14    Q. [Mr. Tomkins]  Did you advise Mr. Ika at any time that you had*

    *15   corresponded  with the U.S. Patent Office to correct  what you*

    *16   characterized  as an error? [The context establishes that Mr. Tomkins and Dr. Farwell are referring to the same document as the one referred to in the footnote in Mr. Tomkins' Preliminary Response above.]*

*17      A. [Dr. Farwell]   Yes, I did.*

**Mr. Tomkins has made the same false statement in pleadings in the various civil cases between the parties.**

**Mr. Tomkins' Response**: By way of background, Dr. Farwell began a working relationship with Brainwave Science, LLC in 2012.  In or about June 2012, Dr. Farwell agreed to assign certain intellectual property, including now-disputed patents, to Brainwave Science, LLC. The assignment was memorialized within Intellectual Property Acknowledgement and Assignment Agreements on June 17, 2013. In exchange for this assignment, Dr. Farwell was granted a minority interest in the company and was paid, on a monthly basis, for his work in developing the intellectual property on behalf of the company.  Payments to Dr. Farwell by the company reportedly total in excess of $500,000 through 2016.  A portion of said payments were in the form of membership interests granted to Dr. Farwell which were sold by Dr. Farwell for approximately $100,000 in 2014.

Dr. Farwell acknowledges a) executing the assignment documents in June of 2013, b) receipt of the membership interests in the company, c) sale of a portion of the membership interests for approximately $100,000 in 2014 and d) receipt of salary payments of $6,000-$11,000 per month through 2016 for his work in developing the intellectual property on behalf of the company.  Dr. Farwell further acknowledges that he filed a "Corrected Assignment" with the USPTO in October of 2013 wherein he claims that the June 2013 assignment was null and void as he did not have authority to effect the assignment. Brainwave disputes the factual basis for this assertion but further questions why, if Dr. Farwell believed the afore-referenced transfer was void for lack of authority, Dr. Farwell would fail to advise the company of his position, or the existence of the "Corrected Assignment" he surreptitiously filed with the USPTO.  Brainwave further questions why Dr. Farwell would continue collecting monthly payments (for nearly three years) from the company for developing IP which supposedly, unbeknownst to the company, was not owned by the company.

Within his sworn deposition testimony, Dr. Farwell did acknowledge that that he had not advised Brainwave LLC membership or management of this 2013 'correction', or the basis thereof, prior to collecting substantial sums in salary from, or selling a portion of his membership interests in, Brainwave Science, LLC. These issues were addressed at some length within Dr. Farwell's deposition testimony.  Dr. Farwell's selective quotation of his sworn testimony within his Complaint to your agency is disingenuous and misleading.  In short, Dr. Farwell claimed, and continues to claim, that his filing of papers with the USPTO itself constitutes "advising" Brainwave of the purported correction.  Dr. Farwell testified as follows:

```
Q. Did you disclose to eHealthcareWorks or
Krishna Ika prior to selling your membership
that you had advised the U.S. Patent Office of
your -- of a position that the IP transfer that
occurred in June of 2013 was null and void and
ineffectual?
```

A. Yes, I did.

Q. And your -- and your position is that they were aware of that and, nonetheless, proceeded to purchase your stock in the company for in excess of $100,000, Dr. Farwell?

A. My position is that the documents that are recorded at the USPTO are public documents. Ika is a sophisticated businessman. He has attorneys. They are certainly capable -- I meanany ten-year-old can do a patent search, can look at the intellectual property, the -- the -
-all of the documents at the USPTO. That was public information from the -- from the day that I filed it. I don't remember when the first e-mails back and forth about that were, but there were e-mails and discussions between myself and Ika about that. I don't remember when those took place.

Q. Would it surprise you to -- to learn that that first series of e-mails was in May of 2016, Dr. Farwell?

A. Well, it would surprise me that -- that an individual such as Mr. Ika, who is a sophisticated businessman, who's owned several companies, has dealt with intellectual property before, would not have any idea about public documents that were filed with the USPTO for a period of a couple years. That's -- that would -- that would surprise me, yes.

Q. Okay. So is it possible then that you didn't personally advise Mr. Ika of your filing with the USPTO but that he found out from another source?

A. Of course that's possible.

………..…

When further questioned regarding what steps he had taken, following his coming to the conclusion that he had assigned the intellectual property in error to the company, Dr. Farwell testified as follows:

> Q. So -- so your answer is, you did nothing? You didn't notify Mr. Ika, you didn't notify Brainwave Science, LLC, you didn't notify any other management or anyone within the company regard -- regarding the fact that you believed that you had signed an agreement in error assigning IP to the company?
>
> A. No, I didn't -- I didn't believe I signed an agreement in error assigning IP to the companyI agreed that I had signed a preliminary draft document, which they then did not act in good faith as far as implementing the intentions of that preliminary draft document. I didn't think I owed them an explanation. They -- they -- they were the ones who didn't act in good faith. They were the ones who had been duplicitous with me.

[End of Mr. Tomkins' Response]

**Dr. Farwell's Response**:  Mr. Tomkins' response repeats several of the same false statements that have been demonstrated as false in my responses to #4 and #5 and in my Complaint.  He again repeats the fiction that the Unexecuted ASI-BWS Draft Document constituted a patent assignment, and that said assignment included compensation flowing to the purported assignor. It did not, as anyone who reads it can verify. I will not repeat the details of the facts here; they are clearly covered in my original Complaint.

The additional sections of the deposition transcript do not change the fact that Mr. Tomkins' statement that I quoted in #11 is false.  A major purpose, if not the major purpose, of recording documents at the USPTO is to notify the public of the same.  In various pleadings, Mr. Tomkins has maintained the fiction that my public recording of documents at the USPTO was somehow "surreptitious" or hidden from Mr. Ika.  That is sheer nonsense.  Anyone who has sufficient knowledge to record a preliminary draft document that was never intended as a patent assignment at the USPTO – as Mr. Ika and his representatives did – cannot credibly claim to be so clueless as to be unaware of other documents recorded with reference to the same patents at the USPTO, and cannot credibly maintain that those who recorded said documents were somehow trying to conceal them.  Concealing documents is the exact opposite of what recording at the USPTO actually accomplishes.   My contention in #11 that Mr. Tomkins' quoted statement is false and misleading stands.

**12-21. Mr. Tomkins' Response:** Allegations 12-21 call for conclusions of law regarding matters in litigation and/or reference information/claims not germane to the issues before your office.  A number of those allegations call for conclusions of fact and/or law regarding the interpretation and enforcement of one a series of LLC Agreements involving Brainwave, Dr. Farwell and other

entities Dr. Farwell purported to represent in 2012-2013.  Dr. Farwell has claimed, and continues to claim, that the referenced LLC Agreement is a "nonexistent fiction":

```
Q. So -- so it's your position that at
the time you executed the documents in
October of
2013, there was not –

A. Exactly.

Q. -- the LLC was a fiction; it didn't

exist? A. Correct.

…………………………..


Q.  So is it your position that at the
time you executed this document October
31st, 2013, that BWS, LLC was a
nonexistent fiction, or
did it exist, and you had authority to execute
documents on its behalf?

A. It was a nonexistent fiction, and I
   was, in fact, as I stated there, a
   major equity holder in that nonexistent
   fiction and a founder of that
   nonexistent fiction. All of those --
   all of those things were correct
```

Notwithstanding the foregoing, the validity and enforceability of the subject LLC Agreement(s) are the subject of presently-pending counterclaims brought by Dr. Farwell before the New York State Supreme Court, New York County.[4]

**Dr. Farwell's Response:** Mr. Tomkins responses, like his pleadings and other relevant documents in the various cases cited, are replete with false and misleading statements.  The above is one case in which his statement is so absurd as to be insulting to any reader who has any familiarity with the relevant documents.

Mr. Tomkins wrote: "Dr. Farwell has claimed, and continues to claim, that the referenced LLC Agreement is a "'nonexistent fiction'".

I have made it abundantly clear in my writings in all five of the frivolous cases that Mr. Tomkins has brought against me and my colleagues that the referenced LLC Agreement was a very real document, and that I executed it in good faith and abided by it.  Mr. Ika, however, did not. In various pleadings and in my original Complaint against Mr. Tomkins I make specific reference to particular clauses in that document, and discuss the ways in which Mr. Ika turned the LLC

that was meant to be created by that document (not the document or the agreement it embodied) into a "non-existent fiction" by malfeasance, deception, fraud in the inducement (and fraud later in the process), bad faith, and defaulting on the terms of the document, not to mention violations of the relevant securities laws and other laws.

Here is a brief summary of the relevant facts, from my Complaint. The facts are specified in more detail, with reference to the relevant exhibits, in later sections of my Complaint.

2.6 When Ika first contacted Dr. Farwell and proposed a business arrangement, he and the other Ika Parties concealed from Dr. Farwell the fact that Kota, an individual who had pleaded guilty and been convicted of attempting to sell stolen high-tech secrets to the Soviet Union – essentially the same crime for which Ika's original racketeering organization was founded and which it has since attempted to perpetrate in multiple countries – would later be identified by BWS LLC as a board member and officer of BWS LLC.

2.7 The steps in said racketeering scheme were as follows:

2.7.1 Ika and other Ika Parties fraudulently induced Dr. Farwell and his company, Brain Fingerprinting Laboratories, Inc. to enter into an LLC agreement with BWS LLC, to be controlled by Ika, by among other things concealing the involvement of Kota and his criminal record and the plans to fraudulently gain control of the Patents and to misappropriate Dr. Farwell's and BFL Inc.'s equity in BWS LLC. (Mr. Tomkins was not involved. However, he later participated in the furtherance of this same scheme.)

2.7.2 Ika and other Ika Parties fraudulently induced Dr. Farwell to sign three Draft Documents that outlined the terms for transfer of the Patents to BWS LLC, but did not yet include any consideration flowing to the apparent "assignors," because that had not yet been negotiated. The Draft Documents were never intended by Dr. Farwell, who signed them, or by ASI, the undisputed owner of the patents, to be patent assignments. The Draft Documents were not executed by or even known to ASI. Dr. Farwell was not a member, owner, officer, or agent of ASI and did not have authority to bind ASI. Then Ika's attorney fraudulently recorded the Draft Documents at the USPTO as "patent assignments" to BWS LLC so as to gain control of the Patents without being required to execute any documents requiring compensation for the same. Then Ika refused to sign any documents requiring any compensation to the patent owners (or anyone else) in exchange for ownership of the patents by BWS LLC, which he controlled. When Dr. Farwell discovered the erroneous recording of the Draft Documents at the USPTO, he and BFL Inc. signed and recorded a Correction that clarified ASI's continuing, uninterrupted ownership of the Patents and the fact that the Draft Documents bearing his signature were null and void, were not valid patent assignments, and had no legal binding effect. Thus, the ownership of the Patents always remained with ASI, and the Ika Parties' initial scheme to fraudulently gain control of the Patents failed. (Mr. Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.3 Ika and other Ika Parties purported to deprive the Minority Shareholders of some of their equity in BWS LLC by the following scheme. Dr. Farwell and BFL Inc. (the Minority Shareholders) initially owned 49% of BWS LLC. HCW, controlled by Ika, owned 51%. The initial agreement required HCW, controlled by Ika, to provide sufficient financing for the LLC. Ika told the Minority Shareholders that he and HCW had run out of money, that they would have to take on a Silent Partner and sell him equity to finance the company,

and that HCW and BFL Inc. would both be diluted proportionally and would both give up ownership proportionally. (Dr. Farwell's ownership was non-dilutable.) Ika then purported to sell equity of BFL Inc. and HCW to an independent Silent Investor (who he implied was Kota). In fact, however, said equity was transferred to an entity controlled and/or owned by Ika. Thus Ika's scheme diluted BFL Inc. but in reality did not diminish Ika's effective ownership of BWS LLC. BFL Inc.'s equity was apparently reduced from 44% to 16% by this scheme, leaving the Minority Shareholders with a total of 21%. (Mr. Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.4   Ika and other Ika Parties then conspired to deprive the Minority Shareholders of their remaining equity in BWS LLC by the following additional scheme. The BWS LLC agreement required consent of all members to any amendments. Ika purported to unilaterally amend the BWS LLC agreement to allow himself as managing member, along with the majority members he controlled, to expel members if, in his sole and absolute discretion, they had done certain things that he interpreted as detrimental to the LLC. Then he called a meeting of the members – consisting solely of himself and Kota as corporate secretary – and purported to expel Dr. Farwell and BFL Inc. as members in BWS LLC, and to transfer their ownership interest to himself and entities that he controlled, all without consent or due process. (Mr. Tomkins was not yet involved. However, he later participated in the furtherance of this same scheme.)

2.7.5   Mr. Tomkins, Ika, and other Ika Parties then implemented yet another scheme to eliminate any ownership by Dr. Farwell and BFL Inc. of the functional entity and to fraudulently gain control of the Patents. They formed a new corporation, Brainwave Science, Inc. (BWS Inc.) BWS Inc. was formed for four purposes, all of them fraudulent, as follows.

2.7.5.1 Mr. Tomkins' first fraudulent purpose of establishing BWS Inc. was to eliminate the Minority Shareholders as owners of the functional corporate entity. (Ika must have known, and his attorney acknowledged, that his scheme to expel the Minority Shareholders without consent or due process was illegal and would not stand.) BWS Inc. had entirely non-overlapping ownership with BWS LLC. BWS LLC is owned by Dr. Farwell, BFL Inc., HCW, and an unidentified Silent Partner whose shares HCW held in trust. Ika has no ownership in BWS LLC. BWS Inc. is owned solely by Ika. By transferring the assets of BWS LLC to BWS Inc. without any compensation to the owners of BWS LLC, Ika purported to eliminate the Minority Shareholders as owners of the functional corporate entity. The assets of BWS LLC could be transferred to an entity solely owned by Ika without compensation to the owners of BWS LLC must constitute one of two scenarios: (a) Ika already owned or controlled all of the owners of BWS LLC except Dr. Farwell and BFL Inc., in which case sale of equity to the Silent Partner (and concomitant dilution of HCW along with BFL Inc.) was a sham set up by Ika to defraud Dr. Farwell and BFL Inc. of their equity, or (b) Ika also defrauded the Silent Partner out of his equity in BWS LLC by forming the new corporation and transferring the assets. In either case, Ika and other Ika Parties committed fraud by forming BWS Inc.

2.7.5.2 Reference is made to US Patents #7,689,272, #5,363,858, #5,406,956, and #5,467,777, (collectively, the "Patents"). Dr. Farwell, the inventor of the Patents, assigned the Patents and all associated intellectual property to ASI. He assigned #5,363,858, #5,406,956, and #5,467,777 (the "Brain Fingerprinting Patents" or the "Expired Patents") in 2003 and #7,689,272 in 2010. He has had no ownership in the Patents or any associated intellectual

property since then.  It is undisputed that ASI owned the Patents in 2013, prior to the Draft Documents.

2.7.5.3 Mr. Tomkins' second purpose of establishing BWS Inc. was to fraudulently gain ownership of the Patents.  There are no documents filed at the USPTO (or anywhere else) that even mention BWS Inc. in connection with ownership of the Patents.  There are no documents anywhere that might imaginably be construed as to assign the Patents to BWS Inc.

In different legal actions Ika, Mr. Tomkins, BWS LLC, and BWS Inc. have made contradictory claims regarding assignments the ownership of the Patents.  Both of the contradictory accounts are demonstrably and unequivocally false.

The claims in the BWS Inc. – Farwell Arbitration are as follows.  In this regard, it was not an accident that BWS Inc. had a similar name and identical initials to BWS LLC.  In said arbitration and other legal actions described below, Ika and other Ika Parties have abbreviated Brainwave Science Inc. as "BWS."  Then they have stated that "BWS" obtained the Patents in 2013 by assignment from ASI.  BWS Inc. stated the following in its Notice in the BWS Inc. – Farwell Arbitration: "Claimant Brainwave Science, Inc. ('BWS') is a Delaware corporation…" "American Scientific Innovations, LLC… assigned BWS all rights, title and interest in… patents [the Patents]… on June 17, 2013." "BWS maintains that it lawfully acquired the subject intellectual property [the Patents]…[through said transaction]."  Said statements are blatantly false.

Brainwave Science, Inc. ("BWS" in the definition of said Notice) was not even mentioned in the documents cited in the Notice as purportedly assigning the Patents to it.  Said documents referred to Brainwave Science, LLC. "BWS" [Inc.] could not possibly have "lawfully acquired" the Patents in 2013 because it did not exist until several years later.  It is striking that Ika and his attorneys presume that the arbitrators and judges in the multiple lawsuits wherein Ika and Mr. Tomkins attempted similar verbal sleight of hand would not have the mental acuity to recognize the difference between two different entities with the same initials (and non-overlapping ownership). BWS Inc. has no evidence whatsoever that BWS LLC, ASI, or any other entity ever assigned the Patents to it. No entity ever executed and recorded at the USPTO any documents – valid or not – that even mention BWS Inc.

The second false account Ika, Mr. Tomkins, and BWS Inc. have given regarding ownership of the Patents is that ASI assigned the Patents to BWS LLC (not BWS Inc.) in 2013, and at some later time BWS LLC assigned the Patents to BWS Inc.  This apparently is their contention in the present Motion to Intervene.  Neither of the alleged assignments in this account ever took place in reality.

(a) The Unexecuted ASI-BWS Draft Document purportedly assigning said Patents (to BWS **LLC**, not BWS **Inc.**) in 2013 was not executed by or even known to ASI, the undisputed owner of the Patents at that time, included no consideration flowing to the apparent "assignor," and could not possibly have transferred ASI's Patents to BWS LLC or any other entity.

(b) Even if the Patents had been assigned to BWS LLC by ASI (which they demonstrably were not), there is no evidence that BWS LLC ever assigned the same to

BWS Inc.  There are no documents filed at the USPTO that even mention BWS Inc. in reference to the Patents.

2.7.5.4 Mr. Tomkins' third fraudulent purpose for establishing BWS Inc. was to provide a vehicle to defraud government agencies in various countries by Ika falsely representing himself and his employees as experts in forensic neuroscience, psychophysiology, event-related brain potentials, and Brain Fingerprinting capable of effecting a technology transfer of Brain Fingerprinting to said agencies, and to sell them a counterfeit system, along with faux "training" thereon by unqualified "trainers," that did not meet the Brain Fingerprinting Scientific Standards established by Dr. Farwell and his colleagues in the scientific literature.  Ika and BWS Inc. currently stand accused of such fraud in South Africa, Pakistan, Nigeria, and Thailand for attempting to implement this scheme.

2.7.5.5 Mr. Tomkins' fourth fraudulent purpose for establishing BWS Inc. was to file patently frivolous legal actions against Dr. Farwell, the primary witness in the first fraud case against Ika, BWS LLC, and BWS Inc. and, as the inventor and world's leading expert in Brain Fingerprinting, the potential expert witness best positioned to testify to expose the fraud that Ika and the Ika Parties have attempted and are attempting in various countries, including those named above, when and if said countries bring Ika and other Ika Parties to justice.  Said frivolous lawsuits constitute witness tampering and an attempt, as part of the Ika Parties' racketeering crimes, to intimidate, coerce, silence, retaliate against, and discredit past and potential future witness Dr. Farwell.  Said frivolous lawsuits are based on two demonstrably and unequivocally false premises:

(a) That Brainwave Science, Inc. acquired the Patents in 2013 -- when it did not yet exist -- through an unexecuted draft document (the Unexecuted ASI-BWS Draft Document) that did not mention Brainwave Science, Inc., was not executed by or even known to the undisputed patent owner at the time (ASI), had no provisions for consideration flowing to the apparent "assignor," and was never intended by either the signer or the undisputed patent owner to be recorded at the USPTO or to constitute a patent assignment;

(b) That Dr. Farwell's unequivocally and demonstrably true – and also privileged – statements were libelous, statements made as a witness in a sworn affidavit in a fraud suit against Ika, BWS LLC, and BWS Inc.

2.8 The above described activities of Mr. Tomkins, Ika, and the Ika Parties constitute racketeering, as described below, because per 18 U.S.C. § 1961 they are "(B) indictable under…the following provisions of title 18, United States Code…section 1341 (relating to mail fraud)...section 1343 (relating to wire fraud), section 1503 (relating to obstruction of justice)...section 1510 (relating to obstruction of criminal investigations)...section 1512 (relating to tampering with a witness...victim, or an informant)...section 1513 (relating to retaliating against a witness...victim, or an informant)" or  "(D) any offense involving…fraud in the sale of securities…"

3.15      As an incentive to invest in BWS LLC and thereby purchase a security, Ika Parties Ika, HCW, GOV, and BWS LLC falsely and fraudulently told the Minority Shareholders that Ika and HCW would finance BWS LLC until either a buyout by a large company, or an IPO, or major funding at a reasonable company valuation was obtained, and the Minority Shareholders would realize a substantial profit unless the company failed and went bankrupt.

3.16    As an incentive to invest in BWS LLC and thereby purchase a security, Ika Parties Ika, HCW, GOV, and BWS LLC falsely and fraudulently told the Minority Shareholders that their equity in BWS LLC would be safe from being assigned to anyone else for any reason; that there was no risk of their equity being assigned to anyone else or otherwise forfeited for any reason; that, although their equity would lose value if the company failed, as long as the company was successful their equity would retain its value, they would continue to own said equity, and they would receive a substantial return on their investment; and that, although their equity could be diluted with their consent when and if additional investors joined the LLC, their equity would never be diluted without their consent.

3.17    At the time of the Minority Shareholders' initial investment and for years thereafter, Ika Parties Ika, HCW, GOV, and BWS LLC concealed from the Minority Shareholders the identity of Ika's Silent Partner, Financier, investor, and equity holder and said partner's history, thus concealing from the Minority Shareholders significant, relevant, material information that would have influenced Minority Shareholders' decision to invest in BWS LLC.

3.18    At the time of the Minority Shareholders' initial investment and for years thereafter, Ika Parties Ika, HCW, BWS LLC, and GOV concealed from the Minority Shareholders the fact that soliciting their investment was part of a scheme, in conspiracy with others, perhaps including the undisclosed Silent Partner and the Financier, to gain control of Dr. Farwell's invention of Brain Fingerprinting and associated patents and intellectual property, then to deprive Dr. Farwell and BFL Inc. of any equity in the entity that controlled said invention or any share in the profits of said entity, and then to attempt to fraudulently sell an imitation of Dr. Farwell's invention of Brain Fingerprinting to foreign governments.

3.19    Ika Parties Ika, HCW, BWS LLC, and GOV committed fraud in the inducement in inducing Dr. Farwell and BFL Inc. to sign the BWS LLC Agreement and other prior and subsequent related and similar agreements, amendments, and re-statements, as described above. (Mr. Tomkins was not yet involved.  However, he later participated in the furtherance of this same scheme.)

3.20    In executing the BWS LLC Agreement, the Minority Shareholders, both Washington residents at the time, purchased a security upon false and fraudulent representations by Ika Parties Ika, HCW, GOV, and BWS LLC.

3.21    Upon information and belief, an undisclosed Silent Partner became a shareholder in BWS LLC subsequent to its formation, without disclosure of the identity or history of said partner to the Minority Shareholders, such that Ika, HCW, and the Silent Partner collectively owned a controlling interest in BWS LLC.

3.22    Ika Parties Ika, HCW, GOV, BWS LLC, and likely others including the Silent Partner and the Financier, conspired to fraudulently deprive Minority Shareholders of their equity in BWS LLC. (Mr. Tomkins was not yet involved.  However, he later participated in the furtherance of this same scheme.)

3.23    The   BWS   LLC   Agreement   (Exhibit   F)   stated   the   following: "Section 26. Amendments. This Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Members."

3.24        Ika Parties Ika, GOV, and HCW, BWS LLC and likely other Ika Parties, unilaterally, without the consent of the Minority Shareholders, purported to amend the BWS LLC Agreement.  The purported amendment granted the Managing Member, Ika/HCW, the authority to remove the Minority Shareholders as members and to transfer all of the Minority Shareholders' equity to Ika, HCW, the Silent Partner, and/or BWS LLC, without consent of the Minority Shareholders and without due process of law.  The only stated requirement for so doing was that in the Managing Member's (Ika's) sole and absolute opinion the Minority Shareholders had engaged in certain actions – whether the Minority Shareholders had actually engaged in said actions or not, and whether Managing Member's opinion was in good faith or not.

3.25        Ika notified Dr. Farwell, but not Brain Fingerprinting Laboratories, Inc., of his intent to hold a meeting to grant himself the authority to expel the Minority Shareholders and misappropriate the Minority Shareholders' equity as described above.  (Exhibit G).

3.26        Dr. Farwell replied that he would not participate in such a meeting, because to do so would clearly be committing a felony (Exhibit H).

3.27        Ika notified Dr. Farwell, but not Brain Fingerprinting Laboratories, Inc., that he had held said meeting and had granted himself the authority to misappropriate the Minority Shareholders' equity without consent or due process (Exhibit I).

3.28        Dr. Farwell replied that Ika, in so doing, had committed a number of felonies (Exhibit J).

3.29        Ika notified Dr. Farwell, but not Brain Fingerprinting Laboratories, Inc., that he had exercised his purported authority to remove the Minority Shareholders as members of BWS LLC and  misappropriate all of the Minority Shareholders' equity, and that Minority Shareholders were no longer members of BWS LLC and no longer had any equity in BWS LLC (Exhibit K).

3.30        Ika Parties paid no compensation to Dr. Farwell and BFL Inc. for Dr. Farwell's and BFL Inc.'s equity in BWS LLC that Ika Parties misappropriated without consent or due process of law (Exhibit K).

3.31        Farwell replied that in misappropriating Farwell's and BFL Inc.'s equity in BWS LLC, Ika Parties had committed a number of felonies and a number of torts, and the misappropriation of Minority Shareholders' equity was not valid and would not stand (Exhibit L).

3.32        Upon information and belief, Mr. Tomkins and Ika Parties Ika, HCW, GOV, and BWS LLC, and likely other Ika Parties, then conspired to further defraud Dr. Farwell and BFL Inc. by dissolving BWS LLC and transferring its assets to a new company, BWS Inc.  The apparent motive for this was that Ika Parties must have realized that their scheme to misappropriate Minority Members' equity as described above was illegal and would not stand up in court, and dissolving BWS LLC and transferring its assets to BWS Inc was a second method to defraud the Minority Shareholders of their equity.

3.33        The BWS LLC Agreement stated the following: "Section 10. Capital Contributions, etc. (a) Capital Contributions of Members. Notwithstanding anything herein to the contrary, the Managing Member [HCW] shall make capital contributions to the equity capital of the Company as determined from time to time by the Managing Member; provided that such capital contributions shall be in amounts sufficient to satisfy any obligations to make any

required payment pursuant to the terms of that certain Consulting Agreement between the Company and Neuroscience Inventions, LLC dated July 5, 2012."

3.34    Ika and HCW defaulted on their agreement to provide said capital contributions.  In so doing they defaulted on the BWS LLC Agreement.

By the above actions, Ika and BWS LLC defaulted on and nullified the BWS LLC agreement.  It was through their actions that BWS LLC became, in Mr. Tomkins' terminology, a "non-existent fiction."  The point of Dr. Farwell's testimony quoted out of context above was that at the time in question, no one could execute any documents on behalf of BWS LLC, because the agreement that founded BWS LLC was no longer in force, after Mr. Ika first committed fraud in the inducement to obtain signatures on it, and then defaulted on his primary obligation under the agreement.

Regarding Mr. Tomkins' response to items 12 – 21, the closing paragraphs of my previous response were remarkably prescient:

> The strategy he [Mr. Tomkins] has followed consistently in the past is not to deny the indisputable facts, but simply to ignore them.  He used verbal trickery to persist in repeating his false statements, surrounded by verbiage designed to distract the reader, verbiage that makes his false statements appear plausible as long as one does not refer to the actual facts of the situation.

> It can be expected that Mr. Tomkins will do what he has done on previous occasions when the same facts have been brought to light: to refuse to directly address each of the specific facts stated above, specifically facts 1 - 21 (along with the corresponding sections of my original Complaint).  Instead, if past behavior is a predictor, he can be expected to engage in an extensive and mostly irrelevant narrative that sidesteps any discussion of the proven facts, attempts to discredit me and my colleagues in various ways and to justify his pattern of forum shopping, and repeats his previous false statements in the midst of various verbiage without ever actually addressing the proven facts that stand in absolute contradiction to his false statements.  This verbiage can be expected to be articulate and internally consistent, and may appear to be reasonable until or unless one considers it in light of the proven contradictory facts 1 – 21 that are specified herein, the corresponding sections of my Complaint, and other facts documented therein.

> **Please take into consideration that until or unless Mr. Tomkins specifically addresses each and every one of the particular facts specified as 1 - 21 above, those 21 facts remain undisputed, and his false statements that are contrary to these facts are indefensible and established as false.**

Mr. Tomkins stated: "**12-21.** Allegations 12-21 call for conclusions of law regarding matters in litigation and/or reference information/claims not germane to the issues before your office."

Consider the actual statements 12 – 21, which Mr. Tomkins does not deny in his Response, and has never denied in his previous statements.

**12. Brainwave Science, LLC (BWS LLC) was formed in 2012 with three members: eHealthCare Works Corp., 51% (HCW; controlled by Mr. Ika), Dr. Farwell (5%, non-dilutable), and Brain Fingerprinting Laboratories, Inc., (BFL; 44%, controlled by Dr. Farwell).**

That is not a "conclusion of law."  It is a well-established, documented, indisputable (and undisputed) fact.

**13. Dr. Farwell and his company, the "Minority Shareholders," collectively owned 49%.**

That is not a "conclusion of law."  It is a well-established, documented, indisputable (and undisputed) fact.

**14. The BWS LLC operating agreement stated that the agreement could be modified only by unanimous decision of the members.**

Again, that is a well-established, documented, indisputable (and undisputed) fact.

**15. Ika unilaterally modified the agreement to grant himself the authority to remove members at his sole and absolute discretion.**

That fact could be disputed, but Mr. Tomkins has never disputed it, despite many opportunities to do so. As I have pointed out in my previous response, "The strategy he has followed consistently in the past is not to deny the indisputable facts, but simply to ignore them.  He used verbal trickery to persist in repeating his false statements, surrounded by verbiage designed to distract the reader, verbiage that makes his false statements appear plausible as long as one does not refer to the actual facts of the situation."

**16. Ika removed the Minority Shareholders Dr. Farwell and BFL without consent or due process.**

It is undisputed that Ika removed the Minority Shareholders without consent.  The "due process" could be disputed.  However, Mr. Tomkins has never disputed it, despite multiple opportunities to do so in half a dozen lawsuits in which these facts play a major role. Here again, his strategy has been to ignore the facts.

**17. Ika transferred the equity of the Minority Shareholders to his company HCW without consent or due process.**

It is undisputed that Ika transferred the equity of the Minority Shareholders to his company HCW without consent, and gave them nothing in return for their equity. The "due process" could be disputed.  However, Mr. Tomkins has never disputed it, despite multiple opportunities to do so in half a dozen lawsuits in which these facts play a major role. Here again, his strategy has been to ignore the facts.

**18. Ika formed a new corporation, Brainwave Science, Inc. (BWS Inc.), solely owned by himself as an individual (with no common management but no ownership in common with BWS LLC).**

That is a well-established, documented, indisputable (and undisputed) fact.

**19. Ika transferred the assets of BWS LLC to BWS Inc., thus giving himself personal ownership of all of the equity and assets formerly owned by the Minority Shareholders, without due process or consent.**

It is indisputable and undisputed that Ika transferred the assets of BWS LLC to BWS Inc., thus giving himself personal ownership of all of the equity and assets formerly owned by the Minority Shareholders. The "without due process" could be disputed.  However, Mr. Tomkins

has never disputed it, despite multiple opportunities to do so in half a dozen lawsuits in which these facts play a major role. Here again, his strategy has been to ignore the facts.

**20. Mr. Ika's actions in the above sequence of events were not legal and will not stand up in court. They took place before Mr. Ika hired Mr. Tomkins.**

Here I'll have to agree in part with Mr. Tomkins. This calls for a conclusion of law regarding matters in litigation. I included it here because Mr. Tomkins has, off the record, admitted that it is true.

**21. Absent illegal acts by Mr. Ika that in the end will not stand up in court, Dr. Farwell and BFL are still Minority Shareholders, 49% owners of the entity that owns all of the property, assets, and rights that Mr. Tomkins is attempting to deprive the Minority Shareholders of through the six lawsuits, all on the identical issues of fact, that Mr. Tomkins has initiated against Dr. Farwell and his associates in various jurisdictions across the country.**

Here I'll have to agree, in part, with Mr. Tomkins. This calls for a conclusion of law regarding matters in litigation.

Mr. Tomkins states that some unspecified parts of numbered statements 12 – 21 are "not germane to the issues before your office." Please refer to my discussion on page 3 of the competing narratives of Mr. Tomkins and myself.

I stated:

> "There are two competing narratives here. One of them is true, and one of them is false. According to Mr. Tomkins' narrative, he is the attorney for a successful, legitimate, competent forensic neuroscience company…They have been successfully practicing forensic neuroscience, and have multiple contracts, each one of which involves several systems each sold for about $400,000.

> "My narrative is that the entire business plan of Brainwave Science constitutes fraud, and that Mr. Tomkins is not simply the attorney to Mr. Ika and his co-conspirators in a racketeering scheme… He is one of the architects, perpetrators, and financial beneficiaries of that scheme."

The above lettered statements a. – w. directly address the issue of which of the two competing narratives is false and which is true. Mr. Ika's affidavit, which was submitted by Mr. Tomkins to this office with his Response, addresses some of these same issues, and makes numerous false statements about the same. The veracity of the demonstrably true statements a. – w., and whether Mr. Tomkins denies, admits, or refuses to deny and attempts to sidestep, the statements a. – w. is more than germane. It is central to the decision by this office regarding the nature of the company employing Mr. Tomkins' and his role as either a legitimate attorney for a legitimate company or a co-conspirator in a fraud.

### Mr. Tomkins' Second New Violation of the Rules of Professional Conduct

The following incident refers to the affidavit of Krishna Ika that Mr. Tomkins appended to his Response. Said affidavit includes many false statements and many statements that are not entirely false but nevertheless are highly misleading, statements that Mr. Tomkins and Mr. Ika have made previously and that I addressed in my previous Response and in my discussion below of the 21 numbered statements therein. In addition, Mr. Ika's affidavit contains one new

statement that is absolutely false and that I have not previously revealed as false, which I will discuss immediately below.

It is likely that Mr. Tomkins wrote the affidavit. In any case, he must have known of its contents and assisted Mr. Ika in preparing the affidavit and making the statements therein.

In other words, given that the statement is false as shown below, Mr. Tomkins either violated RPC 3.3 (a) (1) described above, or RPC 3.4 (b), "A lawyer shall not (b) falsify evidence, counsel or **assist a witness to testify falsely**, or offer an inducement to a witness that is prohibited by law;"

Said affidavit states: "19. Upon being confronted with his actions, Dr. Farwell initially claimed that his signature(s) had been forged.  Dr. Farwell subsequently admitted that he had been the signatory" [on the Draft Document that Mr. Ika fraudulently recorded at the USPTO as a "patent assignment," as discussed below and in my Complaint].

I never said or wrote anything stating or implying that my signature had been forged.  The reason this is important is that Mr. Ika's false statement falsely accused me not only of  lying but also of attempting to deceive Mr. Ika about the nature of the document in question and the events surrounding it, which would give the false impression that I had some guilt of some kind to hide and knew it.  As I have explained in detail in my Complaint and my Responses, I had excellent reasons for signing the document in question, and never would have had any reason to deny doing so.

This may appear at first glance to be Mr. Ika's (and Mr. Tomkins') word against mine.  I could argue that the word of a world-renowned scientist with a stellar lifetime reputation for discovering and representing the truth is more credible than the word of an individual like Mr. Ika, who currently stands accused of fraud in at least four countries -- Pakistan, South Africa, Nigeria, and Thailand (as documented in my Complaint and the exhibits thereto).  However, there is a stronger argument.  Honesty and integrity aside, anyone who is intelligent enough to graduate from Harvard and earn a PhD, and knowledgeable enough to make a living as a forensic scientist for several decades, is also intelligent and educated enough to realize that if he falsely states that his signature has been forged, when it hasn't, he will be detected and discredited.  I would argue that I am too honest to lie about something like that (or anything), and one might or might not believe me.  However, anyone with a shred of common sense must realize that I am intelligent enough not to tell a lie that would certainly be proven as such. Mr. Ika's accusation of the same is false.

In short, any reasonable person who had to determine which one of us is lying in the present case would conclude that Mr. Ika and Mr. Tomkins are lying, and I am telling the truth, at least about this particular incident.

It is likely that Mr. Tomkins wrote the affidavit for Mr. Ika. In any case, he must have known of its contents and assisted Mr. Ika in preparing the affidavit and making the statements therein.

In other words, given that the referenced sworn testimony is false, Mr. Tomkins either violated RPC 3.3 (a) (1) described above, or RPC 3.4 (b), "A lawyer shall not (b) falsify evidence, counsel or **assist a witness to testify falsely…**"

**Brief Background on the Software at Issue in Brainwave Science, Inc. v. Arshee, Inc. et al.**

I invented Brain Fingerprinting in 1985.  I wrote the first program to implement Brain Fingerprinting data acquisition and analysis at that time. I developed and implemented the experimental design, the presentation of stimuli (words and pictures on a computer screen), the recording of brainwaves (EEG), the basic data entry protocols, the plots and graphs of brainwave data, the data analysis algorithms and the mathematics and statistics involved therein, and the algorithms for eliminating noise in the data and enhancing the signal-to-noise ratio so as to obtain clear readings.  Data acquisition was done on a customized DEC PDP-11 and data analysis on a Harris 800.

My colleagues and I published these protocols and algorithms in the scientific journals, and it entered the public domain beginning in 1986 and 1991.  In order to be published, we had to provide our scientific colleagues sufficient information to be able to precisely replicate our research, so we put all of the essential features of Brain Fingerprinting into the public domain at that time (except the specific communication protocols for the amplifiers and digital signal processors and headset).

I patented some of the major features of the process in 1984.  My patents also included the original headset for measuring brainwaves that I developed. However, these patents have now expired, and all of that is in now also the public domain.

Every Brain Fingerprinting system, and in fact every system for detecting concealed information with brainwaves, that has been developed since then has incorporated these same public-domain features comprising the main experimental protocols and algorithms for data acquisition and analysis.

The only feature of substance that differs in the various systems implemented since then is the communication protocols with the amplifiers and digital signal processors, which are now embedded in the various headsets used in the various systems.  Different headsets (and embedded amplifiers and digital signal processors) has different protocols, so that part of the software package differs in different implementations.

There have been several implementations since that time, all including the same basic scientific and experimental protocols and algorithms for data acquisition and data analysis, and different protocols for communicating with the respective headsets.

I provided my source code to Dr. William Iacono and his colleagues, and he implemented a second version of the Farwell Brain Fingerprinting system. He and his colleagues applied it to .

In the early 1990s, I developed a new version of the system on a PC, a far simpler hardware setup than the previous versions, in collaboration with software engineers I employed at Human Brain Research Laboratory, Inc.  This was under a contract from the CIA.  We also used this new system for research at the FBI and the US Navy.  The scientific protocols and scientific, mathematical, and statistical algorithms were the same as my previous system.  The communication with the amplifiers and digital signal processors and headset was different, because these hardware features were different from the original ones.

In 1993, I provided all of the above and oversaw the development of a new system by Westinghouse that was commissioned by the CIA.  The CIA contracted me to oversee the process and provide the necessary guidance and expertise to build and test the system. Here

34

again, the protocols and algorithms were the same as in the previous systems, and the specific software for communicating with the headset was different.

I published several other scientific publications that fully disclosed in the public domain all of the essential protocols and algorithms for the experimental design, the presentation of stimuli (words and pictures on a computer screen), the recording of brainwaves (EEG), the basic data entry protocols, the plots and graphs of brainwave data, the data analysis algorithms and the mathematics and statistics involved therein, and the algorithms for eliminating noise in the data so as to obtain clear readings.

In 2007 I developed a new version of the system in collaboration with software engineers that I hired.  The primary difference was in the data analysis program, which was implemented in IDL and ran on Windows.

In 2013 I provided to Brainwave Science LLC (BWS LLC) all of the essential protocols and algorithms for the experimental design, the presentation of stimuli (words and pictures on a computer screen), the recording of brainwaves (EEG), the basic data entry protocols, the plots and graphs of brainwave data, the data analysis algorithms and the mathematics and statistics involved therein, and the algorithms for eliminating noise in the data so as to obtain clear readings.  The system developed at BWS was a copy of my 2007 system in every respect except the software to communicate with the headset, since BWS system used a different headset.

I introduced BWS to my colleagues at NCTU in Taiwan, and I wrote the specifications for a headset that NCTU then produced and BWS used for the BWS system.

I parted company with BWS when I became aware of several issues.  I discovered that in inducing me to purchase a security by entering into an LLC agreement, Mr. Ika had concealed from me that his partner had been previously convicted in the US of attempting to sell stolen high-technology secrets to a foreign government, essentially the same crime of which Ika now stands accused in four countries, and the same crime that I describe in my Complaint.  Mr. Ika fraudulently recorded preliminary Draft Documents as "patent assignments" that contained no consideration flowing to the undisputed patent owners, in an attempt to obtain the Brain Fingerprinting patents without compensation.  Mr. Ika also defaulted on the original BWS LLC agreement, as described above, by refusing to sign the consulting agreement specified in the LLC agreement or to pay as agreed for consulting.  (He did make some payments for consulting, as I have specified in my various statements to the various courts.)  Also, the quality of the work being produced at that time (prior to Dr. Maison's involvement) by Mr. Ika's software engineers was not sufficient to implement a viable Brain Fingerprinting system, and his promised results in international marketing failed (and have remained a total failure to the present day).  After we parted company, Mr. Ika purported to expel me and the other minority shareholder, my company Brain Fingerprinting Laboratories, Inc., from the LLC and to transfer our equity to a company he controlled without compensation, due process, or any imaginable legal justification.  His attorney offered to allow me to attend the meeting where he committed those crimes, and I replied that I was not interested because what he proposed to do, and then did, involved committing multiple felonies.  All of this is described in detail in my Complaint.

Dr. Thierry Maison later was hired by BWS as CTO.  Dr. Maison is a brilliant, world-class technologist, and he provided excellent work for BWS.  He oversaw the implementation of the system using different open-source software packages to implement the same open-source protocols and algorithms for the experimental design, the presentation of stimuli (words and

35

pictures on a computer screen), the recording of brainwaves (EEG), the basic data entry protocols, the plots and graphs of brainwave data, the data analysis algorithms and the mathematics and statistics involved therein, and the algorithms for eliminating noise in the data so as to obtain clear readings that I had provided to BWS. He wrote most of the software himself. All of this, as Dr. Maison has testified, was implementation through various open-source software packages of the public-domain algorithms and protocols that I had provided to BWS as the basis for their system. The only part of the software that was unique was the part that communicated with the headset, as the BWS system used a different headset from the ones I and others had used previously.

Dr. Maison also parted company with BWS.

Someone at BWS subsequently caused or allowed the entire BWS software package to be uploaded to the internet in a publicly accessible location.

When I entered into discussions with Dr. Maison regarding producing another implementation of my invention, he searched the internet for the software that he had written at BWS. He told me that he found it, and described in some detail the publicly accessible source where he found it. I believed him, and I still believe him. Dr. Maison is a man of the utmost integrity. I have never paid him anything for his work on Farwell Brain Fingerprinting. He has been providing his extraordinary expertise simply because he would like to see my invention of Brain Fingerprinting made available as widely as possible to serve the cause of justice.

Because he found said code, recognized it (since he wrote it), and downloaded it from a publicly accessible source on the internet, the BWS code was be definition in the public domain.

Dr. Maison eliminated the part of the BWS code that communicated with the headset for two reasons. First, the software that communicates with the headset is the only part of the code that might possibly be ultimately be considered, by anyone with understanding of the relevant science and technology, as proprietary to BWS. This is because the headset used by BWS is different from other headsets, so the software that drives it is different from, for example, my 2007 system of which the BWS system was a copy. Second, I proposed to use a headset that was different from, and far superior to, the headset used by BWS, so that part of the software was irrelevant to our needs anyway.

Dr. Maison provided me with software that was, to the best of his and my understanding, knowledge, and belief, public domain. I used it with that understanding, knowledge, and belief.

Ika and BWS Inc. obtained from Dr. Maison a software package similar to what he provided to me. Then they modified the BWS software to make it appear more similar to Dr. Maison's version. Then they hired someone to test the software. They compared the version that they obtained from Dr. Maison with the version of the BWS software that they had modified to make it appear more similar to Dr. Maison's version than the original BWS software was. It is no surprise that these two programs were found to be highly similar.

BWS filed claims under DTSA against Dr. Maison, myself, Arshee, Inc. (a company in Bangladesh was involved in marketing my Brain Fingerprinting system), and Brain Fingerprinting Foundation.

They asked for and received a preliminary injunction, ostensibly to prevent the Defendants from causing "irreparable harm" to BWS Inc. by distributing software that might later in the final outcome of the case be determined to comprise "confidential or proprietary information."

The injunction read as follows:

> *"...defendants are hereby enjoined, pending the final disposition of this case, as follows:*
>
> 1.    *Defendants must take any and all commercially-practicable actions to recall or replace any software containing plaintiff's "confidential or proprietary information" from third parties;*
>
> 2.    *Defendants must not sell or transfer plaintiff's "confidential or proprietary information;"*
>
> 3.    *Defendants must not use plaintiff's "confidential or proprietary information" in any software update or product demonstration; and,*
>
> 4.    *Defendants must provide to plaintiff, at plaintiff's sole expense, a report from an independent third party confirming that any P300-related software demonstration, sale, update, or transfer by defendants does not include plaintiff's "confidential or proprietary information."*
>
> *For the purposes of this preliminary injunction, "confidential or proprietary information" is defined as any portion of the program plaintiff originally submitted to Codequiry as its code.*

In his Response, Mr. Tomkins misrepresented the Court's December 13, 2021 Injunction Order and the events leading up to it.

Mr. Tomkins stated "In June of 2021, Brainwave Science, Inc. ('Brainwave') received confirmation that Dr. Farwell, in conjunction with other individual and corporate actors, was marketing a system which incorporated source code copied from Brainwave's own system." He gives no evidence of the same, and does not reveal who provided said "confirmation." In fact, no "confirmation" has been made by anyone that the system marketed by myself "incorporated source code copied from Brainwave's own system," unless "confirmation" is considered to be synonymous with "unsupported speculation" or "unsupported allegation."

Mr. Tomkins alleged in "Tomkins' [first] Libelous Letter" referenced in my Complaint, that my company had sold a headset that was stolen from BWS Inc. to my client FSL Delhi, India. The indisputable fact is that I have never sold or transferred any system incorporating any headset of the type used by BWS Inc. – let alone a stolen one. My system uses a totally different headset, and the software that I use would not work with BWS Inc.' headset (and vice versa).

Mr. Tomkins stated that the preliminary injunction "directed Dr. Farwell and his co-defendants to recall previously sold/transferred systems." That is not what the injunction said. It stated: "Defendants must take any and all *commercially-practicable actions* to recall *or replace* any software *containing plaintiff's "confidential or proprietary information"* from third parties. It does not require me to "recall previously sold/distributed systems." It refers only to systems that are "*containing plaintiff's "confidential or proprietary information"*. No determination has been made that any of the systems I have sold or transferred contained such information. It does not require me to "recall" said systems – if it is ever determined that any such exist – but only to

take "*commercially-practical actions* to recall *or replace*" the "*software*" in them.  Mr. Tomkins'
statement incorrectly represents that the court determined that I have done something that needs
to be undone, and that I am required to reverse previously made transactions with my clients,
whereas the court did not make such a determination.  Taking back a system that I had sold to
my clients – if it were ever determined that any system I have sold met the criterion stated by the
judge – would be a much different and much more serious event than simply providing a software
upgrade that can be installed in a matter of minutes.

The Order also forbid me and my colleagues to sell or transfer BWS Inc.'s confidential
proprietary information or use it in software updates or demonstrations.

As described above, for decades before BWS LLC existed, I had already been applying and
selling my own system comprising features that I developed and placed in the public domain.
My own system -- which pre-existed BWS LLC's, Mr. Ika's, and BWS Inc.'s entry into the field
-- has been peer-reviewed and published in the scientific journals, ruled admissible in court,
successfully applied in real-world cases, tested and proven at the FBI, the CIA, and the US Navy,
sold and implemented in law enforcement and counterterrorism agencies around the world.
BWS Inc.' system is totally untested and unproven, and has never achieved any of those
milestones.

Moreover, I have publicly (and truthfully) stated that the BWS Inc. system lacks essential
features that are necessary for adequate performance in the laboratory or the field.  Since BWS
Inc.'s system has never been tested in the laboratory and published in the peer-reviewed scientific
literature, and has never been successfully applied in real-world cases in the field, they have no
evidence to the contrary.

There is no imaginable reason why I, or anyone else with my track record of experience and
success in applying the genuine Brain Fingerprinting in the laboratory and the field, would want
to use, sell, or transfer BWS Inc.'s system.

The judge's Order is a reasonable precaution, "pending the final disposition of this case." From
the point of view of the judge, it might turn out in that the Defendants were using and marketing
BWS Inc.'s proprietary information, and preventing that from happening in the meantime is a
reasonable step to take to prevent that.

Such a decision, however, is based only in what the judge knew at the time he made the ruling.
This is where the lies, deception, and violation of RPC by Mr. Tomkins and perjury by Mr. Ika
become relevant.  Together these gave the judge an entirely false view of the situation, as follows.

Mr. Tomkins' lie to the judge in the hearing described above was not an isolated, random
incident.  In Mr. Ika's affidavit provided by Mr. Tomkins in his Response, Mr. Ika's touting of
BWS Inc.'s success in the marketplace was confined to this:  "[unnamed and unspecified]
Agencies and educational institutions within several countries have successfully conducted
testing and validation studies on our system."  It is not an accident that Mr. Ika did not claim that
BWS Inc. had sold its system to multiple customers, each one of which purchased multiple
systems for $400,000 each.  Such a statement, in writing in an affidavit, would have inevitably
been proven false, and Mr. Ika would have unquestionably committed perjury.

(Mr. Ika made many demonstrably and unequivocally false statements in his affidavit. These I
have addressed elsewhere and will not discuss here.)

Mr. Tomkins used a devious ploy to convey that lie to the judge and deceive him regarding the entire situation regarding BWS Inc. The preliminary hearing described above was where the judge obtained much of his information regarding the situation at hand and the status and condition of BWS Inc. Mr. Ika was the only one to testify. Dr. Maison and I were present on the Zoom meeting, but not allowed to speak. In response to the one question the judge asked in the entire hearing, Mr. Tomkins told the boldfaced lie that BWS Inc. had sold its system to multiple customers, each one of which purchased multiple systems for $400,000 each. Dr. Maison and I were the only ones present who knew for certain that it was a lie, and Mr. Tomkins was not under oath and not testifying in writing.

Mr. Tomkins' lie gave the judge the false impression that BWS Inc. had a viable system that had been successfully marketed and applied in the field. In fact, BWS Inc. does not have a system that would be viable for field use, has never successfully applied their system in the laboratory or the field, and has a business model based on fraudulently claiming otherwise.

In that hearing, a second lie, this one by Mr. Ika, completed the judge's erroneous impression of the situation at hand. Mr. Ika stated that the BWS Inc. system included no open-source or public domain features at all. This lie was also strategically placed. Anyone with relevant expertise would immediately recognize Mr. Ika's statement as a lie. The judge has no expertise in the relevant science, however, nor does our attorney, and Dr. Maison and I were not allowed to speak.

As described above, all of the fundamental scientific, procedural, and technological features of Brain Fingerprinting were in the public domain before BWS LLC existed. (The sole possible exception is the software interface with the headset BWS Inc. uses, which is not incorporated in any of the my or my colleagues' software because we use a different and vastly superior headset.) Moreover, when Dr. Maison incorporated these features in the BWS Inc. system, he did so with extensive use of open-source software. Here are some examples, from an email from Dr. Maison to our attorney and myself.

> **From:** Thierry Maison <me@thierrymaison.com>
> **Sent:** Friday, November 5, 2021 1:21 PM
> **To:** Joseph Carbonaro <joe@jcarbonarolaw.com>; Dr. Larry Farwell <brainwave@larryfarwell.com>; 'Abul Kalam Azad' <azad@tracerbd.com>
> **Subject:** RE: Letter Motion to Seal
>
> Joe,
>
> How the software was written free and open-source software.
>
> 1) The Software components are written in Microsoft C# programing language. C# (pronounced See-Sharp) is a popular and modern programming language created by Microsoft in 2000 alongside their .NET framework. They wanted a more flexible language to build a variety of secure and robust modern applications for Windows, web servers, tablets, and phones. It is now arguably one of the most valuable programming languages in the world to know. C# is an open-source programming language. https://dotnet.microsoft.com/languages/csharp
>
> 2) Aside from the language itself, the building blocks of the application use the Microsoft .NET framework (pronounced as "dot net"). .NET framework is a free software developer open-source platform for building software applications. https://dotnet.microsoft.com/

3) The software application uses two different Graphical User Interface (GUI).  The GUI is what dictates how the application will look on the computer screen. We use Microsoft WinForms and Microsoft Windows Presentation Framework (WPF) both in the public domain and open software.
https://en.wikipedia.org/wiki/Windows_Forms
https://github.com/dotnet/wpf

4) To facilitate and speed up the development we used additional software components to create graphs and display data in tables.  The Graphical display software (Interactive Data Display created by Dmitry Voitsekhovskiy and Mikhail.) is open software and freely downloadable on the GitHub repository.
https://www.microsoft.com/en-us/research/project/interactive-data-display/
https://github.com/predictionmachines/InteractiveDataDisplay and
https://github.com/microsoft/InteractiveDataDisplay.WPF

5) The data table package is based on the Extended DataGrid open source project as mentioned in https://www.findbestopensource.com/tagged/datagrid?fq=Ms-PL the project was so successful that it's now incorporated into Microsoft's open-source framework.
https://github.com/dotnet/DataGridExtensions

6) The internal data format for storing data uses the eXtended Markup Language (XML) as denied in open standard
https://www.w3.org/XML/
https://en.wikipedia.org/wiki/XML

7) Microsoft provides free of charge the necessary tools to create software for Windows or other platforms.  We used Microsoft Visual Studio.
https://visualstudio.microsoft.com/vs/community/

Sincerely,
Thierry

**Dr. Thierry Maison**
7 Gloucester Drive
Franklin, MA 02038
(508) 395-1069

Unfortunately, the judge did not have access to that information. All he had in the hearing regarding proprietary versus open-source and public-domain software was the perjury of Mr. Ika.

Mr. Tomkins lie to the judge and Mr. Ika's perjury worked synchronistically to deceive the judge into erroneously considering it to be likely that BWS Inc. was a commercially successful company that has successfully implemented its product in the marketplace and applied it to benefit real-world, paying clients, and that it has a viable, proven, effective, and proprietary brainwave-based technology for detecting concealed information stored in the brain.  In fact, it is none of those things, as the fact delineated above clearly show. BWS Inc. is a vehicle for attempting to enrich its owners by defrauding government agencies and attacking witnesses who expose the truth and others who are providing for the world the science and technology that BWS Inc. fraudulently pretends to be capable of providing.

In the course of the lawsuit, the judge will be provided with the necessary information to make an informed decision regarding proprietary information and the other issues at hand.  I am

confident that he will conclude that neither I nor any of my codefendants have misappropriated anything that is proprietary to BWS Inc. In the meantime, his Order is a mildly inconvenient but not entirely unreasonable restriction on the activities of myself and my colleagues.  It only constrains me and my colleagues to use our own software, which since it is vastly superior to BWS Inc.'s software, is something we will be doing anyway.

41